**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                            :
DUNKIN' DONUTS FRANCHISED                                   :
  RESTAURANTS LLC,                                          :
  a Delaware Limited Liability Company, and                :
                                                            :
DD IP HOLDER LLC,                                           :
  a Delaware Limited Liability Company,                     :
                                                            :        C.A. No. 07-CV-11134 (RJH)
                        Plaintiffs,                         :
                                                            :
            v.                                              :
                                                            :
SHIVAM SUNDRAM, INC.,                                       :
  a New York Corporation,                                   :
                                                            :
                        Defendant.                          :
-------------------------------------------------------------x

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## MOTION FOR A PRELIMINARY INJUNCTION

Ronald D. Degen (RD 7808)            Robert L. Zisk  (RZ 1275)
Scott Goldfinger (SG 9219)           David E. Worthen  (DW 8519)
O'ROURKE & DEGEN, PLLC               Katherine L. Wallman*  (KW 3966)
225 Broadway, Suite 715              GRAY, PLANT, MOOTY, MOOTY
New York, New York 10007               & BENNETT, P.A.
Telephone:    (212) 227-4530         2600 Virginia Avenue, N.W. – Suite 1111
Facsimile:    (212) 385-9813         Washington, DC 20037
E-mail:      rdegen@odlegal.com      Telephone:    (202) 295-2200
                                     Facsimile:    (202) 295-2250
                                     *Not admitted to the D.C. Bar

Dated:  December 17, 2007            Attorneys for Plaintiffs
                                     Dunkin' Donuts Franchised Restaurants
                                     LLC and DD IP Holder LLC

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................................... ii

INTRODUCTION ....................................................................................................................1

FACTUAL BACKGROUND .....................................................................................................1

ARGUMENT ..........................................................................................................................6

A.    THE DEPLORABLE CONDITION OF DEFENDANT'S  SHOP
      HAS CAUSED AND CONTINUES TO CAUSE IRREPARABLE
      INJURY TO DUNKIN'S REPUTATION AND GOODWILL
      FOR WHICH NO ADEQUATE REMEDY AT LAW EXISTS .......................................6

B.    DUNKIN' IS LIKELY TO SUCCEED ON THE MERITS ...............................................9

C.    THE BALANCE OF HARM WEIGHS DECISIVELY IN DUNKIN'S FAVOR............10

D.    THE PUBLIC INTEREST WOULD BE ADVANCED
      BY THE ISSUANCE OF THE REQUESTED INJUNCTION........................................11

CONCLUSION.....................................................................................................................12

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Baskin-Robbins, Inc. v. A. Ender, Ltd.*, No. CV-99-206-ECR, 1999 WL
1318498 (D. Nev. Sept. 10, 1999) ...............................................................................7,10,11,12

*Burger King Corp. v. Stephens*, No. 89-7691,
1989 U.S. Dist. LEXIS 14527 (E.D. Pa. Dec. 6, 1989) ...................................................8

*C.B. Fleet Co., Inc. v. Complete Packaging Corp.*,
739 F. Supp. 393 (N.D. Ill. 1990) ....................................................................................9

*Days Inn of America, Inc.  v. Patel*, 88 F. Supp. 2d 928 (C.D. Ill. 2000)......................................10

*Dunkin' Donuts Inc. v. Albireh Donuts, Inc.*,
96 F. Supp. 2d 146 (N.D.N.Y. 2000) .........................................................................7,10,11

*Dunkin' Donuts Inc. v. Kashi Enters., Inc.*,
106 F. Supp. 2d 1325 (N.D. Ga. 2000).......................................................................7,9,10

*Dunkin' Donuts Inc. v. Priya Enters., Inc.*, 89 F. Supp. 2d 319 (E.D.N.Y. 2000) .......................10

*Frisch's Restaurants, Inc. v. Elby's Big Boy*, 670 F.2d 642 (6th Cir. 1982) .................................11

*International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67 (2d Cir. 1996)……………………...6,11

*McDonald's Corp. v. Robertson*, 147 F.3d 1301 (11th Cir. 1998)..................................................9

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
22 F.3d 546 (4th Cir. 1994) ...............................................................................................8

*Planned Parenthood v. Citizens for Cmty. Action*, 558 F.2d 861 (8th Cir. 1977) ..........................8

*S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371 (3d Cir. 1992) ...................................................8

*Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104 (4th Cir. 1991) .................................9

*Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76 (2d Cir. 1981)..................................................11

*Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d Cir. 1996)........................................8

## FEDERAL STATUTES

15 U.S.C. § 1065.................................................................................................................2

**INTRODUCTION**

Plaintiffs Dunkin' Donuts Franchised Restaurants LLC and DD IP Holder LLC (unless specified, collectively referred to hereinafter as "Dunkin'" or "Dunkin' Donuts") hereby move to enjoin their franchisee, Defendant Shivam Sundram Inc. to cease violating at its Dunkin' Donuts shop the standards for health, sanitation, and safety set forth in Defendant's Franchise Agreement with Dunkin'. At present, Defendant is in flagrant violation of those standards. For example, a recent inspection of Defendant's shop revealed numerous violations of health and safety standards, including evidence of insects in the shop, failure to label food products with expiration dates, dirty equipment used to make food products, improperly stored food products, dairy products kept at high temperatures, the failure to keep daily temperature records and generally unclean and poorly maintained premises. Despite requests by Dunkin' and ample opportunity to cure, Defendant refuses to correct this unacceptable situation. This is an action to effect an immediate cure of specific conditions currently posing a health or safety risk at Defendant's shop. These conditions constitute a material breach of the Franchise Agreement as well. Dunkin' does not seek an order mandating future compliance, but only the cessation of an existing condition.

As discussed *infra*, a preliminary injunction is warranted in this case because Dunkin' is likely to succeed on the merits and will continue to suffer irreparable harm to the goodwill associated with its trademarks and trade name if injunctive relief is not granted. Furthermore, the balance of harms tips decisively in Dunkin's favor, and the public interest would be served by granting the injunction. No adequate remedy at law exists.

**FACTUAL BACKGROUND**

1.    Dunkin' Donuts is engaged in the business of franchising independent

businesspersons to operate Dunkin' Donuts shops throughout the United States. (Laudermilk Cert., Ex. 1, ¶ 3.) Dunkin' Donuts franchisees are licensed to use the trade names, service marks, and trademarks of Dunkin' Donuts and to operate under the Dunkin' Donuts system, which involves the production, merchandising, and sale of doughnuts and related products utilizing a specially designed building with special equipment, equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, specifications, proprietary marks, and information. *Id.*

2.     Dunkin' is the franchisor of the Dunkin' Donuts franchise system. *Id.* ¶ 4.

3.     Plaintiff DD IP Holder LLC, is the owner of the trademark, service mark, and trade name "Dunkin' Donuts," and related marks. Dunkin' Donuts has the exclusive license to use and license others to use these marks and trade name and has used them continuously since approximately 1960 to identify its doughnut shops, and the doughnuts, pastries, coffee, and other products associated with those shops. *Id.* ¶ 5.

4.     Plaintiff DD IP Holder LLC owns numerous federal registrations for the mark Dunkin' Donuts, and related marks. Each of these registrations is in full force and effect, and is incontestable, pursuant to 15 U.S.C. § 1065. *Id.* ¶ 6.

5.     The Dunkin' Donuts marks have been very widely advertised and promoted by Dunkin' Donuts over the years. Dunkin' Donuts and its franchisees have expended approximately $1,500,000,000 in advertising and promoting the Dunkin' Donuts marks over the last thirty-six years. Dunkin' Donuts spent approximately $167,000,000 in fiscal year 2005 alone on advertising and promotion. *Id.* ¶ 7.

6.     Dunkin' Donuts and its franchisees currently operate approximately 5,600 shops in the United States and 2,000 shops outside of the United States. Dunkin' Donuts shops feature

Dunkin' Donuts' distinctive trade dress, including the pink and orange color scheme, and the frankfurter lettering style. In the more than forty-five years since the Dunkin' Donuts system began, millions of consumers have been served in Dunkin' Donuts shops. *Id*. ¶ 8.

7.      As a result of the extensive sales, advertising, and promotion of items identified by the Dunkin' Donuts marks, the public has come to know and recognize the Dunkin' Donuts marks, and to associate them exclusively with products and services offered by Dunkin' Donuts and its franchisees. The Dunkin' Donuts marks are among the best and most widely known trademarks in the United States today, and are assets of inestimable value to Dunkin' Donuts, representing and embodying Dunkin' Donuts' considerable goodwill and favorable reputation. *Id*. ¶ 9.

8.      The goodwill and reputation associated with the Dunkin' Donuts mark are impaired when a franchisee fails to maintain standards and operates an unsanitary or unclean business under the Dunkin' Donuts trademarks. *Id*. ¶ 10. For example, in the fall of 1995, the nationally broadcast television program *PrimeTime Live* did an exposé on standards violations in quick service restaurants. *Id*. ¶ 11. Employees at two Dunkin' franchises with poor standards were shown on hidden camera displaying improper hygiene and food preparation techniques. *Id*. The two franchisees responsible are no longer in the Dunkin' Donuts system. *Id*. Previously, WWOR in New Jersey did a televised exposé on a Dunkin' shop, accusing it of numerous standards violations. *Id*. The type of negative publicity suffered as a result of these incidents can endanger Dunkin's long established reputation and goodwill. *Id*.

9.      Defendant Shivam Sundram Inc. is a Dunkin' Donuts franchisee for a doughnut shop located at 114 Bruckner Boulevard, Bronx, New York ("Defendant's Shop") pursuant to a Franchise Agreement dated April 11, 2005 (the "Franchise Agreement"). Defendant is licensed

3

to use Dunkin' Donuts' trademarks, trade name, and trade dress.  *Id.* ¶ 12.

10.    Dunkin' provides each of its franchisees a set of manuals and guidelines (collectively referred to hereinafter as the "Dunkin' Manuals"), which set forth in detail the procedures, methodology and standards applicable to the operation of a Dunkin' shop.  *Id*. ¶ 13.

11.    Taken together, the Dunkin' Manuals provide detailed and specific guidance and standards for health, sanitation, and safety.  *Id*. ¶ 14.

12.    The Franchise Agreement executed by Defendant contains acknowledgments and agreements by Defendant concerning the importance of maintaining Dunkin's standards for health, sanitation, and safety.   For example, the applicable paragraphs of the Franchise Agreement include:

> a.    Section 5.0 and 5.1:    FRANCHISEE understands and acknowledges the importance to FRANCHISOR, FRANCHISEE and other franchisees, of FRANCHISEE's commitment to at all times operate the Unit in accordance with FRANCHISOR's Standards (as defined in Definitions paragraph "I"), in order to increase the demand for FRANCHISOR's products, to protect and enhance the reputation and goodwill of FRANCHISOR, to promote and protect the value of the Proprietary Marks and other reasons . . .  FRANCHISEE further agrees as follows:

> b.    Section 5.1.1:  To use all products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product storage, handling, preparation, packaging, delivery and sale prescribed by FRANCHISOR. All such items must conform to FRANCHISOR's Standards.  FRANCHISOR reserves the right to specify any item by brand.  FRANCHISEE shall carry out the business covered by this Agreement in accordance with the operational Standards established by FRANCHISOR and set forth in FRANCHISOR's operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to franchisee from time to time.

> c.    Section 5.1.6:  FRANCHISEE shall maintain, at all times and at FRANCHISEE's expense, the interior and exterior of the Unit and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by FRANCHISOR. . . .

Ex. 1A §§ 5.0, 5.1, 5.1.1., and 5.1.6.

13.     The Franchise Agreement also contains acknowledgments and agreements concerning the use of Dunkin' Donuts' proprietary marks.  The relevant sections include:

a.     Section DD-7 7.0 and Section 7.1:  FRANCHISEE acknowledges and agrees that **Dunkin' Donuts**® is a registered trademark owned or controlled by DUNKIN' DONUTS; that said mark has been and is being used by DUNKIN' DONUTS and by its franchisees and licensees; that said mark, together with the other Proprietary Marks presently owned by Dunkin' Donuts System; that valuable goodwill is associated with and attached to said mark and the other Dunkin' Donuts Proprietary Marks; and that any and all goodwill associated with the Dunkin' Donuts Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of DUNKIN' DONUTS. . . . FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement.

b.     Sections 8.0 and 8.0.1:  [N]either FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall . . . do or perform, directly or indirectly, any . . . act injurious or prejudicial to the goodwill associated with FRANCHISOR's Proprietary Marks and the System(s).

Ex. 1A §§ DD-7 7.0, 7.1, 8.0 and 8.0.1.

14.     The Franchise Agreement (at Section 9.3) provides that Defendant shall pay to Dunkin' all damages, costs and expenses, including attorneys' fees, incurred by Dunkin' as a result of any breach of the Franchise Agreement by Defendant and Defendant's  failure to cure said default following notice.

15.     On November 15, 2007, Defendant's Shop was inspected by a Dunkin' representative.  (Matlovsky Cert., Ex. 2, ¶ 4)  Numerous standards violations were identified relating to health, sanitation, and safety.  *Id.*  On November 15, 2007, the Dunkin' representative hand-delivered to Defendant's  Shop a notice to cure listing the standards violations present at Defendant's  Shop and requesting that the violations be cured immediately.  *Id.* ¶ 5.  On November 23, 2007, the Dunkin' representative reinspected Defendant's Shop.  *Id.* ¶ 6. Numerous standards violations remained uncured.  *Id.*

## ARGUMENT

The grant or denial of a preliminary injunction rests in the sound discretion of the trial court.  The factors a court considers in whether to grant a preliminary injunction are well established:

> (1)    whether the plaintiff will suffer irreparable injury if the injunction is not granted; and either
>
> (2)    whether there is a substantial likelihood that the plaintiff will succeed on the merits; *or*
>
> (3)    whether sufficiently serious questions going to the merits exist to make them fair grounds for litigation and a balance of hardships weighs decisively toward the party requesting the injunction.

*See International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 70 (2d Cir. 1996).  An examination of these factors in this case demonstrates that Dunkin' is entitled to a preliminary injunction.

**A.    THE DEPLORABLE CONDITION OF DEFENDANT'S  SHOP HAS CAUSED AND CONTINUES TO CAUSE IRREPARABLE INJURY TO DUNKIN'S REPUTATION AND GOODWILL FOR WHICH NO ADEQUATE REMEDY AT LAW EXISTS.**

Several United States District Courts have held that a Dunkin' franchisee's violation of the identical health, sanitation, and safety standards at issue here constituted irreparable injury warranting a preliminary injunction:

> The possibility of irreparable injury arises because the record evidence indicates that the unsanitary conditions at the defendant's store may result in illness to the plaintiff's customers.  To this end, the court notes that the plaintiff has an important interest in the uniformity of food specifications, preparation methods, quality and appearance, [and] facilities and service of its franchisees.  No[t] only does the defendant's conduct place the plaintiff's trademarks and trade name at risk, but more importantly, it puts the public in danger of food contamination.  Further, the plaintiff has a strong legal interest in avoiding disputes stemming from the cleanliness and safety of its products.  Accordingly, if customers become ill due to the defendant's franchises' unsanitary conditions, the plaintiff's national reputation, goodwill, and business will be harmed.

6

*Dunkin' Donuts Inc. v. Kashi Enters., Inc.*, 106 F. Supp. 2d 1325, 1327 (N.D. Ga. 2000)

(citations omitted). *See also Dunkin' Donuts Inc. v. Albireh Donuts, Inc.*, 96 F. Supp. 2d 146,

149 (N.D.N.Y. 2000) ("[T]he serving of inferior, non-conforming products under [Dunkin's]

name could have a detrimental impact on [Dunkin's] name and goodwill, devalue [Dunkin's]

trademark, and subject [Dunkin'] to a loss of business and exposure to substantial tort liability.

The courts have repeatedly held that such damage is not readily quantifiable and, thus,

constitutes irreparable harm.").

Similarly, another United States District Court held that a franchisee's violation of the

franchisor's standards for health, sanitation, and safety constituted irreparable injury warranting

a preliminary injunction:

> The evidence shows that there is a threat of irreparable injury to plaintiff if the
> injunction is not granted. The possibility of irreparable injury arises because the
> evidence shows that unsanitary conditions at defendant's store may result in
> illness of Baskin-Robbins' customers. The potential of infection of customers
> because of e-coli or other dangerous ailments . . . from unsanitary conditions at
> the store is considerable. If such were to occur, certainly the reputation, goodwill
> and business of Baskin-Robbins at large in the country would be harmed. This
> constitutes irreparable injury.

*Baskin-Robbins, Inc. v. A. Ender, Ltd.,* No. CV-N-99-206-ECR, 1999 WL 1318498, at *3 (D.

Nev. Sept. 10, 1999) (granting the identical injunctive relief sought here) (attached hereto as

Exhibit 3).

This decision follows the well-established principle that a franchisor lacks control over its

trademarks when a franchisee fails to operate its shop in compliance with established standards:

> The public's knowledge of the uniformity of operation and quality of product
> draws business to Burger King restaurants. Therefore, the name "Burger King"
> constitutes a trademark of great value to BKC and to the franchisees. BKC's
> inability to protect and insure the maintenance of the high quality of service that
> the marks represent would cause irreparable injury to BKC's business reputation
> and goodwill.

> If BKC is unable to control the nature and quality of the goods and services defendants provide at Burger King franchised restaurants, *activities not meeting BKC standards at those restaurants could irreparably harm the goodwill associated with BKC's marks and BKC's reputation*. Moreover, failure to meet some of the safety and sanitary standards here involved could subject BKC to substantial civil liability to members of the public personally injured thereby.

*Burger King Corp. v. Stephens*, No. 89-7691, 1989 U.S. Dist. LEXIS 14527, at *26-27 (E.D. Pa. Dec. 6, 1989) (emphasis added) (granting injunction requiring franchisees to comply with franchisor's quality control standards) (attached hereto as Exhibit 4).

Courts have consistently found that injury to reputation or goodwill is not easily measured in monetary terms, and is thus deemed irreparable. *See S&R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 378 (3d Cir. 1992) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.")*; Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) ("[W]hen the failure to grant preliminary relief creates the possibility of . . . the loss of goodwill, the irreparable injury prong is satisfied"); *Planned Parenthood v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977) (finding that goodwill imperiled by defendant's actions constitutes irreparable injury).

In trademark infringement cases, courts have issued injunctions similar to the one sought here. For example, in *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d Cir. 1996), the manufacturer of cough drops, Warner-Lambert, brought a trademark infringement action against its licensee for selling cough drops that did not comply with Warner-Lambert's quality control standards. The Second Circuit granted an injunction prohibiting the sale of the non-conforming products. *Id.* at 6-8. In holding that the injunction was warranted, the court stated:

> A company that avails itself of wholly effective [quality control] procedures will generally be entitled to relief against any measurable sales of non-conforming goods. Sales of non-conforming goods will in those circumstances place poor quality goods where none were before and necessarily devalue the mark associated with them.

*Id.* at 7.  *See also Shell Oil Co. v. Commercial Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991) (affirming injunction against the sale of products that did not meet trademark holder's quality control standards); *C.B. Fleet Co., Inc. v. Complete Packaging Corp.,* 739 F. Supp. 393, 398-99 (N.D. Ill. 1990) (same).

Not only does Defendant's conduct put the franchisor's trademarks and trade name at risk, but more importantly, it endangers the public's health.  *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1309 (11th Cir. 1998) ("[I]t is difficult for the court to conceive of substantially more serious violations than those that could jeopardize the health of [the franchisee's] patrons . . . .").

Dunkin' has invested a tremendous amount of resources over the years in building the considerable goodwill associated with its marks.  Customers have grown to expect high standards for health, sanitation, and safety from Dunkin' franchises.  Defendant's conduct has injured and continues to injure that hard earned reputation and associated goodwill.  Accordingly, ample justification exists for the finding of irreparable injury to Dunkin'.

**B.    DUNKIN' IS LIKELY TO SUCCEED ON THE MERITS.**

The record demonstrates that Defendant has breached the Franchise Agreement.  The Dunkin' Manuals and the Franchise Agreement spell out clearly Defendant's obligation to operate a clean and safe shop.  As the documents and photographs make clear, standards violations were observed at Defendant's Shop, a Notice to Cure was delivered, and, after the opportunity to cure expired, Defendant failed to cure the violations.  Other federal courts have found that such circumstances constitute a clear breach of the Franchise Agreement.  *See Kashi Enters., Inc.*, 106 F. Supp. 2d at 1327 ("[T]he record includes numerous documents, affidavits, and photographs, which demonstrate that the defendant has failed to cure the alleged violations.

Accordingly, the court finds that the plaintiff is likely to succeed in its action to enjoin the defendant from violating the Franchise Agreement standards. . . .”); *Albireh Donuts, Inc*., 96 F. Supp. 2d at 150 (based on similar evidence the court found that it was “likely that [Dunkin’] will succeed on its breach of contract claim”); *A. Ender, Ltd.,* 1999 WL 1318498, at *2-3 (court held that the franchisor was likely to succeed on its breach of contract claim based on evidence that the franchisee violated almost the identical health and safety standards as those at issue here) (Ex. 3). *See also Dunkin’ Donuts Inc. v. Priya Enters., Inc.*, 89 F. Supp. 2d 319, 323 (E.D.N.Y. 2000) (granting summary judgment for Dunkin’ and holding that the violations present at the franchisee’s shops “unquestionably amount to serious breaches of . . . the franchise agreement.”); *Days Inn of America, Inc. v. Patel*, 88 F. Supp. 2d 928, 932-33 (C.D. Ill. 2000) (granting summary judgment on franchisor’s breach of contract claim on the grounds that the franchisee failed to comply with franchisor’s standards). Such conduct also constitutes a violation of the Lanham Act. *See Kashi Enters., Inc.*, 106 F. Supp. 2d at 1327; *Albireh Donuts, Inc*., 96 F. Supp. 2d at 150-51 (citing *Northside Dev. Corp.,* 86 F.3d at 5-8)*.* Accordingly, Dunkin’ is very likely to succeed on the merits.

## C.    THE BALANCE OF HARM WEIGHS DECISIVELY IN DUNKIN’S FAVOR.

Defendant can offer no reasonable justification for its conduct. Issuance of the preliminary injunction would simply require Defendant to comply with the requirements to which they freely agreed in signing the Franchise Agreement. Consequently, no harm will come to Defendant in granting the injunction, and, ironically, their business will likely increase due to the improved condition of the shop. In contrast, Defendant’s conduct threatens the reputation and goodwill of Dunkin’, which extends to each of its franchisees. In *Kashi Enters., Inc.,* the Court noted that the balance of hardships tipped in the franchisor’s favor:

> The instant injunction would only require that the defendant comply with the Franchise Agreement, [into] which it freely entered.  While no harm would befall the defendant by its compliance with the sanitation standards, the court notes that its business and public safety would at worst improve.  Accordingly, the court finds that threatened injury to the plaintiff outweighs any conceivable injury to the defendant.

106 F. Supp. 2d at 1327.  *See also Albireh Donuts, Inc*., 96 F. Supp. 2d at 151 ("[T]he balance of hardships decidedly tip[s] in favor of [Dunkin'] in light of the dangers posed to the public and [Dunkin's] name and goodwill and the insubstantial burden that would be imposed upon Defendant by requiring them to comply with their obligations under the franchise agreement.").

Similarly, the court held in *A. Ender, Ltd*.:

> As contrasted with the cost to [the franchisee] of curing these deficiencies, the outbreak of salmonella or some other disease or infection which may be visited upon the customers of the store, as a result of conditions at the store, tip the hardships in favor of plaintiff, because those risks and those problems are very serious and may have even a national impact on Baskin-Robbins.

1999 WL 1318498, at *3. (Ex. 3.)

Licensed franchisees have placed their trust in the franchisor to protect their substantial investment in the system.  *See Frisch's Restaurants, Inc. v. Elby's Big Boy,* 670 F.2d 642, 651 (6th Cir. 1982); *Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2d Cir. 1981) ("If the injunction is denied, . . . [the franchisor's] licensing program will lose much of the confidence reposed in it by the licensees, who also made substantial investments based upon the exclusivity of their licenses.").  The balance of harms weighs decisively in Dunkin's favor.

## D.    THE PUBLIC INTEREST WOULD BE ADVANCED BY THE ISSUANCE OF THE REQUESTED INJUNCTION.

Although not a factor in the Second Circuit's test for whether injunctive relief should issue, *see Amestoy,* 92 F.3d at 70, little doubt exists that the requested preliminary injunction would advance the public interest.  It is axiomatic that the public has a right to a clean and safe

environment where food is prepared and sold.  Granting the requested preliminary injunction would do no more than require Defendant to create such an environment at its shop.  *See A. Ender, Ltd.,* 1999 WL 1318498, at *3 ("The public health aspects of the evidence show that the public interest favors the granting of the injunction") (Ex. 3).  Moreover, the public has an interest in requiring parties to honor their obligations under contracts into which they freely enter.  Here, Defendant is clearly breaching the Franchise Agreement and endangering the health of their customers.

*   *   *

In sum, the factors the court examines for issuance of a preliminary injunction are more than satisfied by Dunkin' here.  Dunkin' has been and continues to be irreparably injured by Defendant's  conduct, Dunkin' is likely to succeed on the merits, the balance of the equities weighs decisively in Dunkin's favor, and the public interest would be protected by the issuance of an injunction.  Dunkin' has no adequate remedy at law.  Accordingly, Dunkin's Motion for a Preliminary Injunction should be granted.

## CONCLUSION

For the foregoing reasons, Dunkin' respectfully requests that the Court grant its Motion for a Preliminary Injunction.

Respectfully submitted,

/s/ Ronald D. Degen
Ronald D. Degen (RD 7808)
Scott Goldfinger (SG 9219)
O'ROURKE & DEGEN, PLLC
225 Broadway, Suite 715
New York, New York 10007
Telephone:     (212) 227-4530
Facsimile:     (212) 385-9813
E-mail:        rdegen@odlegal.com

Robert L. Zisk  (RZ 1275)
David E. Worthen  (DW 8519)
Katherine L. Wallman*  (KW 3966)
GRAY, PLANT, MOOTY, MOOTY
  & BENNETT, P.A.
2600 Virginia Avenue, N.W. – Suite 1111
Washington, DC 20037
Telephone:     (202) 295-2200
Facsimile:      (202) 295-2250
*Not admitted to the D.C. Bar*

Dated:  December 17, 2007          Attorneys for Plaintiffs
                                   Dunkin' Donuts Franchised Restaurants LLC and
                                   DD IP Holder LLC

13

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                             :
DUNKIN' DONUTS FRANCHISED                                    :
  RESTAURANTS LLC,                                 :
  a Delaware Limited Liability Company, and         :
                                                             :
DD IP HOLDER LLC,                                            :
  a Delaware Limited Liability Company,              :
                                                             :    C.A. No. 07-CV-11134 (RJH)
                Plaintiffs,    :
                                                             :
      v.                                       :
                                                             :
SHIVAM SUNDRAM INC.,                                         :
  a New York Corporation,                            :
                                                             :
               Defendant.      :
-------------------------------------------------------------x

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs Dunkin' Donuts Franchised Restaurants LLC and DD IP Holder LLC (collectively referred to hereinafter as "Dunkin' or Dunkin' Donuts") hereby move to enjoin their franchisee, Defendant Shivam Sundram Inc. to cease violating at its Dunkin' Donuts shop the standards for health, sanitation, and safety set forth in Defendant's Franchise Agreement with Dunkin' and Dunkin's operating manuals. At present, Defendant is in flagrant violation of those standards. For example, a recent inspection of Defendant's shop revealed numerous violations of health and safety standards, including evidence of insects in the shop, failure to label food products with expiration dates, dirty equipment used to make food products, improperly stored food products, dairy products kept at high temperatures, the failure to keep daily temperature records and generally unclean and poorly maintained premises. Despite requests by Dunkin' and ample opportunity to cure, Defendant refuses to correct this unacceptable situation. This is an action to effect an immediate cure of specific conditions currently posing a health or safety risk at Defendant's shop. These conditions are

a material breach of the Franchise Agreement as well.  Dunkin' does not seek an order mandating future compliance, but only the cessation of an existing condition.

1.      Defendant Shivam Sundram Inc. is a Dunkin' Donuts franchisee for a doughnut shop located at 114 Bruckner Boulevard, Bronx, New York pursuant to a Franchise Agreement dated April 11, 2005**.**

2.      A Dunkin' representative recently inspected Defendant's Shop and found numerous violations of health, sanitation, and safety standards.  Despite notice by Dunkin' and ample opportunity to cure, Defendant has failed to correct this situation.

3.      By this Motion, Dunkin' seeks to enjoin Defendant to cease violating at Defendant's Shop the standards for health, sanitation, and safety set forth in the Franchise Agreement between the parties and Dunkin's operating manuals.

4.      In support of this Motion, Dunkin' relies on the accompanying Memorandum of Law, certifications, and exhibits.

WHEREFORE, Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction and enjoin Defendant to cease violating at Defendant's Shop Dunkin's standards for health, sanitation, and safety as identified on the Food Safety and Sanitation Inspection form dated November 23, 2007 within five (5) days of the date of the Court's Order.

Respectfully submitted,


/s/ Ronald D. Degen_____
Ronald D. Degen (RD 7808)
Scott Goldfinger (SG 9219)
O'ROURKE & DEGEN, PLLC
225 Broadway, Suite 715
New York, New York 10007
Telephone:     (212) 227-4530
Facsimile:     (212) 385-9813
E-mail:        rdegen@odlegal.com


Robert L. Zisk  (RZ 1275)
David E. Worthen  (DW 8519)
Katherine L. Wallman*  (KW 3966)
GRAY, PLANT, MOOTY, MOOTY
   & BENNETT, P.A.
2600 Virginia Avenue, N.W. – Suite 1111
Washington, DC 20037
Telephone:     (202) 295-2200
Facsimile:     (202) 295-2250
* *Not admitted to the D.C. Bar*

Dated:  December 17, 2007          Attorneys for Plaintiffs
                                   Dunkin' Donuts Franchised Restaurants LLC and
                                   DD IP Holder LLC

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                      :

DUNKIN' DONUTS FRANCHISED       :
  RESTAURANTS LLC,               :
  a Delaware Limited Liability Company, and :
                      :

DD IP HOLDER LLC,              :
  a Delaware Limited Liability Company,   :
                      :    C.A. No.

          Plaintiffs,      :
                      :

      v.                   :
                      :

SHIVAM SUNDRAM INC.,         :
  a New York Corporation,        :
                      :

         Defendant.      :
-------------------------------------------------------------x

## CERTIFICATION OF JACK LAUDERMILK

      1.      My name is Jack Laudermilk.  I am a citizen and resident of the Commonwealth of Massachusetts, and I make this Certification based on personal knowledge and in support of Plaintiffs' Memorandum in Support of their Motion for a Preliminary Injunction.

      2.      I am Associate General Counsel for Dunkin' Donuts Franchised Restaurants LLC and DD IP HOLDER LLC (unless otherwise specified, collectively referred to hereinafter as "Dunkin' or Dunkin' Donuts").  As Associate General Counsel, I am the custodian of and have access to executed copies of all Dunkin' franchise agreements, leases, correspondence, and other related documents and records concerning each Dunkin' Donuts franchise.  This includes the documents and records relating to the Dunkin' Donuts franchise owned by Defendant in this case.  The documents attached hereto are kept in the course of Dunkin's regularly conducted business activities, and it is Dunkin's normal practice to make and keep these documents.  My job responsibilities include being familiar with Dunkin's standards enforcement policy, including

overseeing litigation brought by or against franchisees.  I am also familiar with the business of Dunkin' generally, including having knowledge regarding the resources Dunkin' has dedicated toward its intellectual property and the relationship between franchisees' operations and the goodwill associated with Dunkin's marks.

      3.      Dunkin' is engaged in the business of franchising independent businesspersons to operate Dunkin' shops throughout the United States.  Dunkin' franchisees are licensed to use the trade names, service marks, and trademarks of Dunkin' and to operate under the Dunkin' Donuts system, which involves the production, merchandising, and sale of doughnuts and related products utilizing a specially designed building with special equipment, equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, specifications, proprietary marks, and information.

      4.      Dunkin' is the franchisor of the Dunkin' Donuts franchise system.

      5.      Plaintiff DD IP Holder LLC is the owner of the trademark, service mark, and trade name Dunkin' Donuts and related marks.  Dunkin' Donuts has the exclusive license to use and license others to use these marks and trade name and has used them continuously since approximately 1960 to identify its doughnut shops, and the doughnuts, pastries, coffee, and other products associated with those shops.

      6.      Plaintiff DD IP Holder LLC owns numerous federal registrations for the mark "Dunkin' Donuts," and related marks.  Each of these registrations is in full force and effect, and is incontestable, pursuant to 15 U.S.C. § 1065.

      7.      The Dunkin' Donuts marks have been very widely advertised and promoted by Dunkin' Donuts over the years.   Dunkin' Donuts and its franchisees have expended approximately $1,500,000,000 in advertising and promoting the Dunkin' Donuts marks over the

last thirty-six years. Dunkin' Donuts spent approximately $167,000,000 in fiscal year 2005 alone on advertising and promotion. *Id.* As a result, the Dunkin' Donuts marks have become famous throughout the United States.

8.    Dunkin' Donuts and its franchisees currently operate approximately 5,600 shops in the United States and 2,000 shops outside of the United States. Dunkin' Donuts shops feature Dunkin' Donuts' distinctive trade dress, including the pink and orange color scheme, and the frankfurter lettering style. In the more than forty-five years since the Dunkin' Donuts system began, millions of consumers have been served in Dunkin' Donuts shops.

9.    As a result of the extensive sales, advertising, and promotion of items identified by the Dunkin' Donuts marks, the public has come to know and recognize the Dunkin' Donuts marks, and to associate them exclusively with products and services offered by Dunkin' Donuts and its franchisees. The Dunkin' Donuts marks are among the best and most widely known trademarks in the United States today, and are assets of inestimable value to Dunkin' Donuts, representing and embodying Dunkin' Donuts' considerable goodwill and favorable reputation.

10.    The goodwill and reputation associated with the Dunkin' Donuts mark are impaired when a franchisee fails to maintain standards and operates an unsanitary or unclean business under the Dunkin' Donuts trademarks.

11.    Conduct such as the Defendant's occasionally gains local or even national media exposure. For example, in the fall of 1995, the nationally broadcast television program *PrimeTime Live* did an expose on standards violations in quick service restaurants. Employees at two Dunkin' franchises with poor standards were shown on hidden camera displaying improper hygiene and food preparation techniques. The two franchisees responsible are no longer in the Dunkin' Donuts system. Previously, WWOR in New Jersey did a televised expose on a Dunkin'

shop, accusing it of numerous standards violations. The type of negative publicity suffered as a result of these incidents can endanger Dunkin's long established reputation and goodwill.

12.    Defendant is a Dunkin' franchisee for a doughnut shop located at 114 Bruckner Boulevard, Bronx, New York ("Defendant's Shop") pursuant to a Franchise Agreement dated April 11, 2005 (the "Franchise Agreement"). A true and correct copy of the Franchise Agreement is attached hereto as Exhibit A. Defendant is licensed to use the Dunkin' Donuts trademarks, trade name and trade dress.

13.    Dunkin' provides each of its franchisees a set of manuals and guidelines (collectively referred to hereinafter as the "Dunkin' Manuals"), which set forth in detail the procedures, methodology and standards applicable to the operation of a Dunkin' Donuts shop.

14.    Taken together, the Dunkin' Manuals provide detailed and specific guidance and standards regarding health, sanitation, and safety.

I certify under penalty of perjury that the foregoing is true and correct. Executed on this ___ day of December, 2007.

JACK LAUDERMILK

4

SDA# 339636

PC# 340725
Bronx, NY

# FRANCHISE AGREEMENT

This Franchise Agreement is dated __4/11/05_____, 2005, and made by and between ~~BASKIN-ROBBINS USA, CO. (hereinafter "BASKIN-ROBBINS"), a California corporation, and~~ **DUNKIN' DONUTS INCORPORATED** (hereinafter "DUNKIN' DONUTS"), a Delaware corporation, ~~and TOGO'S EATERIES, INC. (hereinafter "TOGO'S"), a California corporation, all~~ with principal offices in Canton, Massachusetts (such corporations are hereinafter individually or collectively referred to as "FRANCHISOR") and the following individual(s) and/or entity:

### SHIVAM SUNDRAM INC., a New York corporation
(hereinafter individually or collectively referred to as "FRANCHISEE")

This Franchise Agreement includes the Contract Data Schedule, General Terms and Conditions designated as ("GTC-120104") and the Special Terms and Conditions identified in Item "J" of the Contract Data Schedule below.

## CONTRACT DATA SCHEDULE

A. Location of the Franchised Unit (the "Premises"):

| 114 | Bruckner Boulevard | | Bronx | New York | 10454 |
|---|---|---|---|---|---|
| (number) | (street) | | (city or town) | (state) | (zip code) |

B. Term:..........................Twenty ( 20 ) years from the first date the Unit opens to serve the general public, ~~or, in the case of an existing Unit, until _____ . _____~~

C. Initial Franchise Fee:.................................................................Fifty Thousand dollars ($50,000.00)*
   *Paid under SDA# 339636 ($50,000.00)

D. Marketing Start-Up Fee:.......................................................Five Thousand dollars ($ 5,000.00)*
   *Note Schedule MSF below

E. Continuing Franchise Fee Rate:...........................Five and nine-tenths percent (5.9%) of Gross Sales

F. Minimum Continuing Advertising Fee Rate:...................................Five percent (5.0%) of Gross Sales

G. Refurbishment Date: In the case of a new unit, the date **five (5) years** and **fifteen (15) years** after the first date the Unit opens to serve the general public, ~~or, in the case of an existing unit, on _____.~~

   Remodel Date: In the case of a new unit, the date **ten (10) years** after the first date the Unit opens to serve the general public, ~~or, in the case of an existing unit, on _____.~~

H. Transfer Fee: As provided in subsection 10.4 of the General Terms and Conditions, unless another amount is inserted here: _____**NO CHANGE**_____

I. Address for notice to FRANCHISEE shall be at the Unit Premises, unless another address is inserted here: _____

J. Special Terms and Conditions:
   [X] DD00    Special Terms and Conditions Applicable to a Dunkin' Donuts Franchise
   [X] FD      Special Terms and Conditions Applicable to Development of a New Unit by Franchisee
   [X] NY      Addendum to the ADQSR Franchise Agreement and Store Development Agreement required by the New York General Business Law
   [X] MSF     Special Terms and Conditions Applicable to the Marketing Start-up Fee

K. The Designated Representative for this Unit is _____ ANIL KAPOOR _____
   (List only one person. See definitions in General Terms and Conditions.)    [print full name above]

L. Arbitration under this Agreement shall be initiated in the city and state of New York, New York.

M. If applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit located at PC# 340091 – 511 East 163rd Street – Bronx, New York 10451
   (insert address if this Unit is a Dunkin' Donuts non-producing unit; otherwise insert "not applicable").

Form last revised 12/01/04

Franchisor's corporations are EOE and AA Employers
(Franchisees are not employees)

# FRANCHISE AGREEMENT

© December 2004

## GENERAL TERMS AND CONDITIONS

### INTRODUCTION

**Baskin-Robbins USA Co.**, a California corporation ("BASKIN-ROBBINS"), **Dunkin' Donuts Incorporated**, a Delaware corporation ("DUNKIN' DONUTS") and **Togo's Eateries Inc.**, a California corporation ("TOGO'S") are wholly-owned subsidiaries of Dunkin' Brands, Inc. As a result of the expenditure of time, effort and money, each subsidiary has acquired experience and skill in the development and operation of food service establishments using distinctive systems and techniques for the production, distribution, merchandising and sale of branded food products, including, without limitation, *Baskin-Robbins®* ice cream, yogurt and novelties, *Dunkin' Donuts®* donuts, coffee and freshly baked goods, *Togo's®* fresh sandwiches, salads and deli platters, and other unique and distinctive products, services and business methods (hereinafter each called a "System" and collectively called the "Systems").

The distinguishing characteristics of these Systems include, without limitation, distinctive exterior and interior design, decor, color and identification schemes and furnishings; specially designed manufacturing and merchandising equipment; unique and proprietary information technologies and software; special menu items; standards, specifications and procedures for operations, manufacturing, distribution and delivery; quality of products and services offered; management programs; training and assistance; and marketing, advertising and promotional programs, all of which may be changed, supplemented, improved and further developed from time to time by FRANCHISOR as new learning and best practices are identified and incorporated.

### DEFINITIONS

As used throughout this Agreement, the following defined terms shall have the following meanings:

A.    The "Proprietary Marks" are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin and trade names, which identify for the public the source of goods and services marketed thereunder and represent to the public high and uniform standards of quality, cleanliness, appearance and service, including, without limitation, *Dunkin' Donuts®* owned or controlled by DUNKIN' DONUTS, *Baskin 31 Robbins®* owned or controlled by Baskin-Robbins Incorporated ("BRI"), and *TOGO'S®* owned or controlled by TOGO'S, all of which are registered trademarks on the Principal Register of the United States Patent and Trademark Office.

B.    "FRANCHISOR" refers to Dunkin' Donuts Incorporated with respect to the Dunkin' Donuts System, Baskin-Robbins USA, Co., with respect to the Baskin-Robbins System and Togo's Eateries, Inc. with respect to the Togo's System.

C.    "FRANCHISEE" means the person(s) or entity who signed this Agreement, which may include a sole proprietor, all partners of a general partnership, a corporation or a limited liability company ("LLC"). No person or entity may claim an interest in this Agreement or any Franchise granted hereby without FRANCHISOR's prior written approval.

D.    The "Unit" means the branded food service establishment, including the fixtures, furnishings, equipment, inventory and supplies located therein and/or attached thereto, operated by FRANCHISEE pursuant to this Agreement. If this Agreement authorizes more than one brand, the term "Unit" shall refer to all branded operations authorized hereby, unless such reference is expressly limited to any one brand.

E.    The "Premises" means the land and building or the area within a building, as the case may be, which is (i) approved by FRANCHISOR, (ii) dedicated to the operation of the Unit, and (iii) in the exclusive possession and control of FRANCHISEE. Some portion of the Premises may be under shared possession or control, if approved by FRANCHISOR.

F.    The term "Lease" means the document by which FRANCHISEE occupies and controls the Premises, whether the landlord is a third-party or FRANCHISOR, or one of its subsidiaries or affiliates.

G.    "Gross Sales" means and includes all revenue from the sale of all products and services and all other income of every kind and nature related to the Unit, whether for cash, by redemption of gift certificates or for credit, regardless of collection; provided, however, "Gross Sales" does not include the incidental sales of gift certificates or newspapers, incidental receipts from pay telephones, or any sales taxes or other taxes FRANCHISEE collects from customers for transmittal to the appropriate taxing authority.

H.    The "Designated Representative" is the person from time to time designated by FRANCHISEE as being responsible for the day-to-day operation of the Unit. The Designated Representative must meet FRANCHISOR's then-current qualifications, including, without limitation, successful completion of FRANCHISOR's training, and must be authorized to act for and bind FRANCHISEE in all dealings with FRANCHISOR with respect to the day-to-day operation of the Unit. The initial Designated Representative is identified in Item "K" of the Contract Data Schedule of this Agreement.

-2-

I.    The "Standards" are requirements, specifications, criteria, guidelines, processes, techniques and standards which are from time to time established and revised by FRANCHISOR with respect to selection and development of the Premises, operation of the Unit and other aspects of each System. Examples of "Standards" are, without limitation, requirements and criteria for developing the Unit; specifications for the facility, equipment and products; business processes and techniques for the operation of the Unit; and guidelines and standards for quality, cleanliness, appearance and service.

## Section 1.  Grant of the Franchise and Term

1.0    This Agreement grants to FRANCHISEE the right, subject to all of the terms and conditions hereinafter set forth, to operate a Unit solely at the Premises described in Item "A" of the Contract Data Schedule of this Agreement, including the right to use, solely in such Unit, the System or Systems and Proprietary Marks described in the Special Terms and Conditions attached to and made a part of this Agreement (the "Franchise"). The term of this Agreement shall begin on the date hereof and shall end on the date described in Item "B" of the Contract Data Schedule; provided however, the Franchise shall commence upon the occurrence, of all of the following conditions prior to the initial opening of the Unit or the transfer of the Unit, as the case may be:

1.0.1    **Training.**  FRANCHISEE and its Designated Representative must successfully complete the then-current training program required by FRANCHISOR at one or more of FRANCHISOR's training centers located in Massachusetts, California or at other locations from time to time designated by FRANCHISOR.  This requirement may be waived or modified by FRANCHISOR, in whole or in part, in its sole discretion, if FRANCHISEE or its Designated Representative has had comparable training or on-the-job experience.

1.0.2    **Financing.**  Upon request by FRANCHISOR, FRANCHISEE must deliver evidence to FRANCHISOR that FRANCHISEE has obtained binding commitments for all financing needed to develop and/or operate the Unit.

1.0.3    **Documents.**  FRANCHISEE must execute and deliver to FRANCHISOR all documents related to this Franchise customarily required, in then-current form, as provided by FRANCHISOR.

1.0.4    **Payment.**  FRANCHISEE must, prior to opening or transferring the Unit (as the case may be) pay FRANCHISOR any and all moneys due, including, but not limited to, purchase price, fees, inventory, rent and/or security deposit, if required under the Lease.

1.0.5    **Possession.**  FRANCHISEE must have the exclusive right to occupy and use the Premises for at least the term of this Agreement, whether FRANCHISEE owns the Premises, or leases the Premises pursuant to either (a) a Lease with a third party landlord on terms satisfying FRANCHISOR's then current lease policy and containing provisions required by FRANCHISOR; or (b) a Lease with FRANCHISOR or an affiliated entity.

1.0.6    **For a New Unit.**  If this Unit is newly developed, FRANCHISEE must, prior to the Unit's initial opening, comply with all provisions of the Special Terms & Conditions attached to this Agreement relating to new unit development (Schedule "F/D" or "C/D", as applicable).

1.1    The term of this Agreement shall expire without notice upon any earlier expiration or termination of a Lease, foreclosure of a mortgage, or other event which has the effect of terminating FRANCHISEE's possession and occupancy of the Unit.

1.2    FRANCHISEE represents and warrants that FRANCHISEE and each individual partner, member and/or shareholder of FRANCHISEE, as the case may be, is a United States citizen or a lawful resident alien of the United States; that, where applicable, the FRANCHISEE entity (corporation or LLC) is and shall remain duly organized and in good standing during the term of this Agreement; and that all financial and other information which FRANCHISEE has provided to FRANCHISOR in connection with FRANCHISEE's application for this Franchise is true and accurate. FRANCHISEE's representations and warranties under this paragraph 1.2 are a material inducement to FRANCHISOR's grant of the Franchise to FRANCHISEE.

## Section 2.  Services Furnished by FRANCHISOR

2.0    FRANCHISOR agrees:

2.1    **Prior to and For the Initial Opening of the Unit.**

2.1.1    FRANCHISOR shall make available to FRANCHISEE Standards for the design, construction, equipping and operation of the Unit; and

2.1.2    FRANCHISOR shall make available to two individuals designated by FRANCHISEE, one of whom must be a party to or guarantor of this Agreement FRANCHISOR's then current initial training program with respect to the operation of the Unit, at one or more of FRANCHISOR's Training Centers located in Massachusetts, California and/or at such other training facility as FRANCHISOR may, from time to time, designate; and

2.1.3    FRANCHISOR shall provide its current operating procedures to assist FRANCHISEE in complying with FRANCHISOR's Standards; and

*General Terms and Conditions*

2.1.4    FRANCHISOR shall make available to FRANCHISEE such assistance in the pre-opening, opening and initial operation of the Unit as FRANCHISOR shall deem advisable, based upon FRANCHISEE's organization, prior experience and training.

2.2    **After the Initial Opening of the Unit.**

2.2.1    FRANCHISOR shall maintain a continuing advisory relationship with FRANCHISEE, including consultation in the areas of marketing, merchandising and general business operations; and

2.2.2    FRANCHISOR shall provide FRANCHISEE with FRANCHISOR's Standards for the authorized System(s), as the same may be modified by FRANCHISOR from time to time, in its sole and absolute discretion; and

2.2.3    FRANCHISOR shall continue its efforts to maintain high and uniform standards of quality, cleanliness, appearance and service at all units; and

2.2.4    FRANCHISOR shall make reasonable efforts to disseminate FRANCHISOR's Standards to potential suppliers of products at the written request of FRANCHISEE, subject, however, to specific requirements and limitations of each authorized System.

## Section 3. Advertising and Promotion

3.0    FRANCHISOR has established and administers a marketing, advertising and sales promotion fund (the "Fund") for each of the Systems, and directs the development of all advertising, marketing and promotional programs for each System. FRANCHISEE's payments to the Fund(s) shall be used for advertising, marketing, promotion, production and development of all advertising, marketing, promotional and other programs, product development, merchandising, public relations, administrative expenses, programs designed to increase sales and enhance and further the public reputation of FRANCHISOR and each applicable System, and activities related to any and all of the foregoing. The content of all activities of the Fund(s), including, without limitation, the media selected and employed, as well as the area and units to be targeted for such activities, shall be at the sole discretion of FRANCHISOR. FRANCHISOR undertakes no obligation to make expenditures for FRANCHISEE which are equivalent or proportionate to contributions paid under this Agreement or to insure that FRANCHISEE benefits directly or on a prorata basis from activities of the Fund(s), if any. Upon request, FRANCHISOR will provide FRANCHISEE a statement of receipts and disbursements for any Fund to which FRANCHISEE contributes under the terms of this Agreement, prepared by an independent public accountant for each fiscal year of the Fund.

3.1    FRANCHISEE, prior to using any advertising or promotional material that FRANCHISEE has prepared for use in its local area, shall submit such material to FRANCHISOR for review and approval. If written disapproval of the advertising and promotional material is not received by FRANCHISEE from FRANCHISOR within fifteen (15) days from the date such material is received by FRANCHISEE, said materials shall be deemed approved for use by FRANCHISEE, unless and until subsequently disapproved by FRANCHISOR, in which event FRANCHISEE will promptly discontinue any further use thereof.

3.2    FRANCHISEE acknowledges that this Agreement grants FRANCHISEE no right to use any of the Proprietary Marks to advertise products and/or services for order through the mail or by any electronic or other medium. FRANCHISEE shall not, without the prior written approval of FRANCHISOR, use any of the Proprietary Marks on the Internet or any similar electronic or other communications medium, to promote FRANCHISEE's business and/or advertise and/or sell products and/or services. Notwithstanding the provisions of paragraph 3.1 above, FRANCHISOR's failure to disapprove any request to use the Internet or any similar electronic or other medium within fifteen (15) days shall not give FRANCHISEE the right to undertake such use. FRANCHISOR shall have the sole right to establish an Internet "home page" using any of the Proprietary Marks, and to regulate the establishment and use of linked home pages by its franchisees.

3.3    Special Terms and Conditions for each System authorized for this Unit are attached to this Agreement and contain additional provisions related to advertising and promotion.

## Section 4. Payments

4.0    FRANCHISEE shall pay to FRANCHISOR the following initial charges and continuing fees:

4.1    **Initial Franchise Fee.** - FRANCHISEE shall pay FRANCHISOR an Initial Franchise Fee in the amount set forth in Item "C" of the Contract Data Schedule of this Agreement. Unless the Initial Franchise Fee was prepaid under the terms of a Store Development Agreement, five thousand dollars ($5,000.00) shall be paid upon the execution of this Agreement and the remaining unpaid balance within ten (10) days after FRANCHISEE's receipt of FRANCHISOR's written approval of the Premises; provided however, if the Premises is developed by FRANCHISOR, the balance shall be due in full upon FRANCHISEE's execution of the Lease of the Unit, or on the date FRANCHISEE or the Designated Representative commences FRANCHISOR's training program, whichever date is earlier.

4.2    **Marketing Start-Up Fee.** - FRANCHISEE shall pay a Marketing Start-Up Fee in the amount set forth in Item "D" of the Contract Data Schedule of this Agreement, for a start-up promotional program or such other promotion or advertising program as FRANCHISOR may specify. Payment shall be made in full prior to attendance by FRANCHISEE or the Designated Representative at FRANCHISOR's training program or thirty (30) days prior to the scheduled opening of the Unit, whichever date is earlier, and shall be nonrefundable after the Unit commences operations.

-3-

*General Terms and Conditions*

-4-

4.3    **Continuing Franchise Fees** - FRANCHISEE shall pay FRANCHISOR at Post Office Box 1097, Charlotte, North Carolina 28201-1097 (or to such other address as FRANCHISOR shall from time to time advise FRANCHISEE in writing), on or before Thursday of each week, a sum determined by multiplying the Gross Sales of the Unit for the seven (7) day period ending at the close of business on the preceding Saturday times the percentage set forth in Item "E" of the Contract Data Schedule of this Agreement.

4.4    **Continuing Advertising Fee.** FRANCHISEE shall also pay, at the same time, for the same seven (7) day period, in the same manner as, and in addition to the payments provided for under paragraph 4.3 above, the percentage set forth in Item "F" of the Contract Data Schedule of this Agreement, of the Gross Sales of the Unit, to one or more Funds for advertising, marketing, promotion and other purposes, as specified in Section 3 of this Agreement.

4.4.1    In addition, FRANCHISEE shall participate in and make additional payments to the Fund(s) with respect to all advertising, marketing, promotion and other programs of each authorized brand at the Unit, which from time to time are supported by two-thirds of the units of such brand in the market in which the Unit is located with respect to local programs, and in the continental United States, with respect to national programs.

4.4.2    If FRANCHISEE is authorized to use more than one (1) System at the Unit, fees payable under this paragraph 4.4 with respect to each System shall apply only to that portion of the Unit's Gross Sales which are applicable to that System, as determined by FRANCHISOR.

4.5    If any sales, income, excise, use or privilege tax is imposed or levied by any government or governmental agency on account of the payment of franchise or royalty fees by FRANCHISEE under this Agreement, FRANCHISEE shall pay FRANCHISOR a sum equal to the amount of such tax as an additional royalty fee (but this provision shall not apply to federal or state income taxes imposed upon FRANCHISOR).

4.6    FRANCHISOR shall have the right to require FRANCHISEE, upon written notice, to make payments under this Agreement by electronic funds transfer or to a lock-box located at an independent bank. Acceptance of payment by electronic funds transfer or to a lock-box shall not be deemed a waiver of any rights of FRANCHISOR. If FRANCHISOR establishes a direct debit program with FRANCHISEE's bank for the electronic payment of continuing franchise and advertising or sales promotion fees, FRANCHISEE must provide FRANCHISOR with all consents, authorizations and bank account data necessary to effect such electronic payment.

4.6.1    FRANCHISEE must complete and deliver to FRANCHISOR such forms as may from time to time be required to effectuate any changes as necessary to maintain EFT capability. FRANCHISEE agrees (a) to give FRANCHISOR at least fourteen days written notice (except in the case of emergency) before making any change to FRANCHISEE's EFT bank account, providing all information and specimens required to change EFT to the new account; (b) to pay FRANCHISOR its then-current late fee, plus collection costs and reasonable attorney's fees, if FRANCHISEE's bank rejects FRANCHISOR's EFT request because of insufficient funds; and (c) upon demand, to replace EFT rejected by FRANCHISEE's bank with a bank certified or cashier's check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees.

4.6.2    For each week that FRANCHISEE (a) submits a weekly Gross Sales report via FRANCHISOR's approved electronic form over the Internet, and (b) pays the corresponding weekly continuing franchise and advertising fees by EFT, FRANCHISOR will deduct the fees from FRANCHISEE's bank account on or after the Thursday twelve (12) days after the Saturday of the week for which sales were reported. This benefit will only become available after FRANCHISOR implements an electronic form for reporting weekly sales satisfactory to FRANCHISOR. To have this benefit available, FRANCHISEE must have computer equipment capable of accessing and using the electronic form in the manner required. In FRANCHISOR's discretion or due to system failure, FRANCHISOR may elect to withdraw the electronic form. In any such case, FRANCHISEE must immediately return to reporting Gross Sales in the manner originally required.

4.7    **Late Fees, Interest and Costs.** If any payment required under this Agreement is not paid when due, FRANCHISEE shall pay, in addition to the unpaid amount, FRANCHISOR's then-current late fee for each unpaid invoice. In addition, all amounts payable by FRANCHISEE to FRANCHISOR under any provision of this Agreement, if not paid when the same becomes due, shall bear interest from the date due until paid at the rate of one and one-half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies FRANCHISOR may have. Receipt of any check, draft or other commercial paper shall not constitute payment until all funds therefrom are collected by FRANCHISOR. FRANCHISEE shall pay all collection charges, including reasonable attorney's fees, on dishonored checks. At FRANCHISOR's request, dishonored and returned checks will be promptly replaced by FRANCHISEE by a bank certified or cashiers check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees, set forth in this Agreement.

## Section 5. Covenants of FRANCHISEE

5.0    FRANCHISEE understands and acknowledges the importance to FRANCHISOR, FRANCHISEE and other franchisees, of FRANCHISEE's commitment to at all times operate the Unit in accordance with FRANCHISOR's Standards (as defined in Definitions paragraph "I"), in order to increase the demand for FRANCHISOR's products, to protect and enhance the reputation and goodwill of FRANCHISOR, to promote and protect the value of the Proprietary Marks and other reasons. FRANCHISEE agrees to devote continuous best efforts to successfully develop, manage and operate the Unit and to enhance the goodwill of the Proprietary Marks authorized by this Agreement and the System(s) as a whole.

5.0.1    If, in any consecutive twelve (12) month period, FRANCHISEE shall receive two (2) or more notices to cure any default under this Agreement, FRANCHISOR shall have the right, in addition to all other remedies available, to require that FRANCHISEE (in lieu of any Designated Representative) devote full time to managing the day-to-day operation of the Unit.

5.0.2   FRANCHISEE agrees to operate the Unit in strict accordance with all of FRANCHISOR's Standards as they may be communicated to FRANCHISEE from time to time. Standards shall be established for and distributed to franchisees generally and/or FRANCHISEE specifically, in such form and content as FRANCHISOR may from time to time in its sole discretion prescribe. Standards are copyrighted and FRANCHISEE shall not at any time copy, duplicate, record or otherwise reproduce any materials, in whole or in part, which set forth the standards or other proprietary information, or otherwise make the same available to any unauthorized person. FRANCHISEE shall at all times maintain the documents embodying the Standards at the Unit (or at FRANCHISEE's principal offices, if not the Unit) and shall ensure that such documents are kept current and up to date. In the event of a dispute as to the contents of the Standards, the terms of the master copy(s) maintained by FRANCHISOR shall control.

5.0.3   FRANCHISEE acknowledges that complete uniformity may not be possible or practical throughout the System(s) and agrees that FRANCHISOR may from time to time vary Standards, as FRANCHISOR may deem necessary or desirable for the System(s) or the Unit.

5.1   **Unit Operations.** - FRANCHISEE shall keep the Unit open and in continuous normal operation for such hours as FRANCHISOR shall from time to time direct, provided, however, no longer than the maximum number of hours per day permitted by law, on all days, unless prior written approval is obtained from FRANCHISOR or unless FRANCHISOR otherwise directs in writing. In connection therewith, but without limitation, FRANCHISEE further agrees as follows:

5.1.1   FRANCHISEE shall use all products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product storage, handling, preparation, packaging, delivery and sale prescribed by FRANCHISOR. All such items must conform to FRANCHISOR's Standards. FRANCHISOR reserves the right to specify any item by brand. FRANCHISEE shall carry out the business covered by this Agreement in accordance with the operational Standards established by FRANCHISOR and set forth in FRANCHISOR's operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to franchisees from time to time.

5.1.2   FRANCHISEE shall refrain from using or selling any products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment and methods of product storage, handling, preparation, packaging, merchandising, and delivery, or any other items of any kind, which do not meet FRANCHISOR's Standards. Without limiting the generality of the foregoing, FRANCHISEE shall immediately rectify all hazardous situations, and immediately remove and destroy any and all hazardous products. For purposes of the foregoing sentence, "hazardous situations" are those which have the potential to cause injury, illness or death, and "hazardous products" are products which are unfit for human consumption or which have the potential to cause injury, illness or death.

5.1.3   FRANCHISEE shall offer for sale all products that FRANCHISOR may, from time to time in its sole discretion, designate in writing as approved for sale at the Unit. FRANCHISEE shall sell, distribute and deliver such products only in weights, sizes, forms and packages as are approved in writing by FRANCHISOR. FRANCHISEE further agrees to discontinue offering for sale any product that FRANCHISOR may, at any later time, in its sole discretion, by written notice withdraw approval for sale at the Unit; and FRANCHISEE agrees to refrain from offering for sale any product or products which have not been designated in writing as approved by FRANCHISOR for sale at the Unit. FRANCHISOR may disapprove FRANCHISEE's sale of any product(s) or FRANCHISEE's participation in any program(s), in the event FRANCHISEE fails to comply with operational Standards at the Unit. FRANCHISEE shall have sole and complete discretion as to the price FRANCHISEE charges for all products.

5.1.4   FRANCHISEE shall maintain at all times a sufficient supply of approved products to meet the demand of FRANCHISEE's customers at the Unit.

5.1.5   FRANCHISEE shall purchase all food products, supplies, equipment and materials required for the operation of the Unit from FRANCHISOR or from suppliers who (a) demonstrate, to the reasonable satisfaction of FRANCHISOR, the ability to meet all of FRANCHISOR's Standards for such items, (b) possess adequate capacity and facilities to supply the needs of FRANCHISEE and other franchisees in the quantities, at the times and with the reliability requisite to an efficient operation, and (c) have been approved, in writing, by FRANCHISOR. Prior to purchasing any items from any supplier not previously approved by FRANCHISOR, FRANCHISEE shall submit to FRANCHISOR a written request for approval of the supplier. FRANCHISOR may require that samples from the supplier be delivered to FRANCHISOR or to a designated independent testing laboratory for testing prior to approval and use. FRANCHISEE shall pay FRANCHISOR a fee not to exceed the actual cost of the test; provided, however, no fee shall be charged for the first test requested by FRANCHISEE in any calendar year. This paragraph is subject to Special Terms and Conditions which contain additional provisions and limitations specific to the System(s) authorized for the Unit by this Agreement.

5.1.6   FRANCHISEE shall maintain, at all times and at FRANCHISEE's expense, the interior and exterior of the Unit and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by FRANCHISOR. FRANCHISEE shall make no material alteration, addition, replacement or improvement in or to the interior or exterior of the Unit (including the parking lot and landscaped areas) without FRANCHISOR's prior written consent.

5.1.7   FRANCHISEE shall comply with all civil and criminal laws, ordinances, rules, regulations and orders of public authorities pertaining to the maintenance and operation of the Unit, including, but not limited to, those relating to health, safety, sanitation, employment, environmental regulation and taxation.

-5-

-6-

5.1.7.1    FRANCHISEE agrees to maintain as business records provided in subsection 5.2 below. and to furnish to FRANCHISOR within five (5) days after receipt of written demand therefor, copies of all customer complaints and notices, warnings, citations, inspection reports and other communications related to the Unit from public authorities. FRANCHISEE hereby authorizes any such public authority to provide FRANCHISOR with copies of such notices and/or communications. If any suit, investigation or other legal proceeding related to FRANCHISEE's business should be commenced by or against FRANCHISEE, FRANCHISEE shall immediately notify FRANCHISOR thereof and keep FRANCHISOR continuously advised of the status of the matter.

5.1.8    FRANCHISEE shall manage the Unit at all times with at least two (2) individuals, one of whom must be FRANCHISEE, or a partner, shareholder or member of FRANCHISEE, either of whom must be the Designated Representative and both of whom must have successfully completed FRANCHISOR's training program. Both individuals must have literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to satisfactorily complete FRANCHISOR's training program and to communicate with employees, customers, and suppliers. If FRANCHISEE operates more than one unit, FRANCHISOR requires that each additional unit be managed by a Designated Representative approved by FRANCHISOR.

5.1.8.1    In the event of any resignation, termination, disability, death or other incapacity of the Designated Representative, FRANCHISEE shall notify FRANCHISOR in writing of the name of a qualified successor Designated Representative as soon as possible, but in no event later than two (2) months after such event.

5.1.8.2    FRANCHISEE shall hire, train and supervise efficient, competent and courteous employees of good character for the operation of the Unit and shall ensure that all such employees are trained in accordance with FRANCHISOR's training procedures. FRANCHISEE is solely responsible for hiring and discharging employees of the Unit, and for setting their wages and terms of employment. FRANCHISEE shall ensure that all employees whose duties include customer service have sufficient literacy and fluency in the English language to adequately serve the public in the Unit. FRANCHISEE (or the Designated Representative, as specified by FRANCHISOR) shall attend, and FRANCHISEE shall require employees at the Unit to attend, such further training as FRANCHISOR shall from time to time reasonably require. The cost of training materials, salaries, accommodations and travel expenses, if any, of FRANCHISEE or any other individual employed in the Unit will be borne entirely by FRANCHISEE. FRANCHISEE will bear the cost of all training programs except FRANCHISOR's initial training program referred to in paragraph 2.1.2 of this Agreement.

5.1.9    FRANCHISEE shall accurately report all Gross Sales to FRANCHISOR and implement all procedures recommended by FRANCHISOR to minimize employee theft. FRANCHISEE further acknowledges and agrees that employee theft shall not relieve FRANCHISEE of the obligation to make all payments to FRANCHISOR based on Gross Sales pursuant to Section 4 of this Agreement and that accurate reporting of Gross Sales requires, among other things, compliance with all Standards related thereto and recording all sales at the time the product is delivered to the purchaser, including, without limitation, retail, wholesale and bulk discount sales, whether for cash, by redemption of gift certificates or coupons, or sales for which payment may be deferred.

5.2    Books, Records and Reports.    FRANCHISEE shall keep full, complete and accurate books and accounts with respect to the Unit, in accordance with generally accepted accounting principles and all requirements of law and in the form and manner prescribed below or as from time to time further prescribed by FRANCHISOR. Commencing upon the opening of the Unit:

5.2.1    FRANCHISEE shall submit to FRANCHISOR, on or before Thursday of each week, on a standard form approved by FRANCHISOR, a signed statement of Gross Sales at the Unit for the seven (7) day period ending at the close of business on the preceding Saturday, along with all moneys required to be paid under Section 4 of this Agreement.

5.2.2    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty-five (45) after the close of each of FRANCHISEE's calendar or fiscal month, a profit and loss statement of the Unit for said monthly period.

5.2.3    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty five (45) days after the close of each applicable period, a profit and loss statement prepared in accordance with generally accepted accounting principles, along with a balance sheet (including a statement of retained earnings or partnership account) (i) for the first six (6) months of each of FRANCHISEE's fiscal year; and (ii) for the full twelve (12) months of each of FRANCHISEE's fiscal years. FRANCHISOR shall have the right, in its sole discretion, to require FRANCHISEE to have such annual statements audited by an independent certified public accountant and submitted to FRANCHISOR within ninety (90) days after the close of each of FRANCHISEE's fiscal year.

5.2.4    FRANCHISEE shall submit to FRANCHISOR, at the times and in the form required, such other periodic reports and information as may from time to time be prescribed by FRANCHISOR.

5.2.5    FRANCHISEE shall preserve, in the English language and for the time periods set forth below, all books, tax returns, accounting records and supporting documents relating to the FRANCHISEE's business operations at the Unit (hereinafter called the "Records"), including but not limited to:
    a.  daily cash reports;
    b.  cash receipts journal and general ledger;
    c.  cash disbursements journal and weekly payroll register;
    d.  monthly bank statements, and daily deposit slips and canceled checks;
    e.  all business tax returns;
    f.  suppliers invoices (paid and unpaid);

*General Terms and Conditions*

      g. dated cash register tapes (detailed and summary);
      h. semi-annual balance sheets and monthly profit and loss statements;
      i. weekly inventories;
      j. records of promotion & coupon redemptions;
      k. such other records and information as FRANCHISOR may from time to time request.

FRANCHISEE shall be permitted to preserve Records and submit reports electronically, in accordance with FRANCHISOR's Retail Information System ("RIS") and/or other requirements, or otherwise with the prior written approval of FRANCHISOR. During the term of this Agreement, FRANCHISEE shall preserve and make available to FRANCHISOR all Records for no less than the current fiscal year and the three (3) immediate-past fiscal years. For three (3) years after the date of any transfer of any interest in this Agreement, the transferor of such interest shall preserve and make available to FRANCHISOR all Records of its last three (3) fiscal years of operation under this Agreement. For a period of three (3) years after the expiration of the term of this Agreement (or after any earlier termination thereof) FRANCHISEE shall preserve and make available to FRANCHISOR all Records for the last three (3) fiscal years of FRANCHISEE's business operation at the Unit.

5.2.6    Retail Information System  FRANCHISEE shall record all sales at or from the Unit at the time of sale, in accordance with FRANCHISOR's procedures and on devices, the make, model and serial numbers of which have been individually approved in writing by FRANCHISOR. Such devices must record accumulated sales in a manner that cannot be turned back or reset, and must retain data in memory storage in the event of power loss. FRANCHISEE shall, at its sole cost and expense, upon notice from FRANCHISOR, purchase or lease and install a unit and/or network information technology system, including computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR for the Unit (hereinafter for convenience called "RIS"). The term "RIS" includes, without limitation, all hardware and software designated from time to time by FRANCHISOR and the data stored thereon by FRANCHISEE. Some or all components of RIS may be licensed to FRANCHISOR and used by FRANCHISEE as a sub-licensee. FRANCHISEE shall use RIS solely in connection with the operation of the Unit, in the manner specified by FRANCHISOR from time to time. FRANCHISEE shall comply with such requirements determined by FRANCHISOR from time to time regarding maintenance, training, storage and safeguarding of data, records, reports and other matters relative to RIS.

5.2.6.1 FRANCHISEE shall, at its sole cost and expense: (a) attend, and/or cause the Designated Representative and/or employees in the Unit to attend, such initial and other RIS training as is specified by FRANCHISOR; (b) maintain RIS in continuous operation at the Unit; (c) purchase an ongoing maintenance and support contract from an approved supplier and replace the RIS components as necessary, (d) upgrade RIS from time to time as may be reasonably required by FRANCHISOR; (e) permit FRANCHISOR immediate access to RIS, electronically or otherwise, at all times without prior notice to FRANCHISEE (such access shall not unreasonably interfere with FRANCHISEE's normal Unit operations); and (f) install and maintain telephone or other service required by FRANCHISOR to permit such access.

5.2.6.2 FRANCHISEE shall, at its sole cost and expense, upon FRANCHISOR's request, replace RIS with the computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR from time to time as FRANCHISOR's then-current unit and/or network information system. Such replacements shall take place when deemed advisable by FRANCHISOR given the age, cost to operate, condition of the information system then in the Unit, the then-current and anticipated technology, the information systems then in use at other Units, the needs of the System(s), and other factors as may be relevant.

5.2.6.3 FRANCHISOR makes no representation or warranty as to the costs, sales, or profits, if any, which may result from the installation and use of RIS and its replacements.

5.2.7    FRANCHISOR shall treat any Records received from FRANCHISEE pursuant to this subsection 5.2 as confidential, except that information may be released (a) to any person entitled to the same under any Lease; (b) in connection with any court order, legal proceeding or other dispute resolution process, whether instituted by FRANCHISOR or any other party; (c) to a prospective transferee of any interest subject to the provisions of Section 10 of this Agreement, and (d) as incorporated into anonymous general information disseminated to FRANCHISOR's franchisees and prospective franchisees, and in the formulation of plans and policies in the interest of the System(s).

5.3    Insurance.  FRANCHISEE shall procure, before the commencement of business, and maintain in full force and effect during the entire term of this Agreement, at FRANCHISEE's sole expense, an insurance policy or policies protecting FRANCHISEE and FRANCHISOR, and their directors and employees, against any loss, liability, including without limitation employment practices liability, or expense whatsoever from, without limitation, fire, personal injury, theft, death, property damage or otherwise, arising or occurring upon or in connection with FRANCHISEE's operation of the Unit or by reason of FRANCHISEE's occupancy of the Premises.

5.3.1    Such policy or policies shall include:

5.3.1.1  commercial general liability insurance, including but not limited to, product, contractual, and owned and non-owned vehicle liability coverages, with a limit of two million dollars ($2,000,000.00) per occurrence and two million dollars ($2,000,000.00) in the aggregate or such higher limit as FRANCHISOR, in its sole and absolute discretion, may from time to time require, and as may be required under the terms of any Lease or underlying lease for the Unit, for bodily injury and property damage combined; and

5.3.1.2  "All Risk" property damage insurance, including without limitation flood and earthquake protection, for the full replacement cost value of the Premises and all other property within or relating to the Unit, including signs, with no coinsurance clause and with a replacement cost clause attached; and

*General Terms and Conditions*

-8-

5.3.1.3  plate glass insurance and, if applicable, boiler insurance; and

5.3.1.4  employer's liability, worker's compensation and such statutory insurance as may be required in the state in which the Premises is located.

5.3.1.5  employment practices liability insurance with a limit of one million dollars ($1,000,000.00) per occurrence and one million dollars ($1,000,000.00) in the aggregate.

5.3.2    All insurance required under the terms of this Agreement (i) shall be written in the names of FRANCHISEE, FRANCHISOR and/or other party or parties designated by FRANCHISOR, as their respective interest may appear, by insurance companies reasonably acceptable to FRANCHISOR;  (ii) shall contain provisions denying to the insurer acquisition by subrogation of rights of recovery against any party named;  (iii) shall provide that cancellation or alteration cannot be made without at least thirty (30) days written notice to any party named;  and (iv) shall not be limited in any way by reason of any insurance which may be maintained by FRANCHISOR or any other party named.

5.3.3    During the term of this Agreement, FRANCHISEE shall promptly unless otherwise directed by FRANCHISOR, (but in no event later than ten (10) days after any such policy becomes effective or such payment is due) furnish FRANCHISOR with duplicate originals of all insurance policies, including renewal and replacement policies, together with evidence that all premiums have been paid.  If at any time FRANCHISEE fails to comply with the provisions of this subsection 5.3, FRANCHISOR, in addition to all other remedies available, shall have the right (but not the obligation) to obtain and/or maintain such insurance with respect to the Unit and/or Premises, at FRANCHISEE's sole expense. FRANCHISEE shall pay FRANCHISOR when and as billed for the cost of premiums therefor.  Maintenance of insurance and FRANCHISEE's performance of the obligations contained in this subsection 5.3 shall not relieve FRANCHISEE of liability under the indemnity provisions set forth in paragraph 5.4 below.

5.3.4.   Each of the parties hereby waives any and all rights of recovery against the other parties hereto, or against the officers, employees, agents, and representatives of such other parties, for damage to such waiving party or for loss of its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policy in force at the time of such loss or damage.  FRANCHISEE shall, upon obtaining the policies of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Agreement.

5.4    **Indemnification.** FRANCHISEE shall save, defend, exonerate, indemnify and hold harmless FRANCHISOR, and each of them, and the subsidiaries or each of them, and their respective officers, directors, employees, agents, successors and assigns, from and against (i) any and all claims based upon, arising out of, or in any way related to the operation or condition of any part of the Unit or the Premises, the conduct of business thereupon, the ownership or possession of real or personal property and any negligent act, misfeasance or nonfeasance by FRANCHISEE or any of its agents, contractors, servants, employees, or licensees, and including, without limitation, all obligations of FRANCHISEE incurred pursuant to any provisions of this Agreement, and (ii) any and all fees (including reasonable attorneys' fees), costs and other expenses incurred by or on behalf of FRANCHISOR in the investigation of or defense against any and all such claims.

5.5    **Refurbishment & Remodel of the Premises.** FRANCHISEE shall timely complete future refurbishments and remodels of the Unit in accordance with this subsection 5.5.  Such refurbishments and remodels are in addition to FRANCHISEE's continuing obligations to maintain, repair and replace all equipment, signage, furnishing, decor and personal property related to the Unit in accordance with FRANCHISOR's standards.  FRANCHISEE's obligations to maintain, repair and replace shall not be delayed or deferred pending or in anticipation of any such refurbishment or remodel.

5.5.1    No later than the Refurbishment Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall refurbish the Unit in accordance with FRANCHISOR's then-current refurbishment standards.  It is intended that the cost of the initial refurbishment shall not exceed $10,000.00 and that subsequent refurbishments shall not exceed $10,000.00 increased by the same percentage as the increase to the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the period from the Refurbishment Date to the date of subsequent refurbishment.  The refurbishment required of the FRANCHISEE shall be generally the same as then required of units of the same age and condition.  The above refurbishing costs do not include costs for required maintenance and repair or costs to upgrade, change or replace the Retail Information System.

5.5.2    No later than the Remodel Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall remodel the Unit in accordance with FRANCHISOR's then-current remodeling standards (including but not limited to fixtures, furnishings, signs and equipment).  The remodeling required of FRANCHISEE shall be generally the same as then required of units of the same age, condition, location and geographic region.

5.5.3    FRANCHISEE acknowledges and agrees that the requirements of this subsection 5.5 are both reasonable and necessary to ensure continued public acceptance and patronage of the System(s), to avoid deterioration or obsolescence of the Unit and to take advantage of changes and improvements in design, concept and decor.

5.6    **Cross-Guarantee.** In the event FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other unit franchised by FRANCHISOR, FRANCHISEE shall be jointly and severally liable to FRANCHISOR as guarantor of the obligations of the franchisee under each franchise Agreement for such other unit(s).  Included in such guaranty are, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental and other Lease payments to FRANCHISOR or any of its subsidiaries, if applicable, collection fees and general receivables now or hereafter due and payable to FRANCHISOR or guaranteed by FRANCHISOR to any third party.  FRANCHISEE's liability under this paragraph shall be limited to the extent that the

total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s), member(s) or partner(s), as the case may be, hold in FRANCHISEE. For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE, held by or controlled by the common shareholder(s), member(s) or partner(s) or their immediate family, as the case may be. The terms of this paragraph shall not operate to extend any personal guaranty of any Lease obligations by any shareholder(s), member(s) or partner(s), after such guaranty shall have ended by its terms.

5.7    **FRANCHISEE Entity.** FRANCHISEE may be a sole proprietorship, a general partnership, a corporation or a limited liability company ("LLC"). FRANCHISEE may not be a limited partnership, trust or other entity not specifically authorized herein or approved by FRANCHISOR in writing.

5.7.1    **Corporation.** If FRANCHISEE is a corporation, (i) said corporation's charter shall provide that it is limited to operating the Unit as provided under this Agreement; (ii) all shareholders of the corporation shall enter into a written Agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the corporation's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) each stock certificate of the corporation shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new shares of common or preferred voting stock in the corporation shall be issued to any person, persons, partnership, association, LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all owners of record and all beneficial owners of any class of voting stock of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

5.7.2    **LLC.** If FRANCHISEE is an LLC, (i) said LLC's operating agreement shall provide that is activities are limited to operating the Unit as provided under this Agreement; (ii) all members of the LLC shall enter into a written agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the LLC's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) the LLC's operating agreement shall provide that any assignment or transfer of membership interests in the LLC is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new membership interest(s) in the LLC shall be created for, issued or granted to any person, persons, partnership, association LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all members of record of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

## Section 6.  Certain Rights of FRANCHISOR

6.0    In order to preserve the validity and integrity of the Proprietary Marks and to assure that the Standards of the System(s) are properly employed by FRANCHISEE in the operation of the Unit and, in general, to verify FRANCHISEE's compliance with the terms of this Agreement, FRANCHISOR, or its agents, shall have the right, at all times, with or without prior notice to FRANCHISEE, to enter and inspect any and all public or private area(s) of the Unit and to select materials, ingredients, products, supplies, paper goods, uniforms, fixtures, furnishings, signs and equipment for evaluation purposes to assure that these items conform to the Standards of the System(s). During the course of any such inspection, FRANCHISOR may photograph or videotape any part of the Unit, whether or not FRANCHISEE is present. FRANCHISOR may require FRANCHISEE to remove any item which does not conform to applicable Standards. FRANCHISOR may also, at FRANCHISEE's expense, remove or destroy any item which does not conform to applicable Standards.

6.1    If FRANCHISOR finds any condition on the Premises which FRANCHISOR deems to be hazardous, unsafe, unhealthy, unsanitary, unclean or in material disrepair, FRANCHISOR shall have the following rights in addition to all other rights set forth in this Agreement:

6.1.1    FRANCHISOR shall have the right to require FRANCHISEE to immediately close and suspend operation of the Unit, and/or to require such other actions as FRANCHISOR, in its sole discretion, deems necessary, whenever there is reason to believe that any products in the Unit are contaminated, or for other reasons of imminent risk to public health and safety. FRANCHISEE agrees to notify FRANCHISOR immediately of any suspected product contamination or other violation affecting public health or safety and to promptly take any action which FRANCHISOR requires in connection therewith. FRANCHISEE shall be solely responsible for all losses, costs or other expenses it incurs in complying with the provisions of this subsection 6.1; and/or

6.1.2    FRANCHISOR shall have the right to immediately remove or destroy, at FRANCHISEE's expense, any product which FRANCHISOR believes to be hazardous, contaminated or to otherwise pose an imminent risk to public health or safety; or

6.1.3    FRANCHISOR shall have the right to give FRANCHISEE twenty-four (24) hours written notice requiring the correction of an unsafe, unhealthy, unsanitary or unclean condition, or thirty (30) days written notice requiring maintenance, repairs or alterations to the Unit or correction of any other Standards violation. If FRANCHISEE has not within that time corrected the condition or completed the maintenance, repairs or alterations, as the case may be, FRANCHISOR may enter the Unit, without being guilty of, or liable for, trespass or tort, and may cause the condition to be corrected or the maintenance, repair, or alteration to be completed at the expense of FRANCHISEE and without prejudice to any other rights or remedies of FRANCHISOR.

-10-

6.2    In addition to FRANCHISOR's right to access information through the Retail Information System and otherwise, FRANCHISOR's representatives shall have the right to examine FRANCHISEE's original books, Records and supporting documents at reasonable times, and to perform, with or without notice to FRANCHISEE, such inspections, tests and other analyses as it deems appropriate to verify Gross Sales at the Unit.  If FRANCHISOR determines that the Gross Sales FRANCHISEE reported to FRANCHISOR are less than the Gross Sales ascertained by FRANCHISOR's analysis, FRANCHISEE shall immediately pay to FRANCHISOR all amounts owing to FRANCHISOR, the applicable Fund and FRANCHISOR's affiliated landlord corporation based upon the corrected Gross Sales.  If an analysis is undertaken due to (i) FRANCHISEE's failure to maintain the Retail Information System in continuous operation, or (ii) FRANCHISEE's failure to prepare, deliver or preserve statements or Records required by subsection 5.2 of this Agreement, or (iii) if any analysis of FRANCHISEE's books and Records results in the discovery of a discrepancy greater than three percent (3%) in the Gross Sales reported by FRANCHISEE, FRANCHISEE shall pay, in addition to the unpaid amounts owed FRANCHISOR, its affiliated landlord corporation and the applicable Fund, interest thereon from the date payment was due, at 18% per annum or the highest permissible rate.  FRANCHISEE shall also reimburse FRANCHISOR for all related expenses, including, but not limited to, reasonable investigation, accounting and legal fees and other reasonable expenses and costs such as travel, payroll and overhead expenses for FRANCHISOR's employees.  Such payments shall be without prejudice to any other remedies FRANCHISOR may have under this Agreement, including the right to terminate this Agreement, without opportunity to cure, in the case of intentional under-reporting of Gross Sales.

6.3    In the event that FRANCHISOR shall believe there may have been intentional under-reporting of Gross Sales for the Unit, FRANCHISEE (and all partners, members and shareholders of FRANCHISEE) shall, upon written demand from FRANCHISOR provide FRANCHISOR, in addition to Records described in paragraph 5.2.5, personal federal and state tax returns, bank statements (including deposit slips and canceled checks) and such other documents and information as FRANCHISOR may in its sole discretion request in connection with FRANCHISOR's efforts to verify Gross Sales reported to FRANCHISOR under this Agreement or any Lease of the Unit.  Information provided by FRANCHISEE under this paragraph 6.3 shall be subject to the confidentiality provisions of paragraph 5.2.7, except that exclusion (c) therein does not apply.  Schedules to personal tax returns and other financial data which are unrelated to the business of the Unit need not be provided by any partner, member or shareholder of FRANCHISEE who has not been active in the business, and, in addition, has not directly or indirectly owned or controlled at least a majority interest in the business at the Unit, alone or in conjunction with any other family member or related entity.

6.4    FRANCHISEE hereby grants FRANCHISOR the right to inspect the records of all suppliers, distributors, group purchasing programs, distribution centers, and other third parties supplying food products, supplies, equipment and materials to FRANCHISEE and hereby authorizes such parties to release records of FRANCHISEE's purchases and deliveries to FRANCHISOR, by electronic transfer or otherwise, at such times and places as FRANCHISOR shall request.

6.5    If, during the term of this Agreement or any extension or renewal thereof, FRANCHISEE directly or indirectly acquires ownership or control of the Premises, FRANCHISEE agrees to give FRANCHISOR prompt written notice of such ownership or control and to grant FRANCHISOR, under FRANCHISOR's standard Lease Option Agreement, the option to acquire a leasehold interest in the Premises in the event of default by FRANCHISEE under this Agreement or under any lease or mortgage relating to the Premises.  Said leasehold interest shall be for the remaining term of this Agreement, including any renewal, at "triple-net" fair market value rental for comparable properties and use in the area as mutually agreed by the parties, or, in the absence of agreement, as determined by arbitration.

## Section 7.  Proprietary Marks

7.0    FRANCHISOR has, in connection with its business and the business of its franchisees, developed and used and continues to use and control the usage of Proprietary Marks which are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin, including colors, and certain trade names, including but not limited to **Dunkin' Donuts**®, owned by Dunkin' Donuts Incorporated, **Baskin 31 Robbins**®, owned by Baskin-Robbins Incorporated, and **TOGO'S**®, owned by Togo's Eateries, Inc., all of which are registered as trademarks on the Principal Register of the United States Patent and Trademark Office.  FRANCHISEE's rights to use specific Proprietary Marks under this Agreement are set forth in the Special Terms and Conditions described in Item "J" of the Contract Data Schedule of this Agreement and attached hereto as a part hereof.

7.1    FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement.  FRANCHISEE shall not sublicense the Proprietary Marks.  FRANCHISEE further agrees that any unauthorized use of the Proprietary Marks during the term of or after expiration or the earlier termination of this Agreement shall constitute an incurable default causing irreparable harm subject to injunctive relief.

7.1.1    FRANCHISEE understands and acknowledges that FRANCHISEE's license to use any or all of the Proprietary Marks is non-exclusive and relates solely to the single location set forth in this Agreement.  FRANCHISEE further acknowledges that FRANCHISOR, in its sole discretion, has the right to operate or franchise other units and sales outlets and to grant other licenses in, and to, any or all of the Proprietary Marks, and to develop and establish other systems, products or services using the same or similar Proprietary Marks, or any other proprietary names and marks, and to grant licenses or franchises thereto, in each case at such locations and on such terms and conditions as FRANCHISOR deems acceptable, without providing any rights therein to FRANCHISEE.  FRANCHISEE further acknowledges the FRANCHISOR may license others to use the Proprietary Marks at locations and in ways that competes with FRANCHISEE and draws customers from the same area as the Unit.

*General Terms and Conditions*

7.2     FRANCHISEE agrees that, during the term of this Agreement and after the expiration or termination thereof, FRANCHISEE shall not directly or indirectly contest or aid in contesting the validity or ownership of the Proprietary Marks. FRANCHISEE shall not, directly or indirectly, apply to register, register or otherwise seek to use or control or in any way use any of the Proprietary Marks or any confusingly similar form or variation thereof in any place or jurisdiction outside the United States; nor shall FRANCHISEE assist any others to do so.

7.3     FRANCHISEE shall identify itself as the franchisee of the Unit in conjunction with any use of the Proprietary Marks, including, without limitation, uses on letterheads, invoices, order forms, receipts, and contracts. Upon the written request of FRANCHISOR, FRANCHISEE shall display a notice identifying the Unit as being independently owned and operated by FRANCHISEE, in such content and form and at such conspicuous locations on the Premises as FRANCHISOR may designate.

7.4     FRANCHISEE agrees to notify FRANCHISOR promptly of any litigation instituted by FRANCHISEE, or by any person, firm or corporation against FRANCHISEE, relating to the Proprietary Marks. In the event FRANCHISOR undertakes the defense or prosecution of any such litigation, FRANCHISEE agrees to execute any and all documents and do such acts and things as may, in the opinion of counsel for FRANCHISOR, be necessary to carry out such defense or prosecution.

## Section 8.  Restrictions on FRANCHISEE's Activities

8.0     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination (hereinafter called the "Post-Term Period"), neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall:

8.0.1     Divert or attempt to divert any business or customer of the Unit to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with FRANCHISOR's Proprietary Marks and System(s);

8.0.2     Directly or indirectly contest or aid in contesting the right of FRANCHISOR or any prospective franchisee of FRANCHISOR to obtain a building permit, zoning variance or other governmental approval required for the development of another location as a unit franchised by FRANCHISOR.; or

8.0.3     Except with respect to the ownership or operation of additional units under Franchises granted by FRANCHISOR, own, maintain, engage in, be employed by, or have any interest in any other business which sells or offers to sell the same or substantially similar products to the type FRANCHISOR requires to be offered by FRANCHISEE at the Unit; provided that, during the Post-Term Period only, the provisions of this paragraph 8.0.3 shall not apply to another business located more than five (5) miles from this or any other unit operating under the same Proprietary Marks of FRANCHISOR. Either party to this Agreement, upon notice in writing to the other during the Post-Term Period, shall have the right to have determined whether said five (5) mile radius is a reasonable restriction on FRANCHISEE's activities, by requesting that the matter be submitted to arbitration in accordance with Section 11 of this Agreement. In such event, the decision of the arbitrator shall be final and binding upon the parties. FRANCHISEE further agrees that, in the event arbitration is requested, FRANCHISEE will engage in no competitive activities pending resolution of the dispute.

8.1     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination, neither FRANCHISEE, nor any partner, director, shareholder or member of FRANCHISEE, as the case may be, shall communicate or divulge to, or use for the benefit of any person, persons, partnership, association or corporation, any information or knowledge concerning the methods of constructing, equipping or operating units under any of FRANCHISOR's Systems and all other information or knowledge which FRANCHISOR deems confidential and which may be communicated to FRANCHISEE, or of which FRANCHISEE may be apprised by virtue of FRANCHISEE's operation under the terms of this Agreement. FRANCHISEE shall divulge such confidential information only to such of its employees as must have access to it in order to operate the franchised business. Any and all information, knowledge, and know-how including, without limitation, drawings, materials, specifications, techniques, and other data, which FRANCHISOR designates confidential shall be deemed confidential for purposes of this Agreement.   FRANCHISOR shall have the non-exclusive right to use and incorporate into FRANCHISOR's Systems, for the benefit of itself and other of FRANCHISOR's franchisees licensees and distributors, all modifications, changes, and improvements developed or discovered by FRANCHISEE or FRANCHISEE's employees or agents in connection with the franchised business, without any liability or obligation to the developer thereof.

8.2     The covenants contained in this Section 8 shall be construed as severable and independent and shall be interpreted and applied consistently with the requirements of reasonableness and equity. If all or any portion of a covenant in this Section 8 is held unreasonable or unenforceable by a court, arbitration panel or other agency having valid jurisdiction in a decision to which FRANCHISOR is a party, FRANCHISEE expressly agrees to be bound by any lesser covenant included within the terms of such greater covenant that imposes the maximum duty permitted by law, as if the lesser covenant were separately stated in, and made a part of, this Section 8.

8.3     FRANCHISEE acknowledges that FRANCHISOR shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 8, or of any portion or portions thereof, without FRANCHISEE's consent, and FRANCHISEE agrees to comply forthwith with any covenant as modified.

*General Terms and Conditions*

-12-

## Section 9. Default

9.0     FRANCHISEE shall be in default under this Agreement:

9.0.1     If FRANCHISEE shall become insolvent or make an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by FRANCHISEE, or if such a petition is filed against and consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if FRANCHISEE is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of FRANCHISEE or other custodian for FRANCHISEE's business or assets is filed and is consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if a receiver or other custodian is appointed, or if proceedings for composition with creditors under any state or federal law should be instituted by or against FRANCHISEE, or if the real or personal property of FRANCHISEE shall be sold at levy thereupon by any sheriff, marshall or constable; or

9.0.2     If FRANCHISEE is convicted of or pleads guilty or "nolo contendere" to a felony, a crime involving moral turpitude, or any other crime or offense that FRANCHISOR believes is injurious to the System(s), the Proprietary Marks or the goodwill associated therewith, or if FRANCHISOR has proof that FRANCHISEE has committed such a felony, crime or offense; or

9.0.3     If FRANCHISEE permits the use of the Unit or Premises for any illegal or unauthorized purpose, including, without limitation, palming off or substitution of products under the Proprietary Marks or other marks of FRANCHISOR; or

9.0.4     If any other franchise agreement between FRANCHISEE and FRANCHISOR or any affiliated entity is terminated by reason of FRANCHISEE's default thereunder; or

9.0.5     If FRANCHISEE fails to pay, perform, observe or comply with any of FRANCHISEE's duties and obligations under this Agreement; or if FRANCHISEE fails to carry out in all respects its obligations under any Lease, mortgage, equipment Agreement, promissory note, conditional sales contract or other contract materially affecting the Unit, to which the FRANCHISEE is a party or by which FRANCHISEE is bound, whether or not FRANCHISOR is a party thereto.

9.1     <u>Thirty Day Cure Period.</u>  Except as otherwise provided in this Section 9, FRANCHISEE shall have the right to cure FRANCHISEE's default under this Agreement within thirty (30) days after written notice of default from FRANCHISOR is delivered pursuant to paragraph 14 hereof. Notwithstanding the foregoing, the following lesser periods shall apply under the circumstances described:

9.1.1     <u>Seven Day Cure Period.</u>  A seven (7) day cure period shall apply if FRANCHISEE fails, refuses, or neglects to pay when due to FRANCHISOR any moneys owing to FRANCHISOR or to any Fund, or if FRANCHISEE fails to maintain the insurance coverage set forth in subsection 5.3 of this Agreement.

9.1.2     <u>24 Hour Cure Period.</u>  A twenty-four (24) hour cure period shall apply as provided in paragraph 6.1.3 to the violation of any law, regulation, order or Standard of FRANCHISOR relating to health, sanitation or safety;  or if FRANCHISEE ceases to operate the Unit for a period of forty-eight (48) hours without the prior written consent of FRANCHISOR, provided, however, that if the Unit is abandoned, no cure period shall apply.

9.1.3     <u>Cure on Demand.</u>  FRANCHISEE shall cure on demand all "hazardous situations" and remove and destroy on demand all "hazardous products" as set forth in paragraph 5.1.2.1 and shall cure any situation which poses an imminent risk to public health and safety as provided in subsection 6.1.

9.1.4     <u>No Cure Period.</u>  No cure period shall be available if FRANCHISEE is in default under any paragraph designated 9.0.1 through 9.0.4 above; or if FRANCHISEE abandons the Unit; or if FRANCHISEE intentionally under-reports Gross sales, falsifies financial data or otherwise commits an act of fraud with respect to FRANCHISEE's acquisition of this Franchise or its rights or obligations under this Agreement; or if FRANCHISEE's Lease for the Unit is terminated due to FRANCHISEE's default thereunder.  In addition, no cure period shall be available for any default if FRANCHISEE has received three (3) or more previous notices-to-cure for the same or a substantially similar default (whether or not FRANCHISEE has cured the same), within the immediately preceding twelve (12) month period.

9.2     <u>Statutory Cure Period.</u>  If a statute in the state in which the Premises is located requires a cure period for the applicable default which is longer than any cure period specified in this Section 9, the statutory cure period shall apply.

9.3     <u>Late Fee, Interest and Costs.</u>  If FRANCHISEE fails to cure a default within any applicable time period following notice set forth in subsection 9.1, or if this Agreement is terminated as a result of FRANCHISEE's default, FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, without limitation, late fees, collection fees, interest at one and one-half percent (1.5%) per month, or the highest permissible rate, and reasonable investigation and attorneys' fees incurred by FRANCHISOR as a result of any such default or termination. All such interest, damages, costs and expenses may be included in and form part of the judgment awarded to FRANCHISOR in any proceedings brought by FRANCHISOR against FRANCHISEE.

9.4     <u>Termination.</u>  If FRANCHISEE fails to cure any default within the applicable period following notice from FRANCHISOR, FRANCHISOR may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement. Such termination shall be effective immediately upon receipt of a written notice of termination from FRANCHISOR. Notwithstanding the foregoing, this Agreement shall immediately terminate upon the occurrence of any event set forth in paragraphs 9.0.1 through 9.0.4 or paragraph 9.1.4, without notice or opportunity to cure or notice of termination. Upon any termination or expiration of this Agreement all right of FRANCHISEE to use the Proprietary Marks and the System(s) and to operate the Unit under the Proprietary Marks shall terminate and:

9.4.1    FRANCHISEE shall promptly pay FRANCHISOR all sums owing or accrued from FRANCHISEE to FRANCHISOR, the Fund, and any affiliated landlord entity, including interest and any damages, costs and expenses, including reasonable attorneys' fees, incurred by FRANCHISOR by reason of default on the part of FRANCHISEE; and

9.4.2    FRANCHISEE shall immediately cease to operate the Unit, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former FRANCHISEE of FRANCHISOR; and

9.4.3    FRANCHISEE shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, any feature or method associated with the System(s), any or all of the Proprietary Marks and any other trade secrets, confidential information, operating manuals, slogans, trade dress, signs, symbols or devices which are part of FRANCHISOR's System(s) or are otherwise used in connection with the operation of the Unit. FRANCHISEE agrees that any such unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm. Continued use by FRANCHISEE of FRANCHISOR's trademarks, trade names, Proprietary Marks, and service marks after termination of this Agreement shall constitute willful trademark infringement by FRANCHISEE; and

9.4.4    FRANCHISEE shall immediately return to FRANCHISOR all operating manuals, plans, specifications, and other materials in FRANCHISEE's possession containing information prepared by FRANCHISOR and relative to the operation of the Unit, and all copies thereof (all of which are acknowledged to be FRANCHISOR's property), and shall retain no copy or record of any of the foregoing, except FRANCHISEE's copy of this Agreement, any correspondence between the parties, and any other documents which FRANCHISEE reasonably needs for compliance with any provision of law; and

9.4.5    FRANCHISEE shall remove from the Premises and from any equipment, signs, trade fixtures, furnishings and other personal property (except as provided in paragraph 9.4.6 below) and return to FRANCHISOR, all of the Proprietary Marks or other indicia of FRANCHISOR, and shall disconnect, withdraw and/or terminate, within five (5) days after termination or expiration of this Agreement, any telephone listings and/or fictitious name registration containing any part of the Proprietary Marks.   Upon FRANCHISOR's written demand, however, FRANCHISEE shall assign to FRANCHISOR, upon any termination, expiration or non-renewal of this Agreement, any telephone number used in the operation of the Unit if such number is listed in the directory using any of the Proprietary Marks. FRANCHISEE hereby appoints FRANCHISOR as its attorney-in-fact, in the name of FRANCHISEE, to do any act necessary to effect the intent of this paragraph; and

9.4.6.   FRANCHISEE shall, but only in the case of any early termination of this Agreement due to FRANCHISEE's default, sell to FRANCHISOR, at FRANCHISOR's election, any or all of the equipment, interior and exterior signs, trade fixtures, furnishings and other personal property of FRANCHISEE used in connection with the Unit (hereinafter collectively "Equipment"), at the purchase cost when originally installed in the Unit, less a depreciation deduction computed on a straight line basis over a ten (10) year useful life for the respective items (but in no event less than ten percent (10%) of the original purchase cost for such equipment, fixtures and furnishings). If FRANCHISEE owes a balance due on its purchase or financing of such Equipment, or if the same are otherwise subject to a lien or claim for any indebtedness, the amounts of such balance and/or indebtedness shall be deducted from the purchase price payable to FRANCHISEE.   All sums of money due FRANCHISOR by FRANCHISEE may be offset against the purchase price payable to FRANCHISEE.  Nothing contained herein, however, shall be construed to entitle FRANCHISEE to be released from liability for such unpaid balance or indebtedness, if any, in excess of the portion of the purchase price applied for payment of such debts; and

9.4.7    FRANCHISEE shall, at FRANCHISOR's option by notice to FRANCHISOR within thirty (30) days from the date of termination or expiration, assign to FRANCHISOR any interest which FRANCHISEE has in the Lease or any other Agreement related to the Premises.  If FRANCHISOR does not elect to exercise its option to acquire the Lease, FRANCHISEE shall make such modifications or alterations to the Premises immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of the Premises from that of other units in the System(s), and shall make such specific additional changes thereto as FRANCHISOR may reasonably require for that purpose.  In the event FRANCHISEE fails or refuses to comply with the requirements of this paragraph 9.4.7, FRANCHISOR shall have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making such changes as may be required, at the expense of FRANCHISEE, which expense FRANCHISEE agrees to pay upon demand; and

9.4.8    FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, but not limited to, reasonable investigation and attorney's fees and other reasonable expenses and costs such as travel costs and payroll expenses for FRANCHISOR's employees, incurred in obtaining injunctive or other relief for the enforcement of any provisions of this Section 9; and

9.4.9    FRANCHISEE shall continue to comply with Section 8 of this Agreement, for the Post-Term Period specified therein.  If FRANCHISEE begins to operate any other business wherever situated, FRANCHISEE shall not use, in connection with such other business or the promotion thereof, any reproduction, counterfeit, copy or colorable imitation of any of FRANCHISOR's Proprietary Marks or trade dress; and FRANCHISEE shall not utilize any designation of origin or description or representation which falsely suggests or represent an association or connection with FRANCHISOR whether or not constituting unfair competition.

9.5      Nothing in this Agreement shall preclude FRANCHISOR from seeking any remedy under federal or state law for willful trademark infringement, including, without limitation, injunctive relief. No right or remedy herein conferred upon or reserved to FRANCHISOR is exclusive of any other right or remedy herein, or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy given hereunder.  FRANCHISEE agrees that the existence of any claims against FRANCHISOR, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by FRANCHISOR of any provision of this Agreement.

-13-

-14-

9.6    Because the Unit is one of many units within the System(s) that sell similar products and services to the public, FRANCHISEE agrees that its failure to comply with the terms of this Agreement would cause irreparable damage to FRANCHISOR and the System(s) as a whole for which no adequate remedy at law may be available, including, without limitation, violations of standards, unhealthy, unsafe or unsanitary conditions, unauthorized use of the Proprietary Marks and breaches under Section 8 hereof. In the event of FRANCHISEE's breach or threatened breach of any of the terms of this Agreement, FRANCHISOR shall therefore be forthwith entitled to an injunction restraining such breach and/or to a decree of specific performance, without showing or proving any actual damage or irreparable harm or lack of an adequate remedy at law, and without the requirement for the posting of bond, the same being hereby waived by FRANCHISEE, until a final determination is made by a court of competent jurisdiction. The foregoing remedy shall be in addition to all other remedies or rights which FRANCHISOR might otherwise have by virtue of any breach of this Agreement by FRANCHISEE.

## Section 10.  Transfer Provisions

10.0    **Transfer By FRANCHISOR.**  This Agreement shall inure to the benefit of the successors and assigns of FRANCHISOR either individually or collectively. FRANCHISOR shall each have the right to assign its rights under this Agreement to any person, persons, partnership, association or corporation, provided that the transferee agrees in writing to assume all obligations undertaken by FRANCHISOR herein and FRANCHISEE receives a statement from both FRANCHISOR and its transferee to that effect. Upon such assignment and assumption, FRANCHISOR shall be under no further obligation hereunder except for accrued liabilities if any.

10.0.1    If this Agreement now or hereafter grants FRANCHISEE rights with respect to more than one (1) brand, FRANCHISOR shall have the right, at any time and from time to time, to require FRANCHISEE to execute and deliver separate contracts for each brand, each containing all of the terms of this Agreement pertaining to such brand. FRANCHISEE agrees to execute and return such replacement contracts to FRANCHISOR within thirty (30) days after receipt thereof. If FRANCHISEE fails to do so, FRANCHISOR shall have the right to execute such instruments on FRANCHISEE's behalf and deliver a copy thereof to FRANCHISEE.

10.1    **Transfer By FRANCHISEE.**  FRANCHISEE understands and acknowledges that the rights and duties set forth in this Agreement are personal to FRANCHISEE and that FRANCHISOR has granted the Franchise in reliance on the business skill and experience, financial capacity and personal character of FRANCHISEE. Except as hereinafter provided, neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any member, if FRANCHISEE is a limited liability company ("LLC"), nor any shareholder, if FRANCHISEE is a corporation, without FRANCHISOR's prior written consent, shall, by operation of law or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association, LLC or corporation, any interest in this Agreement, or any interest in the franchise granted hereby, or any interest in any proprietorship, partnership, LLC or corporation which owns any interest in the franchise, nor offer, permit or suffer the same. Any purported assignment or transfer not having the prior written consent of FRANCHISOR shall be null and void and shall constitute default hereunder. Any proposed transfer must meet all the requirements of FRANCHISOR including, but not limited to, those set forth in this Section 10.

10.2    **Consent By FRANCHISOR.**  FRANCHISOR shall not unreasonably withhold its consent to any transfer referred to in paragraph 10.1 above, provided, that:

10.2.1    FRANCHISEE must have operated the Unit for a period of not less than six (6) months prior to the proposed transfer;

10.2.2    The sales price of the interest to be conveyed must not be so high, or the terms of sale so onerous, that, in the judgment of FRANCHISOR, the transferee will be unlikely to properly maintain, operate and promote the Unit and meet the transferee's financial and other obligations to FRANCHISOR, third party suppliers and creditors. This provision shall not create any liability to either transferor or transferee on the part of FRANCHISOR, in the event that FRANCHISOR approves the transfer and the transferee experiences financial difficulties;

10.2.3    The transferee and each partner, shareholder or member of the transferee, as the case may be, must be a United States citizen or lawful resident alien of the United States, must be of good moral character and reputation and must have a good credit rating and business qualifications and aptitude reasonably acceptable to FRANCHISOR. Such qualifications include, without limitation, literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to communicate with employees, customers, and suppliers of FRANCHISOR and to satisfactorily complete FRANCHISOR's required training program and such other tests and interviews as FRANCHISOR shall reasonably deem to be necessary or desirable. FRANCHISEE shall provide FRANCHISOR with such information as FRANCHISOR may require to make a determination concerning each proposed transferee; and

10.2.4    The transferee may not be a limited partnership, trust or other entity not specifically authorized herein.

10.3    **Transfer Requirements.**  Each transfer of any interest in FRANCHISEE, the Unit, this Agreement and/or the Franchise herein granted, must receive the prior written consent of FRANCHISOR set forth in subsection 10.2 above and must conform to and/or comply with the following requirements:

10.3.1    Prior to the transfer, FRANCHISEE must pay and satisfy all accrued money obligations to FRANCHISOR, its affiliates and/or subsidiaries and to any Fund, obligations of FRANCHISEE which FRANCHISOR has guaranteed, liens, deferred rent and other obligations under the Lease for the Unit or other contracts pertaining to the Unit and the transfer fee provided below, as applicable;

*General Terms and Conditions*

10.3.2  Prior to the transfer, the Unit, including equipment, signs, building, improvements, interior and exterior, must be in good operating condition and repair and in compliance with FRANCHISOR's then-current Standards, including, without limitation, Standards for replacements and additions;

10.3.3  FRANCHISEE and any transferor may not assert any security interest, lien, claim or right now or hereafter in this Franchise, the Franchise granted to the transferee, or, if applicable, the Lease for the Unit with FRANCHISOR or its affiliated landlord entity.  Any security interest, lien, claim or right asserted with respect to any personal property at the above location shall not include any after-acquired property and shall be subject, junior and subordinate to any security interest, lien, claim or right now or hereafter asserted by FRANCHISOR, its successors or assigns;

10.3.4  Prior to the transfer, the transferee must comply with the requirements of paragraph 5.1.8 of this Agreement, to the satisfaction of FRANCHISOR;

10.3.5  If the transferee is a corporation or LLC, it must comply with the terms of subsection 5.7 of this Agreement;

10.3.6  The transferee, including, where appropriate, all shareholders, members and partners of the transferee, shall jointly and severally execute, on FRANCHISOR's then-current forms, a franchise agreement and all other standard ancillary agreements, including, without limitation, a priority in payment agreement, if applicable.  The priority in payment agreement provides, among other things, that if the transferee is unable at any time to make payments both to the transferor for the purchase of the Unit and to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s), payments to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s) will have priority.  The transferee's franchise agreement shall not increase any fee based upon a percentage(s) of Gross Sales to a percentage greater than as required by this Agreement for the respective System(s).  Unless a longer period is agreed upon between FRANCHISOR and the transferee, the term of the transferee's franchise agreement shall be for the unexpired term of this Agreement.  The transferee shall pay no franchise fee pursuant to paragraph 4.1 of this Agreement unless a longer term is agreed upon by FRANCHISOR;

10.3.7  FRANCHISEE, including all individuals proposing to transfer an interest in the Franchise or the FRANCHISEE, must execute, on FRANCHISOR's standard form, a general release of all claims against the FRANCHISOR corporations, their affiliated corporations, and the directors, officers and employees of each;  and

10.3.8  In addition, FRANCHISOR shall have the right to promulgate and enforce such additional reasonable requirements as it may, in its sole judgment determine.

10.4    **Transfer Fee.**  The transferor shall pay to FRANCHISOR upon any transfer of any interest of FRANCHISEE in this Agreement or of any interest in the FRANCHISEE entity, a Transfer Fee determined as follows:

10.4.1  **Prior to FRANCHISEE's Fourth Year of Operations.**  The transferor shall pay to FRANCHISOR a Transfer Fee which is the greater of:  (i) five thousand dollars ($5,000.00), increased by five percent (5%) compounded annually during the term FRANCHISEE has operated the Unit under this or other agreements with FRANCHISOR;  or (ii) five percent (5%) of the Adjusted Sales Price of the Unit.

10.4.1.1  The term "Adjusted Sales Price" shall mean the sales price to be received by FRANCHISEE upon transfer of the Unit, less the amount, if any, paid by FRANCHISEE for the Unit, when purchased as an ongoing business from another franchisee or from FRANCHISOR.  No adjustment shall be made for amounts paid in connection with the development of a new unit.  The Adjusted Sales Price shall include, without limitation, cash, assumption of debt, equipment lease obligations and deferred financing and amounts allocated to property of every kind, nature and description:  furniture, fixtures, signs, equipment, supplies and inventory; excluding only amounts reasonably allocated to land and building, if owned by FRANCHISEE.  It is intended that all consideration to be paid to FRANCHISEE, or for the benefit of FRANCHISEE, however designated and whether or not included in the contract of sale shall be deemed part of the Adjusted Sales Price including, but not by way of limitation, amounts allocated to a covenant not to compete or personal service agreement.

10.4.1.2  For purposes of determining the correct Transfer Fee, FRANCHISOR reserves the right to reallocate amounts which FRANCHISEE and the transferee have allocated to land, building, equipment, covenant against competition, personal service agreement, or otherwise, if in FRANCHISOR's opinion, the allocation of the parties is unreasonable in relation to the value of the business.  If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7 hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.2    **From and After FRANCHISEE's Fourth Year of Operations.**  If the transfer takes place after the commencement of FRANCHISEE's fourth year of operations, the transferor shall pay to FRANCHISOR the Transfer Fee indicated below based on the Unit's Gross Sales for the most recently completed twelve (12) calendar month period preceding the date of the contract of sale.  FRANCHISOR reserves the right to select another period or to make appropriate adjustments to such Gross Sales in the event extraordinary occurrences (e.g., road construction, fire or other casualty, etc.) materially affected Unit sales during the indicated twelve (12) month period.

| Sales for Most Recent 12 Month Period | Transfer Fee |
| --- | --- |
| Less than $400,000.00 | $5,000.00 |
| $400,000.00 or more, but less than $600,000.00 | $6,000.00 |
| $600,000.00 or more, but less than $1,000,000.00 | $8,000.00 |
| $1,000,000.00 or more, but less than $1,400,000.00 | $12,000.00 |
| $1,400,000.00 or more | $20,000.00 |

-15-

*General Terms and Conditions*

-16-

10.4.3  If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.4  **Transfer of Less Than Control.**  For any transfer that, either alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, will have the result of the transferee(s) holding an aggregate interest of less than fifty percent (50%) of the franchise licensed herein or the entity licensed hereunder, FRANCHISOR will reduce the Transfer Fee set forth in paragraph 10.4.1 or 10.4.2, as applicable, to a fixed transfer documentation fee of five hundred dollars ($500.00), increased after each five (5) years of the term of this Agreement, including any renewal period, by the same percentage as the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the same period. FRANCHISOR will waive the Transfer Fee entirely with respect to a transfer of less than control, if each transferee was an approved party to (or personal guarantor of) this Agreement prior to transfer.

10.4.5  **Transfer to Spouse or Children.**  Notwithstanding anything else contained in this subsection 10.4, but provided that FRANCHISOR determines that FRANCHISEE has been in full compliance with the terms of all agreements with FRANCHISOR and its affiliates, the Transfer Fee due in connection with a transfer of the Unit to FRANCHISEE's spouse or one or more of FRANCHISEE's children shall be the fixed transfer documentation fee described in paragraph 10.4.4 above. The franchise agreement issued to the spouse and/or children will be on the then-current form in use at the time of transfer including the then-current Transfer Fee provisions.

10.5  **Release of Transferor.**  Upon FRANCHISOR's approval of the transfer and FRANCHISEE's compliance with the aforesaid conditions, the transferor shall, provided that the transferor no longer has an interest in the Franchise, thereupon be relieved of further obligations under the terms of this Agreement, except that the transferor shall remain obligated for FRANCHISEE's money obligations under Section 4 through the date of transfer, and under the covenants contained in Section 8 for the Post Term Period therein described, after the date of transfer.

10.6  **Transfer on Death, Disability or Incapacity.**  In the event of the death, disability or mental incapacity of FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, at any time during the term of this Agreement, the legal representative of the deceased, disabled or incapacitated party, as the case may be, together with all surviving partners, members or shareholders of FRANCHISEE, if any, shall, within six (6) months of such death, disability or mental incapacity, jointly apply, in writing to transfer the Franchise or the interest of the affected party in such Franchise, to such person or persons as the legal representative may specify. Such transfer shall be approved by FRANCHISOR upon fulfillment of all of the conditions set forth in Section 10 of this Agreement. A Transfer Fee shall be due pursuant to subsection 10.4 above, except that paragraph 10.4.5 shall apply if the transferee is a beneficiary or heir of FRANCHISEE.

10.6.1  If the legal representative and all surviving partners, members or shareholders, if any, do not propose a transferee acceptable to FRANCHISOR under the standards set forth in this Agreement within the period set forth in paragraph 10.6 above, or if no transfer of the interest shall have been accomplished consistent with the provisions of this Section 10 within one (1) year from the date of death, disability or mental incapacity, all rights licensed to FRANCHISEE under this Agreement shall terminate forthwith and automatically revert to FRANCHISOR. FRANCHISOR shall have the right and option, exercisable under such termination, to purchase all furniture, fixtures, signs, equipment and other chattels at a price to be agreed upon by the parties or, if no agreement as to price is reached by the parties, at such price as may be determined by a qualified appraiser, approved by both parties, such approval not to be unreasonably withheld. FRANCHISOR shall give notice of its intent to exercise said option no later than twenty-one (21) days prior to termination.

10.6.2  If the deceased, disabled or incapacitated party is the Designated Representative, then during the interim period until a transfer of the interest under this subsection 10.6 has taken place, the legal representative and surviving partners, members or shareholders shall operate the Unit through a successor Designated Representative who shall possess such qualifications for interim management of the Unit as FRANCHISOR may determine, in its discretion, from time to time. Failure of FRANCHISEE or the legal representative to appoint a Designated Representative so qualified within ninety (90) days after the date of death, disability or mental incapacity of the Designated Representative shall be grounds for FRANCHISOR to terminate this Agreement after sending FRANCHISEE a thirty (30) day written notice-to cure.

10.6.3  FRANCHISOR shall have the right to require a certified copy of an order of a court of competent jurisdiction over the estate of the deceased or incapacitated person, in which the legal representative or heir or legatee shall be determined, and may rely on such certified copy for the purposes of subsection 10.6. If not furnished with such certified copy of a court order, or in the event of a legal contest, FRANCHISOR may decline, without liability, to recognize the claim of a party to such interest. FRANCHISOR shall not be liable to any heir, next of kin, devisee, legatee, or legal representatives of a deceased or incapacitated person by reason of approval of a transfer of the interest to the surviving spouse or a child of the deceased, provided such approval is not contrary to an order of a court of competent jurisdiction served on FRANCHISOR.

10.7  **Right of First Refusal.**  If FRANCHISEE, or any shareholder, member or partner thereof, has received and desires to accept a signed, bona fide written offer from a third party to purchase FRANCHISEE's rights under this Agreement or any shareholder's, member's or partner's interest in the franchised business, FRANCHISEE or such shareholder, member or partner shall notify FRANCHISOR and provide it with a complete copy of such offer. FRANCHISOR shall have the right and option, exercisable within sixty (60) days after its receipt of said copy, to purchase or assume and assign without recourse to a third party FRANCHISEE's Franchise, or such shareholder's, member's or partner's interest in the franchised business, on the same terms and conditions as offered by said third party. FRANCHISOR's exercise of its rights hereunder shall not relieve FRANCHISEE of its Transfer Fee obligation to FRANCHISOR. Should FRANCHISOR not exercise this option and the terms of the unaccepted offer be altered, FRANCHISOR shall, in each such instance, be notified of the changed offer and shall again have sixty (60) days to exercise its right to purchase on the altered terms. Should FRANCHISOR not exercise this option, all of the terms of Section 10 shall apply to the transfer.

## Section 11. Arbitration.

11.0    Except as otherwise specified in this Section 11, all controversies, claims or disputes between FRANCHISEE and FRANCHISOR of whatever kind or nature, whether arising out of or relating to the negotiation, performance or breach of this or any other agreement or otherwise, must be settled by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, as herein modified. This provision encompasses all causes of action, whether nominally a "claim", "counterclaim" or "cross-claim", and whether arising under common law or any state or federal statute. As used in this Section 11, the terms "FRANCHISOR" and "FRANCHISEE" include, without limitation, the past and present employees, agents, representatives, officers, directors, shareholders, members, guarantors, sureties, parent corporations, subsidiary corporations, controlled affiliated entities, predecessors, successors and/or assigns of each party hereto. The parties intend that this provision be given the broadest possible interpretation by a court of law.

11.1    **Eligibility and Procedures.** Arbitration must be initiated within the lesser of the time periods (a) set forth in paragraph 11.7.5 below or (b) permitted under the applicable statute of limitations for the cause of action asserted. Any claim, controversy or dispute which is not so initiated within said lesser period shall not be eligible for arbitration under any circumstances. Arbitration shall be initiated as provided in the Rules of the AAA by the filing of a demand for arbitration with the regional office of the AAA located in the city and state inserted in Item "L" of the Contract Data Schedule of this agreement. If no location is inserted in Item "L" or if such insertion is incomplete or inaccurate, Boston, Massachusetts, shall be deemed to apply. The arbitration proceedings, including without limitation all conferences, preliminary and dispositive hearings shall be conducted in such city and state unless all parties agree to another venue. Actions to enforce an express obligation to pay moneys may be brought under the Expedited Procedures of the AAA's Commercial Arbitration Rules, provided there are no counterclaims. The arbitrator(s) may issue such orders for interim relief as may be deemed necessary to safeguard the rights of the parties during the arbitration, but without prejudice to the ultimate rights of the parties, to the final determination of the dispute or to the rights of the FRANCHISOR to seek equitable relief from a court of competent jurisdiction at any time, even during the pendency of any arbitration proceedings initiated hereunder.

11.2    **Enforceability and Effect.** Judgment on the award, including, without limitation, any interim award for interim relief, rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The binding or preclusive effect of any award shall be limited to the actual dispute or claim arbitrated, and to the parties, and will have no collateral effect on any other dispute or claim of any kind whatsoever.

11.3    **Governing Law.** The Federal Arbitration Act and related federal judicial procedure shall govern this contract to the fullest extent possible, excluding all state arbitration law, irrespective of the location of the arbitration proceedings, the nature of the dispute between the parties or the nature of the court in which any related judicial proceedings may be brought. Except as provided in the preceding sentence respecting arbitration law, the resolution of all disputes between the parties bound hereunder, whether in tort and regardless of the place of injury or the place of the alleged wrongdoing or whether arising out of or relating to the parties' contractual relationship, shall be governed by the law of the Commonwealth of Massachusetts without regard to choice of law principles.

11.4    **Exceptions to Arbitration.** Disputes concerning the validity or scope of this Section 11 (arbitration), including, without limitation, whether a dispute is arbitrable hereunder, shall be beyond the authority of the arbitrator(s) and shall be determined by a court of competent jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. §1 et seq., as amended from time to time. In addition, the causes of action specified in the following subsections 11.5 and 11.6 are the sole and exclusive exceptions to the agreement of the parties hereto to resolve disputes through arbitration:

11.5    **FRANCHISOR's Exceptions.** FRANCHISOR shall have the option to litigate any one or more of the causes of action specified in this subsection 11.5 and shall exercise said option by filing a complaint in any court of competent jurisdiction:

11.5.1   the enforcement of an obligation to pay money to FRANCHISOR under an express term of any agreement;

11.5.2   any action based upon an allegation of intentional underreporting of Gross Sales by FRANCHISEE;

11.5.3   any action for declaratory or equitable relief, including, without limitation, seeking of preliminary and/or permanent injunctive relief, specific performance, other relief in the nature of equity or any action at law for damage to FRANCHISOR's property or property interests or in equity to enjoin any harm or threat of harm to FRANCHISOR's goodwill, Proprietary Marks or its tangible or other intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder;

11.5.4   any action seeking to terminate this Agreement based upon FRANCHISEE's material breach of paragraph 5.1.7 of this Agreement (excluding subparagraph 5.1.7.1); or

11.5.5   any action in ejectment or for possession of any interest in real or personal property.

11.6    **FRANCHISEE's Exceptions.** FRANCHISEE shall have the option to litigate any cause of action otherwise eligible for arbitration hereunder and shall exercise said option solely by filing a complaint in any court of competent jurisdiction in which FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. If any such complaint fails to include such express waivers or if any such court of competent jurisdiction determines that all or any part of such waivers shall be ineffective or void for any reason whatsoever, then the parties agree that the action shall thereupon be dismissed without prejudice, leaving the parties to their arbitration remedies, if then available pursuant to this Section 11.

-17-

-18-

11.6.1   In the event FRANCHISOR litigates any cause of action pursuant to subsection 11.5 above, FRANCHISEE shall not file any counterclaim, cross-claim, offset claim or the like against FRANCHISOR in the litigation, unless FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. Otherwise, FRANCHISEE shall submit each such counterclaim, cross-claim, offset claim or the like to arbitration, if then available pursuant to this Section 11.

11.7   **Waiver of Rights.**  THE PARTIES HERETO AND EACH OF THEM KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AGREE AS FOLLOWS:

11.7.1 The parties hereto and each of them EXPRESSLY WAIVE(S) THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY; and

11.7.2.  The parties hereto and each of them EXPRESSLY WAIVE(S) ANY CLAIM FOR PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES, except that FRANCHISOR shall be free at any time hereunder to bring an action for willful trademark infringement and, if successful, to receive an award of multiple damages as provided by law; and

11.7.3   The parties hereto and each of them EXPRESSLY AGREE(S) THAT NO PARTY BOUND HEREBY MAY RECOVER DAMAGES FOR ECONOMIC LOSS ATTRIBUTABLE TO NEGLIGENT ACTS OR OMISSIONS EXCEPT FOR CONDUCT WHICH IS DETERMINED TO CONSTITUTE GROSS NEGLIGENCE OR AN INTENTIONAL WRONG; and

11.7.4 The parties hereto and each of them EXPRESSLY AGREES THAT IN THE EVENT OF ANY FINAL ADJUDICATION OR APPLICABLE ENACTMENT OF LAW THAT PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES MAY NOT BE WAIVED, ANY RECOVERY BY ANY PARTY IN ANY FORUM SHALL NEVER EXCEED TWO (2) TIMES ACTUAL DAMAGES, except for an award of multiple damages to FRANCHISOR for willful trademark infringement, as provided by law.

11.7.5   ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE AND FRANCHISOR OR FRANCHISEE'S OPERATION OF THE UNIT, BROUGHT IN ANY FORUM BY ANY PARTY HERETO AGAINST THE OTHER, MUST BE COMMENCED WITHIN TWO (2) YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED, EXCEPT FOR FINANCIAL OBLIGATIONS OF FRANCHISEE.

11.8   **No Class Actions.**  No party shall initiate or participate in any class action litigation claim against any other party bound hereby, except that FRANCHISEE may initiate or participate in any class action arbitration claim by franchisees of FRANCHISOR against FRANCHISOR limited exclusively to alleged misappropriation of moneys from the Fund of any System authorized by this Agreement, which claim must be brought only in arbitration under the provisions of this Section 11.

11.9   **Post-Term Applicability.**  The provisions of this Section 11 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement, however effected.

### Miscellaneous Provisions.

12.0   **Relationship of the Parties.**  This Agreement does not constitute FRANCHISEE an agent, legal representative, joint venturer, partner, employee or servant of FRANCHISOR or its affiliated corporation for any purpose whatsoever; and it is deemed understood between the parties hereto that FRANCHISEE shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of FRANCHISOR or its affiliated corporation or to create any obligation, express or implied, on behalf of FRANCHISOR or its affiliated corporation.  The parties agree that this Agreement does not create a fiduciary relationship between FRANCHISOR or its affiliated corporation and FRANCHISEE.

12.1   Under no circumstances shall FRANCHISOR or FRANCHISEE be liable for any act, omission, debt or other obligation of the other party.  Each party shall indemnify, protect, defend and save the other party harmless against any such claim.  The cost of defending against any claim arising directly or indirectly from, or as a result of, or in connection with FRANCHISEE's operation of the Unit shall be borne by FRANCHISEE.

13.0   **Non-Waiver.**  Any failure of FRANCHISOR to exercise any power reserved to it hereunder, or to insist upon strict compliance by FRANCHISEE with any term, covenant or condition in this Agreement, and any waiver by FRANCHISOR of any breach of a term, covenant or condition shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition in this Agreement.  Subsequent acceptance by FRANCHISOR of the payments due to it hereunder, in whole or in part, shall not be deemed to be a waiver by FRANCHISOR of any preceding breach by FRANCHISEE of any term, covenant or condition of this Agreement. FRANCHISOR may, in its sole discretion, waive or modify any obligation of other franchisees under agreements similar to this Agreement, and no such waiver or modification shall obligate FRANCHISOR to grant a similar waiver or modification to FRANCHISEE.  Acceptance by FRANCHISOR of payments due under this Agreement from any other person or entity shall be deemed to be acceptance from such person or entity as an agent of FRANCHISEE and not as recognition of such person or entity as an assignee of or successor to FRANCHISEE.

14.0   **Notices.**  All notices hereunder by FRANCHISOR to FRANCHISEE shall, at FRANCHISOR's option, be personally delivered or sent by telecopier, prepaid private courier or certified mail to the FRANCHISEE at the address set forth in Item "I" of the Contract Data Schedule of this Agreement or to such other address as FRANCHISEE may from

*General Terms and Conditions*

time to time give notice of to FRANCHISOR. If delivery is refused, proof of attempted delivery shall be deemed delivery. All notices hereunder by FRANCHISEE to FRANCHISOR shall be sent by certified mail to FRANCHISOR at 130 Royall Street, Canton, MA  02021, Attention: Senior Vice President and General Counsel or to such other address as FRANCHISOR may from time to time give notice to FRANCHISEE by email, regular mail or any other means set forth above.

15.0    **Entire Agreement.**  This Agreement, and the documents referred to herein shall be the entire, full and complete agreement between FRANCHISOR and FRANCHISEE concerning the subject matter hereof, and supersedes all prior agreements, no other representation having induced FRANCHISEE to execute this Agreement; and there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein, which are of any force or effect with reference to this Agreement or otherwise.  No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing.  Captions, paragraph designations and section or subsection headings are included in this Agreement for convenience only, and in no way define, limit, construe or describe the scope or intent of the respective parts of this Agreement.  The Special Terms and Conditions attached to this Agreement supplement the General Terms and Conditions and are intended to be additional thereto.  In the event of any conflict between any provisions thereof, the provisions of the Special Terms and Conditions shall be deemed to prevail.

16.0    **Severability.**  Each section, part, term and provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation of a court or agency having valid jurisdiction, such shall not impair the operation or affect the remaining portions, sections, parts, terms or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid section, part, term or provision shall be deemed not to be a part of this Agreement.

17.0    **Applicable Law.**  This Agreement shall be deemed to have been made in, and shall be interpreted, construed and governed by the laws of, the Commonwealth of Massachusetts.  FRANCHISEE acknowledges that this Agreement is to be performed in part through services rendered to FRANCHISEE in Massachusetts.

18.0    **Independent Investigation.**    THE PROSPECT FOR SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE BY VIRTUE OF THIS AGREEMENT IS SPECULATIVE AND DEPENDS TO A MATERIAL EXTENT UPON FRANCHISEE'S CAPABILITY AS AN INDEPENDENT BUSINESS PERSON AND FRANCHISEE, AS WELL AS OTHER FACTORS.    FRANCHISOR MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE POTENTIAL SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE HEREBY.  FRANCHISEE REPRESENTS AND WARRANTS THAT IT HAS ENTERED INTO THIS AGREEMENT AFTER MAKING INDEPENDENT INVESTIGATIONS OF FRANCHISOR'S BUSINESS, AND NOT IN RELIANCE UPON ANY REPRESENTATION BY FRANCHISOR AS TO SALES OR PROFITS WHICH FRANCHISEE IN PARTICULAR MIGHT BE EXPECTED TO REALIZE.  FRANCHISEE FURTHER REPRESENTS AND WARRANTS THAT FRANCHISOR AND ITS REPRESENTATIVES, EMPLOYEES OR AGENTS HAVE MADE NO REPRESENTATIONS TO INDUCE FRANCHISEE TO ACQUIRE THIS FRANCHISE AND EXECUTE THIS AGREEMENT WHICH ARE NOT EXPRESSLY SET FORTH HEREIN OR IN THE DISCLOSURE MATERIALS PROVIDED TO FRANCHISEE PRIOR TO ENTERING INTO THIS AGREEMENT.

19.0    FRANCHISEE acknowledges receiving a copy of this Agreement, the attachments thereto, and agreements relating thereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. FRANCHISEE further acknowledges receiving, on the date of the first personal meeting between FRANCHISOR and FRANCHISEE and not less than ten (10) business days prior to the date on which this Agreement was executed, the disclosure documents required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures".

RIDER TO FRANCHISE AGREEMENT

**SCHEDULE "DD"**
120104

**SPECIAL TERMS AND CONDITIONS APPLICABLE TO A
DUNKIN' DONUTS FRANCHISE**

In connection with its business and the business of its Dunkin' Donuts franchisees, DUNKIN' DONUTS has developed and used and continues to use and control the usage of certain proprietary interests, trademarks, logos, emblems and other indicia of origin, service marks and trade names, including *Dunkin' Donuts*®, which is registered as a trademark on the Principal Register of the United States Patent and Trademark Office (the "Proprietary Marks"), to identify for the public the source of goods and services marketed thereunder and to represent to the public high and uniform standards of quality, cleanliness, appearance and service.

FRANCHISEE, being cognizant of the distinctive and valuable significance to the public of all of the foregoing, desires to make use of the trademark *Dunkin' Donuts*®, and to enjoy the benefits of that mark, the other Proprietary Marks and the Dunkin' Donuts System. FRANCHISEE understands the importance of FRANCHISOR's high and uniform standards of quality, cleanliness, appearance and service to the value of the Dunkin' Donuts System and the necessity of opening and operating FRANCHISEE's Dunkin' Donuts Unit in conformity with the Dunkin' Donuts System and in accordance with FRANCHISOR's Standards and specifications.

## DEFINITIONS

As used in these Special Terms and Conditions applicable to a Dunkin' Donuts Franchise, the following defined terms shall have the following meanings:

A.  The "Dunkin' Donuts Unit" means all or a portion of the Premises dedicated to the operation of the Dunkin' Donuts System, as approved by FRANCHISOR.

B.   "Dunkin' Donuts Products" shall mean and refer to donuts, bagels, muffins, cookies and other baked goods, sandwiches, coffee, soda, frozen drinks and other beverages, all of a variety of kinds or flavors, made in accordance with specifications designated by FRANCHISOR and identified by the Dunkin' Donuts Proprietary Marks, and such other products as may be specified from time to time in writing by FRANCHISOR for sale in the Dunkin' Donuts Unit.

C.  Where applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit designated in Item "M" of the Contract Data Schedule of this Agreement.

## Section DD-1.  Grant Of The Franchise

1.0   FRANCHISOR grants to FRANCHISEE for and during the term hereof and FRANCHISEE accepts a Franchise to operate a donut shop utilizing the Dunkin' Donuts System in accordance with the terms, covenants and conditions of this agreement, at one location only, the Premises described in Item "A" of the Contract Data Schedule of this agreement (hereinafter called the "Dunkin' Donuts Unit"). In connection therewith, this Franchise includes the right to use at the Dunkin' Donuts Unit only, the trademark *Dunkin' Donuts*®, along with other Proprietary Marks owned and utilized by DUNKIN' DONUTS in connection with other Dunkin' Donuts units, and the right to use at the Unit only, the Dunkin' Donuts System including confidential and valuable information which now exists or may be acquired hereafter and set forth in FRANCHISOR's manuals or as otherwise from time to time disclosed to Dunkin' Donuts franchisees.

## Section DD-2.  Scope Of The Franchise

2.0   This Dunkin' Donuts Franchise is specific to one location only, for the term of this Agreement.  It grants no rights outside the Premises, nor includes any territorial protection against competition. FRANCHISOR reserves and retains the right to operate or permit others to operate Dunkin' Donuts units or to sell or distribute Dunkin' Donuts products and/or services or to otherwise use the Dunkin' Donuts Proprietary Marks and/or the Dunkin' Donuts System, in each case at any other location. FRANCHISOR and other franchisees may compete for customers drawn from the same area as FRANCHISEE's Dunkin' Donuts Unit using the same or different brand(s).

## Section DD-3.  Advertising and Promotion

3.0   FRANCHISOR shall prepare and coordinate a "Start-Up" promotional program (or such other promotional or advertising program as FRANCHISOR may specify) for the initial opening of the Dunkin' Donuts Unit.

3.1   FRANCHISOR shall review for approval all proposed advertising and promotional materials prepared by FRANCHISEE for use in local advertising relating to the Dunkin' Donuts Unit; and

3.3.1  FRANCHISOR shall administer The Dunkin' Donuts Advertising and Sales Promotion Fund (the "Dunkin' Donuts Fund") and shall direct the development of all advertising, marketing and promotional programs for the Dunkin' Donuts System. That portion of FRANCHISEE's payments under paragraph 4.4 of this Agreement equal to one percent (1%) of the Gross Sales of the Dunkin' Donuts Unit will be utilized, at the discretion of FRANCHISOR, to provide for the administrative expenses of the Dunkin' Donuts Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of DUNKIN' DONUTS and the Dunkin' Donuts System.  The balance, including any interest earned by the Dunkin' Donuts Fund, will be used for advertising and related expenses.  Contributions to the Dunkin' Donuts Fund in excess of the percentage of Gross Sales of the Dunkin' Donuts Unit set forth in Item "F" of the Contract Data Schedule shall be used in accordance with the programs to which they relate.

*Dunkin' Donuts Rider - pg.* 1

## Section DD-4. Payments

4.4   FRANCHISEE shall make payments to the Dunkin' Donuts Fund as described in paragraph 4.4 of the General Terms and Conditions, except that sales to wholesale accounts approved by FRANCHISOR are excluded for purposes of calculating fees due under paragraph 4.4 (only).   For wholesale accounts to be approved by FRANCHISOR, FRANCHISEE must provide FRANCHISOR prior written notice of each such account.  Upon FRANCHISOR's receipt of such notice, the account shall be deemed approved, unless FRANCHISOR at any time notifies FRANCHISEE in writing that such account is not approved. FRANCHISEE shall, within ten (10) days of receipt of a disapproval notice, discontinue sales to the disapproved wholesale account.

4.4.1   FRANCHISOR reserves the right in its sole and absolute discretion to designate or change the composition of Dunkin' Donuts Units included in the base for purposes of determining "two-thirds" support.

## Section DD-5.  Covenants of FRANCHISEE

5.0   FRANCHISEE understands and acknowledges that every detail of the Dunkin' Donuts System is important to DUNKIN' DONUTS, to FRANCHISEE and to other Dunkin' Donuts franchisees, in order to maintain high and uniform standards of quality, cleanliness, appearance, service, products and procedures and thereby increase the demand for Dunkin' Donuts Products and protect and enhance the reputation and goodwill of DUNKIN' DONUTS.

5.1     Unless this Unit is expressly authorized to manufacture donut products on the Premises, and except as DUNKIN' DONUTS may otherwise authorize and direct in writing, donut products sold at this Unit shall be produced in the Dunkin' Donuts manufacturing unit located at the address set forth in Item "M" of the Contract Data Schedule of this Agreement (the "Producing Unit").  The individual(s) or entity(ies) that controls at least a fifty percent (50%) interest in FRANCHISEE shall maintain at least a fifty percent (50%) interest in the Producing Unit, or have a documented interest in an approved cooperative production location ("CPL").

5.1.5.1   Franchisees' cooperatively-owned distribution centers under the Distributor Commitment Program ("DCP") are currently approved by DUNKIN' DONUTS to supply franchisees with a variety of ingredients, supplies and equipment. DUNKIN' DONUTS or an affiliated company may from time to time be among the approved suppliers of products, supplies, services, equipment and/or materials required for the operation of the Dunkin' Donuts Unit. If any such party is designated an approved supplier, it will be subject to the same competitive bidding procedure as other suppliers of the same Dunkin' Donuts Products.

5.1.5.2   DUNKIN' DONUTS may, from time to time, enter into national or regional exclusive supply arrangements with one or more independent suppliers for designated Dunkin' Donuts Products.  In evaluating the need for an exclusive supplier, DUNKIN' DONUTS may take into account (without limitation) the uniqueness of the designated Dunkin' Donuts Products, the projected price and required volume of such Dunkin' Donuts Products, the investment required of a supplier in order to meet the needs for such Dunkin' Donuts Products, the supplier's ability to provide such Dunkin' Donuts Products, the lack of availability of qualified alternative suppliers, the duration of exclusivity, the desirability of competitive bidding and such other business considerations as may be relevant.

5.2.1     Sales to approved wholesale accounts must be separately designated as "wholesale" on Gross Sales reports required under paragraph 5.2.1 of the General Terms and Conditions of this Agreement.

5.2.5   FRANCHISEE's Records shall also include, without limitation, daily production, throwaway and finishing records, and records of all wholesale accounts.

## Section DD-7.  Proprietary Marks

7.0   FRANCHISEE acknowledges and agrees that ***Dunkin' Donuts***® is a registered trademark owned or controlled by DUNKIN' DONUTS; that said mark has been and is being used by DUNKIN' DONUTS and by its franchisees and licensees; that said mark, together with the other Proprietary Marks presently owned or controlled by DUNKIN' DONUTS or which may be acquired in the future, constitutes part of the Dunkin' Donuts System; that valuable goodwill is associated with and attached to said mark and the other Dunkin' Donuts Proprietary Marks; and that any and all goodwill associated with the Dunkin' Donuts Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of DUNKIN' DONUTS.

7.5   FRANCHISEE shall operate, advertise and promote the Dunkin' Donuts Unit under the name "Dunkin' Donuts", with no accompanying words or symbols of any nature, except as may be otherwise required by law.  FRANCHISEE shall not use, as part of its corporate or other business name, any Proprietary Marks used by FRANCHISOR, including, but not limited to, "Dunkin' Donuts" or "Dunkin", or any form or variations thereof, including, but not limited to, "Dunk" or "D.D.", which, in the judgment of FRANCHISOR, is likely to cause third parties to be confused or mistaken with respect to the separate identities of DUNKIN' DONUTS and FRANCHISEE.

## Section 10.  Transfer Provisions

10.3.1     <u>Transfer of this Manufacturing Retail Unit</u> - If FRANCHISEE shall propose a transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more of FRANCHISEE, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of this Agreement, be subject to the requirement that an ownership interest of fifty percent (50%) or more of all satellite retail units supplied by this Unit must be transferred to (a) the same qualified transferee, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of this Agreement, and who also must an ownership interest of fifty percent (50%) or more of one or more manufacturing Dunkin' Donuts Unit(s) at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the producing unit(s) for the satellite retail unit(s) or have a documented interest in an approved CPL.

*Dunkin' Donuts Rider – pg.* 2

10.3.2    **Transfer of other Dunkin' Donuts Units supplied by this Manufacturing Retail Unit** - If FRANCHISOR receives notice of a proposed transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more in any Dunkin' Donuts Franchise for a retail unit supplied by this Unit, or the entity holding such Franchise, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, be subject to the requirement that the proposed transferee must (a) also be a qualified transferee of this Unit, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, and who also must an ownership interest of fifty percent (50%) or more of another manufacturing Unit at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the manufacturing unit to supply products for such satellite retail unit or have a documented interest in an approved CPL.

## SPECIAL TERMS AND CONDITIONS APPLICABLE TO
## DEVELOPMENT OF A NEW UNIT BY FRANCHISEE

FRANCHISEE wishes to develop a new Unit that will utilize one or more of FRANCHISOR's Proprietary Marks at the Premises. In order to facilitate FRANCHISEE's obtaining financing and other needed resources, FRANCHISOR may elect to enter into this agreement prior to having had the opportunity to review the Premises to determine if it is suitable for development as such a Unit. FRANCHISEE's right to develop and operate a Unit under the terms of this agreement at the Premises is, therefore, subject to the conditions that 7(i) FRANCHISOR shall approve the Premises as a suitable location for development of a Unit and (ii) FRANCHISOR shall determine that FRANCHISEE meets all of FRANCHISOR's qualifications and requirements for new, or if appropriate multiple-unit, franchisees. This Schedule enumerates the respective responsibilities of the parties pertaining to FRANCHISEE undertaking to develop a Unit on the Premises. In consideration of a conditional grant to FRANCHISEE of one or more franchise(s) for the Premises, FRANCHISEE hereby agrees as follows:

1.0  **Approval of the Premises** - Development of the Premises as a Unit must be approved by FRANCHISOR, as evidenced solely by written notice sent to FRANCHISEE by the General Manager or other duly authorized representative of FRANCHISOR (the "Site Approval Notice") pursuant to the process hereinafter described. Any real estate commitments that FRANCHISEE may make pursuant to this agreement **MUST** be subject to: (a) FRANCHISEE having obtained FRANCHISOR's prior written approval of development of a Unit on the Premises; (b) FRANCHISEE obtaining all necessary permits, licenses and local governmental approvals needed to develop and operate a Unit on the Premises. In addition, FRANCHISEE should include such other contingencies as FRANCHISEE's attorney may recommend. FRANCHISEE must provide FRANCHISOR a copy of any lease of the Premises within ten (10) days after its execution and receipt by FRANCHISEE.

1.1  It shall be FRANCHISEE's responsibility to retain an attorney and other appropriate, independent advisors in connection with negotiating FRANCHISEE's acquisition of the right to develop and operate a Unit on the Premises, including reviewing all agreements with FRANCHISOR. FRANCHISOR assumes no liability or obligation to FRANCHISEE or to any third party for any assistance in negotiation FRANCHISOR may elect to provide to FRANCHISEE. Although FRANCHISOR may comment on FRANCHISEE's negotiations with third parties, any assistance FRANCHISOR provides to FRANCHISEE is no substitute for the advice of independent counsel. FRANCHISOR will not act as agent, employee or fiduciary of FRANCHISEE for the purpose of assisting FRANCHISEE in negotiations.

1.2  In the event that development of a Unit on the Premises is disapproved by FRANCHISOR or by any governmental authority, this Franchise agreement and all of the parties' rights and obligations hereunder shall cease and be of no further force and effect.

1.3  FRANCHISOR's approval of the Premises is not a representation or a warranty that the Unit will be profitable or that FRANCHISEE will achieve any particular level of sales at the Unit. It merely means that the Premises has met certain minimum criteria which FRANCHISOR has established for identifying suitable sites for proposed Units in the region in which the Premises are located. Because unit development is not a precise science, FRANCHISEE agrees that FRANCHISOR's approval or disapproval of a development shall not impose any liability or obligation on FRANCHISOR. The decision to develop any particular Premises is FRANCHISEE's, subject to FRANCHISOR's final approval. A preliminary favorable opinion of the Premises by local or regional representatives of FRANCHISOR is not conclusive or binding approval, because their recommendations may be rejected by FRANCHISOR.

2.0  **Approval of FRANCHISEE** - In addition to approval of the Premises set forth above, FRANCHISEE's qualifications to obtain this Franchise must be approved in writing by FRANCHISOR. In the event FRANCHISOR disapproves FRANCHISEE's qualifications within sixty (60) days of the date of this agreement, this Franchise agreement and all of the parties' rights and obligations hereunder shall cease and expire.

3.0  **Execution of Documents** - FRANCHISEE shall execute such other documents and agreements as are customarily required by FRANCHISOR in such circumstances, including, if appropriate, but not limited to, a standard form of Lease Option Agreement or Rider to Lease, which ensures the continued availability of the Premises as a franchised unit, in the event of a default under this agreement or, if applicable, under FRANCHISEE's lease of the Premises, during the term of this agreement. If FRANCHISEE owns the Premises real estate, FRANCHISEE shall grant FRANCHISOR the right to lease the Premises on negotiated terms comparable to those under which FRANCHISOR leases comparable property from others. A Lease Option Agreement or a Rider to Lease confirming these rights in a form acceptable to FRANCHISOR, must be signed before construction commences on the Premises.

4.0  **Development of the Unit** - The Unit must be developed and constructed in strict accordance with FRANCHISOR's current standards, requirements, procedures, plans, specifications and documentation for the type, configuration and brand(s) approved for the Premises (hereinafter collectively the "Requirements"). In order that development of the Premises proceed as expeditiously as possible, FRANCHISEE shall strictly comply with the following procedures set forth in Sections 4 and 5:

4.1  FRANCHISEE shall request FRANCHISOR's review of a proposed site, submitted in writing on the proscribed form, signed by FRANCHISEE and, if applicable, FRANCHISEE's landlord (the "Request for Site *Schedule "F/D"*

Approval" ). Within approximately thirty (30) days, FRANCHISOR will advise FRANCHISEE if the proposed Premises fails to meet FRANCHISOR's minimum preliminary criteria. Otherwise, FRANCHISOR will schedule a Responsibility Meeting (described below), to be held within approximately sixty (60) days after FRANCHISOR received the Request for Site Approval. This preliminary review procedure is intended to allow FRANCHISEE the opportunity to limit the amount of money FRANCHISEE spends on a site that does not meet FRANCHISOR's minimum criteria.

4.2   Once FRANCHISOR has scheduled a Responsibility Meeting, FRANCHISEE shall promptly hire a licensed architect for the Unit project, whose responsibility shall be to adapt FRANCHISOR's generic plans and/or specifications to the specific requirements of the Premises, the geographical region in which the Premises are located and the building codes and ordinances pertinent to the Premises, and to oversee the contractor's completion of construction of the Unit on the Premises. FRANCHISEE's architect must promptly order such topographical and boundary surveys of the Premises, soil borings and structural engineering tests as FRANCHISOR and/or FRANCHISEE's architect may require (the "Reports"). FRANCHISEE's architect must attend the Responsibility Meeting.

4.3   On the scheduled day, FRANCHISOR's representatives will meet at the Premises with FRANCHISEE and FRANCHISEE's architect, to establish a work schedule and coordinate the respective responsibilities of each of the parties with respect to development of a Unit on the Premises (the "Responsibility Meeting"). The Reports, including copies of zoning ordinances and by-laws applicable to the Premises, shall be made available to FRANCHISOR at the Responsibility Meeting by FRANCHISEE's architect. If any such Report or FRANCHISEE's architect is not available when required, FRANCHISOR may, at its option, postpone the Responsibility Meeting, in which case FRANCHISEE shall reimburse FRANCHISOR's out-of-pocket travel costs, if any.  Should the Responsibility Meeting be so postponed, FRANCHISOR shall reschedule the Responsibility Meeting on a date FRANCHISEE makes a firm commitment that the architect and/or Reports will be available, no later than within thirty (30) additional days. If FRANCHISEE is unable to comply, FRANCHISOR shall have the right to terminate this Franchise agreement, provided that, in FRANCHISOR's good faith judgement, FRANCHISEE has failed to exercise reasonable diligence to comply with the terms of this Schedule.

4.4   Subject to delays caused by FRANCHISEE or its landlord or otherwise beyond FRANCHISOR's reasonable control, FRANCHISOR shall use its best efforts to notify FRANCHISEE of its approval or disapproval of the Premises, within approximately ninety (90) days after the date FRANCHISOR received FRANCHISEE's Request for Site Approval.

4.5    FRANCHISOR assumes no responsibility for (a) evaluation of the soil or subsoil on the Premises for hazardous substances or unstable conditions, (b) inspection of any structure on the Premises for asbestos or other toxic or hazardous materials, or (c) compliance with the Americans With Disabilities Act ("ADA"). It is FRANCHISEE's sole responsibility to obtain satisfactory evidence and/or assurances that the Premises (and any structures thereon) are free from environmental contamination and in compliance with the requirements of ADA.

5.0   **Construction of the Unit** -Prior to commencement of construction of the Unit on the Premises, the plans and specifications prepared by FRANCHISEE's architect must be reviewed by FRANCHISOR and approved for compliance with FRANCHISOR's design Requirements. FRANCHISEE is solely responsible for obtaining all necessary permits from all applicable governmental agencies for completing construction of the Unit. If FRANCHISEE fails to commence construction of the Unit within twelve (12) months from the date of this Franchise Agreement, FRANCHISOR shall have the right, in its sole discretion, to terminate this agreement by written notice to FRANCHISEE.

5.1   FRANCHISEE and its contractor(s) shall obtain a comprehensive general liability insurance policy written by an insurer having at least a rating of A-XII in Best's Insurance Reports and in which FRANCHISOR is named as an additional insured party, Such policy shall comply with Subsection 5.3 of the General Terms and Conditions of this Franchise Agreement.  Coverage under such insurance shall include operations, premises liability, independent contractor's coverage, contractual liability and automobile liability (owned and non-owned). Prior to commencement of construction, FRANCHISEE shall furnish FRANCHISOR an insurance certificate evidencing the foregoing policy and that FRANCHISEE or its contractor(s) have procured worker's compensation insurance covering all persons employed in construction of the Unit.

5.2   FRANCHISOR shall have the right of entry upon the Premises at all times, to inspect construction in progress, to ensure that all of FRANCHISOR's Requirements are being met. FRANCHISOR and its employees shall not act as an architect or agent of FRANCHISEE. The duties of FRANCHISOR's construction representative are limited solely to ensuring that FRANCHISOR's Requirements are met on the Premises.  FRANCHISEE shall not rely upon any opinions expressed by FRANCHISOR or any of its employees or agents regarding structural integrity, safety or construction procedures, building codes or ordinances or other matters properly within the responsibility of FRANCHISEE's architect.  FRANCHISOR assumes no liability or responsibility for architectural or engineering judgments outside the scope of the duties stated above.

5.3   If the Unit does not initially open to serve the general public within fifteen (15) months from the date of this agreement, FRANCHISOR shall have the right, in its sole discretion, (a) to increase the Initial Franchise Fee(s) to the then-current initial franchise fee(s), which increase, if any, shall be payable to FRANCHISOR upon demand; or (b) to terminate this agreement by written notice to FRANCHISEE.  In the event of any delay caused by FRANCHISOR, or if FRANCHISEE has been unavoidably delayed by act of God, government restrictions, labor difficulties, inability to obtain building materials or similar contingencies (other than making any payment) not within FRANCHISEE's control, FRANCHISOR shall extend the deadline for a period of time equal to the period of such unavoidable delay.

*Schedule "F/D"*

2

5.4   Before the Unit opens to serve the general public, FRANCHISEE must obtain FRANCHISOR's final approval of the construction of the building, site improvements and landscaping, as appropriate, and the installation of all signs and equipment. FRANCHISOR's approval of construction of the unit is not a representation or warranty that the Unit has been constructed in accordance with any architectural, engineering or legal standards for design or workmanship. It merely means that FRANCHISOR is satisfied that the Requirements which FRANCHISOR has established for consistency of design and layout have been met (or waived, where appropriate). FRANCHISEE agrees that FRANCHISOR's approval of construction of the Unit shall not impose any liability or obligation on FRANCHISOR. FRANCHISEE also agrees that all franchise and real estate documentation must be complete and all required payments must be received by FRANCHISOR before the Unit is opened.

5.5   As soon as FRANCHISOR approves that construction and equipping the Unit are substantially complete and all conditions required for opening the Unit have been met, FRANCHISEE shall promptly open the Unit to serve the general public. FRANCHISEE agrees that the Unit must open to serve the general public no later than fifteen (15) months from the date of this Agreement.

6.0   **Financing** - Prior to commencing construction of the Unit on the Premises, FRANCHISEE shall provide evidence satisfactory to FRANCHISOR that cash and/or financing is in place, sufficient to fund completion of construction and purchase of necessary improvements, equipment and signs. FRANCHISOR assumes no obligation to guarantee the funding or financing of FRANCHISEE's construction project. FRANCHISOR will not guarantee FRANCHISEE's mortgage, lease or other real estate related obligations. If FRANCHISOR, at its election, finances or guarantees the financing of FRANCHISEE's purchase or leasing of equipment and/or signs, the owner of the Premises real estate must agree that the equipment and signs are not a part of the realty and must waive any and all interest in the equipment and/or signs, in order to permit the financing of the equipment and/or signs. In this connection, the owner of the Premises real estate must sign such reasonable documents as are reasonably required by FRANCHISOR.

7.0   **Control of the Premises** - FRANCHISEE hereby represents to FRANCHISOR that FRANCHISEE will have the following relationship with the owner or lessor of the Premises (place an "x" in the appropriate box):

☒   the Premises will be owned by an independent third party landlord with which FRANCHISEE will <u>not</u> share or maintain any common partner, member, shareholder, officer, director, trustee, beneficiary, family member or other interest; or

☐   the Premises will be owned by a third party landlord with which FRANCHISEE <u>will</u> share or maintain a common partner, member, shareholder, officer, director, trustee, beneficiary, family member or other interest; or

☐   the Premises will be owned by a corporation, LLC, trust, partnership or other entity controlled by FRANCHISEE; or

☐   the Premises will be owned by the same entity that will execute the Franchise Agreement.

FRANCHISEE agrees to promptly advise FRANCHISOR of any change, whatsoever, in the relationship represented above.

120199                                                                                              SCHEDULE "NY"

## ADDENDUM TO THE FRANCHISE AGREEMENT AND
## STORE DEVELOPMENT AGREEMENT
### REQUIRED BY THE NEW YORK GENERAL BUSINESS LAW

Notwithstanding anything to the contrary set forth in the Franchise Agreement (the "Franchise Agreement") and/or the Store Development Agreement ("SDA") the following provisions shall supersede and apply to all Baskin-Robbins, Dunkin' Donuts and Togo's franchises offered and sold in the State of New York.

1.    Subsection 5.4 of the Franchise Agreement and Section 14 of the SDA shall each be supplemented by the addition of the following language as the last sentence of these sections:

However, FRANCHISEE shall not be required to indemnify FRANCHISOR for any claims arising out of a breach of this Agreement by FRANCHISOR or other civil wrongs of FRANCHISOR.

2.    Paragraph 7.4 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

FRANCHISEE must notify FRANCHISOR immediately in writing of any apparent infringement of or challenge to FRANCHISEE's use of any Mark, or claim by any person of any rights in any Mark or any similar trade name, trademark or service mark of which FRANCHISEE becomes aware. FRANCHISEE may not communicate with any person other than FRANCHISOR and its counsel in connection with any such infringement, challenge or claim. FRANCHISOR shall have sole discretion to take such action as it deems appropriate and the right to exclusively control any litigation, U.S. Patent and Trademark Office proceedings or other administrative proceeding or to otherwise protect and maintain its interest in the Marks. FRANCHISOR shall not be obligated to defend the FRANCHISEE against the claim of a third party that the operation of Retail Unit or the FRANCHISEE's use of the Marks infringes any right of the third party and FRANCHISOR shall not be obligated to protect, indemnify or hold harmless the FRANCHISEE from the consequences of any such claim or litigation. In the event FRANCHISOR does not take action, FRANCHISEE will have to protect itself at its own expense.

3.    Paragraph 10.3.7 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

FRANCHISEE must execute a general release in a form satisfactory to FRANCHISOR, releasing FRANCHISOR, its shareholders, directors, officers, employees, in their corporate and individual capacities, of any claims FRANCHISEE may have against them; provided, however, that all rights enjoyed by FRANCHISEE and any causes of action arising in its favor from the provision of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force, it being the intent of this proviso that the non-waiver provisions of the New York State General Business Law Sections 687.4 and 687.5 be satisfied.

4.    Paragraph 10.1 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

This Agreement is fully assignable by FRANCHISOR and shall inure to the benefit of any assignee or other legal successor to the interest of FRANCHISOR herein. However, no assignment shall be made except to an assignee who, in the good faith judgment of FRANCHISOR, is willing and able to assume FRANCHISOR's obligations under this Agreement.

Initials

_____

_____

RIDER TO FRANCHISE AGREEMENT

SCHEDULE "DD"
ADDENDUM FIVE
120104

## SPECIAL TERMS AND CONDITIONS APPLICABLE TO
## A DUNKIN' DONUTS FRANCHISE
### THE MARKETING STARTUP FEE

### TEST AGREEMENT FOR DUNKIN' DONUTS SOLO STORES

1.  Pursuant to Section D. of the Contract Data Schedule and Section 4.2 of the General Terms and Conditions of the Franchise Agreement, Franchisee was to have paid Franchisor a Marketing Startup Fee (the "Fee") in connection with the opening of the Retail Unit to the public.

2. Franchisor has agreed to forebear in collecting the fee at this time in reliance upon Franchisee's representations as set forth in this Agreement.

3. Franchisee hereby represents and warrants to Franchisor that Franchisee shall develop and execute a start up promotional program or such other promotion or advertising program as Franchisor may specify for the Retail Unit.  In connection therewith, Franchisee shall utilize such website(s), program materials and methods as Franchisor shall specify from time to time.  It is anticipated that such program would be undertaken in the period starting four weeks before the opening of the Retail Unit and be complete within 2 months of the opening of the retail unit.

4. In reliance on the foregoing, Franchisor agrees to forebear in collecting the Fee as set forth in the Franchise Agreement. Franchisor may collect the entire Fee, without offset, if Franchisee fails to complete the required program within 2 months of the opening of the Retail Unit.

5.  All of Franchisor's remedies under the Franchise Agreement, including without limitation the right to attorneys fees, are hereby incorporated by reference.

6.  Franchisor reserves the right to rescind this Test Agreement in the event that the web site intended for Franchisee's use in furtherance of this Test Agreement is not operational on the day on which the Retail Unit opens to the public.  In such event, Franchisee agrees to promptly pay the Fee applicable to the market in which the Retail Unit is located and to comply with the provisions of the Franchise Agreement relating to startup promotional program or other Franchisor-required program as if this Test Agreement had not been entered into.

SDA# 339636

PC# 340725
Bronx, NY

IN WITNESS WHEREOF the parties hereto, intending to be legally bound hereby, have duly executed, sealed and delivered this agreement in duplicate, as of the date and year first written above. FRANCHISEE hereby acknowledges receipt of this Franchise Agreement, together with any amendments, at least five (5) business days prior to the date hereof.  FRANCHISEE further acknowledges having carefully read this agreement in its entirety, including all Schedules identified above and the Personal Guaranty below (if applicable).

FRANCHISOR

DUNKIN' DONUTS INCORPORATED
BASKIN-ROBBINS USA, CO.
TOGO'S EATERIES, INC.

By: _____
MARY ANN ORMOND
ASSISTANT SECRETARY

This agreement is not binding upon the above corporation(s) until executed by an authorized officer.

FRANCHISEE ACKNOWLEDGES SECTION 11 OF THE GENERAL TERMS & CONDITIONS OF THIS CONTRACT, WHICH PROVIDES FOR FRANCHISEE'S EXPRESS WAIVER OF RIGHTS TO A JURY TRIAL, TO PARTICIPATE IN CLASS ACTION LAWSUITS, TO OBTAIN PUNITIVE, MULTIPLE OR EXEMPLARY DAMAGES, AND TO BRING ANY CLAIM OR ACTION LATER THAN TWO YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION.

FRANCHISEE

WITNESS/ATTEST:

SHIVAM SUNDRAM INC.

Name: UMA KAPOOR

By: _____
Anil Kapoor, President

Title: _____

### PERSONAL GUARANTEE BY SHAREHOLDERS OF A CORPORATION OR MEMBERS OF A LIMITED LIABILITY COMPANY

We, the undersigned, represent and warrant that we constitute

[X]    the shareholders of one hundred percent (100%) of the originally issued and outstanding capital stock of the above FRANCHISEE, a corporation

[  ]    one hundred percent (100%) of the members of the above FRANCHISEE limited liability company ("LLC")

organized under the laws of the state of **New York**.  Waiving demand and notice, the undersigned hereby, jointly and severally, personally guarantee the full payment of FRANCHISEE's money obligations under Section 4 and the performance of all of FRANCHISEE's other obligations under this Franchise Agreement, including, without limitation, paragraph 6.3 and Section 8, in its entirety relative to the restrictions on the activities of FRANCHISEE. We personally agree that the Franchise Agreement shall be binding upon each of us personally.   The undersigned, jointly and severally, agree that FRANCHISOR may, without notice to or consent of the undersigned, (a) extend, in whole or in part, the time for payment of FRANCHISEE's money obligations under paragraph 4; (b) modify, with the consent of FRANCHISEE, its money or other obligations hereunder; and/or (c) settle, waive or compromise any claim of FRANCHISOR against FRANCHISEE or any of the undersigned, all without in any way affecting the personal guarantee of the undersigned.  This Guarantee is intended to take effect as a sealed instrument.

_____
witness
print name_____

_____
Anil Kapoor, Individually

SDA# 339636

PC# 340725
Bronx, NY

## CERTIFICATION OF FRANCHISEE

DESCRIBE BELOW ALL PROMISES AND REPRESENTATIONS MADE BY FRANCHISOR THAT ARE NOT EXPRESSLY CONTAINED IN THE FRANCHISE AGREEMENT OR UNIFORM FRANCHISE OFFERING CIRCULAR BUT WHICH INFLUENCED FRANCHISEE'S DECISION TO SIGN THIS FRANCHISE AGREEMENT.

*If the answer is "none," please write "NONE" below.*

NONE

FRANCHISEE's completion of this page is a material inducement for FRANCHISOR to grant FRANCHISEE this Franchise. If FRANCHISEE fails to complete, sign and deliver this Certification of Franchisee page to FRANCHISOR along with the Franchise Agreement, FRANCHISOR will not counter-execute the Franchise Agreement or may void the Franchise Agreement if it already has been counter-executed.

THE UNDERSIGNED HEREBY CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS TRUE, that FRANCHISEE had the opportunity to obtain the advice of an attorney, and that FRANCHISEE, and not FRANCHISEE's attorney or other representative, has executed this Certification of Franchisee.

The date of the Certification shall be the date on the Franchise Agreement.

FRANCHISEE

WITNESS/ATTEST:                                    SHIVAM SUNDRAM INC.

By: _____
Name: _____            Anil Kapoor, President
Title: UMA KAPOOR

_____
witness
print name UMA KAPOOR            Anil Kapoor, individually

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
                                                            :
DUNKIN' DONUTS FRANCHISED                                    :
   RESTAURANTS LLC,                                          :
   a Delaware Limited Liability Company, and                :
                                                            :
DD IP HOLDER LLC,                                           :
   a Delaware Limited Liability Company,                     :
                                                            :     C.A. No.
                             Plaintiffs,                     :
                                                            :
          v.                                                 :
                                                            :
SHIVAM SUNDRAM INC.,                                         :
   a New York Corporation,                                   :
                                                            :
                             Defendant.                      :
------------------------------------------------------------x

## CERTIFICATION OF TODD MATLOVSKY

    1.     My name is Todd Matlovsky. I am a citizen and resident of the State of New York, and I make this Certification based on personal knowledge and in support of Plaintiffs' Memorandum in Support of their Motion for a Preliminary Injunction.

    2.     I am presently employed by Dunkin' Donuts Franchised Restaurants LLC and DD IP Holder LLC (collectively referred to hereinafter as "Dunkin' or Dunkin' Donuts") as an Operations Manager. I have been an Operations Manager since June 2005.

    3.     As an Operations Manager, my responsibilities include inspecting the shops of Dunkin' Donuts franchisees located within my designated geographic market to ensure that they comply with the standards of Dunkin' Donuts. My geographic market of responsibility has included Defendant's shop located at 114 Bruckner Boulevard, Bronx, New York ("Defendant's Shop") since October 2005.

4.      On November 15, 2007, I conducted an inspection of Defendant's Shop. Numerous standards violations were found to exist at the shop involving issues of health, sanitation, and safety. The specific violations present on November 15, 2007, are noted in the left hand column labeled "Inspection Date: 11/15/07," on a Food Safety and Sanitation Inspection ("FSSI") form I completed. A true and correct copy of the FSSI is attached hereto as Exhibit A.

5.      On November 15, 2007, I hand-delivered a Notice to Cure to Defendant's Shop listing the standards violations at Defendant's Shop and requesting that these deficiencies be cured immediately. A true and correct copy of the Notice to Cure is attached hereto as Exhibit B.

6.      On November 23, 2007, I re-inspected Defendant's Shop. Numerous standards violations still existed at the shop. I noted the specific violations present on the FSSI in the far right column labeled "Re-inspection Date: 11/23/07." *See* Exhibit A. I also took photographs of many of the standards violations. True and correct copies of the photographs are attached hereto as Exhibit C.

7.      On November 24, 2007, I re-visited the shop and took additional pictures of standards violations still present at the shop that were previously observed the day before during the re-inspection. True and correct copies of the photographs are attached hereto as Exhibit D.

I certify under penalty of perjury that the foregoing is true and correct. Executed on this 17th day of December, 2007.

TODD MATLOVSKY

# FOOD SAFETY & SANITATION INSPECTION REPORT

PC # ~~000340~~ 340725    ADDRESS: 114 Bruckner Blvd Bronx, NY. 10454

| | | RFSS Manual Reference | Photo ID Key | Inspection Date: 11/15/07 "No" = Deficiency | | | | Re-Inspection Date: 11/23/07 "Yes" = Cured "No" = Deficiency ✓ = New Deficiency | | |
|---|---|---|---|---|---|---|---|---|---|---|
| FS 1 | Are sanitizer solutions clean and of adequate concentration, and test strips used? | RFSS 2-31 & 36 | FS 1 | (Yes) | No | N/A | Cured* | (Yes) | No | |
| FS 2 | Are two or three-compartment sinks set up properly (Wash, Rinse, Sanitize, Air-dry)? | RFSS 2-33 & 34 | FS 2 | Yes | (No) | N/A | Cured* | Yes | (No) | |
| FS 3 | Are necessary brushes and cleaning utensils available and in-use? | RFSS 2-32 | FS 3 | (Yes) | No | N/A | Cured* | (Yes) | No | |
| FS 4 | Are equipment & utensils washed, rinsed & sanitized properly and at proper frequency? | RFSS 2-20, 31 to 42 | FS 4 | (Yes) | No | N/A | Cured* | (Yes) | No | |
| FS 5 | Is hot and cold running water available at all sinks? | RFSS 2-8, 2-46 | FS 5 | (Yes) | No | N/A | Cured* | (Yes) | No | |
| FS 6 | Are food probe thermometers in use, accurate & sanitized properly? | RFSS 2-11 & 12 | FS 6 | Yes | (No) | N/A | Cured* | (Yes) | (No) | |
| FS 7 | Are refrigerated items in storage units stored at 41°F maximum? | RFSS 2-16 | FS 7 | (Yes) | No | N/A | Cured* | (Yes) | No | |
| FS 8 | Are refrigerated items in cold holding units stored at 41°F maximum? | RFSS 2-22 & 23 | FS 8 | (Yes) | No | N/A | Cured* | (Yes) | No | |
| FS 9 | Are Employees free of illness symptoms? | RFSS 2-4 & 5, Emp. Health Placard | | (Yes) | No | N/A | Cured* | (Yes) | No | |
| FS 10 | Do the Employees and Restaurant Manager understand the Dunkin' Brands Inc. standard for Employee Health and is placard posted? | RFSS 2-4 & 5 | FS 10 | (Yes) | No | N/A | Cured* | (Yes) | No | |
| FS 11 | Are handwash sinks provided, shielded, accessible, working properly, dedicated for hand washing only and supplied with approved hand soap and single use paper towels or heated hand dryer? | RFSS 2-8, 2-32, 2-46 | FS 11 | (Yes) | No | N/A | Cured* | (Yes) | No | |
| FS 12 | Are all Crewmembers demonstrating proper hygiene (e.g. properly washing hands, properly using gloves, bandaging & covering cuts, burns, & scratches)? | RFSS 2-7 to 10 | FS 12 | (Yes) | No | N/A | Cured* | Yes | (No) | New employees does not happen sanding proculan |
| FS 13 | Is restaurant free of pests? (e.g. no evidence of rodents, bugs, or birds) | RFSS 2-49 to 52 | FS 13 | (Yes) | No | N/A | Cured* | (Yes) | No | |
| FS 14 | Is the restaurant free of imminent health hazards (e.g. sewer backup, alleged illness outbreak, adulterated product, power outage, no running water)? | RFSS 4-2 to 10 | FS 14 | (Yes) | No | N/A | Cured* | (Yes) | No | |
| FS 15 | Are foods protected from contamination (e.g. off floor, covered, not under leaking pipes or condensation, shielded from sink, leftovers used only once, approved storage containers, unprocessed produce washed in colander)? | RFSS 2-15 to 20 & 24 to 30 | FS 15 | Yes | (No) | N/A | Cured* | | | NK |
| FS 16 | Are food allergen risks addressed (e.g. food properly labeled, current flavor strips, allergen decal posted, nut products stored below non-nut products, nut products made after non-nut products, food contact surfaces cleaned after preparation of products containing allergens)? | RFSS 2-16, 19, 24, 27, 41 | FS 16 | | No | Yes | Cured* | | | N |
| FS 17 | Are all foods dated, rotated FIFO and within code date? | RFSS 2-16, 17, 23, 24 | FS 17 | Yes | (No) | N/A | Cured* | (Yes) | No | |
| FS 18 | Are Dunkin' Donuts pre-portioned breakfast items cooked in an approved microwave to 140°F (or per recipe depending on product) for 15 seconds minimum? | RFSS 2-22 | FS 18 | (Yes) | No | N/A | Cured* | (Yes) | No | |
| FS 19 | Are hot potentially hazardous foods held at 140°F minimum? | RFSS 2-22 & 23 | FS 19 | Yes | No | (N/A) | Cured* | Yes | No | N/A |
| FS 20 | Are Bulk Food items (soup, meat, chili) cooked or leftovers reheated in approved equipment to 165°F (or 140°F depending on product) for 15 seconds minimum? | RFSS 2-21 & 22 | FS 20 | Yes | No | (N/A) | Cured* | Yes | No | N/A |

Cured* = The deficiency was "resolved in the moment". A Notice To Cure has not been issued for this item.

# FOOD SAFETY & SANITATION INSPECTION REPORT

HAND DELIVERED

To: _Anil Kapoor_ (Franchisee)          Date: _11/15/07_

Address: _114 Bruckner Blvd._ (Restaurant)     PC #: _340725_

_Bronx, NY. 10454_

From: _Todd Matlovsky & Carole Riley_ (Dunkin' Brands, Inc. Representative)

Franchisor: Dunkin' Donuts, Baskin-Robbins, Togo's

Your restaurant was inspected today for compliance with the Company's Food Safety and Restaurant standards. A copy of the Restaurant Operations Review (Food Safety & Sanitation Inspection Report) is attached to this notice. Any violations of standards are identified as deficiencies in the inspection report. Any deficiency in any of the standards referenced in the inspection report is a default under the terms of your franchise agreement and must be cured in accordance with this notice.

The deficiencies must be cured within **twenty- four (24) hours** from the receipt of this notice. If you are unable to cure a deficiency or deficiencies within the designated cure period, you must immediately contact your Franchise Services Manager to discuss the matter and to request an extension of time to cure the deficiency. Any extension of time granted must be in writing. Receipt of this notice is effective upon personal delivery to the restaurant. If it should be determined, as a matter of law, that a longer cure period is required, then that longer period of time is applicable to this notice.

Your restaurant will be re-inspected without advance notice following the expiration of time provided in this notice. If all of the defaults are not cured by that time, the Company may file a lawsuit against you seeking an order from the court that you cure the defaults and pay our legal fees and costs in bringing the action. In addition, the Company may seek termination of your franchise agreement. Failure to timely cure the defaults may also result in loss of any franchise renewal rights that you may have, rights to develop additional restaurants or other valuable rights that you may have with the Company.

This notice is being hand-delivered this _15th_ day of _November_, _2007_ to you as Franchisee or in care of your employee. **EMPLOYEES HAVE BEEN INSTRUCTED TO DELIVER THIS NOTICE OR NOTIFY YOU IMMEDIATELY.**

| First Inspection: | Re-inspection: |
|---|---|
| Company Representative: _(Signature)_ | Company Representative: _(Signature)_ |
| _Todd Matlovsky_ (Print) | _Todd Matlovsky_ (Print) |
| Date: _11/15/07_ | Date: _11/23/07_ |
| Franchisee/Manager: _(Signature)_ | Franchisee/Manager: _Luis Hernandez_ (Signature) |
| _Eric Martin_ (Print) | _Luis Hernandez_ (Print) |
| Date: _11/15/07_ | Date: _11/23/07_ |

This notice supplements any Notice of Default and/or Termination previously sent, relating to this restaurant. This notice does not supersede any prior Notice nor does it constitute a waiver of any rights pursuant to any Notice.

White – Corporate File     Yellow - Franchisee     Pink – Field File     Goldenrod – Legal                    24 Hr. NTC 3-11-05





FS 15 – Observed on many occasions that money and other non-food actions are being conducted on the prep table. Please note the "Sentry Safe" in front of the microwave



FS 15 – Tools and other non-food related items stored in prep table

FS 16 & FS 17 – Container is not properly labeled and does not indicate an expiration date. The same red marker was used before (see the faint markings at the bottom of the container). Marking it in this way rubs off within a short period of time due to washing or general use



FS 15 – Coffee Cake Streusel topping was stored in a container without a lid or not securely closed inside the container



FS 15 – Food prep area is being used for other purposes that are not food related and cannot be kept cleaned and sanitized.



FS 16 & FS 17 – Container is not properly labeled and does not indicate an expiration date. The same red marker was used before (see the slide regarding the coffee cake streusel). Marking it in this way rubs off within a short period of time due to washing or general use



FS 15 – Bagels boards are dirty and not cleaned.



FS 15 – Bagels boards are dirty and not cleaned.

FS 15 – Food contact surfaces are not protected from contamination. Pressboard shelf is being used to support a undercounter refrigerator on top of the counter and on a food prep area. The refrigerator belongs under a counter and on the floor. Pressboard shelf is exposed and cannot be sanitized thereby harboring bacteria and insects



FS 15 – Coffee shuttles in working condition (per store manager named Mannan) are stored directly on the floor





FS 15 – Food contact surfaces (coffee filters) are being stored open and not protected from contamination.



FS 15 – Food contact surfaces (pink donut paper liners) are being stored open and not protected from contamination.



FS 15 – Sandwich products are being thawed improperly and are in danger of contamination. Using the dirty bagel boards previously observed as a top for the pan of food.



FS 15 – Sandwich products are being thawed improperly and are in danger of contamination. Using the dirty bagel boards previously observed as a top for the pan of food. See this closeup photo and note the egg is in direct contact with the dirty bagel board

FS 4 – Putty knife is in smallwares basket that is used to store cleaning brushes, cleaning utensils, scouring pads, etc. The putty knife is not sanitary nor an approved item in the Dunkin Brands Food Safety System Supplies & Smallwares List (RFSS Manual)



FS 12 – Woman employee was new on the job without the required training before serving guests. Observed her handling food (donuts) with bare hands and not in accordance with food safety protocols



FS 12 – Observed same employee making sandwiches without proper training. Observed her slicing the bagel using bare hands and then putting gloves on.



FS 12 – Employee is using bare hands to move frozen milk through the tube of the dairy dispenser. Dairy dispenser is not adjusted correctly and had been noted on the previous inspection. No corrective measures were taken.



FS 7 – Milk products not below 41 degrees



FS 2 – Three compartment sink is not set-up properly. Air drying side has the side splash cut off and not replaced.



FS 2 – Three compartment sink is not set-up properly. Air drying side has the side splash cut off and not replaced.



FS 4 – Observed the same smallwares in the wash water for more than 90 minutes. No one was washing equipment or utensils properly or at proper frequencies



Bleach cleaner

FS 2 – Sanitized smallwares (pans with portion scoop & Iced coffee stirring spoon) are being stored on the "Wash: side of the sink directly under or with cleaning brushes and under bleach cleaner



FS 2 – Photo #2 Indicating pans are clean



FS 2 – Photo #3 indicating pan and scoop are clean



FS 2 – Photo #4 indicating prior smallwares in prior photos are on the "Wash" side of the sink.



FS 6 – Food probe thermometers are not being used as required. Several missing entries



FS 6 – Food probe thermometers are not being used as required. Several missing entries



FS 6 – Food probe thermometers are not being used as required. Several missing entries (11/19/07)



FS 6 – Food probe thermometers are not being used as required. Several missing entries (11/19/07)



FS 6 – Food probe thermometers are not being used as required. Several missing entries (11/19/07 cont)



FS 6 – Food probe thermometers are not being used as required. Several missing entries (11/11/07)



FS 6 – Food probe thermometers are not being used as required. Several missing entries (11/12/07)



FS 6 – Food probe thermometers are not being used as required. No entries made in the receiving log for 11/4/07 until 11/23/07 as required. (Closeup)



FS 6 – Food probe thermometers are not being used as required. No entries made in the receiving log for 11/4/07 until 11/23/07 as required (long shot)



FS 15 – Ice bucket is being stored upside down and open to dust and debris



FS 15 – Iced coffee dispenser and liner was observed in this position and manner for more than 90 minutes. Iced coffee was never made and container was never covered with required lid



FS 15 – Employee hat is being stored with supplies



FS 15 – Duct tape is being stored with supplies

FS 15 – Panel to the ice machine was not aligned correctly and was open, exposing ice inside to contamination. This was observed on the previous visit and pointed out to the manager



FS 15 – Panel to the ice machine was not aligned correctly and was open, exposing ice inside to contamination.





Actual repair was simple and didn't require any tools. The Operations Manager observed the top fascia had moved slightly and not put back properly where it could line up with the tab sticking out from the door. Operations Manager put the fascia in it's proper place so the panel would close and not expose ice.

Closed panel now properly seated and aligned



Closed panel now properly seated and aligned



Operations Manager tried to screw in the retaining screw but found the screw was not the proper type. It was a sheet metal screw instead of the machine screw that came with the unit. Operations Manager told the shift leader

- Note: The following 5 photos were taken on 11/24/07 during a compliance visit for NGSS.

- The photos faithfully depict deficiencies observed on 11/15/07 & again on 11/23/07. Each deficiency was discussed in detail with Mannan, the store manager.

FS 15 & FS 16 – Several caps were missing in the flavor machine. The photos on the right are indicating there was a significant amount of flavor syrup in the bottom of the pan for each set of flavors. This is due to flavor spilling out of the open containers when the tray is moved out and back during the filling process. Significant contamination and allergen risks are present.









FS 13 – Store has an infestation of nuisance flies. Several dead flies were observed on the wall under this shelf on the menuboard soiffit wall. In addition, a glue board is being used directly with and above areas where food products and supplies are present



FS 15 – Money is being counted on the Drive Thru ready mat where food is staged for delivery to the guest. Employee indicated the paper bag was used to hold the money. The Operations Manager observed this several times and in several places throughout the store on food contact surfaces.

1999 WL 1318498                                                    Page 1
(Cite as: 1999 WL 1318498 (D.Nev.))

C

Only the Westlaw citation is currently available.


United States District Court, D. Nevada.

BASKIN-ROBBINS, INC., Plaintiff,
v.
A. ENDER, LTD., Defendant.

No. CV-N-99-206-ECR (PHA.

Sept. 10, 1999.

David Worthen, Washington, D.C., Katherine Bobier, Reno, Nevada, for the Plaintiff.

Maurice Sullivan, Reno, Nevada, for the Defendant.


COMPUTER-ASSISTED TRANSCRIPTION

REED, J.

RENO, NEVADA
  *1 THE COURT: MS. CLERK, IT'S MY UNDERSTANDING THAT THE COUNSEL ARE ON THE TELEPHONE?

IS MR. WORTHEN ON THE PHONE?
  THE CLERK: YES, YOUR HONOR.

MS. BOBIER, MR. WORTHEN AND MR. SULLIVAN.
  THE COURT: ALL RIGHT.

MR. WORTHEN, CAN YOU HEAR US?
  MR. WORTHEN: YES, YOUR HONOR.
  THE COURT: MS. BOBIER?
  MS. BOBIER: YES, YOUR HONOR.
  THE COURT: AND MR. SULLIVAN?
  MR. SULLIVAN: YES, YOUR HONOR.
  THE COURT: THE COURT AT THIS TIME WILL

ANNOUNCE ITS DECISION ON THE MOTION FOR PRELIMINARY INJUNCTION BROUGH BY PLAINTIFF.

THE HEARING WAS HELD ON THIS MATTER YESTERDAY.

THE FOLLOWING SHALL CONSTITUTE THE FINDINGS OF FACT, CONCLUSIONS OF LAW, AND THE ORDER OF THE COURT IN RESPECT TO THE MOTION FOR PRELIMINARY INJUNCTION:

THE DEFENDANT, A. ENDER, LIMITED, WHICH I SHALL SOMETIMES REFER TO IN THIS DECISION AS ENDER, HAS BEEN A BASKIN-ROBBINS FRANCHISEE WITH A STORE IN SPARKS, NEVADA FOR SOME TWENTY-FIVE YEARS.

THE STORE HAS BEEN VERY SUCCESSFUL.

ONE HAS TO HAVE SOME SYMPATHY IN THESE PROCEEDINGS FOR MR. ART ENDER, PRESIDENT OF THE DEFENDAN CORPORATION AND MANAGER OF THE STORE.

IT LOOKS AS IF HE AND HIS WIFE HAVE PRETTY MUCH PUT THEIR LIFE'S WORK IN THE STORE AND IN ESSENCE STAND TO LOSE THEIR INVESTMENTS OF BOTH TIME AND MONEY. THEY ARE NOT YOUNG PEOPLE.

MR. ENDER FEELS HE'S BEING TREATED UNFAIRLY AFTER HAVING DONE A GREA DEAL OF VALUABLE BUSINESS WITH AND FOR BASKIN-ROBBINS OVER A MANY YEAR PERIOD.

HE FEELS HE IS BEING SINGLED OUT FOR BAD TREATMENT BY BASKIN-ROBBINS FOR SOME UNKNOWN REASON.

THE ORIGINAL TERM OF THE LAS FRANCHISE AGREEMENT RAN FROM APRIL 19, 1993 TO APRIL 30, 1997.

HOWEVER, THAT AGREEMENT CONTAINS A CLAUSE WHICH STATES THAT IF THE AGREEMENT TERMINATES THE FRANCHISE NONETHELESS CONTINUES ON A MONTH-TO-MONTH BASIS IN ACCORDANCE WITH FRANCHISE AGREEMENTS BEING OFFERED TO NEW FRANCHISEES BY BASKIN-ROBBINS AT THE TIME OF THE EXPIRATION OF THE ORIGINAL AGREEMENT, THUS IN THIS CASE FRANCHISE AGREEMENTS BEING OFFERED

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1999 WL 1318498
(Cite as: 1999 WL 1318498 (D.Nev.))

TO NEW FRANCHISEES ON APRIL 30, 1997.

WHILE THE EVIDENCE DOES NOT SHOW WHETHER ENDER HAS EVER RECEIVED OR HAD KNOWLEDGE OF FRANCHISE AGREEMENTS WHICH WERE BEING OFFERED TO NEW FRANCHISEES OF THE BASKIN-ROBBINS IN APRIL OF 1997, WE HAVE IN EVIDENCE A COPY OF THE FRANCHISE AGREEMENTS WHICH WERE BEING USED BY BASKIN-ROBBINS AT THA TIME FOR NEW FRANCHISEES.

ENDER DOES NOT DISPUTE THAT HIS FRANCHISE AGREEMENT, WHICH TERMINATED IN APRIL OF 1997, IS, FOR OUR PURPOSES HERE, ESSENTIALLY THE SAME AS THAT WHICH WAS OFFERED TO NEW FRANCHISEES BY BASKIN-ROBBINS IN APRIL 1997.

NOR DOES ENDER DISPUTE THAT I RECEIVED A COPY OF THE APPLICABLE BASKIN- ROBBINS MANUAL OF STANDARDS FOR OPERATION OF FRANCHISES CURRENTLY USED AT THIS TIME, OR THAT MR. ENDER RECEIVED TRAINING FROM BASKIN-ROBBINS IN OPERATING UNDER THAT MANUAL DURING A VERY RECENT TIME.

IF THERE WERE A PROBLEM WITH THE FRANCHISE REQUIREMENTS IT HAD TO MEET, ENDER HAD SOME OBLIGATION TO CHECK INTO WHAT THOSE REQUIREMENTS WERE, BUT MORE IMPORTANT THAN THAT, AT THE EVIDENTIARY HEARING ENDER DOES NOT SERIOUSLY DISPUTE HIS OBLIGATION TO MEET THE HEALTH AND SANITARY STANDARDS OF BASKIN-ROBBINS' FRANCHISE AGREEMENT.

*2 HE ONLY DISPUTES AT THE EVIDENTIARY HEARING WHETHER OR NO HE HAS MET AND IS MEETING THOSE STANDARDS.

SINCE EXPIRATION OF THE ORIGINAL TERM OF THE FRANCHISE ON APRIL 30, 1997, IT IS CLEAR THAT THE PARTIES HAVE CONTINUED TO OPERATE ON A MONTH-TO-MONTH FRANCHISE BASIS, ACCORDING TO THE SAME TERMS

ESSENTIALLY AS ARE CONTAINED IN THE ENDERS' FRANCHISE AGREEMENT WHICH TERMINATED ON THAT DATE.

AND I MIGHT SAY THERE ARE NO DIFFERENCES IN THE FRANCHISE AGREEMENT WHICH MR. ENDER HAD AND THE FRANCHISE AGREEMENTS BEING OFFERED TO NEW FRANCHISEES IN APRIL OF 1997, WHICH MAKE ANY DIFFERENCE IN THIS CASE.

FOR OUR PURPOSES THEY ARE THE SAME.

ENDER HAS CONTINUED TO PURCHASE CONSIDERABLE QUANTITIES OF PRODUCTS ON A WEEKLY BASIS FROM BASKIN-ROBBINS.

AND HAS PAID THE FOUR PERCEN ROYALTY CHARGE IMPOSED UNDER THE APPLICABLE FRANCHISE AGREEMENT.

ALL THE CREDIBLE EVIDENCE IS THA THE FRANCHISE AGREEMENT HAS BEEN CONTINUED ON A MONTH-TO-MONTH BASIS FROM APRIL 30, 1997 UP TO THE PRESENT DATE.

THE EVIDENCE FURTHER SHOWS THA ENDER IS OBLIGATED TO ABIDE BY THE MANUAL OF HEALTH AND SANITATION STANDARDS OF BASKIN-ROBBINS WHICH ARE PRESENTLY IN FORCE.

THE EVIDENCE SHOWS ALSO THAT ENDER HAS NOT DONE SO AND HAS BEEN IN DEFAULT AND CONTINUES IN DEFAULT OF MEETING THOSE STANDARDS.

THE COURT FINDS THAT THE DEFENDAN IS NOT IN COMPLIANCE WITH THE STANDARDS SET FORTH AS REFLECTED IN EXHIBIT 8, ADMITTED IN EVIDENCE.

ADEQUATE NOTICE OF THESE DEFICIENCIES HAS BEEN GIVEN REPEATEDLY TO ENDER.

WHEREVER OUR SYMPATHIES MAY LIE AND WHATEVER MOTIVES BASKIN-ROBBINS MIGHT HAVE IN SEEKING THIS PRELIMINARY INJUNCTION, OUR

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1999 WL 1318498
(Cite as: 1999 WL 1318498 (D.Nev.))

Page 3

SWORN DUTY IS TO UPHOLD THE LAW.

WE ARE CONCERNED ABOUT THE STATEMENT BY COUNSEL FOR PLAINTIFF IN CLOSING ARGUMENT THAT "WE, BASKIN-ROBBINS, ARE GOING TO HAVE THAT STORE".

THIS SUGGESTS THAT BASKIN-ROBBINS' MOTIVES MAY BE TO TAKE BACK DEFENDANT'S STORE FOR ITS OWN BENEFIT RATHER THAN ALLOWING MR. ENDER TO SELL IT AND REALIZE THE BENEFIT OF THE GOODWILL HE HAS OBVIOUSLY BUILT UP WITH HIS CLIENTELE OVER THE PAST TWENTY-FIVE YEARS.

THERE I REFER TO THE VERY CONSIDERABLE WEEKLY SALES WHICH HE IS MAKING OF THE ICE CREAM PRODUCTS OF BASKIN-ROBBINS.

HOWEVER, THIS IS A MATTER WHICH DOES NOT AFFECT WHETHER OR NOT WE SHOULD ISSUE A PRELIMINARY INJUNCTION REQUIRING ENDER TO CURE WHAT ARE ESSENTIALLY HEALTH AND SANITATION DEFICIENCIES IN MEETING THE REQUIREMENTS OF BASKIN-ROBBINS' NATIONAL STANDARDS.

ENDER IS OBLIGATED TO MEET THOSE STANDARDS.

IT ALSO MAY BE TRUE THA BASKIN-ROBBINS CAN HAVE THE STORE UNDER ITS CONTRACT WITH ENDER, WHETHER ANYBODY ELSE LIKES IT OR NOT, AND WHETHER OR NOT THE FRANCHISEE MAY FROM SOME PERSPECTIVES APPEAR TO BE TREATED UNFAIRLY, SHOULD SUCH OCCUR.

THAT PICTURE IS NOT ENTIRELY ONE-SIDED, HOWEVER.

MR. ENDER RECEIVED NOTICES OF THE DEFICIENCIES COMMENCING IN FEBRUARY 1999, AND ALTHOUGH HE HAS HAD APPROXIMATELY SIX MONTHS TO CURE THEM, HE HASN'T REALLY DONE VERY MUCH ABOUT MEETING THESE DEFICIENCIES.

*3 THIS IS TRUE EVEN WITH RESPECT TO MANY ITEMS WHICH APPEAR RATHER EASY AND INEXPENSIVE TO CURE.

IF I WERE KING SOLOMON, I MIGH DECIDE THIS MATTER IN SOME OTHER WAY, BUT I'M NOT, I AM A JUDGE OF THIS COURT AND MUST DECIDE THE INJUNCTION ON THE BASIS OF THE EVIDENCE AND THE APPLICABLE LAW, NOTWITHSTANDING HOW I MIGHT FEEL ABOUT THAT PERSONALLY.

THE EVIDENCE SHOWS THAT PLAINTIFF WILL PROBABLY SUCCEED ON THE MERITS OF THE LAWSUIT.

DEFENDANT IS BOUND BY AN AGREEMENT WHICH IT IS NO PERFORMING.

THE EVIDENCE SHOWS THAT THERE IS A THREAT OF IRREPARABLE INJURY TO PLAINTIFF IF THE INJUNCTION IS NO GRANTED.

THE POSSIBILITY OF IRREPARABLE INJURY ARISES BECAUSE THE EVIDENCE SHOWS THAT UNSANITARY CONDITIONS A DEFENDANT'S STORE MAY RESULT IN ILLNESS OF BASKIN- ROBBINS' CUSTOMERS.

THE POTENTIAL OF INFECTION OF CUSTOMERS BECAUSE OF E-COLI OR OTHER DANGEROUS AILMENTS RESULTED FROM UNSANITARY CONDITIONS AT THE STORE IS CONSIDERABLE.

IF SUCH WERE TO OCCUR, CERTAINLY THE REPUTATION, GOODWILL AND BUSINESS OF BASKIN-ROBBINS AT LARGE IN THE COUNTRY WOULD BE HARMED.

THIS CONSTITUTES IRREPARABLE INJURY.

THE BALANCE OF THE HARDSHIPS ALSO TIPS IN FAVOR OF PLAINTIFF FOR THE SAME REASON.

THE COST TO BRING DEFENDANT'S STORE IN LINE WITH BASKIN-ROBBINS' STANDARDS IS NOT LARGE, ACCORDING TO THE REPRESENTATIONS MADE AT THE

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1999 WL 1318498                                                           Page 4
(Cite as: 1999 WL 1318498 (D.Nev.))

EVIDENTIARY HEARING.

THE FIGURE OF ONE THOUSAND DOLLARS TO COVER A MAJORITY OF THE COST WAS MENTIONED.

IT APPEARS TO THE COURT THE COST OF MEETING THE DEFICIENCIES MAY BE SOMEWHAT IN EXCESS OF THAT, BUT IT IS NOT A LARGE DOLLAR FIGURE.

AS CONTRASTED WITH THE COST TO ENDER OF CURING THESE DEFICIENCIES, THE OUTBREAK OF SALMONELLA OR SOME OTHER DISEASE OR INFECTION WHICH MAY BE VISITED UPON THE CUSTOMERS OF THE STORE, AS A RESULT OF CONDITIONS AT THE STORE, TIP THE HARDSHIPS IN FAVOR OF PLAINTIFF, BECAUSE THOSE RISKS AND THOSE PROBLEMS ARE VERY SERIOUS AND MAY HAVE EVEN A NATIONAL IMPACT ON BASKIN-ROBBINS.

THE PUBLIC HEALTH ASPECTS OF THE EVIDENCE SHOW THAT THE PUBLIC INTEREST FAVORS THE GRANTING OF THE INJUNCTION.

THUS PLAINTIFF HAS SATISFIED ONE OF THE ALTERNATIVE TESTS FOR GRANTING A PRELIMINARY INJUNCTION IN THE NINTH CIRCUIT.

THERE ARE ESSENTIALLY THREE TESTS.

THE TRADITIONAL TESTS AND THE TWO ALTERNATIVE TESTS, AND THIS TES WHICH IS MET HERE, IS ONE OF THE ALTERNATIVE TESTS PRESCRIBED BY THE NINTH CIRCUIT.

THE THREAT OF IRREPARABLE INJURY TO PLAINTIFF IS IMMEDIATE.

THE EVIDENCE SHOWS THAT UNLESS THE HEALTH THREATENING CONDITIONS A DEFENDANT'S STORE ARE CORRECTED, THERE COULD BE AN OUTBREAK OF ILLNESS AFFECTING BASKIN-ROBBINS' CUSTOMERS AT ANY TIME.

BASKIN-ROBBINS'    HEALTH    STANDARDS

ARE APPARENTLY HIGHER THAN THOSE OF THE WASHOE COUNTY HEALTH DEPARTMENT.

BASKIN-ROBBINS IS ENTITLED, UNDER ITS CONTRACTS, TO INSIST ON STRICTER STANDARDS AND THE STANDARDS BASKIN-ROBBINS REQUIRES DO NOT, IN VIEW OF THE COURT, ACCORDING TO THE EVIDENCE PRESENTED, APPEAR TO BE UNREASONABLE.

BASKIN-ROBBINS OPERATES IN THE FOOD BUSINESS ON A NATIONAL SCALE, AND I MAKES SENSE THAT IT WOULD IMPOSE HIGH HEALTH STANDARDS ACROSS THE MANY AREAS OF THE COUNTRY IN WHICH IT CONDUCTS ITS BUSINESS.

*4 THE FACT THAT BASKIN-ROBBINS HAS CONTINUED TO SELL PRODUCTS TO DEFENDANT THROUGH THIS PERIOD DOES NOT CONSTITUTE A WAIVER OF BASKIN-ROBBINS' RIGHT TO INSIST THA THE FRANCHISE AGREEMENT BE COMPLIED WITH.

BASKIN-ROBBINS HAS ACTED EXPEDITIOUSLY IN SEEKING THE INJUNCTION.

THERE WAS NO UNREASONABLE DELAY, NOR DOES THE TIME PERIOD BETWEEN THE INSPECTIONS AND THE BRINGING OF THE MOTION INDICATE THAT THE THREA IS OTHER THAN IMMEDIATE.

THE FRANCHISE OF DEFENDANT WILL CONTINUE AT LEAST UNTIL JANUARY 2000, AND THAT IS A SUFFICIENT REMAINING PERIOD TO JUSTIFY THE GRANTING OF AN INJUNCTION.

IN OUR ANALYSIS HERE, WHICH IS MADE BASICALLY ON BREACH OF CONTRAC GROUNDS, WE DO NOT HAVE TO GO ON BEYOND THAT TO REACH THE QUESTION OF WHETHER THERE IS TRADEMARK INFRINGEMENT OR TRADEMARK DILUTION INVOLVED IN THE CASE.

THAT ANALYSIS IS UNNECESSARY IN VIEW OF OUR FINDINGS.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1999 WL 1318498                                    Page 5
(Cite as: 1999 WL 1318498 (D.Nev.))

MS. CLERK, YOU WILL THEREFORE ENTER
THE ORDER OF THE COURT AS FOLLOWS:

IT IS ORDERED AND ADJUDGED THA
DEFENDANT, ITS OFFICERS, AGENTS,
SERVANTS, EMPLOYEES, AND ATTORNEYS,
AND THOSE PERSONS IN ACTIVE CONCER
OR PARTICIPATION WITH ANY OF THEM,
AND EACH OF THEM WHO RECEIVE
ACTUAL NOTICE OF THIS ORDER BY
PERSONAL SERVICE OR OTHERWISE, ARE
PRELIMINARILY        ENJOINED       AND
RESTRAINED    PENDING    THE    FURTHER
PROCEEDINGS IN THIS CASE TO CEASE
VIOLATING    THE    BASKIN-   ROBBINS'
HEALTH AND SANITATION STANDARDS
WHICH ARE SEEN TO BE VIOLATED IN
EXHIBIT 8, A COPY OF WHICH SHALL BE
ATTACHED TO THESE MINUTES OF COURT,
AND WHICH IS INCORPORATED IN THE
COURT'S ORDER AND MADE A PAR
THEREOF.

THIS PRELIMINARY INJUNCTION SHALL
TAKE EFFECT TEN DAYS FROM DATE OF
ENTRY OF THIS ORDER.

THE DELAY IN THE EFFECTIVE DATE OF
THE   INJUNCTION    IS    TO    ALLOW
DEFENDANT       A       REASONABLE
OPPORTUNITY TO CURE THE DEFICIENCIES
IN THE INTERIM PERIOD OF TIME.

IF THERE IS SOME SPECIFIC ITEM SE
FORTH IN EXHIBIT 8 WHICH CANNO
REASONABLY BE CORRECTED WITHIN THE
TEN DAY PERIOD, COUNSEL MAY FILE A
TIMELY APPLICATION TO THE COURT FOR
A REASONABLE EXTENSION OF TIME TO
CURE SUCH ITEM, OR A STIPULATION MAY
BE FILED FOR APPROVAL OF THE COUR
PROVIDING FOR SUCH EXTENSION OF TIME.

FURTHER     ORDERED     THAT     THE
INJUNCTION SHALL NOT BE EFFECTIVE
UNTIL PLAINTIFF SHALL POST SECURITY
WITH THE CLERK OF THE COURT IN A
FORM    TO    BE    APPROVED    BY    THE
MAGISTRATE JUDGE IN THE AMOUNT OF
TWO THOUSAND DOLLARS FOR PAYMEN
OF SUCH COSTS AND DAMAGES AS MAY BE
INCURRED OR SUFFERED BY DEFENDAN
IF FOUND TO HAVE BEEN WRONGFULLY

ENJOINED.

THAT IS THE ORDER OF THE COURT AND
COURT STANDS ADJOURNED.

(COURT ADJOURNED, 3:25 P.M.)
I    HEREBY    CERTIFY    THAT    THE
FOREGOING IS A TRUE AND CORREC
COPY OF THE PROCEEDINGS HELD IN THE
ABOVE-ENTITLED ACTION.

1999 WL 1318498, 1999 WL 1318498 (D.Nev.)

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

LEXSEE 1989 U.S. Dist. Lexis 14527

**BURGER KING CORPORATION v. WILLIAM C. STEPHENS and MELINDA C. STEPHENS, T.L.C.S., INC., T.L.C.S., II, INC, T.L.C.S., III, INC., and T.L.C.S., IV, INC.**

**Civil Action No. 89-7691**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**1989 U.S. Dist. LEXIS 14527**

**December 5, 1989, Decided; December 6, 1989, Filed and Entered**

COUNSEL:
[*1]

Howard D. Scher, Esq., Stephen D. Ellis, Esq., MONTGOMERY, MCCRACKEN, WALKER & RHOADS, Philadelphia, Pennsylvania.

WILLIAM STEPHENS, MELINDA STEPHENS, T.L.C.S., INC., T.L.C.S., II, INC. T.L.C.S., III, INC. AND T.L.C.S. IV, INC. by: Mitchell A. Kramer, Esq., MITCHELL A. KRAMER & ASSOCIATES, Robert D. Greenbaum, Esq., Philadelphia, Pennsylvania.

OPINIONBY:
SHAPIRO

OPINION:

FINDINGS OF FACT and CONCLUSIONS OF LAW

NORMA L. SHAPIRO, UNITED STATES DISTRICT JUDGE

Plaintiff, Burger King Corporation ("BKC"), seeks a preliminary injunction to enjoin its franchisees, William and Melinda Stephens ("franchisees" or "Mr. and Mrs. Stephens"), from operating four restaurants located in the Philadelphia area. BKC claims that the franchisees conduct their business operations in a manner violating BKC's operational standards and causing BKC and the public immediate and irreparable harm. BKC alleges that defendants' actions constitute infringement of BKC's trademarks and service marks under the Lanham Act, the Pennsylvania Trademark Act and common law as well as breach of Mr. and Mrs. Stephens' franchise agreements with BKC. The complaint asks for treble damages, attorney's fees and a permanent injunction to enjoin [*2] defendants from using BKC's trademarks and service marks until defendants prove that the restaurants are free from pest infestation, comply with BKC oper-

ational standards and satisfy a follow-up BKC quality assurance audit.

After a hearing on the motion for preliminary injunction, the court makes the following findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 65(d).

Facts

1. BKC is a corporation organized under the laws of the State of Florida, with its principal place of business at 17777 Old Cutler Road, Miami, Florida.

2. BKC operates and franchises Burger King restaurants throughout the United States and abroad using the Burger King System ("BKC System") trademarks and service marks.

3. Defendants William C. and Melinda C. Stephens are individuals who reside in New Jersey. Defendants have leased and are franchised to operate the following four Burger King restaurants: No. 2491 located at 6601 N. Broad Street ("Broad Street restaurant"); No. 2922 located at 56th and Vine Streets ("Vine Street restaurant"); No. 3376 located at 58th and Baltimore Avenue ("Baltimore Avenue restaurant"); and No. 964 located at 448 E. Baltimore Pike ("Media restaurant").

4. [*3] The corporate defendants, T.L.C.S., Inc., T.L.C.S., II, Inc., T.L.C.S., III, Inc. and T.L.C.S., IV, Inc., are incorporated under the laws of the Commonwealth of Pennsylvania.

5. BKC filed a motion for a temporary restraining order and preliminary injunction on Friday, October 27, 1989 in the United States District Court for the Eastern District of Pennsylvania.

6. Defendants and counsel were served with copies of the Summons and Complaint, Motion for Temporary Restraining Order and Preliminary Injunction and supporting memorandum and affidavits on Friday, October

  

27, 1989.

7. There is subject matter jurisdiction under 28 U.S.C. § 1331, based on 15 U.S.C. § 1121, for the claims arising under the Lanham Act, 15 U.S.C. § 1114, and § 1125(a), as well as diversity jurisdiction under 28 U.S.C. § 1332. The court exercises ancillary and pendent jurisdiction over BKC's state law claims.

8 This court has jurisdiction over the parties; venue is proper under 28 U.S.C. § 1391(b).

BKC Trademarks

9. BKC employs and advertises throughout the United States certain trademarks and service marks ("BKC Marks") which identify the source, origin and sponsorship of BKC's facilities, products and services. [*4] All right, title and interest to the BKC Marks and the design, decor and image of the Burger King restaurants remain vested solely in BKC.

10. BKC operates company-owned Burger King restaurants and franchises Burger King restaurants nationally. BKC publicly advertises Burger King restaurants on television, radio and in print media. Franchisees must use the BKC Marks on products such as signs, logos, menu boards, posters, translights, uniforms, plates, cups, tray liners and other such items.

11. BKC's products bearing the BKC Marks are offered and sold in interstate commerce.

12. BKC has developed good will for the BKC Marks and for Burger King restaurants, products and services which bear the BKC Marks.

13. The public is familiar with BKC's Marks, and the products and services associated with the BKC Marks are understood by the public to be produced, marketed, sponsored, supplied or affiliated by or with BKC.

Franchise Agreements

14. On May 31, 1979, BKC entered into a franchise agreement with William Stephens ("Stephens") for the operation of the Broad Street restaurant. The franchise agreement granted Stephens a license for a period of twenty (20) years to use the BKC Marks [*5] and BKC system in the operation of the restaurant. Plaintiff's Complaint, Exhibit B.

15. On May 29, 1980, BKC entered into a franchise agreement with William and Melinda Stephens for the operation of the Vine Street restaurant. The franchise agreement granted Mr. and Mrs. Stephens a license for a period of twenty (20) years to use the BKC Marks and BKC System in the operation of the restaurant. Plaintiff's Complaint, Exhibit C.

16. On May 25, 1982, BKC entered into a franchise agreement with William Stephens for the operation of the Baltimore Avenue restaurant. The franchise agreement granted Stephens a license for a period of twenty (20) years to use the BKC Marks and BKC System in the operation of the restaurant. Plaintiff's Complaint, Exhibit D.

17. On January 14, 1986, BKC entered into a franchise agreement with William and Melinda Stephens for the operation of the Media restaurant. The franchise agreement granted Mr. and Mrs. Stephens a license for a period of approximately twenty one and one-half (21-1/2) years to use the BKC Marks and BKC System in the operation of the restaurant. Plaintiff's Complaint, Exhibit E.

18. Each of the franchise agreements are currently valid and [*6] binding on the parties.

19. Defendants currently have a valid and legal license to use the Burger King name and BKC Marks.

20. BKC built each of the four Burger King restaurants Mr. and Mrs. Stephens currently lease from BKC. N.T. II at 58, 61, 62. n1

n1 Citation to the Notes of Testimony for hearings held by the court on plaintiff's motion for preliminary injunction will be as follows: October 30, 1989 ("N.T. I"); October 31, 1989 ("N.T. II"); and November 1, 1989 ("N.T. III").

21. Each franchise agreement requires the franchisee to adhere to BKC operational standards, including the procedures and specifications set forth in the MOD Manual, and to use BKC's restaurant design, color schemes, signage, interior decor, equipment systems requirements, menu and service format. Franchise Agreement, Section 4.

22. Each franchise agreement defines certain acts as events of default. The franchise agreement requires BKC to give the franchisee notice of the default and time to cure the default before the termination of the agreement based on the default. The cure period varies depending on the type of default. Franchise Agreement, Section 16.

23. Under each franchise agreement, BKC may terminate [*7] the franchise license if the franchisee fails to cure a default within the cure period specified or within 30 days of the notice of default if no period is specified. Franchise Agreement, Section 16A.

24. The franchisee's failure to maintain and operate the franchised restaurant in accordance with BKC standards and specifications as to service, cleanliness, health and sanitation or knowing sale of any product not

  

conforming to BKC's specifications is an act of default. The franchise agreement provides that the franchisee has five days after notification of a violation of BKC's operational, health or sanitation standards to cure the violation. Franchise Agreement, Section 16A(1).

25. Under the franchise agreements, the franchisee's right to use the BKC Marks and the BKC System terminates upon the termination or expiration of the franchise agreement. Franchise Agreement, Section 16B(1).

Lease Agreements

26. Stephens leases the premises where the four Burger King restaurants are located under lease agreements with BKC. N.T. II at 59, 61-2.

27. Events of default under the franchise agreements constitute grounds for termination of the lease, if they remain uncured. N.T. II at 80-1. [*8]

28. Defendants would be obligated under each lease to continue to pay rent to BKC even if the Burger King restaurant were closed. N.T. II at 79.

29. Defendants cannot operate any restaurant other than a Burger King at any of the leased locations without violating the terms of the lease. N.T. II at 80-1.

The Burger King System

30. BKC has established a uniform system of operational standards to regulate and control all aspects of Burger King restaurant operations by requiring adherence to detailed specifications set forth in BKC's Operations Manual, formerly Manual of Operating Data ("MOD Manual"). Plaintiff's Exhibit 7.

31. The MOD Manual prescribes rules governing food preparation and handling, procedures for receipt and storage of food products at acceptable temperatures, cleanliness, health, sanitation, customer service and employee training. Plaintiff's Exhibit 7.

32. BKC distributes a Restaurant Equipment Manual which sets forth operating, maintenance and cleaning instructions for restaurant equipment. Plaintiff's Exhibit 8.

33. BKC employs personnel to conduct periodic inspections of Burger King restaurants, including franchised restaurants, to ensure compliance with BKC [*9] operating procedures. Following inspections, Quality, Service and Cleanliness ("QSC") Progress Reports, evaluating the restaurant's compliance with BKC standards, are issued to the restaurant. The purpose of the QSC Progress Report is "to evaluate restaurant operations and [to] develop an action plan with the restaurant management team/franchisee to correct deficiencies." Plaintiff's

Exhibit 7.

34. BKC's franchise operations manager Thomas Plantulli ("Plantulli"), conducted a QSC evaluation of defendants' four Burger King restaurants on September 18 and 21, 1989 and found numerous and serious deficiencies in each. In a letter dated September 22, 1989, Plantulli informed Stephens of the results of the QSC evaluations. Plaintiff's Exhibit 9.

35. The minimum acceptable grade on a QSC inspection is 80. The QSC scores from Plantulli's inspections of defendants' restaurants were as follows: Broad Street – 36; Vine Street–57; Baltimore – 44; and Media – 50. Plaintiff's Exhibit 9.

36. Following Plantulli's inspections, operations quality assurance manager Kenneth Fittz ("Fittz"), conducted an operations quality assurance audit at each of defendants' four Burger King restaurants.

37. An operations [*10] quality assurance audit evaluates food safety procedures based on an examination of equipment operating temperatures, sanitation, handling of in-process products, protection of product from contamination, pest infestation, food safety training, personal hygiene and product shelf life and rotation. The audit concludes with a consultation and recommendation for an "Action Plan" to ensure compliance with food service sanitation standards. Fittz Affidavit para. 4.

38. The quality assurance audit revealed numerous sanitary and operational standards violations at each of defendants' four restaurants. Fittz Affidavit.

Philadelphia Health Code

39. The Philadelphia Department of Public Health ("the Department") is authorized to inspect food establishments. Title 6 Philadelphia Code § 6-501.

40. The Department has the authority to suspend the operating license of a food establishment or to revoke the license. Title 6 Philadelphia Code §§ 6-503(2) and (3).

41. The Department has not suspended the licenses of the three restaurants within its jurisdiction (Broad Street, Vine Street and Baltimore Avenue). N.T. II at 71.

42. No BKC employee inspected the four franchises with a representative [*11] of the government agency responsible for issuing health certificates to the restaurants.

43. There are no outstanding health and safety violation orders against any of the four restaurants. There was no evidence of non–compliance with any order issued by a government agency to any of the four restaurants. N.T.

  

II at 71.

Preliminary Hearing

44. The court inspected the four Burger King restaurants with counsel for both parties present on the following dates: October 30, 1989 (the Broad Street restaurant) and November 8, 1989 (the Vine Street, Baltimore Avenue and Media restaurants).

45. The court held hearings on BKC's motion on October 30, October 31, November 1 and November 8, 1989 after notice to defendants.

46. BKC presented the testimony of Plantulli, franchise operations manager; Fittz, operations quality assurance manager; Nelson Marchioli, operations quality assurance vice president; and Ronald J. Hertzberg, a food sanitation expert.

47. BKC produced evidence that defendants breached their franchise agreements and violated the Lanham Act, 15 U.S.C. § 1051 et seq., by conducting their business operations in a manner violating BKC's standards of operations and causing immediate [*12] and irreparable harm to its trademarks and service marks and to the consuming public.

48. Testifying on defendants' behalf were William C. Stephens; Troy Stephens, manager of the Broad Street restaurant; Joseph Lichtenstein ("Lichtenstein"), an expert on restaurant sanitation and quality control.

49. Based on his inspection of defendants' four restaurants on October 28, 1989, Lichtenstein testified that none of the restaurants presented health or safety hazards.

50. William Stephens is a named plaintiff in a lawsuit, pending in the United States District Court for the Southern District of Florida, on behalf of a plaintiff class of minority Burger King franchisees against defendant BKC for alleged racial discrimination. Hall v. Burger King Corporation, No. 89–0260 (transferred Jan. 4, 1989, S.D. Fla.) (Kehoe, J.). In the class action suit, the named plaintiffs allege that BKC restricts minority franchisees to economically marginal store locations through a practice of "redlining" in leasing and franchising. Defendants' Exhibit 2.

51. The plaintiffs in the Hall action filed a motion for a temporary restraining order to enjoin BKC from harassing minority franchisees by attempting [*13] to terminate their franchise agreements in order to impede their prosecution of the class action. Hall v. Burger King Corporation, No. 89–0260 (S.D. Fla) (Kehoe, J.); Defendants' Exhibit 4.

52. Defendants claim that BKC's action against them

is part of BKC's attempt to deter prosecution of the class action by the Burger King franchisees who are named plaintiffs therein.

53. Defendants claim that BKC's new ownership no longer wants Burger King restaurants located in inner city areas.

54. Defendants assert that BKC violated the franchise agreements by failing to allow them an opportunity to cure the operational deficiencies noted at their four restaurants.

55. Defendants presented testimony that they have remedied most violations noted in the quality assurance audits and will correct the remaining deficiencies in order to bring the four restaurants into timely compliance with BKC's operational standards. N.T. II at 72, 76, 82; N.T. III at 10. untimely inspections were conducted immediately following September 30, 1989, when the last payment to BKC required by the June 21, 1989 settlement agreement had been made. N.T. II at 77–8.

Broad Street Restaurant

63. As a result of the [*14] September, 1989 QSC evaluation by operations manager Plantulli, Fittz conducted an operations quality assurance audit at the Broad Street restaurant on October 17, 1989. N.T. I at 66.

64. The quality assurance audit at the Broad Street restaurant revealed widespread rodent infestation; improper food storage, handling and preparation increasing the risk of bacterial growth and food contamination; dirty and grease–covered equipment; deficient employee sanitation procedures; and general disrepair including a clogged urinal, dripping equipment and a hose extending into a sink improperly allowing for back siphonage. Back siphonage occurs when a decrease in water pressure causes a vacuum–like effect and siphons dirty water into the domestic water supply. Fittz Affidavit para. 6–19, Exhibits A and B.

65. Stephens received a written report of the inspection of the Broad Street restaurant on October 18, 1989. N.T. II at 74.

66. There was rodent infestation of the restaurant interior evidenced by rodent feces on hamburger buns, paper goods, plastic products and kitchen equipment near food storage areas and animal bite holes in plastic bags containing food products, particularly hamburger buns. [*15] Holes in the restaurant door and wall provide access to the restaurant interior by rodents and insects.

67. The court observed uncovered poison bait at the Broad Street restaurant, both in the public seating area and kitchen.

  

68. The Broad Street restaurant was in a general state of disrepair. There were peeling ceiling tiles in the kitchen, a leaking urinal in the men's bathroom, uncovered drains, litter inside and outside the restaurant and dirt and grease on the cooking equipment. In addition, the court observed dirty, rancid water under the wet, rotting, wooden floor of the walk-in freezer.

69. Food and paper products were stored improperly; food products were left uncovered. Raw and cooked egg mix, dairy, chicken and sausage products were kept and cooked at temperatures above or below the range required.

70. The employees at the Broad Street restaurant lack adequate training in food safety techniques; there is no VCR machine or a videotape to train employees in basic food sanitation procedures as required by the BKC MOD Manual.

Vine Street Restaurant

71. Mr. and Mrs. Stephens were the original lessees of the Vine Street restaurant. N.T. II at 62.

72. As a result of the September, [*16] 1989 QSC evaluation at the Vine Street restaurant by operations manager Plantulli, Fittz conducted an operations quality assurance audit on October 18, 1989. N.T. I at 69.

73. The quality assurance audit at the Vine Street restaurant found roach infestation; inadequate employee hygiene; food storage equipment (holding chamber, refrigerator and freezer) operated at temperatures violating BKC's operating requirements; a potential back siphonage problem; filthy food storage areas and stagnant water puddles on the restaurant floor. Fittz Affidavit, paras. 31–37, Exhibits E and F.

74. Stephens received a written report of the inspection on October 27, 1989 when Fittz consulted Stephens about the problems regarding the Vine Street restaurant. N.T. I at 68; N.T. II at 74.

75. The court observed the presence of two rodents in the stacked flats of hamburger buns. Animal teeth marks on plastic and paper products as well as rodent feces were in evidence at the Vine Street restaurant. The court also observed a cockroach crawling into an uncovered drain near the drive-in window.

76. Dirt and grease covered the kitchen equipment at the Vine Street restaurant. The Vine Street restaurant was in a [*17] general state of disrepair with uncovered drains, uncovered overhead lights and litter.

77. The employees at the Vine Street restaurant had not been adequately trained in food safety and food handling procedures.

Baltimore Avenue Restaurant

78. Stephens was the original tenant at the Baltimore Avenue restaurant. N.T. II at 62.

79. As a result of the September, 1989 QSC evaluation of the Baltimore Avenue restaurant by operations manager Plantulli, Fittz conducted an operations quality assurance audit restaurant on October 20, 1989. N.T. I at 69.

80. The quality assurance audit at the Baltimore Avenue restaurant found rodent and insect infestation; equipment deficiencies in the refrigeration units and steamers resulting in food storage and preparation at improper temperatures; and several pieces of dirty equipment. Fittz Affidavit, paras. 38–43, Exhibits G and H.

81. Stephens received a written report of the inspection on October 27, 1989. N.T. I at 68; N.T. II at 75.

82. The Baltimore Avenue restaurant was fairly clean. The appearance of the Baltimore venue restaurant was better than that of the Broad Street and Vine Street restaurants in several respects.

83. The court did not [*18] observe evidence of rodent feces or animal markings on food products stored at the Baltimore Avenue restaurant.

84. The temperatures of the food storage equipment such as the walk-in freezer, shake machine and steamer did not violate BKC standards.

85. The cooking equipment was fairly clean and free from grease and grime.

Media Restaurant

86. BKC built the Media restaurant in 1978 and occupied and operated it as a company-owned restaurant until May, 1986 when Mr. and Mrs. Stephens acquired the franchise and lease for that location. N.T. II at 62.

87. As a result of the September, 1989 QSC evaluation of the Media restaurant by operations manager Plantulli, Fittz conducted an operations quality assurance audit on October 16, 1989. N.T. I at 65.

88. The quality assurance audit at the Media restaurant revealed defective cooking equipment causing food to be cooked at temperatures below minimum acceptable levels; food storage at unsafe temperatures; absence of a three-compartment sink for adequate sanitation procedures; dirty equipment; failure to observe holding time guidelines for food products; and a general disrepair of the restaurant. Fittz Affidavit, para. 20–30, Exhibits C and [*19] D.

89. Stephens received a written report of the inspec-

  

tion on October 17, 1989. N.T. I at 66; N.T. II at 72.

90. The court did not personally observe evidence of rodent or insect infestation in the restaurant.

91. The Media restaurant's kitchen area was relatively clean.

92. The restaurant's exterior was dirty and littered.

Walnut Street Restaurant

93. The court also inspected a Burger King franchise located at 40th and Walnut Streets (No. 2832) in Philadelphia on November 8, 1989 in order to evaluate claims of discriminatory treatment. The Walnut Street Burger King is owned by someone other than Mr. Stephens.

94. The Walnut Street restaurant was similar in appearance to defendants' restaurants. The court observed operational standards violations as well as dirty equipment at the Walnut Street Burger King. Although the violations at the Walnut Street Burger King were not as numerous as those at Mr. and Mrs. Stephens' restaurants, the conditions at the Walnut Street restaurant also raised concerns about health, sanitation and restaurant maintenance.

95. Notwithstanding the problems at the Walnut Street restaurant, it received an acceptable QSC rating. The average QSC score for [*20] the Walnut Street restaurant for the period from November 1, 1988 through October 30, 1989 was 82 percent. Plaintiff's Exhibit 10. Mr. and Mrs. Stephens' restaurants' average QSC ratings for the same period were as follows: Broad Street (No. 2491) – 48; Vine Street (No. 2922) – 48.3; Baltimore Avenue (No. 3376) – 56.9; and Media (No. 964) – 47.7. Plaintiff's Exhibit 10.

Discussion

To support a preliminary injunction, the moving party must prove reasonable probability of success on the merits and irreparable injury if the preliminary relief is not granted pending final adjudication on the merits. See American Greetings Corporation v. Dan-Dee Imports, Inc., 807 F.2d 1136, 1140 (3d Cir. 1986). The district court must also consider the potential harm to the party opposing the preliminary injunction as well as the public interest. Id.

A. Probability of Success on the Merits

The hallmark of trademark infringement is confusion as to the source of a product or service in the public mind. Trademark law protects against the sale of goods consumers are likely to associate with an established, registered trademark. To determine whether a likelihood

of confusion exists, a [*21] court may consider the following factors:

a. the degree of similarity between the owner's mark and the alleged infringing mark;

b. the strength of the owner's mark;

c. the good's price and other factors indicative of the care and attention expected of consumers when making a purchase;

d. the length of time that the defendant has used the mark without evidence of actual confusion arising;

e. the defendant's intent in adopting the mark;

f. the evidence of actual confusion;

g. whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

h. the extent to which the targets of the parties' sales efforts are the same;

i. the relationship of the goods in consumer's minds because of functional similarity; and

j. other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

Interpace Corp. v. Lapp Inc., 721 F.2d 460, 463 (3d Cir. 1978).

A likelihood of confusion entitles a trademark owner to injunctive relief. Id. at 462.

A licensor has a right to terminate a license to use trademarks [*22] when the licensee fails to meet the standards established by the licensor for products marketed under its trademark. Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, Inc., 212 F.Supp. 715, 740 (E.D. Pa. 1962).

Plaintiff presented credible evidence of violations of BKC operational standards at all four restaurants. The QSC scores and deviations from operational standards, if not corrected to a minimal level of acceptability within a reasonable time, demonstrate that BKC would most likely prevail on the merits and obtain a permanent injunction preventing use of the trademarks until verified corrective action has been taken to the satisfaction of the franchisor. The conditions at the Broad Street and Vine Street restaurants were more than mere violations of unrealistic standards; they were deplorable, intolerable and indeed in some instances a likely threat to public health. The conditions were attested to by the regular inspector (Plantulli) and the special inspector for prob-

  

lem franchises (Fittz). The existence of the substandard conditions was corroborated by photographs in the case of the Broad Street restaurant and court inspection of all four restaurants.

Defendants contend [*23] they have not been provided the contractual 30–day cure period; this is correct in part. However, in deciding whether to grant preliminary relief pending final adjudication, the court must determine the likelihood of prompt, corrective action during a cure period. While some of the conditions complained of are readily correctable, others are not. It is clear that defendants will do whatever is easy and inexpensive to do in order to remedy deficiencies as promptly as possible. In fact, in response to the filing of this civil action and in anticipation of the court's inspection, much improvement was made in a very short time. The court credits Stephens' testimony that his current problems are to some extent a result of his wife's recent illness and that he has taken steps to correct some deficiencies and that he intends to deal promptly with others. But some problems are major and the corrective steps required will take an amount of time and money that Stephens was not even able to estimate. The court lacks confidence that defendants could or would correct these conditions within the foreseeable future. Whether Stephens lacks the will or wherewithal, whether he is over extended and [*24] lacks the ability to supervise four restaurants spread out over a large geographical area or whether market conditions do not permit sufficient profit to maintain the premises according to BKC standards in view of the BKC imposed overhead cannot be determined on this preliminary record.

Defendants' expert, an experienced restaurateur, testified that all four restaurants were not so bad, at least in comparison with the restaurant chain for which he was formerly responsible. This testimony although sincere was simply not persuasive. Because of the prompt hearing a motion for a preliminary injunction requires, defendants had a limited opportunity to prepare; therefore, the defense expert's inspection was cursory; he addressed certain complaints about temperature noncompliance (which he could not check for lack of temperature testing devices) by stating they were unimportant. However, the franchisees agreed by contract to comply with the standards of its franchisor, so the standards or experience of other restaurant chains is to a large extent irrelevant. Finally, in the rushed circumstances of his non-critical inspection, this witness failed to observe conditions still readily apparent [*25] to the court on later viewing the premises in person. Therefore, this expert testimony lacked credibility.

The record supports BKC's likelihood of success on

its claim of violations of BKC's quality and safety standards, especially at the Broad Street and Vine Street restaurants. Failure to adhere to BKC operation standards would constitute a violation of the franchise agreements; BKC would be entitled to terminate defendants' right to use the BKC Marks. BKC has a reasonable probability of success on the merits of its claims for Lanham Act trademark infringement and breach of franchise agreements.

B. Irreparable Harm

Stephens' position as a Burger King franchisee and concomitant license to use the BKC Marks virtually guarantees that consumers will identify products sold at the Broad Street and Vine Street restaurants with BKC approved products. The Broad Street and Vine Street restaurant offer an identical selection of food in the same manner and at the same price as other Burger King restaurants. Like BKC, defendants target the market of consumers to whom the appeal of the speedy service of hamburgers and fries has enabled the term "fast–food" to become embedded in the American [*26] vernacular.

The cornerstone of the franchise system is the trademark or trade name of a product. Uniformity of product and control of its quality cause the public to turn to franchise restaurants. Susser v. Carvel Corp., 206 F. Supp. 636, 640–641 (S.D.N.Y. 1962); N.T. II at 126.

The franchisee/franchisor relationship allows the franchisee to sell Burger King products from a store of uniform and distinctive design that has as an integral structural feature the Burger King trademark erected on the roof as a prominent identifying mark.

The public's knowledge of the uniformity of operation and quality of product draws business to Burger King restaurants. Therefore, the name "Burger King" constitutes a trademark of great value to BKC and to the franchisees. BKC's inability to protect and insure the maintenance of the high quality of service that the marks represent would cause irreparable injury to BKC's business reputation and good will.

To the extent BKC is likely to prevail on the merits, it has demonstrated irreparable harm. If BKC is unable to control the nature and quality of the goods and services defendants provide at Burger King franchised restaurants, activities not meeting [*27] BKC standards at those restaurants could irreparably harm the goodwill associated with BKC's marks and BKC's reputation. Moreover, failure to meet some of the safety and sanitary standards here involved could subject BKC to substantial civil liability to members of the public personally injured thereby. Even though BKC is likely to prevail on the merits and accordingly can demonstrate

  

irreparable harm, the presence of other relevant factors requires that the preliminary relief requested be somewhat limited.

Defendants contended that similar operating conditions have been tolerated in white-owned and operated franchises and that the new standards target minority operators. For that reason, the court inspected a franchise operation at 40th and Walnut. Many of the conditions complained of by BKC existed there also; the overall compliance seemed greater than Broad Street and Vine Street but about the same as Baltimore Avenue and Media, although its average QSC was undeservedly much higher.

BKC claims a recent change in ownership has resulted in a program to enforce its standards more strictly. Defendants claim this is a subterfuge to eliminate minority franchisees, particularly in inner [*28] city minority residential areas. But there seems no question that by BKC standards, defendants' franchises received the lowest QSC evaluations in the Delaware Valley. Plaintiff's Exhibit 10. BKC is not required to act against all franchisees simultaneously.

Defendants' contention that BKC's action is in retaliation for Stephens' joining a class action against BKC, and that BKC's lack of good faith is demonstrated by the timing of this action is not without some apparent validity. Although the conditions complained of have existed for an extended period of time, BKC was willing to settle a prior eviction action by accepting installment payment of only a portion of sums allegedly overdue if defendants' agreed to keep current on franchise payments in the future. The last of the past due installment payments was made in September. Delay in instituting this action until a total of $125,804.67 had been paid suggests that BKC's concern about operating conditions is not genuine but an excuse to terminate defendants and destroy their standing as class action plaintiffs. In support of this contention, defendants presented evidence that BKC had proceeded similarly with regard to other class [*29] action plaintiffs.

The conduct with regard to third parties seems distinguishable and will be evaluated in the Florida class action. Based on its limited knowledge of the Florida class action, this court cannot agree that the grant of a preliminary injunction or final injunction, or the permanent termination of defendants' franchises (not sought in this action) will eliminate Stephens' standing to pursue damages for past racial discrimination, although it might affect entitlement to injunctive relief. The court cannot say that the pendency of the Florida action did not affect its decision in any way. In balancing the equities in regard to the preliminary injunction, the court has weighed

the allegations of BKC's racially discriminatory conduct as well as its timing of this action.

C. Harm to Defendants

Closing these four franchised restaurants will cause substantial financial harm to defendants. Defendants' evidence was directed to the devastating financial effect of permanent and complete closure: claimed loss of a $2 million investment and default on loans in the amount of $384,000. While evidence of profit was lacking, it is likely that the franchises are somewhat profitable [*30] to defendants or they would not struggle to keep them; closing the restaurants would deny defendants income from sales although rental payments under the lease and certain loan obligations would continue. It is unlikely that defendants could be required to pay franchise fees such as advertising for restaurants that were not in operation, nor would it be necessary to meet employee payrolls if there were no employees.

The effect of temporary closure is more difficult to determine. In view of the transience of the employment market, no permanent harm to the employee complement from temporary closure can be foreseen. However, sales income would be eliminated for the period each restaurant would be closed and certain lease and franchise payments might continue to be due. If a restaurant is closed, there is not only loss of actual income but loss of patronage as well. There was no evidence of customer behavior regarding brand identification versus geographical convenience or competitive factors in the geographical areas of these franchises from which to predict what percentage of lost patronage would be regained immediately or eventually upon reopening.

The effect of partial closure was [*31] not contemplated by the parties and no evidence specific to such relief was presented. But obviously a closure of some franchises would limit income only in part and would be less harmful to defendants than a total closure. Temporary closure of some franchises would help defendants make necessary improvements by concentrating supervision efforts where the need is greatest. It would permit income from some franchises to provide the wherewithal to make the necessary improvements from substandard to satisfactory conditions.

Evidence of sales figures was limited and imprecise; there were total figures for funds invested but not the rate of return; the court cannot make either a cash-flow or profit analysis of each franchise operation. The financial harm to defendants has been sufficiently considered in limiting equitable relief to temporary closure of two of the four franchises where conditions necessitate temporary closure to ensure substantial compliance

  

1989 U.S. Dist. LEXIS 14527, *31

with BKC operational standards. The Baltimore Avenue and Media restaurants may be brought into compliance without temporary closure but the Broad Street and Vine Street restaurants present a threat to public health and safety that weighs [*32] heavier than the detriment to the franchisee.

### D. Public Interest

Failure to maintain required quality standards constitutes an imminent threat to public health and safety. Filth and grease in proximity to open flames present a substantial risk of fire; improperly refrigerated dairy products may cause salmonella poisoning. The obvious evidence of mice or rat infestation (feces, rodent holes on paper covering and the observed presence of rodents in bread trays) cannot be credibly controverted

The court is mindful that the local regulatory agencies have not acted against defendants' operations. In the absence of evidence of recent inspection or agency notification, there can be no inference that the conditions have been or should be tolerated. The lack of proper enforcement of health codes enacted for the protection of the public does not mean that such conditions must be ignored when brought to the attention of a court. This court deems that it is required to inform the appropriate regulatory bodies of the charges made, conditions found and the decision of the court regarding preliminary relief so that a report of action or inaction by a board of health may be considered with regard [*33] to the issues of entitlement to permanent relief remaining to be determined on a more complete record.

On balance, in view of the likelihood BKC will prevail on the merits, at least in substantial part, and the possibility of irreparable harm to BKC pending final determination of the issues involved, factors that outweigh the financial harm to defendants, especially in view of the serious threat to public health and safety at some but not all of the franchised operations, a preliminary in-

junction will issue granting in part the relief requested.

Any facts stated in this section are incorporated in the preceding findings of fact as if stated therein.

Conclusions of Law

1. The court has jurisdiction over the parties and the subject matter.

2. BKC has a reasonable probability of success on the merits of its trademark infringement and breach of franchise agreement claims.

3. BKC will be irreparably harmed by the persistence of substandard conditions at defendants' restaurants and BKC's inability to control the quality of the goods and services provided by defendants.

4. The financial harm to the defendants from the temporary closing of the restaurants is great.

5. The public interest [*34] in maintaining clean and sanitary restaurants as well as avoiding illness from contaminated food outweighs financial harm to defendants resulting from the imposition of preliminary injunctive relief.

6. The differences in the nature of quantity of operational and health violations between the Broad Street, Vine Street, Baltimore Avenue and Media restaurants justify the limitations imposed on the preliminary injunctive relief. Defendants will be ordered to close the Broad Street and Vine Street restaurants until there is reasonable compliance with BKC operational standards as set forth in the quality assurance audit action plans presented to defendants for those restaurants. The Baltimore Avenue and Media restaurants may remain open provided that defendants bring the restaurants into substantial compliance with BKC operation standards as set forth in the quality assurance audit action plans for those restaurants within a reasonable time.

  
LexisNexis™    LexisNexis™    LexisNexis™

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
                                                           :
DUNKIN' DONUTS FRANCHISED                                   :
   RESTAURANTS LLC,                                         :
   a Delaware Limited Liability Company, and                :
                                                           :
DD IP HOLDER LLC,                                          :
   a Delaware Limited Liability Company,                    :
                                                           :        C.A. No. 07-CV-11134 (RJH)
                                                           :
                              Plaintiffs,                   :
                                                           :
          v.                                               :
                                                           :
SHIVAM SUNDRAM INC.,                                       :
   a New York Corporation,                                  :
                                                           :
                              Defendant.                    :
-----------------------------------------------------------x

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify, under penalty of perjury, that on December 18, 2007, I served Plaintiffs'

Order to Show Cause, Certification Pursuant to Local Rule 6.1(d), Motion, Memorandum of

Law, Certifications and Exhibits, together with the summons and complaint, by overnight carrier

for next business day delivery addressed as follows:

        Shivam Sundram Inc.
        d/b/a Dunkin' Donuts
        114 Bruckner Boulevard
        Bronx, New York 10454


Dated: December 18, 2007

                                        /s/ Ronald D. Degen_____
                                        **RONALD D. DEGEN** (RD 7808)