**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

DUNKIN' DONUTS FRANCHISED       :
   RESTAURANTS LLC,                  :
                      et al.     :
                                :
           Plaintiffs,     :
                                :
              v.              :     C.A. No. 07-CV-11134 (RJH)
                                :
SUNDRAM, INC.,                :
                         et al.     :
                                :
           Defendants.    :

-------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Ronald Degen, Esq. (RD 7808)         Robert L. Zisk, Esq. (RZ 1275)
Scott Goldfinger, Esq. (SC 9219)     David E. Worthen, Esq. (DW 8519)
O'ROURKE & DEGEN, PLLC         Katherine L. Wallman, Esq. (KW 3966)[*]
225 Broadway, Suite 715           GRAY, PLANT, MOOTY, MOOTY
New York, NY 10007                & BENNETT, P.A.
Telephone:  (212) 227-4530       2600 Virginia Avenue, N.W., Suite 1111
Facsimile:  (212) 385-9813        Washington, DC 20037
                                      Telephone:  (202) 295-2200
                                      Facsimile:  (202) 295-2250

Dated: January 16, 2008              Counsel for Plaintiffs

---

[*] Not admitted to D.C. Bar

TABLE OF AUTHORITIES ........................................................................................................ii

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS ......................................................................................................1

    The Dunkin' Donuts System......................................................................................4

    The Baskin-Robbins System.....................................................................................6

    Defendants' Obligations Under the Franchise Agreements....................................7

    Nonpayment of Franchise Fees and Advertising Fees...........................................8

    Supplemental Notice of Termination......................................................................9

ARGUMENT .........................................................................................................................9

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS............................................10

    A. Defendants Are Liable for Breach of Contract Under the Franchise Agreements
    Because They Have Failed to Pay Monies Due (Count II)....................................10

    B. Plaintiffs Are Likely to Succeed On Their Trademark Infringement Claim
    (Count V) ...............................................................................................................12

    C. Plaintiffs Are Likely to Succeed On Their Unfair Competition and Trade Dress
    Infringement Claims (Counts VI and VIII) ..........................................................15

II. DEFENDANTS' CONTINUED USE OF PLAINTIFFS' PROPRIETARY
MARKS AND METHODS HAS CAUSED AND CONTINUES TO CAUSE
IRREPARABLE HARM TO PLAINTIFFS...............................................................................16

III. SUFFICIENTLY SERIOUS QUESTIONS REGARDING THE
MERITS EXIST TO MAKE THIS MATTER FAIR GROUNDS
FOR LITIGATION AND THE BALANCE OF HARDSHIPS
WEIGHS DECISIVELY IN PLAINTIFFS' FAVOR ................................................................17

CONCLUSION.....................................................................................................................20

## TABLE OF AUTHORITIES

*Amerada Hess Corp. v. Quinn,* 362 A.2d 1258, 1268 (1976)..........................................11

*American Home Prods. Corp. v. Johnson Chem. Co.*, 589 F.2d 103, 107, 197 (2d Cir. 1978) ...............................................................................................................................18

*ARP Films, Inc. v. Marvel Entm't Group, Inc.*, 952 F.2d 643, 649 (2d Cir. 1991) .......................11

*Burger King v. Hall*, 770 F. Supp. 633, 638 (S.D. Fla. 1991) ........................................15

*Burger King v. Majeed*, 805 F. Supp. 994, 1002-03, 1006 (S.D. Fla. 1992) ....................13, 14, 18

*Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995)................18

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986)........................................................................................19

*Dieter v. B&H Indus.*, 880 F.2d 322, 326 (11th Cir. 1989) ...........................................12

*Dunkin' Donuts Inc. v. Northern Queens Bakery, Inc.*, 216 F. Supp. 2d 31, 40, 44 (E.D.N.Y. 2001) ................................................. 13, 15-16, 17

*El Greco Leather Prods., Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986).................16

*Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988) ...............................................................12

*Forschner Group v. Arrow Trading Co.*, 904 F. Supp. 1409, 1417 (S.D.N.Y. 1995)..................15

*Frank Burckhorst Co. v. G. Heileman Brewing Co.*, 875 F. Supp. 966, 975 (E.D.N.Y. 1994) ...............................................................................................................................12

*Frisch's Restaurants, Inc. v. Elby's Big Boy,* 670 F.2d 642, 651 (6th Cir. 1982) ........................19

*General Cigar Co. v. G.D.M. Inc.*, 988 F. Supp. 647, 663 (S.D.N.Y. 1997) ...............................12

*Helene Curtis v. Nat'l Wholesale Liquidators,* Inc., 890 F. Supp. 152, 160 (E.D.N.Y. 1995) ...............................................................................................................................16

*Hinkleman v. Shell Oil Co.*, 962 F.2d 372, 376 (4th Cir. 1992) ....................................11

*International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 70 (2d Cir. 1996).........................10, 18

*Jews for Jesus v. Brodsky*, 993 F. Supp. 282, 312 (D.N.J. 1998) ...................................18

*L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co., Inc.,* 79 F.3d 258, 262 (2d Cir. 1996) ...................................................................................................................................15

*Lane Capital Mgmt. v. Lane Capital Mgmt.,* 15 F. Supp. 2d 389, 398 (S.D.N.Y. 1998) ..............13

*Liu v. Dunkin' Donuts, Inc.* No. 99-3344, No. 00-3666, 2000 U.S. Dist. LEXIS 18388, at *11-13 (E.D. Pa. Dec. 21, 2000)................................................11

*Louis Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 871 (2d Cir. 1986).............12

*McDonald's Corp. v. Robert A. Makin, Inc.,* 653 F. Supp. 401, 403-04 (W.D.N.Y. 1986) ..........11

*McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1310 (11th Cir. 1998) ......................................17

*Morningside Group v. Morningside Capital Group,* 182 F.3d 133, 138 (2d Cir. 1999)...............14

*Otokoyama Co. v. Wine of Japan Import, Inc.,* 175 F.3d 266, 270 (2d Cir. 1999).......................12

*Opticians Ass'n of America v. Independent Opticians of America,* 920 F.2d 195 (3rd Cir. 1990) ...........................................................................................................................................13, 19

*Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2nd Cir. 1961).......................14

*S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 375, 379 (3d Cir. 1992) ...................12, 17, 18

*Southland Corp. v. Froelich,* 41 F. Supp.2d 227, 243 (E.D.N.Y. 1999) .................................13, 15

*Tanel Corp. v. Reebok Int'l, Ltd.,* 774 F. Supp. 49, 51 (D. Mass. 1990).......................................18

*Two Men & a Truck/Int'l Inc. v. Two Men & a Truck/Kalamazoo, Inc.,* 949 F. Supp. 500, 505 (W.D. Mich. 1996) .................................................................................11

*Versames v. Palazzolo,* 96 F. Supp. 2d 361, 366 (S.D.N.Y. 2000) ................................................12

*Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2d Cir. 1981)...........................................19

15 U.S.C. § 1065 ............................................................................................................................12

4 *McCarthy on Trademarks and Unfair Competition* § 25.31 (4th ed. 1999) ...............................13

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

Defendants have violated the terms of their Franchise Agreements with Plaintiffs for their Dunkin' Donuts franchises and Dunkin' Donuts and Baskin-Robbins combination franchise in the Bronx, New York. Among other things, payment of franchise fees and advertising fees to Plaintiffs are consideration for Defendants' rights to use the Dunkin' and Baskin' trademarks and franchise systems under the Franchise Agreements. Defendants have failed to pay such fees, including after receiving written notice and an opportunity to cure their default, thereby resulting in the termination of their Franchise Agreements. Nevertheless, Defendants continue to use the Dunkin' and Baskin proprietary marks without a license to do so. Accordingly, Plaintiffs seek immediate injunctive relief to enjoin Defendants' infringing activities and to bar Defendants from their continued unlicensed use of Plaintiffs' proprietary marks in violation of the Lanham Act, 15 U.S.C. §§ 1114 *et seq*.

### STATEMENT OF FACTS

1.    Plaintiff Dunkin' Donuts Franchised Restaurants LLC, successor-in-interest to Dunkin' Donuts LLC and Dunkin' Donuts Incorporated, is a Delaware limited liability company with its principal place of business at 130 Royall Street, Canton, Massachusetts. All Dunkin' Donuts Franchise Agreements dated prior to May 26, 2006 have been assigned to Dunkin' Donuts Franchised Restaurants LLC. It is engaged in the business of franchising independent businesspersons to operate Dunkin' Donuts shops throughout the United States. Dunkin' Donuts franchisees are licensed to use the trade names, service marks, and trademarks of Dunkin' Donuts and to operate under the Dunkin' Donuts System, which involves the production, merchandising, and sale of donuts and related products utilizing a

specially designed building with special equipment, equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, specifications, proprietary marks and identification. Certification of Jack Laudermilk, Ex. 1, ¶ 4 (attached hereto).

2.      Plaintiff DD IP Holder LLC, Dunkin's wholly-owned subsidiary and successor-in-interest to Dunkin' Donuts USA, Inc., is a Delaware limited liability company with its principal place of business at 130 Royall Street, Canton, Massachusetts. DD IP Holder LLC is the owner of the trademark, service mark, and trade name "Dunkin' Donuts," and related marks. Unless otherwise specified, Dunkin' Donuts Franchised Restaurants LLC and DD IP Holder LLC are collectively referred to hereinafter as "Dunkin'" or "Dunkin' Donuts." *Id.* at ¶ 5.

3.      Plaintiff Baskin-Robbins Franchised Shops LLC, successor-in-interest to Baskin-Robbins USA LLC and Baskin-Robbins USA, Co., is a Delaware limited liability company with its principal place of business at 130 Royall Street, Canton, Massachusetts. All Baskin-Robbins Franchise Agreements dated prior to May 26, 2006 have been assigned to Baskin-Robbins Franchised Shops LLC. Baskin-Robbins is authorized to use the trademarks, service marks and trade names owned by BR IP Holder LLC and to sublicense Baskin-Robbins franchisees, as independent businesspersons, to use these marks and trade names. Baskin-Robbins franchisees are licensed to use the Baskin-Robbins trade names, service marks, and trademarks and to operate under the Baskin-Robbins system, which involves the production, merchandising, and sale of ice cream and related products utilizing special equipment, equipment layouts, interior and exterior accessories, identification

schemes, products, management programs, standards, specifications, proprietary marks, and information. *Id*. at ¶ 6.

4.      Plaintiff BR IP Holder LLC, successor-in-interest to Baskin-Robbins Incorporated, is a Delaware limited liability company with its principal place of business at 130 Royall Street, Canton, Massachusetts. BR IP Holder LLC is the owner of the trademark, service mark, and trade name "Baskin-Robbins" and related marks. Unless otherwise specified, Baskin-Robbins Franchised Shops LLC and BR IP Holder LLC are collectively referred hereinafter as "Baskin-Robbins" or "Baskin." *Id*. at ¶ 7.

5.      Dunkin' and Baskin operate as separate corporations. However, they pursue or permit joint development of units in selected markets, which are commonly referred to as "combo" shops. *Id*. at ¶ 8.

6.      Defendant Sundram, Inc. ("Sundram") is a New York corporation and, upon information and belief, its principal place of business is in the Bronx, New York. Defendant Sundram was the owner of a Dunkin' Donuts shop located at 511 East 163rd Street, Bronx, New York, pursuant to a Franchise Agreement dated June 15, 2004. *Id*. at ¶ 9.

7.      Defendant Satyam Shivam, Inc., upon information and belief now operating without Plaintiffs' authority or approval as Satyam Eastchester LLC ("Satyam Shivam"), is a New York corporation and, upon information and belief, its principal place of business is in the Bronx, New York. Defendant Satyam Shivam was the owner of a Dunkin' Donuts shop located at 2451 Eastchester Road, Bronx, New York, pursuant to a Franchise Agreement dated January 18, 2004. *Id*. at ¶ 10.

8.      Defendant Shivam Sundram, Inc., upon information and belief now operating without Plaintiffs' authority or approval as Shivam Bruckner LLC ("Shivam Sundram"), is a

New York corporation, and upon information and belief, its principal place of business is in

the Bronx, New York.  Defendant Shivam Sundram was the owner of a Dunkin' Donuts shop

located at 114 Bruckner Boulevard, Bronx, New York, pursuant to a Franchise Agreement

dated April 11, 2005.  *Id*. at ¶ 11.

9.      Defendant TKNY Partners, LLC ("TNKY Partners") is a New York limited

liability company and, upon information and belief, its principal place of business is in New

York, New York.  TNKY Partner was the owner of a Dunkin' Donuts and Baskin-Robbins

combo shop located at 145 East 125th Street, New York, New York, pursuant to a Franchise

Agreement dated February 1, 2006.  *Id*. at ¶ 12.

10.     Defendant Anil Kapoor is, upon information and belief, a natural person and a

citizen and resident of the Commonwealth of Massachusetts.  Defendant Anil Kapoor is an

officer, member, and/or shareholder of Sundram, Satyam Shivam, Shivam Sundram, and

TKNY Partners, and personally guaranteed the obligations of the foregoing entities pursuant

to executed personal guarantees.  *Id*. at ¶ 13.

11.     Defendant Pran Tiku is, upon information and belief, a natural person and a

citizen and resident of the Commonwealth of Massachusetts.  Defendant Pran Tiku is an

officer, member, and/or shareholder of TKNY Partners, and personally guaranteed the

obligations of the foregoing entity pursuant to an executed personal guarantee.  *Id*. at ¶ 14.

### The Dunkin' Donuts System

12.     Dunkin' is the franchisor of the Dunkin' Donuts franchise system.  *Id*. at ¶ 15.

13.     DD IP Holder LLC is the owner of the trademark, service mark, and trade

name "Dunkin' Donuts," and related marks.  Dunkin' Donuts Franchised Restaurants LLC

has the exclusive license to use and license others to use these marks and trade name and has

4

used them continuously since approximately 1960 to identify its doughnut shops, and the
doughnuts, pastries, coffee, and other products associated with those shops. *Id*. at ¶ 16.

14.    The Dunkin' Donuts trademarks and trade name are distinctive and famous
and have acquired secondary meaning. *Id*. at ¶ 17.

15.    The Dunkin' Donuts trademarks and trade name are utilized in interstate
commerce. *Id*. at ¶ 18.

16.    The Dunkin' Donuts marks have been very widely advertised and promoted
by Dunkin' Donuts over the years. Dunkin' Donuts and its franchisees have expended
approximately $1,500,000,000 in advertising and promoting the Dunkin' Donuts marks over
the last thirty-five years. Dunkin' Donuts spent approximately $167,000,000 in fiscal year
2005 alone on advertising and promotion. *Id*. at ¶ 19.

17.    Dunkin' Donuts and its franchisees currently operate approximately 5,600
shops in the United States and 2,000 shops outside of the United States. Dunkin' Donuts
shops feature Dunkin' Donuts' distinctive trade dress, including the pink and orange color
scheme, and the frankfurter lettering style. In the more than forty-five years since the
Dunkin' Donuts system began, millions of consumers have been served in Dunkin' Donuts
shops. *Id*. at ¶ 20.

18.    As a result of the extensive sales, advertising, and promotion of items
identified by the Dunkin' Donuts marks, the public has come to know and recognize the
Dunkin' Donuts marks, and to associate them exclusively with products and services offered
by Dunkin' Donuts and its franchisees. The Dunkin' Donuts marks are among the best and
most widely known trademarks in the United States today, and are assets of inestimable

5

value to Dunkin' Donuts, representing and embodying Dunkin' Donuts' considerable goodwill and favorable reputation. *Id*. at ¶ 21.

### The Baskin-Robbins System

19.     Baskin-Robbins is the franchisor of the Baskin-Robbins system. *Id*. at ¶ 22.

20.     BR IP Holder LLC is the owner of the trademark, service mark, and trade name "Baskin-Robbins" and related marks. Baskin-Robbins Franchised Shops LLC has the exclusive license to use and license others to use these marks and trade names and has used them continuously since approximately 1947 to identify its ice cream stores, and the ice cream and other products associated with those stores. *Id*. at ¶ 23.

21.     BR IP Holder LLC owns numerous federal registrations for the mark "Baskin-Robbins" or derivations thereof, as well as related marks. Each of these registrations is in full force and effect, and most of them are incontestable pursuant to 15 U.S.C. § 1065. *Id*. at ¶ 24.

22.     The Baskin-Robbins trademarks are utilized in interstate commerce. *Id*. at ¶ 25.

23.     The Baskin-Robbins marks have been very widely advertised and promoted by Baskin-Robbins over the years. As a result, the Baskin-Robbins marks have become famous throughout the United States. *Id*. at ¶ 26.

24.     Baskin-Robbins and its franchisees currently operate approximately 2,500 stores in the United States and 3,000 stores outside of the United States. In the more than fifty-five years since the Baskin-Robbins System began, millions of consumers have been served in Baskin-Robbins stores. *Id*. ¶ 27.

25.     As a result of the extensive sales, advertising, and promotion of items identified by the Baskin-Robbins marks, the public has come to know and recognize the Baskin-Robbins marks, and to associate them exclusively with products and services offered by Baskin-Robbins and its franchisees.  The Baskin-Robbins marks are among the best and most widely known trademarks in the United States today, and are assets of inestimable value to Baskin-Robbins, representing and embodying Baskin-Robbins' considerable goodwill and favorable reputation.  *Id.* ¶ 28.

### Defendants' Obligations Under the Franchise Agreements

26.     Under the terms of the Franchise Agreements, Defendants agreed they would use Dunkin' Donuts' and Baskin-Robbins' proprietary marks, including, but not limited to, their trademarks, logos, emblems, trade dress and other indicia of origin, "only in the manner and to the extent specifically licensed" by the agreements.  Exs. 1.A-1.D §§ 7.0 and 7.1

27.     Under the terms of the Franchise Agreements, Defendants agreed that any unauthorized use of the Plaintiffs' proprietary marks during or after the expiration or earlier termination of the agreements would constitute an incurable default causing irreparable harm subject to injunctive relief.  *Id.* §§ 7.1, 9.4.3.

28.     Under the terms of the Franchise Agreements, Defendants agreed as follows:

(a)     To pay Dunkin' and Baskin a franchise fee of 5.9 percent of the gross sales of the business (*Id.*, Contract Data Schedule Item "E", § 4.3);

(b)     To pay Dunkin' and Baskin an advertising fee of 5.0 percent of the gross sales of the business to the Franchise Owners Advertising and Sales Promotion Fund (*Id.*, Contract Data Schedule Item "F", § 4.4);

(c)     To accurately report on an approved form each week gross sales for the preceding calendar week, at which time all fees required to be paid were to be remitted (*Id.*, § 5.2.1); and

(d)     To pay interest on unpaid monies due under Section 4 of the Franchise Agreement (*Id.*, § 9.3).

29.     Under the terms of the Franchise Agreements, in the event Defendants fail to pay franchise fees and advertising fees in a timely manner, they are entitled to a written notice of default and seven (7) days to cure their financial default.  *Id.* § 9.1.1.

30.     In the event that Defendants fail to cure the financial default within the time provided, Dunkin' and Baskin have the right to immediately terminate the Franchise Agreements.  *Id.* § 9.4.

31.     Under the terms of the Franchise Agreements, Defendants agreed that upon the termination of the agreements, their rights to use Dunkin' Donuts' and Baskin-Robbins' proprietary marks and their Systems would cease.  *Id.* §§ 9.4, 9.4.1, 9.4.2.

## Nonpayment of Franchise Fees and Advertising Fees

32.     As set forth above, under the Franchise Agreements, Defendants agreed to pay Dunkin' and Baskin franchise fees and advertising fees on a weekly basis, as well as interest on unpaid monies due under Section 4 of the Franchise Agreements.

33.     Defendants failed to pay franchise and advertising fees to Dunkin' and Baskin as required by the Franchise Agreements.  As of December 10, 2007, Defendants owed Plaintiffs $30,523.22 in unpaid franchise fees, advertising fees, and other charges. Certification of Gary Zullig, Ex. 2, ¶ 8 (attached hereto).

34.     On or about December 10, 2007, Plaintiffs served a written Notice to Cure on Defendants advising them that they were in default under the Franchise Agreements for failing to pay Dunkin' and Baskin monies due under the Agreements.  Plaintiffs provided Defendants with fifteen (15) days in which to cure the defaults.  Ex. 1.E.

35.     Defendants failed to cure their defaults within the fifteen (15) days provided in the Notice to Cure.  Ex. 2 at ¶ 9.

36.     As of January 9, 2008, Defendants owed Plaintiffs $33,861.53 in past due franchise fees, advertising fees, and other charges.  *Id.* ¶ 9.

## Supplemental Notice of Termination

37.     Pursuant to the applicable provisions of the Franchise Agreements, on January 8, 2007, Plaintiffs sent Defendants Supplemental Notice of Termination, terminating the Franchise Agreements, and demanding that they cease using Dunkin' Donuts' and Baskin-Robbins' trade names and proprietary marks immediately upon the effective date of termination and thereafter comply with their post-termination obligations under the Franchise Agreements.  Ex. 1.F.

38.     Defendants have refused to accept termination and continue to operate as if they were licensed Dunkin' and Baskin franchisees, which they are not.

## ARGUMENT

The grant or denial of a preliminary injunction rests in the sound discretion of the trial court.  The factors a court considers in whether to grant a preliminary injunction are:

(1)     whether the plaintiff will suffer irreparable injury if the injunction is not granted; and either

(2)    whether there is a substantial likelihood that the plaintiff will succeed on the merits; *or*

(3)    whether sufficiently serious questions going to the merits exist to make them fair grounds for litigation and a balance of hardships weighs decisively toward the party requesting the injunction.

*See International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 70 (2d Cir. 1996).  Given the claims at issue in this case, Plaintiffs will address the likelihood of success prong before turning to that of irreparable injury.  Regardless, it is clear that the requested injunction should be granted.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.    Defendants Are Liable for Breach of Contract Under the Franchise Agreements Because They Have Failed to Pay Monies Due (Count II).

There can be no issue that Defendants' Franchise Agreements were properly terminated and that Defendants have refused to comply with their post-termination obligations under those agreements.  Under the express terms of the Franchise Agreements, Defendants were required to pay franchise fees and advertising fees to Dunkin' and Baskin. Statement of Facts ¶ 28 ("SOF").  Under the Franchise Agreements, a failure to pay financial obligations is a default, which, if not timely cured, allows for immediate termination of the Franchise Agreements.  *Id.* ¶¶ 29-30.

It cannot be disputed that as of December 10, 2007, Defendants owed Plaintiffs $30,523.22 in franchise fees, advertising fees, and other charges.  *Id.* ¶ 33.  Plaintiffs served Defendants with a written notice to cure on that same date, demanding that Defendants cure their financial defaults within fifteen days.  *Id.* ¶ 34.  Defendants did not cure their financial defaults within fifteen days and, therefore, on January 8, 2007, Plaintiffs served a

Supplemental Notice of Termination on Defendants, which terminated the Franchise Agreements. *Id.* ¶ 37.

Plaintiffs are highly likely to succeed on their claims for breach of contract based on Defendants' failure to pay their financial obligations. The franchisees' obligation to pay royalties and fees is a vital part of any franchise relationship. *E.g., Amerada Hess Corp. v. Quinn,* 362 A.2d 1258, 1268, 143 N.J. Super. 237, 256 (1976). The nonpayment of fees constitutes just cause for termination both under the express terms of the Franchise Agreements and pursuant to case law. *See ARP Films, Inc. v. Marvel Entm't Group, Inc.,* 952 F.2d 643, 649 (2d Cir. 1991) (holding that "failure to tender payment is generally deemed a material breach of a contract"); *see also Hinkleman v. Shell Oil Co.,* 962 F.2d 372, 376 (4th Cir. 1992) (holding that franchisor had cause to terminate franchisee for nonpayment of fees, despite allegation by franchisee that rent charged was excessive), *cert. denied,* 506 U.S. 1041 (1992); *Two Men & a Truck/Int'l Inc. v. Two Men & a Truck/Kalamazoo, Inc.,* 949 F. Supp. 500, 505 (W.D. Mich. 1996); *McDonald's Corp. v. Robert A. Makin, Inc.,* 653 F. Supp. 401, 403-04 (W.D.N.Y. 1986); *Liu v. Dunkin' Donuts, Inc.* No. 99-3344, No. 00-3666, 2000 U.S. Dist. LEXIS 18388, at *11-13 (E.D. Pa. Dec. 21, 2000) (a true and correct copy of which is attached as Exhibit 3). Thus, Defendants' Franchise Agreements were validly terminated pursuant to their express terms.

The Franchise Agreements require Defendants to cease using Plaintiffs' proprietary marks after the termination of their Franchise Agreements. SOF ¶ 31. To date, Defendants have refused to comply with their post-termination obligations. SOF ¶ 38. Defendants have indisputably breached the express terms of the contract, and Plaintiffs are thus likely to succeed on Count II of their Amended Complaint.

**B.    Plaintiffs Are Likely to Succeed On Their Trademark Infringement Claim (Count V).**

Because Plaintiffs are likely to succeed on their termination claims, they are also likely to succeed on their trademark infringement claims.  To prevail on a trademark infringement claim, a plaintiff must establish (1) the use by another of plaintiff's valid trademark, (2) in a way that is likely to confuse consumers as to the source of the product. *See Otokoyama Co. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir. 1999); *Louis Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986).  The standard by which to judge likelihood of success is whether the plaintiff has made a showing that the probability of its prevailing is better than fifty percent.  *See Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988) (citing *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)); *Versames v. Palazzolo*, 96 F. Supp. 2d 361, 366 (S.D.N.Y. 2000).

Plaintiffs' marks have been properly registered in accordance with the Lanham Act (SOF ¶¶ 13, 21), and are thus valid and legally protectable.  *See* 15 U.S.C. § 1065; *see also Frank Burckhorst Co. v. G. Heileman Brewing Co.*, 875 F. Supp. 966, 975 (E.D.N.Y. 1994) ("The existence of a trademark registration is prima facie evidence of a valid trademark."); *Dieter v. B&H Indus.*, 880 F.2d 322, 326 (11th Cir. 1989) (validity of incontestable marks is "conclusively presumed"); *General Cigar Co. v. G.D.M. Inc.*, 988 F. Supp. 647, 663 (S.D.N.Y. 1997) ("registration of a trademark establishes a presumption that it is distinctive and should receive the utmost protection").  Defendants have used, and continue to use, those marks in offering Plaintiffs' products for sale.

Turning to the second element, "there is a great likelihood of confusion when the infringer uses the exact trademark' as the plaintiff."  *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3d Cir. 1992) (quoting *Opticians Ass'n v. Independent Opticians*, 920 F.2d

187, 195 (3d Cir. 1990)); *see also Lane Capital Mgmt. v. Lane Capital Mgmt.*, 15 F. Supp. 2d

389, 398 (S.D.N.Y. 1998), *aff'd*, 192 F.3d 337 (2d Cir. 1999).  Indeed, in such a case, "'the

likelihood of confusion is inevitable.'"  *Dunkin' Donuts Inc. v. Northern Queens Bakery,*

*Inc.*, 216 F. Supp. 2d 31, 44 (E.D.N.Y. 2001) (quoting *Opticians Ass'n*, 920 F.2d at 195).

> Cases where a defendant uses an identical mark on competitive goods hardly
> ever find their way into the appellate reports.  *Such cases are "open and shut"*
> and do not involve protracted litigation to determine liability for trademark
> infringement.

*Opticians Ass'n*, 920 F.2d at 195 (quoting J. McCarthy, 2 *McCarthy on Trademarks and*

*Unfair Competition* § 23:3 (2d ed. 1984)) (emphasis added); *see also Southland Corp. v.*

*Froelich*, 41 F. Supp.2d 227, 243 (E.D.N.Y. 1999) ("[W]here the unauthorized user of the

trademark continues to use the identical, previously licensed trademark, after revocation of

the license, likelihood of confusion is established.") .

> Simply put, Defendants' status as "holdover" franchisees is *dispositive* of the

infringement issue:

> Once a license contract is terminated, there is no doubt that the ex-licensee has
> no authorization or consent to continue use of the mark.  After the license has
> ended, the ex-licensee must stop use of the mark.  Continued use by an ex-
> licensee of the licensor's mark constitutes a fraud on the public, since they are
> led to think that the ex-licensee is still connected with the licensor.  As the
> Eleventh Circuit observed:  "Common sense compels the conclusion that a
> strong risk of consumer confusion arises when a terminated franchisee
> continues to use the former franchisor's trademarks."
>
> . . . Understandably, many ex-franchisees and ex-licensees are reluctant to
> give up use of the mark.  Nevertheless, they clearly can be enjoined from any
> such further use.

4 *McCarthy on Trademarks and Unfair Competition* § 25.31 (4th ed. 1999) (footnote

omitted) (quoting *Burger King Corp. v. Mason*, 710 F.2d 1480, 1492 (11th Cir. 1983)); *see*

*also Burger King v. Majeed*, 805 F. Supp. 994, 1002-03 (S.D. Fla. 1992) (noting "well-

settled doctrine that a terminated franchisee's continued use of its former franchisor's trademarks, by its very nature, constitutes unfair competition").

Defendants have been terminated and thus are operating as holdover franchisees. This is dispositive of the issue of infringement and thus there is no need to conduct the Second Circuit's eight-factor test for determining likelihood of confusion.[1]  Were such an analysis necessary, it would only confirm that a likelihood of confusion exists under the facts presented:  (1) strength of mark – Plaintiffs' marks are registered, incontestable under 15 U.S.C. § 1065, and entitled to a statutory presumption of validity; (2) degree of similarity of the marks – the marks in question are the same because Defendants continue to use Plaintiffs' marks; (3) similarity of products – the products are identical because Defendants continue to operate their shops as if they were *bona fide* franchisees of Plaintiffs; (4) bridging the gap – Plaintiffs already offer their products through identical retail outlets to the same customers; (5) actual confusion (not required to show likelihood of confusion) – Defendants' unauthorized use of Plaintiffs' marks can have no result other than to cause actual confusion because customers cannot possibly know that Defendants are not licensed franchisees of Plaintiffs; (6) Defendants' intent – Defendants clearly intend to pass off their shops as authorized shops of Plaintiffs despite the knowledge that their Franchise Agreements have been terminated; (7) quality of the respective goods – even if Defendants are selling quality products, that would only serve to heighten the confusion to customers; and (8) sophistication of prospective purchasers – Plaintiffs' products are frequently purchased on impulse and thus not subject to a high degree of scrutiny.  *See Majeed*, 805 F. Supp. at 1002-03 and *Burger*

---

[1]  The Second Circuit's eight factor test is set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).  *See also Morningside Group v. Morningside Capital Group*, 182 F.3d 133, 138 (2d Cir. 1999) (listing the *Polaroid* factors).

*King v. Hall*, 770 F. Supp. 633, 638 (S.D. Fla. 1991) (conducting similar analysis for holdover franchisees).

Here, Defendants are continuing to use the exact same marks as when they were licensed franchisees. Accordingly, confusion is not only likely, it is inevitable, and the Court should find that Plaintiffs are likely to succeed on the merits at trial.

### C.  Plaintiffs Are Likely to Succeed on Their Unfair Competition and Trade Dress Infringement Claims (Counts VI and VIII).

In Counts VI and VIII of the Amended Complaint, Plaintiffs allege trade dress infringement and unfair competition. In order to succeed on a trade dress infringement claim, Plaintiffs must show (1) that their trade dress is inherently distinctive or has become inherently distinctive through secondary meaning, and (2) their trade dress is being used by another in a manner likely to cause confusion as to the origin of the goods or services. *See L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co., Inc.,* 79 F.3d 258, 262 (2d Cir. 1996). Dunkin' has made the requisite showing. *See* SOF ¶¶ 13-18, 20-25, Section I.B, *supra*. To succeed on their claim for unfair competition, Plaintiffs must show "two essential elements: (1) an association of origin by the consumer between the mark and the first user, and (2) a likelihood of consumer confusion when the mark is applied to the second user's good." *Forschner Group v. Arrow Trading Co.*, 904 F. Supp. 1409, 1417 (S.D.N.Y. 1995), *aff'd*, 124 F.3d 402 (2d Cir. 1997). Those elements are easily met in this case. It is beyond question that consumers associate the distinctive marks of Plaintiffs with Dunkin' Donuts and Baskin-Robbins. *See* SOF ¶¶ 13-18, 20-25. And, as explained above, likelihood of confusion is established in cases like this one where an "unauthorized user of the trademark continues to use the identical, previously licensed trademark, after revocation of the license." *Froelich*, 41 F. Supp. 2d at 243; *Northern Queens*, 216 F. Supp. 2d at 44 ("Here, defendants

are using the exact same mark as they used when they were properly franchised, which will generate confusion among Dunkin' Donuts customers as to the source of defendants' goods and services."). Plaintiffs are likely to succeed on their trade dress and unfair competition claims.

## II.    DEFENDANTS' CONTINUED USE OF PLAINTIFFS' PROPRIETARY MARKS AND METHODS HAS CAUSED AND CONTINUES TO CAUSE IRREPARABLE HARM TO PLAINTIFFS.

Where "a plaintiff in a trademark infringement case has demonstrated a likelihood of success on the merits 'irreparable injury . . . almost inevitably follows' and, indeed, is presumed." *Helene Curtis v. Nat'l Wholesale Liquidators,* Inc., 890 F. Supp. 152, 160 (E.D.N.Y. 1995) (quoting *Omega Importing Corp. v. Petri-Kine Camera, Co.,* 451 F.2d 1190, 1195 (2d Cir. 1971)). Here, Plaintiffs have been and will continue to be irreparably harmed by Defendants' unlicensed use of their marks.

A franchisor, like any trademark owner, has the right to license others to use its trademarks only in the manner that it prescribes. The unauthorized or unlicensed use of those marks creates a situation where the franchisor no longer can control its reputation and goodwill. Courts have uniformly held that the lack of control amounts to irreparable injury warranting an injunction. As the Second Circuit has stated:

> One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured under the holder's trademark.

*El Greco Leather Prods., Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986).

A franchisor lacks control over its trademarks when a franchise agreement is terminated and yet the franchisee continues to utilize the franchisor's trademarks – which is the precise situation here. In such circumstances, the courts have consistently recognized a franchisor's right to an injunction preventing the continued unauthorized use of its trademarks. For example, in *Jiffy Lube Int'l, Inc.,* the Third Circuit held:

16

> The franchisor has the power to terminate the relationship where the terms of the franchise agreement are violated. *Once a franchise is terminated, the franchisor has the right to enjoin unauthorized use of its trademark under the Lanham Act.*

968 F.2d at 375 (emphasis added).

Plaintiffs have invested a tremendous amount of resources over the years in building the considerable goodwill associated with their marks. Defendants' conduct in continuing to operate their shops after termination of the Franchise Agreements interferes with the ability of Plaintiffs to control the quality of the goods and services that Defendants continue to provide under Plaintiffs' marks.

The lack of control that Plaintiffs have over their marks is demonstrated in other ways as well. Assuming that they are dealing with an authorized franchisee of Plaintiffs, customers of Defendants' shops will believe they are purchasing authentic goods of Plaintiffs, when in fact they are not. As Judge Sifton held in granting Dunkin's preliminary injunction motion in *Northern Queens*, "[w]here the party seeking a preliminary injunction in trademark case shows that it will 'will lose control over the reputation of its trademark pending trial,' the requirement of irreparable injury is satisfied." *Northern Queens*, 216 F. Supp. 2d at 40. As a result of Defendants' distribution of products held out to be those of Plaintiffs, Plaintiffs face damage to their reputation, and consequently loss of customers. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1310 (11th Cir. 1998). "[D]amages to a business's goodwill as a result of unauthorized trademark usage are not readily quantifiable and, thus, constitute irreparable injury." *Northern Queens*, 216 F. Supp. 2d at 40. Accordingly, ample justification exists for a finding of irreparable injury to Plaintiffs.

**III.    SUFFICIENTLY SERIOUS QUESTIONS REGARDING THE MERITS EXIST TO MAKE THIS MATTER FAIR GROUNDS FOR LITIGATION AND THE BALANCE OF HARDSHIPS WEIGHS DECISIVELY IN PLAINTIFFS' FAVOR.**

By demonstrating its likelihood of success on the merits, *supra*, Plaintiffs have already made the lesser showing that sufficiently serious questions going to the merits exist

to make them fair grounds for litigation. *See Amestoy*, 92 F.3d at 70. Furthermore, it is plain that the balance of hardships weighs decisively in Plaintiffs' favor.

The harm to Plaintiffs from Defendants' unlicensed use of their marks outweighs any harm the Defendants may suffer from the grant of the requested injunction. In contrast to the irreparable harm suffered by Plaintiffs, any harm to Defendants is completely self-inflicted and thus cannot be deemed irreparable as a matter of law. *See, e.g., Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) (self-inflicted harm cannot be deemed "irreparable"). *See also, Jiffy Lube*, 968 F.2d at 379 (The terminated franchisee's "self-inflicted harm is far outweighed by the immeasurable damage done Jiffy Lube by the infringement of its trademark."); *American Home Prods. Corp. v. Johnson Chem. Co.*, 589 F.2d 103, 107 (2d Cir. 1978); *Majeed,* 805 F. Supp. at 1006 ("Defendants simply have no equitable standing to complain of injury should their infringements be preliminarily enjoined."); *Jews for Jesus v. Brodsky*, 993 F. Supp. 282, 312 (D.N.J. 1998) ("The Defendant cannot complain he will suffer irreparable injury if a preliminary injunction is issued because he misappropriated the Mark and the Name of the Plaintiff Organization with full knowledge of the rights of the Plaintiff."). After all, "[o]ne who adopts the mark of another for similar goods acts at his own peril," because he has no claim to the profits or advantages thereby derived. *American Home*, 589 F.2d at 197.

Moreover, any costs to Defendants are insignificant when balanced against the irreparable injury to the goodwill that Plaintiffs have created through the expenditure of over a billion dollars in advertising and promoting their marks for over four decades. *See Tanel Corp. v. Reebok Int'l, Ltd.*, 774 F. Supp. 49, 51 (D. Mass. 1990) (holding that plaintiff's

expenditures on four years' worth of advertising and promotion outweighed harm to infringers).

The denial of an injunction will adversely affect Plaintiffs' other franchisees – those who play by the rules and abide by their own franchise agreements.  Those franchisees have a significant interest in preventing unlicensed individuals from operating under Plaintiffs' marks.  Licensed franchisees have placed their trust in Plaintiffs to protect their substantial investment in the system.  *See Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2d Cir. 1981) ("If the injunction is denied, . . . [the franchisor's] licensing program will lose much of the confidence reposed in it by the licensees, who also made substantial investments based upon the exclusivity of their licenses.").  *See also Frisch's Restaurants, Inc. v. Elby's Big Boy,* 670 F.2d 642, 651 (6th Cir. 1982).  The balance of harms weighs decisively in Plaintiffs' favor.

Finally, although not a factor in the Second Circuit's test, the public interest favors the grant of an injunction.  As discussed above, central to a trademark infringement action is whether the public is likely to be confused as to the source of the products in question. While the public interest is often defined in different ways, in a trademark case it is most often synonymous with the right of the public not to be deceived or confused.  *See Opticians Ass'n*, 920 F.2d at 195 (citing 2 *McCarthy on Trademarks and Unfair Competition* § 30:21). Indeed, the Second Circuit has stated, "[T]he public interest is especially served by issuing a preliminary injunction against a former licensee as the licensee's status increases the probability of consumer confusion."  *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986).  The Court should issue the requested injunction.

## <u>CONCLUSION</u>

The requisite elements for issuance of an injunction are more than satisfied here.

Plaintiffs have been and continue to be irreparably injured by Defendants' conduct.  Plaintiffs

are likely to succeed on the merits, or, at the very least, have established the existence of

sufficiently serious questions going to the merits which, when coupled with the hardships

facing them, militate in favor of an injunction.  Furthermore, Plaintiffs do not have an

adequate remedy at law.  Accordingly, Plaintiffs respectfully request that the requested

injunction be granted.

Respectfully submitted,


By:/s/ Ronald D. Degen_____
    Ronald Degen, Esq. (RD 7808)
    Scott Goldfinger, Esq. (SC 9219)
    O'ROURKE & DEGEN, PLLC
    225 Broadway, Suite 715
    New York, NY 10007
    Telephone:   (212) 227-4530
    Facsimile:    (212) 385-9813

Robert L. Zisk, Esq. (RZ 1275)
David E. Worthen, Esq. (DW 8519)
Katherine L. Wallman, Esq. (KW 3966)[*]
GRAY, PLANT, MOOTY, MOOTY
    & BENNETT, P.A.
2600 Virginia Avenue, N.W., Suite 1111
Washington, DC 20037
Telephone:   (202) 295-2200
Facsimile:    (202) 295-2250

Dated:  January 16, 2008            Counsel for Plaintiffs

---

[*] Not admitted to D.C. Bar

Exhibit 1

**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

DUNKIN' DONUTS FRANCHISED              :
  RESTAURANTS LLC,                     :
  a Delaware Limited Liability Company, :
DD IP HOLDER LLC,                      :
  a Delaware Limited Liability Company, :
BASKIN-ROBBINS FRANCHISED              :
  SHOPS LLC,                           :
  a Delaware Limited Liability Company, and :
BR IP HOLDER LLC,                      :
  a Delaware Limited Liability Company, :
                                      :
             Plaintiffs,          :
                                      :
           v.                   :   C.A. No. 07-CV-11134 (RJH)
                                      :
SUNDRAM, INC.,                         :
  a New York Corporation,              :
SATYAM SHIVAM, INC.,                   :
  (now known as Satyam Eastchester LLC) :
  a New York Corporation,              :
SHIVAM SUNDRAM, INC.,                  :
  (now known as Shivam Bruckner LLC)   :
  a New York Corporation,              :
TKNY PARTNERS, LLC,                    :
  a New York Limited Liability Company, :
ANIL KAPOOR,                           :
  a resident of Massachusetts, and     :
PRAN TIKU,                             :
  a resident of Massachusetts,         :
                                      :
             Defendants.          :

------------------------------------------------------------------x

## CERTIFICATION OF JACK LAUDERMILK

1.      My name is Jack Laudermilk.  I am a citizen and resident of the Commonwealth

of Massachusetts, and I make this Certification based on personal knowledge and in support of

Plaintiffs' Memorandum in Support of Their Motion for a Preliminary Injunction.

2.      I am Associate General Counsel for Dunkin' Donuts Brands, Inc., the parent

corporation of Dunkin' Donuts Franchised Restaurants LLC and Baskin-Robbins Franchised

Shops LLC. I have been employed by Dunkin' Brands or its predecessors since 1971.

3.      As Associate General Counsel, I am the custodian of and have access to executed

copies of all Dunkin' and Baskin franchise agreements, leases, correspondence, and other related

documents and records concerning each Dunkin' Donuts and Baskin-Robbins franchise. This

includes the documents and records relating to the Dunkin' Donuts and Dunkin' Donuts/Baskin-

Robbins franchises owned by Defendants in this case. The documents attached hereto are kept in

the course of Dunkin's and Baskin-Robbins' regularly conducted business activities, and it is

Dunkin's and Baskin-Robbins' normal practice to make and keep these documents. My job

responsibilities include overseeing litigation brought by or against franchisees. I am also

familiar with the business of Dunkin' and Baskin-Robbins generally, including having

knowledge regarding the resources Dunkin' and Baskin-Robbins have dedicated toward their

intellectual property and the relationship between franchisees' operations and the goodwill

associated with Dunkin's and Baskin-Robbins' marks.

4.      Plaintiff Dunkin' Donuts Franchised Restaurants LLC, successor-in-interest to

Dunkin' Donuts LLC and Dunkin' Donuts Incorporated, is a Delaware limited liability company

with its principal place of business at 130 Royall Street, Canton, Massachusetts. All Dunkin'

Donuts Franchise Agreements dated prior to May 26, 2006 have been assigned to Dunkin'

Donuts Franchised Restaurants LLC. It is engaged in the business of franchising independent

businesspersons to operate Dunkin' Donuts shops throughout the United States. Dunkin' Donuts

franchisees are licensed to use the trade names, service marks, and trademarks of Dunkin'

Donuts and to operate under the Dunkin' Donuts System, which involves the production,

2

merchandising, and sale of donuts and related products utilizing a specially designed building with special equipment, equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, specifications, proprietary marks and identification.

5.      Plaintiff DD IP Holder LLC, Dunkin's wholly-owned subsidiary and successor-in-interest to Dunkin' Donuts USA, Inc., is a Delaware limited liability company with its principal place of business at 130 Royall Street, Canton, Massachusetts. DD IP Holder LLC is the owner of the trademark, service mark, and trade name "Dunkin' Donuts," and related marks. Unless otherwise specified, Dunkin' Donuts Franchised Restaurants LLC and DD IP Holder LLC are collectively referred to hereinafter as "Dunkin'" or "Dunkin' Donuts."

6.      Plaintiff Baskin-Robbins Franchised Shops LLC, successor-in-interest to Baskin-Robbins USA LLC and Baskin-Robbins USA, Co., is a Delaware limited liability company with its principal place of business at 130 Royall Street, Canton, Massachusetts. All Baskin-Robbins Franchise Agreements dated prior to May 26, 2006 have been assigned to Baskin-Robbins Franchised Shops LLC. Baskin-Robbins is authorized to use the trademarks, service marks and trade names owned by BR IP Holder LLC and to sublicense Baskin-Robbins franchisees, as independent businesspersons, to use these marks and trade names. Baskin-Robbins franchisees are licensed to use the Baskin-Robbins trade names, service marks, and trademarks and to operate under the Baskin-Robbins system, which involves the production, merchandising, and sale of ice cream and related products utilizing special equipment, equipment layouts, interior and exterior accessories, identification schemes, products, management programs, standards, specifications, proprietary marks, and information.

7.      Plaintiff BR IP Holder LLC, successor-in-interest to Baskin-Robbins

3

Incorporated, is a Delaware limited liability company with its principal place of business at 130 Royall Street, Canton, Massachusetts. BR IP Holder LLC is the owner of the trademark, service mark, and trade name "Baskin-Robbins" and related marks. Unless otherwise specified, Baskin-Robbins Franchised Shops LLC and BR IP Holder LLC are collectively referred hereinafter as "Baskin-Robbins" or "Baskin."

8.     Dunkin' and Baskin operate as separate corporations. However, they pursue or permit joint development of units in selected markets, which are commonly referred to as "combo" shops.

9.     Defendant Sundram, Inc. ("Sundram") is a New York corporation and, upon information and belief, its principal place of business is in the Bronx, New York. Defendant Sundram was the owner of a Dunkin' Donuts shop located at 511 East 163rd Street, Bronx, New York, pursuant to a Franchise Agreement dated June 15, 2004. A true and correct copy of the 511 East 163rd Street Franchise Agreement is attached hereto as Exhibit A.

10.    Defendant Satyam Shivam, Inc., upon information and belief now operating without Plaintiffs' authority or approval as Satyam Eastchester LLC ("Satyam Shivam"), is a New York corporation and, upon information and belief, its principal place of business is in the Bronx, New York. Defendant Satyam Shivam was the owner of a Dunkin' Donuts shop located at 2451 Eastchester Road, Bronx, New York, pursuant to a Franchise Agreement dated January 18, 2004. A true and correct copy of the 2451 Eastchester Road Franchise Agreement is attached hereto as Exhibit B.

11.    Defendant Shivam Sundram, Inc., upon information and belief now operating without Plaintiffs' authority or approval as Shivam Bruckner LLC ("Shivam Sundram"), is a New York corporation, and upon information and belief, its principal place of business is in the

4

Bronx, New York. Defendant Shivam Sundram was the owner of a Dunkin' Donuts shop located at 114 Bruckner Boulevard, Bronx, New York, pursuant to a Franchise Agreement dated April 11, 2005. A true and correct copy of the 114 Bruckner Boulevard Franchise Agreement is attached hereto as Exhibit C.

12.     Defendant TKNY Partners, LLC ("TNKY Partners") is a New York limited liability company and, upon information and belief, its principal place of business is in New York, New York. TNKY Partner was the owner of a Dunkin' Donuts and Baskin-Robbins combo shop located at 145 East 125th Street, New York, New York, pursuant to a Franchise Agreement dated February 1, 2006. A true and correct copy of the 145 East 125th Street Franchise Agreement is attached hereto as Exhibit D.

13.     Defendant Anil Kapoor is, upon information and belief, a natural person and a citizen and resident of the Commonwealth of Massachusetts. Defendant Anil Kapoor is an officer, member, and/or shareholder of Sundram, Satyam Shivam, Shivam Sundram, and TKNY Partners, and personally guaranteed the obligations of the foregoing entities pursuant to executed personal guarantees.

14.     Defendant Pran Tiku is, upon information and belief, a natural person and a citizen and resident of the Commonwealth of Massachusetts. Defendant Pran Tiku is an officer, member, and/or shareholder of TKNY Partners, and personally guaranteed the obligations of the foregoing entity pursuant to an executed personal guarantee.

## The Dunkin' Donuts System

15.     Dunkin' is the franchisor of the Dunkin' Donuts franchise system.

16.     DD IP Holder LLC is the owner of the trademark, service mark, and trade name "Dunkin' Donuts," and related marks. Dunkin' Donuts Franchised Restaurants LLC has the

5

exclusive license to use and license others to use these marks and trade name and has used them continuously since approximately 1960 to identify its doughnut shops, and the doughnuts, pastries, coffee, and other products associated with those shops.

17.    The Dunkin' Donuts trademarks and trade name are distinctive and famous and have acquired secondary meaning.

18.    The Dunkin' Donuts trademarks and trade name are utilized in interstate commerce.

19.    The Dunkin' Donuts marks have been very widely advertised and promoted by Dunkin' Donuts over the years. Dunkin' Donuts and its franchisees have expended approximately $1,500,000,000 in advertising and promoting the Dunkin' Donuts marks over the last thirty-five years. Dunkin' Donuts spent approximately $167,000,000 in fiscal year 2005 alone on advertising and promotion.

20.    Dunkin' Donuts and its franchisees currently operate approximately 5,600 shops in the United States and 2,000 shops outside of the United States. Dunkin' Donuts shops feature Dunkin' Donuts' distinctive trade dress, including the pink and orange color scheme, and the frankfurter lettering style. In the more than forty-five years since the Dunkin' Donuts system began, millions of consumers have been served in Dunkin' Donuts shops.

21.    As a result of the extensive sales, advertising, and promotion of items identified by the Dunkin' Donuts marks, the public has come to know and recognize the Dunkin' Donuts marks, and to associate them exclusively with products and services offered by Dunkin' Donuts and its franchisees. The Dunkin' Donuts marks are among the best and most widely known trademarks in the United States today, and are assets of inestimable value to Dunkin' Donuts, representing and embodying Dunkin' Donuts' considerable goodwill and favorable reputation.

6

### The Baskin-Robbins System

22.     Baskin-Robbins is the franchisor of the Baskin-Robbins system.

23.     BR IP Holder LLC is the owner of the trademark, service mark, and trade name "Baskin-Robbins" and related marks. Baskin-Robbins Franchised Shops LLC has the exclusive license to use and license others to use these marks and trade names and has used them continuously since approximately 1947 to identify its ice cream stores, and the ice cream and other products associated with those stores.

24.     BR IP Holder LLC owns numerous federal registrations for the mark "Baskin-Robbins" or derivations thereof, as well as related marks. Each of these registrations is in full force and effect, and most of them are incontestable pursuant to 15 U.S.C. § 1065.

25.     The Baskin-Robbins trademarks are utilized in interstate commerce.

26.     The Baskin-Robbins marks have been very widely advertised and promoted by Baskin-Robbins over the years. As a result, the Baskin-Robbins marks have become famous throughout the United States.

27.     Baskin-Robbins and its franchisees currently operate approximately 2,500 stores in the United States and 3,000 stores outside of the United States. In the more than fifty-five years since the Baskin-Robbins System began, millions of consumers have been served in Baskin-Robbins stores.

28.     As a result of the extensive sales, advertising, and promotion of items identified by the Baskin-Robbins marks, the public has come to know and recognize the Baskin-Robbins marks, and to associate them exclusively with products and services offered by Baskin-Robbins and its franchisees. The Baskin-Robbins marks are among the best and most widely known

7

trademarks in the United States today, and are assets of inestimable value to Baskin-Robbins,
representing and embodying Baskin-Robbins' considerable goodwill and favorable reputation.

29.    Attached hereto as Exhibit E is a true and correct copy of a Notice to Cure sent by
Plaintiffs' outside counsel to Defendants dated December 10, 2007.

30.    Attached hereto as Exhibit F is a true and correct copy of a Supplemental Notice
of Termination sent by Plaintiffs' outside counsel to Defendants dated January 8, 2008.

I certify under penalty of perjury that the foregoing is true and correct. Executed on this
_____ day of January, 2008.

Jack Laudermilk

8

# Exhibit 1A

SDA# 339636

PC# 340091
Bronx, New York

## FRANCHISE AGREEMENT
### ALLIED DOMECQ QUICK SERVICE RESTAURANTS

This Franchise Agreement is dated 6/15/04, 2004, and made by and between ~~BASKIN-ROBBINS USA, CO. (hereinafter "BASKIN-ROBBINS"), a California corporation, and~~ DUNKIN' DONUTS INCORPORATED (hereinafter "DUNKIN' DONUTS"), a Delaware corporation, ~~and TOGO'S EATERIES, INC. (hereinafter "TOGO'S"), a California corporation~~, all with principal offices in Randolph, Massachusetts (such corporations are hereinafter individually or collectively referred to as "FRANCHISOR") and the following individual(s) and/or entity:

### SUNDRAM, INC., a New York corporation
(hereinafter individually or collectively referred to as "FRANCHISEE")

This Franchise Agreement includes the Contract Data Schedule, General Terms and Conditions designated as ("ADQSR-120103") and the Special Terms and Conditions identified in Item "J" of the Contract Data Schedule below.

## CONTRACT DATA SCHEDULE

A.  Location of the Franchised Unit (the "Premises"):

| 511 | East 163rd Street | | Bronx | New York | 10451 |
|-----|-------------------|--|-------|----------|-------|
| (number) | (street) | | (city or town) | (state) | (zip code) |

B.  Term:............................Twenty (20) years from the first date the Unit opens to serve the general public, ~~or, in the case of an existing Unit, until~~

C.  Initial Franchise Fee:................................................................Fifty Thousand dollars ($ 50,000.00)*
*Paid Under SDA# 339636 ($50,000.00)

D.  Marketing Start-Up Fee:.........................................................Five Thousand dollars ($5,000.00)*
*Note Schedule MSF below

E.  Continuing Franchise Fee Rate:...............................Five and nine-tenths percent (5.9%) of Gross Sales

F.  Minimum Continuing Advertising Fee Rate:.......................................Five percent (5.0%) of Gross Sales

G.  Refurbishment Date: In the case of a new unit, the date five (5) years and fifteen (15) years after the first date the Unit opens to serve the general public; ~~or, in the case of an existing unit, on~~
Remodel Date:    In the case of a new unit, the date ten (10) years after the first date the Unit opens to serve the general public, ~~or, in the case of an existing unit, on~~

H.  Transfer Fee: As provided in subsection 10.4 of the General Terms and Conditions, unless another amount is inserted here:    NO CHANGE

I.  Address for notice to FRANCHISEE shall be at the Unit Premises, unless another address is inserted here:

J.  Special Terms and      [X] DD-00    Special Terms and Conditions Applicable to a
    Conditions:                          Dunkin' Donuts Franchise
                          [X] DD-01    Additional Provisions for a Dunkin' Donuts
                                       Manufacturing Retail Unit (A Full-Producing Unit)
                          [X] FD       Special Terms and Conditions Applicable to
                                       Development of a New Unit By Franchisee
                          [X] NY       Addendum to the ADQSR Franchise Agreement and
                                       Store Development Agreement required by the
                                       New York General Business Law
                          [X] MSF      Special Terms and Conditions Applicable to
                                       the Marketing Startup Fee

K.  The Designated Representative for this Unit is    ANIL KAPOOR
    (List only one person. See definitions in General Terms and Conditions.) [print full name above]

L.  Arbitration under this Agreement shall be initiated in the city and state of New York, New York.

M.  If applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit located at _____ N/A _____
    (insert address if this Unit is a Dunkin' Donuts non-producing unit; otherwise insert "not applicable").

Form last revised 12/01/02

Allied Domecq QSR corporations are EOE and AA Employers
(Franchisees are not employees)

ADQSR-120103

# ALLIED-DOMECQ QUICK SERVICE RESTAURANTS
## FRANCHISE AGREEMENT
© December, 2003

## GENERAL TERMS AND CONDITIONS

### INTRODUCTION

**Baskin-Robbins USA Co.**, a California corporation ("BASKIN-ROBBINS"), **Dunkin' Donuts Incorporated**, a Delaware corporation ("DUNKIN' DONUTS") and **Togo's Eateries Inc.**, a California corporation ("TOGO'S") are indirect wholly-owned subsidiaries of Allied Domecq PLC, a publicly-traded United Kingdom company. To take advantage of synergies between them, the three subsidiaries share certain common field and support personnel and form an unincorporated division called "Allied Domecq Quick Service Restaurants". As a result of the expenditure of time, effort and money, each subsidiary has acquired experience and skill in the development and operation of food service establishments using distinctive systems and techniques for the production, distribution, merchandising and sale of branded food products, including, without limitation, *Baskin-Robbins®* ice cream, yogurt and novelties, *Dunkin' Donuts®* donuts, coffee and freshly baked goods, *Togo's®* fresh sandwiches, salads and deli platters, and other unique and distinctive products, services and business methods (hereinafter each called a "System" and collectively called the "Systems").

The distinguishing characteristics of these Systems include, without limitation, distinctive exterior and interior design, decor, color and identification schemes and furnishings; specially designed manufacturing and merchandising equipment; unique and proprietary information technologies and software; special menu items; standards, specifications and procedures for operations, manufacturing, distribution and delivery; quality of products and services offered; management programs; training and assistance; and marketing, advertising and promotional programs, all of which may be changed, supplemented, improved and further developed from time to time by FRANCHISOR as new learning and best practices are identified and incorporated.

### DEFINITIONS

As used throughout this Agreement, the following defined terms shall have the following meanings:

A.    The "Proprietary Marks" are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin and trade names, which identify for the public the source of goods and services marketed thereunder and represent to the public high and uniform standards of quality, cleanliness, appearance and service, including, without limitation, *Dunkin' Donuts®* owned or controlled by DUNKIN' DONUTS, *Baskin 31 Robbins®* owned or controlled by Baskin-Robbins Incorporated ("BRI"), and *TOGO'S®* owned or controlled by TOGO'S, all of which are registered trademarks on the Principal Register of the United States Patent and Trademark Office.

B.    "FRANCHISOR" refers to Dunkin' Donuts Incorporated with respect to the Dunkin' Donuts System, Baskin-Robbins USA, Co., with respect to the Baskin-Robbins System and Togo's Eateries, Inc. with respect to the Togo's System.

C.    "FRANCHISEE" means the person(s) or entity who signed this Agreement, which may include a sole proprietor, all partners of a general partnership, a corporation or a limited liability company ("LLC"). No person or entity may claim an interest in this Agreement or any Franchise granted hereby without FRANCHISOR's prior written approval.

D.    The "Unit" means the branded food service establishment, including the fixtures, furnishings, equipment, inventory and supplies located therein and/or attached thereto, operated by FRANCHISEE pursuant to this Agreement. If this Agreement authorizes more than one brand, the term "Unit" shall refer to all branded operations authorized hereby, unless such reference is expressly limited to any one brand.

E.    The "Premises" means the land and building or the area within a building, as the case may be, which is (i) approved by FRANCHISOR, (ii) dedicated to the operation of the Unit, and (iii) in the exclusive possession and control of FRANCHISEE. Some portion of the Premises may be under shared possession or control, if approved by FRANCHISOR.

F.    The term "Lease" means the document by which FRANCHISEE occupies and controls the Premises, whether the landlord is a third-party or FRANCHISOR, or one of its subsidiaries or affiliates.

G.    "Gross Sales" means and includes all revenue from the sale of all products and services and all other income of every kind and nature related to the Unit, whether for cash, by redemption of gift certificates or for credit, regardless of collection; provided, however, "Gross Sales" does not include the incidental sales of gift certificates or newspapers, incidental receipts from pay telephones, or any sales taxes or other taxes FRANCHISEE collects from customers for transmittal to the appropriate taxing authority.

H.    The "Designated Representative" is the person from time to time designated by FRANCHISEE as being responsible for the day-to-day operation of the Unit. The Designated Representative must meet FRANCHISOR's then-current qualifications, including, without limitation, successful completion of FRANCHISOR's training, and must be authorized to act for and bind FRANCHISEE in all dealings with FRANCHISOR with respect to the day-to-day operation of the Unit. The initial Designated Representative is identified in Item "K" of the Contract Data Schedule of this Agreement.

I.     The "Standards" are requirements, specifications, criteria, guidelines, processes, techniques and standards which are from time to time established and revised by FRANCHISOR with respect to selection and development of the Premises, operation of the Unit and other aspects of each System. Examples of "Standards" are, without limitation, requirements and criteria for developing the Unit; specifications for the facility, equipment and products; business processes and techniques for the operation of the Unit; and guidelines and standards for quality, cleanliness, appearance and service.

## Section 1. Grant of the Franchise and Term

1.0     This Agreement grants to FRANCHISEE the right, subject to all of the terms and conditions hereinafter set forth, to operate a Unit solely at the Premises described in Item "A" of the Contract Data Schedule of this Agreement, including the right to use, solely in such Unit, the System or Systems and Proprietary Marks described in the Special Terms and Conditions attached to and made a part of this Agreement (the "Franchise"). The term of this Agreement shall begin on the date hereof and shall end on the date described in Item "B" of the Contract Data Schedule; provided however, the Franchise shall commence upon the occurrence, of all of the following conditions prior to the initial opening of the Unit or the transfer of the Unit, as the case may be:

1.0.1     <u>Training.</u> FRANCHISEE and its Designated Representative must successfully complete the then-current training program required by FRANCHISOR at one or more of FRANCHISOR's training centers located in Massachusetts, California or at other locations from time to time designated by FRANCHISOR. This requirement may be waived or modified by FRANCHISOR, in whole or in part, in its sole discretion, if FRANCHISEE or its Designated Representative has had comparable training or on-the-job experience.

1.0.2     <u>Financing.</u> Upon request by FRANCHISOR, FRANCHISEE must deliver evidence to FRANCHISOR that FRANCHISEE has obtained binding commitments for all financing needed to develop and/or operate the Unit.

1.0.3     <u>Documents.</u> FRANCHISEE must execute and deliver to FRANCHISOR all documents related to this Franchise customarily required, in then-current form, as provided by FRANCHISOR.

1.0.4     <u>Payment.</u> FRANCHISEE must, prior to opening or transferring the Unit (as the case may be) pay FRANCHISOR any and all moneys due, including, but not limited to, purchase price, fees, inventory, rent and/or security deposit, if required under the Lease.

1.0.5     <u>Possession.</u> FRANCHISEE must have the exclusive right to occupy and use the Premises for at least the term of this Agreement, whether FRANCHISEE owns the Premises, or leases the Premises pursuant to either (a) a Lease with a third party landlord on terms satisfying FRANCHISOR's then current lease policy and containing provisions required by FRANCHISOR; or (b) a Lease with FRANCHISOR or an affiliated entity.

1.0.6     <u>For a New Unit.</u> If this Unit is newly developed, FRANCHISEE must, prior to the Unit's initial opening, comply with all provisions of the Special Terms & Conditions attached to this Agreement relating to new unit development (Schedule "F/D" or "C/D", as applicable).

1.1     The term of this Agreement shall expire without notice upon any earlier expiration or termination of a Lease, foreclosure of a mortgage, or other event which has the effect of terminating FRANCHISEE's possession and occupancy of the Unit.

1.2     FRANCHISEE represents and warrants that FRANCHISEE and each individual partner, member and/or shareholder of FRANCHISEE, as the case may be, is a United States citizen or a lawful resident alien of the United States; that, where applicable, the FRANCHISEE entity (corporation or LLC) is and shall remain duly organized and in good standing during the term of this Agreement; and that all financial and other information which FRANCHISEE has provided to FRANCHISOR in connection with FRANCHISEE's application for this Franchise is true and accurate. FRANCHISEE's representations and warranties under this paragraph 1.2 are a material inducement to FRANCHISOR's grant of the Franchise to FRANCHISEE.

## Section 2. Services Furnished by FRANCHISOR

2.0     FRANCHISOR agrees:

2.1     <u>Prior to and For the Initial Opening of the Unit.</u>

2.1.1     FRANCHISOR shall make available to FRANCHISEE Standards for the design, construction, equipping and operation of the Unit; and

2.1.2     FRANCHISOR shall make available to two individuals designated by FRANCHISEE, one of whom must be a party to or guarantor of this Agreement FRANCHISOR's then current initial training program with respect to the operation of the Unit, at one or more of FRANCHISOR's Training Centers located in Massachusetts, California and/or at such other training facility as FRANCHISOR may, from time to time, designate; and

2.1.3     FRANCHISOR shall provide its current operating procedures to assist FRANCHISEE in complying with FRANCHISOR's Standards; and

2.1.4    FRANCHISOR shall make available to FRANCHISEE such assistance in the pre-opening, opening and initial operation of the Unit as FRANCHISOR shall deem advisable, based upon FRANCHISEE's organization, prior experience and training.

**2.2    After the Initial Opening of the Unit.**

2.2.1    FRANCHISOR shall maintain a continuing advisory relationship with FRANCHISEE, including consultation in the areas of marketing, merchandising and general business operations; and

2.2.2    FRANCHISOR shall provide FRANCHISEE with FRANCHISOR's Standards for the authorized System(s), as the same may be modified by FRANCHISOR from time to time, in its sole and absolute discretion; and

2.2.3    FRANCHISOR shall continue its efforts to maintain high and uniform standards of quality, cleanliness, appearance and service at all units; and

2.2.4    FRANCHISOR shall make reasonable efforts to disseminate FRANCHISOR's Standards to potential suppliers of products at the written request of FRANCHISEE, subject, however, to specific requirements and limitations of each authorized System.

## Section 3. Advertising and Promotion

3.0    FRANCHISOR has established and administers a marketing, advertising and sales promotion fund (the "Fund") for each of the Systems, and directs the development of all advertising, marketing and promotional programs for each System. FRANCHISEE's payments to the Fund(s) shall be used for advertising, marketing, promotion, production and development of all advertising, marketing, promotional and other programs, product development, merchandising, public relations, administrative expenses, programs designed to increase sales and enhance and further the public reputation of FRANCHISOR and each applicable System, and activities related to any and all of the foregoing. The content of all activities of the Fund(s), including, without limitation, the media selected and employed, as well as the area and units to be targeted for such activities, shall be at the sole discretion of FRANCHISOR. FRANCHISOR undertakes no obligation to make expenditures for FRANCHISEE which are equivalent or proportionate to contributions paid under this Agreement or to insure that FRANCHISEE benefits directly or on a prorata basis from activities of the Fund(s), if any. Upon request, FRANCHISOR will provide FRANCHISEE a statement of receipts and disbursements for any Fund to which FRANCHISEE contributes under the terms of this Agreement, prepared by an independent public accountant for each fiscal year of the Fund.

3.1    FRANCHISEE, prior to using any advertising or promotional material that FRANCHISEE has prepared for use in its local area, shall submit such material to FRANCHISOR for review and approval. If written disapproval of the advertising and promotional material is not received by FRANCHISEE from FRANCHISOR within fifteen (15) days from the date such material is received by FRANCHISEE, said materials shall be deemed approved for use by FRANCHISEE, unless and until subsequently disapproved by FRANCHISOR, in which event FRANCHISEE will promptly discontinue any further use thereof.

3.2    FRANCHISEE acknowledges that this Agreement grants FRANCHISEE no right to use any of the Proprietary Marks to advertise products and/or services for order through the mail or by any electronic or other medium. FRANCHISEE shall not, without the prior written approval of FRANCHISOR, use any of the Proprietary Marks on the Internet or any similar electronic or other communications medium, to promote FRANCHISEE's business and/or advertise and/or sell products and/or services. Notwithstanding the provisions of paragraph 3.1 above, FRANCHISOR's failure to disapprove any request to use the Internet or any similar electronic or other medium within fifteen (15) days shall not give FRANCHISEE the right to undertake such use. FRANCHISOR shall have the sole right to establish an Internet "home page" using any of the Proprietary Marks, and to regulate the establishment and use of linked home pages by its franchisees.

3.3    Special Terms and Conditions for each System authorized for this Unit are attached to this Agreement and contain additional provisions related to advertising and promotion.

## Section 4. Payments

4.0    FRANCHISEE shall pay to FRANCHISOR the following initial charges and continuing fees:

4.1.    **Initial Franchise Fee.** - FRANCHISEE shall pay FRANCHISOR an Initial Franchise Fee in the amount set forth in Item "C" of the Contract Data Schedule of this Agreement. Unless the Initial Franchise Fee was prepaid under the terms of a Store Development Agreement, five thousand dollars ($5,000.00) shall be paid upon the execution of this Agreement and the remaining unpaid balance within ten (10) days after FRANCHISEE's receipt of FRANCHISOR's written approval of the Premises; provided however, if the Premises is developed by FRANCHISOR, the balance shall be due in full upon FRANCHISEE's execution of the Lease of the Unit, or on the date FRANCHISEE or the Designated Representative commences FRANCHISOR's training program, whichever date is earlier.

4.2    **Marketing Start-Up Fee.** - FRANCHISEE shall pay a Marketing Start-Up Fee in the amount set forth in Item "D" of the Contract Data Schedule of this Agreement, for a start-up promotional program or such other promotion or advertising program as FRANCHISOR may specify. Payment shall be made in full prior to attendance by FRANCHISEE or the Designated Representative at FRANCHISOR's training program or thirty (30) days prior to the scheduled opening of the Unit, whichever date is earlier, and shall be nonrefundable after the Unit commences operations.

4.3    **Continuing Franchise Fees** - FRANCHISEE shall pay FRANCHISOR at Post Office Box 1097, Charlotte, North Carolina 28201-1097 (or to such other address as FRANCHISOR shall from time to time advise FRANCHISEE in writing), on or before Thursday of each week, a sum determined by multiplying the Gross Sales of the Unit for the seven (7) day period ending at the close of business on the preceding Saturday times the percentage set forth in Item "E" of the Contract Data Schedule of this Agreement.

4.4.    **Continuing Advertising Fee.** FRANCHISEE shall also pay, at the same time, for the same seven (7) day period, in the same manner as, and in addition to the payments provided for under paragraph 4.3 above, the percentage set forth in Item "F" of the Contract Data Schedule of this Agreement, of the Gross Sales of the Unit, to one or more Funds for advertising, marketing, promotion and other purposes, as specified in Section 3 of this Agreement.

4.4.1    In addition, FRANCHISEE shall participate in and make additional payments to the Fund(s) with respect to all advertising, marketing, promotion and other programs of each authorized brand at the Unit, which from time to time are supported by two-thirds of the units of such brand in the market in which the Unit is located with respect to local programs, and in the continental United States, with respect to national programs.

4.4.2    If FRANCHISEE is authorized to use more than one (1) System at the Unit, fees payable under this paragraph 4.4 with respect to each System shall apply only to that portion of the Unit's Gross Sales which are applicable to that System, as determined by FRANCHISOR.

4.5    If any sales, income, excise, use or privilege tax is imposed or levied by any government or governmental agency on account of the payment of franchise or royalty fees by FRANCHISEE under this Agreement, FRANCHISEE shall pay FRANCHISOR a sum equal to the amount of such tax as an additional royalty fee (but this provision shall not apply to federal or state income taxes imposed upon FRANCHISOR).

4.6    FRANCHISOR shall have the right to require FRANCHISEE, upon written notice, to make payments under this Agreement by electronic funds transfer or to a lock-box located at an independent bank. Acceptance of payment by electronic funds transfer or to a lock-box shall not be deemed a waiver of any rights of FRANCHISOR. If FRANCHISOR establishes a direct debit program with FRANCHISEE's bank for the electronic payment of continuing franchise and advertising or sales promotion fees, FRANCHISEE must provide FRANCHISOR with all consents, authorizations and bank account data necessary to effect such electronic payment.

4.6.1    FRANCHISEE must complete and deliver to FRANCHISOR such forms as may from time to time be required to effectuate any changes as necessary to maintain EFT capability. FRANCHISEE agrees (a) to give FRANCHISOR at least fourteen days written notice (except in the case of emergency) before making any change to FRANCHISEE's EFT bank account, providing all information and specimens required to change EFT to the new account; (b) to pay FRANCHISOR its then-current late fee, plus collection costs and reasonable attorney's fees, if FRANCHISEE'S bank rejects FRANCHISOR's EFT request because of insufficient funds; and (c) upon demand, to replace EFT rejected by FRANCHISEE's bank with a bank certified or cashier's check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees.

4.6.2    For each week that FRANCHISEE (a) submits a weekly Gross Sales report via FRANCHISOR's approved electronic form over the Internet, and (b) pays the corresponding weekly continuing franchise and advertising fees by EFT, FRANCHISOR will deduct the fees from FRANCHISEE's bank account on or after the Thursday twelve (12) days after the Saturday of the week for which sales were reported. This benefit will only become available after FRANCHISOR implements an electronic form for reporting weekly sales satisfactory to FRANCHISOR. To have this benefit available, FRANCHISEE must have computer equipment capable of accessing and using the electronic form in the manner required. In FRANCHISOR's discretion or due to system failure, FRANCHISOR may elect to withdraw the electronic form. In any such case, FRANCHISEE must immediately return to reporting Gross Sales in the manner originally required.

4.7    **Late Fee, Interest and Costs.** If any payment required under this Agreement is not paid when due, FRANCHISEE shall pay, in addition to the unpaid amount, FRANCHISOR's then-current late fee for each unpaid invoice. In addition, all amounts payable by FRANCHISEE to FRANCHISOR under any provision of this Agreement, if not paid when the same becomes due, shall bear interest from the date due until paid at the rate of one and one-half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies FRANCHISOR may have. Receipt of any check, draft or other commercial paper shall not constitute payment until all funds therefrom are collected by FRANCHISOR. FRANCHISEE shall pay all collection charges, including reasonable attorney's fees, on dishonored checks. At FRANCHISOR's request, dishonored and returned checks will be promptly replaced by FRANCHISEE by a bank certified or cashiers check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees, set forth in this Agreement.

## Section 5. Covenants of FRANCHISEE

5.0    FRANCHISEE understands and acknowledges the importance to FRANCHISOR, FRANCHISEE and other franchisees, of FRANCHISEE's commitment to at all times operate the Unit in accordance with FRANCHISOR's Standards (as defined in Definitions paragraph "I"), in order to increase the demand for FRANCHISOR's products, to protect and enhance the reputation and goodwill of FRANCHISOR, to promote and protect the value of the Proprietary Marks and other reasons. FRANCHISEE agrees to devote continuous best efforts to successfully develop, manage and operate the Unit and to enhance the goodwill of the Proprietary Marks authorized by this Agreement and the System(s) as a whole.

5.0.1    If, in any consecutive twelve (12) month period, FRANCHISEE shall receive two (2) or more notices to cure any default under this Agreement, FRANCHISOR shall have the right, in addition to all other remedies available, to require that FRANCHISEE (in lieu of any Designated Representative) devote full time to managing the day-to-day operation of the Unit.

*General Terms and Conditions*

5.0.2    FRANCHISEE agrees to operate the Unit in strict accordance with all of FRANCHISOR's Standards as they may be communicated to FRANCHISEE from time to time. Standards shall be established for and distributed to franchisees generally and/or FRANCHISEE specifically, in such form and content as FRANCHISOR may from time to time in its sole discretion prescribe. Standards are copyrighted and FRANCHISEE shall not at any time copy, duplicate, record or otherwise reproduce any materials, in whole or in part, which set forth the standards or other proprietary information, or otherwise make the same available to any unauthorized person. FRANCHISEE shall at all times maintain the documents embodying the Standards at the Unit (or at FRANCHISEE's principal offices, if not the Unit) and shall ensure that such documents are kept current and up to date. In the event of a dispute as to the contents of the Standards, the terms of the master copy(s) maintained by FRANCHISOR shall control.

5.0.3    FRANCHISEE acknowledges that complete uniformity may not be possible or practical throughout the System(s) and agrees that FRANCHISOR may from time to time vary Standards, as FRANCHISOR may deem necessary or desirable for the System(s) or the Unit.

5.1    **Unit Operations.** - FRANCHISEE shall keep the Unit open and in continuous normal operation for such hours as FRANCHISOR shall from time to time direct, provided, however, no longer than the maximum number of hours per day permitted by law, on all days, unless prior written approval is obtained from FRANCHISOR or unless FRANCHISOR otherwise directs in writing. In connection therewith, but without limitation, FRANCHISEE further agrees as follows:

5.1.1    FRANCHISEE shall use all products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product storage, handling, preparation, packaging, delivery and sale prescribed by FRANCHISOR. All such items must conform to FRANCHISOR's Standards. FRANCHISOR reserves the right to specify any item by brand. FRANCHISEE shall carry out the business covered by this Agreement in accordance with the operational Standards established by FRANCHISOR and set forth in FRANCHISOR's operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to franchisees from time to time.

5.1.2    FRANCHISEE shall refrain from using or selling any products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment and methods of product storage, handling, preparation, packaging, merchandising, and delivery, or any other items of any kind, which do not meet FRANCHISOR's Standards. Without limiting the generality of the foregoing, FRANCHISEE shall immediately rectify all hazardous situations, and immediately remove and destroy any and all hazardous products. For purposes of the foregoing sentence, "hazardous situations" are those which have the potential to cause injury, illness or death, and "hazardous products" are products which are unfit for human consumption or which have the potential to cause injury, illness or death.

5.1.3    FRANCHISEE shall offer for sale all products that FRANCHISOR may, from time to time in its sole discretion, designate in writing as approved for sale at the Unit. FRANCHISEE shall sell, distribute and deliver such products only in weights, sizes, forms and packages as are approved in writing by FRANCHISOR. FRANCHISEE further agrees to discontinue offering for sale any product that FRANCHISOR may, at any later time, in its sole discretion, by written notice withdraw approval for sale at the Unit; and FRANCHISEE agrees to refrain from offering for sale any product or products which have not been designated in writing as approved by FRANCHISOR for sale at the Unit. FRANCHISOR may disapprove FRANCHISEE's sale of any product(s) or FRANCHISEE's participation in any program(s), in the event FRANCHISEE fails to comply with operational Standards at the Unit. FRANCHISEE shall have sole and complete discretion as to the price FRANCHISEE charges for all products.

5.1.4    FRANCHISEE shall maintain at all times a sufficient supply of approved products to meet the demand of FRANCHISEE's customers at the Unit.

5.1.5    FRANCHISEE shall purchase all food products, supplies, equipment and materials required for the operation of the Unit from FRANCHISOR or from suppliers who (a) demonstrate, to the reasonable satisfaction of FRANCHISOR, the ability to meet all of FRANCHISOR's Standards for such items, (b) possess adequate capacity and facilities to supply the needs of FRANCHISEE and other franchisees in the quantities, at the times and with the reliability requisite to an efficient operation, and (c) have been approved, in writing, by FRANCHISOR. Prior to purchasing any items from any supplier not previously approved by FRANCHISOR, FRANCHISEE shall submit to FRANCHISOR a written request for approval of the supplier. FRANCHISOR may require that samples from the supplier be delivered to FRANCHISOR or to a designated independent testing laboratory for testing prior to approval and use. FRANCHISEE shall pay FRANCHISOR a fee not to exceed the actual cost of the test; provided, however, no fee shall be charged for the first test requested by FRANCHISEE in any calendar year. This paragraph is subject to Special Terms and Conditions which contain additional provisions and limitations specific to the System(s) authorized for the Unit by this Agreement.

5.1.6    FRANCHISEE shall maintain, at all times and at FRANCHISEE's expense, the interior and exterior of the Unit and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by FRANCHISOR. FRANCHISEE shall make no material alteration, addition, replacement or improvement in or to the interior or exterior of the Unit (including the parking lot and landscaped areas) without FRANCHISOR's prior written consent.

5.1.7    FRANCHISEE shall comply with all civil and criminal laws, ordinances, rules, regulations and orders of public authorities pertaining to the maintenance and operation of the Unit, including, but not limited to, those relating to health, safety, sanitation, employment, environmental regulation and taxation.

5.1.7.1 FRANCHISEE agrees to maintain as business records provided in subsection 5.2 below. and to furnish to FRANCHISOR within five (5) days after receipt of written demand therefor, copies of all customer complaints and notices, warnings, citations, inspection reports and other communications related to the Unit from public authorities. FRANCHISEE hereby authorizes any such public authority to provide FRANCHISOR with copies of such notices and/or communications. If any suit, investigation or other legal proceeding related to FRANCHISEE's business should be commenced by or against FRANCHISEE, FRANCHISEE shall immediately notify FRANCHISOR thereof and keep FRANCHISOR continuously advised of the status of the matter.

5.1.8    FRANCHISEE shall manage the Unit at all times with at least two (2) individuals, one of whom must be FRANCHISEE, or a partner, shareholder or member of FRANCHISEE, either of whom must be the Designated Representative and both of whom must have successfully completed FRANCHISOR's training program. Both individuals must have literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to satisfactorily complete FRANCHISOR's training program and to communicate with employees, customers, and suppliers. If FRANCHISEE operates more than one unit, FRANCHISOR requires that each additional unit be managed by a Designated Representative approved by FRANCHISOR.

5.1.8.1 In the event of any resignation, termination, disability, death or other incapacity of the Designated Representative, FRANCHISEE shall notify FRANCHISOR in writing of the name of a qualified successor Designated Representative as soon as possible, but in no event later than two (2) months after such event.

5.1.8.2 FRANCHISEE shall hire, train and supervise efficient, competent and courteous employees of good character for the operation of the Unit and shall ensure that all such employees are trained in accordance with FRANCHISOR's training procedures. FRANCHISEE is solely responsible for hiring and discharging employees of the Unit, and for setting their wages and terms of employment. FRANCHISEE shall ensure that all employees whose duties include customer service have sufficient literacy and fluency in the English language to adequately serve the public in the Unit. FRANCHISEE (or the Designated Representative, as specified by FRANCHISOR) shall attend, and FRANCHISEE shall require employees at the Unit to attend, such further training as FRANCHISOR shall from time to time reasonably require. The cost of all training materials, salaries, accommodations and travel expenses, if any, of FRANCHISEE or any other individual employed in the Unit will be borne entirely by FRANCHISEE. FRANCHISEE will bear the cost of all training programs except FRANCHISOR's initial training program referred to in paragraph 2.1.2 of this Agreement.

5.1.9    FRANCHISEE shall accurately report all Gross Sales to FRANCHISOR and implement all procedures recommended by FRANCHISOR to minimize employee theft. FRANCHISEE further acknowledges and agrees that employee theft shall not relieve FRANCHISEE of the obligation to make all payments to FRANCHISOR based on Gross Sales pursuant to Section 4 of this Agreement and that accurate reporting of Gross Sales requires, among other things, compliance with all Standards related thereto and recording all sales at the time the product is delivered to the purchaser, including, without limitation, retail, wholesale and bulk discount sales, whether for cash, by redemption of gift certificates or coupons, or sales for which payment may be deferred.

5.2    **Books, Records and Reports.** FRANCHISEE shall keep full, complete and accurate books and accounts with respect to the Unit, in accordance with generally accepted accounting principles and all requirements of law and in the form and manner prescribed below or as from time to time further prescribed by FRANCHISOR. Commencing upon the opening of the Unit:

5.2.1    FRANCHISEE shall submit to FRANCHISOR, on or before Thursday of each week, on a standard form approved by FRANCHISOR, a signed statement of Gross Sales at the Unit for the seven (7) day period ending at the close of business on the preceding Saturday, along with all moneys required to be paid under Section 4 of this Agreement.

5.2.2    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty-five (45) after the close of each of FRANCHISEE's calendar or fiscal month, a profit and loss statement of the Unit for said monthly period.

5.2.3    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty five (45) days after the close of each applicable period, a profit and loss statement prepared in accordance with generally accepted accounting principles, along with a balance sheet (including a statement of retained earnings or partnership account) (i) for the first six (6) months of each of FRANCHISEE's fiscal year; and (ii) for the full twelve (12) months of each of FRANCHISEE's fiscal years. FRANCHISOR shall have the right, in its sole discretion, to require that such annual financial statements be certified by an independent certified public accountant or such other independent public accountant acceptable to FRANCHISOR.

5.2.4    FRANCHISEE shall submit to FRANCHISOR, at the times and in the form required, such other periodic reports and information as may from time to time be prescribed by FRANCHISOR.

5.2.5    FRANCHISEE shall preserve, in the English language and for the time periods set forth below, all books, tax returns, accounting records and supporting documents relating to the FRANCHISEE's business operations at the Unit (hereinafter called the "Records"), including but not limited to:
    a. daily cash reports;
    b. cash receipts journal and general ledger;
    c. cash disbursements journal and weekly payroll register;
    d. monthly bank statements, and daily deposit slips and canceled checks;
    e. all business tax returns;
    f. suppliers invoices (paid and unpaid);

g. dated cash register tapes (detailed and summary);
h. semi-annual balance sheets and monthly profit and loss statements;
i. weekly inventories;
j. records of promotion & coupon redemptions;
k. such other records and information as FRANCHISOR may from time to time request.

FRANCHISEE shall be permitted to preserve Records and submit reports electronically, in accordance with FRANCHISOR's Retail Information System ("RIS") and/or other requirements, or otherwise with the prior written approval of FRANCHISOR. During the term of this Agreement, FRANCHISEE shall preserve and make available to FRANCHISOR all Records for no less than the current fiscal year and the three (3) immediate-past fiscal years. For three (3) years after the date of any transfer of any interest in this Agreement, the transferor of such interest shall preserve and make available to FRANCHISOR all Records of its last three (3) fiscal years of operation under this Agreement. For a period of three (3) years after the expiration of the term of this Agreement (or after any earlier termination thereof) FRANCHISEE shall preserve and make available to FRANCHISOR all Records for the last three (3) fiscal years of FRANCHISEE's business operation at the Unit.

5.2.6    Retail Information System  FRANCHISEE shall record all sales at or from the Unit at the time of sale, in accordance with FRANCHISOR's procedures and on devices, the make, model and serial numbers of which have been individually approved in writing by FRANCHISOR. Such devices must record accumulated sales in a manner that cannot be turned back or reset, and must retain data in memory storage in the event of power loss. FRANCHISEE shall, at its sole cost and expense, upon notice from FRANCHISOR, purchase or lease and install a unit and/or network information technology system, including computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR for the Unit (hereinafter for convenience called "RIS"). The term "RIS" includes, without limitation, all hardware and software designated from time to time by FRANCHISOR and the data stored thereon by FRANCHISEE. Some or all components of RIS may be licensed to FRANCHISOR and used by FRANCHISEE as a sub-licensee. FRANCHISEE shall use RIS solely in connection with the operation of the Unit, in the manner specified by FRANCHISOR from time to time. FRANCHISEE shall comply with such requirements determined by FRANCHISOR from time to time regarding maintenance, training, storage and safeguarding of data, records, reports and other matters relative to RIS.

5.2.6.1  FRANCHISEE shall, at its sole cost and expense: (a) attend, and/or cause the Designated Representative and/or employees in the Unit to attend, such initial and other RIS training as is specified by FRANCHISOR; (b) maintain RIS in continuous operation at the Unit; (c) purchase an ongoing maintenance and support contract from an approved supplier and replace the RIS components as necessary, (d) upgrade RIS from time to time as may be reasonably required by FRANCHISOR; (e) permit FRANCHISOR immediate access to RIS, electronically or otherwise, at all times without prior notice to FRANCHISEE (such access shall not unreasonably interfere with FRANCHISEE's normal Unit operations); and (f) install and maintain telephone or other service required by FRANCHISOR to permit such access.

5.2.6.2  FRANCHISEE shall, at its sole cost and expense, upon FRANCHISOR's request, replace RIS with the computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR from time to time as FRANCHISOR's then-current unit and/or network information system. Such replacements shall take place when deemed advisable by FRANCHISOR given the age, cost to operate, condition of the information system then in the Unit, the then-current and anticipated technology, the information systems then in use at other Units, the needs of the System(s), and other factors as may be relevant.

5.2.6.3  FRANCHISOR makes no representation or warranty as to the costs, sales, or profits, if any, which may result from the installation and use of RIS and its replacements.

5.2.7    FRANCHISOR shall treat any Records received from FRANCHISEE pursuant to this subsection 5.2 as confidential, except that information may be released (a) to any person entitled to the same under any Lease; (b) in connection with any court order, legal proceeding or other dispute resolution process, whether instituted by FRANCHISOR or any other party; (c) to a prospective transferee of any interest subject to the provisions of Section 10 of this Agreement, and (d) as incorporated into anonymous general information disseminated to FRANCHISOR's franchisees and prospective franchisees, and in the formulation of plans and policies in the interest of the System(s).

5.3    **Insurance.**  FRANCHISEE shall procure, before the commencement of business, and maintain in full force and effect during the entire term of this Agreement, at FRANCHISEE's sole expense, an insurance policy or policies protecting FRANCHISEE and FRANCHISOR, and their directors and employees, against any loss, liability, including without limitation employment practices liability, or expense whatsoever from, without limitation, fire, personal injury, theft, death, property damage or otherwise, arising or occurring upon or in connection with FRANCHISEE's operation of the Unit or by reason of FRANCHISEE's occupancy of the Premises.

5.3.1    Such policy or policies shall include:

5.3.1.1  commercial general liability insurance, including but not limited to, product, contractual, and owned and non-owned vehicle liability coverages, with an aggregate single limit of two million dollars ($2,000,000.00) or such higher limit as FRANCHISOR, in its sole and absolute discretion, may from time to time require, and as may be required under the terms of any Lease or underlying lease for the Unit, for bodily injury and property damage combined; and

5.3.1.2  "All Risk" property damage insurance, including without limitation flood and earthquake protection, for the full replacement cost value of the Premises and all other property within or relating to the Unit, including signs, with no coinsurance clause and with a replacement cost clause attached; and

5.3.1.3  plate glass insurance and, if applicable, boiler insurance; and

5.3.1.4  employer's liability, worker's compensation and such statutory insurance as may be required in the state in which the Premises is located.

5.3.2    All insurance required under the terms of this Agreement (i) shall be written in the names of FRANCHISEE, FRANCHISOR and/or other party or parties designated by FRANCHISOR, as their respective interest may appear, by insurance companies reasonably acceptable to FRANCHISOR; (ii) shall contain provisions denying to the insurer acquisition by subrogation of rights of recovery against any party named; (iii) shall provide that cancellation or alteration cannot be made without at least thirty (30) days written notice to any party named; and (iv) shall not be limited in any way by reason of any insurance which may be maintained by FRANCHISOR or any other party named.

5.3.3    During the term of this Agreement, FRANCHISEE shall promptly unless otherwise directed by FRANCHISOR, (but in no event later than ten (10) days after any such policy becomes effective or such payment is due) furnish FRANCHISOR with duplicate originals of all insurance policies, including renewal and replacement policies, together with evidence that all premiums have been paid. If at any time FRANCHISEE fails to comply with the provisions of this subsection 5.3, FRANCHISOR, in addition to all other remedies available, shall have the right (but not the obligation) to obtain and/or maintain such insurance with respect to the Unit and/or Premises, at FRANCHISEE's sole expense. FRANCHISEE shall pay FRANCHISOR when and as billed for the cost of premiums therefor. Maintenance of insurance and FRANCHISEE's perfor-mance of the obligations contained in this subsection 5.3 shall not relieve FRANCHISEE of liability under the indemnity provisions set forth in paragraph 5.4 below.

5.3.4.   Each of the parties hereby waives any and all rights of recovery against the other parties hereto, or against the officers, employees, agents, and representatives of such other parties, for damage to such waiving party or for loss of its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policy in force at the time of such loss or damage. FRANCHISEE shall, upon obtaining the polices of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Agreement.

5.4      **Indemnification.** FRANCHISEE shall save, defend, exonerate, indemnify and hold harmless FRANCHISOR, and each of them, and the subsidiaries or each of them, and their respective officers, directors, employees, agents, successors and assigns, from and against (i) any and all claims based upon, arising out of, or in any way related to the operation or condition of any part of the Unit or the Premises, the conduct of business thereupon, the ownership or possession of real or personal property and any negligent act, misfeasance or nonfeasance by FRANCHISEE or any of its agents, contractors, servants, employees, or licensees, and including, without limitation, all obligations of FRANCHISEE incurred pursuant to any provisions of this Agreement, and (ii) any and all fees (including reasonable attorneys' fees), costs and other expenses incurred by or on behalf of FRANCHISOR in the investigation of or defense against any and all such claims.

5.5      **Refurbishment & Remodel of the Premises.** FRANCHISEE shall timely complete future refurbishments and remodels of the Unit in accordance with this subsection 5.5. Such refurbishments and remodels are in addition to FRANCHISEE's continuing obligations to maintain, repair and replace all equipment, signage, furnishing, decor and personal property related to the Unit in accordance with FRANCHISOR's standards. FRANCHISEE's obligations to maintain, repair and replace shall not be delayed or deferred pending or in anticipation of any such refurbishment or remodel.

5.5.1    No later than the Refurbishment Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall refurbish the Unit in accordance with FRANCHISOR's then-current refurbishment standards. It is intended that the cost of the initial refurbishment shall not exceed $10,000.00 and that subsequent refurbishments shall not exceed $10,000.00 increased by the same percentage as the increase to the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the period from the Refurbishment Date to the date of subsequent refurbishment. The refurbishment required of the FRANCHISEE shall be generally the same as then required of units of the same age and condition. The above refurbishing costs do not include costs for required maintenance and repair or costs to upgrade, change or replace the Retail Information System.

5.5.2    No later than the Remodel Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall remodel the Unit in accordance with FRANCHISOR's then-current remodeling standards (including but not limited to fixtures, furnishings, signs and equipment). The remodeling required of FRANCHISEE shall be generally the same as then required of units of the same age, condition, location and geographic region.

5.5.3    FRANCHISEE acknowledges and agrees that the requirements of this subsection 5.5 are both reasonable and necessary to ensure continued public acceptance and patronage of the System(s), to avoid deterioration or obsolescence of the Unit and to take advantage of changes and improvements in design, concept and decor.

5.6      **Cross-Guarantee.** In the event FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other unit franchised by FRANCHISOR, FRANCHISEE shall be jointly and severally liable to FRANCHISOR as guarantor of the obligations of the franchisee under each franchise Agreement for such other unit(s). Included in such guaranty are, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental and other Lease payments to FRANCHISOR or any of its subsidiaries, if applicable, collection fees and general receivables now or hereafter due and payable to FRANCHISOR or guaranteed by FRANCHISOR to any third party. FRANCHISEE's liability under this paragraph shall be limited to the extent that the

total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s), member(s) or partner(s), as the case may be, hold in FRANCHISEE. For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE, held by or controlled by the common shareholder(s), member(s) or partner(s) or their immediate family, as the case may be. The terms of this paragraph shall not operate to extend any personal guaranty of any Lease obligations by any shareholder(s), member(s) or partner(s), after such guaranty shall have ended by its terms.

5.7    **FRANCHISEE Entity.** FRANCHISEE may be a sole proprietorship, a general partnership, a corporation or a limited liability company ("LLC"). FRANCHISEE may not be a limited partnership, trust or other entity not specifically authorized herein or approved by FRANCHISOR in writing.

5.7.1    **Corporation.** If FRANCHISEE is a corporation, (i) said corporation's charter shall provide that it is authorized to operate the Unit as provided under this Agreement; (ii) all shareholders of the corporation shall enter into a written Agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the corporation's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) each stock certificate of the corporation shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new shares of common or preferred voting stock in the corporation shall be issued to any person, persons, partnership, association, LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all owners of record and all beneficial owners of any class of voting stock of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

5.7.2    **LLC.** If FRANCHISEE is an LLC, (i) said LLC's operating agreement shall provide that its activities are limited to operating the Unit as provided under this Agreement; (ii) all members of the LLC shall enter into a written agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the LLC's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) the LLC's operating agreement shall provide that any assignment or transfer of membership interests in the LLC is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new membership interest(s) in the LLC shall be created for, issued or granted to any person, persons, partnership, association LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all members of record of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

## Section 6. Certain Rights of FRANCHISOR

6.0    In order to preserve the validity and integrity of the Proprietary Marks and to assure that the Standards of the System(s) are properly employed by FRANCHISEE in the operation of the Unit and, in general, to verify FRANCHISEE's compliance with the terms of this Agreement, FRANCHISOR, or its agents, shall have the right, at all times, with or without prior notice to FRANCHISEE, to enter and inspect any and all public or private area(s) of the Unit and to select materials, ingredients, products, supplies, paper goods, uniforms, fixtures, furnishings, signs and equipment for evaluation purposes to assure that these items conform to the Standards of the System(s). During the course of any such inspection, FRANCHISOR may photograph or videotape any part of the Unit, whether or not FRANCHISEE is present. FRANCHISOR may require FRANCHISEE to remove any item which does not conform to applicable Standards. FRANCHISOR may also, at FRANCHISEE's expense, remove or destroy any item which does not conform to applicable Standards.

6.1    If FRANCHISOR finds any condition on the Premises which FRANCHISOR deems to be hazardous, unsafe, unhealthy, unsanitary, unclean or in material disrepair, FRANCHISOR shall have the following rights in addition to all other rights set forth in this Agreement:

6.1.1    FRANCHISOR shall have the right to require FRANCHISEE to immediately close and suspend operation of the Unit, and/or to require such other actions as FRANCHISOR, in its sole discretion, deems necessary, whenever there is reason to believe that any products in the Unit are contaminated, or for other reasons of imminent risk to public health and safety. FRANCHISEE agrees to notify FRANCHISOR immediately of any suspected product contamination or other violation affecting public health or safety and to promptly take any action which FRANCHISOR requires in connection therewith. FRANCHISEE shall be solely responsible for all losses, costs or other expenses it incurs in complying with the provisions of this subsection 6.1; and/or

6.1.2    FRANCHISOR shall have the right to immediately remove or destroy, at FRANCHISEE's expense, any product which FRANCHISOR believes to be hazardous, contaminated or to otherwise pose an imminent risk to public health or safety; or

6.1.3    FRANCHISOR shall have the right to give FRANCHISEE twenty-four (24) hours written notice requiring the correction of an unsafe, unhealthy, unsanitary or unclean condition, or thirty (30) days written notice requiring maintenance, repairs or alterations to the Unit or correction of any other Standards violation. If FRANCHISEE has not within that time corrected the condition or completed the maintenance, repairs or alterations, as the case may be, FRANCHISOR may enter the Unit, without being guilty of, or liable for, trespass or tort, and may cause the condition to be corrected or the maintenance, repair, or alteration to be completed at the expense of FRANCHISEE and without prejudice to any other rights or remedies of FRANCHISOR.

6.2      In addition to FRANCHISOR's right to access information through the Retail Information System and otherwise, FRANCHISOR's representatives shall have the right to examine FRANCHISEE's original books, Records and supporting documents at reasonable times, and to perform, with or without notice to FRANCHISEE, such inspections, tests and other analyses as it deems appropriate to verify Gross Sales at the Unit. If FRANCHISOR determines that the Gross Sales FRANCHISEE reported to FRANCHISOR are less than the Gross Sales ascertained by FRANCHISOR's analysis, FRAN-CHISEE shall immediately pay to FRANCHISOR all amounts owing to FRANCHISOR, the applicable Fund and FRANCHISOR's affiliated landlord corporation based upon the corrected Gross Sales. If an analysis is undertaken due to (i) FRANCHISEE's failure to maintain the Retail Information System in continuous operation, or (ii) FRANCHISEE's failure to prepare, deliver or preserve statements or Records required by subsection 5.2 of this Agreement, or (iii) if any analysis of FRANCHISEE's books and Records results in the discovery of a discrepancy greater than three percent (3%) in the Gross Sales reported by FRANCHISEE, FRANCHISEE shall pay, in addition to the unpaid amounts owed FRANCHISOR, its affiliated landlord corporation and the applicable Fund, interest thereon from the date payment was due, at 18% per annum or the highest permissible rate. FRANCHISEE shall also reimburse FRANCHISOR for all related expenses, including, but not limited to, reasonable investigation, accounting and legal fees and other reasonable expenses and costs such as travel, payroll and overhead expenses for FRANCHISOR's employees. Such payments shall be without prejudice to any other remedies FRANCHISOR may have under this Agreement, including the right to terminate this Agreement, without opportunity to cure, in the case of intentional under-reporting of Gross Sales.

6.3      In the event that FRANCHISOR shall believe there may have been intentional under-reporting of Gross Sales for the Unit, FRANCHISEE (and all partners, members and shareholders of FRANCHISEE) shall, upon written demand from FRANCHISOR provide FRANCHISOR, in addition to Records described in paragraph 5.2.5, personal federal and state tax returns, bank statements (including deposit slips and canceled checks) and such other documents and information as FRANCHISOR may in its sole discretion request in connection with FRANCHISOR's efforts to verify Gross Sales reported to FRANCHISOR under this Agreement or any Lease of the Unit. Information provided by FRANCHISEE under this paragraph 6.3 shall be subject to the confidentiality provisions of paragraph 5.2.7, except that inclusion (c) therein does not apply. Schedules to personal tax returns and other financial data which are unrelated to the business of the Unit need not be provided by any partner, member or shareholder of FRANCHISEE who has not been active in the business, and, in addition, has not directly or indirectly owned or controlled at least a majority interest in the business at the Unit, alone or in conjunction with any other family member or related entity.

6.4      FRANCHISEE hereby grants FRANCHISOR the right to inspect the records of all suppliers, distributors, group purchasing programs, distribution centers, and other third parties supplying food products, supplies, equipment and materials to FRANCHISEE and hereby authorizes such parties to release records of FRANCHISEE's purchases and deliveries to FRANCHISOR, by electronic transfer or otherwise, at such times and places as FRANCHISOR shall request.

6.5      If, during the term of this Agreement or any extension or renewal thereof, FRANCHISEE directly or indirectly acquires ownership or control of the Premises, FRANCHISEE agrees to give FRANCHISOR prompt written notice of such ownership or control and to grant FRANCHISOR, under FRANCHISOR's standard Lease Option Agreement, the option to acquire a leasehold interest in the Premises in the event of default by FRANCHISEE under this Agreement or under any lease or mortgage relating to the Premises. Said leasehold interest shall be for the remaining term of this Agreement, including any renewal, at "triple-net" fair market value rental for comparable properties and use in the area as mutually agreed by the parties, or, in the absence of agreement, as determined by arbitration.

## Section 7. Proprietary Marks

7.0      FRANCHISOR has, in connection with its business and the business of its franchisees, developed and used and continues to use and control the usage of Proprietary Marks which are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin, including colors, and certain trade names, including but not limited to **Dunkin' Donuts®**, owned by Dunkin' Donuts Incorporated, **Baskin 31 Robbins®**, owned by Baskin-Robbins Incorporated, and **TOGO'S®**, owned by Togo's Eateries, Inc., all of which are registered as trademarks on the Principal Register of the United States Patent and Trademark Office. FRANCHISEE's rights to use specific Proprietary Marks under this Agreement are set forth in the Special Terms and Conditions described in Item "J" of the Contract Data Schedule of this Agreement and attached hereto as a part hereof.

7.1      FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement. FRANCHISEE shall not sublicense the Proprietary Marks. FRANCHISEE further agrees that any unauthorized use of the Proprietary Marks during the term of or after expiration or the earlier termination of this Agreement shall constitute an incurable default causing irreparable harm subject to injunctive relief.

7.1.1      FRANCHISEE understands and acknowledges that FRANCHISEE's license to use any or all of the Proprietary Marks is non-exclusive and relates solely to the single location set forth in this Agreement. FRANCHISEE further acknowledges that FRANCHISOR, in its sole discretion, has the right to operate or franchise other units and sales outlets and to grant other licenses in, and to, any or all of the Proprietary Marks, and to develop and establish other systems, products or services using the same or similar Proprietary Marks, or any other proprietary names and marks, and to grant licenses or franchises thereto, in each case at such locations and on such terms and conditions as FRANCHISOR deems acceptable, without providing any rights therein to FRANCHISEE. FRANCHISEE further acknowledges the FRANCHISOR may license others to use the Proprietary Marks at locations and in ways that competes with FRANCHISEE and draws customers from the same area as the Unit.

7.2     FRANCHISEE agrees that, during the term of this Agreement and after the expiration or termination thereof, FRANCHISEE shall not directly or indirectly contest or aid in contesting the validity or ownership of the Proprietary Marks. FRANCHISEE shall not, directly or indirectly, apply to register, register or otherwise seek to use or control or in any way use any of the Proprietary Marks or any confusingly similar form or variation thereof in any place or jurisdiction outside the United States; nor shall FRANCHISEE assist any others to do so.

7.3     FRANCHISEE shall identify itself as the franchisee of the Unit in conjunction with any use of the Proprietary Marks, including, without limitation, uses on letterheads, invoices, order forms, receipts, and contracts. Upon the written request of FRANCHISOR, FRANCHISEE shall display a notice identifying the Unit as being independently owned and operated by FRANCHISEE, in such content and form and at such conspicuous locations on the Premises as FRANCHISOR may designate.

7.4     FRANCHISEE agrees to notify FRANCHISOR promptly of any litigation instituted by FRANCHISOR, or by any person, firm or corporation against FRANCHISEE, relating to the Proprietary Marks. In the event FRANCHISOR undertakes the defense or prosecution of any such litigation, FRANCHISEE agrees to execute any and all documents and do such acts and things as may, in the opinion of counsel for FRANCHISOR, be necessary to carry out such defense or prosecution.

## Section 8. Restrictions on FRANCHISEE's Activities

8.0     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination (hereinafter called the "Post-Term Period"), neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall:

8.0.1     Divert or attempt to divert any business or customer of the Unit to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with FRANCHISOR's Proprietary Marks and System(s);

8.0.2     Directly or indirectly contest or aid in contesting the right of FRANCHISOR or any prospective franchisee of FRANCHISOR to obtain a building permit, zoning variance or other governmental approval required for the development of another location as a unit franchised by FRANCHISOR.; or

8.0.3     Except with respect to the ownership or operation of additional units under Franchises granted by FRANCHISOR, own, maintain, engage in, be employed by, or have any interest in any other business which sells or offers to sell the same or substantially similar products to the type FRANCHISOR requires to be offered by FRANCHISEE at the Unit; provided that, during the Post-Term Period only, the provisions of this paragraph 8.0.3 shall not apply to another business located more than five (5) miles from this or any other unit operating under the same Proprietary Marks of FRANCHISOR. Either party to this Agreement, upon notice in writing to the other during the Post-Term Period, shall have the right to have determined whether said five (5) mile radius is a reasonable restriction on FRANCHISEE's activities, by requesting that the matter be submitted to arbitration in accordance with Section 11 of this Agreement. In such event, the decision of the arbitrator shall be final and binding upon the parties. FRANCHISEE further agrees that, in the event arbitration is requested, FRANCHISEE will engage in no competitive activities pending resolution of the dispute.

8.1     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination, neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall communicate or divulge to, or use for the benefit of any person, persons, partnership, association or corporation, any information or knowledge concerning the methods of constructing, equipping or operating units under any of FRANCHISOR's Systems and all other information or knowledge which FRANCHISOR deems confidential and which may be communicated to FRANCHISEE, or of which FRANCHISEE may be apprised by virtue of FRANCHISEE's operation under the terms of this Agreement. FRANCHISEE shall divulge such confidential information only to such of its employees as must have access to it in order to operate the franchised business. Any and all information, knowledge, and know-how including, without limitation, drawings, materials, specifications, techniques, and other data, which FRANCHISOR designates confidential shall be deemed confidential for purposes of this Agreement. FRANCHISOR shall have the non-exclusive right to use and incorporate into FRANCHISOR's Systems, for the benefit of itself and other of FRANCHISOR's franchisees licensees and distributors, all modifications, changes, and improvements developed or discovered by FRANCHISEE or FRANCHISEE's employees or agents in connection with the franchised business, without any liability or obligation to the developer thereof.

8.2     The covenants contained in this Section 8 shall be construed as severable and independent and shall be interpreted and applied consistently with the requirements of reasonableness and equity. If all or any portion of a covenant in this Section 8 is held unreasonable or unenforceable by a court, arbitration panel or other agency having valid jurisdiction in a decision to which FRANCHISOR is a party, FRANCHISEE expressly agrees to be bound by any lesser covenant included within the terms of such greater covenant that imposes the maximum duty permitted by law, as if the lesser covenant were separately stated in, and made a part of, this Section 8.

8.3     FRANCHISEE acknowledges that FRANCHISOR shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 8, or of any portion or portions thereof, without FRANCHISEE's consent, and FRANCHISEE agrees to comply forthwith with any covenant as modified.

## Section 9. Default

9.0    FRANCHISEE shall be in default under this Agreement:

9.0.1    If FRANCHISEE shall become insolvent or make an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by FRANCHISEE, or if such a petition is filed against and consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if FRANCHISEE is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of FRANCHISEE or other custodian for FRANCHISEE's business or assets is filed and is consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if a receiver or other custodian is appointed, or if proceedings for composition with creditors under any state or federal law should be instituted by or against FRANCHISEE, or if the real or personal property of FRANCHISEE shall be sold at levy thereupon by any sheriff, marshall or constable; or

9.0.2    If FRANCHISEE is convicted of or pleads guilty or "nolo contendere" to a felony, a crime involving moral turpitude, or any other crime or offense that FRANCHISOR believes is injurious to the System(s), the Proprietary Marks or the goodwill associated therewith, or if FRANCHISOR has proof that FRANCHISEE has committed such a felony, crime or offense; or

9.0.3    If FRANCHISEE permits the use of the Unit or Premises for any illegal or unauthorized purpose, including, without limitation, palming off or substitution of products under the Proprietary Marks or other marks of FRANCHISOR; or

9.0.4    If any other franchise agreement between FRANCHISEE and FRANCHISOR or any affiliated entity is terminated by reason of FRANCHISEE's default thereunder; or

9.0.5    If FRANCHISEE fails to pay, perform, observe or comply with any of FRANCHISEE's duties and obligations under this Agreement; or if FRANCHISEE fails to carry out in all respects its obligations under any Lease, mortgage, equipment Agreement, promissory note, conditional sales contract or other contract materially affecting the Unit, to which the FRANCHISEE is a party or by which FRANCHISEE is bound, whether or not FRANCHISOR is a party thereto.

9.1    **Thirty Day Cure Period.** Except as otherwise provided in this Section 9, FRANCHISEE shall have the right to cure FRANCHISEE's default under this Agreement within thirty (30) days after written notice of default from FRANCHISOR is delivered pursuant to paragraph 14 hereof. Notwithstanding the foregoing, the following lesser periods shall apply under the circumstances described:

9.1.1    **Seven Day Cure Period.** A seven (7) day cure period shall apply if FRANCHISEE fails, refuses, or neglects to pay when due to FRANCHISOR any moneys owing to FRANCHISOR or to any Fund, or if FRANCHISEE fails to maintain the insurance coverage set forth in subsection 5.3 of this Agreement.

9.1.2    **24 Hour Cure Period.** A twenty-four (24) hour cure period shall apply as provided in paragraph 6.1.3 to the violation of any law, regulation, order or Standard of FRANCHISOR relating to health, sanitation or safety; or if FRANCHISEE ceases to operate the Unit for a period of forty-eight (48) hours without the prior written consent of FRANCHISOR, provided, however, that if the Unit is abandoned, no cure period shall apply.

9.1.3    **Cure on Demand.** FRANCHISEE shall cure on demand all "hazardous situations" and remove and destroy on demand all "hazardous products" as set forth in paragraph 5.1.2.1 and shall cure any situation which poses an imminent risk to public health and safety as provided in subsection 6.1.

9.1.4    **No Cure Period.** No cure period shall be available if FRANCHISEE is in default under any paragraph designated 9.0.1 through 9.0.4 above; or if FRANCHISEE abandons the Unit; or if FRANCHISEE intentionally under-reports Gross sales, falsifies financial data or otherwise commits an act of fraud with respect to FRANCHISEE's acquisition of this Franchise or its rights or obligations under this Agreement; or if FRANCHISEE's Lease for the Unit is terminated due to FRANCHISEE's default thereunder. In addition, no cure period shall be available for any default if FRANCHISEE has received three (3) or more previous notices-to-cure for the same or a substantially similar default (whether or not FRANCHISEE has cured the same), within the immediately preceding twelve (12) month period.

9.2    **Statutory Cure Period.** If a statute in the state in which the Premises is located requires a cure period for the applicable default which is longer than any cure period specified in this Section 9, the statutory cure period shall apply.

9.3    **Late Fee, Interest and Costs.** If FRANCHISEE fails to cure a default within any applicable time period following notice set forth in subsection 9.1, or if this Agreement is terminated as a result of FRANCHISEE's default, FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, without limitation, late fees, collection fees, interest at one and one-half percent (1.5%) per month, or the highest permissible rate, and reasonable investigation and attorneys' fees incurred by FRANCHISOR as a result of any such default or termination. All such interest, damages, costs and expenses may be included in and form part of the judgment awarded to FRANCHISOR in any proceedings brought by FRANCHISOR against FRANCHISEE.

9.4    **Termination.** If FRANCHISEE fails to cure any default within the applicable period following notice from FRANCHISOR, FRANCHISOR may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement. Such termination shall be effective immediately upon receipt of a written notice of termination from FRANCHISOR. Notwithstanding the foregoing, this Agreement shall terminate upon the occurrence of any event set forth in paragraphs 9.0.1 through 9.0.4 or paragraph 9.1.4, without notice or opportunity to cure or notice of termination. Upon any termination or expiration of this Agreement all right of FRANCHISEE to use the Proprietary Marks and the System(s) and to operate the Unit under the Proprietary Marks shall terminate and:

9.4.1    FRANCHISEE shall promptly pay FRANCHISOR all sums owing or accrued from FRANCHISEE to FRANCHISOR, the Fund, and any affiliated landlord entity, including interest and any damages, costs and expenses, including reasonable attorneys' fees, incurred by FRANCHISOR by reason of default on the part of FRANCHISEE; and

9.4.2    FRANCHISEE shall immediately cease to operate the Unit, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former FRANCHISEE of FRANCHISOR; and

9.4.3    FRANCHISEE shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, any feature or method associated with the System(s), any or all of the Proprietary Marks and any other trade secrets, confidential information, operating manuals, slogans, trade dress, signs, symbols or devices which are part of FRANCHISOR's System(s) or are otherwise used in connection with the operation of the Unit. FRANCHISEE agrees that any such unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm. Continued use by FRANCHISEE of FRANCHISOR's trademarks, trade names, Proprietary Marks, and service marks after termination of this Agreement shall constitute willful trademark infringement by FRANCHISEE; and

9.4.4    FRANCHISEE shall immediately return to FRANCHISOR all operating manuals, plans, specifications, and other materials in FRANCHISEE's possession containing information prepared by FRANCHISOR and relative to the operation of the Unit, and all copies thereof (all of which are acknowledged to be FRANCHISOR's property), and shall retain no copy or record of any of the foregoing, except FRANCHISEE's copy of this Agreement, any correspondence between the parties, and any other documents which FRANCHISEE reasonably needs for compliance with any provision of law; and

9.4.5    FRANCHISEE shall remove from the Premises and from any equipment, signs, trade fixtures, furnishings and other personal property (except as provided in paragraph 9.4.6 below) and return to FRANCHISOR, all of the Proprietary Marks or other indicia of FRANCHISOR, and shall disconnect, withdraw and/or terminate, within five (5) days after termination or expiration of this Agreement, any telephone listings and/or fictitious name registration containing any part of the Proprietary Marks. Upon FRANCHISOR's written demand, however, FRANCHISEE shall assign to FRANCHISOR, upon any termination, expiration or non-renewal of this Agreement, any telephone number used in the operation of the Unit if such number is listed in the directory using any of the Proprietary Marks. FRANCHISEE hereby appoints FRANCHISOR as its attorney-in-fact, in the name of FRANCHISEE, to do any act necessary to effect the intent of this paragraph; and

9.4.6.    FRANCHISEE shall, but only in the case of any early termination of this Agreement due to FRANCHISEE's default, sell to FRANCHISOR, at FRANCHISOR's election, any or all of the equipment, interior and exterior signs, trade fixtures, furnishings and other personal property of FRANCHISEE used in connection with the Unit (hereinafter collectively "Equipment"), at the purchase cost when originally installed in the Unit, less a depreciation deduction computed on a straight line basis over a ten (10) year useful life for the respective items (but in no event less than ten percent (10%) of the original purchase cost for such equipment, fixtures and furnishings). If FRANCHISEE owes a balance due on its purchase or financing of such Equipment, or if the same are otherwise subject to a lien or claim for any indebtedness, the amounts of such balance and/or indebtedness shall be deducted from the purchase price payable to FRANCHISEE. All sums of money due FRANCHISOR by FRANCHISEE may be offset against the purchase price payable to FRANCHISEE. Nothing contained herein, however, shall be construed to entitle FRANCHISEE to be released from liability for such unpaid balance or indebtedness, if any, in excess of the portion of the purchase price applied for payment of such debts; and

9.4.7    FRANCHISEE shall, at FRANCHISOR's option by notice to FRANCHISEE within thirty (30) days from the date of termination or expiration, assign to FRANCHISOR any interest which FRANCHISEE has in the Lease or any other Agreement related to the Premises. If FRANCHISOR does not elect to exercise its option to acquire the Lease, FRANCHISEE shall make such modifications or alterations to the Premises immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of the Premises from that of other units in the System(s), and shall make such specific additional changes thereto as FRANCHISOR may reasonably require for that purpose. In the event FRANCHISEE fails or refuses to comply with the requirements of this paragraph 9.4.7, FRANCHISOR shall have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making such changes as may be required, at the expense of FRANCHISEE, which expense FRANCHISEE agrees to pay upon demand; and

9.4.8    FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, but not limited to, reasonable investigation and attorney's fees and other reasonable expenses and costs such as travel costs and payroll expenses for FRANCHISOR's employees, incurred in obtaining injunctive or other relief for the enforcement of any provisions of this Section 9; and

9.4.9    FRANCHISEE shall continue to comply with Section 8 of this Agreement, for the Post-Term Period specified therein. If FRANCHISEE begins to operate any other business wherever situated, FRANCHISEE shall not use, in connection with such other business or the promotion thereof, any reproduction, counterfeit, copy or colorable imitation of any of FRANCHISOR's Proprietary Marks or trade dress; and FRANCHISEE shall not utilize any designation of origin or description or representation which falsely suggests or represent an association or connection with FRANCHISOR whether or not constituting unfair competition.

9.5    Nothing in this Agreement shall preclude FRANCHISOR from seeking any remedy under federal or state law for willful trademark infringement, including, without limitation, injunctive relief; No right or remedy herein conferred upon or reserved to FRANCHISOR is exclusive of any other right or remedy herein, or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy given hereunder. FRANCHISEE agrees that the existence of any claims against FRANCHISOR, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by FRANCHISOR of any provision of this Agreement.

-14-

9.6     Because the Unit is one of many units within the System(s) that sell similar products and services to the public, FRANCHISEE agrees that its failure to comply with the terms of this Agreement would cause irreparable damage to FRANCHISOR and the System(s) as a whole for which no adequate remedy at law may be available, including, without limitation, violations of standards, unhealthy, unsafe or unsanitary conditions, unauthorized use of the Proprietary Marks and breaches under Section 8 hereof. In the event of FRANCHISEE's breach or threatened breach of any of the terms of this Agreement, FRANCHISOR shall therefore be forthwith entitled to an injunction restraining such breach and/or to a decree of specific performance, without showing or proving any actual damage or irreparable harm or lack of an adequate remedy at law, and without the requirement for the posting of bond, the same being hereby waived by FRANCHISEE, until a final determination is made by a court of competent jurisdiction. The foregoing remedy shall be in addition to all other remedies or rights which FRANCHISOR might otherwise have by virtue of any breach of this Agreement by FRANCHISEE.

## Section 10. Transfer Provisions

10.0    **Transfer By FRANCHISOR.** This Agreement shall inure to the benefit of the successors and assigns of FRANCHISOR either individually or collectively. FRANCHISOR shall each have the right to assign its rights under this Agreement to any person, persons, partnership, association or corporation, provided that the transferee agrees in writing to assume all obligations undertaken by FRANCHISOR herein and FRANCHISEE receives a statement from both FRANCHISOR and its transferee to that effect. Upon such assignment and assumption, FRANCHISOR shall be under no further obligation hereunder except for accrued liabilities if any.

10.0.1   If this Agreement now or hereafter grants FRANCHISEE rights with respect to more than one (1) brand, FRANCHISOR shall have the right, at any time and from time to time, to require FRANCHISEE to execute and deliver separate contracts for each brand, each containing all of the terms of this Agreement pertaining to such brand. FRANCHISEE agrees to execute and return such replacement contracts to FRANCHISOR within thirty (30) days after receipt thereof. If FRANCHISEE fails to do so, FRANCHISOR shall have the right to execute such instruments on FRANCHISEE's behalf and deliver a copy thereof to FRANCHISEE.

10.1    **Transfer By FRANCHISEE.** FRANCHISEE understands and acknowledges that the rights and duties set forth in this Agreement are personal to FRANCHISEE and that FRANCHISOR has granted the Franchise in reliance on the business skill and experience, financial capacity and personal character of FRANCHISEE. Except as hereinafter provided, neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any member, if FRANCHISEE is a limited liability company ("LLC"), nor any shareholder, if FRANCHISEE is a corporation, without FRANCHISOR's prior written consent, shall, by operation of law or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association, LLC or corporation, any interest in this Agreement, or any interest in the franchise granted hereby, or any interest in any proprietorship, partnership, LLC or corporation which owns any interest in the franchise, nor offer, permit or suffer the same. Any purported assignment or transfer not having the prior written consent of FRANCHISOR shall be null and void and shall constitute default hereunder. Any proposed transfer must meet all the requirements of FRANCHISOR including, but not limited to, those set forth in this Section 10.

10.2    **Consent By FRANCHISOR.** FRANCHISOR shall not unreasonably withhold its consent to any transfer referred to in paragraph 10.1 above, provided that:

10.2.1   FRANCHISEE must have operated the Unit for a period of not less than six (6) months prior to the proposed transfer;

10.2.2   The sales price of the interest to be conveyed must not be so high, or the terms of sale so onerous, that, in the judgment of FRANCHISOR, the transferee will be unlikely to properly maintain, operate and promote the Unit and meet the transferee's financial and other obligations to FRANCHISOR, third party suppliers and creditors. This provision shall not create any liability to either transferor or transferee on the part of FRANCHISOR, in the event that FRANCHISOR approves the transfer and the transferee experiences financial difficulties;

10.2.3   The transferee and each partner, shareholder or member of the transferee, as the case may be, must be a United States citizen or lawful resident alien of the United States, must be of good moral character and reputation and must have a good credit rating and business qualifications and aptitude reasonably acceptable to FRANCHISOR. Such qualifications include, without limitation, literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to communicate with employees, customers, and suppliers of FRANCHISOR and to satisfactorily complete FRANCHISOR's required training program and such other tests and interviews as FRANCHISOR shall reasonably deem to be necessary or desirable. FRANCHISEE shall provide FRANCHISOR with such information as FRANCHISOR may require to make a determination concerning each proposed transferee; and

10.2.4   The transferee may not be a limited partnership, trust or other entity not specifically authorized herein.

10.3    **Transfer Requirements.** Each transfer of any interest in FRANCHISEE, the Unit, this Agreement and/or the Franchise herein granted, must receive the prior written consent of FRANCHISOR set forth in subsection 10.2 above and must conform to and/or comply with the following requirements:

10.3.1   Prior to the transfer, FRANCHISEE must pay and satisfy all accrued money obligations to FRANCHISOR, its affiliates and/or subsidiaries and to any Fund, obligations of FRANCHISEE which FRANCHISOR has guaranteed, liens, deferred rent and other obligations under the Lease for the Unit or other contracts pertaining to the Unit and the transfer fee provided below, as applicable;

10.3.2   Prior to the transfer, the Unit, including equipment, signs, building, improvements, interior and exterior, must be in good operating condition and repair and in compliance with FRANCHISOR's then-current Standards, including, without limitation, Standards for replacements and additions;

10.3.3   FRANCHISEE and any transferor may not assert any security interest, lien, claim or right now or hereafter in this Franchise, the Franchise granted to the transferee, or, if applicable, the Lease for the Unit with FRANCHISOR or its affiliated landlord entity. Any security interest, lien, claim or right asserted with respect to any personal property at the above location shall not include any after-acquired property and shall be subject, junior and subordinate to any security interest, lien, claim or right now or hereafter asserted by FRANCHISOR, its successors or assigns;

10.3.4   Prior to the transfer, the transferee must comply with the requirements of paragraph 5.1.8 of this Agreement, to the satisfaction of FRANCHISOR;

10.3.5   If the transferee is a corporation or LLC, it must comply with the terms of subsection 5.7 of this Agreement;

10.3.6   The transferee, including, where appropriate, all shareholders, members and partners of the transferee, shall jointly and severally execute, on FRANCHISOR's then-current forms, a franchise agreement and all other standard ancillary agreements, including, without limitation, a priority in payment agreement, if applicable. The priority in payment agreement provides, among other things, that if the transferee is unable at any time to make payments both to the transferor for the purchase of the Unit and to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s), payments to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s) will have priority. The transferee's franchise agreement shall not increase any fee based upon a percentage(s) of Gross Sales to a percentage greater than as required by this Agreement for the respective System(s). Unless a longer period is agreed upon between FRANCHISOR and the transferee, the term of the transferee's franchise agreement shall be for the unexpired term of this Agreement. The transferee shall pay no franchise fee pursuant to paragraph 4.1 of this Agreement unless a longer term is agreed upon by FRANCHISOR;

10.3.7   FRANCHISEE, including all individuals proposing to transfer an interest in the Franchise or the FRANCHISEE, must execute, on FRANCHISOR's standard form, a general release of all claims against the FRANCHISOR corporations, their affiliated corporations, and the directors, officers and employees of each; and

10.3.8   In addition, FRANCHISOR shall have the right to promulgate and enforce such additional reasonable requirements as it may, in its sole judgment determine.

10.4   **Transfer Fee.** The transferor shall pay to FRANCHISOR upon any transfer of any interest of FRANCHISEE in this Agreement or of any interest in the FRANCHISEE entity, a Transfer Fee determined as follows:

10.4.1   **Prior to FRANCHISEE's Fourth Year of Operations.** The transferor shall pay to FRANCHISOR a Transfer Fee which is the greater of: (i) five thousand dollars ($5,000.00), increased by five percent (5%) compounded annually during the term FRANCHISEE has operated the Unit under this or other agreements with FRANCHISOR; or (ii) five percent (5%) of the Adjusted Sales Price of the Unit.

10.4.1.1 The term "Adjusted Sales Price" shall mean the sales price to be received by FRANCHISEE upon transfer of the Unit, less the amount, if any, paid by FRANCHISEE for the Unit, when purchased as an ongoing business from another franchisee or from FRANCHISOR. No adjustment shall be made for amounts paid in connection with the development of a new unit. The Adjusted Sales Price shall include, without limitation, cash, assumption of debt, equipment lease obligations and deferred financing and amounts allocated to property of every kind, nature and description: furniture, fixtures, signs, equipment, supplies and inventory; excluding only amounts reasonably allocated to land and building, if owned by FRANCHISEE. It is intended that all consideration to be paid to FRANCHISEE, or for the benefit of FRANCHISEE, however designated and whether or not included in the contract of sale shall be deemed part of the Adjusted Sales Price including, but not by way of limitation, amounts allocated to a covenant not to compete or personal service agreement.

10.4.1.2 For purposes of determining the correct Transfer Fee, FRANCHISOR reserves the right to reallocate amounts which FRANCHISEE and the transferee have allocated to land, building, equipment, covenant against competition, personal service agreement, or otherwise, if in FRANCHISOR's opinion, the allocation of the parties is unreasonable in relation to the value of the business. If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.2   **From and After FRANCHISEE's Fourth Year of Operations.** If the transfer takes place after the commencement of FRANCHISEE's fourth year of operations, the transferor shall pay to FRANCHISOR the Transfer Fee indicated below based on the Unit's Gross Sales for the most recently completed twelve (12) calendar month period preceding the date of the contract of sale. FRANCHISOR reserves the right to select another period or to make appropriate adjustments to such Gross Sales in the event extraordinary occurrences (e.g., road construction, fire or other casualty, etc.) materially affected Unit sales during the indicated twelve (12) month period.

| Sales for Most Recent 12 Month Period | Transfer Fee |
|---|---|
| Less than $400,000.00 | $5,000.00 |
| $400,000.00 or more, but less than $600,000.00 | $6,000.00 |
| $600,000.00 or more, but less than $1,000,000.00 | $8,000.00 |
| $1,000,000.00 or more, but less than $1,400,000.00 | $12,000.00 |
| $1,400,000.00 or more | $20,000.00 |

10.4.3   If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.4   **Transfer of Less Than Control.** For any transfer that, either alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, will have the result of the transferee(s) holding an aggregate interest of less than fifty percent (50%) of the franchise licensed herein or the entity licensed hereunder, FRANCHISOR will reduce the Transfer Fee set forth in paragraph 10.4.1 or 10.4.2, as applicable, to a fixed transfer documentation fee of five hundred dollars ($500.00), increased after each five (5) years of the term of this Agreement, including any renewal period, by the same percentage as the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the same period. FRANCHISOR will waive the Transfer Fee entirely with respect to a transfer of less than control, if each transferee was an approved party to (or personal guarantor of) this Agreement prior to transfer.

10.4.5   **Transfer to Spouse or Children.** Notwithstanding anything else contained in this subsection 10.4, but provided that FRANCHISOR determines that FRANCHISEE has been in full compliance with the terms of all agreements with FRANCHISOR and its affiliates, the Transfer Fee due in connection with a transfer of the Unit to FRANCHISEE's spouse or one or more of FRANCHISEE's children shall be the fixed transfer documentation fee described in paragraph 10.4.4 above. The franchise agreement issued to the spouse and/or children will be on the then-current form in use at the time of transfer including the then-current Transfer Fee provisions.

10.5   **Release of Transferor.** Upon FRANCHISOR's approval of the transfer and FRANCHISEE's compliance with the aforesaid conditions, the transferor shall, provided that the transferor no longer has an interest in the Franchise, thereupon be relieved of further obligations under the terms of this Agreement, except that the transferor shall remain obligated for FRANCHISEE's money obligations under Section 4 through the date of transfer, and under the covenants contained in Section 8 for the Post Term Period therein described, after the date of transfer.

10.6   **Transfer on Death, Disability or Incapacity.** In the event of the death, disability or mental incapacity of FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, at any time during the term of this Agreement, the legal representative of the deceased, disabled or incapacitated party, as the case may be, together with all surviving partners, members or shareholders of FRANCHISEE, if any, shall, within six (6) months of such death, disability or mental incapacity, jointly apply, in writing to transfer the Franchise or the interest of the affected party in such Franchise, to such person or persons as the legal representative may specify. Such transfer shall be approved by FRANCHISOR upon fulfillment of all of the conditions set forth in Section 10 of this Agreement. A Transfer Fee shall be due pursuant to subsection 10.4 above, except that paragraph 10.4.5 shall apply if the transferee is a beneficiary or heir of FRANCHISEE.

10.6.1   If the legal representative and all surviving partners, members or shareholders, if any, do not propose a transferee acceptable to FRANCHISOR under the standards set forth in this Agreement within the period set forth in paragraph 10.6 above, or if no transfer of the interest shall have been accomplished consistent with the provisions of this Section 10 within one (1) year from the date of death, disability or mental incapacity, all rights licensed to FRANCHISEE under this Agreement shall terminate forthwith and automatically revert to FRANCHISOR. FRANCHISOR shall have the right and option, exercisable under such termination, to purchase all furniture, fixtures, signs, equipment and other chattels at a price to be agreed upon by the parties or, if no agreement as to price is reached by the parties, at such price as may be determined by a qualified appraiser, approved by both parties, such approval not to be unreasonably withheld. FRANCHISOR shall give notice of its intent to exercise said option no later than twenty-one (21) days prior to termination.

10.6.2   If the deceased, disabled or incapacitated party is the Designated Representative, then during the interim period until a transfer of the interest under this subsection 10.6 has taken place, the legal representative and surviving partners, members or shareholders shall operate the Unit through a successor Designated Representative who shall possess such qualifications for interim management of the Unit as FRANCHISOR may determine, in its discretion, from time to time. Failure of FRANCHISEE or the legal representative to appoint a Designated Representative so qualified within ninety (90) days after the date of death, disability or mental incapacity of the Designated Representative shall be grounds for FRANCHISOR to terminate this Agreement after sending FRANCHISEE a thirty (30) day written notice-to cure.

10.6.3   FRANCHISOR shall have the right to require a certified copy of an order of a court of competent jurisdiction over the estate of the deceased or incapacitated person, in which the legal representative or heir or legatee shall be determined, and may rely on such certified copy for the purposes of subsection 10.6. If not furnished with such certified copy of a court order, or in the event of a legal contest, FRANCHISOR may decline, without liability, to recognize the claim of a party to such interest. FRANCHISOR shall not be liable to any heir, next of kin, devisee, legatee, or legal representatives of a deceased or incapacitated person by reason of approval of a transfer of the interest to the surviving spouse or a child of the deceased, provided such approval is not contrary to an order of a court of competent jurisdiction served on FRANCHISOR.

10.7   **Right of First Refusal.** If FRANCHISEE, or any shareholder, member or partner thereof, has received and desires to accept a signed, bona fide written offer from a third party to purchase FRANCHISEE's rights under this Agreement or any shareholder's, member's or partner's interest in the franchised business, FRANCHISEE or such shareholder, member or partner shall notify FRANCHISOR and provide it with a complete copy of such offer. FRANCHISOR shall have the right and option, exercisable within sixty (60) days after its receipt of said copy, to purchase FRANCHISEE's Franchise, or such shareholder's, member's or partner's interest in the franchised business, on the same terms and conditions as offered by said third party. FRANCHISOR's exercise of its rights hereunder shall not relieve FRANCHISEE of its Transfer Fee obligation to FRANCHISOR. Should FRANCHISOR not exercise this option and the terms of the unaccepted offer be altered, FRANCHISOR shall, in each such instance, be notified of the changed offer and shall again have sixty (60) days to exercise its right to purchase on the altered terms. Should FRANCHISOR not exercise this option, all of the terms of Section 10 shall apply to the transfer.

## Section 11. Arbitration.

11.0  Except as otherwise specified in this Section 11, all controversies, claims or disputes between FRANCHISEE and FRANCHISOR of whatever kind or nature, whether arising out of or relating to the negotiation, performance or breach of this or any other agreement or otherwise, must be settled by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, as herein modified. This provision encompasses all causes of action, whether nominally a "claim", "counterclaim" or "cross-claim", and whether arising under common law or any state or federal statute. As used in this Section 11, the terms "FRANCHISOR" and "FRANCHISEE" include, without limitation, the past and present employees, agents, representatives, officers, directors, shareholders, members, guarantors, sureties, parent corporations, subsidiary corporations, controlled affiliated entities, predecessors, successors and/or assigns of each party hereto. The parties intend that this provision be given the broadest possible interpretation by a court of law.

11.1  **Eligibility and Procedures.** Arbitration must be initiated within the lesser of the time periods (a) set forth in paragraph 11.7.5 below or (b) permitted under the applicable statute of limitations for the cause of action asserted. Any claim, controversy or dispute which is not so initiated within said lesser period shall not be eligible for arbitration under any circumstances. Arbitration shall be initiated as provided in the Rules of the AAA by the filing of a demand for arbitration with the regional office of the AAA located in the city and state inserted in Item "L" of the Contract Data Schedule of this agreement. If no location is inserted in Item "L" or if such insertion is incomplete or inaccurate, Boston, Massachusetts, shall be deemed to apply. The arbitration proceedings, including without limitation all conferences, preliminary and dispositive hearings shall be conducted in such city and state unless all parties agree to another venue. Actions to enforce an express obligation to pay moneys may be brought under the Expedited Procedures of the AAA's Commercial Arbitration Rules, provided there are no counterclaims. The arbitrator(s) may issue such orders for interim relief as may be deemed necessary to safeguard the rights of the parties during the arbitration, but without prejudice to the ultimate rights of the parties, to the final determination of the dispute or to the rights of the FRANCHISOR to seek equitable relief from a court of competent jurisdiction at any time, even during the pendency of any arbitration proceedings initiated hereunder.

11.2  **Enforceability and Effect.** Judgment on the award, including, without limitation, any interim award for interim relief, rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The binding or preclusive effect of any award shall be limited to the actual dispute or claim arbitrated, and to the parties, and will have no collateral effect on any other dispute or claim of any kind whatsoever.

11.3  **Governing Law.** The Federal Arbitration Act and related federal judicial procedure shall govern this contract to the fullest extent possible, excluding all state arbitration law, irrespective of the location of the arbitration proceedings, the nature of the dispute between the parties or the nature of the court in which any related judicial proceedings may be brought. Except as provided in the preceding sentence respecting arbitration law, the resolution of all disputes between the parties bound hereunder, whether in tort and regardless of the place of injury or the place of the alleged wrongdoing or whether arising out of or relating to the parties' contractual relationship, shall be governed by the law of the Commonwealth of Massachusetts without regard to choice of law principles.

11.4  **Exceptions to Arbitration.** Disputes concerning the validity or scope of this Section 11 (arbitration), including, without limitation, whether a dispute is arbitrable hereunder, shall be beyond the authority of the arbitrator(s) and shall be determined by a court of competent jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. §1 et seq., as amended from time to time. In addition, the causes of action specified in the following subsections 11.5 and 11.6 are the sole and exclusive exceptions to the agreement of the parties hereto to resolve disputes through arbitration:

11.5  **FRANCHISOR's Exceptions.** FRANCHISOR shall have the option to litigate any one or more of the causes of action specified in this subsection 11.5 and shall exercise said option by filing a complaint in any court of competent jurisdiction:

11.5.1  the enforcement of an obligation to pay money to FRANCHISOR under an express term of any agreement;

11.5.2  any action based upon an allegation of intentional underreporting of Gross Sales by FRANCHISEE;

11.5.3  any action for declaratory or equitable relief, including, without limitation, seeking of preliminary and/or permanent injunctive relief, specific performance, other relief in the nature of equity or any action at law for damage to FRANCHISOR's property or property interests or in equity to enjoin any harm or threat of harm to FRANCHISOR's goodwill, Proprietary Marks or its tangible or other intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder;

11.5.4  any action seeking to terminate this Agreement based upon FRANCHISEE's material breach of paragraph 5.1.7 of this Agreement (excluding subparagraph 5.1.7.1); or

11.5.5  any action in ejectment or for possession of any interest in real or personal property.

11.6  **FRANCHISEE's Exceptions.** FRANCHISEE shall have the option to litigate any cause of action otherwise eligible for arbitration hereunder and shall exercise said option solely by filing a complaint in any court of competent jurisdiction in which FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. If any such complaint fails to include such express waivers or if any such court of competent jurisdiction determines that all or any part of such waivers shall be ineffective or void for any reason whatsoever, then the parties agree that the action shall thereupon be dismissed without prejudice, leaving the parties to their arbitration remedies, if then available pursuant to this Section 11.

11.6.1   In the event FRANCHISOR litigates any cause of action pursuant to subsection 11.5 above, FRANCHISEE shall not file any counterclaim, cross-claim, offset claim or the like against FRANCHISOR in the litigation, unless FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. Otherwise, FRANCHISEE shall submit each such counterclaim, cross-claim, offset claim or the like to arbitration, if then available pursuant to this Section 11.

11.7    **Waiver of Rights.** THE PARTIES HERETO AND EACH OF THEM KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AGREE AS FOLLOWS:

11.7.1   The parties hereto and each of them EXPRESSLY WAIVE(S) THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY; and

11.7.2   The parties hereto and each of them EXPRESSLY WAIVE(S) ANY CLAIM FOR PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES, except that FRANCHISOR shall be free at any time hereunder to bring an action for willful trademark infringement and, if successful, to receive an award of multiple damages as provided by law; and

11.7.3   The parties hereto and each of them EXPRESSLY AGREE(S) THAT NO PARTY BOUND HEREBY MAY RECOVER DAMAGES FOR ECONOMIC LOSS ATTRIBUTABLE TO NEGLIGENT ACTS OR OMISSIONS EXCEPT FOR CONDUCT WHICH IS DETERMINED TO CONSTITUTE GROSS NEGLIGENCE OR AN INTENTIONAL WRONG; and

11.7.4   The parties hereto and each of them EXPRESSLY AGREES THAT IN THE EVENT OF ANY FINAL ADJUDICATION OR APPLICABLE ENACTMENT OF LAW THAT PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES MAY NOT BE WAIVED, ANY RECOVERY BY ANY PARTY IN ANY FORUM SHALL NEVER EXCEED TWO (2) TIMES ACTUAL DAMAGES, except for an award of multiple damages to FRANCHISOR for willful trademark infringement, as provided by law.

11.7.5   ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE AND FRANCHISOR OR FRANCHISEE'S OPERATION OF THE UNIT, BROUGHT IN ANY FORUM BY ANY PARTY HERETO AGAINST THE OTHER, MUST BE COMMENCED WITHIN TWO (2) YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED, EXCEPT FOR FINANCIAL OBLIGATIONS OF FRANCHISEE.

11.8    **No Class Actions.** No party shall initiate or participate in any class action litigation claim against any other party bound hereby, except that FRANCHISEE may initiate or participate in any class action arbitration claim by franchisees of FRANCHISOR against FRANCHISOR limited exclusively to alleged misappropriation of moneys from the Fund of any System authorized by this Agreement, which claim must be brought only in arbitration under the provisions of this Section 11.

11.9    **Post-Term Applicability.** The provisions of this Section 11 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement, however effected.

## Miscellaneous Provisions.

12.0    **Relationship of the Parties.** This Agreement does not constitute FRANCHISEE an agent, legal representative, joint venturer, partner, employee or servant of FRANCHISOR or its affiliated corporation for any purpose whatsoever; and it is deemed understood between the parties hereto that FRANCHISEE shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of FRANCHISOR or its affiliated corporation or to create any obligation, express or implied, on behalf of FRANCHISOR or its affiliated corporation. The parties agree that this Agreement does not create a fiduciary relationship between FRANCHISOR or its affiliated corporation and FRANCHISEE.

12.1    Under no circumstances shall FRANCHISOR or FRANCHISEE be liable for any act, omission, debt or other obligation of the other party. Each party shall indemnify, protect, defend and save the other party harmless against any such claim. The cost of defending against any claim arising directly or indirectly from, or as a result of, or in connection with FRANCHISEE's operation of the Unit shall be borne by FRANCHISEE.

13.0    **Non-Waiver.** Any failure of FRANCHISOR to exercise any power reserved to it hereunder, or to insist upon strict compliance by FRANCHISEE with any term, covenant or condition in this Agreement, and any waiver by FRANCHISOR of any breach of a term, covenant or condition shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition in this Agreement. Subsequent acceptance by FRANCHISOR of the payments due to it hereunder, in whole or in part, shall not be deemed to be a waiver by FRANCHISOR of any preceding breach by FRANCHISEE of any term, covenant or condition of this Agreement. FRANCHISOR may, in its sole discretion, waive or modify any obligation of other franchisees under agreements similar to this Agreement, and no such waiver or modification shall obligate FRANCHISOR to grant a similar waiver or modification to FRANCHISEE. Acceptance by FRANCHISOR of payments due under this Agreement from any other person or entity shall be deemed to be acceptance from such person or entity as an agent of FRANCHISEE and not as recognition of such person or entity as an assignee of or successor to FRANCHISEE.

14.0    **Notices.** All notices hereunder by FRANCHISOR to FRANCHISEE shall, at FRANCHISOR's option, be personally delivered or sent by telecopier, prepaid private courier or certified mail to the FRANCHISEE at the address set forth in Item "I" of the Contract Data Schedule of this Agreement or to such other address as FRANCHISEE may from

time to time give notice of to FRANCHISOR. If delivery is refused, proof of attempted delivery shall be deemed delivery. All notices hereunder by FRANCHISEE to FRANCHISOR shall be sent by certified mail to Allied Domecq Retailing USA, at Post Office Box 317, 14 Pacella Park Drive, Randolph, Massachusetts 02368, Attention: Senior Vice President and General Counsel or to such other address as FRANCHISOR may from time to time give notice to FRANCHISEE.

15.0    **Entire Agreement.** This Agreement, and the documents referred to herein shall be the entire, full and complete agreement between FRANCHISOR and FRANCHISEE concerning the subject matter hereof, and supersedes all prior agreements, no other representation having induced FRANCHISEE to execute this Agreement; and there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein, which are of any force or effect with reference to this Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing. Captions, paragraph designations and section or subsection headings are included in this Agreement for convenience only, and in no way define, limit, construe or describe the scope or intent of the respective parts of this Agreement. The Special Terms and Conditions attached to this Agreement supplement the General Terms and Conditions and are intended to be additional thereto. In the event of any conflict between any provisions thereof, the provisions of the Special Terms and Conditions shall be deemed to prevail.

16.0    **Severability.** Each section, part, term and provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation of a court or agency having valid jurisdiction, such shall not impair the operation or affect the remaining portions, sections, parts, terms or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid section, part, term or provision shall be deemed not to be a part of this Agreement.

17.0    **Applicable Law.** This Agreement shall be deemed to have been made in, and shall be interpreted, construed and governed by the laws of, the Commonwealth of Massachusetts. FRANCHISEE acknowledges that this Agreement is to be performed in part through services rendered to FRANCHISEE in Massachusetts.

18.0    **Independent Investigation.** THE PROSPECT FOR SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE BY VIRTUE OF THIS AGREEMENT IS SPECULATIVE AND DEPENDS ON A MATERIAL EXTENT UPON FRANCHISEE'S CAPABILITY AS AN INDEPENDENT BUSINESS PERSON AND FRANCHISEE, AS WELL AS OTHER FACTORS. FRANCHISOR MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE POTENTIAL SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE HEREBY. FRANCHISEE REPRESENTS AND WARRANTS THAT IT HAS ENTERED INTO THIS AGREEMENT AFTER MAKING INDEPENDENT INVESTIGATIONS OF FRANCHISOR'S BUSINESS, AND NOT IN RELIANCE UPON ANY REPRESENTATION BY FRANCHISOR AS TO SALES OR PROFITS WHICH FRANCHISEE IN PARTICULAR MIGHT BE EXPECTED TO REALIZE. FRANCHISEE FURTHER REPRESENTS AND WARRANTS THAT FRANCHISOR AND ITS REPRESENTATIVES, EMPLOYEES OR AGENTS HAVE MADE NO REPRESENTATIONS TO INDUCE FRANCHISEE TO ACQUIRE THIS FRANCHISE AND EXECUTE THIS AGREEMENT WHICH ARE NOT EXPRESSLY SET FORTH HEREIN OR IN THE DISCLOSURE MATERIALS PROVIDED TO FRANCHISEE PRIOR TO ENTERING INTO THIS AGREEMENT.

19.0    FRANCHISEE acknowledges receiving a copy of this Agreement, the attachments thereto, and agreements relating thereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. FRANCHISEE further acknowledges receiving, on the date of the first personal meeting between FRANCHISOR and FRANCHISEE and not less than ten (10) business days prior to the date on which this Agreement was executed, the disclosure documents required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures".



Initials



ALLIED DOMECQ QSR
RIDER TO FRANCHISE AGREEMENT

SCHEDULE "DD"
120103

### SPECIAL TERMS AND CONDITIONS APPLICABLE TO A
### DUNKIN' DONUTS FRANCHISE

In connection with its business and the business of its Dunkin' Donuts franchisees, DUNKIN' DONUTS has developed and used and continues to use and control the usage of certain proprietary interests, trademarks, logos, emblems and other indicia of origin, service marks and trade names, including *Dunkin' Donuts*®, which is registered as a trademark on the Principal Register of the United States Patent and Trademark Office (the "Proprietary Marks"), to identify for the public the source of goods and services marketed thereunder and to represent to the public high and uniform standards of quality, cleanliness, appearance and service.

FRANCHISEE, being cognizant of the distinctive and valuable significance to the public of all of the foregoing, desires to make use of the trademark *Dunkin' Donuts*®, and to enjoy the benefits of that mark, the other Proprietary Marks and the Dunkin' Donuts System. FRANCHISEE understands the importance of FRANCHISOR's high and uniform standards of quality, cleanliness, appearance and service to the value of the Dunkin' Donuts System and the necessity of opening and operating FRANCHISEE's Dunkin' Donuts Unit in conformity with the Dunkin' Donuts System and in accordance with FRANCHISOR's Standards and specifications.

### DEFINITIONS

As used in these Special Terms and Conditions applicable to a Dunkin' Donuts Franchise, the following defined terms shall have the following meanings:

A. The "Dunkin' Donuts Unit" means all or a portion of the Premises dedicated to the operation of the Dunkin' Donuts System, as approved by FRANCHISOR.

B. "Dunkin' Donuts Products" shall mean and refer to donuts, bagels, muffins, cookies and other baked goods, sandwiches, coffee, soda, frozen drinks and other beverages, all of a variety of kinds or flavors, made in accordance with specifications designated by FRANCHISOR and identified by the Dunkin' Donuts Proprietary Marks, and such other products as may be specified from time to time in writing by FRANCHISOR for sale in the Dunkin' Donuts Unit.

C. Where applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit designated in Item "M" of the Contract Data Schedule of this Agreement.

### Section DD-1.  Grant Of The Franchise

1.0    FRANCHISOR grants to FRANCHISEE for and during the term hereof and FRANCHISEE accepts a Franchise to operate a donut shop utilizing the Dunkin' Donuts System in accordance with the terms, covenants and conditions of this agreement, at one location only, the Premises described in Item "A" of the Contract Data Schedule of this agreement (hereinafter called the "Dunkin' Donuts Unit"). In connection therewith, this Franchise includes the right to use at the Dunkin' Donuts Unit only, the trademark *Dunkin' Donuts*®, along with other Proprietary Marks owned and utilized by DUNKIN' DONUTS in connection with other Dunkin' Donuts units, and the right to use at the Unit only, the Dunkin' Donuts System including confidential and valuable information which now exists or may be acquired hereafter and set forth in FRANCHISOR's manuals or as otherwise from time to time disclosed to Dunkin' Donuts franchisees.

### Section DD-2.  Scope Of The Franchise

2.0    This Dunkin' Donuts Franchise is specific to one location only, for the term of this Agreement.  It grants no rights outside the Premises, nor includes any territorial protection against competition.  FRANCHISOR reserves and retains the right to operate or permit others to operate Dunkin' Donuts units or to sell or distribute Dunkin' Donuts products and/or services or to otherwise use the Dunkin' Donuts Proprietary Marks and/or the Dunkin' Donuts System, in each case at any other location.  FRANCHISOR and other franchisees may compete for customers drawn from the same area as FRANCHISEE's Dunkin' Donuts Unit using the same or different brand(s).

### Section DD-3.  Advertising and Promotion

3.0    FRANCHISOR shall prepare and coordinate a "Start-Up" promotional program (or such other promotional or advertising program as FRANCHISOR may specify) for the initial opening of the Dunkin' Donuts Unit.

3.1    FRANCHISOR shall review for approval all proposed advertising and promotional materials prepared by FRANCHISEE for use in local advertising relating to the Dunkin' Donuts Unit; and

3.3.1    FRANCHISOR shall administer The Dunkin' Donuts Advertising and Sales Promotion Fund (the "Dunkin' Donuts Fund") and shall direct the development of all advertising, marketing and promotional programs for the Dunkin' Donuts System.  That portion of FRANCHISEE's payments under paragraph 4.4 of this Agreement equal to one percent (1%) of the Gross Sales of the Dunkin' Donuts Unit will be utilized, at the discretion of FRANCHISOR, to provide for the administrative expenses of the Dunkin' Donuts Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of DUNKIN' DONUTS and the Dunkin' Donuts System. The balance, including any interest earned by the Dunkin' Donuts Fund, will be used for advertising and related expenses. Contributions to the Dunkin' Donuts Fund in excess of the percentage of Gross Sales of the Dunkin' Donuts Unit set forth in Item "F" of the Contract Data Schedule shall be used in accordance with the programs to which they relate.

 

## Section DD-4. Payments

4.4  FRANCHISEE shall make payments to the Dunkin' Donuts Fund as described in paragraph 4.4 of the General Terms and Conditions, except that sales to wholesale accounts approved by FRANCHISOR are excluded for purposes of calculating fees due under paragraph 4.4 (only).  For wholesale accounts to be approved by FRANCHISOR, FRANCHISEE must provide FRANCHISOR prior written notice of each such account.  Upon FRANCHISOR's receipt of such notice, the account shall be deemed approved, unless FRANCHISOR at any time notifies FRANCHISEE in writing that such account is not approved.  FRANCHISEE shall, within ten (10) days of receipt of a disapproval notice, discontinue sales to the disapproved wholesale account.

4.4.1  FRANCHISOR reserves the right in its sole and absolute discretion to designate or change the composition of Dunkin' Donuts Units included in the base for purposes of determining "two-thirds" support.

## Section DD-5. Covenants of FRANCHISEE

5.0  FRANCHISEE understands and acknowledges that every detail of the Dunkin' Donuts System is important to DUNKIN' DONUTS, to FRANCHISEE and to other Dunkin' Donuts franchisees, in order to maintain high and uniform standards of quality, cleanliness, appearance, service, products and procedures and thereby increase the demand for Dunkin' Donuts Products and protect and enhance the reputation and goodwill of DUNKIN' DONUTS.

5.1  Unless this Unit is expressly authorized to manufacture donut products on the Premises, and except as DUNKIN' DONUTS may otherwise authorize and direct in writing, donut products sold at this Unit shall be produced in the Dunkin' Donuts manufacturing unit located at the address set forth in Item "M" of the Contract Data Schedule of this Agreement (the "Producing Unit").

5.1.5.1  Franchisees' cooperatively-owned distribution centers under the Distributor Commitment Program ("DCP") are currently approved by DUNKIN' DONUTS to supply franchisees with a variety of ingredients, supplies and equipment.  DUNKIN' DONUTS or an affiliated company may from time to time be among the approved suppliers of products, supplies, services, equipment and/or materials required for the operation of the Dunkin' Donuts Unit.  If any such party is designated an approved supplier, it will be subject to the same competitive bidding procedure as other suppliers of the same Dunkin' Donuts Products.

5.1.5.2  DUNKIN' DONUTS may, from time to time, enter into national or regional exclusive supply arrangements with one or more independent suppliers for designated Dunkin' Donuts Products.  In evaluating the need for an exclusive supplier, DUNKIN' DONUTS may take into account (without limitation) the uniqueness of the designated Dunkin' Donuts Products, the projected price and required volume of such Dunkin' Donuts Products, the investment required of a supplier in order to meet the needs for such Dunkin' Donuts Products, the supplier's ability to provide such Dunkin' Donuts Products, the lack of availability of qualified alternative suppliers, the duration of exclusivity, the desirability of competitive bidding and such other business considerations as may be relevant.

5.2.1  Sales to approved wholesale accounts must be separately designated as "wholesale" on Gross Sales reports required under paragraph 5.2.1 of the General Terms and Conditions of this Agreement.

5.2.5  FRANCHISEE's Records shall also include, without limitation, daily production, throwaway and finishing records, and records of all wholesale accounts.

## Section DD-7. Proprietary Marks

7.0  FRANCHISEE acknowledges and agrees that *Dunkin' Donuts*® is a registered trademark owned or controlled by DUNKIN' DONUTS; that said mark has been and is being used by DUNKIN' DONUTS and by its franchisees and licensees; that said mark, together with the other Proprietary Marks presently owned or controlled by DUNKIN' DONUTS or which may be acquired in the future, constitutes part of the Dunkin' Donuts System; that valuable goodwill is associated with and attached to said mark and the other Dunkin' Donuts Proprietary Marks; and that any and all goodwill associated with the Dunkin' Donuts Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of DUNKIN' DONUTS.

7.5  FRANCHISEE shall operate, advertise and promote the Dunkin' Donuts Unit under the name "Dunkin' Donuts", with no accompanying words or symbols of any nature, except as may be otherwise required by law. FRANCHISEE shall not use, as part of its corporate or other business name, any Proprietary Marks used by FRANCHISOR, including, but not limited to, "Dunkin' Donuts" or "Dunkin", or any form or variations thereof, including, but not limited to, "Dunk" or "D.D.", which, in the judgment of FRANCHISOR, is likely to cause third parties to be confused or mistaken with respect to the separate identities of DUNKIN' DONUTS and FRANCHISEE.

## Section 10. Transfer Provisions

10.3.1  **Transfer of this Manufacturing Retail Unit** - If FRANCHISEE shall propose a transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more of the Franchise for this Unit, or the entity holding such Franchise, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of this Agreement, be subject to the requirement that a controlling interest in all satellite retail units supplied by this Unit must be transferred to (a) the same qualified transferee, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of this Agreement, and who also must control one or more manufacturing Dunkin' Donuts Unit(s) at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the producing unit(s) for the satellite retail Dunkin' Donuts unit(s).

10.3.2    <u>**Transfer of other Dunkin' Donuts Units supplied by this Manufacturing Retail Unit**</u> - If FRANCHISOR receives notice of a proposed transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more in any Dunkin' Donuts Franchise for a retail unit supplied by this Unit, or the entity holding such Franchise, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, be subject to the requirement that the proposed transferee must (a) also be a qualified transferee of this Unit, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, and who also must control another manufacturing retail Unit at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the manufacturing unit to supply products for such satellite retail unit.

ALLIED DOMECQ QSR
RIDER TO FRANCHISE AGREEMENT

SCHEDULE "DD"
ADDENDUM ONE
110100

## SPECIAL TERMS AND CONDITIONS APPLICABLE TO
## A DUNKIN' DONUTS FRANCHISE

### ADDITIONAL PROVISIONS FOR A DUNKIN' DONUTS MANUFACTURING RETAIL UNIT
### (A FULL-PRODUCING UNIT)

#### Section DD-5.1 - Covenants of FRANCHISEE

5.1.1    **Percentage Rent** - Except as hereinafter set forth, if FRANCHISEE, or, if applicable, the partners or shareholders of FRANCHISEE, leases this manufacturing Retail Unit from FRANCHISOR or its designated landlord entity, products manufactured at this Unit for retail sale at other Dunkin' Donuts units shall not be included in determining percentage rent, if any, as defined in this Unit's lease. Wholesale sales made from any Dunkin' Donuts unit supplied by this Unit shall be deemed to be sales from this Unit and subject to percentage rent and other charges under the terms of such lease for this Unit.  In addition and notwithstanding the foregoing, FRANCHISEE shall pay to FRANCHISOR's designated landlord entity any percentage rent and other charges which said designated landlord entity may be required to pay under any underlying lease applicable to this Unit, because of any sales of products manufactured at this Unit and sold from other Dunkin' Donuts unit(s). FRANCHISEE shall execute an amendment to the lease for this Unit in a form satisfactory to FRANCHISOR or its designated landlord entity, incorporating the foregoing provisions.

5.1.2    **Manufacture and Transportation of Products** - FRANCHISEE shall not, without the prior written consent of FRANCHISOR, deliver any products manufactured or finished at this Unit nor any other location(s), except as authorized or directed by FRANCHISOR. FRANCHISOR reserves the right, in its sole and absolute discretion, to require FRANCHISEE to manufacture, in whole or in part, and/or to finish at this Unit and to deliver to all authorized non-manufacturing satellite retail units, such products as are now or hereafter designated as approved for sale at such Dunkin' Donuts units. Products not finished at this Unit must be finished at the satellite retail units and at no other place unless prior written approval is granted by FRANCHISOR. FRANCHISEE shall transport products and supplies from this Unit to the authorized satellite retail units on a schedule and in a manner acceptable to FRANCHISOR that ensures compliance with federal, state and local regulation as well as FRANCHISOR's sanitation, quality, freshness and other standards and that an adequate supply of product is available for sale at all times that such satellite retail units are open for business.

5.1.3    **Product and Vehicle Liability Insurance** - FRANCHISEE shall also maintain a policy or policies of product liability, vehicle liability, and non-owned vehicle liability insurance coverages, in the amounts set forth in paragraph 5.3 of the Franchise Agreement.

## Section DD-10.  Transfer Provisions

10.3.1    **Transfer of this Manufacturing Retail Unit** - If FRANCHISEE shall propose a transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more of the Franchise for this Unit, or the entity holding such Franchise, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of this Agreement, be subject to the requirement that a controlling interest in all satellite retail units supplied by this Unit must be transferred to (a) the same qualified transferee, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of this Agreement, and who also must control one or more manufacturing Dunkin' Donuts Unit(s) at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the producing unit(s) for the satellite retail Dunkin' Donuts unit(s).

10.3.2    **Transfer of other Dunkin' Donuts Units supplied by this Manufacturing Retail Unit** - If FRANCHISOR receives notice of a proposed transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more in any Dunkin' Donuts Franchise for a retail unit supplied by this Unit, or the entity holding such Franchise, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, be subject to the requirement that the proposed transferee must (a) also be a qualified transferee of this Unit, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, and who also must control another manufacturing retail Unit at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the manufacturing unit to supply products for such satellite retail unit.

Dunkin' Donuts Rider - Addendum One

ALLIED DOMECQ QSR
FRANCHISE AGREEMENT

## SPECIAL TERMS AND CONDITIONS APPLICABLE TO
## DEVELOPMENT OF A NEW UNIT BY FRANCHISEE

FRANCHISEE wishes to develop a new Unit that will utilize one or more of FRANCHISOR's Proprietary Marks at the Premises. In order to facilitate FRANCHISEE's obtaining financing and other needed resources, FRANCHISOR may elect to enter into this agreement prior to having had the opportunity to review the Premises to determine if it is suitable for development as such a Unit. FRANCHISEE's right to develop and operate a Unit under the terms of this agreement at the Premises is, therefore, subject to the conditions that 7(i) FRANCHISOR shall approve the Premises as a suitable location for development of a Unit and (ii) FRANCHISOR shall determine that FRANCHISEE meets all of FRANCHISOR's qualifications and requirements for new, or if appropriate multiple-unit, franchisees. This Schedule enumerates the respective responsibilities of the parties pertaining to FRANCHISEE undertaking to develop a Unit on the Premises. In consideration of a conditional grant to FRANCHISEE of one or more franchise(s) for the Premises, FRANCHISEE hereby agrees as follows:

1.0  **Approval of the Premises** - Development of the Premises as a Unit must be approved by FRANCHISOR, as evidenced solely by written notice sent to FRANCHISEE by the General Manager or other duly authorized representative of FRANCHISOR (the "Site Approval Notice") pursuant to the process hereinafter described. Any real estate commitments that FRANCHISEE may make pursuant to this agreement **MUST** be subject to: (a) FRANCHISEE having obtained FRANCHISOR's prior written approval of development of a Unit on the Premises; (b) FRANCHISEE obtaining all necessary permits, licenses and local governmental approvals needed to develop and operate a Unit on the Premises. In addition, FRANCHISEE should include such other contingencies as FRANCHISEE's attorney may recommend. FRANCHISEE must provide FRANCHISOR a copy of any lease of the Premises within ten (10) days after its execution and receipt by FRANCHISEE.

1.1  It shall be FRANCHISEE's responsibility to retain an attorney and other appropriate, independent advisors in connection with negotiating FRANCHISEE's acquisition of the right to develop and operate a Unit on the Premises, including reviewing all agreements with FRANCHISOR. FRANCHISOR assumes no liability or obligation to FRANCHISEE or to any third party for any assistance in negotiation FRANCHISOR may elect to provide to FRANCHISEE. Although FRANCHISOR may comment on FRANCHISEE's negotiations with third parties, any assistance FRANCHISOR provides to FRANCHISEE is no substitute for the advice of independent counsel. FRANCHISOR will not act as agent, employee or fiduciary of FRANCHISEE for the purpose of assisting FRANCHISEE in negotiations.

1.2  In the event that development of a Unit on the Premises is disapproved by FRANCHISOR or by any governmental authority, this Franchise agreement and all of the parties' rights and obligations hereunder shall cease and be of no further force and effect.

1.3  FRANCHISOR's approval of the Premises is not a representation or a warranty that the Unit will be profitable or that FRANCHISEE will achieve any particular level of sales at the Unit. It merely means that the Premises has met certain minimum criteria which FRANCHISOR has established for identifying suitable sites for proposed Units in the region in which the Premises are located. Because unit development is not a precise science, FRANCHISEE agrees that FRANCHISOR's approval or disapproval of a development shall not impose any liability or obligation on FRANCHISOR. The decision to develop any particular Premises is FRANCHISEE's, subject to FRANCHISOR's final approval. A preliminary favorable opinion of the Premises by local or regional representatives of FRANCHISOR is not conclusive or binding approval, because their recommendations may be rejected by FRANCHISOR.

2.0  **Approval of FRANCHISEE** - In addition to approval of the Premises set forth above, FRANCHISEE's qualifications to obtain this Franchise must be approved in writing by FRANCHISOR. In the event FRANCHISOR disapproves FRANCHISEE's qualifications within sixty (60) days of the date of this agreement, this Franchise agreement and all of the parties' rights and obligations hereunder shall cease and expire.

3.0  **Execution of Documents** - FRANCHISEE shall execute such other documents and agreements as are customarily required by FRANCHISOR in such circumstances, including, if appropriate, but not limited to, a standard form of Lease Option Agreement or Rider to Lease, which ensures the continued availability of the Premises as a franchised unit, in the event of a default under this agreement or, if applicable, under FRANCHISEE's lease of the Premises, during the term of this agreement. If FRANCHISEE owns the Premises real estate, FRANCHISEE shall grant FRANCHISOR the right to lease the Premises on negotiated terms comparable to those under which FRANCHISOR leases comparable property from others. A Lease Option Agreement or a Rider to Lease confirming these rights in a form acceptable to FRANCHISOR, must be signed before construction commences on the Premises.

4.0  **Development of the Unit** - The Unit must be developed and constructed in strict accordance with FRANCHISOR's current standards, requirements, procedures, plans, specifications and documentation for the type, configuration and brand(s) approved for the Premises (hereinafter collectively the "Requirements"). In order that development of the Premises proceed as expeditiously as possible, FRANCHISEE shall strictly comply with the following procedures set forth in Sections 4 and 5:

4.1  FRANCHISEE shall request FRANCHISOR's review of a proposed site, submitted in writing on the proscribed form, signed by FRANCHISEE and, if applicable, FRANCHISEE's landlord (the "Request for Site

*Schedule "F/D"*

1

 

Approval" ). Within approximately thirty (30) days, FRANCHISOR will advise FRANCHISEE if the proposed Premises fails to meet FRANCHISOR's minimum preliminary criteria. Otherwise, FRANCHISOR will schedule a Responsibility Meeting (described below), to be held within approximately sixty (60) days after FRANCHISOR received the Request for Site Approval. This preliminary review procedure is intended to allow FRANCHISEE the opportunity to limit the amount of money FRANCHISEE spends on a site that does not meet FRANCHISOR's minimum criteria.

4.2    Once FRANCHISOR has scheduled a Responsibility Meeting, FRANCHISEE shall promptly hire a licensed architect for the Unit project, whose responsibility shall be to adapt FRANCHISOR's generic plans and/or specifications to the specific requirements of the Premises, the geographical region in which the Premises are located and the building codes and ordinances pertinent to the Premises, and to oversee the contractor's completion of construction of the Unit on the Premises. FRANCHISEE's architect must promptly order such topographical and boundary surveys of the Premises, soil borings and structural engineering tests as FRANCHISOR and/or FRANCHISEE's architect may require (the "Reports"). FRANCHISEE's architect must attend the Responsibility Meeting.

4.3    On the scheduled day, FRANCHISOR's representatives will meet at the Premises with FRANCHISEE and FRANCHISEE's architect, to establish a work schedule and coordinate the respective responsibilities of each of the parties with respect to development of a Unit on the Premises (the "Responsibility Meeting"). The Reports, including copies of zoning ordinances and by-laws applicable to the Premises, shall be made available to FRANCHISOR at the Responsibility Meeting by FRANCHISEE's architect. If any such Report or FRANCHISEE's architect is not available when required, FRANCHISOR may, at its option, postpone the Responsibility Meeting, in which case FRANCHISEE shall reimburse FRANCHISOR's out-of-pocket travel costs, if any. Should the Responsibility Meeting be so postponed, FRANCHISOR shall reschedule the Responsibility Meeting on a date FRANCHISEE makes a firm commitment that the architect and/or Reports will be available, no later than within thirty (30) additional days. If FRANCHISEE is unable to comply, FRANCHISOR shall have the right to terminate this Franchise agreement, provided that, in FRANCHISOR's good faith judgement, FRANCHISEE has failed to exercise reasonable diligence to comply with the terms of this Schedule.

4.4    Subject to delays caused by FRANCHISEE or its landlord or otherwise beyond FRANCHISOR's reasonable control, FRANCHISOR shall use its best efforts to notify FRANCHISEE of its approval or disapproval of the Premises, within approximately ninety (90) days after the date FRANCHISOR received FRANCHISEE's Request for Site Approval.

4.5    FRANCHISOR assumes no responsibility for (a) evaluation of the soil or subsoil on the Premises for hazardous substances or unstable conditions, (b) inspection of any structure on the Premises for asbestos or other toxic or hazardous materials, or (c) compliance with the Americans With Disabilities Act ("ADA"). It is FRANCHISEE's sole responsibility to obtain satisfactory evidence and/or assurances that the Premises (and any structures thereon) are free from environmental contamination and in compliance with the requirements of ADA.

5.0    **Construction of the Unit** -Prior to commencement of construction of the Unit on the Premises, the plans and specifications prepared by FRANCHISEE's architect must be reviewed by FRANCHISOR and approved for compliance with FRANCHISOR's design Requirements. FRANCHISEE is solely responsible for obtaining all necessary permits from all applicable governmental agencies for completing construction of the Unit. If FRANCHISE fails to commence construction of the Unit within twelve (12) months from the date of this Franchise Agreement, FRANCHISOR shall have the right, in its sole discretion, to terminate this agreement by written notice to FRANCHISEE.

5.1    FRANCHISEE and its contractor(s) shall obtain a comprehensive general liability insurance policy written by an insurer having at least a rating of A-XII in Best's Insurance Reports and in which FRANCHISOR is named as an additional insured party. Such policy shall comply with Subsection 5.3 of the General Terms and Conditions of this Franchise Agreement. Coverage under such insurance shall include operations, premises liability, independent contractor's coverage, contractual liability and automobile liability (owned and non-owned). Prior to commencement of construction, FRANCHISEE shall furnish FRANCHISOR an insurance certificate evidencing the foregoing policy and that FRANCHISEE or its contractor(s) have procured worker's compensation insurance covering all persons employed in construction of the Unit.

5.2    FRANCHISOR shall have the right of entry upon the Premises at all times, to inspect construction in progress, to ensure that all of FRANCHISOR's Requirements are being met. FRANCHISOR and its employees shall not act as an architect or agent of FRANCHISEE. The duties of FRANCHISOR's construction representative are limited solely to ensuring that FRANCHISOR's Requirements are met on the Premises. FRANCHISEE shall not rely upon any opinions expressed by FRANCHISOR or any of its employees or agents regarding structural integrity, safety or construction procedures, building codes or ordinances or other matters properly within the responsibility of FRANCHISEE's architect. FRANCHISOR assumes no liability or responsibility for architectural or engineering judgments outside the scope of the duties stated above.

5.3    If the Unit does not initially open to serve the general public within fifteen (15) months from the date of this agreement, FRANCHISOR shall have the right, in its sole discretion, (a) to increase the Initial Franchise Fee(s) to the then-current initial franchise fee(s), which increase, if any, shall be payable to FRANCHISOR upon demand; or (b) to terminate this agreement by written notice to FRANCHISEE. In the event of any delay caused by FRANCHISOR, or if FRANCHISEE has been unavoidably delayed by act of God, government restrictions, labor difficulties, inability to obtain building materials or similar contingencies (other than making any payment) not within FRANCHISEE's control, FRANCHISOR shall extend the deadline for a period of time equal to the period of such unavoidable delay.

*Schedule "F/D"*

2

5.4  Before the Unit opens to serve the general public, FRANCHISEE must obtain FRANCHISOR's final approval of the construction of the building, site improvements and landscaping, as appropriate, and the installation of all signs and equipment. FRANCHISOR's approval of construction of the unit is not a representation or warranty that the Unit has been constructed in accordance with any architectural, engineering or legal standards for design or workmanship. It merely means that FRANCHISOR is satisfied that the Requirements which FRANCHISOR has established for consistency of design and layout have been met (or waived, where appropriate). FRANCHISEE agrees that FRANCHISOR's approval of construction of the Unit shall not impose any liability or obligation on FRANCHISOR. FRANCHISEE also agrees that all franchise and real estate documentation must be complete and all required payments must be received by FRANCHISOR before the Unit is opened.

5.5  As soon as FRANCHISOR approves that construction and equipping the Unit are substantially complete and all conditions required for opening the Unit have been met, FRANCHISEE shall promptly open the Unit to serve the general public. FRANCHISEE agrees that the Unit must open to serve the general public no later than fifteen (15) months from the date of this Agreement.

6.0  **Financing** - Prior to commencing construction of the Unit on the Premises, FRANCHISEE shall provide evidence satisfactory to FRANCHISOR that cash and/or financing is in place, sufficient to fund completion of construction and purchase of necessary improvements, equipment and signs. FRANCHISOR assumes no obligation to guarantee the funding or financing of FRANCHISEE's construction project. FRANCHISOR will not guarantee FRANCHISEE's mortgage, lease or other real estate related obligations. If FRANCHISOR, at its election, finances or guarantees the financing of FRANCHISEE's purchase or leasing of equipment and/or signs, the owner of the Premises real estate must agree that the equipment and signs are not a part of the realty and must waive any and all interest in the equipment and/or signs, in order to permit the financing of the equipment and/or signs. In this connection, the owner of the Premises real estate must sign such reasonable documents as are reasonably required by FRANCHISOR.

7.0  **Control of the Premises** - FRANCHISEE hereby represents to FRANCHISOR that FRANCHISEE will have the following relationship with the owner or lessor of the Premises (place an "x" in the appropriate box):

☒  the Premises will be owned by an independent third party landlord with which FRANCHISEE will <u>not</u> share or maintain any common partner, member, shareholder, officer, director, trustee, beneficiary, family member or other interest; or

☐  the Premises will be owned by a third party landlord with which FRANCHISEE <u>will</u> share or maintain a common partner, member, shareholder, officer, director, trustee, beneficiary, family member or other interest; or

☐  the Premises will be owned by a corporation, LLC, trust, partnership or other entity controlled by FRANCHISEE; or

☐  the Premises will be owned by the same entity that will execute the Franchise Agreement.

FRANCHISEE agrees to promptly advise FRANCHISOR of any change, whatsoever, in the relationship represented above.

*Schedule "F/D"*

3

120199

SCHEDULE "NY"

### ADDENDUM TO THE ADQSR FRANCHISE AGREEMENT AND STORE DEVELOPMENT AGREEMENT REQUIRED BY THE NEW YORK GENERAL BUSINESS LAW

Notwithstanding anything to the contrary set forth in the ADQSR Franchise Agreement (the "Franchise Agreement") and/or the Store Development Agreement ("SDA") the following provisions shall supersede and apply to all Baskin-Robbins, Dunkin' Donuts and Togo's franchises offered and sold in the State of New York.

1.    Subsection 5.4 of the Franchise Agreement and Section 14 of the SDA shall each be supplemented by the addition of the following language as the last sentence of these sections:

However, FRANCHISEE shall not be required to indemnify FRANCHISOR for any claims arising out of a breach of this Agreement by FRANCHISOR or other civil wrongs of FRANCHISOR.

2.    Paragraph 7.4 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

FRANCHISEE must notify FRANCHISOR immediately in writing of any apparent infringement of or challenge to FRANCHISEE's use of any Mark, or claim by any person of any rights in any Mark or any similar trade name, trademark or service mark of which FRANCHISEE becomes aware. FRANCHISEE may not communicate with any person other than FRANCHISOR and its counsel in connection with any such infringement, challenge or claim. FRANCHISOR shall have sole discretion to take such action as it deems appropriate and the right to exclusively control any litigation, U.S. Patent and Trademark Office proceedings or other administrative proceeding or to otherwise protect and maintain its interest in the Marks. FRANCHISOR shall not be obligated to defend the FRANCHISEE against the claim of a third party that the operation of Retail Unit or the FRANCHISEE's use of the Marks infringes any right of the third party and FRANCHISOR shall not be obligated to protect, indemnify or hold harmless the FRANCHISEE from the consequences of any such claim or litigation. In the event FRANCHISOR does not take action, FRANCHISEE will have to protect itself at its own expense.

3.    Paragraph 10.3.7 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

FRANCHISEE must execute a general release in a form satisfactory to FRANCHISOR, releasing FRANCHISOR, its shareholders, directors, officers, employees, in their corporate and individual capacities, of any claims FRANCHISEE may have against them; provided, however, that all rights enjoyed by FRANCHISEE and any causes of action arising in its favor from the provision of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force, it being the intent of this proviso that the non-waiver provisions of the New York State General Business Law Sections 687.4 and 687.5 be satisfied.

4.    Paragraph 10.1 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

This Agreement is fully assignable by FRANCHISOR and shall inure to the benefit of any assignee or other legal successor to the interest of FRANCHISOR herein. However, no assignment shall be made except to an assignee who, in the good faith judgment of FRANCHISOR, is willing and able to assume FRANCHISOR's obligations under this Agreement.

Initials

1

PC# 340091
Bronx, New York

### ALLIED DOMECQ QSR FRANCHISE AGREEMENT

#### SPECIAL TERMS AND CONDITIONS APPLICABLE TO THE MARKETING STARTUP FEE

#### TEST AGREEMENT

Addendum To The Franchise Agreement dated ___6|15|04.___ by and between Dunkin' Donuts Incorporated, (hereinafter the "Franchisors") and SUNDRAM, INC. (hereinafter the "Franchisee") for PC# 340091 located at 511 East 163rd Street – Bronx, New York 10456 (hereinafter "The Store")

#### RECITATIONS

1. Pursuant to Section D. of the Contract Data Schedule and Section 4.2 of the General Terms and Conditions of the Franchise Agreement, Franchisee was to have paid Franchisor a Marketing Start up Fee (the "Fee") in connection with the opening of the Retail Unit to the public.

2. Franchisor has agreed to forebear in collecting the fee at this time in reliance upon Franchisee's representations as set forth in this Agreement.

3. Franchisee hereby represents and warrants to Franchisor that Franchisee shall develop and execute a start up promotional program or such other promotion or advertising program as Franchisor may specify for the Retail Unit. In connection therewith, Franchisee shall utilize such website(s), program materials and methods as Franchisor shall specify from time to time. It is anticipated that such program would be undertaken in the period starting four weeks before the opening of the Retail Unit and be complete within 2 months of the opening of the retail unit.

4. In reliance on the foregoing, Franchisor agrees to forebear in collecting the Fee as set forth in the Franchise Agreement. Franchisor may collect the entire Fee, without offset, if Franchisee fails to complete the required program within 2 months of the opening of the Retail Unit.

5. All of Franchisor's remedies under the Franchise Agreement, including without limitation the right to attorneys fees, are hereby incorporated by reference.

6. Franchisor reserves the right to recind this Test Agreement in the event that the web site intended for Franchisee's use in furtherance of this Test Agreement is not operational on the day on which the Retail Unit opens to the public. In such event, Franchisee agrees to promptly pay the Fee applicable to the market in which the Retail Unit is located and to comply with the provisions of the Franchise Agreement relating to startup promotional program or other Franchisor-required program as if this Test Agreement had not been entered into.

**FRANCHISOR:**
**DUNKIN' DONUTS INCORPORATED**

GAIL R. SORRENTINO
ASSISTANT SECRETARY/CLERK

**FRANCHISEE:**
**SUNDRAM, INC.**

Anil Kapoor, President

SDA# 339636

PC# 340091
Bronx, New York

IN WITNESS WHEREOF the parties hereto, intending to be legally bound hereby, have duly executed, sealed and delivered this agreement in triplicate, as of the date and year first written above. FRANCHISEE hereby acknowledges receipt of this Franchise Agreement, together with any amendments, at least five (5) business days prior to the date hereof. FRANCHISEE further acknowledges having carefully read this agreement in its entirety, including all Schedules identified above and the Personal Guaranty below (if applicable).

FRANCHISOR

ATTEST:

DUNKIN' DONUTS INCORPORATED

By: _____

**GAIL R. SORRENTINO**
**ASSISTANT SECRETARY/CLERK**

This agreement is not binding upon the above corporation(s) until executed and attested by an authorized officer.

FRANCHISEE ACKNOWLEDGES SECTION 11 OF THE GENERAL TERMS & CONDITIONS OF THIS CONTRACT, WHICH PROVIDES FOR FRANCHISEE'S EXPRESS WAIVER OF RIGHTS TO A JURY TRIAL, TO PARTICIPATE IN CLASS ACTION LAWSUITS, TO OBTAIN PUNITIVE, MULTIPLE OR EXEMPLARY DAMAGES, AND TO BRING ANY CLAIM OR ACTION LATER THAN TWO YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION.

FRANCHISEE

WITNESS/ATTEST:

SUNDRAM, INC.

By: _____
Name: _____ Kapoor
Title: _____

Name: Anil Kapoor
Title: President

## PERSONAL GUARANTEE BY SHAREHOLDERS OF A CORPORATION
## OR MEMBERS OF A LIMITED LIABILITY COMPANY

We, the undersigned, represent and warrant that we constitute *[check whichever statement applies]*

[ X ]  the shareholders of one hundred percent (100%) of the originally issued and outstanding capital stock of the above FRANCHISEE, a corporation

[  ]  one hundred percent (100%) of the members of the above FRANCHISEE limited liability company ("LLC")

organized under the laws of the state of <u>New York</u>. Waiving demand and notice, the undersigned hereby, jointly and severally, personally guarantee the full payment of FRANCHISEE's money obligations under Section 4 and the performance of all of FRANCHISEE's other obligations under this Franchise Agreement, including, without limitation, paragraph 6.3 and Section 8, in its entirety relative to the restrictions on the activities of FRANCHISEE. We personally agree that the Franchise Agreement shall be binding upon each of us personally. The undersigned, jointly and severally, agree that FRANCHISOR may, without notice to or consent of the undersigned, (a) extend, in whole or in part, the time for payment of FRANCHISEE's money obligations under paragraph 4; (b) modify, with the consent of FRANCHISEE, its money or other obligations hereunder; and/or (c) settle, waive or compromise any claim of FRANCHISOR against FRANCHISEE or any of the undersigned, all without in any way affecting the personal guarantee of the undersigned. This Guarantee is intended to take effect as a sealed instrument.

_____
witness

_____
Name: Anil Kapoor, individually

SDA# 339636

PC# 340091
Bronx, New York

## CERTIFICATION OF FRANCHISEE

DESCRIBE BELOW ALL PROMISES AND REPRESENTATIONS MADE BY FRANCHISOR THAT ARE NOT EXPRESSLY CONTAINED IN THE FRANCHISE AGREEMENT OR UNIFORM FRANCHISE OFFERING CIRCULAR BUT WHICH INFLUENCED FRANCHISEE'S DECISION TO SIGN THIS FRANCHISE AGREEMENT.

*If the answer is "none," please write "NONE" below.*

None

FRANCHISEE's completion of this page is a material inducement for FRANCHISOR to grant FRANCHISEE this Franchise. If FRANCHISEE fails to complete, sign and deliver this Certification of Franchisee page to FRANCHISOR along with the Franchise Agreement, FRANCHISOR will not counter-execute the Franchise Agreement or may void the Franchise Agreement if it already has been counter-executed.

THE UNDERSIGNED HEREBY CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS TRUE, that FRANCHISEE had the opportunity to obtain the advice of an attorney, and that FRANCHISEE, and not FRANCHISEE's attorney or other representative, has executed this Certification of Franchisee.

The date of the Certification shall be the date on the Franchise Agreement

Witness/Attest:

FRANCHISEE: **SUNDRAM, INC.**

By: _____
Name: Anil Kapoor
Title:    President

Name: _____
Title:

_____ witness

_____
Anil Kapoor, individually

# Exhibit 1B

SDA # 339636

PC # 340367
Bronx, New York

## FRANCHISE AGREEMENT
### ALLIED DOMECQ QUICK SERVICE RESTAURANTS

This Franchise Agreement is dated ___1/18/04___, ____, and made by and between ~~BASKIN-ROBBINS USA, CO. (hereinafter "BASKIN-ROBBINS"), a California corporation, and~~ DUNKIN' DONUTS INCORPORATED (hereinafter "DUNKIN' DONUTS"), a Delaware corporation, ~~and TOGO'S EATERIES, INC. (hereinafter "TOGO'S"), a California corporation, all~~ with principal offices in Randolph, Massachusetts (such corporations are hereinafter individually or collectively referred to as "FRANCHISOR") and the following individual(s) and/or entity:

### SATYAM SHIVAM, INC., a New York corporation
(hereinafter individually or collectively referred to as "FRANCHISEE")

This Franchise Agreement includes the Contract Data Schedule, General Terms and Conditions designated as ("ADQSR-120102") and the Special Terms and Conditions identified in Item "J" of the Contract Data Schedule below.

### CONTRACT DATA SCHEDULE

A.  Location of the Franchised Unit (the "Premises"):

| 2451 | Eastchester Road | Bronx | New York | 10469 |
|---|---|---|---|---|
| (number) | (street) | (city or town) | (state) | (zip code) |

B.  Term:......................... Twenty (20) years from the first date the Unit opens to serve the general public, ~~or, in the case of an existing Unit, until~~ _____, _____.

C.  Initial Franchise Fee:................................................................Fifty Thousand Dollars ($50,000.00)*
    *Paid under SDA# 339636 ($50,000.00)

D.  Marketing Start-Up Fee:........................................................ Five Thousand Dollars ($5,000.00)

E.  Continuing Franchise Fee Rate:.........................Five and Nine-Tenths percent (5.9%) of Gross Sales

F.  Minimum Continuing Advertising Fee Rate:.....................................Five percent (5.0%) of Gross Sales

G.  Refurbishment Date: In the case of a new unit, the date five (5) years and fifteen (15) years after the first date the Unit opens to serve the general public; ~~or, in the case of an existing unit, on~~ _____. Remodel Date: In the case of a new unit, the date ten (10) years after the first date the Unit opens to serve the general public, ~~or, in the case of an existing unit, on~~ _____.

H.  Transfer Fee: As provided in subsection 10.4 of the General Terms and Conditions, unless another amount is inserted here: _____No Change_____

I.  Address for notice to FRANCHISEE shall be at the Unit Premises, unless another address is inserted here: _____

J.  Special Terms and Conditions:

   [ X ] DD-00   Special Terms and Conditions Applicable to a Dunkin' Donuts Franchise

   [ X ] FD    Special Terms and Conditions Applicable to Development of a New Unit By Franchisee

   [ X ] NY    Addendum to the ADQSR Franchise Agreement and Store Development Agreement required by the New York General Business Law

K.  The Designated Representative for this Unit is ____ANIL KAPOOR____
    [print full name above]
    (List only one person. See definitions in General Terms and Conditions.)

L.  Arbitration under this Agreement shall be initiated in the city and state of ___New York, New York___.

M.  If applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit located at  PC# 340091 – 507-11 163rd Street – Bronx, New York 10451 ( SEE SUPPLIER RGMT )

Form last revised 12/01/02

Allied Domecq QSR corporations are EOE and AA Employers
(Franchisees are not employees)

# ALLIED-DOMECQ QUICK SERVICE RESTAURANTS FRANCHISE AGREEMENT
© December 2002

## GENERAL TERMS AND CONDITIONS

### INTRODUCTION

**Baskin-Robbins USA Co.**, a California corporation ("BASKIN-ROBBINS"), **Dunkin' Donuts Incorporated**, a Delaware corporation ("DUNKIN' DONUTS") and **Togo's Eateries Inc.**, a California corporation ("TOGO'S") are indirect wholly-owned subsidiaries of Allied Domecq PLC, a publicly-traded United Kingdom company. To take advantage of synergies between them, the three subsidiaries share certain common field and support personnel and form an unincorporated division called "Allied Domecq Quick Service Restaurants". As a result of the expenditure of time, effort and money, each subsidiary has acquired experience and skill in the development and operation of food service establishments using distinctive systems and techniques for the production, distribution, merchandising and sale of branded food products, including, without limitation, *Baskin-Robbins*® ice cream, yogurt and novelties, *Dunkin' Donuts*® donuts, coffee and freshly baked goods, *Togo's*® fresh sandwiches, salads and deli platters, and other unique and distinctive products, services and business methods (hereinafter each called a "System" and collectively called the "Systems").

The distinguishing characteristics of these Systems include, without limitation, distinctive exterior and interior design, decor, color and identification schemes and furnishings; specially designed manufacturing and merchandising equipment; unique and proprietary information technologies and software; special menu items; standards, specifications and procedures for operations, manufacturing, distribution and delivery; quality of products and services offered; management programs; training and assistance; and marketing, advertising and promotional programs, all of which may be changed, supplemented, improved and further developed from time to time by FRANCHISOR as new learning and best practices are identified and incorporated.

### DEFINITIONS

As used throughout this Agreement, the following defined terms shall have the following meanings:

A.    The "Proprietary Marks" are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin and trade names, which identify for the public the source of goods and services marketed thereunder and represent to the public high and uniform standards of quality, cleanliness, appearance and service, including, without limitation, *Dunkin' Donuts*® owned or controlled by DUNKIN' DONUTS, *Baskin 31 Robbins*® owned or controlled by Baskin-Robbins Incorporated ("BRI"), and *TOGO'S*® owned or controlled by TOGO'S, all of which are registered trademarks on the Principal Register of the United States Patent and Trademark Office.

B.    "FRANCHISOR" refers to Dunkin' Donuts Incorporated with respect to the Dunkin' Donuts System, Baskin-Robbins USA, Co., with respect to the Baskin-Robbins System and Togo's Eateries, Inc. with respect to the Togo's System.

C.    "FRANCHISEE" means the person(s) or entity who signed this Agreement, which may include a sole proprietor, all partners of a general partnership, a corporation or a limited liability company ("LLC"). No person or entity may claim an interest in this Agreement or any Franchise granted hereby without FRANCHISOR's prior written approval.

D.    The "Unit" means the branded food service establishment, including the fixtures, furnishings, equipment, inventory and supplies located therein and/or attached thereto, operated by FRANCHISEE pursuant to this Agreement. If this Agreement authorizes more than one brand, the term "Unit" shall refer to all branded operations authorized hereby, unless such reference is expressly limited to any one brand.

E.    The "Premises" means the land and building or the area within a building, as the case may be, which is (i) approved by FRANCHISOR, (ii) dedicated to the operation of the Unit, and (iii) in the exclusive possession and control of FRANCHISEE. Some portion of the Premises may be under shared possession or control, if approved by FRANCHISOR.

F.    The term "Lease" means the document by which FRANCHISEE occupies and controls the Premises, whether the landlord is a third-party or FRANCHISOR, or one of its subsidiaries or affiliates.

G.    "Gross Sales" means and includes all revenue from the sale of all products and services and all other income of every kind and nature related to the Unit, whether for cash, by redemption of gift certificates or for credit, regardless of collection; provided, however, "Gross Sales" does not include the incidental sales of gift certificates or newspapers, incidental receipts from pay telephones, or any sales taxes or other taxes FRANCHISEE collects from customers for transmittal to the appropriate taxing authority.

H.    The "Designated Representative" is the person from time to time designated by FRANCHISEE as being responsible for the day-to-day operation of the Unit. The Designated Representative must meet FRANCHISOR's then-current qualifications, including, without limitation, successful completion of FRANCHISOR's training, and must be authorized to act for and bind FRANCHISEE in all dealings with FRANCHISOR with respect to the day-to-day operation of the Unit. The initial Designated Representative is identified in Item "K" of the Contract Data Schedule of this Agreement.

I.       The "Standards" are requirements, specifications, criteria, guidelines, processes, techniques and standards which are from time to time established and revised by FRANCHISOR with respect to selection and development of the Premises, operation of the Unit and other aspects of each System.  Examples of "Standards" are, without limitation, requirements and criteria for developing the Unit;  specifications for the facility, equipment and products;  business processes and techniques for the operation of the Unit;  and guidelines and standards for quality, cleanliness, appearance and service.

## Section 1.  Grant of the Franchise and Term

1.0      This Agreement grants to FRANCHISEE the right, subject to all of the terms and conditions hereinafter set forth, to operate a Unit solely at the Premises described in Item "A" of the Contract Data Schedule of this Agreement, including the right to use, solely in such Unit, the System or Systems and Proprietary Marks described in the Special Terms and Conditions attached to and made a part of this Agreement (the "Franchise").  The term of this Agreement shall begin on the date hereof and shall end on the date described in Item "B" of the Contract Data Schedule;  provided however, the Franchise shall commence upon the occurrence, of all of the following conditions prior to the initial opening of the Unit or the transfer of the Unit, as the case may be:

1.0.1    **Training.**  FRANCHISEE and its Designated Representative must successfully complete the then-current training program required by FRANCHISOR at one or more of FRANCHISOR's training centers located in Massachusetts, California or at other locations from time to time designated by FRANCHISOR.  This requirement may be waived or modified by FRANCHISOR, in whole or in part, in its sole discretion, if FRANCHISEE or its Designated Representative has had comparable training or on-the-job experience.

1.0.2    **Financing.**  Upon request by FRANCHISOR, FRANCHISEE must deliver evidence to FRANCHISOR that FRANCHISEE has obtained binding commitments for all financing needed to develop and/or operate the Unit.

1.0.3    **Documents.**  FRANCHISEE must execute and deliver to FRANCHISOR all documents related to this Franchise customarily required, in then-current form, as provided by FRANCHISOR.

1.0.4    **Payment.**  FRANCHISEE must, prior to opening or transferring the Unit (as the case may be) pay FRANCHISOR any and all moneys due, including, but not limited to, purchase price, fees, inventory, rent and/or security deposit, if required under the Lease.

1.0.5    **Possession.**  FRANCHISEE must have the exclusive right to occupy and use the Premises for at least the term of this Agreement, whether FRANCHISEE owns the Premises, or leases the Premises pursuant to either (a) a Lease with a third party landlord on terms satisfying FRANCHISOR's then current lease policy and containing provisions required by FRANCHISOR; or (b) a Lease with FRANCHISOR or an affiliated entity.

1.0.6    **For a New Unit.**  If this Unit is newly developed, FRANCHISEE must, prior to the Unit's initial opening, comply with all provisions of the Special Terms & Conditions attached to this Agreement relating to new unit development (Schedule "F/D" or "C/D", as applicable).

1.1      The term of this Agreement shall expire without notice upon any earlier expiration or termination of a Lease, foreclosure of a mortgage, or other event which has the effect of terminating FRANCHISEE's possession and occupancy of the Unit.

1.2      FRANCHISEE represents and warrants that FRANCHISEE and each individual partner, member and/or shareholder of FRANCHISEE, as the case may be, is a United States citizen or a lawful resident alien of the United States; that, where applicable, the FRANCHISEE entity (corporation or LLC) is and shall remain duly organized and in good standing during the term of this Agreement;  and that all financial and other information which FRANCHISEE has provided to FRANCHISOR in connection with FRANCHISEE's application for this Franchise is true and accurate. FRANCHISEE's representations and warranties under this paragraph 1.2 are a material inducement to FRANCHISOR's grant of the Franchise to FRANCHISEE.

## Section 2.  Services Furnished by FRANCHISOR

2.0      FRANCHISOR agrees:

2.1      **Prior to and For the Initial Opening of the Unit.**

2.1.1    FRANCHISOR shall make available to FRANCHISEE Standards for the design, construction, equipping and operation of the Unit; and

2.1.2    FRANCHISOR shall make available to two individuals designated by FRANCHISEE, one of whom must be a party to or guarantor of this Agreement FRANCHISOR's then current initial training program with respect to the operation of the Unit, at one or more of FRANCHISOR's Training Centers located in Massachusetts, California and/or at such other training facility as FRANCHISOR may, from time to time, designate; and

2.1.3    FRANCHISOR shall provide its current operating procedures to assist FRANCHISEE in complying with FRANCHISOR's Standards; and

*General Terms and Conditions*

2.1.4    FRANCHISOR shall make available to FRANCHISEE such assistance in the pre-opening, opening and initial operation of the Unit as FRANCHISOR shall deem advisable, based upon FRANCHISEE's organization, prior experience and training.

2.2    **After the Initial Opening of the Unit.**

2.2.1    FRANCHISOR shall maintain a continuing advisory relationship with FRANCHISEE, including consultation in the areas of marketing, merchandising and general business operations; and

2.2.2    FRANCHISOR shall provide FRANCHISEE with FRANCHISOR's Standards for the authorized System(s), as the same may be modified by FRANCHISOR from time to time, in its sole and absolute discretion; and

2.2.3    FRANCHISOR shall continue its efforts to maintain high and uniform standards of quality, cleanliness, appearance and service at all units; and

2.2.4    FRANCHISOR shall make reasonable efforts to disseminate FRANCHISOR's Standards to potential suppliers of products at the written request of FRANCHISEE, subject, however, to specific requirements and limitations of each authorized System.

## Section 3. Advertising and Promotion

3.0    FRANCHISOR has established and administers a marketing, advertising and sales promotion fund (the "Fund") for each of the Systems, and directs the development of all advertising, marketing and promotional programs for each System.  FRANCHISOR has also established and administers a marketing, advertising and sales promotion fund for Stores that operate under all three (3) brands - the Dunkin' Donuts, Baskin-Robbins and Togo's brands ("TROMBO Stores") and certain stores that operate two (2) brands (certain "Combo Stores").  FRANCHISEE's payments to the Fund(s) shall be used for advertising, marketing, promotion, production and development of all advertising, marketing, promotional and other programs, product development, merchandising, public relations, administrative expenses, programs designed to increase sales and enhance and further the public reputation of FRANCHISOR and each applicable System, and activities related to any and all of the foregoing.  The content of all activities of the Fund(s), including, without limitation, the media selected and employed, as well as the area and units to be targeted for such activities, shall be at the sole discretion of FRANCHISOR.  FRANCHISOR undertakes no obligation to make expenditures for FRANCHISEE which are equivalent or proportionate to contributions paid under this Agreement or to insure that FRANCHISEE benefits directly or on a prorata basis from activities of the Fund(s), if any.  Upon request, FRANCHISOR will provide FRANCHISEE a statement of receipts and disbursements for any Fund to which FRANCHISEE contributes under the terms of this Agreement, prepared by an independent public accountant for each fiscal year of the Fund.

3.1    FRANCHISEE, prior to using any advertising or promotional material that FRANCHISEE has prepared for use in its local area, shall submit such material to FRANCHISOR for review and approval.  If written disapproval of the advertising and promotional material is not received by FRANCHISEE from FRANCHISOR within fifteen (15) days from the date such material is received by FRANCHISOR, said materials shall be deemed approved for use by FRANCHISEE, unless and until subsequently disapproved by FRANCHISOR, in which event FRANCHISEE will promptly discontinue any further use thereof.

3.2    FRANCHISEE acknowledges that this Agreement grants FRANCHISEE no right to use any of the Proprietary Marks to advertise products and/or services for order through the mail or by any electronic or other medium.  FRANCHISEE shall not, without the prior written approval of FRANCHISOR, use any of the Proprietary Marks on the Internet or any similar electronic or other communications medium, to promote FRANCHISEE's business and/or advertise and/or sell products and/or services.  Notwithstanding the provisions of paragraph 3.1 above, FRANCHISOR's failure to disapprove any request to use the Internet or any similar electronic or other medium within fifteen (15) days shall not give FRANCHISEE the right to undertake such use.  FRANCHISOR shall have the sole right to establish an Internet "home page" using any of the Proprietary Marks, and to regulate the establishment and use of linked home pages by its franchisees.

3.3    Special Terms and Conditions for each System authorized for this Unit are attached to this Agreement and contain additional provisions related to advertising and promotion.

## Section 4.  Payments

4.0    FRANCHISEE shall pay to FRANCHISOR the following initial charges and continuing fees:

4.1.    **Initial Franchise Fee.** - FRANCHISEE shall pay FRANCHISOR an Initial Franchise Fee in the amount set forth in Item "C" of the Contract Data Schedule of this Agreement.  Unless the Initial Franchise Fee was prepaid under the terms of a Store Development Agreement, five thousand dollars ($5,000.00) shall be paid upon the execution of this Agreement and the remaining unpaid balance within ten (10) days after FRANCHISEE's receipt of FRANCHISOR's written approval of the Premises; provided however, if the Premises is developed by FRANCHISOR, the balance shall be due in full upon FRANCHISEE's execution of the Lease of the Unit, or on the date FRANCHISEE or the Designated Representative commences FRANCHISOR's training program, whichever date is earlier.

4.2    **Marketing Start-Up Fee.** - FRANCHISEE shall pay a Marketing Start-Up Fee in the amount set forth in Item "D" of the Contract Data Schedule of this Agreement, for a start-up promotional program or such other promotion or advertising program as FRANCHISOR may specify.  Payment shall be made in full prior to attendance by FRANCHISEE or the Designated Representative at FRANCHISOR's training program or thirty (30) days prior to the scheduled opening of the Unit, whichever date is earlier, and shall be nonrefundable after the Unit commences operations.

*General Terms and Conditions*

4.3     **Continuing Franchise Fees** - FRANCHISEE shall pay FRANCHISOR at Post Office Box 1097, Charlotte, North Carolina 28201-1097 (or to such other address as FRANCHISOR shall from time to time advise FRANCHISEE in writing), on or before Thursday of each week, a sum determined by multiplying the Gross Sales of the Unit for the seven (7) day period ending at the close of business on the preceding Saturday times the percentage set forth in Item "E" of the Contract Data Schedule of this Agreement.

4.4.    **Continuing Advertising Fee.** FRANCHISEE shall also pay, at the same time, for the same seven (7) day period, in the same manner as, and in addition to the payments provided for under paragraph 4.3 above, the percentage set forth in Item "F" of the Contract Data Schedule of this Agreement, of the Gross Sales of the Unit, to one or more Funds for advertising, marketing, promotion and other purposes, as specified in Section 3 of this Agreement.

4.4.1   In addition, FRANCHISEE shall participate in and make additional payments to the Fund(s) with respect to all advertising, marketing, promotion and other programs of each authorized brand at the Unit, which from time to time are supported by two-thirds of the units of such brand in the market in which the Unit is located with respect to local programs, and in the continental United States, with respect to national programs.

4.4.2   IF FRANCHISEE is authorized to use more than one (1) System at the Unit, fees payable under this paragraph 4.4 with respect to each System shall apply only to that portion of the Unit's Gross Sales which are applicable to that System, as determined by FRANCHISOR.

4.5     If any sales, income, excise, use or privilege tax is imposed or levied by any government or governmental agency on account of the payment of franchise or royalty fees by FRANCHISEE under this Agreement, FRANCHISEE shall pay FRANCHISOR a sum equal to the amount of such tax as an additional royalty fee (but this provision shall not apply to federal or state income taxes imposed upon FRANCHISOR).

4.6     FRANCHISOR shall have the right to require FRANCHISEE, upon written notice, to make payments under this Agreement by electronic funds transfer or to a lock-box located at an independent bank.  Acceptance of payment by electronic funds transfer or to a lock-box shall not be deemed a waiver of any rights of FRANCHISOR.  If FRANCHISOR establishes a direct debit program with FRANCHISEE's bank for the electronic payment of continuing franchise and advertising or sales promotion fees, FRANCHISEE must provide FRANCHISOR with all consents, authorizations and bank account data necessary to effect such electronic payment.

4.6.1   FRANCHISEE must complete and deliver to FRANCHISOR such forms as may from time to time be required to effectuate any changes as necessary to maintain EFT capability.  FRANCHISEE agrees (a) to give FRANCHISOR at least fourteen days written notice (except in the case of emergency) before making any change to FRANCHISEE's EFT bank account, providing all information and specimens required to change EFT to the new account;  (b) to pay FRANCHISOR its then-current late fee, plus collection costs and reasonable attorney's fees, if FRANCHISEE'S bank rejects FRANCHISOR's EFT request because of insufficient funds;  and (c) upon demand, to replace EFT rejected by FRANCHISEE's bank with a bank certified or cashier's check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees.

4.6.2   For each week that FRANCHISEE (a) submits a weekly Gross Sales report via FRANCHISOR's approved electronic form over the Internet, and (b) pays the corresponding weekly continuing franchise and advertising fees by EFT, FRANCHISOR will deduct the fees from FRANCHISEE's bank account on or after the Thursday twelve (12) days after the Saturday of the week for which sales were reported.  This benefit will only become available after FRANCHISOR implements an electronic form for reporting weekly sales satisfactory to FRANCHISOR.  To have this benefit available, FRANCHISEE must have computer equipment capable of accessing and using the electronic form in the manner required. In FRANCHISOR's discretion or due to system failure, FRANCHISOR may elect to withdraw the electronic form.  In any such case, FRANCHISEE must immediately return to reporting Gross Sales in the manner originally required.

4.7     **Late Fee, Interest and Costs.**  If any payment required under this Agreement is not paid when due, FRANCHISEE shall pay, in addition to the unpaid amount, FRANCHISOR's then-current late fee for each unpaid invoice. In addition, all amounts payable by FRANCHISEE to FRANCHISOR under any provision of this Agreement, if not paid when the same becomes due, shall bear interest from the date due until paid at the rate of one and one-half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less.  Entitlement to such interest shall be in addition to any other remedies FRANCHISOR may have.  Receipt of any check, draft or other commercial paper shall not constitute payment until all funds therefrom are collected by FRANCHISOR.  FRANCHISEE shall pay all collection charges, including reasonable attorney's fees, on dishonored checks.  At FRANCHISOR's request, dishonored and returned checks will be promptly replaced by FRANCHISEE by a bank certified or cashiers check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees, set forth in this Agreement.

## Section 5.  Covenants of FRANCHISEE

5.0     FRANCHISEE understands and acknowledges the importance to FRANCHISOR, FRANCHISEE and other franchisees, of FRANCHISEE's commitment to at all times operate the Unit in accordance with FRANCHISOR's Standards (as defined in Definitions paragraph "I"), in order to increase the demand for FRANCHISOR's products, to protect and enhance the reputation and goodwill of FRANCHISOR, to promote and protect the value of the Proprietary Marks and other reasons.  FRANCHISEE agrees to devote continuous best efforts to successfully develop, manage and operate the Unit and to enhance the goodwill of the Proprietary Marks authorized by this Agreement and the System(s) as a whole.

5.0.1   If, in any consecutive twelve (12) month period, FRANCHISEE shall receive two (2) or more notices to cure any default under this Agreement, FRANCHISOR shall have the right, in addition to all other remedies available, to require that FRANCHISEE (in lieu of any Designated Representative) devote full time to managing the day-to-day operation of the Unit.

-4-

*General Terms and Conditions*

5.0.2    FRANCHISEE agrees to operate the Unit in strict accordance with all of FRANCHISOR's Standards as they may be communicated to FRANCHISEE from time to time.  Standards shall be established for and distributed to franchisees generally and/or FRANCHISEE specifically, in such form and content as FRANCHISOR may from time to time in its sole discretion prescribe.  Standards are copyrighted and FRANCHISEE shall not at any time copy, duplicate, record or otherwise reproduce any materials, in whole or in part, which set forth the standards or other proprietary information, or otherwise make the same available to any unauthorized person.  FRANCHISEE shall at all times maintain the documents embodying the Standards at the Unit (or at FRANCHISEE's principal offices, if not the Unit) and shall ensure that such documents are kept current and up to date.  In the event of a dispute as to the contents of the Standards, the terms of the master copy(s) maintained by FRANCHISOR shall control.

5.0.3    FRANCHISEE acknowledges that complete uniformity may not be possible or practical throughout the System(s) and agrees that FRANCHISOR may from time to time vary Standards, as FRANCHISOR may deem necessary or desirable for the System(s) or the Unit.

5.1    <u>**Unit Operations.**</u> - FRANCHISEE shall keep the Unit open and in continuous normal operation for such hours as FRANCHISOR shall from time to time direct, provided, however, no longer than the maximum number of hours per day permitted by law, on all days except Christmas and Thanksgiving, unless prior written approval is obtained from FRANCHISOR or unless FRANCHISOR otherwise directs in writing.  In connection therewith, but without limitation, FRANCHISEE further agrees as follows:

5.1.1    FRANCHISEE shall use all products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product storage, handling, preparation, packaging, delivery and sale prescribed by FRANCHISOR.  All such items must conform to FRANCHISOR's Standards.  FRANCHISOR reserves the right to specify any item by brand.  FRANCHISEE shall carry out the business covered by this Agreement in accordance with the operational Standards established by FRANCHISOR and set forth in FRANCHISOR's operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to franchisees from time to time.

5.1.2    FRANCHISEE shall refrain from using or selling any products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment and methods of product storage, handling, preparation, packaging, merchandising, and delivery, or any other items of any kind, which do not meet FRANCHISOR's Standards.  Without limiting the generality of the foregoing, FRANCHISEE shall immediately rectify all hazardous situations, and immediately remove and destroy any and all hazardous products.  For purposes of the foregoing sentence, "hazardous situations" are those which have the potential to cause injury, illness or death, and "hazardous products" are products which are unfit for human consumption or which have the potential to cause injury, illness or death.

5.1.3    FRANCHISEE shall offer for sale all products that FRANCHISOR may, from time to time in its sole discretion, designate in writing as approved for sale at the Unit.  FRANCHISEE shall sell, distribute and deliver such products only in weights, sizes, forms and packages as are approved in writing by FRANCHISOR.  FRANCHISEE further agrees to discontinue offering for sale any product that FRANCHISOR may, at any later time, in its sole discretion, by written notice withdraw approval for sale at the Unit;  and FRANCHISEE agrees to refrain from offering for sale any product or products which have not been designated in writing as approved by FRANCHISOR for sale at the Unit.  FRANCHISOR may disapprove FRANCHISEE's sale of any product(s) or FRANCHISEE's participation in any program(s), in the event FRANCHISEE fails to comply with operational Standards at the Unit.  FRANCHISEE shall have sole and complete discretion as to the price FRANCHISEE charges for all products.

5.1.4    FRANCHISEE shall maintain at all times a sufficient supply of approved products to meet the demand of FRANCHISEE's customers at the Unit.

5.1.5    FRANCHISEE shall purchase all food products, supplies, equipment and materials required for the operation of the Unit from FRANCHISOR or from suppliers who (a) demonstrate, to the reasonable satisfaction of FRANCHISOR, the ability to meet all of FRANCHISOR's Standards for such items, (b) possess adequate capacity and facilities to supply the needs of FRANCHISEE and other franchisees in the quantities, at the times and with the reliability requisite to an efficient operation, and (c) have been approved, in writing, by FRANCHISOR.  Prior to purchasing any items from any supplier not previously approved by FRANCHISOR, FRANCHISEE shall submit to FRANCHISOR a written request for approval of the supplier.  FRANCHISOR may require that samples from the supplier be delivered to FRANCHISOR or to a designated independent testing laboratory for testing prior to approval and use.  FRANCHISEE shall pay FRANCHISOR a fee not to exceed the actual cost of the test; provided, however, no fee shall be charged for the first test requested by FRANCHISEE in any calendar year.  This paragraph is subject to Special Terms and Conditions which contain additional provisions and limitations specific to the System(s) authorized for the Unit by this Agreement.

5.1.6    FRANCHISEE shall maintain, at all times and at FRANCHISEE's expense, the interior and exterior of the Unit and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by FRANCHISOR.  FRANCHISEE shall make no material alteration, addition, replacement or improvement in or to the interior or exterior of the Unit (including the parking lot and landscaped areas) without FRANCHISOR's prior written consent.

5.1.7    FRANCHISEE shall comply with all  civil and criminal laws, ordinances, rules, regulations and orders of public authorities pertaining to the maintenance and operation of the Unit, including, but not limited to, those relating to health, safety, sanitation, employment, environmental regulation and taxation.

-5-

*General Terms and Conditions*

5.1.7.1    FRANCHISEE agrees to maintain as business records provided in subsection 5.2 below. and to furnish to FRANCHISOR within five (5) days after receipt of written demand therefor, copies of all customer complaints and notices, warnings, citations, inspection reports and other communications related to the Unit from public authorities. FRANCHISEE hereby authorizes any such public authority to provide FRANCHISOR with copies of such notices and/or communications.    If any suit, investigation or other legal proceeding related to FRANCHISEE's business should be commenced by or against FRANCHISEE, FRANCHISEE shall immediately notify FRANCHISOR thereof and keep FRANCHISOR continuously advised of the status of the matter.

5.1.8    FRANCHISEE shall manage the Unit at all times with at least two (2) individuals, one of whom must be FRANCHISEE, or a partner, shareholder or member of FRANCHISEE, either of whom must be the Designated Representative and both of whom must have successfully completed FRANCHISOR's training program.  Both individuals must have literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to satisfactorily complete FRANCHISOR's training program and to communicate with employees, customers, and suppliers.  If FRANCHISEE operates more than one unit, FRANCHISOR requires that each additional unit be managed by a Designated Representative approved by FRANCHISOR.

5.1.8.1  In the event of any resignation, termination, disability, death or other incapacity of the Designated Representative, FRANCHISEE shall notify FRANCHISOR in writing of the name of a qualified successor Designated Representative as soon as possible, but in no event later than two (2) months after such event.

5.1.8.2  FRANCHISEE shall hire, train and supervise efficient, competent and courteous employees of good character for the operation of the Unit and shall ensure that all such employees are trained in accordance with FRANCHISOR's training procedures.  FRANCHISEE is solely responsible for hiring and discharging employees of the Unit, and for setting their wages and terms of employment.  FRANCHISEE shall ensure that all employees whose duties include customer service have sufficient literacy and fluency in the English language to adequately serve the public in the Unit.  FRANCHISEE (or the Designated Representative, as specified by FRANCHISOR) shall attend, and FRANCHISEE shall require employees at the Unit to attend, such further training as FRANCHISOR shall from time to time reasonably require.  The cost of training materials, salaries, accommodations and travel expenses, if any, of FRANCHISEE or any other individual employed in the Unit will be borne entirely by FRANCHISEE.    FRANCHISEE will bear the cost of all training programs except FRANCHISOR's initial training program referred to in paragraph 2.1.2 of this Agreement.

5.1.9    FRANCHISEE shall accurately report all Gross Sales to FRANCHISOR and implement all procedures recommended by FRANCHISOR to minimize employee theft.  FRANCHISEE further acknowledges and agrees that employee theft shall not relieve FRANCHISEE of the obligation to make all payments to FRANCHISOR based on Gross Sales pursuant to Section 4 of this Agreement and that accurate reporting of Gross Sales requires, among other things, compliance with all Standards related thereto and recording all sales at the time the product is delivered to the purchaser, including, without limitation, retail, wholesale and bulk discount sales, whether for cash, by redemption of gift certificates or coupons, or sales for which payment may be deferred.

5.2    **Books, Records and Reports.**  FRANCHISEE shall keep full, complete and accurate books and accounts with respect to the Unit, in accordance with generally accepted accounting principles and all requirements of law and in the form and manner prescribed below or as from time to time further prescribed by FRANCHISOR.  Commencing upon the opening of the Unit:

5.2.1    FRANCHISEE shall submit to FRANCHISOR, on or before Thursday of each week, on a standard form approved by FRANCHISOR, a signed statement of Gross Sales at the Unit for the seven (7) day period ending at the close of business on the preceding Saturday, along with all moneys required to be paid under Section 4 of this Agreement.

5.2.2    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty-five (45) after the close of each of FRANCHISEE's calendar or fiscal month, a profit and loss statement of the Unit for said monthly period.

5.2.3    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty five (45) days after the close of each applicable period, a profit and loss statement prepared in accordance with generally accepted accounting principles, along with a balance sheet (including a statement of retained earnings or partnership account) (i) for the first six (6) months of each of FRANCHISEE's fiscal year; and  (ii) for the full twelve (12) months of each of FRANCHISEE's fiscal years.  FRANCHISOR shall have the right, in its sole discretion, to require that such annual financial statements be certified by an independent certified public accountant or such other independent public accountant acceptable to FRANCHISOR.

5.2.4    FRANCHISEE shall submit to FRANCHISOR, at the times and in the form required, such other periodic reports and information as may from time to time be prescribed by FRANCHISOR.

5.2.5    FRANCHISEE shall preserve, in the English language and for the time periods set forth below, all books, tax returns, accounting records and supporting documents relating to the FRANCHISEE's business operations at the Unit (hereinafter called the "Records"), including but not limited to:
    a.  daily cash reports;
    b.  cash receipts journal and general ledger;
    c.  cash disbursements journal and weekly payroll register;
    d.  monthly bank statements, and daily deposit slips and canceled checks;
    e.  all business tax returns;
    f.  suppliers invoices (paid and unpaid);

*General Terms and Conditions*

     g.  dated cash register tapes (detailed and summary);
     h.  semi-annual balance sheets and monthly profit and loss statements;
     i.  weekly inventories;
     j.  records of promotion & coupon redemptions;
     k.  such other records and information as FRANCHISOR may from time to time request.

FRANCHISEE shall be permitted to preserve Records and submit reports electronically, in accordance with FRANCHISOR's Retail Information System ("RIS") and/or other requirements, or otherwise with the prior written approval of FRANCHISOR. During the term of this Agreement, FRANCHISEE shall preserve and make available to FRANCHISOR all Records for no less than the current fiscal year and the three (3) immediate-past fiscal years. For three (3) years after the date of any transfer of any interest in this Agreement, the transferor of such interest shall preserve and make available to FRANCHISOR all Records of its last three (3) fiscal years of operation under this Agreement. For a period of three (3) years after the expiration of the term of this Agreement (or after any earlier termination thereof) FRANCHISEE shall preserve and make available to FRANCHISOR all Records for the last three (3) fiscal years of FRANCHISEE's business operation at the Unit.

5.2.6    <u>Retail Information System</u>    FRANCHISEE shall record all sales at or from the Unit at the time of sale, in accordance with FRANCHISOR's procedures and on devices, the make, model and serial numbers of which have been individually approved in writing by FRANCHISOR. Such devices must record accumulated sales in a manner that cannot be turned back or reset, and must retain data in memory storage in the event of power loss. FRANCHISEE shall, at its sole cost and expense, upon notice from FRANCHISOR, purchase or lease and install a unit and/or network information technology system, including computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR for the Unit (hereinafter for convenience called "RIS"). The term "RIS" includes, without limitation, all hardware and software designated from time to time by FRANCHISOR and the data stored thereon by FRANCHISEE. Some or all components of RIS may be licensed to FRANCHISOR and used by FRANCHISEE as a sub-licensee. FRANCHISEE shall use RIS solely in connection with the operation of the Unit, in the manner specified by FRANCHISOR from time to time. FRANCHISEE shall comply with such requirements determined by FRANCHISOR from time to time regarding maintenance, training, storage and safeguarding of data, records, reports and other matters relative to RIS.

5.2.6.1  FRANCHISEE shall, at its sole cost and expense: (a) attend, and/or cause the Designated Representative and/or employees in the Unit to attend, such initial and other RIS training as is specified by FRANCHISOR; (b) maintain RIS in continuous operation at the Unit; (c) purchase an ongoing maintenance and support contract from an approved supplier and replace the RIS components as necessary, (d) upgrade RIS from time to time as may be reasonably required by FRANCHISOR; (e) permit FRANCHISOR immediate access to RIS, electronically or otherwise, at all times without prior notice to FRANCHISEE (such access shall not unreasonably interfere with FRANCHISEE's normal Unit operations); and (f) install and maintain telephone or other service required by FRANCHISOR to permit such access.

5.2.6.2  FRANCHISEE shall, at its sole cost and expense, upon FRANCHISOR's request, replace RIS with the computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR from time to time as FRANCHISOR's then-current unit and/or network information system. Such replacements shall take place when deemed advisable by FRANCHISOR given the age, cost to operate, condition of the information system then in the Unit, the then-current and anticipated technology, the information systems then in use at other Units, the needs of the System(s), and other factors as may be relevant.

5.2.6.3  FRANCHISOR makes no representation or warranty as to the costs, sales, or profits, if any, which may result from the installation and use of RIS and its replacements.

5.2.7    FRANCHISOR shall treat any Records received from FRANCHISEE pursuant to this subsection 5.2 as confidential, except that information may be released (a) to any person entitled to the same under any Lease; (b) in connection with any court order, legal proceeding or other dispute resolution process, whether instituted by FRANCHISOR or any other party; (c) to a prospective transferee of any interest subject to the provisions of Section 10 of this Agreement, and (d) as incorporated into anonymous general information disseminated to FRANCHISOR's franchisees and prospective franchisees, and in the formulation of plans and policies in the interest of the System(s).

5.3    <u>**Insurance.**</u>  FRANCHISEE shall procure, before the commencement of business, and maintain in full force and effect during the entire term of this Agreement, at FRANCHISEE's sole expense, an insurance policy or policies protecting FRANCHISEE and FRANCHISOR, and their directors and employees, against any loss, liability, including without limitation employment practices liability, or expense whatsoever from, without limitation, fire, personal injury, theft, death, property damage or otherwise, arising or occurring upon or in connection with FRANCHISEE's operation of the Unit or by reason of FRANCHISEE's occupancy of the Premises.

5.3.1    Such policy or policies shall include:

5.3.1.1  commercial general liability insurance, including but not limited to, product, contractual, and owned and non-owned vehicle liability coverages, with an aggregate single limit of two million dollars ($2,000,000.00) or such higher limit as FRANCHISOR, in its sole and absolute discretion, may from time to time require, and as may be required under the terms of any Lease or underlying lease for the Unit, for bodily injury and property damage combined; and

5.3.1.2  "All Risk" property damage insurance, including without limitation flood and earthquake protection, for the full replacement cost value of the Premises and all other property within or relating to the Unit, including signs, with no coinsurance clause and with a replacement cost clause attached; and

*General Terms and Conditions*

5.3.1.3  plate glass insurance and, if applicable, boiler insurance;  and

5.3.1.4  employer's liability, worker's compensation and such statutory insurance as may be required in the state in which the Premises is located.

5.3.2  All insurance required under the terms of this Agreement (i) shall be written in the names of FRANCHISEE, FRANCHISOR and/or other party or parties designated by FRANCHISOR, as their respective interest may appear, by insurance companies reasonably acceptable to FRANCHISOR;  (ii) shall contain provisions denying to the insurer acquisition by subrogation of rights of recovery against any party named; (iii) shall provide that cancellation or alteration cannot be made without at least thirty (30) days written notice to any party named;  and (iv) shall not be limited in any way by reason of any insurance which may be maintained by FRANCHISOR or any other party named.

5.3.3  During the term of this Agreement, FRANCHISEE shall promptly unless otherwise directed by FRANCHISOR, (but in no event later than ten (10) days after any such policy becomes effective or such payment is due) furnish FRANCHISOR with duplicate originals of all insurance policies, including renewal and replacement policies, together with evidence that all premiums have been paid.  If at any time FRANCHISEE fails to comply with the provisions of this subsection 5.3, FRANCHISOR, in addition to all other remedies available, shall have the right (but not the obligation) to obtain and/or maintain such insurance with respect to the Unit and/or Premises, at FRANCHISEE's sole expense. FRANCHISEE shall pay FRANCHISOR when and as billed for the cost of premiums therefor.  Maintenance of insurance and FRANCHISEE's performance of the obligations contained in this subsection 5.3 shall not relieve FRANCHISEE of liability under the indemnity provisions set forth in paragraph 5.4 below.

5.3.4.  Each of the parties hereby waives any and all rights of recovery against the other parties hereto, or against the officers, employees, agents, and representatives of such other parties, for damage to such waiving party or for loss of its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policy in force at the time of such loss or damage.  FRANCHISEE shall, upon obtaining the polices of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Agreement.

5.4  **Indemnification.**  FRANCHISEE shall save, defend, exonerate, indemnify and hold harmless FRANCHISOR, and each of them, and the subsidiaries or each of them, and their respective officers, directors, employees, agents, successors and assigns, from and against (i) any and all claims based upon, arising out of, or in any way related to the operation or condition of any part of the Unit or the Premises, the conduct of business thereupon, the ownership or possession of real or personal property and any negligent act, misfeasance or nonfeasance by FRANCHISEE or any of its agents, contractors, servants, employees, or licensees, and including, without limitation, all obligations of FRANCHISEE incurred pursuant to any provisions of this Agreement, and (ii) any and all fees (including reasonable attorneys' fees), costs and other expenses incurred by or on behalf of FRANCHISOR in the investigation or defense against any and all such claims.

5.5  **Refurbishment & Remodel of the Premises.**  FRANCHISEE shall timely complete future refurbishments and remodels of the Unit in accordance with this subsection 5.5.  Such refurbishments and remodels are in addition to FRANCHISEE's continuing obligations to maintain, repair and replace all equipment, signage, furnishing, decor and personal property related to the Unit in accordance with FRANCHISOR's standards.  FRANCHISEE's obligations to maintain, repair and replace shall not be delayed or deferred pending or in anticipation of any such refurbishment or remodel.

5.5.1  No later than the Refurbishment Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall refurbish the Unit in accordance with FRANCHISOR's then-current refurbishment standards.  It is intended that the cost of the initial refurbishment shall not exceed $10,000.00 and that subsequent refurbishments shall not exceed $10,000.00 increased by the same percentage as the increase to the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the period from the Refurbishment Date to the date of subsequent refurbishment.  The refurbishment required of the FRANCHISEE shall be generally the same as then required of units of the same age and condition.  The above refurbishing costs do not include costs for required maintenance and repair or costs to upgrade, change or replace the Retail Information System.

5.5.2  No later than the Remodel Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall remodel the Unit in accordance with FRANCHISOR's then-current remodeling standards (including but not limited to fixtures, furnishings, signs and equipment).  The remodeling required of FRANCHISEE shall be generally the same as then required of units of the same age, condition, location and geographic region.

5.5.3  FRANCHISEE acknowledges and agrees that the requirements of this subsection 5.5 are both reasonable and necessary to ensure continued public acceptance and patronage of the System(s), to avoid deterioration or obsolescence of the Unit and to take advantage of changes and improvements in design, concept and decor.

5.6  **Cross-Guarantee.**  In the event FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other unit franchised by FRANCHISOR, FRANCHISEE shall be jointly and severally liable to FRANCHISOR as guarantor of the obligations of the franchisee under each franchise Agreement for such other unit(s).  Included in such guaranty are, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental and other Lease payments to FRANCHISOR or any of its subsidiaries, if applicable, collection fees and general receivables now or hereafter due and payable to FRANCHISOR or guaranteed by FRANCHISOR to any third party.  FRANCHISEE's liability under this paragraph shall be limited to the extent that the

*General Terms and Conditions*

total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s), member(s) or partner(s), as the case may be, hold in FRANCHISEE. For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE, held by or controlled by the common shareholder(s), member(s) or partner(s) or their immediate family, as the case may be. The terms of this paragraph shall not operate to extend any personal guaranty of any Lease obligations by any shareholder(s), member(s) or partner(s), after such guaranty shall have ended by its terms.

5.7    **FRANCHISEE Entity.**  FRANCHISEE may be a sole proprietorship, a general partnership, a corporation or a limited liability company ("LLC").  FRANCHISEE may not be a limited partnership, trust or other entity not specifically authorized herein or approved by FRANCHISOR in writing.

5.7.1    **Corporation.**  If FRANCHISEE is a corporation, (i) said corporation's charter shall provide that it is authorized to operate the Unit as provided under this Agreement;  (ii) all shareholders of the corporation shall enter into a written Agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the corporation's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement;  (iii) each stock certificate of the corporation shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to all restrictions imposed upon transfers by this Agreement; and  (iv) no new shares of common or preferred voting stock in the corporation shall be issued to any person, persons, partnership, association, LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all owners of record and all beneficial owners of any class of voting stock of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

5.7.2    **LLC.**  If FRANCHISEE is an LLC, (i) said LLC's operating agreement shall provide that its activities are limited to operating the Unit as provided under this Agreement;  (ii) all members of the LLC shall enter into a written agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the LLC's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement;  (iii) the LLC's operating agreement shall provide that any assignment or transfer of membership interests in the LLC is subject to all restrictions imposed upon transfers by this Agreement; and  (iv) no new membership interest(s) in the LLC shall be created for, issued or granted to any person, persons, partnership, association LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all members of record of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

## Section 6.  Certain Rights of FRANCHISOR

6.0    In order to preserve the validity and integrity of the Proprietary Marks and to assure that the Standards of the System(s) are properly employed by FRANCHISEE in the operation of the Unit and, in general, to verify FRANCHISEE's compliance with the terms of this Agreement, FRANCHISOR, or its agents, shall have the right, at all times, with or without prior notice to FRANCHISEE, to enter and inspect any and all public or private area(s) of the Unit and to select materials, ingredients, products, supplies, paper goods, uniforms, fixtures, furnishings, signs and equipment for evaluation purposes to assure that these items conform to the Standards of the System(s).  During the course of any such inspection, FRANCHISOR may photograph or videotape any part of the Unit, whether or not FRANCHISEE is present. FRANCHISOR may require FRANCHISEE to remove any item which does not conform to applicable Standards. FRANCHISOR may also, at FRANCHISEE's expense, remove or destroy any item which does not conform to applicable Standards.

6.1    If FRANCHISOR finds any condition on the Premises which FRANCHISOR deems to be hazardous, unsafe, unhealthy, unsanitary, unclean or in material disrepair, FRANCHISOR shall have the following rights in addition to all other rights set forth in this Agreement:

6.1.1    FRANCHISOR shall have the right to require FRANCHISEE to immediately close and suspend operation of the Unit, and/or to require such other actions as FRANCHISOR, in its sole discretion, deems necessary, whenever there is reason to believe that any products in the Unit are contaminated, or for other reasons of imminent risk to public health and safety. FRANCHISEE agrees to notify FRANCHISOR immediately of any suspected product contamination or other violation affecting public health or safety and to promptly take any action which FRANCHISOR requires in connection therewith. FRANCHISEE shall be solely responsible for all losses, costs or other expenses it incurs in complying with the provisions of this subsection 6.1; and/or

6.1.2    FRANCHISOR shall have the right to immediately remove or destroy, at FRANCHISEE's expense, any product which FRANCHISOR believes to be hazardous, contaminated or to otherwise pose an imminent risk to public health or safety; or

6.1.3    FRANCHISOR shall have the right to give FRANCHISEE twenty-four (24) hours written notice requiring the correction of an unsafe, unhealthy, unsanitary or unclean condition, or thirty (30) days written notice requiring maintenance, repairs or alterations to the Unit or correction of any other Standards violation.  If FRANCHISEE has not within that time corrected the condition or completed the maintenance, repairs or alterations, as the case may be, FRANCHISOR may enter the Unit, without being guilty of, or liable for, trespass or tort, and may cause the condition to be corrected or the maintenance, repair, or alteration to be completed at the expense of FRANCHISEE and without prejudice to any other rights or remedies of FRANCHISOR.

6.2     In addition to FRANCHISOR's right to access information through the Retail Information System and otherwise, FRANCHISOR's representatives shall have the right to examine FRANCHISEE's original books, Records and supporting documents at reasonable times, and to perform, with or without notice to FRANCHISEE, such inspections, tests and other analyses as it deems appropriate to verify Gross Sales at the Unit.  If FRANCHISOR determines that the Gross Sales FRANCHISEE reported to FRANCHISOR are less than the Gross Sales ascertained by FRANCHISOR's analysis, FRANCHISEE shall immediately pay to FRANCHISOR all amounts owing to FRANCHISOR, the applicable Fund and FRANCHISOR's affiliated landlord corporation based upon the corrected Gross Sales.  If an analysis is undertaken due to (i) FRANCHISEE's failure to maintain the Retail Information System in continuous operation, or (ii) FRANCHISEE's failure to prepare, deliver or preserve statements or Records required by subsection 5.2 of this Agreement, or (iii) if any analysis of FRANCHISEE's books and Records results in the discovery of a discrepancy greater than three percent (3%) in the Gross Sales reported by FRANCHISEE, FRANCHISEE shall pay, in addition to the unpaid amounts owed FRANCHISOR, its affiliated landlord corporation and the applicable Fund, interest thereon from the date payment was due, at 18% per annum or the highest permissible rate.  FRANCHISEE shall also reimburse FRANCHISOR for all related expenses, including, but not limited to, reasonable investigation, accounting and legal fees and other reasonable expenses and costs such as travel, payroll and overhead expenses for FRANCHISOR's employees.  Such payments shall be without prejudice to any other remedies FRANCHISOR may have under this Agreement, including the right to terminate this Agreement, without opportunity to cure, in the case of intentional under-reporting of Gross Sales.

6.3     In the event that FRANCHISOR shall believe there may have been intentional under-reporting of Gross Sales for the Unit, FRANCHISEE (and all partners, members and shareholders of FRANCHISEE) shall, upon written demand from FRANCHISOR provide FRANCHISOR, in addition to Records described in paragraph 5.2.5, personal federal and state tax returns, bank statements (including deposit slips and canceled checks) and such other documents and information as FRANCHISOR may in its sole discretion request in connection with FRANCHISOR's efforts to verify Gross Sales reported to FRANCHISOR under this Agreement or any Lease of the Unit.  Information provided by FRANCHISEE under this paragraph 6.3 shall be subject to the confidentiality provisions of paragraph 5.2.7, except that exclusion (c) therein does not apply.  Schedules to personal tax returns and other financial data which are unrelated to the business of the Unit need not be provided by any partner, member or shareholder of FRANCHISEE who has not been active in the business, and, in addition, has not directly or indirectly owned or controlled at least a majority interest in the business at the Unit, alone or in conjunction with any other family member or related entity.

6.4     FRANCHISEE hereby grants FRANCHISOR the right to inspect the records of all suppliers, distributors, group purchasing programs, distribution centers, and other third parties supplying food products, supplies, equipment and materials to FRANCHISEE and hereby authorizes such parties to release records of FRANCHISEE's purchases and deliveries to FRANCHISOR, by electronic transfer or otherwise, at such times and places as FRANCHISOR shall request.

6.5     If, during the term of this Agreement or any extension or renewal thereof, FRANCHISEE directly or indirectly acquires ownership or control of the Premises, FRANCHISEE agrees to give FRANCHISOR prompt written notice of such ownership or control and to grant FRANCHISOR, under FRANCHISOR's standard Lease Option Agreement, the option to acquire a leasehold interest in the Premises in the event of default by FRANCHISEE under this Agreement or under any lease or mortgage relating to the Premises.  Said leasehold interest shall be for the remaining term of this Agreement, including any renewal, at "triple-net" fair market value rental for comparable properties and use in the area as mutually agreed by the parties, or, in the absence of agreement, as determined by arbitration.

## Section 7.  Proprietary Marks

7.0     FRANCHISOR has, in connection with its business and the business of its franchisees, developed and used and continues to use and control the usage of Proprietary Marks which are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin, including colors, and certain trade names, including but not limited to **Dunkin' Donuts**®, owned by Dunkin' Donuts Incorporated, **Baskin** *31* **Robbins**® owned by Baskin-Robbins Incorporated, and **TOGO'S**®, owned by Togo's Eateries, Inc., all of which are registered as trademarks on the Principal Register of the United States Patent and Trademark Office.  FRANCHISEE's rights to use specific Proprietary Marks under this Agreement are set forth in the Special Terms and Conditions described in Item "J" of the Contract Data Schedule of this Agreement and attached hereto as a part hereof.

7.1     FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement.  FRANCHISEE shall not sublicense the Proprietary Marks.  FRANCHISEE further agrees that any unauthorized use of the Proprietary Marks during the term of or after expiration or the earlier termination of this Agreement shall constitute an incurable default causing irreparable harm subject to injunctive relief.

7.1.1   FRANCHISEE understands and acknowledges that FRANCHISEE's license to use any or all of the Proprietary Marks is non-exclusive and relates solely to the single location set forth in this Agreement.  FRANCHISEE further acknowledges that FRANCHISOR, in its sole discretion, has the right to operate or franchise other units and sales outlets and to grant other licenses in, and to, any or all of the Proprietary Marks, and to develop and establish other systems, products or services using the same or similar Proprietary Marks, or any other proprietary names and marks, and to grant licenses or franchises thereto, in each case at such locations and on such terms and conditions as FRANCHISOR deems acceptable, without providing any rights therein to FRANCHISEE.  FRANCHISEE further acknowledges the FRANCHISOR may license others to use the Proprietary Marks at locations and in ways that competes with FRANCHISEE and draws customers from the same area as the Unit.

-10-

*General Terms and Conditions*

7.2     FRANCHISEE agrees that, during the term of this Agreement and after the expiration or termination thereof, FRANCHISEE shall not directly or indirectly contest or aid in contesting the validity or ownership of the Proprietary Marks.  FRANCHISEE shall not, directly or indirectly, apply to register, register or otherwise seek to use or control or in any way use any of the Proprietary Marks or any confusingly similar form or variation thereof in any place or jurisdiction outside the United States;  nor shall FRANCHISEE assist any others to do so.

7.3     FRANCHISEE shall identify itself as the franchisee of the Unit in conjunction with any use of the Proprietary Marks, including, without limitation, uses on letterheads, invoices, order forms, receipts, and contracts.  Upon the written request of FRANCHISOR, FRANCHISEE shall display a notice identifying the Unit as being independently owned and operated by FRANCHISEE, in such content and form and at such conspicuous locations on the Premises as FRANCHISOR may designate.

7.4     FRANCHISEE agrees to notify FRANCHISOR promptly of any litigation instituted by FRANCHISEE, or by any person, firm or corporation against FRANCHISEE, relating to the Proprietary Marks.  In the event FRANCHISOR undertakes the defense or prosecution of any such litigation, FRANCHISEE agrees to execute any and all documents and do such acts and things as may, in the opinion of counsel for FRANCHISOR, be necessary to carry out such defense or prosecution.

## Section 8.  Restrictions on FRANCHISEE's Activities

8.0     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination (hereinafter called the "Post-Term Period"), neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall:

8.0.1     Divert or attempt to divert any business or customer of the Unit to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with FRANCHISOR's Proprietary Marks and System(s);

8.0.2     Directly or indirectly contest or aid in contesting the right of FRANCHISOR or any prospective franchisee of FRANCHISOR to obtain a building permit, zoning variance or other governmental approval required for the development of another location as a unit franchised by FRANCHISOR.; or

8.0.3     Except with respect to the ownership or operation of additional units under Franchises granted by FRANCHISOR, own, maintain, engage in, be employed by, or have any interest in any other business which sells or offers to sell the same or substantially similar products to the type FRANCHISOR requires to be offered by FRANCHISEE at the Unit; provided that, during the Post-Term Period only, the provisions of this paragraph 8.0.3 shall not apply to another business located more than five (5) miles from this or any other unit operating under the same Proprietary Marks of FRANCHISOR.  Either party to this Agreement, upon notice in writing to the other during the Post-Term Period, shall have the right to have determined whether said five (5) mile radius is a reasonable restriction on FRANCHISEE's activities, by requesting that the matter be submitted to arbitration in accordance with Section 11 of this Agreement.  In such event, the decision of the arbitrator shall be final and binding upon the parties.  FRANCHISEE further agrees that, in the event arbitration is requested, FRANCHISEE will engage in no competitive activities pending resolution of the dispute.

8.1     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination, neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall communicate or divulge to, or use for the benefit of any person, persons, partnership, association or corporation, any information or knowledge concerning the methods of constructing, equipping or operating units under any of FRANCHISOR's Systems and all other information or knowledge which FRANCHISOR deems confidential and which may be communicated to FRANCHISEE, or of which FRANCHISEE may be apprised by virtue of FRANCHISEE's operation under the terms of this Agreement. FRANCHISEE shall divulge such confidential information only to such of its employees as must have access to it in order to operate the franchised business.  Any and all information, knowledge, and know-how including, without limitation, drawings, materials, specifications, techniques, and other data, which FRANCHISOR designates confidential shall be deemed confidential for purposes of this Agreement.  FRANCHISOR shall have the non-exclusive right to use and incorporate into FRANCHISOR's Systems, for the benefit of itself and other of FRANCHISOR's franchisees licensees and distributors, all modifications, changes, and improvements developed or discovered by FRANCHISEE or FRANCHISEE's employees or agents in connection with the franchised business, without any liability or obligation to the developer thereof.

8.2     The covenants contained in this Section 8 shall be construed as severable and independent and shall be interpreted and applied consistently with the requirements of reasonableness and equity.  If all or any portion of a covenant in this Section 8 is held unreasonable or unenforceable by a court, arbitration panel or other agency having valid jurisdiction in a decision to which FRANCHISOR is a party, FRANCHISEE expressly agrees to be bound by any lesser covenant included within the terms of such greater covenant that imposes the maximum duty permitted by law, as if the lesser covenant were separately stated in, and made a part of, this Section 8.

8.3     FRANCHISEE acknowledges that FRANCHISOR shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 8, or of any portion or portions thereof, without FRANCHISEE's consent, and FRANCHISEE agrees to comply forthwith with any covenant as modified.

-11-

*General Terms and Conditions*

## Section 9.  Default

9.0       FRANCHISEE shall be in default under this Agreement:

9.0.1     If FRANCHISEE shall become insolvent or make an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by FRANCHISEE, or if such a petition is filed against and consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if FRANCHISEE is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of FRANCHISEE or other custodian for FRANCHISEE's business or assets is filed and is consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if a receiver or other custodian is appointed, or if proceedings for composition with creditors under any state or federal law should be instituted by or against FRANCHISEE, or if the real or personal property of FRANCHISEE shall be sold at levy thereupon by any sheriff, marshall or constable; or

9.0.2     If FRANCHISEE is convicted of or pleads guilty or "nolo contendere" to a felony, a crime involving moral turpitude, or any other crime or offense that FRANCHISOR believes is injurious to the System(s), the Proprietary Marks or the goodwill associated therewith, or if FRANCHISOR has proof that FRANCHISEE has committed such a felony, crime or offense; or

9.0.3     If FRANCHISEE permits the use of the Unit or Premises for any illegal or unauthorized purpose, including, without limitation, palming off or substitution of products under the Proprietary Marks or other marks of FRANCHISOR; or

9.0.4     If any other franchise agreement between FRANCHISEE and FRANCHISOR or any affiliated entity is terminated by reason of FRANCHISEE's default thereunder; or

9.0.5     If FRANCHISEE fails to pay, perform, observe or comply with any of FRANCHISEE's duties and obligations under this Agreement; or if FRANCHISEE fails to carry out in all respects its obligations under any Lease, mortgage, equipment Agreement, promissory note, conditional sales contract or other contract materially affecting the Unit, to which the FRANCHISEE is a party or by which FRANCHISEE is bound, whether or not FRANCHISOR is a party thereto.

9.1       **Thirty Day Cure Period.**  Except as otherwise provided in this Section 9, FRANCHISEE shall have the right to cure FRANCHISEE's default under this Agreement within thirty (30) days after written notice of default from FRANCHISOR is delivered pursuant to paragraph 14 hereof.  Notwithstanding the foregoing, the following lesser periods shall apply under the circumstances described:

9.1.1     **Seven Day Cure Period.**  A seven (7) day cure period shall apply if FRANCHISEE fails, refuses, or neglects to pay when due to FRANCHISOR any moneys owing to FRANCHISOR or to any Fund, or if FRANCHISEE fails to maintain the insurance coverage set forth in subsection 5.3 of this Agreement.

9.1.2     **24 Hour Cure Period.**  A twenty-four (24) hour cure period shall apply as provided in paragraph 6.1.3 to the violation of any law, regulation, order or Standard of FRANCHISOR relating to health, sanitation or safety;  or if FRANCHISEE ceases to operate the Unit for a period of forty-eight (48) hours without the prior written consent of FRANCHISOR, provided, however, that if the Unit is abandoned, no cure period shall apply.

9.1.3     **Cure on Demand.**  FRANCHISEE shall cure on demand all "hazardous situations" and remove and destroy on demand all "hazardous products" as set forth in paragraph 5.1.2.1 and shall cure any situation which poses an imminent risk to public health and safety as provided in subsection 6.1.

9.1.4     **No Cure Period.**  No cure period shall be available if FRANCHISEE is in default under any paragraph designated 9.0.1 through 9.0.4 above; or if FRANCHISEE abandons the Unit; or if FRANCHISEE intentionally under-reports Gross sales, falsifies financial data or otherwise commits an act of fraud with respect to FRANCHISEE's acquisition of this Franchise or its rights or obligations under this Agreement; or if FRANCHISEE's Lease for the Unit is terminated due to FRANCHISEE's default thereunder.  In addition, no cure period shall be available for any default if FRANCHISEE has received three (3) or more previous notices-to-cure for the same or a substantially similar default (whether or not FRANCHISEE has cured the same), within the immediately preceding twelve (12) month period.

9.2       **Statutory Cure Period.**  If a statute in the state in which the Premises is located requires a cure period for the applicable default which is longer than any cure period specified in this Section 9, the statutory cure period shall apply.

9.3       **Late Fee, Interest and Costs.**  If FRANCHISEE fails to cure a default within any applicable time period following notice set forth in subsection 9.1, or if this Agreement is terminated as a result of FRANCHISEE's default, FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, without limitation, late fees, collection fees, interest at one and one-half percent (1.5%) per month, or the highest permissible rate, and reasonable investigation and attorneys' fees incurred by FRANCHISOR as a result of any such default or termination.  All such interest, damages, costs and expenses may be included in and form part of the judgment awarded to FRANCHISOR in any proceedings brought by FRANCHISOR against FRANCHISEE.

9.4       **Termination.**  If FRANCHISEE fails to cure any default within the applicable period following notice from FRANCHISOR, FRANCHISOR may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement.  Such termination shall be effective immediately upon receipt of a written notice of termination from FRANCHISOR.  Notwithstanding the foregoing, this Agreement shall immediately terminate upon the occurrence of any event set forth in paragraphs 9.0.1 through 9.0.4 or paragraph 9.1.4, without notice or opportunity to cure or notice of termination.  Upon any termination or expiration of this Agreement all right of FRANCHISEE to use the Proprietary Marks and the System(s) and to operate the Unit under the Proprietary Marks shall terminate and:

-12-

9.4.1    FRANCHISEE shall promptly pay FRANCHISOR all sums owing or accrued from FRANCHISEE to FRANCHISOR, the Fund, and any affiliated landlord entity, including interest and any damages, costs and expenses, including reasonable attorneys' fees, incurred by FRANCHISOR by reason of default on the part of FRANCHISEE;  and

9.4.2    FRANCHISEE shall immediately cease to operate the Unit, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former FRANCHISEE of FRANCHISOR;  and

9.4.3    FRANCHISEE shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, any feature or method associated with the System(s), any or all of the Proprietary Marks and any other trade secrets, confidential information, operating manuals, slogans, trade dress, signs, symbols or devices which are part of FRANCHISOR's System(s) or are otherwise used in connection with the operation of the Unit.  FRANCHISEE agrees that any such unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm. Continued use by FRANCHISEE of FRANCHISOR's trademarks, trade names, Proprietary Marks, and service marks after termination of this Agreement shall constitute willful trademark infringement by FRANCHISEE;  and

9.4.4    FRANCHISEE shall immediately return to FRANCHISOR all operating manuals, plans, specifications, and other materials in FRANCHISEE's possession containing information prepared by FRANCHISOR and relative to the operation of the Unit, and all copies thereof (all of which are acknowledged to be FRANCHISOR's property), and shall retain no copy or record of any of the foregoing, except FRANCHISEE's copy of this Agreement, any correspondence between the parties, and any other documents which FRANCHISEE reasonably needs for compliance with any provision of law;  and

9.4.5    FRANCHISEE shall remove from the Premises and from any equipment, signs, trade fixtures, furnishings and other personal property (except as provided in paragraph 9.4.6 below) and return to FRANCHISOR, all of the Proprietary Marks or other indicia of FRANCHISOR, and shall disconnect, withdraw and/or terminate, within five (5) days after termination or expiration of this Agreement, any telephone listings and/or fictitious name registration containing any part of the Proprietary Marks.  Upon FRANCHISOR's written demand, however, FRANCHISEE shall assign to FRANCHISOR, upon any termination, expiration or non-renewal of this Agreement, any telephone number used in the operation of the Unit if such number is listed in the directory using any of the Proprietary Marks.  FRANCHISEE hereby appoints FRANCHISOR as its attorney-in-fact, in the name of FRANCHISEE, to do any act necessary to effect the intent of this paragraph;  and

9.4.6.    FRANCHISEE shall, but only in the case of any early termination of this Agreement due to FRANCHISEE's default, sell to FRANCHISOR, at FRANCHISOR's election, any or all of the equipment, interior and exterior signs, trade fixtures, furnishings and other personal property of FRANCHISEE used in connection with the Unit (hereinafter collectively "Equipment"), at the purchase cost when originally installed in the Unit, less a depreciation deduction computed on a straight line basis over a ten (10) year useful life for the respective items (but in no event less than ten percent (10%) of the original purchase cost for such equipment, fixtures and furnishings).  If FRANCHISEE owes a balance due on its purchase or financing of such Equipment, or if the same are otherwise subject to a lien or claim for any indebtedness, the amounts of such balance and/or indebtedness shall be deducted from the purchase price payable to FRANCHISEE.  All sums of money due FRANCHISOR by FRANCHISEE may be offset against the purchase price payable to FRANCHISEE.  Nothing contained herein, however, shall be construed to entitle FRANCHISEE to be released from liability for such unpaid balance or indebtedness, if any, in excess of the portion of the purchase price applied for payment of such debts;  and

9.4.7    FRANCHISEE shall, at FRANCHISOR's option by notice to FRANCHISEE within thirty (30) days from the date of termination or expiration, assign to FRANCHISOR any interest which FRANCHISEE has in the Lease or any other Agreement related to the Premises.  If FRANCHISOR does not elect to exercise its option to acquire the Lease, FRANCHISEE shall make such modifications or alterations to the Premises immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of the Premises from that of other units in the System(s), and shall make such specific additional changes thereto as FRANCHISOR may reasonably require for that purpose.  In the event FRANCHISEE fails or refuses to comply with the requirements of this paragraph 9.4.7, FRANCHISOR shall have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making such changes as may be required, at the expense of FRANCHISEE, which expense FRANCHISEE agrees to pay upon demand;  and

9.4.8    FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, but not limited to, reasonable investigation and attorney's fees and other reasonable expenses and costs such as travel costs and payroll expenses for FRANCHISOR's employees, incurred in obtaining injunctive or other relief for the enforcement of any provisions of this Section 9;  and

9.4.9    FRANCHISEE shall continue to comply with Section 8 of this Agreement, for the Post-Term Period specified therein.  If FRANCHISEE begins to operate any other business wherever situated, FRANCHISEE shall not use, in connection with such other business or the promotion thereof, any reproduction, counterfeit, copy or colorable imitation of any of FRANCHISOR's Proprietary Marks or trade dress;  and FRANCHISEE shall not utilize any designation of origin or description or representation which falsely suggests or represent an association or connection with FRANCHISOR whether or not constituting unfair competition.

9.5    Nothing in this Agreement shall preclude FRANCHISOR from seeking any remedy under federal or state law for willful trademark infringement, including, without limitation,  injunctive relief;  No right or remedy herein conferred upon or reserved to FRANCHISOR is exclusive of any other right or remedy herein, or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy given hereunder.  FRANCHISEE agrees that the existence of any claims against FRANCHISOR, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by FRANCHISOR of any provision of this Agreement.

-13-

9.6      Because the Unit is one of many units within the System(s) that sell similar products and services to the public, FRANCHISEE agrees that its failure to comply with the terms of this Agreement would cause irreparable damage to FRANCHISOR and the System(s) as a whole for which no adequate remedy at law may be available, including, without limitation, violations of standards, unhealthy, unsafe or unsanitary conditions, unauthorized use of the Proprietary Marks and breaches under Section 8 hereof.  In the event of FRANCHISEE's breach or threatened breach of any of the terms of this Agreement, FRANCHISOR shall therefore be forthwith entitled to an injunction restraining such breach and/or to a decree of specific performance, without showing or proving any actual damage or irreparable harm or lack of an adequate remedy at law, and without the requirement for the posting of bond, the same being hereby waived by FRANCHISEE, until a final determination is made by a court of competent jurisdiction.  The foregoing remedy shall be in addition to all other remedies or rights which FRANCHISOR might otherwise have by virtue of any breach of this Agreement by FRANCHISEE.

## Section 10.  Transfer Provisions

10.0      **Transfer By FRANCHISOR.**  This Agreement shall inure to the benefit of the successors and assigns of FRANCHISOR either individually or collectively.  FRANCHISOR shall each have the right to assign its rights under this Agreement to any person, persons, partnership, association or corporation, provided that the transferee agrees in writing to assume all obligations undertaken by FRANCHISOR herein and FRANCHISEE receives a statement from both FRANCHISOR and its transferee to that effect.  Upon such assignment and assumption, FRANCHISOR shall be under no further obligation hereunder except for accrued liabilities if any.

10.0.1     If this Agreement now or hereafter grants FRANCHISEE rights with respect to more than one (1) brand, FRANCHISOR shall have the right, at any time and from time to time, to require FRANCHISEE to execute and deliver separate contracts for each brand, each containing all of the terms of this Agreement pertaining to such brand. FRANCHISEE agrees to execute and return such replacement contracts to FRANCHISOR within thirty (30) days after receipt thereof.  If FRANCHISEE fails to do so, FRANCHISOR shall have the right to execute such instruments on FRANCHISEE's behalf and deliver a copy thereof to FRANCHISEE.

10.1      **Transfer By FRANCHISEE.**  FRANCHISEE understands and acknowledges that the rights and duties set forth in this Agreement are personal to FRANCHISEE and that FRANCHISOR has granted the Franchise in reliance on the business skill and experience, financial capacity and personal character of FRANCHISEE.  Except as hereinafter provided, neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any member, if FRANCHISEE is a limited liability company ("LLC"), nor any shareholder, if FRANCHISEE is a corporation, without FRANCHISOR's prior written consent, shall, by operation of law or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association, LLC or corporation, any interest in this Agreement, or any interest in the franchise granted hereby, or any interest in any proprietorship, partnership, LLC or corporation which owns any interest in the franchise, nor offer, permit or suffer the same.  Any purported assignment or transfer not having the prior written consent of FRANCHISOR shall be null and void and shall constitute default hereunder.  Any proposed transfer must meet all the requirements of FRANCHISOR including, but not limited to, those set forth in this Section 10.

10.2      **Consent By FRANCHISOR.**  FRANCHISOR shall not unreasonably withhold its consent to any transfer referred to in paragraph 10.1 above, provided, that:

10.2.1     FRANCHISEE must have operated the Unit for a period of not less than six (6) months prior to the proposed transfer;

10.2.2     The sales price of the interest to be conveyed must not be so high, or the terms of sale so onerous, that, in the judgment of FRANCHISOR, the transferee will be unlikely to properly maintain, operate and promote the Unit and meet the transferee's financial and other obligations to FRANCHISOR, third party suppliers and creditors.  This provision shall not create any liability to either transferor or transferee on the part of FRANCHISOR, in the event that FRANCHISOR approves the transfer and the transferee experiences financial difficulties;

10.2.3     The transferee and each partner, shareholder or member of the transferee, as the case may be, must be a United States citizen or lawful resident alien of the United States, must be of good moral character and reputation and must have a good credit rating and business qualifications and aptitude reasonably acceptable to FRANCHISOR.  Such qualifications include, without limitation, literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to communicate with employees, customers, and suppliers of FRANCHISOR and to satisfactorily complete FRANCHISOR's required training program and such other tests and interviews as FRANCHISOR shall reasonably deem to be necessary or desirable.  FRANCHISEE shall provide FRANCHISOR with such information as FRANCHISOR may require to make a determination concerning each proposed transferee;  and

10.2.4     The transferee may not be a limited partnership, trust or other entity not specifically authorized herein.

10.3      **Transfer Requirements.**  Each transfer of any interest in FRANCHISEE, the Unit, this Agreement and/or the Franchise herein granted, must receive the prior written consent of FRANCHISOR set forth in subsection 10.2 above and must conform to and/or comply with the following requirements:

10.3.1     Prior to the transfer, FRANCHISEE must pay and satisfy all accrued money obligations to FRANCHISOR, its affiliates and/or subsidiaries and to any Fund, obligations of FRANCHISEE which FRANCHISOR has guaranteed, liens, deferred rent and other obligations under the Lease for the Unit or other contracts pertaining to the Unit and the transfer fee provided below, as applicable;

-14-

*General Terms and Conditions*

10.3.2  Prior to the transfer, the Unit, including equipment, signs, building, improvements, interior and exterior, must be in good operating condition and repair and in compliance with FRANCHISOR's then-current Standards, including, without limitation, Standards for replacements and additions;

10.3.3  FRANCHISEE and any transferor may not assert any security interest, lien, claim or right now or hereafter in this Franchise, the Franchise granted to the transferee, or, if applicable, the Lease for the Unit with FRANCHISOR or its affiliated landlord entity.  Any security interest, lien, claim or right asserted with respect to any personal property at the above location shall not include any after-acquired property and shall be subject, junior and subordinate to any security interest, lien, claim or right now or hereafter asserted by FRANCHISOR, its successors or assigns;

10.3.4  Prior to the transfer, the transferee must comply with the requirements of paragraph 5.1.8 of this Agreement, to the satisfaction of FRANCHISOR;

10.3.5  If the transferee is a corporation or LLC, it must comply with the terms of subsection 5.7 of this Agreement;

10.3.6  The transferee, including, where appropriate, all shareholders, members and partners of the transferee, shall jointly and severally execute, on FRANCHISOR's then-current forms, a franchise agreement and all other standard ancillary agreements, including, without limitation, a priority in payment agreement, if applicable.  The priority in payment agreement provides, among other things, that if the transferee is unable at any time to make payments both to the transferor for the purchase of the Unit and to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s), payments to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s) will have priority.  The transferee's franchise agreement shall not increase any fee based upon a percentage(s) of Gross Sales to a percentage greater than as required by this Agreement for the respective System(s).  Unless a longer period is agreed upon between FRANCHISOR and the transferee, the term of the transferee's franchise agreement shall be for the unexpired term of this Agreement.  The transferee shall pay no franchise fee pursuant to paragraph 4.1 of this Agreement unless a longer term is agreed upon by FRANCHISOR;

10.3.7  FRANCHISEE, including all individuals proposing to transfer an interest in the Franchise or the FRANCHISEE, must execute, on FRANCHISOR's standard form, a general release of all claims against the FRANCHISOR corporations, their affiliated corporations, and the directors, officers and employees of each;  and

10.3.8  In addition, FRANCHISOR shall have the right to promulgate and enforce such additional reasonable requirements as it may, in its sole judgment determine.

10.4    **Transfer Fee.**  The transferor shall pay to FRANCHISOR upon any transfer of any interest of FRANCHISEE in this Agreement or of any interest in the FRANCHISEE entity, a Transfer Fee determined as follows:

10.4.1  **Prior to FRANCHISEE's Fourth Year of Operations.**  The transferor shall pay to FRANCHISOR a Transfer Fee which is the greater of:  (i) five thousand dollars ($5,000.00), increased by five percent (5%) compounded annually during the term FRANCHISEE has operated the Unit under this or other agreements with FRANCHISOR;  or (ii) five percent (5%) of the Adjusted Sales Price of the Unit.

10.4.1.1  The term "Adjusted Sales Price" shall mean the sales price to be received by FRANCHISEE upon transfer of the Unit, less the amount, if any, paid by FRANCHISEE for the Unit, when purchased as an ongoing business from another franchisee or from FRANCHISOR.  No adjustment shall be made for amounts paid in connection with the development of a new unit.  The Adjusted Sales Price shall include, without limitation, cash, assumption of debt, equipment lease obligations and deferred financing and amounts allocated to property of every kind, nature and description:  furniture, fixtures, signs, equipment, supplies and inventory; excluding only amounts reasonably allocated to land and building, if owned by FRANCHISEE.  It is intended that all consideration to be paid to FRANCHISEE, or for the benefit of FRANCHISEE, however designated and whether or not included in the contract of sale shall be deemed part of the Adjusted Sales Price including, but not by way of limitation, amounts allocated to a covenant not to compete or personal service agreement.

10.4.1.2  For purposes of determining the correct Transfer Fee, FRANCHISOR reserves the right to reallocate amounts which FRANCHISEE and the transferee have allocated to land, building, equipment, covenant against competition, personal service agreement, or otherwise, if in FRANCHISOR's opinion, the allocation of the parties is unreasonable in relation to the value of the business.  If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.2    **From and After FRANCHISEE's Fourth Year of Operations.**  If the transfer takes place after the commencement of FRANCHISEE's fourth year of operations, the transferor shall pay to FRANCHISOR the Transfer Fee indicated below based on the Unit's Gross Sales for the most recently completed twelve (12) calendar month period preceding the date of the contract of sale.  FRANCHISOR reserves the right to select another period or to make appropriate adjustments to such Gross Sales in the event extraordinary occurrences (e.g., road construction, fire or other casualty, etc.) materially affected Unit sales during the indicated twelve (12) month period.

| Sales for Most Recent 12 Month Period | Transfer Fee |
|---|---|
| Less than $400,000.00 | $5,000.00 |
| $400,000.00 or more, but less than $600,000.00 | $6,000.00 |
| $600,000.00 or more, but less than $1,000,000.00 | $8,000.00 |
| $1,000,000.00 or more, but less than $1,400,000.00 | $12,000.00 |
| $1,400,000.00 or more | $20,000.00 |

-15-

10.4.3  If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.4  **Transfer of Less Than Control.**  For any transfer that, either alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, will have the result of the transferee(s) holding an aggregate interest of less than fifty percent (50%) of the franchise licensed herein or the entity licensed hereunder, FRANCHISOR will reduce the Transfer Fee set forth in paragraph 10.4.1 or 10.4.2, as applicable, to a fixed transfer documentation fee of five hundred dollars ($500.00), increased after each five (5) years of the term of this Agreement, including any renewal period, by the same percentage as the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the same period.  FRANCHISOR will waive the Transfer Fee entirely with respect to a transfer of less than control, if each transferee was an approved party to (or personal guarantor of) this Agreement prior to transfer.

10.4.5  **Transfer to Spouse or Children.**  Notwithstanding anything else contained in this subsection 10.4, but provided that FRANCHISOR determines that FRANCHISEE has been in full compliance with the terms of all agreements with FRANCHISOR and its affiliates, the Transfer Fee due in connection with a transfer of the Unit to FRANCHISEE's spouse or one or more of FRANCHISEE's children shall be the fixed transfer documentation fee described in paragraph 10.4.4 above.  The franchise agreement issued to the spouse and/or children will be on the then-current form in use at the time of transfer including the then-current Transfer Fee provisions.

10.5    **Release of Transferor.**  Upon FRANCHISOR's approval of the transfer and FRANCHISEE's compliance with the aforesaid conditions, the transferor shall, provided that the transferor no longer has an interest in the Franchise, thereupon be relieved of further obligations under the terms of this Agreement, except that the transferor shall remain obligated for FRANCHISEE's money obligations under Section 4 through the date of transfer, and under the covenants contained in Section 8 for the Post Term Period therein described, after the date of transfer.

10.6    **Transfer on Death, Disability or Incapacity.**  In the event of the death, disability or mental incapacity of FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, at any time during the term of this Agreement, the legal representative of the deceased, disabled or incapacitated party, as the case may be, together with all surviving partners, members or shareholders of FRANCHISEE, if any, shall, within six (6) months of such death, disability or mental incapacity, jointly apply, in writing to transfer the Franchise or the interest of the affected party in such Franchise, to such person or persons as the legal representative may specify.  Such transfer shall be approved by FRANCHISOR upon fulfillment of all of the conditions set forth in Section 10 of this Agreement.  A Transfer Fee shall be due pursuant to subsection 10.4 above, except that paragraph 10.4.5 shall apply if the transferee is a beneficiary or heir of FRANCHISEE.

10.6.1  If the legal representative and all surviving partners, members or shareholders, if any, do not propose a transferee acceptable to FRANCHISOR under the standards set forth in this Agreement within the period set forth in paragraph 10.6 above, or if no transfer of the interest that have been accomplished consistent with the provisions of this Section 10 within one (1) year from the date of death, disability or mental incapacity, all rights licensed to FRANCHISEE under this Agreement shall terminate forthwith and automatically revert to FRANCHISOR.  FRANCHISOR shall have the right and option, exercisable under such termination, to purchase all furniture, fixtures, signs, equipment and other chattels at a price to be agreed upon by the parties or, if no agreement as to price is reached by the parties, at such price as may be determined by a qualified appraiser, approved by both parties, such approval not to be unreasonably withheld.  FRANCHISOR shall give notice of its intent to exercise said option no later than twenty-one (21) days prior to termination.

10.6.2  If the deceased, disabled or incapacitated party is the Designated Representative, then during the interim period until a transfer of the interest under this subsection 10.6 has taken place, the legal representative and surviving partners, members or shareholders shall operate the Unit through a successor Designated Representative who shall possess such qualifications for interim management of the Unit as FRANCHISOR may determine, in its discretion, from time to time.  Failure of FRANCHISEE or the legal representative to appoint a Designated Representative so qualified within ninety (90) days after the date of death, disability or mental incapacity of the Designated Representative shall be grounds for FRANCHISOR to terminate this Agreement after sending FRANCHISEE a thirty (30) day written notice-to-cure.

10.6.3  FRANCHISOR shall have the right to require a certified copy of an order of a court of competent jurisdiction over the estate of the deceased or incapacitated person, in which the legal representative or heir or legatee shall be determined, and may rely on such certified copy for the purposes of subsection 10.6.  If not furnished with such certified copy of a court order, or in the event of a legal contest, FRANCHISOR may decline, without liability, to recognize the claim of a party to such transfer.  FRANCHISOR shall not be liable to any heir, next of kin, devisee, legatee, or legal representatives of a deceased or incapacitated person by reason of approval of a transfer of the interest to the surviving spouse or a child of the deceased, provided such approval is not contrary to an order of a court of competent jurisdiction served on FRANCHISOR.

10.7    **Right of First Refusal.**  If FRANCHISEE, or any shareholder, member or partner thereof, has received and desires to accept a signed, bona fide written offer from a third party to purchase FRANCHISEE's rights under this Agreement or any shareholder's, member's or partner's interest in the franchised business, FRANCHISEE or such shareholder, member or partner shall notify FRANCHISOR and provide it with a complete copy of such offer.  FRANCHISOR shall have the right and option, exercisable within sixty (60) days after its receipt of said copy, to purchase FRANCHISEE's Franchise, or such shareholder's, member's or partner's interest in the franchised business, on the same terms and conditions as offered by said third party.  FRANCHISOR's exercise of its rights hereunder shall not relieve FRANCHISEE of its Transfer Fee obligation to FRANCHISOR.  Should FRANCHISOR not exercise this option and the terms of the unaccepted offer be altered, FRANCHISOR shall, in each such instance, be notified of the changed offer and shall again have sixty (60) days to exercise its right to purchase on the altered terms.  Should FRANCHISOR not exercise this option, all of the terms of Section 10 shall apply to the transfer.

*General Terms and Conditions*

## Section 11.  Arbitration.

11.0     Except as otherwise specified in this Section 11, all controversies, claims or disputes between FRANCHISEE and FRANCHISOR of whatever kind or nature, whether arising out of or relating to the negotiation, performance or breach of this or any other agreement or otherwise, must be settled by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, as herein provided.  This provision encompasses all causes of action, whether nominally a "claim", "counterclaim" or "cross-claim", and whether arising under common law or any state or federal statute.  As used in this Section 11, the terms "FRANCHISOR" and "FRANCHISEE" include, without limitation, the past and present employees, agents, representatives, officers, directors, shareholders, members, guarantors, sureties, parent corporations, subsidiary corporations, controlled affiliated entities, predecessors, successors and/or assigns of each party hereto.  The parties intend that this provision be given the broadest possible interpretation by a court of law.

11.1     **Eligibility and Procedures.**  Arbitration must be initiated within the lesser of the time periods (a) set forth in paragraph 11.7.5 below or (b) permitted under the applicable statute of limitations for the cause of action asserted.  Any claim, controversy or dispute which is not so initiated within said lesser period shall not be eligible for arbitration under any circumstances.  Arbitration shall be initiated as provided in the Rules of the AAA by the filing of a demand for arbitration with the regional office of the AAA located in the city and state inserted in Item "L" of the Contract Data Schedule of this agreement.  If no location is inserted in Item "L" or if such insertion is incomplete or inaccurate, Boston, Massachusetts, shall be deemed to apply.  The arbitration proceedings, including without limitation all conferences, preliminary and dispositive hearings shall be conducted in such city and state unless all parties agree to another venue.  Actions to enforce an express obligation to pay moneys may be brought under the Expedited Procedures of the AAA's Commercial Arbitration Rules, provided there are no counterclaims.  The arbitrator(s) may issue such orders for interim relief as may be deemed necessary to safeguard the rights of the parties during the arbitration, but without prejudice to the ultimate rights of the parties, to the final determination of the dispute or to the rights of the FRANCHISOR to seek equitable relief from a court of competent jurisdiction at any time, even during the pendency of any arbitration proceedings initiated hereunder.

11.2     **Enforceability and Effect.**  Judgment on the award, including, without limitation, any interim award for interim relief, rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.  The binding or preclusive effect of any award shall be limited to the actual dispute or claim arbitrated, and to the parties, and will have no collateral effect on any other dispute or claim of any kind whatsoever.

11.3     **Governing Law.**  The Federal Arbitration Act and related federal judicial procedure shall govern this contract to the fullest extent possible, excluding all state arbitration law, irrespective of the location of the arbitration proceedings, the nature of the dispute between the parties or the nature of the court in which any related judicial proceedings may be brought.  Except as provided in the preceding sentence respecting arbitration law, the resolution of all disputes between the parties bound hereunder, whether in tort and regardless of the place of injury or the place of the alleged wrongdoing or whether arising out of or relating to the parties' contractual relationship, shall be governed by the law of the Commonwealth of Massachusetts without regard to choice of law principles.

11.4     **Exceptions to Arbitration.**  Disputes concerning the validity or scope of this Section 11 (arbitration), including, without limitation, whether a dispute is arbitrable hereunder, shall be beyond the authority of the arbitrator(s) and shall be determined by a court of competent jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. §1 et seq., as amended from time to time.  In addition, the causes of action specified in the following subsections 11.5 and 11.6 are the sole and exclusive exceptions to the agreement of the parties hereto to resolve disputes through arbitration:

11.5     **FRANCHISOR's Exceptions.**  FRANCHISOR shall have the option to litigate any one or more of the causes of action specified in this subsection 11.5 and shall exercise said option by filing a complaint  in any court of competent jurisdiction:

11.5.1   the enforcement of an obligation to pay money to FRANCHISOR under an express term of any agreement;

11.5.2   any action based upon an allegation of intentional underreporting of Gross Sales by FRANCHISEE;

11.5.3    any action for declaratory or equitable relief, including, without limitation, seeking of preliminary and/or permanent injunctive relief, specific performance, other relief in the nature of equity or any action at law for damage to FRANCHISOR's property or property interests or in equity to enjoin any harm or threat of harm to FRANCHISOR's goodwill, Proprietary Marks or its tangible or other intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder;

11.5.4   any action seeking to terminate this Agreement based upon FRANCHISEE's material breach of paragraph 5.1.7 of this Agreement (excluding subparagraph 5.1.7.1);  or

11.5.5   any action in ejectment or for possession of any interest in real or personal property.

11.6     **FRANCHISEE's Exceptions.**  FRANCHISEE shall have the option to litigate any cause of action otherwise eligible for arbitration hereunder and shall exercise said option solely by filing a complaint  in any court of competent jurisdiction in which FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages.  If any such complaint fails to include such express waivers or if any such court of competent jurisdiction determines that all or any part of such waivers shall be ineffective or void for any reason whatsoever, then the parties agree that the action shall thereupon be dismissed without prejudice, leaving the parties to their arbitration remedies, if then available pursuant to this Section 11.

-17-

11.6.1   In the event FRANCHISOR litigates any cause of action pursuant to subsection 11.5 above, FRANCHISEE shall not file any counterclaim, cross-claim, offset claim or the like against FRANCHISOR in the litigation, unless FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. Otherwise, FRANCHISEE shall submit each such counterclaim, cross-claim, offset claim or the like to arbitration, if then available pursuant to this Section 11.

11.7      **Waiver of Rights.**  THE PARTIES HERETO AND EACH OF THEM KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AGREE AS FOLLOWS:

11.7.1 The parties hereto and each of them EXPRESSLY WAIVE(S) THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY; and

11.7.2.   The parties hereto and each of them EXPRESSLY WAIVE(S) ANY CLAIM FOR PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES, except that FRANCHISOR shall be free at any time hereunder to bring an action for willful trademark infringement and, if successful, to receive an award of multiple damages as provided by law;  and

11.7.3   The parties hereto and each of them EXPRESSLY AGREE(S) THAT NO PARTY BOUND HEREBY MAY RECOVER DAMAGES FOR ECONOMIC LOSS ATTRIBUTABLE TO NEGLIGENT ACTS OR OMISSIONS EXCEPT FOR CONDUCT WHICH IS DETERMINED TO CONSTITUTE GROSS NEGLIGENCE OR AN INTENTIONAL WRONG; and

11.7.4 The parties hereto and each of them EXPRESSLY AGREES THAT IN THE EVENT OF ANY FINAL ADJUDICATION OR APPLICABLE ENACTMENT OF LAW THAT PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES MAY NOT BE WAIVED, ANY RECOVERY BY ANY PARTY IN ANY FORUM SHALL NEVER EXCEED TWO (2) TIMES ACTUAL DAMAGES, except for an award of multiple damages to FRANCHISOR for willful trademark infringement, as provided by law.

11.7.5   ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE AND FRANCHISOR OR FRANCHISEE'S OPERATION OF THE UNIT, BROUGHT IN ANY FORUM BY ANY PARTY HERETO AGAINST THE OTHER, MUST BE COMMENCED WITHIN TWO (2) YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED, EXCEPT FOR FINANCIAL OBLIGATIONS OF FRANCHISEE.

11.8      **No Class Actions.**  No party shall initiate or participate in any class action litigation claim against any other party bound hereby, except that FRANCHISEE may initiate or participate in any class action arbitration claim by franchisees of FRANCHISOR against FRANCHISOR limited exclusively to alleged misappropriation of moneys from the Fund of any System authorized by this Agreement, which claim must be brought only in arbitration under the provisions of this Section 11.

11.9      **Post-Term Applicability.**  The provisions of this Section 11 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement, however effected.

## Miscellaneous Provisions.

12.0      **Relationship of the Parties.**  This Agreement does not constitute FRANCHISEE an agent, legal representative, joint venturer, partner, employee or servant of FRANCHISOR or its affiliated corporation for any purpose whatsoever; and it is deemed understood between the parties hereto that FRANCHISEE shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of FRANCHISOR or its affiliated corporation or to create any obligation, express or implied, on behalf of FRANCHISOR or its affiliated corporation. The parties agree that this Agreement does not create a fiduciary relationship between FRANCHISOR or its affiliated corporation and FRANCHISEE.

12.1      Under no circumstances shall FRANCHISOR or FRANCHISEE be liable for any act, omission, debt or other obligation of the other party.  Each party shall indemnify, protect, defend and save the other party harmless against any such claim.  The cost of defending against any claim arising directly or indirectly from, or as a result of, or in connection with FRANCHISEE's operation of the Unit shall be borne by FRANCHISEE.

13.0      **Non-Waiver.**  Any failure of FRANCHISOR to exercise any power reserved to it hereunder, or to insist upon strict compliance by FRANCHISEE with any term, covenant or condition in this Agreement, and any waiver by FRANCHISOR of any breach of a term, covenant or condition shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition in this Agreement.  Subsequent acceptance by FRANCHISOR of the payments due to it hereunder, in whole or in part, shall not be deemed to be a waiver by FRANCHISOR of any preceding breach by FRANCHISEE of any term, covenant or condition of this Agreement. FRANCHISOR may, in its sole discretion, waive or modify any obligation of other franchisees under agreements similar to this Agreement, and no such waiver or modification shall obligate FRANCHISOR to grant a similar waiver or modification to FRANCHISEE.  Acceptance by FRANCHISOR of payments due under this Agreement from any other person or entity shall be deemed to be acceptance from such person or entity as an agent of FRANCHISEE and not as recognition of such person or entity as an assignee of or successor to FRANCHISEE.

14.0      **Notices.**  All notices hereunder by FRANCHISOR to FRANCHISEE shall, at FRANCHISOR's option, be personally delivered or sent by telecopier, prepaid private courier or certified mail to the FRANCHISEE at the address set forth in Item "I" of the Contract Data Schedule of this Agreement or to such other address as FRANCHISEE may from

time to time give notice of to FRANCHISOR. If delivery is refused, proof of attempted delivery shall be deemed delivery. All notices hereunder by FRANCHISEE to FRANCHISOR shall be sent by certified mail to Allied Domecq Retailing USA, at Post Office Box 317, 14 Pacella Park Drive, Randolph, Massachusetts 02368, Attention: Senior Vice President and General Counsel or to such other address as FRANCHISOR may from time to time give notice to FRANCHISEE.

15.0    **Entire Agreement.** This Agreement, and the documents referred to herein shall be the entire, full and complete agreement between FRANCHISOR and FRANCHISEE concerning the subject matter hereof, and supersedes all prior agreements, no other representation having induced FRANCHISEE to execute this Agreement; and there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein, which are of any force or effect with reference to this Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing. Captions, paragraph designations and section or subsection headings are included in this Agreement for convenience only, and in no way define, limit, construe or describe the scope or intent of the respective parts of this Agreement. The Special Terms and Conditions attached to this Agreement supplement the General Terms and Conditions and are intended to be additional thereto. In the event of any conflict between any provisions thereof, the provisions of the Special Terms and Conditions shall be deemed to prevail.

16.0    **Severability.** Each section, part, term and provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation of a court or agency having valid jurisdiction, such shall not impair the operation or affect the remaining portions, sections, parts, terms or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid section, part, term or provision shall be deemed not to be a part of this Agreement.

17.0    **Applicable Law.** This Agreement shall be deemed to have been made in, and shall be interpreted, construed and governed by the laws of, the Commonwealth of Massachusetts. FRANCHISEE acknowledges that this Agreement is to be performed in part through services rendered to FRANCHISEE in Massachusetts.

18.0    **Independent Investigation.** THE PROSPECT FOR SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE BY VIRTUE OF THIS AGREEMENT IS SPECULATIVE AND DEPENDS TO A MATERIAL EXTENT UPON FRANCHISEE'S CAPABILITY AS AN INDEPENDENT BUSINESS PERSON AND FRANCHISEE, AS WELL AS OTHER FACTORS. FRANCHISOR MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE POTENTIAL SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE HEREBY. FRANCHISEE REPRESENTS AND WARRANTS THAT IT HAS ENTERED INTO THIS AGREEMENT AFTER MAKING INDEPENDENT INVESTIGATIONS OF FRANCHISOR'S BUSINESS, AND NOT IN RELIANCE UPON ANY REPRESENTATION BY FRANCHISOR AS TO SALES OR PROFITS WHICH FRANCHISEE IN PARTICULAR MIGHT BE EXPECTED TO REALIZE. FRANCHISEE FURTHER REPRESENTS AND WARRANTS THAT FRANCHISOR AND ITS REPRESENTATIVES, EMPLOYEES OR AGENTS HAVE MADE NO REPRESENTATIONS TO INDUCE FRANCHISEE TO ACQUIRE THIS FRANCHISE AND EXECUTE THIS AGREEMENT WHICH ARE NOT EXPRESSLY SET FORTH HEREIN OR IN THE DISCLOSURE MATERIALS PROVIDED TO FRANCHISEE PRIOR TO ENTERING INTO THIS AGREEMENT.

19.0    FRANCHISEE acknowledges receiving a copy of this Agreement, the attachments thereto, and agreements relating thereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. FRANCHISEE further acknowledges receiving, on the date of the first personal meeting between FRANCHISOR and FRANCHISEE and not less than ten (10) business days prior to the date on which this Agreement was executed, the disclosure documents required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures".

Initials

ALLIED DOMECQ QSR
RIDER TO FRANCHISE AGREEMENT

### SPECIAL TERMS AND CONDITIONS APPLICABLE TO A
### DUNKIN' DONUTS FRANCHISE

In connection with its business and the business of its Dunkin' Donuts franchisees, DUNKIN' DONUTS has developed and used and continues to use and control the usage of certain proprietary interests, trademarks, logos, emblems and other indicia of origin, service marks and trade names, including *Dunkin' Donuts®*, which is registered as a trademark on the Principal Register of the United States Patent and Trademark Office (the "Proprietary Marks"), to identify for the public the source of goods and services marketed thereunder and to represent to the public high and uniform standards of quality, cleanliness, appearance and service.

FRANCHISEE, being cognizant of the distinctive and valuable significance to the public of all of the foregoing, desires to make use of the trademark *Dunkin' Donuts®*, and to enjoy the benefits of that mark, the other Proprietary Marks and the Dunkin' Donuts System. FRANCHISEE understands the importance of FRANCHISOR's high and uniform standards of quality, cleanliness, appearance and service to the value of the Dunkin' Donuts System and the necessity of opening and operating FRANCHISEE's Dunkin' Donuts Unit in conformity with the Dunkin' Donuts System and in accordance with FRANCHISOR's Standards and specifications.

### DEFINITIONS

As used in these Special Terms and Conditions applicable to a Dunkin' Donuts Franchise, the following defined terms shall have the following meanings:

A.   The "Dunkin' Donuts Unit" means all or a portion of the Premises dedicated to the operation of the Dunkin' Donuts System, as approved by FRANCHISOR.

B.   "Dunkin' Donuts Products" shall mean and refer to donuts, bagels, muffins, cookies and other baked goods, sandwiches, coffee, soda, frozen drinks and other beverages, all of a variety of kinds or flavors, made in accordance with specifications designated by FRANCHISOR and identified by the Dunkin' Donuts Proprietary Marks, and such other products as may be specified from time to time in writing by FRANCHISOR for sale in the Dunkin' Donuts Unit.

C.   Where applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit designated in Item "M" of the Contract Data Schedule of this Agreement.

### Section DD-1.  Grant Of The Franchise

1.0   FRANCHISOR grants to FRANCHISEE for and during the term hereof and FRANCHISEE accepts a Franchise to operate a donut shop utilizing the Dunkin' Donuts System in accordance with the terms, covenants and conditions of this agreement, at one location only, the Premises described in Item "A" of the Contract Data Schedule of this agreement (hereinafter called the "Dunkin' Donuts Unit"). In connection therewith, this Franchise includes the right to use at the Dunkin' Donuts Unit only, the trademark *Dunkin' Donuts®*, along with other Proprietary Marks owned and utilized by DUNKIN' DONUTS in connection with other Dunkin' Donuts units, and the right to use at the Unit only, the Dunkin' Donuts System including confidential and valuable information which now exists or may be acquired hereafter and set forth in FRANCHISOR's manuals or as otherwise from time to time disclosed to Dunkin' Donuts franchisees.

### Section DD-2.  Scope Of The Franchise

2.0   This Dunkin' Donuts Franchise is specific to one location only, for the term of this Agreement. It grants no rights outside the Premises, nor includes any territorial protection against competition. FRANCHISOR reserves and retains the right to operate or permit others to operate Dunkin' Donuts units or to sell or distribute Dunkin' Donuts products and/or services or to otherwise use the Dunkin' Donuts Proprietary Marks and/or the Dunkin' Donuts System, in each case at any other location. FRANCHISOR and other franchisees may compete for customers drawn from the same area as FRANCHISEE's Dunkin' Donuts Unit using the same or different brand(s).

### Section DD-3.  Advertising and Promotion

3.0   FRANCHISOR shall prepare and coordinate a "Start-Up" promotional program (or such other promotional or advertising program as FRANCHISOR may specify) for the initial opening of the Dunkin' Donuts Unit.

3.1   FRANCHISOR shall review for approval all proposed advertising and promotional materials prepared by FRANCHISEE for use in local advertising relating to the Dunkin' Donuts Unit; and

3.3.1   FRANCHISOR shall administer The Dunkin' Donuts Advertising and Sales Promotion Fund (the "Dunkin' Donuts Fund") and shall direct the development of all advertising, marketing and promotional programs for the Dunkin' Donuts System. That portion of FRANCHISEE's payments under paragraph 4.4 of this Agreement equal to one percent (1%) of the Gross Sales of the Dunkin' Donuts Unit will be utilized, at the discretion of FRANCHISOR, to provide for the administrative expenses of the Dunkin' Donuts Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of DUNKIN' DONUTS and the Dunkin' Donuts System. The balance, including any interest earned by the Dunkin' Donuts Fund, will be used for advertising and related expenses. Contributions to the Dunkin' Donuts Fund in excess of the percentage of Gross Sales of the Dunkin' Donuts Unit set forth in Item "F" of the Contract Data Schedule shall be used in accordance with the programs to which they relate.

## Section DD-4. Payments

4.4   FRANCHISEE shall make payments to the Dunkin' Donuts Fund as described in paragraph 4.4 of the General Terms and Conditions, except that sales to wholesale accounts approved by FRANCHISOR are excluded for purposes of calculating fees due under paragraph 4.4 (only).   For wholesale accounts to be approved by FRANCHISOR, FRANCHISEE must provide FRANCHISOR prior written notice of each such account.   Upon FRANCHISOR's receipt of such notice, the account shall be deemed approved, unless FRANCHISOR at any time notifies FRANCHISEE in writing that such account is not approved.   FRANCHISEE shall, within ten (10) days of receipt of a disapproval notice, discontinue sales to the disapproved wholesale account.

4.4.1   FRANCHISOR reserves the right in its sole and absolute discretion to designate or change the composition of Dunkin' Donuts Units included in the base for purposes of determining "two-thirds" support.

## Section DD-5. Covenants of FRANCHISEE

5.0   FRANCHISEE understands and acknowledges that every detail of the Dunkin' Donuts System is important to DUNKIN' DONUTS, to FRANCHISEE and to other Dunkin' Donuts franchisees, in order to maintain high and uniform standards of quality, cleanliness, appearance, service, products and procedures and thereby increase the demand for Dunkin' Donuts Products and protect and enhance the reputation and goodwill of DUNKIN' DONUTS.

5.1   Unless this Unit is expressly authorized to manufacture donut products on the Premises, and except as DUNKIN' DONUTS may otherwise authorize and direct in writing, donut products sold at this Unit shall be produced in the Dunkin' Donuts manufacturing unit located at the address set forth in Item "M" of the Contract Data Schedule of this Agreement (the "Producing Unit").

5.1.5.1   Franchisees' cooperatively-owned distribution centers under the Distributor Commitment Program ("DCP") are currently approved by DUNKIN' DONUTS to supply franchisees with a variety of ingredients, supplies and equipment.   DUNKIN' DONUTS or an affiliated company may from time to time be among the approved suppliers of products, supplies, services, equipment and/or materials required for the operation of the Dunkin' Donuts Unit.   If any such party is designated an approved supplier, it will be subject to the same competitive bidding procedure as other suppliers of the same Dunkin' Donuts Products.

5.1.5.2   DUNKIN' DONUTS may, from time to time, enter into national or regional exclusive supply arrangements with one or more independent suppliers for designated Dunkin' Donuts Products.   In evaluating the need for an exclusive supplier, DUNKIN' DONUTS may take into account (without limitation) the uniqueness of the designated Dunkin' Donuts Products, the projected price and required volume of such Dunkin' Donuts Products, the investment required of a supplier in order to meet the needs for such Dunkin' Donuts Products, the supplier's ability to provide such Dunkin' Donuts Products, the lack of availability of qualified alternative suppliers, the duration of exclusivity, the desirability of competitive bidding and such other business considerations as may be relevant.

5.2.1   Sales to approved wholesale accounts must be separately designated as "wholesale" on Gross Sales reports required under paragraph 5.2.1 of the General Terms and Conditions of this Agreement.

5.2.5   FRANCHISEE's Records shall also include, without limitation, daily production, throwaway and finishing records, and records of all wholesale accounts.

## Section DD-7. Proprietary Marks

7.0   FRANCHISEE acknowledges and agrees that *Dunkin' Donuts*® is a registered trademark owned or controlled by DUNKIN' DONUTS; that said mark has been and is being used by DUNKIN' DONUTS and by its franchisees and licensees; that said mark, together with the other Proprietary Marks presently owned or controlled by DUNKIN' DONUTS or which may be acquired in the future, constitutes part of the Dunkin' Donuts System; that valuable goodwill is associated with and attached to said mark and the other Dunkin' Donuts Proprietary Marks; and that any and all goodwill associated with the Dunkin' Donuts Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of DUNKIN' DONUTS.

7.5   FRANCHISEE shall operate, advertise and promote the Dunkin' Donuts Unit under the name "Dunkin' Donuts", with no accompanying words or symbols of any nature, except as may be otherwise required by law. FRANCHISEE shall not use, as part of its corporate or other business name, any Proprietary Marks used by FRANCHISOR, including, but not limited to, "Dunkin' Donuts" or "Dunkin", or any form or variations thereof, including, but not limited to, "Dunk" or "D.D.", which, in the judgment of FRANCHISOR, is likely to cause third parties to be confused or mistaken with respect to the separate identities of DUNKIN' DONUTS and FRANCHISEE.

## Section 10. Transfer Provisions

10.3.1   Transfer of this Manufacturing Retail Unit - If FRANCHISEE shall propose a transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more of the Franchise for this Unit, or the entity holding such Franchise, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of this Agreement, be subject to the requirement that a controlling interest in all satellite retail units supplied by this Unit must be transferred to (a) the same qualified transferee, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of this Agreement, and who also must control one or more manufacturing Dunkin' Donuts Unit(s) at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the producing unit(s) for the satellite retail Dunkin' Donuts unit(s).

*Dunkin' Donuts Rider - pg.* 2

10.3.2    **Transfer of other Dunkin' Donuts Units supplied by this Manufacturing Retail Unit** - If FRANCHISOR receives notice of a proposed transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more in any Dunkin' Donuts Franchise for a retail unit supplied by this Unit, or the entity holding such Franchise, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, be subject to the requirement that the proposed transferee must (a) also be a qualified transferee of this Unit, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, and who also must control another manufacturing retail Unit at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the manufacturing unit to supply products for such satellite retail unit.

ALLIED DOMECQ QSR
FRANCHISE AGREEMENT

SCHEDULE "F/D"
110100

## SPECIAL TERMS AND CONDITIONS APPLICABLE TO
## DEVELOPMENT OF A NEW UNIT BY FRANCHISEE

FRANCHISEE wishes to develop a new Unit that will utilize one or more of FRANCHISOR's Proprietary Marks at the Premises. In order to facilitate FRANCHISEE's obtaining financing and other needed resources, FRANCHISOR may elect to enter into this agreement prior to having had the opportunity to review the Premises to determine if it is suitable for development as such a Unit. FRANCHISEE's right to develop and operate a Unit under the terms of this agreement at the Premises is, therefore, subject to the conditions that 7(i) FRANCHISOR shall approve the Premises as a suitable location for development of a Unit and (ii) FRANCHISOR shall determine that FRANCHISEE meets all of FRANCHISOR's qualifications and requirements for new, or if appropriate multiple-unit, franchisees. This Schedule enumerates the respective responsibilities of the parties pertaining to FRANCHISEE undertaking to develop a Unit on the Premises. In consideration of a conditional grant to FRANCHISEE of one or more franchise(s) for the Premises, FRANCHISEE hereby agrees as follows:

1.0 **Approval of the Premises** - Development of the Premises as a Unit must be approved by FRANCHISOR, as evidenced solely by written notice sent to FRANCHISEE by the General Manager or other duly authorized representative of FRANCHISOR (the "Site Approval Notice") pursuant to the process hereinafter described. Any real estate commitments that FRANCHISEE may make pursuant to this agreement **MUST** be subject to: (a) FRANCHISEE having obtained FRANCHISOR's prior written approval of development of a Unit on the Premises; (b) FRANCHISEE obtaining all necessary permits, licenses and local governmental approvals needed to develop and operate a Unit on the Premises. In addition, FRANCHISEE should include such other contingencies as FRANCHISEE's attorney may recommend. FRANCHISEE must provide FRANCHISOR a copy of any lease of the Premises within ten (10) days after its execution and receipt by FRANCHISEE.

1.1 It shall be FRANCHISEE's responsibility to retain an attorney and other appropriate, independent advisors in connection with negotiating FRANCHISEE's acquisition of the right to develop and operate a Unit on the Premises, including reviewing all agreements with FRANCHISOR. FRANCHISOR assumes no liability or obligation to FRANCHISEE or to any third party for any assistance in negotiation FRANCHISOR may elect to provide to FRANCHISEE. Although FRANCHISOR may comment on FRANCHISEE's negotiations with third parties, any assistance FRANCHISOR provides to FRANCHISEE is no substitute for the advice of independent counsel. FRANCHISOR will not act as agent, employee or fiduciary of FRANCHISEE for the purpose of assisting FRANCHISEE in negotiations.

1.2 In the event that development of a Unit on the Premises is disapproved by FRANCHISOR or by any governmental authority, this Franchise agreement and all of the parties' rights and obligations hereunder shall cease and be of no further force and effect.

1.3 FRANCHISOR's approval of the Premises is not a representation or a warranty that the Unit will be profitable or that FRANCHISEE will achieve any particular level of sales at the Unit. It merely means that the Premises has met certain minimum criteria which FRANCHISOR has established for identifying suitable sites for proposed Units in the region in which the Premises are located. Because unit development is not a precise science, FRANCHISEE agrees that FRANCHISOR's approval or disapproval of a development shall not impose any liability or obligation on FRANCHISOR. The decision to develop any particular Premises is FRANCHISEE's, subject to FRANCHISOR's final approval. A preliminary favorable opinion of the Premises by local or regional representatives of FRANCHISOR is not conclusive or binding approval, because their recommendations may be rejected by FRANCHISOR.

2.0 **Approval of FRANCHISEE** - In addition to approval of the Premises set forth above, FRANCHISEE's qualifications to obtain this Franchise must be approved in writing by FRANCHISOR. In the event FRANCHISOR disapproves FRANCHISEE's qualifications within sixty (60) days of the date of this agreement, this Franchise agreement and all of the parties' rights and obligations hereunder shall cease and expire.

3.0 **Execution of Documents** - FRANCHISEE shall execute such other documents and agreements as are customarily required by FRANCHISOR in such circumstances, including, if appropriate, but not limited to, a standard form of Lease Option Agreement or Rider to Lease, which ensures the continued availability of the Premises as a franchised unit, in the event of a default under this agreement or, if applicable, under FRANCHISEE's lease of the Premises, during the term of this agreement. If FRANCHISOR owns the Premises real estate, FRANCHISEE shall grant FRANCHISOR the right to lease the Premises on negotiated terms comparable to those under which FRANCHISOR leases comparable property from others. A Lease Option Agreement or a Rider to Lease confirming these rights in a form acceptable to FRANCHISOR, must be signed before construction commences on the Premises.

4.0 **Development of the Unit** - The Unit must be developed and constructed in strict accordance with FRANCHISOR's current standards, requirements, procedures, plans, specifications and documentation for the type, configuration and brand(s) approved for the Premises (hereinafter collectively the "Requirements"). In order that development of the Premises proceed as expeditiously as possible, FRANCHISEE shall strictly comply with the following procedures set forth in Sections 4 and 5:

4.1 FRANCHISEE shall request FRANCHISOR's review of a proposed site, submitted in writing on the prescribed form, signed by FRANCHISEE and, if applicable, FRANCHISEE's landlord (the "Request for Site

Schedule "F/D"

1

Approval" ).  Within approximately thirty (30) days, FRANCHISOR will advise FRANCHISEE if the proposed Premises fails to meet FRANCHISOR's minimum preliminary criteria.  Otherwise, FRANCHISOR will schedule a Responsibility Meeting (described below), to be held within approximately sixty (60) days after FRANCHISOR received the Request for Site Approval. This preliminary review procedure is intended to allow FRANCHISEE the opportunity to limit the amount of money FRANCHISEE spends on a site that does not meet FRANCHISOR's minimum criteria.

4.2   Once FRANCHISOR has scheduled a Responsibility Meeting, FRANCHISEE shall promptly hire a licensed architect for the Unit project, whose responsibility shall be to adapt FRANCHISOR's generic plans and/or specifications to the specific requirements of the Premises, the geographical region in which the Premises are located and the building codes and ordinances pertinent to the Premises, and to oversee the contractor's completion of construction of the Unit on the Premises.  FRANCHISEE's architect must promptly order such topographical and boundary surveys of the Premises, soil borings and structural engineering tests as FRANCHISOR and/or FRANCHISEE's architect may require (the "Reports").  FRANCHISEE's architect must attend the Responsibility Meeting.

4.3   On the scheduled day, FRANCHISOR's representatives will meet at the Premises with FRANCHISEE and FRANCHISEE's architect, to establish a work schedule and coordinate the respective responsibilities of each of the parties with respect to development of a Unit on the Premises (the "Responsibility Meeting").  The Reports, including copies of zoning ordinances and by-laws applicable to the Premises, shall be made available to FRANCHISOR at the Responsibility Meeting by FRANCHISEE's architect.  If any such Report or FRANCHISEE's architect is not available when required, FRANCHISOR may, at its option, postpone the Responsibility Meeting, in which case FRANCHISEE shall reimburse FRANCHISOR's out-of-pocket travel costs, if any.  Should the Responsibility Meeting be so postponed, FRANCHISOR shall reschedule the Responsibility Meeting on a date FRANCHISEE makes a firm commitment that the architect and/or Reports will be available, no later than within thirty (30) additional days.  If FRANCHISEE is unable to comply, FRANCHISOR shall have the right to terminate this Franchise agreement, provided that, in FRANCHISOR's good faith judgement, FRANCHISEE has failed to exercise reasonable diligence to comply with the terms of this Schedule.

4.4   Subject to delays caused by FRANCHISEE or its landlord or otherwise beyond FRANCHISOR's reasonable control, FRANCHISOR shall use its best efforts to notify FRANCHISEE of its approval or disapproval of the Premises, within approximately ninety (90) days after the date FRANCHISOR received FRANCHISEE's Request for Site Approval.

4.5   FRANCHISOR assumes no responsibility for (a) evaluation of the soil or subsoil on the Premises for hazardous substances or unstable conditions, (b) inspection of any structure on the Premises for asbestos or other toxic or hazardous materials, or (c) compliance with the Americans With Disabilities Act ("ADA").  It is FRANCHISEE's sole responsibility to obtain satisfactory evidence and/or assurances that the Premises (and any structures thereon) are free from environmental contamination and in compliance with the requirements of ADA.

5.0   **Construction of the Unit** -Prior to commencement of construction of the Unit on the Premises, the plans and specifications prepared by FRANCHISEE's architect must be reviewed by FRANCHISOR and approved for compliance with FRANCHISOR's design Requirements.  FRANCHISEE is solely responsible for obtaining all necessary permits from all applicable governmental agencies for completing construction of the Unit.  If FRANCHISE fails to commence construction of the Unit within twelve (12) months from the date of this Franchise Agreement, FRANCHISOR shall have the right, in its sole discretion, to terminate this agreement by written notice to FRANCHISEE.

5.1   FRANCHISEE and its contractor(s) shall obtain a comprehensive general liability insurance policy written by an insurer having at least a rating of A-XII in Best's Insurance Reports and in which FRANCHISOR is named as an additional insured party, Such policy shall comply with Subsection 5.3 of the General Terms and Conditions of this Franchise Agreement.  Coverage under such insurance shall include operations, premises liability, independent contractor's coverage, contractual liability and automobile liability (owned and non-owned).  Prior to commencement of construction, FRANCHISEE shall furnish FRANCHISOR an insurance certificate evidencing the foregoing policy and that FRANCHISEE or its contractor(s) have procured worker's compensation insurance covering all persons employed in construction of the Unit.

5.2   FRANCHISOR shall have the right of entry upon the Premises at all times, to inspect construction in progress, to ensure that all of FRANCHISOR's Requirements are being met.  FRANCHISOR and its employees shall not act as an architect or agent of FRANCHISEE.  The duties of FRANCHISOR's construction representative are limited solely to ensuring that FRANCHISOR's Requirements are met on the Premises.  FRANCHISEE shall not rely upon any opinions expressed by FRANCHISOR or any of its employees or agents regarding structural integrity, safety or construction procedures, building codes or ordinances or other matters properly within the responsibility of FRANCHISEE's architect.  FRANCHISOR assumes no liability or responsibility for architectural or engineering judgments outside the scope of the duties stated above.

5.3   If the Unit does not initially open to serve the general public within fifteen (15) months from the date of this agreement, FRANCHISOR shall have the right, in its sole discretion, (a) to increase the Initial Franchise Fee(s) to the then-current initial franchise fee(s), which increase, if any, shall be payable to FRANCHISOR upon demand; or (b) to terminate this agreement by written notice to FRANCHISEE.  In the event of any delay caused by FRANCHISOR, or if FRANCHISEE has been unavoidably delayed by act of God, government restrictions, labor difficulties, inability to obtain building materials or similar contingencies (other than making any payment) not within FRANCHISEE's control, FRANCHISOR shall extend the deadline for a period of time equal to the period of such unavoidable delay.

*Schedule "F/D"*

2

5.4  Before the Unit opens to serve the general public, FRANCHISEE must obtain FRANCHISOR's final approval of the construction of the building, site improvements and landscaping, as appropriate, and the installation of all signs and equipment.  FRANCHISOR's approval of construction of the unit is not a representation or warranty that the Unit has been constructed in accordance with any architectural, engineering or legal standards for design or workmanship.  It merely means that FRANCHISOR is satisfied that the Requirements which FRANCHISOR has established for consistency of design and layout have been met (or waived, where appropriate).  FRANCHISEE agrees that FRANCHISOR's approval of construction of the Unit shall not impose any liability or obligation on FRANCHISOR.  FRANCHISEE also agrees that all franchise and real estate documentation must be complete and all required payments must be received by FRANCHISOR before the Unit is opened.

5.5  As soon as FRANCHISOR approves that construction and equipping the Unit are substantially complete and all conditions required for opening the Unit have been met, FRANCHISEE shall promptly open the Unit to serve the general public.  FRANCHISEE agrees that the Unit must open to serve the general public no later than fifteen (15) months from the date of this Agreement.

6.0  **Financing** - Prior to commencing construction of the Unit on the Premises, FRANCHISEE shall provide evidence satisfactory to FRANCHISOR that cash and/or financing is in place, sufficient to fund completion of construction and purchase of necessary improvements, equipment and signs.  FRANCHISOR assumes no obligation to guarantee the funding or financing of FRANCHISEE's construction project.  FRANCHISOR will not guarantee FRANCHISEE's mortgage, lease or other real estate related obligations.  If FRANCHISOR, at its election, finances or guarantees the financing of FRANCHISEE's purchase or leasing of equipment and/or signs, the owner of the Premises real estate must agree that the equipment and signs are not a part of the realty and must waive any and all interest in the equipment and/or signs, in order to permit the financing of the equipment and/or signs.  In this connection, the owner of the Premises real estate must sign such reasonable documents as are reasonably required by FRANCHISOR.

7.0  **Control of the Premises** - FRANCHISEE hereby represents to FRANCHISOR that FRANCHISEE will have the following relationship with the owner or lessor of the Premises (place an "x" in the appropriate box):

☒   the Premises will be owned by an independent third party landlord with which FRANCHISEE will not share or maintain any common partner, member, shareholder, officer, director, trustee, beneficiary, family member or other interest; or

☐   the Premises will be owned by a third party landlord with which FRANCHISEE will share or maintain a common partner, member, shareholder, officer, director, trustee, beneficiary, family member or other interest; or

☐   the Premises will be owned by a corporation, LLC, trust, partnership or other entity controlled by FRANCHISEE; or

☐   the Premises will be owned by the same entity that will execute the Franchise Agreement.

FRANCHISEE agrees to promptly advise FRANCHISOR of any change, whatsoever, in the relationship represented above.

Schedule "F/D"

3

120199                                                                SCHEDULE "NY"

## ADDENDUM TO THE ADQSR FRANCHISE AGREEMENT AND
## STORE DEVELOPMENT AGREEMENT
## REQUIRED BY THE NEW YORK GENERAL BUSINESS LAW

Notwithstanding anything to the contrary set forth in the ADQSR Franchise Agreement (the "Franchise Agreement") and/or the Store Development Agreement ("SDA") the following provisions shall supersede and apply to all Baskin-Robbins, Dunkin' Donuts and Togo's franchises offered and sold in the State of New York.

1.      Subsection 5.4 of the Franchise Agreement and Section 14 of the SDA shall each be supplemented by the addition of the following language as the last sentence of these sections:

However, FRANCHISEE shall not be required to indemnify FRANCHISOR for any claims arising out of a breach of this Agreement by FRANCHISOR or other civil wrongs of FRANCHISOR.

2.      Paragraph 7.4 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

FRANCHISEE must notify FRANCHISOR immediately in writing of any apparent infringement of or challenge to FRANCHISEE's use of any Mark, or claim by any person of any rights in any Mark or any similar trade name, trademark or service mark of which FRANCHISEE becomes aware. FRANCHISEE may not communicate with any person other than FRANCHISOR and its counsel in connection with any such infringement, challenge or claim. FRANCHISOR shall have sole discretion to take such action as it deems appropriate and the right to exclusively control any litigation, U.S. Patent and Trademark Office proceedings or other administrative proceeding or to otherwise protect and maintain its interest in the Marks. FRANCHISOR shall not be obligated to defend the FRANCHISEE against the claim of a third party that the operation of Retail Unit or the FRANCHISEE's use of the Marks infringes any right of the third party and FRANCHISOR shall not be obligated to protect, indemnify or hold harmless the FRANCHISEE from the consequences of any such claim or litigation. In the event FRANCHISOR does not take action, FRANCHISEE will have to protect itself at its own expense.

3.      Paragraph 10.3.7 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

FRANCHISEE must execute a general release in a form satisfactory to FRANCHISOR, releasing FRANCHISOR, its shareholders, directors, officers, employees, in their corporate and individual capacities, of any claims FRANCHISEE may have against them; provided, however, that all rights enjoyed by FRANCHISEE and any causes of action arising in its favor from the provision of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force, it being the intent of this proviso that the non-waiver provisions of the New York State General Business Law Sections 687.4 and 687.5 be satisfied.

4.      Paragraph 10.1 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

This Agreement is fully assignable by FRANCHISOR and shall inure to the benefit of any assignee or other legal successor to the interest of FRANCHISOR herein. However, no assignment shall be made except to an assignee who, in the good faith judgment of FRANCHISOR, is willing and able to assume FRANCHISOR's obligations under this Agreement.

Initials

SDA # 339636

PC # 340367
Bronx, New York

IN WITNESS WHEREOF the parties hereto, intending to be legally bound hereby, have duly executed, sealed and delivered this agreement in triplicate, as of the date and year first written above. FRANCHISEE hereby acknowledges receipt of this Franchise Agreement, together with any amendments, at least five (5) business days prior to the date hereof. FRANCHISEE further acknowledges having carefully read this agreement in its entirety, including all Schedules identified above and the Personal Guaranty below (if applicable).

FRANCHISOR

ATTEST:                                          DUNKIN' DONUTS INCORPORATED

_____                      _____
Assistant Secretary/Clerk                     Mark McClellan, Director of Development

This agreement is not binding upon the above corporation(s) until executed and attested by an authorized officer.

FRANCHISEE ACKNOWLEDGES SECTION 11 OF THE GENERAL TERMS & CONDITIONS OF THIS CONTRACT, WHICH PROVIDES FOR FRANCHISEE'S EXPRESS WAIVER OF RIGHTS TO A JURY TRIAL, TO PARTICIPATE IN CLASS ACTION LAWSUITS, TO OBTAIN PUNITIVE, MULTIPLE OR EXEMPLARY DAMAGES, AND TO BRING ANY CLAIM OR ACTION LATER THAN TWO YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION.

FRANCHISEE

WITNESS/ATTEST:                                 SATYAM SHIVAM, INC.

_____                      _____
               witness                        Anil Kapoor, President

### PERSONAL GUARANTEE BY SHAREHOLDERS OF A CORPORATION OR MEMBERS OF A LIMITED LIABILITY COMPANY

We, the undersigned, represent and warrant that we constitute

[X]     the shareholders of one hundred percent (100%) of the originally issued and outstanding capital stock of the above FRANCHISEE, a corporation

[ ]     one hundred percent (100%) of the members of the above FRANCHISEE limited liability company ("LLC")

organized under the laws of the state of New York. Waiving demand and notice, the undersigned hereby, jointly and severally, personally guarantee the full payment of FRANCHISEE's money obligations under Section 4 and the performance of all of FRANCHISEE's other obligations under this Franchise Agreement, including, without limitation, paragraph 6.3 and Section 8, in its entirety relative to the restrictions on the activities of FRANCHISEE. We personally agree that the Franchise Agreement shall be binding upon each of us personally. The undersigned, jointly and severally, agree that FRANCHISOR may, without notice to or consent of the undersigned, (a) extend, in whole or in part, the time for payment of FRANCHISEE's money obligations under paragraph 4; (b) modify, with the consent of FRANCHISEE, its money or other obligations hereunder; and/or (c) settle, waive or compromise any claim of FRANCHISOR against FRANCHISEE or any of the undersigned, all without in any way affecting the personal guarantee of the undersigned. This Guarantee is intended to take effect as a sealed instrument.

_____                      _____
               witness                        Anil Kapoor, individually

SDA # 339636

PC # 340367
Bronx, New York

## CERTIFICATION OF FRANCHISEE

DESCRIBE BELOW ALL PROMISES AND REPRESENTATIONS MADE BY FRANCHISOR THAT ARE NOT EXPRESSLY CONTAINED IN THE FRANCHISE AGREEMENT OR UNIFORM FRANCHISE OFFERING CIRCULAR BUT WHICH INFLUENCED FRANCHISEE'S DECISION TO SIGN THIS FRANCHISE AGREEMENT.

*If the answer is "none," please write "NONE" below.*

" None "

FRANCHISEE's completion of this page is a material inducement for FRANCHISOR to grant FRANCHISEE this Franchise. If FRANCHISEE fails to complete, sign and deliver this Certification of Franchisee page to FRANCHISOR along with the Franchise Agreement, FRANCHISOR will not counter-execute the Franchise Agreement or may void the Franchise Agreement if it already has been counter-executed.

THE UNDERSIGNED HEREBY CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS TRUE, that FRANCHISEE had the opportunity to obtain the advice of an attorney, and that FRANCHISEE, and not FRANCHISEE's attorney or other representative, has executed this Certification of Franchisee.

The date of the Certification shall be the date on the Franchise Agreement.

WITNESS/ATTEST:

SATYAM SHIVAM, INC.

_____
witness

_____
Anil Kapoor, President and individually

# Exhibit 1C

SDA# 339636

PC# 340725
Bronx, NY

## FRANCHISE AGREEMENT

This Franchise Agreement is dated ___4/11/05___ , 2005, and made by and between ~~BASKIN ROBBINS USA, CO. (hereinafter "BASKIN ROBBINS"), a California corporation, and~~ DUNKIN' DONUTS INCORPORATED (hereinafter "DUNKIN' DONUTS"), a Delaware corporation, ~~and TOGO'S EATERIES, INC. (hereinafter "TOGO'S"), a California corporation, all~~ with principal offices in Canton, Massachusetts (such corporations are hereinafter individually or collectively referred to as "FRANCHISOR") and the following individual(s) and/or entity:

**SHIVAM SUNDRAM INC., a New York corporation**

(hereinafter individually or collectively referred to as "FRANCHISEE")

This Franchise Agreement includes the Contract Data Schedule, General Terms and Conditions designated as ("GTC-120104") and the Special Terms and Conditions identified in Item "J" of the Contract Data Schedule below.

### CONTRACT DATA SCHEDULE

A. Location of the Franchised Unit (the "Premises"):

| 114 | Bruckner Boulevard | Bronx | New York | 10454 |
|---|---|---|---|---|
| (number) | (street) | (city or town) | (state) | (zip code) |

B. Term:..........................Twenty ( 20 ) years from the first date the Unit opens to serve the general public, ~~or, in the case of an existing Unit, until_____.~~

C. Initial Franchise Fee:.............................................................Fifty Thousand dollars ($50,000.00)*
*Paid under SDA# 339636 ($50,000.00)

D. Marketing Start-Up Fee:.............................................................Five Thousand dollars ($ 5,000.00)*
*Note Schedule MSF below

E. Continuing Franchise Fee Rate:..........................Five and nine-tenths percent (5.9%) of Gross Sales

F. Minimum Continuing Advertising Fee Rate:....................................Five percent (5.0%) of Gross Sales

G. Refurbishment Date: In the case of a new unit, the date five (5) years and fifteen (15) years after the first date the Unit opens to serve the general public, ~~or, in the case of an existing unit, on_____.~~

   Remodel Date: In the case of a new unit, the date ten (10) years after the first date the Unit opens to serve the general public, ~~or, in the case of an existing unit, on _____.~~

H. Transfer Fee: As provided in subsection 10.4 of the General Terms and Conditions, unless another amount is inserted here: _____NO CHANGE_____

I. Address for notice to FRANCHISEE shall be at the Unit Premises, unless another address is inserted here: _____

J. Special Terms and Conditions:
   [X] DDOO    Special Terms and Conditions Applicable to a Dunkin' Donuts Franchise
   [X] FD      Special Terms and Conditions Applicable to Development of a New Unit by Franchisee
   [X] NY      Addendum to the ADQSR Franchise Agreement and Store Development Agreement required by the New York General Business Law
   [X] MSF     Special Terms and Conditions Applicable to the Marketing Start-up Fee

K. The Designated Representative for this Unit is ___ANIL KAPOOR___
   (List only one person. See definitions in General Terms and Conditions.)    [print full name above]

L. Arbitration under this Agreement shall be initiated in the city and state of New York, New York.

M. If applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit located at PC# 340091 – 511 East 163rd Street – Bronx, New York 10451
   (insert address if this Unit is a Dunkin' Donuts non-producing unit; otherwise insert "not applicable").

Form last revised 12/01/04

Franchisor's corporations are EOE and AA Employers
(Franchisees are not employees)

GTC-120104

# FRANCHISE AGREEMENT

© December 2004

## GENERAL TERMS AND CONDITIONS

### INTRODUCTION

**Baskin-Robbins USA Co.**, a California corporation ("BASKIN-ROBBINS"), **Dunkin' Donuts Incorporated**, a Delaware corporation ("DUNKIN' DONUTS") and **Togo's Eateries Inc.**, a California corporation ("TOGO'S") are wholly-owned subsidiaries of Dunkin' Brands, Inc. As a result of the expenditure of time, effort and money, each subsidiary has acquired experience and skill in the development and operation of food service establishments using distinctive systems and techniques for the production, distribution, merchandising and sale of branded food products, including, without limitation, *Baskin-Robbins*® ice cream, yogurt and novelties, *Dunkin' Donuts*® donuts, coffee and freshly baked goods, *Togo's*® fresh sandwiches, salads and deli platters, and other unique and distinctive products, services and business methods (hereinafter each called a "System" and collectively called the "Systems").

The distinguishing characteristics of these Systems include, without limitation, distinctive exterior and interior design, decor, color and identification schemes and furnishings; specially designed manufacturing and merchandising equipment; unique and proprietary information technologies and software; special menu items; standards, specifications and procedures for operations, manufacturing, distribution and delivery; quality of products and services offered; management programs; training and assistance; and marketing, advertising and promotional programs, all of which may be changed, supplemented, improved and further developed from time to time by FRANCHISOR as new learning and best practices are identified and incorporated.

### DEFINITIONS

As used throughout this Agreement, the following defined terms shall have the following meanings:

A.      The "Proprietary Marks" are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin and trade names, which identify for the public the source of goods and services marketed thereunder and represent to the public high and uniform standards of quality, cleanliness, appearance and service, including, without limitation, *Dunkin' Donuts*® owned or controlled by DUNKIN' DONUTS, *Baskin 31 Robbins*® owned or controlled by Baskin-Robbins Incorporated ("BRI"), and *TOGO'S*® owned or controlled by TOGO'S, all of which are registered trademarks on the Principal Register of the United States Patent and Trademark Office.

B.      "FRANCHISOR" refers to Dunkin' Donuts Incorporated with respect to the Dunkin' Donuts System, Baskin-Robbins USA, Co., with respect to the Baskin-Robbins System and Togo's Eateries, Inc. with respect to the Togo's System.

C.      "FRANCHISEE" means the person(s) or entity who signed this Agreement, which may include a sole proprietor, all partners of a general partnership, a corporation or a limited liability company ("LLC"). No person or entity may claim an interest in this Agreement or any Franchise granted hereby without FRANCHISOR's prior written approval.

D.      The "Unit" means the branded food service establishment, including the fixtures, furnishings, equipment, inventory and supplies located therein and/or attached thereto, operated by FRANCHISEE pursuant to this Agreement. If this Agreement authorizes more than one brand, the term "Unit" shall refer to all branded operations authorized hereby, unless such reference is expressly limited to any one brand.

E.      The "Premises" means the land and building or the area within a building, as the case may be, which is (i) approved by FRANCHISOR, (ii) dedicated to the operation of the Unit, and (iii) in the exclusive possession and control of FRANCHISEE. Some portion of the Premises may be under shared possession or control, if approved by FRANCHISOR.

F.      The term "Lease" means the document by which FRANCHISEE occupies and controls the Premises, whether the landlord is a third-party or FRANCHISOR, or one of its subsidiaries or affiliates.

G.      "Gross Sales" means and includes all revenue from the sale of all products and services and all other income of every kind and nature related to the Unit, whether for cash, by redemption of gift certificates or for credit, regardless of collection; provided, however, "Gross Sales" does not include the incidental sales of gift certificates or newspapers, incidental receipts from pay telephones, or any sales taxes or other taxes FRANCHISEE collects from customers for transmittal to the appropriate taxing authority.

H.      The "Designated Representative" is the person from time to time designated by FRANCHISEE as being responsible for the day-to-day operation of the Unit. The Designated Representative must meet FRANCHISOR's then-current qualifications, including, without limitation, successful completion of FRANCHISOR's training, and must be authorized to act for and bind FRANCHISEE in all dealings with FRANCHISOR with respect to the day-to-day operation of the Unit. The initial Designated Representative is identified in Item "K" of the Contract Data Schedule of this Agreement.

I.      The "Standards" are requirements, specifications, criteria, guidelines, processes, techniques and standards which are from time to time established and revised by FRANCHISOR with respect to selection and development of the Premises, operation of the Unit and other aspects of each System. Examples of "Standards" are, without limitation, requirements and criteria for developing the Unit; specifications for the facility, equipment and products; business processes and techniques for the operation of the Unit; and guidelines and standards for quality, cleanliness, appearance and service.

## Section 1. Grant of the Franchise and Term

1.0      This Agreement grants to FRANCHISEE the right, subject to all of the terms and conditions hereinafter set forth, to operate a Unit solely at the Premises described in Item "A" of the Contract Data Schedule of this Agreement, including the right to use, solely in such Unit, the System or Systems and Proprietary Marks described in the Special Terms and Conditions attached to and made a part of this Agreement (the "Franchise"). The term of this Agreement shall begin on the date hereof and shall end on the date described in Item "B" of the Contract Data Schedule; provided however, the Franchise shall commence upon the occurrence, of all of the following conditions prior to the initial opening of the Unit or the transfer of the Unit, as the case may be:

1.0.1      Training. FRANCHISEE and its Designated Representative must successfully complete the then-current training program required by FRANCHISOR at one or more of FRANCHISOR's training centers located in Massachusetts, California or at other locations from time to time designated by FRANCHISOR. This requirement may be waived or modified by FRANCHISOR, in whole or in part, in its sole discretion, if FRANCHISEE or its Designated Representative has had comparable training or on-the-job experience.

1.0.2      Financing. Upon request by FRANCHISOR, FRANCHISEE must deliver evidence to FRANCHISOR that FRANCHISEE has obtained binding commitments for all financing needed to develop and/or operate the Unit.

1.0.3      Documents. FRANCHISEE must execute and deliver to FRANCHISOR all documents related to this Franchise customarily required, in then-current form, as provided by FRANCHISOR.

1.0.4      Payment. FRANCHISEE must, prior to opening or transferring the Unit (as the case may be) pay FRANCHISOR any and all moneys due, including, but not limited to, purchase price, fees, inventory, rent and/or security deposit, if required under the Lease.

1.0.5      Possession. FRANCHISEE must have the exclusive right to occupy and use the Premises for at least the term of this Agreement, whether FRANCHISEE owns the Premises, or leases the Premises pursuant to either (a) a Lease with a third party landlord on terms satisfying FRANCHISOR's then current lease policy and containing provisions required by FRANCHISOR; or (b) a Lease with FRANCHISOR or an affiliated entity.

1.0.6      For a New Unit. If this Unit is newly developed, FRANCHISEE must, prior to the Unit's initial opening, comply with all provisions of the Special Terms & Conditions attached to this Agreement relating to new unit development (Schedule "F/D" or "C/D", as applicable).

1.1      The term of this Agreement shall expire without notice upon any earlier expiration or termination of a Lease, foreclosure of a mortgage, or other event which has the effect of terminating FRANCHISEE's possession and occupancy of the Unit.

1.2      FRANCHISEE represents and warrants that FRANCHISEE and each individual partner, member and/or shareholder of FRANCHISEE, as the case may be, is a United States citizen or a lawful resident alien of the United States; that, where applicable, the FRANCHISEE entity (corporation or LLC) is and shall remain duly organized and in good standing during the term of this Agreement; and that all financial and other information which FRANCHISEE has provided to FRANCHISOR in connection with FRANCHISEE's application for this Franchise is true and accurate. FRANCHISEE's representations and warranties under this paragraph 1.2 are a material inducement to FRANCHISOR's grant of the Franchise to FRANCHISEE.

## Section 2. Services Furnished by FRANCHISOR

2.0      FRANCHISOR agrees:

2.1      Prior to and For the Initial Opening of the Unit.

2.1.1      FRANCHISOR shall make available to FRANCHISEE Standards for the design, construction, equipping and operation of the Unit; and

2.1.2      FRANCHISOR shall make available to two individuals designated by FRANCHISEE, one of whom must be a party to or guarantor of this Agreement FRANCHISOR's then current initial training program with respect to the operation of the Unit, at one or more of FRANCHISOR's Training Centers located in Massachusetts, California and/or at such other training facility as FRANCHISOR may, from time to time, designate; and

2.1.3      FRANCHISOR shall provide its current operating procedures to assist FRANCHISEE in complying with FRANCHISOR's Standards; and

2.1.4    FRANCHISOR shall make available to FRANCHISEE such assistance in the pre-opening, opening and initial operation of the Unit as FRANCHISOR shall deem advisable, based upon FRANCHISEE's organization, prior experience and training.

2.2    **After the Initial Opening of the Unit.**

2.2.1    FRANCHISOR shall maintain a continuing advisory relationship with FRANCHISEE, including consultation in the areas of marketing, merchandising and general business operations; and

2.2.2    FRANCHISOR shall provide FRANCHISEE with FRANCHISOR's Standards for the authorized System(s), as the same may be modified by FRANCHISOR from time to time, in its sole and absolute discretion; and

2.2.3    FRANCHISOR shall continue its efforts to maintain high and uniform standards of quality, cleanliness, appearance and service at all units; and

2.2.4    FRANCHISOR shall make reasonable efforts to disseminate FRANCHISOR's Standards to potential suppliers of products at the written request of FRANCHISEE, subject, however, to specific requirements and limitations of each authorized System.

## Section 3. Advertising and Promotion

3.0    FRANCHISOR has established and administers a marketing, advertising and sales promotion fund (the "Fund") for each of the Systems, and directs the development of all advertising, marketing and promotional programs for each System. FRANCHISEE's payments to the Fund(s) shall be used for advertising, marketing, promotion, production and development of all advertising, marketing, promotional and other programs, product development, merchandising, public relations, administrative expenses, programs designed to increase sales and enhance and further the public reputation of FRANCHISOR and each applicable System, and activities related to any and all of the foregoing. The content of all activities of the Fund(s), including, without limitation, the media selected and employed, as well as the area and units to be targeted for such activities, shall be at the sole discretion of FRANCHISOR. FRANCHISOR undertakes no obligation to make expenditures for FRANCHISEE which are equivalent or proportionate to contributions paid under this Agreement or to insure that FRANCHISEE benefits directly or on a prorata basis from activities of the Fund(s), if any. Upon request, FRANCHISOR will provide FRANCHISEE a statement of receipts and disbursements for any Fund to which FRANCHISEE contributes under the terms of this Agreement, prepared by an independent public accountant for each fiscal year of the Fund.

3.1    FRANCHISEE, prior to using any advertising or promotional material that FRANCHISEE has prepared for use in its local area, shall submit such material to FRANCHISOR for review and approval. If written disapproval of the advertising and promotional material is not received by FRANCHISEE from FRANCHISOR within fifteen (15) days from the date such material is received by FRANCHISEE, said materials shall be deemed approved for use by FRANCHISEE, unless and until subsequently disapproved by FRANCHISOR, in which event FRANCHISEE will promptly discontinue any further use thereof.

3.2    FRANCHISEE acknowledges that this Agreement grants FRANCHISEE no right to use any of the Proprietary Marks to advertise products and/or services for order through the mail or by any electronic or other medium. FRANCHISEE shall not, without the prior written approval of FRANCHISOR, use any of the Proprietary Marks on the Internet or any similar electronic or other communications medium, to promote FRANCHISEE's business and/or advertise and/or sell products and/or services. Notwithstanding the provisions of paragraph 3.1 above, FRANCHISOR's failure to disapprove any request to use the Internet or any similar electronic or other medium within fifteen (15) days shall not give FRANCHISEE the right to undertake such use. FRANCHISOR shall have the sole right to establish an Internet "home page" using any of the Proprietary Marks, and to regulate the establishment and use of linked home pages by its franchisees.

3.3    Special Terms and Conditions for each System authorized for this Unit are attached to this Agreement and contain additional provisions related to advertising and promotion.

## Section 4. Payments

4.0    FRANCHISEE shall pay to FRANCHISOR the following initial charges and continuing fees:

4.1    **Initial Franchise Fee.** - FRANCHISEE shall pay FRANCHISOR an Initial Franchise Fee in the amount set forth in Item "C" of the Contract Data Schedule of this Agreement. Unless the Initial Franchise Fee was prepaid under the terms of a Store Development Agreement, five thousand dollars ($5,000.00) shall be paid upon the execution of this Agreement and the remaining unpaid balance within ten (10) days after FRANCHISEE's receipt of FRANCHISOR's written approval of the Premises; provided however, if the Premises is developed by FRANCHISOR, the balance shall be due in full upon FRANCHISEE's execution of the Lease of the Unit, or on the date FRANCHISEE or the Designated Representative commences FRANCHISOR's training program, whichever date is earlier.

4.2    **Marketing Start-Up Fee.** - FRANCHISEE shall pay a Marketing Start-Up Fee in the amount set forth in Item "D" of the Contract Data Schedule of this Agreement, for a start-up promotional program or such other promotion or advertising program as FRANCHISOR may specify. Payment shall be made in full prior to attendance by FRANCHISEE or the Designated Representative at FRANCHISOR's training program or thirty (30) days prior to the scheduled opening of the Unit, whichever date is earlier, and shall be nonrefundable after the Unit commences operations.

*General Terms and Conditions*

-4-

4.3  __Continuing Franchise Fees__ - FRANCHISEE shall pay FRANCHISOR at Post Office Box 1097, Charlotte, North Carolina 28201-1097 (or to such other address as FRANCHISOR shall from time to time advise FRANCHISEE in writing), on or before Thursday of each week, a sum determined by multiplying the Gross Sales of the Unit for the seven (7) day period ending at the close of business on the preceding Saturday times the percentage set forth in Item "E" of the Contract Data Schedule of this Agreement.

4.4  __Continuing Advertising Fee.__ FRANCHISEE shall also pay, at the same time, for the same seven (7) day period, in the same manner as, and in addition to the payments provided for under paragraph 4.3 above, the percentage set forth in Item "F" of the Contract Data Schedule of this Agreement, of the Gross Sales of the Unit, to one or more Funds for advertising, marketing, promotion and other purposes, as specified in Section 3 of this Agreement.

4.4.1  In addition, FRANCHISEE shall participate in and make additional payments to the Fund(s) with respect to all advertising, marketing, promotion and other programs of each authorized brand at the Unit, which from time to time are supported by two-thirds of the units of such brand in the market in which the Unit is located with respect to local programs, and in the continental United States, with respect to national programs.

4.4.2  If FRANCHISEE is authorized to use more than one (1) System at the Unit, fees payable under this paragraph 4.4 with respect to each System shall apply only to that portion of the Unit's Gross Sales which are applicable to that System, as determined by FRANCHISOR.

4.5  If any sales, income, excise, use or privilege tax is imposed or levied by any government or governmental agency on account of the payment of franchise or royalty fees by FRANCHISEE under this Agreement, FRANCHISEE shall pay FRANCHISOR a sum equal to the amount of such tax as an additional royalty fee (but this provision shall not apply to federal or state income taxes imposed upon FRANCHISOR).

4.6  FRANCHISOR shall have the right to require FRANCHISEE, upon written notice, to make payments under this Agreement by electronic funds transfer or to a lock-box located at an independent bank.  Acceptance of payment by electronic funds transfer or to a lock-box shall not be deemed a waiver of any rights of FRANCHISOR.  If FRANCHISOR establishes a direct debit program with FRANCHISEE's bank for the electronic payment of continuing franchise and advertising or sales promotion fees, FRANCHISEE must provide FRANCHISOR with all consents, authorizations and bank account data necessary to effect such electronic payment.

4.6.1  FRANCHISEE must complete and deliver to FRANCHISOR such forms as may from time to time be required to effectuate any changes as necessary to maintain EFT capability.  FRANCHISEE agrees (a) to give FRANCHISOR at least fourteen days written notice (except in the case of emergency) before making any change to FRANCHISEE's EFT bank account, providing all information and specimens required to change EFT to the new account;  (b) to pay FRANCHISOR its then-current late fee, plus collection costs and reasonable attorney's fees, if FRANCHISEE's bank rejects FRANCHISOR's EFT request because of insufficient funds;  and (c) upon demand, to replace EFT rejected by FRANCHISEE's bank with a bank certified or cashier's check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees.

4.6.2  For each week that FRANCHISEE (a) submits a weekly Gross Sales report via FRANCHISOR's approved electronic form over the Internet, and (b) pays the corresponding weekly continuing franchise and advertising fees by EFT, FRANCHISOR will deduct the fees from FRANCHISEE's bank account on or after the Thursday twelve (12) days after the Saturday of the week for which sales were reported.  This benefit will only become available after FRANCHISOR implements an electronic form for reporting weekly sales satisfactory to FRANCHISOR.  To have this benefit available, FRANCHISEE must have computer equipment capable of accessing and using the electronic form in the manner required.  In FRANCHISOR's discretion or due to system failure, FRANCHISOR may elect to withdraw the electronic form.  In any such case, FRANCHISEE must immediately return to reporting Gross Sales in the manner originally required.

4.7  __Late Fees, Interest and Costs.__  If any payment required under this Agreement is not paid when due, FRANCHISEE shall pay, in addition to the unpaid amount, FRANCHISOR's then-current late fee for each unpaid invoice. In addition, all amounts payable by FRANCHISEE to FRANCHISOR under any provision of this Agreement, if not paid when the same becomes due, shall bear interest from the date due until paid at the rate of one and one-half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less.  Entitlement to such interest shall be in addition to any other remedies FRANCHISOR may have.  Receipt of any check, draft or other commercial paper shall not constitute payment until all funds therefrom are collected by FRANCHISOR.  FRANCHISEE shall pay all collection charges, including reasonable attorney's fees, on dishonored checks.  At FRANCHISOR's request, dishonored and returned checks will be promptly replaced by FRANCHISEE by a bank certified or cashiers check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees, set forth in this Agreement.


## Section 5.  Covenants of FRANCHISEE

5.0  FRANCHISEE understands and acknowledges the importance to FRANCHISOR, FRANCHISEE and other franchisees, of FRANCHISEE's commitment to at all times operate the Unit in accordance with FRANCHISOR's Standards (as defined in Definitions paragraph "I"), in order to increase the demand for FRANCHISOR's products, to protect and enhance the reputation and goodwill of FRANCHISOR, to promote and protect the value of the Proprietary Marks and other reasons.  FRANCHISEE agrees to devote continuous best efforts to successfully develop, manage and operate the Unit and to enhance the goodwill of the Proprietary Marks authorized by this Agreement and the System(s) as a whole.

5.0.1  If, in any consecutive twelve (12) month period, FRANCHISEE shall receive two (2) or more notices to cure any default under this Agreement, FRANCHISOR shall have the right, in addition to all other remedies available, to require that FRANCHISEE (in lieu of any Designated Representative) devote full time to managing the day-to-day operation of the Unit.

5.0.2    FRANCHISEE agrees to operate the Unit in strict accordance with all of FRANCHISOR's Standards as they may be communicated to FRANCHISEE from time to time. Standards shall be established for and distributed to franchisees generally and/or FRANCHISEE specifically, in such form and content as FRANCHISOR may from time to time in its sole discretion prescribe. Standards are copyrighted and FRANCHISEE shall not at any time copy, duplicate, record or otherwise reproduce any materials, in whole or in part, which set forth the standards or other proprietary information, or otherwise make the same available to any unauthorized person. FRANCHISEE shall at all times maintain the documents embodying the Standards at the Unit (or at FRANCHISEE's principal offices, if not the Unit) and shall ensure that such documents are kept current and up to date. In the event of a dispute as to the contents of the Standards, the terms of the master copy(s) maintained by FRANCHISOR shall control.

5.0.3    FRANCHISEE acknowledges that complete uniformity may not be possible or practical throughout the System(s) and agrees that FRANCHISOR may from time to time vary Standards, as FRANCHISOR may deem necessary or desirable for the System(s) or the Unit.

5.1    **Unit Operations.** - FRANCHISEE shall keep the Unit open and in continuous normal operation for such hours as FRANCHISOR shall from time to time direct, provided, however, no longer than the maximum number of hours per day permitted by law, on all days, unless prior written approval is obtained from FRANCHISOR or unless FRANCHISOR otherwise directs in writing. In connection therewith, but without limitation, FRANCHISEE further agrees as follows:

5.1.1    FRANCHISEE shall use all products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product storage, handling, preparation, packaging, delivery and sale prescribed by FRANCHISOR. All such items must conform to FRANCHISOR's Standards. FRANCHISOR reserves the right to specify any item by brand. FRANCHISEE shall carry out the business covered by this Agreement in accordance with the operational Standards established by FRANCHISOR and set forth in FRANCHISOR's operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to franchisees from time to time.

5.1.2    FRANCHISEE shall refrain from using or selling any products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment and methods of product storage, handling, preparation, packaging, merchandising, and delivery, or any other items of any kind, which do not meet FRANCHISOR's Standards. Without limiting the generality of the foregoing, FRANCHISEE shall immediately rectify all hazardous situations, and immediately remove and destroy any and all hazardous products. For purposes of the foregoing sentence, "hazardous situations" are those which have the potential to cause injury, illness or death, and "hazardous products" are products which are unfit for human consumption or which have the potential to cause injury, illness or death.

5.1.3    FRANCHISEE shall offer for sale all products that FRANCHISOR may, from time to time in its sole discretion, designate in writing as approved for sale at the Unit. FRANCHISEE shall sell, distribute and deliver such products only in weights, sizes, forms and packages as are approved in writing by FRANCHISOR. FRANCHISEE further agrees to discontinue offering for sale any product that FRANCHISOR may, at any later time, in its sole discretion, by written notice withdraw approval for sale at the Unit; and FRANCHISEE agrees to refrain from offering for sale any product or products which have not been designated in writing as approved by FRANCHISOR for sale at the Unit. FRANCHISOR may disapprove FRANCHISEE's sale of any product(s) or FRANCHISEE's participation in any program(s), in the event FRANCHISEE fails to comply with operational Standards at the Unit. FRANCHISEE shall have sole and complete discretion as to the price FRANCHISEE charges for all products.

5.1.4    FRANCHISEE shall maintain at all times a sufficient supply of approved products to meet the demand of FRANCHISEE's customers at the Unit.

5.1.5    FRANCHISEE shall purchase all food products, supplies, equipment and materials required for the operation of the Unit from FRANCHISOR or from suppliers who (a) demonstrate, to the reasonable satisfaction of FRANCHISOR, the ability to meet all of FRANCHISOR's Standards for such items, (b) possess adequate capacity and facilities to supply the needs of FRANCHISEE and other franchisees in the quantities, at the times and with the reliability requisite to an efficient operation, and (c) have been approved, in writing, by FRANCHISOR. Prior to purchasing any items from any supplier not previously approved by FRANCHISOR, FRANCHISEE shall submit to FRANCHISOR a written request for approval of the supplier. FRANCHISOR may require that samples from the supplier be delivered to FRANCHISOR or to a designated independent testing laboratory for testing prior to approval and use. FRANCHISEE shall pay FRANCHISOR a fee not to exceed the actual cost of the test; provided, however, no fee shall be charged for the first test requested by FRANCHISEE in any calendar year. This paragraph is subject to Special Terms and Conditions which contain additional provisions and limitations specific to the System(s) authorized for the Unit by this Agreement.

5.1.6    FRANCHISEE shall maintain, at all times and at FRANCHISEE's expense, the interior and exterior of the Unit and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by FRANCHISOR. FRANCHISEE shall make no material alteration, addition, replacement or improvement in or to the interior or exterior of the Unit (including the parking lot and landscaped areas) without FRANCHISOR's prior written consent.

5.1.7    FRANCHISEE shall comply with all civil and criminal laws, ordinances, rules, regulations and orders of public authorities pertaining to the maintenance and operation of the Unit, including, but not limited to, those relating to health, safety, sanitation, employment, environmental regulation and taxation.

-5-

*General Terms and Conditions*

-6-

5.1.7.1    FRANCHISEE agrees to maintain as business records provided in subsection 5.2 below, and to furnish to FRANCHISOR within five (5) days after receipt of written demand therefor, copies of all customer complaints and notices, warnings, citations, inspection reports and other communications related to the Unit from public authorities. FRANCHISEE hereby authorizes any such public authority to provide FRANCHISOR with copies of such notices and/or communications. If any suit, investigation or other legal proceeding related to FRANCHISEE's business should be commenced by or against FRANCHISEE, FRANCHISEE shall immediately notify FRANCHISOR thereof and keep FRANCHISOR continuously advised of the status of the matter.

5.1.8    FRANCHISEE shall manage the Unit at all times with at least two (2) individuals, one of whom must be FRANCHISEE, or a partner, shareholder or member of FRANCHISEE, either of whom must be the Designated Representative and both of whom must have successfully completed FRANCHISOR's training program. Both individuals must have literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to satisfactorily complete FRANCHISOR's training program and to communicate with employees, customers, and suppliers.  If FRANCHISEE operates more than one unit, FRANCHISOR requires that each additional unit be managed by a Designated Representative approved by FRANCHISOR.

5.1.8.1    In the event of any resignation, termination, disability, death or other incapacity of the Designated Representative, FRANCHISEE shall notify FRANCHISOR in writing of the name of a qualified successor Designated Representative as soon as possible, but in no event later than two (2) months after such event.

5.1.8.2    FRANCHISEE shall hire, train and supervise efficient, competent and courteous employees of good character for the operation of the Unit and shall ensure that all such employees are trained in accordance with FRANCHISOR's training procedures. FRANCHISEE is solely responsible for hiring and discharging employees of the Unit, and for setting their wages and terms of employment. FRANCHISEE shall ensure that all employees whose duties include customer service have sufficient literacy and fluency in the English language to adequately serve the public in the Unit. FRANCHISEE (or the Designated Representative, as specified by FRANCHISOR) shall attend, and FRANCHISEE shall require employees at the Unit to attend, such further training as FRANCHISOR shall from time to time reasonably require.  The cost of training materials, salaries, accommodations and travel expenses, if any, of FRANCHISEE or any other individual employed in the Unit will be borne entirely by FRANCHISEE.  FRANCHISEE will bear the cost of all training programs except FRANCHISOR's initial training program referred to in paragraph 2.1.2 of this Agreement.

5.1.9    FRANCHISEE shall accurately report all Gross Sales to FRANCHISOR and implement all procedures recommended by FRANCHISOR to minimize employee theft.  FRANCHISEE further acknowledges and agrees that employee theft shall not relieve FRANCHISEE of the obligation to make all payments to FRANCHISOR based on Gross Sales pursuant to Section 4 of this Agreement and that accurate reporting of Gross Sales requires, among other things, compliance with all Standards related thereto and recording all sales at the time the product is delivered to the purchaser, including, without limitation, retail, wholesale and bulk discount sales, whether for cash, by redemption of gift certificates or coupons, or sales for which payment may be deferred.

5.2    <u>Books, Records and Reports.</u>  FRANCHISEE shall keep full, complete and accurate books and accounts with respect to the Unit, in accordance with generally accepted accounting principles and all requirements of law and in the form and manner prescribed below or as from time to time further prescribed by FRANCHISOR.  Commencing upon the opening of the Unit:

5.2.1    FRANCHISEE shall submit to FRANCHISOR, on or before Thursday of each week, on a standard form approved by FRANCHISOR, a signed statement of Gross Sales at the Unit for the seven (7) day period ending at the close of business on the preceding Saturday, along with all moneys required to be paid under Section 4 of this Agreement.

5.2.2    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty-five (45) after the close of each of FRANCHISEE's calendar or fiscal month, a profit and loss statement of the Unit for said monthly period.

5.2.3    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty five (45) days after the close of each applicable period, a profit and loss statement prepared in accordance with generally accepted accounting principles, along with a balance sheet (including a statement of retained earnings or partnership account) (i) for the first six (6) months of each of FRANCHISEE's fiscal year; and  (ii) for the full twelve (12) months of each of FRANCHISEE's fiscal years. FRANCHISOR shall have the right, in its sole discretion, to require FRANCHISEE to have such annual statements audited by an independent certified public accountant  and submitted to FRANCHISOR within ninety (90) days after the close of each of FRANCHISEE's fiscal year.

5.2.4    FRANCHISEE shall submit to FRANCHISOR, at the times and in the form required, such other periodic reports and information as may from time to time be prescribed by FRANCHISOR.

5.2.5    FRANCHISEE shall preserve, in the English language and for the time periods set forth below, all books, tax returns, accounting records and supporting documents relating to the FRANCHISEE's business operations at the Unit (hereinafter called the "Records"), including but not limited to:

    a.  daily cash reports;
    b.  cash receipts journal and general ledger;
    c.  cash disbursements journal and weekly payroll register;
    d.  monthly bank statements, and daily deposit slips and canceled checks;
    e.  all business tax returns;
    f.  suppliers invoices (paid and unpaid);

*General Terms and Conditions*

g. dated cash register tapes (detailed and summary);
h. semi-annual balance sheets and monthly profit and loss statements;
i. weekly inventories;
j. records of promotion & coupon redemptions;
k. such other records and information as FRANCHISOR may from time to time request.

FRANCHISEE shall be permitted to preserve Records and submit reports electronically, in accordance with FRANCHISOR's Retail Information System ("RIS") and/or other requirements, or otherwise with the prior written approval of FRANCHISOR. During the term of this Agreement, FRANCHISEE shall preserve and make available to FRANCHISOR all Records for no less than the current fiscal year and the three (3) immediate-past fiscal years. For three (3) years after the date of any transfer of any interest in this Agreement, the transferor of such interest shall preserve and make available to FRANCHISOR all Records of its last three (3) fiscal years of operation under this Agreement. For a period of three (3) years after the expiration of the term of this Agreement (or after any earlier termination thereof) FRANCHISEE shall preserve and make available to FRANCHISOR all Records for the last three (3) fiscal years of FRANCHISEE's business operation at the Unit.

5.2.6    Retail Information System. FRANCHISEE shall record all sales at or from the Unit at the time of sale, in accordance with FRANCHISOR's procedures and on devices, the make, model and serial numbers of which have been individually approved in writing by FRANCHISOR. Such devices must record accumulated sales in a manner that cannot be turned back or reset, and must retain data in memory storage in the event of power loss. FRANCHISEE shall, at its sole cost and expense, upon notice from FRANCHISOR, purchase or lease and install a unit and/or network information technology system, including computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR for the Unit (hereinafter for convenience called "RIS"). The term "RIS" includes, without limitation, all hardware and software designated from time to time by FRANCHISOR and the data stored thereon by FRANCHISEE. Some or all components of RIS may be licensed to FRANCHISOR and used by FRANCHISEE as a sub-licensee. FRANCHISEE shall use RIS solely in connection with the operation of the Unit, in the manner specified by FRANCHISOR from time to time. FRANCHISEE shall comply with such requirements determined by FRANCHISOR from time to time regarding maintenance, training, storage and safeguarding of data, records, reports and other matters relative to RIS.

5.2.6.1 FRANCHISEE shall, at its sole cost and expense: (a) attend, and/or cause the Designated Representative and/or employees in the Unit to attend, such initial and other RIS training as is specified by FRANCHISOR; (b) maintain RIS in continuous operation at the Unit; (c) purchase an ongoing maintenance and support contract from an approved supplier and replace the RIS components as necessary, (d) upgrade RIS from time to time as may be reasonably required by FRANCHISOR; (e) permit FRANCHISOR immediate access to RIS, electronically or otherwise, at all times without prior notice to FRANCHISEE (such access shall not unreasonably interfere with FRANCHISEE's normal Unit operations); and (f) install and maintain telephone or other service required by FRANCHISOR to permit such access.

5.2.6.2 FRANCHISEE shall, at its sole cost and expense, upon FRANCHISOR's request, replace RIS with the computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR from time to time as FRANCHISOR's then-current unit and/or network information system. Such replacements shall take place when deemed advisable by FRANCHISOR given the age, cost to operate, condition of the information system then in the Unit, the then-current and anticipated technology, the information systems then in use at other Units, the needs of the System(s), and other factors as may be relevant.

5.2.6.3 FRANCHISOR makes no representation or warranty as to the costs, sales, or profits, if any, which may result from the installation and use of RIS and its replacements.

5.2.7    FRANCHISOR shall treat any Records received from FRANCHISEE pursuant to this subsection 5.2 as confidential, except that information may be released (a) to any person entitled to the same under any Lease; (b) in connection with any court order, legal proceeding or other dispute resolution process, whether instituted by FRANCHISOR or any other party; (c) to a prospective transferee of any interest subject to the provisions of Section 10 of this Agreement, and (d) as incorporated into anonymous general information disseminated to FRANCHISOR's franchisees and prospective franchisees, and in the formulation of plans and policies in the interest of the System(s).

5.3    Insurance. FRANCHISEE shall procure, before the commencement of business, and maintain in full force and effect during the entire term of this Agreement, at FRANCHISEE's sole expense, an insurance policy or policies protecting FRANCHISEE and FRANCHISOR, and their directors and employees, against any loss, liability, including without limitation employment practices liability, or expense whatsoever from, without limitation, fire, personal injury, theft, death, property damage or otherwise, arising or occurring upon or in connection with FRANCHISEE's operation of the Unit or by reason of FRANCHISEE's occupancy of the Premises.

5.3.1    Such policy or policies shall include:

5.3.1.1 commercial general liability insurance, including but not limited to, product, contractual, and owned and non-owned vehicle liability coverages, with a limit of two million dollars ($2,000,000.00) per occurrence and two million dollars ($2,000,000.00) in the aggregate or such higher limit as FRANCHISOR, in its sole and absolute discretion, may from time to time require, and as may be required under the terms of any Lease or underlying lease for the Unit, for bodily injury and property damage combined; and

5.3.1.2 "All Risk" property damage insurance, including without limitation flood and earthquake protection, for the full replacement cost value of the Premises and all other property within or relating to the Unit, including signs, with no coinsurance clause and with a replacement cost clause attached; and

-7-

5.3.1.3  plate glass insurance and, if applicable, boiler insurance; and

5.3.1.4  employer's liability, worker's compensation and such statutory insurance as may be required in the state in which the Premises is located.

5.3.1.5  employment practices liability insurance with a limit of one million dollars ($1,000,000.00) per occurrence and one million dollars ($1,000,000.00) in the aggregate.

5.3.2  All insurance required under the terms of this Agreement (i) shall be written in the names of FRANCHISEE, FRANCHISOR and/or other party or parties designated by FRANCHISOR, as their respective interest may appear, by insurance companies reasonably acceptable to FRANCHISOR;  (ii) shall contain provisions denying to the insurer acquisition by subrogation of rights of recovery against any party named;  (iii) shall provide that cancellation or alteration cannot be made without at least thirty (30) days written notice to any party named; and (iv) shall not be limited in any way by reason of any insurance which may be maintained by FRANCHISOR or any other party named.

5.3.3  During the term of this Agreement, FRANCHISEE shall promptly unless otherwise directed by FRANCHISOR, (but in no event later than ten (10) days after any such policy becomes effective or such payment is due) furnish FRANCHISOR with duplicate originals of all insurance policies, including renewal and replacement policies, together with evidence that all premiums have been paid.  If at any time FRANCHISEE fails to comply with the provisions of this subsection 5.3, FRANCHISOR, in addition to all other remedies available, shall have the right (but not the obligation) to obtain and/or maintain such insurance with respect to the Unit and/or Premises, at FRANCHISEE's sole expense. FRANCHISEE shall pay FRANCHISOR when and as billed for the cost of premiums therefor.  Maintenance of insurance and FRANCHISEE's performance of the obligations contained in this subsection 5.3 shall not relieve FRANCHISEE of liability under the indemnity provisions set forth in paragraph 5.4 below.

5.3.4.  Each of the parties hereby waives any and all rights of recovery against the other parties hereto, or against the officers, employees, agents, and representatives of such other parties, for damage to such waiving party or for loss of its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policy in force at the time of such loss or damage.  FRANCHISEE shall, upon obtaining the policies of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Agreement.

5.4      **Indemnification.**  FRANCHISEE shall save, defend, exonerate, indemnify and hold harmless FRANCHISOR, and each of them, and the subsidiaries or each of them, and their respective officers, directors, employees, agents, successors and assigns, from and against (i) any and all claims based upon, arising out of, or in any way related to the operation or condition of any part of the Unit or the Premises, the conduct of business thereupon, the ownership or possession of real or personal property and any negligent act, misfeasance or nonfeasance by FRANCHISEE or any of its agents, contractors, servants, employees, or licensees, and including, without limitation, all obligations of FRANCHISEE incurred pursuant to any provisions of this Agreement, and (ii) any and all fees (including reasonable attorneys' fees), costs and other expenses incurred by or on behalf of FRANCHISOR in the investigation of or defense against any and all such claims.

5.5      **Refurbishment & Remodel of the Premises.**  FRANCHISEE shall timely complete future refurbishments and remodels of the Unit in accordance with this subsection 5.5.  Such refurbishments and remodels are in addition to FRANCHISEE's continuing obligations to maintain, repair and replace all equipment, signage, furnishing, decor and personal property related to the Unit in accordance with FRANCHISOR's standards.  FRANCHISEE's obligations to maintain, repair and replace shall not be delayed or deferred pending or in anticipation of any such refurbishment or remodel.

5.5.1   No later than the Refurbishment Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall refurbish the Unit in accordance with FRANCHISOR's then-current refurbishment standards.  It is intended that the cost of the initial refurbishment shall not exceed $10,000.00 and that subsequent refurbishments shall not exceed $10,000.00 increased by the same percentage as the increase to the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the period from the Refurbishment Date to the date of subsequent refurbishment.  The refurbishment required of the FRANCHISEE shall be generally the same as then required of units of the same age and condition.  The above refurbishing costs do not include costs for required maintenance and repair or costs to upgrade, change or replace the Retail Information System.

5.5.2   No later than the Remodel Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall remodel the Unit in accordance with FRANCHISOR's then-current remodeling standards (including but not limited to fixtures, furnishings, signs and equipment).  The remodeling required of FRANCHISEE shall be generally the same as then required of units of the same age, condition, location and geographic region.

5.5.3   FRANCHISEE acknowledges and agrees that the requirements of this subsection 5.5 are both reasonable and necessary to ensure continued public acceptance and patronage of the System(s), to avoid deterioration or obsolescence of the Unit and to take advantage of changes and improvements in design, concept and decor.

5.6      **Cross-Guarantee.**  In the event FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other unit franchised by FRANCHISOR, FRANCHISEE shall be jointly and severally liable to FRANCHISOR as guarantor of the obligations of the franchisee under each franchise Agreement for such other unit(s).  Included in such guaranty are, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental and other Lease payments to FRANCHISOR or any of its subsidiaries, if applicable, collection fees and general receivables now or hereafter due and payable to FRANCHISOR or guaranteed by FRANCHISOR to any third party.  FRANCHISEE's liability under this paragraph shall be limited to the extent that the

total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s), member(s) or partner(s), as the case may be, hold in FRANCHISEE. For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE, held by or controlled by the common shareholder(s), member(s) or partner(s) or their immediate family, as the case may be. The terms of this paragraph shall not operate to extend any personal guaranty of any Lease obligations by any shareholder(s), member(s) or partner(s), after such guaranty shall have ended by its terms.

5.7    **FRANCHISEE Entity.** FRANCHISEE may be a sole proprietorship, a general partnership, a corporation or a limited liability company ("LLC"). FRANCHISEE may not be a limited partnership, trust or other entity not specifically authorized herein or approved by FRANCHISOR in writing.

5.7.1    **Corporation.** If FRANCHISEE is a corporation, (i) said corporation's charter shall provide that it is limited to operating the Unit as provided under this Agreement; (ii) all shareholders of the corporation shall enter into a written Agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the corporation's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) each stock certificate of the corporation shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new shares of common or preferred voting stock in the corporation shall be issued to any person, persons, partnership, association, LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all owners of record and all beneficial owners of any class of voting stock of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

5.7.2    **LLC.** If FRANCHISEE is an LLC, (i) said LLC's operating agreement shall provide that it is limited to operating the Unit as provided under this Agreement; (ii) all members of the LLC shall enter into a written agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the LLC's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) the LLC's operating agreement shall provide that any assignment or transfer of membership interests in the LLC is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new membership interest(s) in the LLC shall be created for, issued or granted to any person, persons, partnership, association LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all members of record of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

## Section 6. Certain Rights of FRANCHISOR

6.0    In order to preserve the validity and integrity of the Proprietary Marks and to assure that the Standards of the System(s) are properly employed by FRANCHISEE in the operation of the Unit and, in general, to verify FRANCHISEE's compliance with the terms of this Agreement, FRANCHISOR, or its agents, shall have the right, at all times, with or without prior notice to FRANCHISEE, to enter and inspect any and all public or private area(s) of the Unit and to select materials, ingredients, products, supplies, paper goods, uniforms, fixtures, furnishings, signs and equipment for evaluation purposes to assure that these items conform to the Standards of the System(s). During the course of any such inspection, FRANCHISOR may photograph or videotape any part of the Unit, whether or not FRANCHISEE is present. FRANCHISOR may require FRANCHISEE to remove any item which does not conform to applicable Standards. FRANCHISOR may also, at FRANCHISEE's expense, remove or destroy any item which does not conform to applicable Standards.

6.1    If FRANCHISOR finds any condition on the Premises which FRANCHISOR deems to be hazardous, unsafe, unhealthy, unsanitary, unclean or in material disrepair, FRANCHISOR shall have the following rights in addition to all other rights set forth in this Agreement:

6.1.1    FRANCHISOR shall have the right to require FRANCHISEE to immediately close and suspend operation of the Unit, and/or to require such other actions as FRANCHISOR, in its sole discretion, deems necessary, whenever there is reason to believe that any products in the Unit are contaminated, or for other reasons of imminent risk to public health and safety. FRANCHISEE agrees to notify FRANCHISOR immediately of any suspected product contamination or other violation affecting public health or safety and to promptly take any action which FRANCHISOR requires in connection therewith. FRANCHISEE shall be solely responsible for all losses, costs or other expenses it incurs in complying with the provisions of this subsection 6.1; and/or

6.1.2    FRANCHISOR shall have the right to immediately remove or destroy, at FRANCHISEE's expense, any product which FRANCHISOR believes to be hazardous, contaminated or to otherwise pose an imminent risk to public health or safety; or

6.1.3    FRANCHISOR shall have the right to give FRANCHISEE twenty-four (24) hours written notice requiring the correction of an unsafe, unhealthy, unsanitary or unclean condition, or thirty (30) days written notice requiring maintenance, repairs or alterations to the Unit or correction of any other Standards violation. If FRANCHISEE has not within that time corrected the condition or completed the maintenance, repairs or alterations, as the case may be, FRANCHISOR may enter the Unit, without being guilty of, or liable for, trespass or tort, and may cause the condition to be corrected or the maintenance, repair, or alteration to be completed at the expense of FRANCHISEE and without prejudice to any other rights or remedies of FRANCHISOR.

-9-

6.2    In addition to FRANCHISOR's right to access information through the Retail Information System and otherwise, FRANCHISOR's representatives shall have the right to examine FRANCHISEE's original books, Records and supporting documents at reasonable times, and to perform, with or without notice to FRANCHISEE, such inspections, tests and other analyses as it deems appropriate to verify Gross Sales at the Unit.  If FRANCHISOR determines that the Gross Sales FRANCHISEE reported to FRANCHISOR are less than the Gross Sales ascertained by FRANCHISOR's analysis, FRANCHISEE shall immediately pay to FRANCHISOR all amounts owing to FRANCHISOR, the applicable Fund and FRANCHISOR's affiliated landlord corporation based upon the corrected Gross Sales.  If an analysis is undertaken due to (i) FRANCHISEE's failure to maintain the Retail Information System in continuous operation, or (ii) FRANCHISEE's failure to prepare, deliver or preserve statements or Records required by subsection 5.2 of this Agreement, or (iii) if any analysis of FRANCHISEE's books and Records results in the discovery of a discrepancy greater than three percent (3%) in the Gross Sales reported by FRANCHISEE, FRANCHISEE shall pay, in addition to the unpaid amounts owed FRANCHISOR, its affiliated landlord corporation and the applicable Fund, interest thereon from the date payment was due, at 18% per annum or the highest permissible rate.  FRANCHISEE shall also reimburse FRANCHISOR for all related expenses, including, but not limited to, reasonable investigation, accounting and legal fees and other reasonable expenses and costs such as travel, payroll and overhead expenses for FRANCHISOR's employees.  Such payments shall be without prejudice to any other remedies FRANCHISOR may have under this Agreement, including the right to terminate this Agreement, without opportunity to cure, in the case of intentional under-reporting of Gross Sales.

6.3    In the event that FRANCHISOR shall believe there may have been intentional under-reporting of Gross Sales for the Unit, FRANCHISEE (and all partners, members and shareholders of FRANCHISEE) shall, upon written demand from FRANCHISOR provide FRANCHISOR, in addition to Records described in paragraph 5.2.5, personal federal and state tax returns, bank statements (including deposit slips and canceled checks) and such other documents and information as FRANCHISOR may in its sole discretion request in connection with FRANCHISOR's efforts to verify Gross Sales reported to FRANCHISOR under this Agreement or any Lease of the Unit.  Information provided by FRANCHISEE under this paragraph 6.3 shall be subject to the confidentiality provisions of paragraph 5.2.7, except that exclusion (c) therein does not apply.  Schedules to personal tax returns and other financial data which are unrelated to the business of the Unit need not be provided by any partner, member or shareholder of FRANCHISEE who has not been active in the business, and, in addition, has not directly or indirectly owned or controlled at least a majority interest in the business at the Unit, alone or in conjunction with any other family member or related entity.

6.4    FRANCHISEE hereby grants FRANCHISOR the right to inspect the records of all suppliers, distributors, group purchasing programs, distribution centers, and other third parties supplying food products, supplies, equipment and materials to FRANCHISEE and hereby authorizes such parties to release records of FRANCHISEE's purchases and deliveries to FRANCHISOR, by electronic transfer or otherwise, at such times and places as FRANCHISOR shall request.

6.5    If, during the term of this Agreement or any extension or renewal thereof, FRANCHISEE directly or indirectly acquires ownership or control of the Premises, FRANCHISEE agrees to give FRANCHISOR prompt written notice of such ownership or control and to grant FRANCHISOR, under FRANCHISOR's standard Lease Option Agreement, the option to acquire a leasehold interest in the Premises in the event of default by FRANCHISEE under this Agreement or under any lease or mortgage relating to the Premises.  Said leasehold interest shall be for the remaining term of this Agreement, including any renewal, at "triple-net" fair market value rental for comparable properties and use in the area as mutually agreed by the parties, or, in the absence of agreement, as determined by arbitration.

### Section 7.  Proprietary Marks

7.0    FRANCHISOR has, in connection with its business and the business of its franchisees, developed and used and continues to use and control the usage of Proprietary Marks which are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin, including colors, and certain trade names, including but not limited to **Dunkin' Donuts®**, owned by Dunkin' Donuts Incorporated, **Baskin 31 Robbins®**, owned by Baskin-Robbins Incorporated, and **TOGO'S®**, owned by Togo's Eateries, Inc., all of which are registered as trademarks on the Principal Register of the United States Patent and Trademark Office.  FRANCHISEE's rights to use specific Proprietary Marks under this Agreement are set forth in the Special Terms and Conditions described in Item "J" of the Contract Data Schedule of this Agreement and attached hereto as a part hereof.

7.1    FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement.  FRANCHISEE shall not sublicense the Proprietary Marks.  FRANCHISEE further agrees that any unauthorized use of the Proprietary Marks during the term of or after expiration or the earlier termination of this Agreement shall constitute an incurable default causing irreparable harm subject to injunctive relief.

7.1.1    FRANCHISEE understands and acknowledges that FRANCHISEE's license to use any or all of the Proprietary Marks is non-exclusive and relates solely to the single location set forth in this Agreement.  FRANCHISEE further acknowledges that FRANCHISOR, in its sole discretion, has the right to operate or franchise other units and sales outlets and to grant other licenses in, and to, any or all of the Proprietary Marks, and to develop and establish other systems, products or services using the same or similar Proprietary Marks, or any other proprietary names and marks, and to grant licenses or franchises thereto, in each case at such locations and on such terms and conditions as FRANCHISOR deems acceptable, without providing any rights therein to FRANCHISEE.  FRANCHISEE further acknowledges the FRANCHISOR may license others to use the Proprietary Marks at locations and in ways that competes with FRANCHISEE and draws customers from the same area as the Unit.

7.2     FRANCHISEE agrees that, during the term of this Agreement and after the expiration or termination thereof, FRANCHISEE shall not directly or indirectly contest or aid in contesting the validity or ownership of the Proprietary Marks. FRANCHISEE shall not, directly or indirectly, apply to register, register or otherwise seek to use or control or in any way use any of the Proprietary Marks or any confusingly similar form or variation thereof in any place or jurisdiction outside the United States; nor shall FRANCHISEE assist any others to do so.

7.3     FRANCHISEE shall identify itself as the franchisee of the Unit in conjunction with any use of the Proprietary Marks, including, without limitation, uses on letterheads, invoices, order forms, receipts, and contracts. Upon the written request of FRANCHISOR, FRANCHISEE shall display a notice identifying the Unit as being independently owned and operated by FRANCHISEE, in such content and form and at such conspicuous locations on the Premises as FRANCHISOR may designate.

7.4     FRANCHISEE agrees to notify FRANCHISOR promptly of any litigation instituted by FRANCHISEE, or by any person, firm or corporation against FRANCHISEE, relating to the Proprietary Marks. In the event FRANCHISOR undertakes the defense or prosecution of any such litigation, FRANCHISEE agrees to execute any and all documents and do such acts and things as may, in the opinion of counsel for FRANCHISOR, be necessary to carry out such defense or prosecution.

## Section 8. Restrictions on FRANCHISEE's Activities

8.0     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination (hereinafter called the "Post-Term Period"), neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall:

8.0.1     Divert or attempt to divert any business or customer of the Unit to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with FRANCHISOR's Proprietary Marks and System(s);

8.0.2     Directly or indirectly contest or aid in contesting the right of FRANCHISOR or any prospective franchisee of FRANCHISOR to obtain a building permit, zoning variance or other governmental approval required for the development of another location as a unit franchised by FRANCHISOR.; or

8.0.3     Except with respect to the ownership or operation of additional units under Franchises granted by FRANCHISOR, own, maintain, engage in, be employed by, or have any interest in any other business which sells or offers to sell the same or substantially similar products to the type FRANCHISOR requires to be offered by FRANCHISEE at the Unit; provided that, during the Post-Term Period only, the provisions of this paragraph 8.0.3 shall not apply to another business located more than five (5) miles from this or any other unit operating under the same Proprietary Marks of FRANCHISOR. Either party to this Agreement, upon notice in writing to the other during the Post-Term Period, shall have the right to have determined whether said five (5) mile radius is a reasonable restriction on FRANCHISEE's activities, by requesting that the matter be submitted to arbitration in accordance with Section 11 of this Agreement. In such event, the decision of the arbitrator shall be final and binding upon the parties. FRANCHISEE further agrees that, in the event arbitration is requested, FRANCHISEE will engage in no competitive activities pending resolution of the dispute.

8.1     During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination, neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall communicate or divulge to, or use for the benefit of any person, persons, partnership, association or corporation, any information or knowledge concerning the methods of constructing, equipping or operating units under any of FRANCHISOR's Systems and all other information or knowledge which FRANCHISOR deems confidential and which may be communicated to FRANCHISEE, or of which FRANCHISEE may be apprised by virtue of FRANCHISEE's operation under the terms of this Agreement. FRANCHISEE shall divulge such confidential information only to such of its employees as must have access to it in order to operate the franchised business. Any and all information, knowledge, and know-how including, without limitation, drawings, materials, specifications, techniques, and other data, which FRANCHISOR designates confidential shall be deemed confidential for purposes of this Agreement. FRANCHISOR shall have the non-exclusive right to use and incorporate into FRANCHISOR's Systems, for the benefit of itself and other of FRANCHISOR's franchisees licensees and distributors, all modifications, changes, and improvements developed or discovered by FRANCHISEE or FRANCHISEE's employees or agents in connection with the franchised business, without any liability or obligation to the developer thereof.

8.2     The covenants contained in this Section 8 shall be construed as severable and independent and shall be interpreted and applied consistently with the requirements of reasonableness and equity. If all or any portion of a covenant in this Section 8 is held unreasonable or unenforceable by a court, arbitration panel or other agency having valid jurisdiction in a decision to which FRANCHISOR is a party, FRANCHISEE expressly agrees to be bound by any lesser covenant included within the terms of such greater covenant that imposes the maximum duty permitted by law, as if the lesser covenant were separately stated in, and made a part of, this Section 8.

8.3     FRANCHISEE acknowledges that FRANCHISOR shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 8, or of any portion or portions thereof, without FRANCHISEE's consent, and FRANCHISEE agrees to comply forthwith with any covenant as modified.

-11-

-12-

## Section 9. Default

9.0    FRANCHISEE shall be in default under this Agreement:

9.0.1    If FRANCHISEE shall become insolvent or make an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by FRANCHISEE, or if such a petition is filed against and consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if FRANCHISEE is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of FRANCHISEE or other custodian for FRANCHISEE's business or assets is filed and is consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if a receiver or other custodian is appointed, or if proceedings for composition with creditors under any state or federal law should be instituted by or against FRANCHISEE, or if the real or personal property of FRANCHISEE shall be sold at levy thereupon by any sheriff, marshall or constable; or

9.0.2    If FRANCHISEE is convicted of or pleads guilty or "nolo contendere" to a felony, a crime involving moral turpitude, or any other crime or offense that FRANCHISOR believes is injurious to the System(s), the Proprietary Marks or the goodwill associated therewith, or if FRANCHISOR has proof that FRANCHISEE has committed such a felony, crime or offense; or

9.0.3    If FRANCHISEE permits the use of the Unit or Premises for any illegal or unauthorized purpose, including, without limitation, palming off or substitution of products under the Proprietary Marks or other marks of FRANCHISOR; or

9.0.4    If any other franchise agreement between FRANCHISEE and FRANCHISOR or any affiliated entity is terminated by reason of FRANCHISEE's default thereunder; or

9.0.5    If FRANCHISEE fails to pay, perform, observe or comply with any of FRANCHISEE's duties and obligations under this Agreement; or if FRANCHISEE fails to carry out in all respects its obligations under any Lease, mortgage, equipment Agreement, promissory note, conditional sales contract or other contract materially affecting the Unit, to which the FRANCHISEE is a party or by which FRANCHISEE is bound, whether or not FRANCHISOR is a party thereto.

9.1    <u>Thirty Day Cure Period.</u> Except as otherwise provided in this Section 9, FRANCHISEE shall have the right to cure FRANCHISEE's default under this Agreement within thirty (30) days after written notice of default from FRANCHISOR is delivered pursuant to paragraph 14 hereof.  Notwithstanding the foregoing, the following lesser periods shall apply under the circumstances described:

9.1.1    <u>Seven Day Cure Period.</u> A seven (7) day cure period shall apply if FRANCHISEE fails, refuses, or neglects to pay when due to FRANCHISOR any moneys owing to FRANCHISOR or to any Fund, or if FRANCHISEE fails to maintain the insurance coverage set forth in subsection 5.3 of this Agreement.

9.1.2    <u>24 Hour Cure Period.</u> A twenty-four (24) hour cure period shall apply as provided in paragraph 6.1.3 to the violation of any law, regulation, order or Standard of FRANCHISOR relating to health, sanitation or safety;  or if FRANCHISEE ceases to operate the Unit for a period of forty-eight (48) hours without the prior written consent of FRANCHISOR, provided, however, that if the Unit is abandoned, no cure period shall apply.

9.1.3    <u>Cure on Demand.</u> FRANCHISEE shall cure on demand all "hazardous situations" and remove and destroy on demand all "hazardous products" as set forth in paragraph 5.1.2.1 and shall cure any situation which poses an imminent risk to public health and safety as provided in subsection 6.1.

9.1.4    <u>No Cure Period.</u> No cure period shall be available if FRANCHISEE is in default under any paragraph designated 9.0.1 through 9.0.4 above; or if FRANCHISEE abandons the Unit; or if FRANCHISEE intentionally under-reports Gross sales, falsifies financial data or otherwise commits an act of fraud with respect to FRANCHISEE's acquisition of this Franchise or its rights or obligations under this Agreement; or if FRANCHISEE's Lease for the Unit is terminated due to FRANCHISEE's default thereunder.  In addition, no cure period shall be available for any default if FRANCHISEE has received three (3) or more previous notices-to-cure for the same or a substantially similar default (whether or not FRANCHISEE has cured the same), within the immediately preceding twelve (12) month period.

9.2    <u>Statutory Cure Period.</u> If a statute in the state in which the Premises is located requires a cure period for the applicable default which is longer than any cure period specified in this Section 9, the statutory cure period shall apply.

9.3    <u>Late Fee, Interest and Costs.</u> If FRANCHISEE fails to cure a default within any applicable time period following notice set forth in subsection 9.1, or if this Agreement is terminated as a result of FRANCHISEE's default, FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, without limitation, late fees, collection fees, interest at one and one-half percent (1.5%) per month, or the highest permissible rate, and reasonable investigation and attorneys' fees incurred by FRANCHISOR as a result of any such default or termination.  All such interest, damages, costs and expenses may be included in and form part of the judgment awarded to FRANCHISOR in any proceedings brought by FRANCHISOR against FRANCHISEE.

9.4    <u>Termination.</u> If FRANCHISEE fails to cure any default within the applicable period following notice from FRANCHISOR, FRANCHISOR may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement.  Such termination shall be effective immediately upon receipt of a written notice of termination from FRANCHISOR.  Notwithstanding the foregoing, this Agreement shall immediately terminate upon the occurrence of any event set forth in paragraphs 9.0.1 through 9.0.4 or paragraph 9.1.4, without notice or opportunity to cure or notice of termination.  Upon any termination or expiration of this Agreement all right of FRANCHISEE to use the Proprietary Marks and the System(s) and to operate the Unit under the Proprietary Marks shall terminate and:

*General Terms and Conditions*

9.4.1    FRANCHISEE shall promptly pay FRANCHISOR all sums owing or accrued from FRANCHISEE to FRANCHISOR, the Fund, and any affiliated landlord entity, including interest and any damages, costs and expenses, including reasonable attorneys' fees, incurred by FRANCHISOR by reason of default on the part of FRANCHISEE; and

9.4.2    FRANCHISEE shall immediately cease to operate the Unit, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former FRANCHISEE of FRANCHISOR; and

9.4.3    FRANCHISEE shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, any feature or method associated with the System(s), any or all of the Proprietary Marks and any other trade secrets, confidential information, operating manuals, slogans, trade dress, signs, symbols or devices which are part of FRANCHISOR's System(s) or are otherwise used in connection with the operation of the Unit. FRANCHISEE agrees that any such unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm. Continued use by FRANCHISEE of FRANCHISOR's trademarks, trade names, Proprietary Marks, and service marks after termination of this Agreement shall constitute willful trademark infringement by FRANCHISEE; and

9.4.4    FRANCHISEE shall immediately return to FRANCHISOR all operating manuals, plans, specifications, and other materials in FRANCHISEE's possession containing information prepared by FRANCHISOR and relative to the operation of the Unit, and all copies thereof (all of which are acknowledged to be FRANCHISOR's property), and shall retain no copy or record of any of the foregoing, except FRANCHISEE's copy of this Agreement, any correspondence between the parties, and any other documents which FRANCHISEE reasonably needs for compliance with any provision of law; and

9.4.5    FRANCHISEE shall remove from the Premises and from any equipment, signs, trade fixtures, furnishings and other personal property (except as provided in paragraph 9.4.6 below) and return to FRANCHISOR, all of the Proprietary Marks or other indicia of FRANCHISOR, and shall disconnect, withdraw and/or terminate, within five (5) days after termination or expiration of this Agreement, any telephone listings and/or fictitious name registration containing any part of the Proprietary Marks. Upon FRANCHISOR's written demand, however, FRANCHISEE shall assign to FRANCHISOR, upon any termination, expiration or non-renewal of this Agreement, any telephone number used in the operation of the Unit if such number is listed in the directory using any of the Proprietary Marks. FRANCHISEE hereby appoints FRANCHISOR as its attorney-in-fact, in the name of FRANCHISEE, to do any act necessary to effect the intent of this paragraph; and

9.4.6.    FRANCHISEE shall, but only in the case of any early termination of this Agreement due to FRANCHISEE's default, sell to FRANCHISOR, at FRANCHISOR's election, any or all of the equipment, interior and exterior signs, trade fixtures, furnishings and other personal property of FRANCHISEE used in connection with the Unit (hereinafter collectively "Equipment"), at the purchase cost when originally installed in the Unit, less a depreciation deduction computed on a straight line basis over a ten (10) year useful life for the respective items (but in no event less than ten percent (10%) of the original purchase cost for such equipment, fixtures and furnishings). If FRANCHISEE owes a balance due on its purchase or financing of such Equipment, or if the same are otherwise subject to a lien or claim for any indebtedness, the amounts of such balance and/or indebtedness shall be deducted from the purchase price payable to FRANCHISEE. All sums of money due FRANCHISOR by FRANCHISEE may be offset against the purchase price payable to FRANCHISEE. Nothing contained herein, however, shall be construed to entitle FRANCHISEE to be released from liability for such unpaid balance or indebtedness, if any, in excess of the portion of the purchase price applied for payment of such debts; and

9.4.7    FRANCHISEE shall, at FRANCHISOR's option by notice to FRANCHISOR within thirty (30) days from the date of termination or expiration, assign to FRANCHISOR any interest which FRANCHISEE has in the Lease or any other Agreement related to the Premises. If FRANCHISOR does not elect to exercise its option to acquire the Lease, FRANCHISEE shall make such modifications or alterations to the Premises immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of the Premises from that of other units in the System(s), and shall make such specific additional changes thereto as FRANCHISOR may reasonably require for that purpose. In the event FRANCHISEE fails or refuses to comply with the requirements of this paragraph 9.4.7, FRANCHISOR shall have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making such changes as may be required, at the expense of FRANCHISEE, which expense FRANCHISEE agrees to pay upon demand; and

9.4.8    FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, but not limited to, reasonable investigation and attorney's fees and other reasonable expenses and costs such as travel costs and payroll expenses for FRANCHISOR's employees, incurred in obtaining injunctive or other relief for the enforcement of any provisions of this Section 9; and

9.4.9    FRANCHISEE shall continue to comply with Section 8 of this Agreement, for the Post-Term Period specified therein. If FRANCHISEE begins to operate any other business wherever situated, FRANCHISEE shall not use, in connection with such other business or the promotion thereof, any reproduction, counterfeit, copy or colorable imitation of any of FRANCHISOR's Proprietary Marks or trade dress; and FRANCHISEE shall not utilize any designation of origin or description or representation which falsely suggests or represent an association or connection with FRANCHISOR whether or not constituting unfair competition.

9.5    Nothing in this Agreement shall preclude FRANCHISOR from seeking any remedy under federal or state law for willful trademark infringement, including, without limitation, injunctive relief. No right or remedy herein conferred upon or reserved to FRANCHISOR is exclusive of any other right or remedy herein, or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy given hereunder. FRANCHISEE agrees that the existence of any claims against FRANCHISOR, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by FRANCHISOR of any provision of this Agreement.

-13-

-14-

9.6     Because the Unit is one of many units within the System(s) that sell similar products and services to the public, FRANCHISEE agrees that its failure to comply with the terms of this Agreement would cause irreparable damage to FRANCHISOR and the System(s) as a whole for which no adequate remedy at law may be available, including, without limitation, violations of standards, unhealthy, unsafe or unsanitary conditions, unauthorized use of the Proprietary Marks and breaches under Section 8 hereof. In the event of FRANCHISEE's breach or threatened breach of any of the terms of this Agreement, FRANCHISOR shall therefore be forthwith entitled to an injunction restraining such breach and/or to a decree of specific performance, without showing or proving any actual damage or irreparable harm or lack of an adequate remedy at law, and without the requirement for the posting of bond, the same being hereby waived by FRANCHISEE, until a final determination is made by a court of competent jurisdiction. The foregoing remedy shall be in addition to all other remedies or rights which FRANCHISOR might otherwise have by virtue of any breach of this Agreement by FRANCHISEE.

## Section 10.  Transfer Provisions

10.0     **Transfer By FRANCHISOR.**  This Agreement shall inure to the benefit of the successors and assigns of FRANCHISOR either individually or collectively. FRANCHISOR shall each have the right to assign its rights under this Agreement to any person, persons, partnership, association or corporation, provided that the transferee agrees in writing to assume all obligations undertaken by FRANCHISOR herein and FRANCHISEE receives a statement from both FRANCHISOR and its transferee to that effect. Upon such assignment and assumption, FRANCHISOR shall be under no further obligation hereunder except for accrued liabilities if any.

10.0.1     If this Agreement now or hereafter grants FRANCHISEE rights with respect to more than one (1) brand, FRANCHISOR shall have the right, at any time and from time to time, to require FRANCHISEE to execute and deliver separate contracts for each brand, each containing all of the terms of this Agreement pertaining to such brand. FRANCHISEE agrees to execute and return such replacement contracts to FRANCHISOR within thirty (30) days after receipt thereof. If FRANCHISEE fails to do so, FRANCHISOR shall have the right to execute such instruments on FRANCHISEE's behalf and deliver a copy thereof to FRANCHISEE.

10.1     **Transfer By FRANCHISEE.**  FRANCHISEE understands and acknowledges that the rights and duties set forth in this Agreement are personal to FRANCHISEE and that FRANCHISOR has granted the Franchise in reliance on the business skill and experience, financial capacity and personal character of FRANCHISEE. Except as hereinafter provided, neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any member, if FRANCHISEE is a limited liability company ("LLC"), nor any shareholder, if FRANCHISEE is a corporation, without FRANCHISOR's prior written consent, shall, by operation of law or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association, LLC or corporation, any interest in this Agreement, or any interest in the franchise granted hereby, or any interest in any proprietorship, partnership, LLC or corporation which owns any interest in the franchise, nor offer, permit or suffer the same. Any purported assignment or transfer not having the prior written consent of FRANCHISOR shall be null and void and shall constitute default hereunder. Any proposed transfer must meet all the requirements of FRANCHISOR including, but not limited to, those set forth in this Section 10.

10.2     **Consent By FRANCHISOR.**  FRANCHISOR shall not unreasonably withhold its consent to any transfer referred to in paragraph 10.1 above, provided, that:

10.2.1     FRANCHISEE must have operated the Unit for a period of not less than six (6) months prior to the proposed transfer;

10.2.2     The sales price of the interest to be conveyed must not be so high, or the terms of sale so onerous, that, in the judgment of FRANCHISOR, the transferee will be unlikely to properly maintain, operate and promote the Unit and meet the transferee's financial and other obligations to FRANCHISOR, third party suppliers and creditors. This provision shall not create any liability to either transferor or transferee on the part of FRANCHISOR, in the event that FRANCHISOR approves the transfer and the transferee experiences financial difficulties;

10.2.3     The transferee and each partner, shareholder or member of the transferee, as the case may be, must be a United States citizen or lawful resident alien of the United States, must be of good moral character and reputation and must have a good credit rating and business qualifications and aptitude reasonably acceptable to FRANCHISOR. Such qualifications include, without limitation, literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to communicate with employees, customers, and suppliers of FRANCHISOR and to satisfactorily complete FRANCHISOR's required training program and such other tests and interviews as FRANCHISOR shall reasonably deem to be necessary or desirable. FRANCHISEE shall provide FRANCHISOR with such information as FRANCHISOR may require to make a determination concerning each proposed transferee; and

10.2.4     The transferee may not be a limited partnership, trust or other entity not specifically authorized herein.

10.3     **Transfer Requirements.**  Each transfer of any interest in FRANCHISEE, the Unit, this Agreement and/or the Franchise herein granted, must receive the prior written consent of FRANCHISOR set forth in subsection 10.2 above and must conform to and/or comply with the following requirements:

10.3.1     Prior to the transfer, FRANCHISEE must pay and satisfy all accrued money obligations to FRANCHISOR, its affiliates and/or subsidiaries and to any Fund, obligations of FRANCHISEE which FRANCHISOR has guaranteed, liens, deferred rent and other obligations under the Lease for the Unit or other contracts pertaining to the Unit and the transfer fee provided below, as applicable;

*General Terms and Conditions*

10.3.2  Prior to the transfer, the Unit, including equipment, signs, building, improvements, interior and exterior, must be in good operating condition and repair and in compliance with FRANCHISOR's then-current Standards, including, without limitation, Standards for replacements and additions;

10.3.3  FRANCHISEE and any transferor may not assert any security interest, lien, claim or right now or hereafter in this Franchise, the Franchise granted to the transferee, or, if applicable, the Lease for the Unit with FRANCHISOR or its affiliated landlord entity. Any security interest, lien, claim or right asserted with respect to any personal property at the above location shall not include any after-acquired property and shall be subject, junior and subordinate to any security interest, lien, claim or right now or hereafter asserted by FRANCHISOR, its successors or assigns;

10.3.4  Prior to the transfer, the transferee must comply with the requirements of paragraph 5.1.8 of this Agreement, to the satisfaction of FRANCHISOR;

10.3.5  If the transferee is a corporation or LLC, it must comply with the terms of subsection 5.7 of this Agreement;

10.3.6  The transferee, including, where appropriate, all shareholders, members and partners of the transferee, shall jointly and severally execute, on FRANCHISOR's then-current forms, a franchise agreement and all other standard ancillary agreements, including, without limitation, a priority in payment agreement, if applicable. The priority in payment agreement provides, among other things, that if the transferee is unable at any time to make payments both to the transferor for the purchase of the Unit and to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s), payments to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s) will have priority. The transferee's franchise agreement shall not increase any fee based upon a percentage(s) of Gross Sales to a percentage greater than as required by this Agreement for the respective System(s). Unless a longer period is agreed upon between FRANCHISOR and the transferee, the term of the transferee's franchise agreement shall be for the unexpired term of this Agreement. The transferee shall pay no franchise fee pursuant to paragraph 4.1 of this Agreement unless a longer term is agreed upon by FRANCHISOR;

10.3.7  FRANCHISEE, including all individuals proposing to transfer an interest in the Franchise or the FRANCHISEE, must execute, on FRANCHISOR's standard form, a general release of all claims against the FRANCHISOR corporations, their affiliated corporations, and the directors, officers and employees of each; and

10.3.8  In addition, FRANCHISOR shall have the right to promulgate and enforce such additional reasonable requirements as it may, in its sole judgment determine.

10.4     **Transfer Fee.**  The transferor shall pay to FRANCHISOR upon any transfer of any interest of FRANCHISEE in this Agreement or of any interest in the FRANCHISEE entity, a Transfer Fee determined as follows:

10.4.1  **Prior to FRANCHISEE's Fourth Year of Operations.**  The transferor shall pay to FRANCHISOR a Transfer Fee which is the greater of: (i) five thousand dollars ($5,000.00), increased by five percent (5%) compounded annually during the term FRANCHISEE has operated the Unit under this or other agreements with FRANCHISOR; or (ii) five percent (5%) of the Adjusted Sales Price of the Unit.

10.4.1.1  The term "Adjusted Sales Price" shall mean the sales price to be received by FRANCHISEE upon transfer of the Unit, less the amount, if any, paid by FRANCHISEE for the Unit, when purchased as an ongoing business from another franchisee or from FRANCHISOR. No adjustment shall be made for amounts paid in connection with the development of a new unit. The Adjusted Sales Price shall include, without limitation, cash, assumption of debt, equipment lease obligations and deferred financing and amounts allocated to property of every kind, nature and description: furniture, fixtures, signs, equipment, supplies and inventory; excluding only amounts reasonably allocated to land and building, if owned by FRANCHISEE. It is intended that all consideration to be paid to FRANCHISEE, or for the benefit of FRANCHISEE, however designated and whether or not included in the contract of sale shall be deemed part of the Adjusted Sales Price including, but not by way of limitation, amounts allocated to a covenant not to compete or personal service agreement.

10.4.1.2  For purposes of determining the correct Transfer Fee, FRANCHISOR reserves the right to reallocate amounts which FRANCHISEE and the transferee have allocated to land, building, equipment, covenant against competition, personal service agreement, or otherwise, if in FRANCHISOR's opinion, the allocation of the parties is unreasonable in relation to the value of the business. If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.2  **From and After FRANCHISEE's Fourth Year of Operations.**  If the transfer takes place after the commencement of FRANCHISEE's fourth year of operations, the transferor shall pay to FRANCHISOR the Transfer Fee indicated below based on the Unit's Gross Sales for the most recently completed twelve (12) calendar month period preceding the date of the contract of sale. FRANCHISOR reserves the right to select another period or to make appropriate adjustments to such Gross Sales in the event extraordinary occurrences (e.g., road construction, fire or other casualty, etc.) materially affected Unit sales during the indicated twelve (12) month period.

| Sales for Most Recent 12 Month Period | Transfer Fee |
|---|---|
| Less than $400,000.00 | $5,000.00 |
| $400,000.00 or more, but less than $600,000.00 | $6,000.00 |
| $600,000.00 or more, but less than $1,000,000.00 | $8,000.00 |
| $1,000,000.00 or more, but less than $1,400,000.00 | $12,000.00 |
| $1,400,000.00 or more | $20,000.00 |

-15-

*General Terms and Conditions*

-16-

10.4.3   If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.4   **Transfer of Less Than Control.**  For any transfer that, either alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, will have the result of the transferee(s) holding an aggregate interest of less than fifty percent (50%) of the franchise licensed herein or the entity licensed hereunder, FRANCHISOR will reduce the Transfer Fee set forth in paragraph 10.4.1 or 10.4.2, as applicable, to a fixed transfer documentation fee of five hundred dollars ($500.00), increased after each five (5) years of the term of this Agreement, including any renewal period, by the same percentage as the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the same period.  FRANCHISOR will waive the Transfer Fee entirely with respect to a transfer of less than control, if each transferee was an approved party to (or personal guarantor of) this Agreement prior to transfer.

10.4.5   **Transfer to Spouse or Children.**  Notwithstanding anything else contained in this subsection 10.4, but provided that FRANCHISOR determines that FRANCHISEE has been in full compliance with the terms of all agreements with FRANCHISOR and its affiliates, the Transfer Fee due in connection with a transfer of the Unit to FRANCHISEE's spouse or one or more of FRANCHISEE's children shall be the fixed transfer documentation fee described in paragraph 10.4.4 above.  The franchise agreement issued to the spouse and/or children will be on the then-current form in use at the time of transfer including the then-current Transfer Fee provisions.

10.5    **Release of Transferor.**  Upon FRANCHISOR's approval of the transfer and FRANCHISEE's compliance with the aforesaid conditions, the transferor shall, provided that the transferor no longer has an interest in the Franchise, thereupon be relieved of further obligations under the terms of this Agreement, except that the transferor shall remain obligated for FRANCHISEE's money obligations under Section 4 through the date of transfer, and under the covenants contained in Section 8 for the Post Term Period therein described, after the date of transfer.

10.6    **Transfer on Death, Disability or Incapacity.**  In the event of the death, disability or mental incapacity of FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, at any time during the term of this Agreement, the legal representative of the deceased, disabled or incapacitated party, as the case may be, together with all surviving partners, members or shareholders of FRANCHISEE, if any, shall, within six (6) months of such death, disability or mental incapacity, jointly apply, in writing to transfer the Franchise or the interest of the affected party in such Franchise, to such person or persons as the legal representative may specify.  Such transfer shall be approved by FRANCHISOR upon fulfillment of all of the conditions set forth in Section 10 of this Agreement.  A Transfer Fee shall be due pursuant to subsection 10.4 above, except that paragraph 10.4.5 shall apply if the transferee is a beneficiary or heir of FRANCHISEE.

10.6.1   If the legal representative and all surviving partners, members or shareholders, if any, do not propose a transferee acceptable to FRANCHISOR under the standards set forth in this Agreement within the period set forth in paragraph 10.6 above, or if no transfer of the interest shall have been accomplished consistent with the provisions of this Section 10 within one (1) year from the date of death, disability or mental incapacity, all rights licensed to FRANCHISEE under this Agreement shall terminate forthwith and automatically revert to FRANCHISOR.  FRANCHISOR shall have the right and option, exercisable under such termination, to purchase all furniture, fixtures, signs, equipment and other chattels at a price to be agreed upon by the parties or, if no agreement as to price is reached by the parties, at such price as may be determined by a qualified appraiser, approved by both parties, such approval not to be unreasonably withheld.  FRANCHISOR shall give notice of its intent to exercise said option no later than twenty-one (21) days prior to termination.

10.6.2   If the deceased, disabled or incapacitated party is the Designated Representative, then during the interim period until a transfer of the interest under this subsection 10.6 has taken place, the legal representative and surviving partners, members or shareholders shall operate the Unit through a successor Designated Representative who shall possess such qualifications for interim management of the Unit as FRANCHISOR may determine, in its discretion, from time to time.  Failure of FRANCHISEE or the legal representative to appoint a Designated Representative so qualified within ninety (90) days after the date of death, disability or mental incapacity of the Designated Representative shall be grounds for FRANCHISOR to terminate this Agreement after sending FRANCHISEE a thirty (30) day written notice to cure.

10.6.3   FRANCHISOR shall have the right to require a certified copy of an order of a court of competent jurisdiction over the estate of the deceased or incapacitated person, in which the legal representative or heir or legatee shall be determined, and may rely on such certified copy for the purposes of subsection 10.6.  If not furnished with such certified copy of a court order, or in the event of a legal contest, FRANCHISOR may decline, without liability, to recognize the claim of a party to such interest.  FRANCHISOR shall not be liable to any heir, next of kin, devisee, legatee, or legal representatives of a deceased or incapacitated person by reason of approval of a transfer of the interest to the surviving spouse or a child of the deceased, provided such approval is not contrary to an order of a court of competent jurisdiction served on FRANCHISOR.

10.7    **Right of First Refusal.**  If FRANCHISEE, or any shareholder, member or partner thereof, has received and desires to accept a signed, bona fide written offer from a third party to purchase FRANCHISEE's rights under this Agreement or any shareholder's, member's or partner's interest in the franchised business, FRANCHISEE or such shareholder, member or partner shall notify FRANCHISOR and provide it with a complete copy of such offer.  FRANCHISOR shall have the right and option, exercisable within sixty (60) days after its receipt of said copy, to purchase or assume and assign without recourse to a third party FRANCHISEE's Franchise, or such shareholder's, member's or partner's interest in the franchised business, on the same terms and conditions as offered by said third party.  FRANCHISOR's exercise of its rights hereunder shall not relieve FRANCHISEE of its Transfer Fee obligation to FRANCHISOR.  Should FRANCHISOR not exercise this option and the terms of the unaccepted offer be altered, FRANCHISOR shall, in each such instance, be notified of the changed offer and shall again have sixty (60) days to exercise its right to purchase on the altered terms.  Should FRANCHISOR not exercise this option, all of the terms of Section 10 shall apply to the transfer.

## Section 11. Arbitration.

11.0    Except as otherwise specified in this Section 11, all controversies, claims or disputes between FRANCHISEE and FRANCHISOR of whatever kind or nature, whether arising out of or relating to the negotiation, performance or breach of this or any other agreement or otherwise, must be settled by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, as herein modified. This provision encompasses all causes of action, whether nominally a "claim", "counterclaim" or "cross-claim", and whether arising under common law or any state or federal statute. As used in this Section 11, the terms "FRANCHISOR" and "FRANCHISEE" include, without limitation, the past and present employees, agents, representatives, officers, directors, shareholders, members, guarantors, sureties, parent corporations, subsidiary corporations, controlled affiliated entities, predecessors, successors and/or assigns of each party hereto. The parties intend that this provision be given the broadest possible interpretation by a court of law.

11.1    **Eligibility and Procedures.** Arbitration must be initiated within the lesser of the time periods (a) set forth in paragraph 11.7.5 below or (b) permitted under the applicable statute of limitations for the cause of action asserted. Any claim, controversy or dispute which is not so initiated within said lesser period shall not be eligible for arbitration under any circumstances. Arbitration shall be initiated as provided in the Rules of the AAA by the filing of a demand for arbitration with the regional office of the AAA located in the city and state inserted in Item "L" of the Contract Data Schedule of this agreement. If no location is inserted in Item "L" or if such insertion is incomplete or inaccurate, Boston, Massachusetts, shall be deemed to apply. The arbitration proceedings, including without limitation all conferences, preliminary and dispositive hearings shall be conducted in such city and state unless all parties agree to another venue. Actions to enforce an express obligation to pay moneys may be brought under the Expedited Procedures of the AAA's Commercial Arbitration Rules, provided there are no counterclaims. The arbitrator(s) may issue such orders for interim relief as may be deemed necessary to safeguard the rights of the parties during the arbitration, but without prejudice to the ultimate rights of the parties, to the final determination of the dispute or to the rights of the FRANCHISOR to seek equitable relief from a court of competent jurisdiction at any time, even during the pendency of any arbitration proceedings initiated hereunder.

11.2    **Enforceability and Effect.** Judgment on the award, including, without limitation, any interim award for interim relief, rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The binding or preclusive effect of any award shall be limited to the actual dispute or claim arbitrated, and to the parties, and will have no collateral effect on any other dispute or claim of any kind whatsoever.

11.3    **Governing Law.** The Federal Arbitration Act and related federal judicial procedure shall govern this contract to the fullest extent possible, excluding all state arbitration law, irrespective of the location of the arbitration proceedings, the nature of the dispute between the parties or the nature of the court in which any related judicial proceedings may be brought. Except as provided in the preceding sentence respecting arbitration law, the resolution of all disputes between the parties bound hereunder, whether in tort and regardless of the place of injury or the place of the alleged wrongdoing or whether arising out of or relating to the parties' contractual relationship, shall be governed by the law of the Commonwealth of Massachusetts without regard to choice of law principles.

11.4    **Exceptions to Arbitration.** Disputes concerning the validity or scope of this Section 11 (arbitration), including, without limitation, whether a dispute is arbitrable hereunder, shall be beyond the authority of the arbitrator(s) and shall be determined by a court of competent jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. §1 et seq., as amended from time to time. In addition, the causes of action specified in the following subsections 11.5 and 11.6 are the sole and exclusive exceptions to the agreement of the parties hereto to resolve disputes through arbitration:

11.5    **FRANCHISOR's Exceptions.** FRANCHISOR shall have the option to litigate any one or more of the causes of action specified in this subsection 11.5 and shall exercise said option by filing a complaint in any court of competent jurisdiction:

11.5.1   the enforcement of an obligation to pay money to FRANCHISOR under an express term of any agreement;

11.5.2   any action based upon an allegation of intentional underreporting of Gross Sales by FRANCHISEE;

11.5.3   any action for declaratory or equitable relief, including, without limitation, seeking of preliminary and/or permanent injunctive relief, specific performance, other relief in the nature of equity or any action at law for damage to FRANCHISOR's property or property interests or in equity to enjoin any harm or threat of harm to FRANCHISOR's goodwill, Proprietary Marks or its tangible or other intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder;

11.5.4   any action seeking to terminate this Agreement based upon FRANCHISEE's material breach of paragraph 5.1.7 of this Agreement (excluding subparagraph 5.1.7.1); or

11.5.5   any action in ejectment or for possession of any interest in real or personal property.

11.6    **FRANCHISEE's Exceptions.** FRANCHISEE shall have the option to litigate any cause of action otherwise eligible for arbitration hereunder and shall exercise said option solely by filing a complaint in any court of competent jurisdiction in which FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. If any such complaint fails to include such express waivers or if any such court of competent jurisdiction determines that all or any part of such waivers shall be ineffective or void for any reason whatsoever, then the parties agree that the action shall thereupon be dismissed without prejudice, leaving the parties to their arbitration remedies, if then available pursuant to this Section 11.

-17-

11.6.1  In the event FRANCHISOR litigates any cause of action pursuant to subsection 11.5 above, FRANCHISEE shall not file any counterclaim, cross-claim, offset claim or the like against FRANCHISOR in the litigation, unless FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. Otherwise, FRANCHISEE shall submit each such counterclaim, cross-claim, offset claim or the like to arbitration, if then available pursuant to this Section 11.

11.7   **Waiver of Rights.**  THE PARTIES HERETO AND EACH OF THEM KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AGREE AS FOLLOWS:

11.7.1 The parties hereto and each of them EXPRESSLY WAIVE(S) THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY; and

11.7.2.  The parties hereto and each of them EXPRESSLY WAIVE(S) ANY CLAIM FOR PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES, except that FRANCHISOR shall be free at any time hereunder to bring an action for willful trademark infringement and, if successful, to receive an award of multiple damages as provided by law; and

11.7.3   The parties hereto and each of them EXPRESSLY AGREE(S) THAT NO PARTY BOUND HEREBY MAY RECOVER DAMAGES FOR ECONOMIC LOSS ATTRIBUTABLE TO NEGLIGENT ACTS OR OMISSIONS EXCEPT FOR CONDUCT WHICH IS DETERMINED TO CONSTITUTE GROSS NEGLIGENCE OR AN INTENTIONAL WRONG; and

11.7.4 The parties hereto and each of them EXPRESSLY AGREES THAT IN THE EVENT OF ANY FINAL ADJUDICATION OR APPLICABLE ENACTMENT OF LAW THAT PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES MAY NOT BE WAIVED, ANY RECOVERY BY ANY PARTY IN ANY FORUM SHALL NEVER EXCEED TWO (2) TIMES ACTUAL DAMAGES, except for an award of multiple damages to FRANCHISOR for willful trademark infringement, as provided by law.

11.7.5   ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE AND FRANCHISOR OR FRANCHISEE'S OPERATION OF THE UNIT, BROUGHT IN ANY FORUM BY ANY PARTY HERETO AGAINST THE OTHER, MUST BE COMMENCED WITHIN TWO (2) YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED, EXCEPT FOR FINANCIAL OBLIGATIONS OF FRANCHISEE.

11.8   **No Class Actions.**  No party shall initiate or participate in any class action litigation claim against any other party bound hereby, except that FRANCHISEE may initiate or participate in any class action arbitration claim by franchisees of FRANCHISOR against FRANCHISOR limited exclusively to alleged misappropriation of moneys from the Fund of any System authorized by this Agreement, which claim must be brought only in arbitration under the provisions of this Section 11.

11.9   **Post-Term Applicability.**  The provisions of this Section 11 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement, however effected.

## Miscellaneous Provisions.

12.0   **Relationship of the Parties.**  This Agreement does not constitute FRANCHISEE an agent, legal representative, joint venturer, partner, employee or servant of FRANCHISOR or its affiliated corporation for any purpose whatsoever; and it is deemed understood between the parties hereto that FRANCHISEE shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of FRANCHISOR or its affiliated corporation or to create any obligation, express or implied, on behalf of FRANCHISOR or its affiliated corporation. The parties agree that this Agreement does not create a fiduciary relationship between FRANCHISOR or its affiliated corporation and FRANCHISEE.

12.1   Under no circumstances shall FRANCHISOR or FRANCHISEE be liable for any act, omission, debt or other obligation of the other party. Each party shall indemnify, protect, defend and save the other party harmless against any such claim. The cost of defending against any claim arising directly or indirectly from, or as a result of, or in connection with FRANCHISEE's operation of the Unit shall be borne by FRANCHISEE.

13.0   **Non-Waiver.**  Any failure of FRANCHISOR to exercise any power reserved to it hereunder, or to insist upon strict compliance by FRANCHISEE with any term, covenant or condition in this Agreement, and any waiver by FRANCHISOR of any breach of a term, covenant or condition shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition in this Agreement. Subsequent acceptance by FRANCHISOR of the payments due to it hereunder, in whole or in part, shall not be deemed to be a waiver by FRANCHISOR of any preceding breach by FRANCHISEE of any term, covenant or condition of this Agreement. FRANCHISOR may, in its sole discretion, waive or modify any obligation of other franchisees under agreements similar to this Agreement, and no such waiver or modification shall obligate FRANCHISOR to grant a similar waiver or modification to FRANCHISEE. Acceptance by FRANCHISOR of payments due under this Agreement from any other person or entity shall be deemed to be acceptance from such person or entity as an agent of FRANCHISEE and not as recognition of such person or entity as an assignee of or successor to FRANCHISEE.

14.0   **Notices.**  All notices hereunder by FRANCHISOR to FRANCHISEE shall, at FRANCHISOR's option, be personally delivered or sent by telecopier, prepaid private courier or certified mail to the FRANCHISEE at the address set forth in Item "I" of the Contract Data Schedule of this Agreement or to such other address as FRANCHISEE may from

time to time give notice of to FRANCHISOR. If delivery is refused, proof of attempted delivery shall be deemed delivery. All notices hereunder by FRANCHISEE to FRANCHISOR shall be sent by certified mail to FRANCHISOR at 130 Royall Street, Canton, MA 02021, Attention: Senior Vice President and General Counsel or to such other address as FRANCHISOR may from time to time give notice to FRANCHISEE by email, regular mail or any other means set forth above.

15.0    **Entire Agreement.** This Agreement, and the documents referred to herein shall be the entire, full and complete agreement between FRANCHISOR and FRANCHISEE concerning the subject matter hereof, and supersedes all prior agreements, no other representation having induced FRANCHISEE to execute this Agreement; and there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein, which are of any force or effect with reference to this Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing. Captions, paragraph designations and section or subsection headings are included in this Agreement for convenience only, and in no way define, limit, construe or describe the scope or intent of the respective parts of this Agreement. The Special Terms and Conditions attached to this Agreement supplement the General Terms and Conditions and are intended to be additional thereto. In the event of any conflict between any provisions thereof, the provisions of the Special Terms and Conditions shall be deemed to prevail.

16.0    **Severability.** Each section, part, term and provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation of a court or agency having valid jurisdiction, such shall not impair the operation or affect the remaining portions, sections, parts, terms or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid section, part, term or provision shall be deemed not to be a part of this Agreement.

17.0    **Applicable Law.** This Agreement shall be deemed to have been made in, and shall be interpreted, construed and governed by the laws of, the Commonwealth of Massachusetts. FRANCHISEE acknowledges that this Agreement is to be performed in part through services rendered to FRANCHISEE in Massachusetts.

18.0    **Independent Investigation.**    THE PROSPECT FOR SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE BY VIRTUE OF THIS AGREEMENT IS SPECULATIVE AND DEPENDS TO A MATERIAL EXTENT UPON FRANCHISEE'S CAPABILITY AS AN INDEPENDENT BUSINESS PERSON AND FRANCHISEE, AS WELL AS OTHER FACTORS.    FRANCHISOR MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE POTENTIAL SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE HEREBY. FRANCHISEE REPRESENTS AND WARRANTS THAT IT HAS ENTERED INTO THIS AGREEMENT AFTER MAKING INDEPENDENT INVESTIGATIONS OF FRANCHISOR'S BUSINESS, AND NOT IN RELIANCE UPON ANY REPRESENTATION BY FRANCHISOR AS TO SALES OR PROFITS WHICH FRANCHISEE IN PARTICULAR MIGHT BE EXPECTED TO REALIZE. FRANCHISEE FURTHER REPRESENTS AND WARRANTS THAT FRANCHISOR AND ITS REPRESENTATIVES, EMPLOYEES OR AGENTS HAVE MADE NO REPRESENTATIONS TO INDUCE FRANCHISEE TO ACQUIRE THIS FRANCHISE AND EXECUTE THIS AGREEMENT WHICH ARE NOT EXPRESSLY SET FORTH HEREIN OR IN THE DISCLOSURE MATERIALS PROVIDED TO FRANCHISEE PRIOR TO ENTERING INTO THIS AGREEMENT.

19.0    FRANCHISEE acknowledges receiving a copy of this Agreement, the attachments thereto, and agreements relating thereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. FRANCHISEE further acknowledges receiving, on the date of the first personal meeting between FRANCHISOR and FRANCHISEE and not less than ten (10) business days prior to the date on which this Agreement was executed, the disclosure documents required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures".

*General Terms and Conditions*

**SCHEDULE "DD"**
120104

### SPECIAL TERMS AND CONDITIONS APPLICABLE TO A
### DUNKIN' DONUTS FRANCHISE

In connection with its business and the business of its Dunkin' Donuts franchisees, DUNKIN' DONUTS has developed and used and continues to use and control the usage of certain proprietary interests, trademarks, logos, emblems and other indicia of origin, service marks and trade names, including *Dunkin' Donuts*®, which is registered as a trademark on the Principal Register of the United States Patent and Trademark Office (the "Proprietary Marks"), to identify for the public the source of goods and services marketed thereunder and to represent to the public high and uniform standards of quality, cleanliness, appearance and service.

FRANCHISEE, being cognizant of the distinctive and valuable significance to the public of all of the foregoing, desires to make use of the trademark *Dunkin' Donuts*®, and to enjoy the benefits of that mark, the other Proprietary Marks and the Dunkin' Donuts System. FRANCHISEE understands the importance of FRANCHISOR's high and uniform standards of quality, cleanliness, appearance and service to the value of the Dunkin' Donuts System and the necessity of opening and operating FRANCHISEE's Dunkin' Donuts Unit in conformity with the Dunkin' Donuts System and in accordance with FRANCHISOR's Standards and specifications.

### DEFINITIONS

As used in these Special Terms and Conditions applicable to a Dunkin' Donuts Franchise, the following defined terms shall have the following meanings:

A.   The "Dunkin' Donuts Unit" means all or a portion of the Premises dedicated to the operation of the Dunkin' Donuts System, as approved by FRANCHISOR.

B.   "Dunkin' Donuts Products" shall mean and refer to donuts, bagels, muffins, cookies and other baked goods, sandwiches, coffee, soda, frozen drinks and other beverages, all of a variety of kinds or flavors, made in accordance with specifications designated by FRANCHISOR and identified by the Dunkin' Donuts Proprietary Marks, and such other products as may be specified from time to time in writing by FRANCHISOR for sale in the Dunkin' Donuts Unit.

C.   Where applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit designated in Item "M" of the Contract Data Schedule of this Agreement.

### Section DD-1.  Grant Of The Franchise

1.0   FRANCHISOR grants to FRANCHISEE for and during the term hereof and FRANCHISEE accepts a Franchise to operate a donut shop utilizing the Dunkin' Donuts System in accordance with the terms, covenants and conditions of this agreement, at one location only, the Premises described in Item "A" of the Contract Data Schedule of this agreement (hereinafter called the "Dunkin' Donuts Unit").   In connection therewith, this Franchise includes the right to use at the Dunkin' Donuts Unit only, the trademark *Dunkin' Donuts*®, along with other Proprietary Marks owned and utilized by DUNKIN' DONUTS in connection with other Dunkin' Donuts units, and the right to use at the Unit only, the Dunkin' Donuts System including confidential and valuable information which now exists or may be acquired hereafter and set forth in FRANCHISOR's manuals or as otherwise from time to time disclosed to Dunkin' Donuts franchisees.

### Section DD-2.  Scope Of The Franchise

2.0   This Dunkin' Donuts Franchise is specific to one location only, for the term of this Agreement.   It grants no rights outside the Premises, nor includes any territorial protection against competition.   FRANCHISOR reserves and retains the right to operate or permit others to operate Dunkin' Donuts units or to sell or distribute Dunkin' Donuts products and/or services or to otherwise use the Dunkin' Donuts Proprietary Marks and/or the Dunkin' Donuts System, in each case at any other location.   FRANCHISOR and other franchisees may compete for customers drawn from the same area as FRANCHISEE's Dunkin' Donuts Unit using the same or different brand(s).

### Section DD-3.  Advertising and Promotion

3.0   FRANCHISOR shall prepare and coordinate a "Start-Up" promotional program (or such other promotional or advertising program as FRANCHISOR may specify) for the initial opening of the Dunkin' Donuts Unit.

3.1   FRANCHISOR shall review for approval all proposed advertising and promotional materials prepared by FRANCHISEE for use in local advertising relating to the Dunkin' Donuts Unit; and

3.3.1   FRANCHISOR shall administer The Dunkin' Donuts Advertising and Sales Promotion Fund (the "Dunkin' Donuts Fund") and shall direct the development of all advertising, marketing and promotional programs for the Dunkin' Donuts System.   That portion of FRANCHISEE's payments under paragraph 4.4 of this Agreement equal to one percent (1%) of the Gross Sales of the Dunkin' Donuts Unit will be utilized, at the discretion of FRANCHISOR, to provide for the administrative expenses of the Dunkin' Donuts Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of DUNKIN' DONUTS and the Dunkin' Donuts System.   The balance, including any interest earned by the Dunkin' Donuts Fund, will be used for advertising and related expenses.   Contributions to the Dunkin' Donuts Fund in excess of the percentage of Gross Sales of the Dunkin' Donuts Unit set forth in Item "F" of the Contract Data Schedule shall be used in accordance with the programs to which they relate.



## Section DD-4. Payments

4.4   FRANCHISEE shall make payments to the Dunkin' Donuts Fund as described in paragraph 4.4 of the General Terms and Conditions, except that sales to wholesale accounts approved by FRANCHISOR are excluded for purposes of calculating fees due under paragraph 4.4 (only).   For wholesale accounts to be approved by FRANCHISOR, FRANCHISEE must provide FRANCHISOR prior written notice of each such account.  Upon FRANCHISOR's receipt of such notice, the account shall be deemed approved, unless FRANCHISOR at any time notifies FRANCHISEE in writing that such account is not approved. FRANCHISEE shall, within ten (10) days of receipt of a disapproval notice, discontinue sales to the disapproved wholesale account.

4.4.1   FRANCHISOR reserves the right in its sole and absolute discretion to designate or change the composition of Dunkin' Donuts Units included in the base for purposes of determining "two-thirds" support.

## Section DD-5.  Covenants of FRANCHISEE

5.0   FRANCHISEE understands and acknowledges that every detail of the Dunkin' Donuts System is important to DUNKIN' DONUTS, to FRANCHISEE and to other Dunkin' Donuts franchisees, in order to maintain high and uniform standards of quality, cleanliness, appearance, service, products and procedures and thereby increase the demand for Dunkin' Donuts Products and protect and enhance the reputation and goodwill of DUNKIN' DONUTS.

5.1   Unless this Unit is expressly authorized to manufacture donut products on the Premises, and except as DUNKIN' DONUTS may otherwise authorize and direct in writing, donut products sold at this Unit shall be produced in the Dunkin' Donuts manufacturing unit located at the address set forth in Item "M" of the Contract Data Schedule of this Agreement (the "Producing Unit").   The individual(s) or entity(ies) that controls at least a fifty percent (50%) interest in FRANCHISEE shall maintain at least a fifty percent (50%) interest in the Producing Unit, or have a documented interest in an approved cooperative production location ("CPL").

5.1.5.1   Franchisees' cooperatively-owned distribution centers under the Distributor Commitment Program ("DCP") are currently approved by DUNKIN' DONUTS to supply franchisees with a variety of ingredients, supplies and equipment. DUNKIN' DONUTS or an affiliated company may from time to time be among the approved suppliers of products, supplies, services, equipment and/or materials required for the operation of the Dunkin' Donuts Unit.  If any such party is designated an approved supplier, it will be subject to the same competitive bidding procedure as other suppliers of the same Dunkin' Donuts Products.

5.1.5.2   DUNKIN' DONUTS may, from time to time, enter into national or regional exclusive supply arrangements with one or more independent suppliers for designated Dunkin' Donuts Products.  In evaluating the need for an exclusive supplier, DUNKIN' DONUTS may take into account (without limitation) the uniqueness of the designated Dunkin' Donuts Products, the projected price and required volume of such Dunkin' Donuts Products, the investment required of a supplier in order to meet the needs for such Dunkin' Donuts Products, the supplier's ability to provide such Dunkin' Donuts Products, the lack of availability of qualified alternative suppliers, the duration of exclusivity, the desirability of competitive bidding and such other business considerations as may be relevant.

5.2.1   Sales to approved wholesale accounts must be separately designated as "wholesale" on Gross Sales reports required under paragraph 5.2.1 of the General Terms and Conditions of this Agreement.

5.2.5   FRANCHISEE's Records shall also include, without limitation, daily production, throwaway and finishing records, and records of all wholesale accounts.

## Section DD-7.  Proprietary Marks

7.0   FRANCHISEE acknowledges and agrees that *Dunkin' Donuts*® is a registered trademark owned or controlled by DUNKIN' DONUTS; that said mark has been and is being used by DUNKIN' DONUTS and by its franchisees and licensees; that said mark, together with the other Proprietary Marks presently owned or controlled by DUNKIN' DONUTS or which may be acquired in the future, constitutes part of the Dunkin' Donuts System; that valuable goodwill is associated with and attached to said mark and the other Dunkin' Donuts Proprietary Marks; and that any and all goodwill associated with the Dunkin' Donuts Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of DUNKIN' DONUTS.

7.5   FRANCHISEE shall operate, advertise and promote the Dunkin' Donuts Unit under the name "Dunkin' Donuts", with no accompanying words or symbols of any nature, except as may be otherwise required by law.  FRANCHISEE shall not use, as part of its corporate or other business name, any Proprietary Marks used by FRANCHISOR, including, but not limited to, "Dunkin' Donuts" or "Dunkin", or any form or variations thereof, including, but not limited to, "Dunk" or "D.D.", which, in the judgment of FRANCHISOR, is likely to cause third parties to be confused or mistaken with respect to the separate identities of DUNKIN' DONUTS and FRANCHISEE.

## Section 10.  Transfer Provisions

10.3.1   <u>Transfer of this Manufacturing Retail Unit</u> - If FRANCHISEE shall propose a transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more of FRANCHISEE, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of this Agreement, be subject to the requirement that an ownership interest of fifty percent (50%) or more of all satellite retail units supplied by this Unit must be transferred to (a) the same qualified transferee, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of this Agreement, and who also must an ownership interest of fifty percent (50%) or more of one or more manufacturing Dunkin' Donuts Unit(s) at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the producing unit(s) for the satellite retail unit(s) or have a documented interest in an approved CPL.

10.3.2    <u>Transfer of other Dunkin' Donuts Units supplied by this Manufacturing Retail Unit</u> - If FRANCHISOR receives notice of a proposed transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more in any Dunkin' Donuts Franchise for a retail unit supplied by this Unit, or the entity holding such Franchise, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, be subject to the requirement that the proposed transferee must (a) also be a qualified transferee of this Unit, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, and who also must an ownership interest of fifty percent (50%) or more of another manufacturing Unit at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the manufacturing unit to supply products for such satellite retail unit or have a documented interest in an approved CPL.

FRANCHISE AGREEMENT

SCHEDULE "F/D"
110100

## SPECIAL TERMS AND CONDITIONS APPLICABLE TO
## DEVELOPMENT OF A NEW UNIT BY FRANCHISEE

FRANCHISEE wishes to develop a new Unit that will utilize one or more of FRANCHISOR's Proprietary Marks at the Premises. In order to facilitate FRANCHISEE's obtaining financing and other needed resources, FRANCHISOR may elect to enter into this agreement prior to having had the opportunity to review the Premises to determine if it is suitable for development as such a Unit. FRANCHISEE's right to develop and operate a Unit under the terms of this agreement at the Premises is, therefore, subject to the conditions that 7(i) FRANCHISOR shall approve the Premises as a suitable location for development of a Unit and (ii) FRANCHISOR shall determine that FRANCHISEE meets all of FRANCHISOR's qualifications and requirements for new, or if appropriate multiple-unit, franchisees. This Schedule enumerates the respective responsibilities of the parties pertaining to FRANCHISEE undertaking to develop a Unit on the Premises. In consideration of a conditional grant to FRANCHISEE of one or more franchise(s) for the Premises, FRANCHISEE hereby agrees as follows:

1.0  **Approval of the Premises** - Development of the Premises as a Unit must be approved by FRANCHISOR, as evidenced solely by written notice sent to FRANCHISEE by the General Manager or other duly authorized representative of FRANCHISOR (the "Site Approval Notice") pursuant to the process hereinafter described. Any real estate commitments that FRANCHISEE may make pursuant to this agreement **MUST** be subject to: (a) FRANCHISEE having obtained FRANCHISOR's prior written approval of development of a Unit on the Premises; (b) FRANCHISEE obtaining all necessary permits, licenses and local governmental approvals needed to develop and operate a Unit on the Premises. In addition, FRANCHISEE should include such other contingencies as FRANCHISEE's attorney may recommend. FRANCHISEE must provide FRANCHISOR a copy of any lease of the Premises within ten (10) days after its execution and receipt by FRANCHISEE.

1.1  It shall be FRANCHISEE's responsibility to retain an attorney and other appropriate, independent advisors in connection with negotiating FRANCHISEE's acquisition of the right to develop and operate a Unit on the Premises, including reviewing all agreements with FRANCHISOR. FRANCHISOR assumes no liability or obligation to FRANCHISEE or to any third party for any assistance in negotiation FRANCHISOR may elect to provide to FRANCHISEE. Although FRANCHISOR may comment on FRANCHISEE's negotiations with third parties, any assistance FRANCHISOR provides to FRANCHISEE is no substitute for the advice of independent counsel. FRANCHISOR will not act as agent, employee or fiduciary of FRANCHISEE for the purpose of assisting FRANCHISEE in negotiations.

1.2  In the event that development of a Unit on the Premises is disapproved by FRANCHISOR or by any governmental authority, this Franchise agreement and all of the parties' rights and obligations hereunder shall cease and be of no further force and effect.

1.3  FRANCHISEE's approval of the Premises is not a representation or a warranty that the Unit will be profitable or that FRANCHISEE will achieve any particular level of sales at the Unit. It merely means that the Premises has met certain minimum criteria which FRANCHISOR has established for identifying suitable sites for proposed Units in the region in which the Premises are located. Because unit development is not a precise science, FRANCHISEE agrees that FRANCHISOR's approval or disapproval of a development shall not impose any liability or obligation on FRANCHISOR. The decision to develop any particular Premises is FRANCHISEE's, subject to FRANCHISOR's final approval. A preliminary favorable opinion of the Premises by local or regional representatives of FRANCHISOR is not conclusive or binding approval, because their recommendations may be rejected by FRANCHISOR.

2.0  **Approval of FRANCHISEE** - In addition to approval of the Premises set forth above, FRANCHISEE's qualifications to obtain this Franchise must be approved in writing by FRANCHISOR. In the event FRANCHISOR disapproves FRANCHISEE's qualifications within sixty (60) days of the date of this agreement, this Franchise agreement and all of the parties' rights and obligations hereunder shall cease and expire.

3.0  **Execution of Documents** - FRANCHISEE shall execute such other documents and agreements as are customarily required by FRANCHISOR in such circumstances, including, if appropriate, but not limited to, a standard form of Lease Option Agreement or Rider to Lease, which ensures the continued availability of the Premises as a franchised unit, in the event of a default under this agreement or, if applicable, under FRANCHISEE's lease of the Premises, during the term of this agreement. If FRANCHISEE owns the Premises real estate, FRANCHISEE shall grant FRANCHISOR the right to lease the Premises on negotiated terms comparable to those under which FRANCHISOR leases comparable property from others. A Lease Option Agreement or a Rider to Lease confirming these rights in a form acceptable to FRANCHISOR, must be signed before construction commences on the Premises.

4.0  **Development of the Unit** - The Unit must be developed and constructed in strict accordance with FRANCHISOR's current standards, requirements, procedures, plans, specifications and documentation for the type, configuration and brand(s) approved for the Premises (hereinafter collectively the "Requirements"). In order that development of the Premises proceed as expeditiously as possible, FRANCHISEE shall strictly comply with the following procedures set forth in Sections 4 and 5:

4.1  FRANCHISEE shall request FRANCHISOR's review of a proposed site, submitted in writing on the proscribed form, signed by FRANCHISEE and, if applicable, FRANCHISEE's landlord (the "Request for Site

*Schedule "F/D"*

1

Approval" ).  Within approximately thirty (30) days, FRANCHISOR will advise FRANCHISEE if the proposed Premises fails to meet FRANCHISOR's minimum preliminary criteria. Otherwise, FRANCHISOR will schedule a Responsibility Meeting (described below), to be held within approximately sixty (60) days after FRANCHISOR received the Request for Site Approval. This preliminary review procedure is intended to allow FRANCHISEE the opportunity to limit the amount of money FRANCHISEE spends on a site that does not meet FRANCHISOR's minimum criteria.

4.2  Once FRANCHISOR has scheduled a Responsibility Meeting, FRANCHISEE shall promptly hire a licensed architect for the Unit project, whose responsibility shall be to adapt FRANCHISOR's generic plans and/or specifications to the specific requirements of the Premises, the geographical region in which the Premises are located and the building codes and ordinances pertinent to the Premises, and to oversee the contractor's completion of construction of the Unit on the Premises. FRANCHISEE's architect must promptly order such topographical and boundary surveys of the Premises, soil borings and structural engineering tests as FRANCHISOR and/or FRANCHISEE's architect may require (the "Reports"). FRANCHISEE's architect must attend the Responsibility Meeting.

4.3  On the scheduled day, FRANCHISOR's representatives will meet at the Premises with FRANCHISEE and FRANCHISEE's architect, to establish a work schedule and coordinate the respective responsibilities of each of the parties with respect to development of a Unit on the Premises (the "Responsibility Meeting"). The Reports, including copies of zoning ordinances and by-laws applicable to the Premises, shall be made available to FRANCHISOR at the Responsibility Meeting by FRANCHISEE's architect. If any such Report or FRANCHISEE's architect is not available when required, FRANCHISOR may, at its option, postpone the Responsibility Meeting, in which case FRANCHISEE shall reimburse FRANCHISOR's out-of-pocket travel costs, if any.  Should the Responsibility Meeting be so postponed, FRANCHISOR shall reschedule the Responsibility Meeting on a date FRANCHISEE makes a firm commitment that the architect and/or Reports will be available, no later than within thirty (30) additional days. If FRANCHISEE is unable to comply, FRANCHISOR shall have the right to terminate this Franchise agreement, provided that, in FRANCHISOR's good faith judgement, FRANCHISEE has failed to exercise reasonable diligence to comply with the terms of this Schedule.

4.4  Subject to delays caused by FRANCHISEE or its landlord or otherwise beyond FRANCHISOR's reasonable control, FRANCHISOR shall use its best efforts to notify FRANCHISEE of its approval or disapproval of the Premises, within approximately ninety (90) days after the date FRANCHISOR received FRANCHISEE's Request for Site Approval.

4.5  FRANCHISOR assumes no responsibility for (a) evaluation of the soil or subsoil on the Premises for hazardous substances or unstable conditions, (b) inspection of any structure on the Premises for asbestos or other toxic or hazardous materials, or (c) compliance with the Americans With Disabilities Act ("ADA").  It is FRANCHISEE's sole responsibility to obtain satisfactory evidence and/or assurances that the Premises (and any structures thereon) are free from environmental contamination and in compliance with the requirements of ADA.

5.0  **Construction of the Unit** -Prior to commencement of construction of the Unit on the Premises, the plans and specifications prepared by FRANCHISEE's architect must be reviewed by FRANCHISOR and approved for compliance with FRANCHISOR's design Requirements. FRANCHISEE is solely responsible for obtaining all necessary permits from all applicable governmental agencies for completing construction of the Unit. If FRANCHISE fails to commence construction of the Unit within twelve (12) months from the date of this Franchise Agreement, FRANCHISOR shall have the right, in its sole discretion, to terminate this agreement by written notice to FRANCHISEE.

5.1  FRANCHISEE and its contractor(s) shall obtain a comprehensive general liability insurance policy written by an insurer having at least a rating of A-XII in Best's Insurance Reports and in which FRANCHISOR is named as an additional insured party. Such policy shall comply with Subsection 5.3 of the General Terms and Conditions of this Franchise Agreement.  Coverage under such insurance shall include operations, premises liability, independent contractor's coverage, contractual liability and automobile liability (owned and non-owned).  Prior to commencement of construction, FRANCHISEE shall furnish FRANCHISOR an insurance certificate evidencing the foregoing policy and that FRANCHISEE or its contractor(s) have procured worker's compensation insurance covering all persons employed in construction of the Unit.

5.2  FRANCHISOR shall have the right of entry upon the Premises at all times, to inspect construction in progress, to ensure that all of FRANCHISOR's Requirements are being met. FRANCHISOR and its employees shall not act as an architect or agent of FRANCHISEE.  The duties of FRANCHISOR's construction representative are limited solely to ensuring that FRANCHISOR's Requirements are met on the Premises. FRANCHISEE shall not rely upon any opinions expressed by FRANCHISOR or any of its employees or agents regarding structural integrity, safety or construction procedures, building codes or ordinances or other matters properly within the responsibility of FRANCHISEE's architect. FRANCHISOR assumes no liability or responsibility for architectural or engineering judgments outside the scope of the duties stated above.

5.3  If the Unit does not initially open to serve the general public within fifteen (15) months from the date of this agreement, FRANCHISOR shall have the right, in its sole discretion, (a) to increase the Initial Franchise Fee(s) to the then-current initial franchise fee(s), which increase, if any, shall be payable to FRANCHISOR upon demand; or (b) to terminate this agreement by written notice to FRANCHISEE.  In the event of any delay caused by FRANCHISOR, or if FRANCHISEE has been unavoidably delayed by act of God, government restrictions, labor difficulties, inability to obtain building materials or similar contingencies (other than making any payment) not within FRANCHISEE's control, FRANCHISOR shall extend the deadline for a period of time equal to the period of such unavoidable delay.

*Schedule "F/D"*

2

5.4  Before the Unit opens to serve the general public, FRANCHISOR must obtain FRANCHISOR's final approval of the construction of the building, site improvements and landscaping, as appropriate, and the installation of all signs and equipment. FRANCHISOR's approval of construction of the unit is not a representation or warranty that the Unit has been constructed in accordance with any architectural, engineering or legal standards for design or workmanship. It merely means that FRANCHISOR is satisfied that the Requirements which FRANCHISOR has established for consistency of design and layout have been met (or waived, where appropriate). FRANCHISEE agrees that FRANCHISOR's approval of construction of the Unit shall not impose any liability or obligation on FRANCHISOR. FRANCHISEE also agrees that all franchise and real estate documentation must be complete and all required payments must be received by FRANCHISOR before the Unit is opened.

5.5  As soon as FRANCHISOR approves that construction and equipping the Unit are substantially complete and all conditions required for opening the Unit have been met, FRANCHISEE shall promptly open the Unit to serve the general public. FRANCHISEE agrees that the Unit must open to serve the general public no later than fifteen (15) months from the date of this Agreement.

6.0  **Financing** - Prior to commencing construction of the Unit on the Premises, FRANCHISEE shall provide evidence satisfactory to FRANCHISOR that cash and/or financing is in place, sufficient to fund completion of construction and purchase of necessary improvements, equipment and signs. FRANCHISOR assumes no obligation to guarantee the funding or financing of FRANCHISEE's construction project. FRANCHISOR will not guarantee FRANCHISEE's mortgage, lease or other real estate related obligations. If FRANCHISOR, at its election, finances or guarantees the financing of FRANCHISEE's purchase or leasing of equipment and/or signs, the owner of the Premises real estate must agree that the equipment and signs are not a part of the realty and must waive any and all interest in the equipment and/or signs, in order to permit the financing of the equipment and/or signs. In this connection, the owner of the Premises real estate must sign such reasonable documents as are reasonably required by FRANCHISOR.

7.0  **Control of the Premises** - FRANCHISEE hereby represents to FRANCHISOR that FRANCHISEE will have the following relationship with the owner or lessor of the Premises (place an "x" in the appropriate box):

[X]  the Premises will be owned by an independent third party landlord with which FRANCHISEE will not share or maintain any common partner, member, shareholder, officer, director, trustee, beneficiary, family member or other interest; or

[ ]  the Premises will be owned by a third party landlord with which FRANCHISEE will share or maintain a common partner, member, shareholder, officer, director, trustee, beneficiary, family member or other interest; or

[ ]  the Premises will be owned by a corporation, LLC, trust, partnership or other entity controlled by FRANCHISEE; or

[ ]  the Premises will be owned by the same entity that will execute the Franchise Agreement.

FRANCHISEE agrees to promptly advise FRANCHISOR of any change, whatsoever, in the relationship represented above.

120199                                                        SCHEDULE "NY"

## ADDENDUM TO THE FRANCHISE AGREEMENT AND
## STORE DEVELOPMENT AGREEMENT
## REQUIRED BY THE NEW YORK GENERAL BUSINESS LAW

Notwithstanding anything to the contrary set forth in the Franchise Agreement (the "Franchise Agreement") and/or the Store Development Agreement ("SDA") the following provisions shall supersede and apply to all Baskin-Robbins, Dunkin' Donuts and Togo's franchises offered and sold in the State of New York.

1.      Subsection 5.4 of the Franchise Agreement and Section 14 of the SDA shall each be supplemented by the addition of the following language as the last sentence of these sections:

However, FRANCHISEE shall not be required to indemnify FRANCHISOR for any claims arising out of a breach of this Agreement by FRANCHISOR or other civil wrongs of FRANCHISOR.

2.      Paragraph 7.4 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

FRANCHISEE must notify FRANCHISOR immediately in writing of any apparent infringement of or challenge to FRANCHISEE's use of any Mark, or claim by any person of any rights in any Mark or any similar trade name, trademark or service mark of which FRANCHISEE becomes aware. FRANCHISEE may not communicate with any person other than FRANCHISOR and its counsel in connection with any such infringement, challenge or claim. FRANCHISOR shall have sole discretion to take such action as it deems appropriate and the right to exclusively control any litigation, U.S. Patent and Trademark Office proceedings or other administrative proceeding or to otherwise protect and maintain its interest in the Marks. FRANCHISOR shall not be obligated to defend the FRANCHISEE against the claim of a third party that the operation of Retail Unit or the FRANCHISEE's use of the Marks infringes any right of the third party and FRANCHISOR shall not be obligated to protect, indemnify or hold harmless the FRANCHISEE from the consequences of any such claim or litigation. In the event FRANCHISOR does not take action, FRANCHISEE will have to protect itself at its own expense.

3.      Paragraph 10.3.7 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

FRANCHISEE must execute a general release in a form satisfactory to FRANCHISOR, releasing FRANCHISOR, its shareholders, directors, officers, employees, in their corporate and individual capacities, of any claims FRANCHISEE may have against them; provided, however, that all rights enjoyed by FRANCHISEE and any causes of action arising in its favor from the provision of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force, it being the intent of this proviso that the non-waiver provisions of the New York State General Business Law Sections 687.4 and 687.5 be satisfied.

4.      Paragraph 10.1 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

This Agreement is fully assignable by FRANCHISOR and shall inure to the benefit of any assignee or other legal successor to the interest of FRANCHISOR herein. However, no assignment shall be made except to an assignee who, in the good faith judgment of FRANCHISOR, is willing and able to assume FRANCHISOR's obligations under this Agreement.

Initials

_____

_____

1

RIDER TO FRANCHISE AGREEMENT

SCHEDULE "DD"
ADDENDUM FIVE
120104

## SPECIAL TERMS AND CONDITIONS APPLICABLE TO
## A DUNKIN' DONUTS FRANCHISE

### THE MARKETING STARTUP FEE

### TEST AGREEMENT FOR DUNKIN' DONUTS SOLO STORES

1. Pursuant to Section D. of the Contract Data Schedule and Section 4.2 of the General Terms and Conditions of the Franchise Agreement, Franchisee was to have paid Franchisor a Marketing Startup Fee (the "Fee") in connection with the opening of the Retail Unit to the public.

2. Franchisor has agreed to forebear in collecting the fee at this time in reliance upon Franchisee's representations as set forth in this Agreement.

3. Franchisee hereby represents and warrants to Franchisor that Franchisee shall develop and execute a start up promotional program or such other promotion or advertising program as Franchisor may specify for the Retail Unit. In connection therewith, Franchisee shall utilize such website(s), program materials and methods as Franchisor shall specify from time to time. It is anticipated that such program would be undertaken in the period starting four weeks before the opening of the Retail Unit and be complete within 2 months of the opening of the retail unit.

4. In reliance on the foregoing, Franchisor agrees to forebear in collecting the Fee as set forth in the Franchise Agreement. Franchisor may collect the entire Fee, without offset, if Franchisee fails to complete the required program within 2 months of the opening of the Retail Unit.

5. All of Franchisor's remedies under the Franchise Agreement, including without limitation the right to attorneys fees, are hereby incorporated by reference.

6. Franchisor reserves the right to rescind this Test Agreement in the event that the web site intended for Franchisee's use in furtherance of this Test Agreement is not operational on the day on which the Retail Unit opens to the public. In such event, Franchisee agrees to promptly pay the Fee applicable to the market in which the Retail Unit is located and to comply with the provisions of the Franchise Agreement relating to startup promotional program or other Franchisor-required program as if this Test Agreement had not been entered into.

SDA# 339636

PC# 340725
Bronx, NY

IN WITNESS WHEREOF the parties hereto, intending to be legally bound hereby, have duly executed, sealed and delivered this agreement in duplicate, as of the date and year first written above. FRANCHISEE hereby acknowledges receipt of this Franchise Agreement, together with any amendments, at least five (5) business days prior to the date hereof. FRANCHISEE further acknowledges having carefully read this agreement in its entirety, including all Schedules identified above and the Personal Guaranty below (if applicable).

FRANCHISOR

DUNKIN' DONUTS INCORPORATED
BASKIN-ROBBINS USA, CO.
TOGO'S EATERIES, INC.

By: _____
MARY ANN ORMOND
ASSISTANT SECRETARY

This agreement is not binding upon the above corporation(s) until executed by an authorized officer.

FRANCHISEE ACKNOWLEDGES SECTION 11 OF THE GENERAL TERMS & CONDITIONS OF THIS CONTRACT, WHICH PROVIDES FOR FRANCHISEE'S EXPRESS WAIVER OF RIGHTS TO A JURY TRIAL, TO PARTICIPATE IN CLASS ACTION LAWSUITS, TO OBTAIN PUNITIVE, MULTIPLE OR EXEMPLARY DAMAGES, AND TO BRING ANY CLAIM OR ACTION LATER THAN TWO YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION.

FRANCHISEE

WITNESS/ATTEST:                         SHIVAM SUNDRAM INC.

By: _____
Anil Kapoor, President

Name: UMA KAPOOR
Title:

## PERSONAL GUARANTEE BY SHAREHOLDERS OF A CORPORATION OR MEMBERS OF A LIMITED LIABILITY COMPANY

We, the undersigned, represent and warrant that we constitute

[X]    the shareholders of one hundred percent (100%) of the originally issued and outstanding capital stock of the above FRANCHISEE, a corporation

[ ]    one hundred percent (100%) of the members of the above FRANCHISEE limited liability company ("LLC")

organized under the laws of the state of New York. Waiving demand and notice, the undersigned hereby, jointly and severally, personally guarantee the full payment of FRANCHISEE's money obligations under Section 4 and the performance of all of FRANCHISEE's other obligations under this Franchise Agreement, including, without limitation, paragraph 6.3 and Section 8, in its entirety relative to the restrictions on the activities of FRANCHISEE. We personally agree that the Franchise Agreement shall be binding upon each of us personally. The undersigned, jointly and severally, agree that FRANCHISOR may, without notice to or consent of the undersigned, (a) extend, in whole or in part, the time for payment of FRANCHISEE's money obligations under paragraph 4; (b) modify, with the consent of FRANCHISEE, its money or other obligations hereunder; and/or (c) settle, waive or compromise any claim of FRANCHISOR against FRANCHISEE or any of the undersigned, all without in any way affecting the personal guarantee of the undersigned. This Guarantee is intended to take effect as a sealed instrument.

_____
witness
print name_____

_____
Anil Kapoor, Individually

SDA# 339636

PC# 340725
Bronx, NY

## CERTIFICATION OF FRANCHISEE

DESCRIBE BELOW ALL PROMISES AND REPRESENTATIONS MADE BY FRANCHISOR THAT ARE NOT EXPRESSLY CONTAINED IN THE FRANCHISE AGREEMENT OR UNIFORM FRANCHISE OFFERING CIRCULAR BUT WHICH INFLUENCED FRANCHISEE'S DECISION TO SIGN THIS FRANCHISE AGREEMENT.

*If the answer is "none," please write "NONE" below.*

NONE

FRANCHISEE's completion of this page is a material inducement for FRANCHISOR to grant FRANCHISEE this Franchise. If FRANCHISEE fails to complete, sign and deliver this Certification of Franchisee page to FRANCHISOR along with the Franchise Agreement, FRANCHISOR will not counter-execute the Franchise Agreement or may void the Franchise Agreement if it already has been counter-executed.

THE UNDERSIGNED HEREBY CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS TRUE, that FRANCHISEE had the opportunity to obtain the advice of an attorney, and that FRANCHISEE, and not FRANCHISEE's attorney or other representative, has executed this Certification of Franchisee.

The date of the Certification shall be the date on the Franchise Agreement.

**FRANCHISEE**

WITNESS/ATTEST:                     SHIVAM SUNDRAM INC.

By: _____
Name: Uma Kapor              Anil Kapoor, President
Title: UMA KAPOOR

_____
witness                          Anil Kapoor, individually
print name____Uma KAPOOR____

# Exhibit 1D

SDA # N/A  PC # 337513/BR# 4171 – New York, NY

# FRANCHISE AGREEMENT

This Franchise Agreement is dated ___1ˢᵗ Feb 2006___, and made by and between **BASKIN-ROBBINS USA, CO.** (hereinafter "BASKIN-ROBBINS"), a California corporation, and **DUNKIN' DONUTS INCORPORATED** (hereinafter "DUNKIN' DONUTS"), a Delaware corporation, and TOGO'S EATERIES, INC. (hereinafter "TOGO'S"), a California corporation, all with principal offices in Canton, Massachusetts (such corporations are hereinafter individually or collectively referred to as "FRANCHISOR") and the following individual(s) and/or entity:

___**TKNY PARTNERS LLC, A New York Limited Liability Company**___
(hereinafter individually or collectively referred to as "FRANCHISEE")

This Franchise Agreement includes the Contract Data Schedule, General Terms and Conditions designated as ("GTC – 120105 ") and the Special Terms and Conditions identified in Item "J" of the Contract Data Schedule below.

## CONTRACT DATA SCHEDULE

A.  Location of the Franchised Unit (the "Premises"):

| 145 | East 125ᵗʰ Street | New York | New York | 10035 |
|---|---|---|---|---|
| (number) | (street) | (city or town) | (state) | (zip code) |

B.  Term: ......................Twenty( 20 ) years from the first date the Unit opens to serve the general public.

C.  Initial Franchise Fee: .............................................................**Sixty Thousand dollars ($ 60,000.00)** *
    * Paid with check # 55044

D.  Marketing Start-Up Fee: ..........................................................**Five Thousand dollars ($ 5,000.00)**

E.  Continuing Franchise Fee Rate: ..................... **Five and Nine-Tenths percent (5.9%)** of Gross Sales

F.  Minimum Continuing Advertising Fee Rate...................................**Five percent (5.0%)** of Gross Sales

G.  Refurbishment Date: In the case of a new unit, the date **five (5) years** and **fifteen (15) years** after the first date the Unit opens to serve the general public. or in case of an existing unit, on:_____

    Remodel Date:    In the case of a new unit, the date **ten (10) years** after the first date the Unit opens to serve the general public. or, in case of an existing unit, on:_____

H.  Transfer Fee:  As provided in subsection 10.4 of the General Terms and Conditions, unless another amount is inserted here: _____**No Change**_____

I.  Address for notice to FRANCHISEE shall be at the Unit Premises, unless another address is inserted here: _____

J.  Special Terms and      [X] BR00 Special Terms and Conditions Applicable to a Baskin Robbins
    Conditions:                  Franchise
                            [X] DD00 Special Terms and Conditions Applicable to a Dunkin' Donuts
                                Franchise
                            [X] FD Special Terms and Conditions Applicable to Development of a New Unit
                                by Franchisee
                            [X] Schedule DD/BR Addendum One-Marketing Start-up Fee Test Agreement
                                Combo
                            [X] NY- Addendum to the Franchise Agreement Required by the New York
                                General Business Law
                            [X] Passive Partner Letter

K.  The Designated Representative for this Unit is _____ANIL  KAPOOR___
                                                        [print full name above]
    (List only one person. See definitions in General Terms and Conditions.)

L.  Arbitration under this Agreement shall be initiated in the city and state of **New York, New York.**

M.  If applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit located at PC# 340500 – 46 East 167ᵗʰ Street, Bronx, New York 10542  (TSA)

Form last revised 12/01/04

Franchisor's corporations are EOE and AA Employers
(Franchisees are not employees)

 

RIDER TO FRANCHISE AGREEMENT

**SCHEDULE "BR"**
120102

## SPECIAL TERMS AND CONDITIONS APPLICABLE TO A
## BASKIN-ROBBINS FRANCHISE

In connection with its business and the business of its Baskin-Robbins franchisees, BASKIN-ROBBINS has developed, used and continues to use and control the usage of certain proprietary interests, trademarks, logos, emblems and other indicia of origin, service marks and trade names, including, without limitation, *Baskin 31 Robbins®*, which is registered as a trademark on the Principal Register of the United States Patent and Trademark Office (the "Proprietary Marks"), to identify for the public the source of goods and services marketed thereunder and to represent to the public high and uniform standards of quality, cleanliness, appearance and service.

FRANCHISEE, being cognizant of the distinctive and valuable significance to the public of the Baskin-Robbins System and Proprietary Marks, desires to make use of the trademark *Baskin 31 Robbins®*, and to enjoy the benefits of that mark, the other Proprietary Marks and the Baskin-Robbins System. FRANCHISEE understands the importance of FRANCHISOR's high and uniform standards of quality, cleanliness, appearance and service to the value of the Baskin-Robbins System and the necessity of opening and operating FRANCHISEE's Baskin-Robbins Unit in conformity with the Baskin-Robbins System and in accordance with FRANCHISOR's Standards and specifications.

## DEFINITIONS

As used in these Special Terms and Conditions applicable to a Baskin-Robbins Franchise, the following defined terms shall have the following meanings:

A.  The "Baskin-Robbins Unit" is all or a portion of the Premises dedicated to the operation of the Baskin-Robbins System, as approved by FRANCHISOR.

B.  "Baskin-Robbins Products" mean and refer to ice cream, ice milk, sherbets, water ices, yogurts, frozen desserts, syrups, toppings, confections, novelties, food, beverages and fountain ingredients, all of a variety of kinds or flavors, made in accordance with the formulas or specifications designated by BASKIN-ROBBINS and identified by the Baskin-Robbins Proprietary Marks.

C.  "Associated BR Products" mean and refer to such other products and supplies as may be specified from time to time in writing by FRANCHISOR for sale in the Baskin-Robbins Unit.

## Section BR-1. Grant Of The Franchise

1.0  BASKIN-ROBBINS grants to FRANCHISEE for and during the term hereof and FRANCHISEE accepts a Franchise to operate an ice cream and yogurt store utilizing the Baskin-Robbins System in accordance with the terms, covenants and conditions of this Agreement, at one location only, the Premises described in Item "A" of the Contract Data Schedule of this Agreement (hereinafter called the "Baskin-Robbins Unit"). In connection therewith, this Franchise includes the right to use at the Baskin-Robbins Unit only, the trademark *Baskin 31 Robbins®*, along with other Proprietary Marks owned by BRI and utilized by BASKIN-ROBBINS in connection with other Baskin-Robbins units, and the right to use at the Unit only, the Baskin-Robbins System including confidential and valuable information which now exists or may be acquired hereafter and set forth in FRANCHISOR's manuals or as otherwise from time to time disclosed to Baskin-Robbins franchisees.

## Section BR-2. Scope Of The Franchise

2.0  This Baskin-Robbins Franchise is specific to one location only, for the term of this Agreement. It grants no rights outside the Premises, nor includes any territorial protection against competition. FRANCHISOR reserves and retains the right to operate or permit others to operate Baskin-Robbins units or to sell or distribute Baskin-Robbins Products and/or services or to otherwise use the Baskin-Robbins Proprietary Marks and/or the Baskin-Robbins System, in each case at any other location. FRANCHISOR and other franchisees may compete for customers drawn from the same area as FRANCHISEE's Baskin-Robbins Unit using the same or different brand(s).

2.2.4  Baskin-Robbins Products will be supplied to FRANCHISEE by BASKIN-ROBBINS, or one or more suppliers approved by BASKIN-ROBBINS.

## Section BR-3. Advertising and Promotion

3.0  FRANCHISOR shall prepare and coordinate a "Start-Up" promotional program (or such other promotional advertising program as FRANCHISOR may specify) for the initial opening of the Baskin-Robbins Unit.

3.1  FRANCHISOR shall review for approval all proposed advertising and promotional materials prepared by FRANCHISEE for use in local advertising relating to the Baskin-Robbins Unit; and

3.3.1  FRANCHISOR shall administer The Baskin-Robbins Advertising and Sales Promotion Fund (the "Baskin-Robbins Fund") and shall oversee all Baskin-Robbins System and product marketing, advertising and promotion, with sole discretion to approve or disapprove the creative concepts, materials and media used in the same, and the placement and allocation thereof. That portion of FRANCHISEE's payments



GTC-120105

# FRANCHISE AGREEMENT
© December 2005

## GENERAL TERMS AND CONDITIONS

### INTRODUCTION

Baskin-Robbins USA Co., a California corporation ("BASKIN-ROBBINS"), Dunkin' Donuts Incorporated, a Delaware corporation ("DUNKIN' DONUTS") and Togo's Eateries Inc., a California corporation ("TOGO'S") are wholly-owned subsidiaries of Dunkin' Brands, Inc. As a result of the expenditure of time, effort and money, each subsidiary has acquired experience and skill in the development and operation of food service establishments using distinctive systems and techniques for the production, distribution, merchandising and sale of branded food products, including, without limitation, *Baskin-Robbins®* ice cream, yogurt and novelties, *Dunkin' Donuts®* donuts, coffee and freshly baked goods, *Togo's®* fresh sandwiches, salads and deli platters, and other unique and distinctive products, services and business methods (hereinafter each called a "System" and collectively called the "Systems").

The distinguishing characteristics of these Systems include, without limitation, distinctive exterior and interior design, decor, color and identification schemes and furnishings; specially designed manufacturing and merchandising equipment; unique and proprietary information technologies and software; special menu items; standards, specifications and procedures for operations, manufacturing, distribution and delivery; quality of products and services offered; management programs; training and assistance; and marketing, advertising and promotional programs, all of which may be changed, supplemented, improved and further developed from time to time by FRANCHISOR as new learning and best practices are identified and incorporated.

### DEFINITIONS

As used throughout this Agreement, the following defined terms shall have the following meanings:

A.  The "Proprietary Marks" are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin and trade names, which identify for the public the source of goods and services marketed thereunder and represent to the public high and uniform standards of quality, cleanliness, appearance and service, including, without limitation, *Dunkin' Donuts®* owned or controlled by DUNKIN' DONUTS, *Baskin 31 Robbins®* owned or controlled by Baskin-Robbins Incorporated ("BRI"), and *TOGO'S®* owned or controlled by TOGO'S, all of which are registered trademarks on the Principal Register of the United States Patent and Trademark Office.

B.  "FRANCHISOR" refers to Dunkin' Donuts Incorporated with respect to the Dunkin' Donuts System, Baskin-Robbins USA, Co., with respect to the Baskin-Robbins System and Togo's Eateries, Inc. with respect to the Togo's System.

C.  "FRANCHISEE" means the person(s) or entity who signed this Agreement, which may include a sole proprietor, all partners of a general partnership, a corporation or a limited liability company ("LLC"). No person or entity may claim an interest in this Agreement or any Franchise granted hereby without FRANCHISOR's prior written approval.

D.  The "Unit" means the branded food service establishment, including the fixtures, furnishings, equipment, inventory and supplies located therein and/or attached thereto, operated by FRANCHISEE pursuant to this Agreement. If this Agreement authorizes more than one brand, the term "Unit" shall refer to all branded operations authorized hereby, unless such reference is expressly limited to any one brand.

E.  The "Premises" means the land and building or the area within a building, as the case may be, which is (i) approved by FRANCHISOR, (ii) dedicated to the operation of the Unit, and (iii) in the exclusive possession and control of FRANCHISEE. Some portion of the Premises may be under shared possession or control, if approved by FRANCHISOR.

F.  The term "Lease" means the document by which FRANCHISEE occupies and controls the Premises, whether the landlord is a third-party or FRANCHISOR, or one of its subsidiaries or affiliates.

G.  "Gross Sales" means and includes all revenue from the sale of all products and services and all other income of every kind and nature related to the Unit, whether for cash, by redemption of gift certificates or for credit, regardless of collection; provided, however, "Gross Sales" does not include the incidental sales of gift certificates or newspapers, incidental receipts from pay telephones, or any sales taxes or other taxes FRANCHISEE collects from customers for transmittal to the appropriate taxing authority.

H.  The "Designated Representative" is the person from time to time designated by FRANCHISEE as being responsible for the day-to-day operation of the Unit. The Designated Representative must meet FRANCHISOR's then-current qualifications, including, without limitation, successful completion of FRANCHISOR's training, and must be authorized to act for and bind FRANCHISEE in all dealings with FRANCHISOR with respect to the day-to-day operation of the Unit. The initial Designated Representative is identified in Item "K" of the Contract Data Schedule of this Agreement.

*General Terms and Conditions*

-2-

I.      The "Standards" are requirements, specifications, criteria, guidelines, processes, techniques and standards which are from time to time established and revised by FRANCHISOR with respect to selection and development of the Premises, operation of the Unit and other aspects of each System. Examples of "Standards" are, without limitation, requirements and criteria for developing the Unit; specifications for the facility, equipment and products; business processes and techniques for the operation of the Unit; and guidelines and standards for quality, cleanliness, appearance and service.

## Section 1. Grant of the Franchise and Term

1.0     This Agreement grants to FRANCHISEE the right, subject to all of the terms and conditions hereinafter set forth, to operate a Unit solely at the Premises described in Item "A" of the Contract Data Schedule of this Agreement, including the right to use, solely in such Unit, the System or Systems and Proprietary Marks described in the Special Terms and Conditions attached to and made a part of this Agreement (the "Franchise"). The term of this Agreement shall begin on the date hereof and shall end on the date described in Item "B" of the Contract Data Schedule; provided however, the Franchise shall commence upon the occurrence, of all of the following conditions prior to the initial opening of the Unit or the transfer of the Unit, as the case may be:

1.0.1     Training.   FRANCHISEE and its Designated Representative must successfully complete the then-current training program required by FRANCHISOR at one or more of FRANCHISOR's training centers located in Massachusetts, California or at other locations from time to time designated by FRANCHISOR.  This requirement may be waived or modified by FRANCHISOR, in whole or in part, in its sole discretion, if FRANCHISEE or its Designated Representative has had comparable training or on-the-job experience.

1.0.2     Financing.   Upon request by FRANCHISOR, FRANCHISEE must deliver evidence to FRANCHISOR that FRANCHISEE has obtained binding commitments for all financing needed to develop and/or operate the Unit.

1.0.3     Documents.   FRANCHISEE must execute and deliver to FRANCHISOR all documents related to this Franchise customarily required, in then-current form, as provided by FRANCHISOR.

1.0.4     Payment.   FRANCHISEE must, prior to opening or transferring the Unit (as the case may be) pay FRANCHISOR any and all moneys due, including, but not limited to, purchase price, fees, inventory, rent and/or security deposit, if required under the Lease.

1.0.5     Possession.   FRANCHISEE must have the exclusive right to occupy and use the Premises for at least the term of this Agreement, whether FRANCHISEE owns the Premises, or leases the Premises pursuant to either (a) a Lease with a third party landlord on terms satisfying FRANCHISOR's then current lease policy and containing provisions required by FRANCHISOR; or (b) a Lease with FRANCHISOR or an affiliated entity.

1.0.6     For a New Unit.   If this Unit is newly developed, FRANCHISEE must, prior to the Unit's initial opening, comply with all provisions of the Special Terms & Conditions attached to this Agreement relating to new unit development (Schedule "F/D" or "C/D", as applicable).

1.1     The term of this Agreement shall expire without notice upon any earlier expiration or termination of a Lease, foreclosure of a mortgage, or other event which has the effect of terminating FRANCHISEE's possession and occupancy of the Unit.

1.2     FRANCHISEE represents and warrants that FRANCHISEE and each individual partner, member and/or shareholder of FRANCHISEE, as the case may be, is a United States citizen or a lawful resident alien of the United States; that, where applicable, the FRANCHISEE entity (corporation or LLC) is and shall remain duly organized and in good standing during the term of this Agreement; and that all financial and other information which FRANCHISEE has provided to FRANCHISOR in connection with FRANCHISEE's application for this Franchise is true and accurate. FRANCHISEE's representations and warranties under this paragraph 1.2 are a material inducement to FRANCHISOR's grant of the Franchise to FRANCHISEE.

## Section 2. Services Furnished by FRANCHISOR

2.0     FRANCHISOR agrees:

2.1     Prior to and For the Initial Opening of the Unit.

2.1.1     FRANCHISOR shall make available to FRANCHISEE Standards for the design, construction, equipping and operation of the Unit; and

2.1.2     FRANCHISOR shall make available to two individuals designated by FRANCHISEE, one of whom must be a party to or guarantor of this Agreement FRANCHISOR's then current initial training program with respect to the operation of the Unit, at one or more of FRANCHISOR's Training Centers located in Massachusetts, California and/or at such other training facility as FRANCHISOR may, from time to time, designate; and

2.1.3     FRANCHISOR shall provide its current operating procedures to assist FRANCHISEE in complying with FRANCHISOR's Standards; and

*General Terms and Conditions*




2.1.4    FRANCHISOR shall make available to FRANCHISEE such assistance in the pre-opening, opening and initial operation of the Unit as FRANCHISOR shall deem advisable, based upon FRANCHISEE's organization, prior experience and training.

2.2    <u>After the Initial Opening of the Unit.</u>

2.2.1    FRANCHISOR shall maintain a continuing advisory relationship with FRANCHISEE, including consultation in the areas of marketing, merchandising and general business operations; and

2.2.2    FRANCHISOR shall provide FRANCHISEE with FRANCHISOR's Standards for the authorized System(s), as the same may be modified by FRANCHISOR from time to time, in its sole and absolute discretion; and

2.2.3    FRANCHISOR shall continue its efforts to maintain high and uniform standards of quality, cleanliness, appearance and service at all units; and

2.2.4    FRANCHISOR shall make reasonable efforts to disseminate FRANCHISOR's Standards to potential suppliers of products at the written request of FRANCHISEE, subject, however, to specific requirements and limitations of each authorized System.

## Section 3. Advertising and Promotion

3.0    FRANCHISOR has established and administers a marketing, advertising and sales promotion fund (the "Fund") for each of the Systems, and directs the development of all advertising, marketing and promotional programs for each System. FRANCHISEE's payments to the Fund(s) shall be used for advertising, marketing, promotion, production and development of all advertising, marketing, promotional and other programs, product development, merchandising, public relations, administrative expenses, programs designed to increase sales and enhance and further the public reputation of FRANCHISOR and each applicable System, and activities related to any and all of the foregoing. The content of all activities of the Fund(s), including, without limitation, the media selected and employed, as well as the area and units to be targeted for such activities, shall be at the sole discretion of FRANCHISOR. FRANCHISOR undertakes no obligation to make expenditures for FRANCHISEE which are equivalent or proportionate to contributions paid under this Agreement or to insure that FRANCHISEE benefits directly or on a prorata basis from activities of the Fund(s), if any. Upon request, FRANCHISOR will provide FRANCHISEE a statement of receipts and disbursements for any Fund to which FRANCHISEE contributes under the terms of this Agreement, prepared by an independent public accountant for each fiscal year of the Fund.

3.1    FRANCHISEE, prior to using any advertising or promotional material that FRANCHISEE has prepared for use in its local area, shall submit such material to FRANCHISOR for review and approval. If written disapproval of the advertising and promotional material is not received by FRANCHISEE from FRANCHISOR within fifteen (15) days from the date such material is received by FRANCHISOR, said materials shall be deemed approved for use by FRANCHISEE, unless and until subsequently disapproved by FRANCHISOR, in which event FRANCHISEE will promptly discontinue any further use thereof.

3.2    FRANCHISEE acknowledges that this Agreement grants FRANCHISEE no right to use any of the Proprietary Marks to advertise products and/or services for order through the mail or by any electronic or other medium. FRANCHISEE shall not, without the prior written approval of FRANCHISOR, use any of the Proprietary Marks on the Internet or any similar electronic or other communications medium, to promote FRANCHISEE's business and/or advertise and/or sell products and/or services. Notwithstanding the provisions of paragraph 3.1 above, FRANCHISOR's failure to disapprove any request to use the Internet or any similar electronic or other medium within fifteen (15) days shall not give FRANCHISEE the right to undertake such use. FRANCHISOR shall have the sole right to establish an Internet "home page" using any of the Proprietary Marks, and to regulate the establishment and use of linked home pages by its franchisees.

3.3    Special Terms and Conditions for each System authorized for this Unit are attached to this Agreement and contain additional provisions related to advertising and promotion.

## Section 4. Payments

4.0    FRANCHISEE shall pay to FRANCHISOR the following initial charges and continuing fees:

4.1    <u>Initial Franchise Fee.</u> - FRANCHISEE shall pay FRANCHISOR an Initial Franchise Fee in the amount set forth in Item "C" of the Contract Data Schedule of this Agreement. Unless the Initial Franchise Fee was prepaid under the terms of a Store Development Agreement, five thousand dollars ($5,000.00) shall be paid upon the execution of this Agreement and the remaining unpaid balance within ten (10) days after FRANCHISEE's receipt of FRANCHISOR's written approval of the Premises; provided however, if the Premises is developed by FRANCHISOR, the balance shall be due in full upon FRANCHISEE's execution of the Lease of the Unit, or on the date FRANCHISEE or the Designated Representative commences FRANCHISOR's training program, whichever date is earlier.

4.2    <u>Marketing Start-Up Fee.</u> - FRANCHISEE shall pay a Marketing Start-Up Fee in the amount set forth in Item "D" of the Contract Data Schedule of this Agreement, for a start-up promotional program or such other promotion or advertising program as FRANCHISOR may specify. Payment shall be made in full prior to attendance by FRANCHISEE or the Designated Representative at FRANCHISOR's training program or thirty (30) days prior to the scheduled opening of the Unit, whichever date is earlier, and shall be nonrefundable after the Unit commences operations.

-4-

4.3    **Continuing Franchise Fees** - FRANCHISEE shall pay FRANCHISOR at Post Office Box 1097, Charlotte, North Carolina 28201-1097 (or to such other address as FRANCHISOR shall from time to time advise FRANCHISEE in writing), on or before Thursday of each week, a sum determined by multiplying the Gross Sales of the Unit for the seven (7) day period ending at the close of business on the preceding Saturday times the percentage set forth in Item "E" of the Contract Data Schedule of this Agreement.

4.4    **Continuing Advertising Fee.** FRANCHISEE shall also pay, at the same time, for the same seven (7) day period, in the same manner as, and in addition to the payments provided for under paragraph 4.3 above, the percentage set forth in Item "F" of the Contract Data Schedule of this Agreement, of the Gross Sales of the Unit, to one or more Funds for advertising, marketing, promotion and other purposes, as specified in Section 3 of this Agreement.

4.4.1    In addition, FRANCHISEE shall participate in and make additional payments to the Fund(s) with respect to all advertising, marketing, promotion and other programs of each authorized brand at the Unit, which from time to time are supported by two-thirds of the units of such brand in the market in which the Unit is located with respect to local programs, and in the continental United States, with respect to national programs.

4.4.2    If FRANCHISEE is authorized to use more than one (1) System at the Unit, fees payable under this paragraph 4.4 with respect to each System shall apply only to that portion of the Unit's Gross Sales which are applicable to that System, as determined by FRANCHISOR.

4.5    If any sales, income, excise, use or privilege tax is imposed or levied by any government or governmental agency on account of the payment of franchise or royalty fees by FRANCHISEE under this Agreement, FRANCHISEE shall pay FRANCHISOR a sum equal to the amount of such tax as an additional royalty fee (but this provision shall not apply to federal or state income taxes imposed upon FRANCHISOR).

4.6    FRANCHISOR shall have the right to require FRANCHISEE, upon written notice, to make payments under this Agreement by electronic funds transfer or to a lock-box located at an independent bank. Acceptance of payment by electronic funds transfer or to a lock-box shall not be deemed a waiver of any rights of FRANCHISOR. If FRANCHISOR establishes a direct debit program with FRANCHISEE's bank for the electronic payment of continuing franchise and advertising or sales promotion fees, FRANCHISEE must provide FRANCHISOR with all consents, authorizations and bank account data necessary to effect such electronic payment.

4.6.1    FRANCHISEE must complete and deliver to FRANCHISOR such forms as may from time to time be required to effectuate any changes as necessary to maintain EFT capability. FRANCHISEE agrees (a) to give FRANCHISOR at least fourteen days written notice (except in the case of emergency) before making any change to FRANCHISEE's EFT bank account, providing all information and specimens required to change EFT to the new account; (b) to pay FRANCHISOR its then-current late fee, plus collection costs and reasonable attorney's fees, if FRANCHISEE's bank rejects FRANCHISOR's EFT request because of insufficient funds; and (c) upon demand, to replace EFT rejected by FRANCHISEE's bank with a bank certified or cashier's check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees.

4.6.2    For each week that FRANCHISEE (a) submits a weekly Gross Sales report via FRANCHISOR's approved electronic form over the Internet, and (b) pays the corresponding weekly continuing franchise and advertising fees by EFT, FRANCHISOR will deduct the fees from FRANCHISEE's bank account on or after the Thursday twelve (12) days after the Saturday of the week for which sales were reported. This benefit will only become available after FRANCHISOR implements an electronic form for reporting weekly sales satisfactory to FRANCHISOR. To have this benefit available, FRANCHISEE must have computer equipment capable of accessing and using the electronic form in the manner required. In FRANCHISOR's discretion or due to system failure, FRANCHISOR may elect to withdraw the electronic form. In any such case, FRANCHISEE must immediately return to reporting Gross Sales in the manner originally required.

4.7    **Late Fee, Interest and Costs.** If any payment required under this Agreement is not paid when due, FRANCHISEE shall pay, in addition to the unpaid amount, FRANCHISOR's then-current late fee for each unpaid invoice. In addition, all amounts payable by FRANCHISEE to FRANCHISOR under any provision of this Agreement, if not paid when the same becomes due, shall bear interest from the date due until paid at the rate of one and one-half percent (1.5%) per month, or the maximum rate permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies FRANCHISOR may have. Receipt of any check, draft or other commercial paper shall not constitute payment until all funds therefrom are collected by FRANCHISOR. FRANCHISEE shall pay all collection charges, including reasonable attorney's fees, on dishonored checks. At FRANCHISOR's request, dishonored and returned checks will be promptly replaced by FRANCHISEE by a bank certified or cashiers check in the aggregate amount owed, plus interest, late fees, collection fees, costs of collection and attorneys fees, set forth in this Agreement.

## Section 5. Covenants of FRANCHISEE

5.0    FRANCHISEE understands and acknowledges the importance to FRANCHISOR, FRANCHISEE and other franchisees, of FRANCHISEE's commitment to at all times operate the Unit in accordance with FRANCHISOR's Standards (as defined in Definitions paragraph "T"), in order to increase the demand for FRANCHISOR's products, to protect and enhance the reputation and goodwill of FRANCHISOR, to promote and protect the value of the Proprietary Marks and for other reasons. FRANCHISEE agrees to devote continuous best efforts to successfully develop, manage and operate the Unit and to enhance the goodwill of the Proprietary Marks authorized by this Agreement and the System(s) as a whole.

5.0.1    If, in any consecutive twelve (12) month period, FRANCHISEE shall receive two (2) or more notices to cure any default under this Agreement, FRANCHISOR shall have the right, in addition to all other remedies available, to require that FRANCHISEE (in lieu of any Designated Representative) devote full time to managing the day-to-day operation of the Unit.

*General Terms and Conditions*



5.0.2    FRANCHISEE agrees to operate the Unit in strict accordance with all of FRANCHISOR's Standards as they may be communicated to FRANCHISEE from time to time. Standards shall be established for and distributed to franchisees generally and/or FRANCHISEE specifically, in such form and content as FRANCHISOR may from time to time in its sole discretion prescribe. Standards are copyrighted and FRANCHISEE shall not at any time copy, duplicate, record or otherwise reproduce any materials, in whole or in part, which set forth the standards or other proprietary information, or otherwise make the same available to any unauthorized person. FRANCHISEE shall at all times maintain the documents embodying the Standards at the Unit (or at FRANCHISEE's principal offices, if not the Unit) and shall ensure that such documents are kept current and up to date. In the event of a dispute as to the contents of the Standards, the terms of the master copy(s) maintained by FRANCHISOR shall control.

5.0.3    FRANCHISEE acknowledges that complete uniformity may not be possible or practical throughout the System(s) and agrees that FRANCHISOR may from time to time vary Standards, as FRANCHISOR may deem necessary or desirable for the System(s) or the Unit.

5.1    **Unit Operations.** - FRANCHISEE shall keep the Unit open and in continuous normal operation for such hours as FRANCHISOR shall from time to time direct, provided, however, no longer than the maximum number of hours per day permitted by law, on all days, unless prior written approval is obtained from FRANCHISOR or unless FRANCHISOR otherwise directs in writing. In connection therewith, but without limitation, FRANCHISEE further agrees as follows:

5.1.1    FRANCHISEE shall use all products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment, methods of exterior and interior design and construction and methods of product storage, handling, preparation, packaging, delivery and sale prescribed by FRANCHISOR. All such items must conform to FRANCHISOR's Standards. FRANCHISOR reserves the right to specify any item by brand. FRANCHISEE shall carry out the business covered by this Agreement in accordance with the operational Standards established by FRANCHISOR and set forth in FRANCHISOR's operating manuals and other documents as they presently exist or shall exist in the future or as may be otherwise disclosed to franchisees from time to time.

5.1.2    FRANCHISEE shall refrain from using or selling any products, materials, ingredients, supplies, paper goods, uniforms, fixtures, furnishings, signs, equipment and methods of product storage, handling, preparation, packaging, merchandising, and delivery, or any other items of any kind, which do not meet FRANCHISOR's Standards. Without limiting the generality of the foregoing, FRANCHISEE shall immediately rectify all hazardous situations, and immediately remove and destroy any and all hazardous products. For purposes of the foregoing sentence, "hazardous situations" are those which have the potential to cause injury, illness or death, and "hazardous products" are products which are unfit for human consumption or which have the potential to cause injury, illness or death.

5.1.3    FRANCHISEE shall offer for sale all products that FRANCHISOR may, from time to time in its sole discretion, designate in writing as approved for sale at the Unit. FRANCHISEE shall sell, distribute and deliver such products only in weights, sizes, forms and packages as are approved in writing by FRANCHISOR. FRANCHISEE further agrees to discontinue offering for sale any product that FRANCHISOR may, at any later time, in its sole discretion, by written notice withdraw approval for sale at the Unit; and FRANCHISEE agrees to refrain from offering for sale any product or products which have not been designated in writing as approved by FRANCHISOR for sale at the Unit. FRANCHISOR may disapprove FRANCHISEE's sale of any product(s) or FRANCHISEE's participation in any program(s), in the event FRANCHISEE fails to comply with operational Standards at the Unit. FRANCHISEE shall have sole and complete discretion as to the price FRANCHISEE charges for all products.

5.1.4    FRANCHISEE shall maintain at all times a sufficient supply of approved products to meet the demand of FRANCHISEE's customers at the Unit.

5.1.5    FRANCHISEE shall purchase all food products, supplies, equipment and materials required for the operation of the Unit from FRANCHISOR or from suppliers who (a) demonstrate, to the reasonable satisfaction of FRANCHISOR, the ability to meet all of FRANCHISOR's Standards for such items, (b) possess adequate capacity and facilities to supply the needs of FRANCHISEE and other franchisees in the quantities, at the times and with the reliability requisite to an efficient operation, and (c) have been approved, in writing, by FRANCHISOR. Prior to purchasing any items from any supplier not previously approved by FRANCHISOR, FRANCHISEE shall submit to FRANCHISOR a written request for approval of the supplier. FRANCHISOR may require that samples from the supplier be delivered to FRANCHISOR or to a designated independent testing laboratory for testing prior to approval and use. FRANCHISEE shall pay FRANCHISOR a fee not to exceed the actual cost of the test; provided, however, no fee shall be charged for the first test requested by FRANCHISEE in any calendar year. This paragraph is subject to Special Terms and Conditions which contain additional provisions and limitations specific to the System(s) authorized for the Unit by this Agreement.

5.1.6    FRANCHISEE shall maintain, at all times and at FRANCHISEE's expense, the interior and exterior of the Unit and all fixtures, furnishings, signs and equipment in the highest degree of cleanliness, orderliness, sanitation and repair, as reasonably required by FRANCHISOR. FRANCHISEE shall make no material alteration, addition, replacement or improvement in or to the interior or exterior of the Unit (including the parking lot and landscaped areas) without FRANCHISOR's prior written consent.

5.1.7    FRANCHISEE shall comply with all civil and criminal laws, ordinances, rules, regulations and orders of public authorities pertaining to the maintenance and operation of the Unit, including, but not limited to, those relating to health, safety, sanitation, employment, environmental regulation and taxation.

-5-

*General Terms and Conditions*

-6-

5.1.7.1    FRANCHISEE agrees to maintain as business records provided in subsection 5.2 below, and to furnish to FRANCHISOR within five (5) days after receipt of written demand therefor, copies of all customer complaints and notices, warnings, citations, inspection reports and other communications related to the Unit from public authorities. FRANCHISEE hereby authorizes any such public authority to provide FRANCHISOR with copies of such notices and/or communications. If any suit, investigation or other legal proceeding related to FRANCHISEE's business should be commenced by or against FRANCHISEE, FRANCHISEE shall immediately notify FRANCHISOR thereof and keep FRANCHISOR continuously advised of the status of the matter.

5.1.8    FRANCHISEE shall manage the Unit at all times with at least two (2) individuals, one of whom must be FRANCHISEE, or a partner, shareholder or member of FRANCHISEE, either of whom must be the Designated Representative and both of whom must have successfully completed FRANCHISOR's training program. Both individuals must have literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to satisfactorily complete FRANCHISOR's training program and to communicate with employees, customers, and suppliers.  If FRANCHISEE operates more than one unit, FRANCHISOR requires that each additional unit be managed by a Designated Representative approved by FRANCHISOR.

5.1.8.1    In the event of any resignation, termination, disability, death or other incapacity of the Designated Representative, FRANCHISEE shall notify FRANCHISOR in writing of the name of a qualified successor Designated Representative as soon as possible, but in no event later than two (2) months after such event.

5.1.8.2    FRANCHISEE shall hire, train and supervise efficient, competent and courteous employees of good character for the operation of the Unit and shall ensure that all such employees are trained in accordance with FRANCHISOR's training procedures. FRANCHISEE is solely responsible for hiring and discharging employees of the Unit, and for setting their wages and terms of employment. FRANCHISEE shall ensure that all employees whose duties include customer service have sufficient literacy and fluency in the English language to adequately serve the public in the Unit. FRANCHISEE (or the Designated Representative, as specified by FRANCHISOR) shall attend, and FRANCHISEE shall require employees at the Unit to attend, such further training as FRANCHISOR shall from time to time reasonably require. The cost of training materials, salaries, accommodations and travel expenses, if any, of FRANCHISEE or any other individual employed in the Unit will be borne entirely by FRANCHISEE.  FRANCHISEE will bear the cost of all training programs except FRANCHISOR's initial training program referred to in paragraph 2.1.2 of this Agreement.

5.1.9    FRANCHISEE shall accurately report all Gross Sales to FRANCHISOR and implement all procedures recommended by FRANCHISOR to minimize employee theft.  FRANCHISEE further acknowledges and agrees that employee theft shall not relieve FRANCHISEE of the obligation to make all payments to FRANCHISOR based on Gross Sales pursuant to Section 4 of this Agreement and that accurate reporting of Gross Sales requires, among other things, compliance with all Standards related thereto and recording all sales at the time the product is delivered to the purchaser, including, without limitation, retail, wholesale and bulk discount sales, whether for cash, by redemption of gift certificates or coupons, or sales for which payment may be deferred.

5.2    **Books, Records and Reports.**  FRANCHISEE shall keep full, complete and accurate books and accounts with respect to the Unit, in accordance with generally accepted accounting principles and all requirements of law and in the form and manner prescribed below or as from time to time further prescribed by FRANCHISOR. Commencing upon the opening of the Unit:

5.2.1    FRANCHISEE shall submit to FRANCHISOR, on or before Thursday of each week, on a standard form approved by FRANCHISOR, a signed statement of Gross Sales at the Unit for the seven (7) day period ending at the close of business on the preceding Saturday, along with all moneys required to be paid under Section 4 of this Agreement.

5.2.2    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty-five (45) after the close of each of FRANCHISEE's calendar or fiscal month, a profit and loss statement of the Unit for said monthly period.

5.2.3    FRANCHISEE shall submit to FRANCHISOR, on a standard form approved by FRANCHISOR, within forty five (45) days after the close of each applicable period, a profit and loss statement prepared in accordance with generally accepted accounting principles, along with a balance sheet (including a statement of retained earnings or partnership account) (i) for the first six (6) months of each of FRANCHISEE's fiscal year; and  (ii) for the full twelve (12) months of each of FRANCHISEE's fiscal years.  FRANCHISOR shall have the right, in its sole discretion, to require FRANCHISEE to have such annual statements audited by an independent certified public accountant  and submitted to FRANCHISOR within ninety (90) days after the close of each of FRANCHISEE's fiscal year.

5.2.4    FRANCHISEE shall submit to FRANCHISOR, at the times and in the form required, such other periodic reports and information as may from time to time be prescribed by FRANCHISOR.

5.2.5    FRANCHISEE shall preserve, in the English language and for the time periods set forth below, all books, tax returns, accounting records and supporting documents relating to the FRANCHISEE's business operations at the Unit (hereinafter called the "Records"), including but not limited to:

    a.  daily cash reports;
    b.  cash receipts journal and general ledger;
    c.  cash disbursements journal and weekly payroll register;
    d.  monthly bank statements, and daily deposit slips and canceled checks;
    e.  all business tax returns;
    f.  suppliers invoices (paid and unpaid);

*General Terms and Conditions*



g. dated cash register tapes (detailed and summary);
h. semi-annual balance sheets and monthly profit and loss statements;
i. weekly inventories;
j. records of promotion & coupon redemptions;
k. such other records and information as FRANCHISOR may from time to time request.

FRANCHISEE shall be permitted to preserve Records and submit reports electronically, in accordance with FRANCHISOR's Retail Information System ("RIS") and/or other requirements, or otherwise with the prior written approval of FRANCHISOR. During the term of this Agreement, FRANCHISEE shall preserve and make available to FRANCHISOR all Records for no less than the current fiscal year and the three (3) immediate-past fiscal years. For three (3) years after the date of any transfer of any interest in this Agreement, the transferor of such interest shall preserve and make available to FRANCHISOR all Records of its last three (3) fiscal years of operation under this Agreement. For a period of three (3) years after the expiration of the term of this Agreement (or after any earlier termination thereof) FRANCHISEE shall preserve and make available to FRANCHISOR all Records for the last three (3) fiscal years of FRANCHISEE's business operation at the Unit.

5.2.6    Retail Information System    FRANCHISEE shall record all sales at or from the Unit at the time of sale, in accordance with FRANCHISOR's procedures and on devices, the make, model and serial numbers of which have been individually approved in writing by FRANCHISOR. Such devices must record accumulated sales in a manner that cannot be turned back or reset, and must retain data in memory storage in the event of power loss. FRANCHISEE shall, at its sole cost and expense, upon notice from FRANCHISOR, purchase or lease and install a unit and/or network information technology system, including computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR for the Unit (hereinafter for convenience called "RIS"). The term "RIS" includes, without limitation, all hardware and software designated from time to time by FRANCHISOR and the data stored thereon by FRANCHISEE. Some or all components of RIS may be licensed to FRANCHISOR and used by FRANCHISEE as a sub-licensee. FRANCHISEE shall use RIS solely in connection with the operation of the Unit, in the manner specified by FRANCHISOR from time to time. FRANCHISEE shall comply with such requirements determined by FRANCHISOR from time to time regarding maintenance, training, storage and safeguarding of data, records, reports and other matters relative to RIS.

5.2.6.1 FRANCHISEE shall, at its sole cost and expense: (a) attend, and/or cause the Designated Representative and/or employees in the Unit to attend, such initial and other RIS training as is specified by FRANCHISOR; (b) maintain RIS in continuous operation at the Unit; (c) purchase an ongoing maintenance and support contract from an approved supplier and replace the RIS components as necessary, (d) upgrade RIS from time to time as may be reasonably required by FRANCHISOR; (e) permit FRANCHISOR immediate access to RIS, electronically or otherwise, at all times without prior notice to FRANCHISEE (such access shall not unreasonably interfere with FRANCHISEE's normal Unit operations); and (f) install and maintain telephone or other service required by FRANCHISOR to permit such access.

5.2.6.2 FRANCHISEE shall, at its sole cost and expense, upon FRANCHISOR's request, replace RIS with the computers, printers, touch heads, cash drawers, software and other equipment designated by FRANCHISOR from time to time as FRANCHISOR's then-current unit and/or network information system. Such replacements shall take place when deemed advisable by FRANCHISOR given the age, cost to operate, condition of the information system then in the Unit, the then-current and anticipated technology, the information systems then in use at other Units, the needs of the System(s), and other factors as may be relevant.

5.2.6.3 FRANCHISOR makes no representation or warranty as to the costs, sales, or profits, if any, which may result from the installation and use of RIS and its replacements.

5.2.7    FRANCHISOR shall treat any Records received from FRANCHISEE pursuant to this subsection 5.2 as confidential, except that information may be released (a) to any person entitled to the same under any Lease; (b) in connection with any court order, legal proceeding or other dispute resolution process, whether instituted by FRANCHISOR or any other party; (c) to a prospective transferee of any interest subject to the provisions of Section 10 of this Agreement, and (d) as incorporated into anonymous general information disseminated to FRANCHISOR's franchisees and prospective franchisees, and in the formulation of plans and policies in the interest of the System(s).

5.3     Insurance.  FRANCHISEE shall procure, before the commencement of business, and maintain in full force and effect during the entire term of this Agreement, at FRANCHISEE's sole expense, an insurance policy or policies protecting FRANCHISEE and FRANCHISOR, and their directors and employees, against any loss, liability, including without limitation employment practices liability, or expense whatsoever from, without limitation, fire, personal injury, theft, death, property damage or otherwise, arising or occurring upon or in connection with FRANCHISEE's operation of the Unit or by reason of FRANCHISEE's occupancy of the Premises.

5.3.1   Such policy or policies shall include:

5.3.1.1 commercial general liability insurance, including but not limited to, product, contractual, and owned and non-owned vehicle liability coverages, with a limit of two million dollars ($2,000,000.00) per occurrence and two million dollars ($2,000,000.00) in the aggregate or such higher limit as FRANCHISOR, in its sole and absolute discretion, may from time to time require, and as may be required under the terms of any Lease or underlying lease for the Unit, for bodily injury and property damage combined; and

5.3.1.2 "All Risk" property damage insurance, including without limitation flood and earthquake protection, for the full replacement cost value of the Premises and all other property within or relating to the Unit, including signs, with no coinsurance clause and with a replacement cost clause attached; and

-7-

*General Terms and Conditions*

-8-

5.3.1.3  plate glass insurance and, if applicable, boiler insurance; and

5.3.1.4  employer's liability, worker's compensation and such statutory insurance as may be required in the state in which the Premises is located.

5.3.1.5  employment practices liability insurance with a limit of one million dollars ($1,000,000.00) per occurrence and one million dollars ($1,000,000.00) in the aggregate.

5.3.2  All insurance required under the terms of this Agreement (i) shall be written in the names of FRANCHISEE, FRANCHISOR and/or other party or parties designated by FRANCHISOR, as their respective interest may appear, by insurance companies reasonably acceptable to FRANCHISOR; (ii) shall contain provisions denying to the insurer acquisition by subrogation of rights of recovery against any party named; (iii) shall provide that cancellation or alteration cannot be made without at least thirty (30) days written notice to any party named; and (iv) shall not be limited in any way by reason of any insurance which may be maintained by FRANCHISOR or any other party named.

5.3.3  During the term of this Agreement, FRANCHISEE shall promptly unless otherwise directed by FRANCHISOR, (but in no event later than ten (10) days after any such policy becomes effective or such payment is due) furnish FRANCHISOR with duplicate originals of all insurance policies, including renewal and replacement policies, together with evidence that all premiums have been paid.  If at any time FRANCHISEE fails to comply with the provisions of this subsection 5.3, FRANCHISOR, in addition to all other remedies available, shall have the right (but not the obligation) to obtain and/or maintain such insurance with respect to the Unit and/or Premises, at FRANCHISEE's sole expense. FRANCHISEE shall pay FRANCHISOR when and as billed for the cost of premiums thereof.  Maintenance of insurance and FRANCHISEE's performance of the obligations contained in this subsection 5.3 shall not relieve FRANCHISEE of liability under the indemnity provisions set forth in paragraph 5.4 below.

5.3.4.  Each of the parties hereby waives any and all rights of recovery against the other parties hereto, or against the officers, employees, agents, and representatives of such other parties, for damage to such waiving party or for loss of its property or the property of others under its control to the extent that such loss or damage is insured against under any insurance policy in force at the time of such loss or damage.  FRANCHISEE shall, upon obtaining the policies of insurance required hereunder, give notice to the insurance carrier or carriers that the foregoing mutual waiver of subrogation is contained in this Agreement.

5.4    Indemnification.  FRANCHISEE shall save, defend, exonerate, indemnify and hold harmless FRANCHISOR, and each of them, and the subsidiaries or each of them, and their respective officers, directors, employees, agents, successors and assigns, from and against (i) any and all claims based upon, arising out of, or in any way related to the operation or condition of any part of the Unit or the Premises, the conduct of business thereupon, the ownership or possession of real or personal property and any negligent act, misfeasance or nonfeasance by FRANCHISEE or any of its agents, contractors, servants, employees, or licensees, and including, without limitation, all obligations of FRANCHISEE incurred pursuant to any provisions of this Agreement, and (ii) any and all fees (including reasonable attorneys' fees), costs and other expenses incurred by or on behalf of FRANCHISOR in the investigation or defense against any and all such claims.

5.5    Refurbishment & Remodel of the Premises.  FRANCHISEE shall timely complete future refurbishments and remodels of the Unit in accordance with this subsection 5.5.  Such refurbishments and remodels are in addition to FRANCHISEE's continuing obligations to maintain, repair and replace all equipment, signage, furnishing, decor and personal property related to the Unit in accordance with FRANCHISOR's standards.  FRANCHISEE's obligations to maintain, repair and replace shall not be delayed or deferred pending or in anticipation of any such refurbishment or remodel.

5.5.1  No later than the Refurbishment Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall refurbish the Unit in accordance with FRANCHISOR's then-current refurbishment standards. The refurbishment required of the FRANCHISEE shall be generally the same as then required of units of the same age and condition.  The above refurbishing costs do not include costs for required maintenance and repair or costs to upgrade, change or replace the Retail Information System.

5.5.2  No later than the Remodel Date set forth in Item "G" of the Contract Data Schedule of this Agreement, and at the end of each ten (10) year period thereafter (if this Agreement is renewed), FRANCHISEE shall remodel the Unit in accordance with FRANCHISOR's then-current remodeling standards (including but not limited to fixtures, furnishings, signs and equipment).  The remodeling required of FRANCHISEE shall be generally the same as then required of units of the same age, condition, location and geographic region.

5.5.3  FRANCHISEE acknowledges and agrees that the requirements of this subsection 5.5 are both reasonable and necessary to ensure continued public acceptance and patronage of the System(s), to avoid deterioration or obsolescence of the Unit and to take advantage of changes and improvements in design, concept and decor.

5.6    Cross-Guarantee.  In the event FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, now holds or hereafter acquires an interest in any other unit franchised by FRANCHISOR, FRANCHISEE shall be jointly and severally liable to FRANCHISOR as guarantor of the obligations of the franchisee under each franchise Agreement for such other unit(s).  Included in such guaranty are, without limitation, payment of all franchise fees, advertising fees, equipment payments, note payments, rental and other Lease payments to FRANCHISOR or any of its subsidiaries, if applicable, collection fees and general receivables now or hereafter due and payable to FRANCHISOR or guaranteed by FRANCHISOR to any third party.  FRANCHISEE's liability under this paragraph shall be limited to the extent that the

total sum due and payable by FRANCHISEE upon the account or debt of any other franchisee in default shall not exceed the total interest (as hereinafter defined) that the common shareholder(s), member(s) or partner(s), as the case may be, hold in FRANCHISEE. For this purpose, "interest" shall include without limitation, all equity in, assets, real estate interests of, loans or other financial interests of FRANCHISEE, held by or controlled by the common shareholder(s), member(s) or partner(s) or their immediate family, as the case may be. The terms of this paragraph shall not operate to extend any personal guaranty of any Lease obligations by any shareholder(s), member(s) or partner(s), after such guaranty shall have ended by its terms.

5.7     **FRANCHISEE Entity.** FRANCHISEE may be a sole proprietorship, a general partnership, a corporation or a limited liability company ("LLC"). FRANCHISEE may not be a limited partnership, trust or other entity not specifically authorized herein or approved by FRANCHISOR in writing.

5.7.1     **Corporation.** If FRANCHISEE is a corporation, (i) said corporation's charter shall provide that it is limited to operating the Unit as provided under this Agreement; (ii) all shareholders of the corporation shall enter into a written Agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the corporation's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) each stock certificate of the corporation shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new shares of common or preferred voting stock in the corporation shall be issued to any person, persons, partnership, association, LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all owners of record and all beneficial owners of any class of voting stock of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

5.7.2     **LLC.** If FRANCHISEE is an LLC, (i) said LLC's operating agreement shall provide that its activities are limited to operating the Unit as provided under this Agreement; (ii) all members of the LLC shall enter into a written agreement, in a form satisfactory to FRANCHISOR, to jointly and severally guaranty the full payment and performance of the LLC's obligations to FRANCHISOR and to assume all personal obligations required of partners, members and/or shareholders contained in this Agreement; (iii) the LLC's operating agreement shall provide that any assignment or transfer of membership interests in the LLC is subject to all restrictions imposed upon transfers by this Agreement; and (iv) no new membership interest(s) in the LLC shall be created for, issued or granted to any person, persons, partnership, association LLC or corporation without obtaining FRANCHISOR's prior written consent, pursuant to Section 10 of this Agreement. FRANCHISEE shall at all times maintain a current list of all members of record of FRANCHISEE and shall furnish the list to FRANCHISOR upon request.

### Section 6.  Certain Rights of FRANCHISOR

6.0     In order to preserve the validity and integrity of the Proprietary Marks and to assure that the Standards of the System(s) are properly employed by FRANCHISEE in the operation of the Unit and, in general, to verify FRANCHISEE's compliance with the terms of this Agreement, FRANCHISOR, or its agents, shall have the right, at all times, with or without prior notice to FRANCHISEE, to enter and inspect any and all public or private area(s) of the Unit and to select materials, ingredients, products, supplies, paper goods, uniforms, fixtures, furnishings, signs and equipment for evaluation purposes to assure that these items conform to the Standards of the System(s). During the course of any such inspection, FRANCHISOR may photograph or videotape any part of the Unit, whether or not FRANCHISEE is present. FRANCHISOR may require FRANCHISEE to remove any item which does not conform to applicable Standards. FRANCHISOR may also, at FRANCHISEE's expense, remove or destroy any item which does not conform to applicable Standards.

6.1     If FRANCHISOR finds any condition on the Premises which FRANCHISOR deems to be hazardous, unsafe, unhealthy, unsanitary, unclean or in material disrepair, FRANCHISOR shall have the following rights in addition to all other rights set forth in this Agreement:

6.1.1     FRANCHISOR shall have the right to require FRANCHISEE to immediately close and suspend operation of the Unit, and/or to require such other actions as FRANCHISOR, in its sole discretion, deems necessary, whenever there is reason to believe that any products in the Unit are contaminated, or for other reasons of imminent risk to public health and safety. FRANCHISEE agrees to notify FRANCHISOR immediately of any suspected product contamination or other violation affecting public health or safety and to promptly take any action which FRANCHISOR requires in connection therewith. FRANCHISEE shall be solely responsible for all losses, costs or other expenses it incurs in complying with the provisions of this subsection 6.1; and/or

6.1.2     FRANCHISOR shall have the right to immediately remove or destroy, at FRANCHISEE's expense, any product which FRANCHISOR believes to be hazardous, contaminated or to otherwise pose an imminent risk to public health or safety; or

6.1.3     FRANCHISOR shall have the right to give FRANCHISEE twenty-four (24) hours written notice requiring the correction of an unsafe, unhealthy, unsanitary or unclean condition, or thirty (30) days written notice requiring maintenance, repairs or alterations to the Unit or correction of any other Standards violation. If FRANCHISEE has not within that time corrected the condition or completed the maintenance, repairs or alterations, as the case may be, FRANCHISOR may enter the Unit, without being guilty of, or liable for, trespass or tort, and may cause the condition to be corrected or the maintenance, repair, or alteration to be completed at the expense of FRANCHISEE and without prejudice to any other rights or remedies of FRANCHISOR.

-9-

-10-

6.2    In addition to FRANCHISOR's right to access information through the Retail Information System and otherwise, FRANCHISOR's representatives shall have the right to examine FRANCHISEE's original books, Records and supporting documents at reasonable times, and to perform, with or without notice to FRANCHISEE, such inspections, tests and other analyses as it deems appropriate to verify Gross Sales at the Unit. If FRANCHISOR determines that the Gross Sales FRANCHISEE reported to FRANCHISOR are less than the Gross Sales ascertained by FRANCHISOR's analysis, FRANCHISEE shall immediately pay to FRANCHISOR all amounts owing to FRANCHISOR, the applicable Fund and FRANCHISOR's affiliated landlord corporation based upon the corrected Gross Sales. If an analysis is undertaken due to (i) FRANCHISEE's failure to maintain the Retail Information System in continuous operation, or (ii) FRANCHISEE's failure to prepare, deliver or preserve statements or Records required by subsection 5.2 of this Agreement, or (iii) if any analysis of FRANCHISEE's books and Records results in the discovery of a discrepancy greater than three percent (3%) in the Gross Sales reported by FRANCHISEE, FRANCHISEE shall pay, in addition to the unpaid amounts owed FRANCHISOR, its affiliated landlord corporation and the applicable Fund, interest thereon from the date payment was due, at 18% per annum or the highest permissible rate. FRANCHISEE shall also reimburse FRANCHISOR for all related expenses, including, but not limited to, reasonable investigation, accounting and legal fees and other reasonable expenses and costs such as travel, payroll and overhead expenses for FRANCHISOR's employees. Such payments shall be without prejudice to any other remedies FRANCHISOR may have under this Agreement, including the right to terminate this Agreement, without opportunity to cure, in the case of intentional under-reporting of Gross Sales.

6.3    In the event that FRANCHISOR shall believe there may have been intentional under-reporting of Gross Sales for the Unit, FRANCHISEE (and all partners, members and shareholders of FRANCHISEE) shall, upon written demand from FRANCHISOR provide FRANCHISOR, in addition to Records described in paragraph 5.2.5, personal federal and state tax returns, bank statements (including deposit slips and canceled checks) and such other documents and information as FRANCHISOR may in its sole discretion request in connection with FRANCHISOR's efforts to verify Gross Sales reported to FRANCHISOR under this Agreement or any Lease of the Unit. Information provided by FRANCHISEE under this paragraph 6.3 shall be subject to the confidentiality provisions of paragraph 5.2.7, except that exclusion (c) therein does not apply. Schedules to personal tax returns and other financial data which are unrelated to the business of the Unit need not be provided by any partner, member or shareholder of FRANCHISEE who has not been active in the business, and, in addition, has not directly or indirectly owned or controlled at least a majority interest in the business at the Unit, alone or in conjunction with any other family member or related entity.

6.4    FRANCHISEE hereby grants FRANCHISOR the right to inspect the records of all suppliers, distributors, group purchasing programs, distribution centers, and other third parties supplying food products, supplies, equipment and materials to FRANCHISEE and hereby authorizes such parties to release records of FRANCHISEE's purchases and deliveries to FRANCHISOR, by electronic transfer or otherwise, at such times and places as FRANCHISOR shall request.

6.5    If, during the term of this Agreement or any extension or renewal thereof, FRANCHISEE directly or indirectly acquires ownership or control of the Premises, FRANCHISEE agrees to give FRANCHISOR prompt written notice of such ownership or control and to grant FRANCHISOR, under FRANCHISOR's standard Lease Option Agreement, the option to acquire a leasehold interest in the Premises in the event of default by FRANCHISEE under this Agreement or under any lease or mortgage relating to the Premises. Said leasehold interest shall be for the remaining term of this Agreement, including any renewal, at "triple-net" fair market value rental for comparable properties and use in the area as mutually agreed by the parties, or, in the absence of agreement, as determined by arbitration.

## Section 7.  Proprietary Marks

7.0    FRANCHISOR has, in connection with its business and the business of its franchisees, developed and used and continues to use and control the usage of Proprietary Marks which are certain proprietary interests, trademarks, service marks, logos, emblems, trade dress and other indicia of origin, including colors, and certain trade names, including but not limited to Dunkin' Donuts®, owned by Dunkin' Donuts Incorporated, Baskin 31 Robbins® owned by Baskin-Robbins Incorporated, and TOGO'S®, owned by Togo's Eateries, Inc., all of which are registered as trademarks on the Principal Register of the United States Patent and Trademark Office. FRANCHISEE's rights to use specific Proprietary Marks under this Agreement are set forth in the Special Terms and Conditions described in Item "J" of the Contract Data Schedule of this Agreement and attached hereto as a part hereof.

7.1    FRANCHISEE agrees to use the Proprietary Marks only in the manner and to the extent specifically licensed by this Agreement. FRANCHISEE shall not sublicense the Proprietary Marks. FRANCHISEE further agrees that any unauthorized use of the Proprietary Marks during the term of or after expiration or the earlier termination of this Agreement shall constitute an incurable default causing irreparable harm subject to injunctive relief.

7.1.1    FRANCHISEE understands and acknowledges that FRANCHISEE's license to use any or all of the Proprietary Marks is non-exclusive and relates solely to the single location set forth in this Agreement. FRANCHISEE further acknowledges that FRANCHISOR, in its sole discretion, has the right to operate or franchise other units and sales outlets and to grant other licenses in, and to, any or all of the Proprietary Marks, and to develop and establish other systems, products or services using the same or similar Proprietary Marks, or any other proprietary names and marks, and to grant licenses or franchises thereto, in each case at such locations and on such terms and conditions as FRANCHISOR deems acceptable, without providing any rights therein to FRANCHISEE. FRANCHISEE further acknowledges the FRANCHISOR may license others to use the Proprietary Marks at locations and in ways that competes with FRANCHISEE and draws customers from the same area as the Unit.

*General Terms and Conditions*

7.2    FRANCHISEE agrees that, during the term of this Agreement and after the expiration or termination thereof, FRANCHISEE shall not directly or indirectly contest or aid in contesting the validity or ownership of the Proprietary Marks. FRANCHISEE shall not, directly or indirectly, apply to register, register or otherwise seek to use or control or in any way use any of the Proprietary Marks or any confusingly similar form or variation thereof in any place or jurisdiction outside the United States; nor shall FRANCHISEE assist any others to do so.

7.3    FRANCHISEE shall identify itself as the franchisee of the Unit in conjunction with any use of the Proprietary Marks, including, without limitation, uses on letterheads, invoices, order forms, receipts, and contracts. Upon the written request of FRANCHISOR, FRANCHISEE shall display a notice identifying the Unit as being independently owned and operated by FRANCHISEE, in such content and form and at such conspicuous locations on the Premises as FRANCHISOR may designate.

7.4    FRANCHISEE agrees to notify FRANCHISOR promptly of any litigation instituted by FRANCHISEE, or by any person, firm or corporation against FRANCHISEE, relating to the Proprietary Marks. In the event FRANCHISOR undertakes the defense or prosecution of any such litigation, FRANCHISEE agrees to execute any and all documents and do such acts and things as may, in the opinion of counsel for FRANCHISOR, be necessary to carry out such defense or prosecution.

## Section 8.  Restrictions on FRANCHISEE's Activities

8.0    During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination (hereinafter called the "Post-Term Period"), neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall:

8.0.1    Divert or attempt to divert any business or customer of the Unit to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with FRANCHISOR's Proprietary Marks and System(s);

8.0.2    Directly or indirectly contest or aid in contesting the right of FRANCHISOR or any prospective franchisee of FRANCHISOR to obtain a building permit, zoning variance or other governmental approval required for the development of another location as a unit franchised by FRANCHISOR.; or

8.0.3    Except with respect to the ownership or operation of additional units under Franchises granted by FRANCHISOR, own, maintain, engage in, be employed by, or have any interest in any other business which sells or offers to sell the same or substantially similar products to the type FRANCHISOR requires to be offered by FRANCHISEE at the Unit; provided that, during the Post-Term Period only, the provisions of this paragraph 8.0.3 shall not apply to another business located more than five (5) miles from this or any other unit operating under the same Proprietary Marks of FRANCHISOR. Either party to this Agreement, upon notice in writing to the other during the Post-Term Period, shall have the right to have determined whether said five (5) mile radius is a reasonable restriction on FRANCHISEE's activities, by requesting that the matter be submitted to arbitration in accordance with Section 11 of this Agreement. In such event, the decision of the arbitrator shall be final and binding upon the parties. FRANCHISEE further agrees that, in the event arbitration is requested, FRANCHISEE will engage in no competitive activities pending resolution of the dispute.

8.1    During the term of this Agreement, including any extension or renewal thereof, and for a period of two (2) years after expiration or termination of this Agreement, regardless of the cause of termination, neither FRANCHISEE, nor any partner, officer, director, shareholder or member of FRANCHISEE, as the case may be, shall communicate or divulge to, or use for the benefit of any person, persons, partnership, association or corporation, any information or knowledge concerning the methods of constructing, equipping or operating units under any of FRANCHISOR's Systems and all other information or knowledge which FRANCHISOR deems confidential and which may be communicated to FRANCHISEE, or of which FRANCHISEE may be apprised by virtue of FRANCHISEE's operation under the terms of this Agreement. FRANCHISEE shall divulge such confidential information only to such of its employees as must have access to it in order to operate the franchised business. Any and all information, knowledge, and know-how including, without limitation, drawings, materials, specifications, techniques, and other data, which FRANCHISOR designates confidential shall be deemed confidential for purposes of this Agreement. FRANCHISOR shall have the non-exclusive right to use and incorporate into FRANCHISOR's Systems, for the benefit of itself and other of FRANCHISOR's franchisees licensees and distributors, all modifications, changes, and improvements developed or discovered by FRANCHISEE or FRANCHISEE's employees or agents in connection with the franchised business, without any liability or obligation to the developer thereof.

8.2    The covenants contained in this Section 8 shall be construed as severable and independent and shall be interpreted and applied consistently with the requirements of reasonableness and equity. If all or any portion of a covenant in this Section 8 is held unreasonable or unenforceable by a court, arbitration panel or other agency having valid jurisdiction in a decision to which FRANCHISOR is a party, FRANCHISEE expressly agrees to be bound by any lesser covenant included within the terms of such greater covenant that imposes the maximum duty permitted by law, as if the lesser covenant were separately stated in, and made a part of, this Section 8.

8.3    FRANCHISEE acknowledges that FRANCHISOR shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 8, or of any portion or portions thereof, without FRANCHISEE's consent, and FRANCHISEE agrees to comply forthwith with any covenant as modified.

-11-

-12-

## Section 9. Default

9.0     FRANCHISEE shall be in default under this Agreement:

9.0.1     If FRANCHISEE shall become insolvent or make an assignment for the benefit of creditors, or if a petition in bankruptcy is filed by FRANCHISEE, or if such a petition is filed against and consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if FRANCHISEE is adjudicated a bankrupt, or if a bill in equity or other proceeding for the appointment of a receiver of FRANCHISEE or other custodian for FRANCHISEE's business or assets is filed and is consented to by FRANCHISEE or is not dismissed within thirty (30) days, or if a receiver or other custodian is appointed, or if proceedings for composition with creditors under any state or federal law should be instituted by or against FRANCHISEE, or if the real or personal property of FRANCHISEE shall be sold at levy thereupon by any sheriff, marshall or constable; or

9.0.2     If FRANCHISEE is convicted of or pleads guilty or "nolo contendere" to a felony, a crime involving moral turpitude, or any other crime or offense that FRANCHISOR believes is injurious to the System(s), the Proprietary Marks or the goodwill associated therewith, or if FRANCHISOR has proof that FRANCHISEE has committed such a felony, crime or offense; or

9.0.3     If FRANCHISEE permits the use of the Unit or Premises for any illegal or unauthorized purpose, including, without limitation, palming off or substitution of products under the Proprietary Marks or other marks of FRANCHISOR; or

9.0.4     If any other franchise agreement between FRANCHISEE and FRANCHISOR or any affiliated entity is terminated by reason of FRANCHISEE's default thereunder; or

9.0.5     If FRANCHISEE fails to pay, perform, observe or comply with any of FRANCHISEE's duties and obligations under this Agreement; or if FRANCHISEE fails to carry out in all respects its obligations under any Lease, mortgage, equipment Agreement, promissory note, conditional sales contract or other contract materially affecting the Unit, to which the FRANCHISEE is a party to or by which FRANCHISEE is bound, whether or not FRANCHISOR is a party thereto.

9.1     **Thirty Day Cure Period.** Except as otherwise provided in this Section 9, FRANCHISEE shall have the right to cure FRANCHISEE's default under this Agreement within thirty (30) days after written notice of default from FRANCHISOR is delivered pursuant to paragraph 14 hereof. Notwithstanding the foregoing, the following lesser periods shall apply under the circumstances described:

9.1.1     **Seven Day Cure Period.** A seven (7) day cure period shall apply if FRANCHISEE fails, refuses, or neglects to pay when due to FRANCHISOR any moneys owing to FRANCHISOR or to any Fund, or if FRANCHISEE fails to maintain the insurance coverage set forth in subsection 5.3 of this Agreement.

9.1.2     **24 Hour Cure Period.** A twenty-four (24) hour cure period shall apply as provided in paragraph 6.1.3 to the violation of any law, regulation, order or Standard of FRANCHISOR relating to health, sanitation or safety;  or if FRANCHISEE ceases to operate the Unit for a period of forty-eight (48) hours without the prior written consent of FRANCHISOR, provided, however, that if the Unit is abandoned, no cure period shall apply.

9.1.3     **Cure on Demand.** FRANCHISEE shall cure on demand all "hazardous situations" and remove and destroy on demand all "hazardous products" as set forth in paragraph 5.1.2.1 and shall cure any situation which poses an imminent risk to public health and safety as provided in subsection 6.1.

9.1.4     **No Cure Period.** No cure period shall be available if FRANCHISEE is in default under any paragraph designated 9.0.1 through 9.0.4 above; or if FRANCHISEE abandons the Unit; or if FRANCHISEE intentionally under-reports Gross sales, falsifies financial data or otherwise commits an act of fraud with respect to FRANCHISEE's acquisition of this Franchise or its rights or obligations under this Agreement; or if FRANCHISEE's Lease for the Unit is terminated due to FRANCHISEE's default thereunder. In addition, no cure period shall be available for any default if FRANCHISEE has received three (3) or more previous notices-to-cure for the same or a substantially similar default (whether or not FRANCHISEE has cured the same), within the immediately preceding twelve (12) month period.

9.2     **Statutory Cure Period.** If a statute in the state in which the Premises is located requires a cure period for the applicable default which is longer than any cure period specified in this Section 9, the statutory cure period shall apply.

9.3     **Late Fees, Interest and Costs.** If FRANCHISEE fails to cure a default within any applicable time period following notice set forth in subsection 9.1, or if this Agreement is terminated as a result of FRANCHISEE's default, FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, without limitation, late fees, collection fees, interest at one and one-half percent (1.5%) per month, or the highest permissible rate, and reasonable investigation and attorneys' fees incurred by FRANCHISOR as a result of any such default or termination. All such interest, damages, costs and expenses may be included in and form part of the judgment awarded to FRANCHISOR in any proceedings brought by FRANCHISOR against FRANCHISEE.

9.4     **Termination.** If FRANCHISEE fails to cure any default within the applicable period following notice from FRANCHISOR, FRANCHISOR may, in addition to all other remedies at law or in equity or as otherwise set forth in this Agreement, immediately terminate this Agreement. Such termination shall be effective immediately upon receipt of a written notice of termination from FRANCHISOR. Notwithstanding the foregoing, this Agreement shall immediately terminate upon the occurrence of any event set forth in paragraphs 9.0.1 through 9.0.4 or paragraph 9.1.4, without notice or opportunity to cure or notice of termination. Upon any termination or expiration of this Agreement all right of FRANCHISEE to use the Proprietary Marks and the System(s) and to operate the Unit under the Proprietary Marks shall terminate and:

*General Terms and Conditions*



9.4.1    FRANCHISEE shall promptly pay FRANCHISOR all sums owing or accrued from FRANCHISEE to FRANCHISOR, the Fund, and any affiliated landlord entity, including interest and any damages, costs and expenses, including reasonable attorneys' fees, incurred by FRANCHISOR by reason of default on the part of FRANCHISEE; and

9.4.2    FRANCHISEE shall immediately cease to operate the Unit, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former FRANCHISEE of FRANCHISOR; and

9.4.3    FRANCHISEE shall immediately and permanently cease to use, by advertising or in any other manner whatsoever, any feature or method associated with the System(s), any or all of the Proprietary Marks and any other trade secrets, confidential information, operating manuals, slogans, trade dress, signs, symbols or devices which are part of FRANCHISOR's System(s) or are otherwise used in connection with the operation of the Unit.  FRANCHISEE agrees that any such unauthorized use or continued use after the termination of this Agreement shall constitute irreparable harm. Continued use by FRANCHISEE of FRANCHISOR's trademarks, trade names, Proprietary Marks, and service marks after termination of this Agreement shall constitute willful trademark infringement by FRANCHISEE; and

9.4.4    FRANCHISEE shall immediately return to FRANCHISOR all operating manuals, plans, specifications, and other materials in FRANCHISEE's possession containing information prepared by FRANCHISOR and relative to the operation of the Unit, and all copies thereof (all of which are acknowledged to be FRANCHISOR's property), and shall retain no copy or record of any of the foregoing, except FRANCHISEE's copy of this Agreement, any correspondence between the parties, and any other documents which FRANCHISEE reasonably needs for compliance with any provision of law; and

9.4.5    FRANCHISEE shall remove from the Premises and from any equipment, signs, trade fixtures, furnishings and other personal property (except as provided in paragraph 9.4.6 below) and return to FRANCHISOR, all of the Proprietary Marks or other indicia of FRANCHISOR, and shall disconnect, withdraw and/or terminate, within five (5) days after termination or expiration of this Agreement, any telephone listings and/or fictitious name registration containing any part of the Proprietary Marks.  Upon FRANCHISOR's written demand, however, FRANCHISEE shall assign to FRANCHISOR, upon any termination, expiration or non-renewal of this Agreement, any telephone number used in the operation of the Unit if such number is listed in the directory using any of the Proprietary Marks.  FRANCHISEE hereby appoints FRANCHISOR as its attorney-in-fact, in the name of FRANCHISEE, to do any act necessary to effect the intent of this paragraph; and

9.4.6.    FRANCHISEE shall, but only in the case of any early termination of this Agreement due to FRANCHISEE's default, sell to FRANCHISOR, at FRANCHISOR's election, any or all of the equipment, interior and exterior signs, trade fixtures, furnishings and other personal property of FRANCHISEE used in connection with the Unit (hereinafter collectively "Equipment"), at the purchase cost when originally installed in the Unit, less a depreciation deduction computed on a straight line basis over a ten (10) year useful life for the respective items (but in no event less than ten percent (10%) of the original purchase cost for such equipment, fixtures and furnishings).  If FRANCHISEE owes a balance due on its purchase or financing of such Equipment, or if the same are otherwise subject to a lien or claim for any indebtedness, the amounts of such balance and/or indebtedness shall be deducted from the purchase price payable to FRANCHISEE.  All sums of money due FRANCHISOR by FRANCHISEE may be offset against the purchase price payable to FRANCHISEE.  Nothing contained herein, however, shall be construed to entitle FRANCHISEE to be released from liability for such unpaid balance or indebtedness, if any, in excess of the portion of the purchase price applied for payment of such debts; and

9.4.7    FRANCHISEE shall, at FRANCHISOR's option by notice to FRANCHISEE within thirty (30) days from the date of termination or expiration, assign to FRANCHISOR any interest which FRANCHISEE has in the Lease or any other Agreement related to the Premises.  If FRANCHISOR does not elect to exercise its option to acquire the Lease, FRANCHISEE shall make such modifications or alterations to the Premises immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of the Premises from that of other units in the System(s), and shall make such specific additional changes thereto as FRANCHISOR may reasonably require for that purpose.  In the event FRANCHISEE fails or refuses to comply with the requirements of this paragraph 9.4.7, FRANCHISOR shall have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making such changes as may be required, at the expense of FRANCHISEE, which expense FRANCHISEE agrees to pay upon demand; and

9.4.8    FRANCHISEE shall pay to FRANCHISOR all damages, costs and expenses, including, but not limited to, reasonable investigation and attorney's fees and other reasonable expenses and costs such as travel costs and payroll expenses for FRANCHISOR's employees, incurred in obtaining injunctive or other relief for the enforcement of any provisions of this Section 9; and

9.4.9    FRANCHISEE shall continue to comply with Section 8 of this Agreement, for the Post-Term Period specified therein.  If FRANCHISEE begins to operate any other business wherever situated, FRANCHISEE shall not use, in connection with such other business or the promotion thereof, any reproduction, counterfeit, copy or colorable imitation of any of FRANCHISOR's Proprietary Marks or trade dress; and FRANCHISEE shall not utilize any designation of origin or description or representation which falsely suggests or represent any association or connection with FRANCHISOR whether or not constituting unfair competition.

9.5    Nothing in this Agreement shall preclude FRANCHISOR from seeking any remedy under federal or state law for willful trademark infringement, including, without limitation, injunctive relief.  No right or remedy herein conferred upon or reserved to FRANCHISOR is exclusive of any other right or remedy herein, or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy given hereunder.  FRANCHISEE agrees that the existence of any claims against FRANCHISOR, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by FRANCHISOR of any provision of this Agreement.

-13-

-14-

9.6    Because the Unit is one of many units within the System(s) that sell similar products and services to the public, FRANCHISEE agrees that its failure to comply with the terms of this Agreement would cause irreparable damage to FRANCHISOR and the System(s) as a whole for which no adequate remedy at law may be available, including, without limitation, violations of standards, unhealthy, unsafe or unsanitary conditions, unauthorized use of the Proprietary Marks and breaches under Section 8 hereof. In the event of FRANCHISEE's breach or threatened breach of any of the terms of this Agreement, FRANCHISEE shall therefore be forthwith entitled to an injunction restraining such breach and/or to a decree of specific performance, without showing or proving any actual damage or irreparable harm or lack of an adequate remedy at law, and without the requirement for the posting of bond, the same being hereby waived by FRANCHISEE, until a final determination is made by a court of competent jurisdiction. The foregoing remedy shall be in addition to all other remedies or rights which FRANCHISOR might otherwise have by virtue of any breach of this Agreement by FRANCHISEE.

## Section 10.  Transfer Provisions

10.0    **Transfer By FRANCHISOR.** This Agreement shall inure to the benefit of the successors and assigns of FRANCHISOR either individually or collectively. FRANCHISOR shall each have the right to assign its rights under this Agreement to any person, persons, partnership, association or corporation, provided that the transferee agrees in writing to assume all obligations undertaken by FRANCHISOR herein and FRANCHISEE receives a statement from both FRANCHISOR and its transferee to that effect. Upon such assignment and assumption, FRANCHISOR shall be under no further obligation hereunder except for accrued liabilities if any.

10.0.1    If this Agreement now or hereafter grants FRANCHISEE rights with respect to more than one (1) brand, FRANCHISOR shall have the right, at any time and from time to time, to require FRANCHISEE to execute and deliver separate contracts for each brand, each containing all of the terms of this Agreement pertaining to such brand. FRANCHISEE agrees to execute and return such replacement contracts to FRANCHISOR within thirty (30) days after receipt thereof. If FRANCHISEE fails to do so, FRANCHISOR shall have the right to execute such instruments on FRANCHISEE's behalf and deliver a copy thereof to FRANCHISEE.

10.1    **Transfer By FRANCHISEE.** FRANCHISEE understands and acknowledges that the rights and duties set forth in this Agreement are personal to FRANCHISEE and that FRANCHISOR has granted the Franchise in reliance on the business skill and experience, financial capacity and personal character of FRANCHISEE. Except as hereinafter provided, neither FRANCHISEE, nor any partner, if FRANCHISEE is a partnership, nor any member, if FRANCHISEE is a limited liability company ("LLC"), nor any shareholder, if FRANCHISEE is a corporation, without FRANCHISOR's prior written consent, shall, by operation of law or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association, LLC or corporation, any interest in this Agreement, or any interest in the franchise granted hereby, or any interest in any proprietorship, partnership, LLC or corporation which owns any interest in the franchise, nor offer, permit or suffer the same. Any purported assignment or transfer not having the prior written consent of FRANCHISOR shall be null and void and shall constitute default hereunder. Any proposed transfer must meet all the requirements of FRANCHISOR including, but not limited to, those set forth in this Section 10.

10.2    **Consent By FRANCHISOR.** FRANCHISOR shall not unreasonably withhold its consent to any transfer referred to in paragraph 10.1 above, provided, that:

10.2.1    FRANCHISEE must have operated the Unit for a period of not less than six (6) months prior to the proposed transfer;

10.2.2    The sales price of the interest to be conveyed must not be so high, or the terms of sale so onerous, that, in the judgment of FRANCHISOR, the transferee will be unlikely to properly maintain, operate and promote the Unit and meet the transferee's financial and other obligations to FRANCHISOR, third party suppliers and creditors. This provision shall not create any liability to either transferor or transferee on the part of FRANCHISOR, in the event that FRANCHISOR approves the transfer and the transferee experiences financial difficulties;

10.2.3    The transferee and each partner, shareholder or member of the transferee, as the case may be, must be a United States citizen or lawful resident alien of the United States, must be of good moral character and reputation and must have a good credit rating and business qualifications and aptitude reasonably acceptable to FRANCHISOR. Such qualifications include, without limitation, literacy and fluency in the English language sufficient, in FRANCHISOR's opinion, to communicate with employees, customers, and suppliers of FRANCHISOR and to satisfactorily complete FRANCHISOR's required training program and such other tests and interviews as FRANCHISOR shall reasonably deem to be necessary or desirable. FRANCHISEE shall provide FRANCHISOR with such information as FRANCHISOR may require to make a determination concerning each proposed transferee; and

10.2.4    The transferee may not be a limited partnership, trust or other entity not specifically authorized herein.

10.3    **Transfer Requirements.** Each transfer of any interest in FRANCHISEE, the Unit, this Agreement and/or the Franchise herein granted, must receive the prior written consent of FRANCHISOR set forth in subsection 10.2 above and must conform to and/or comply with the following requirements:

10.3.1    Prior to the transfer, FRANCHISEE must pay and satisfy all accrued money obligations to FRANCHISOR, its affiliates and/or subsidiaries and to any Fund, obligations of FRANCHISEE which FRANCHISOR has guaranteed, liens, deferred rent and other obligations under the Lease for the Unit or other contracts pertaining to the Unit and the transfer fee provided below, as applicable;

*General Terms and Conditions*

10.3.2  Prior to the transfer, the Unit, including equipment, signs, building, improvements, interior and exterior, must be in good operating condition and repair and in compliance with FRANCHISOR's then-current Standards, including, without limitation, Standards for replacements and additions;

10.3.3  FRANCHISEE and any transferor may not assert any security interest, lien, claim or right now or hereafter in this Franchise, the Franchise granted to the transferee, or, if applicable, the Lease for the Unit with FRANCHISOR or its affiliated landlord entity. Any security interest, lien, claim or right asserted with respect to any personal property at the above location shall not include any after-acquired property and shall be subject, junior and subordinate to any security interest, lien, claim or right now or hereafter asserted by FRANCHISOR, its successors or assigns;

10.3.4  Prior to the transfer, the transferee must comply with the requirements of paragraph 5.1.8 of this Agreement, to the satisfaction of FRANCHISOR;

10.3.5  If the transferee is a corporation or LLC, it must comply with the terms of subsection 5.7 of this Agreement;

10.3.6  The transferee, including, where appropriate, all shareholders, members and partners of the transferee, shall jointly and severally execute, on FRANCHISOR's then-current forms, a franchise agreement and all other standard ancillary agreements, including, without limitation, a priority in payment agreement, if applicable. The priority in payment agreement provides, among other things, that if the transferee is unable at any time to make payments both to the transferor for the purchase of the Unit and to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s), payments to FRANCHISOR, its affiliates and/or subsidiaries and the Fund(s) will have priority. The transferee's franchise agreement shall not increase any fee based upon a percentage(s) of Gross Sales to a percentage greater than as required by this Agreement for the respective System(s). Unless a longer period is agreed upon between FRANCHISOR and the transferee, the term of the transferee's franchise agreement shall be for the unexpired term of this Agreement. The transferee shall pay no franchise fee pursuant to paragraph 4.1 of this Agreement unless a longer term is agreed upon by FRANCHISOR;

10.3.7  FRANCHISEE, including all individuals proposing to transfer an interest in the Franchise or the FRANCHISEE, must execute, on FRANCHISOR's standard form, a general release of all claims against the FRANCHISOR corporations, their affiliated corporations, and the directors, officers and employees of each; and

10.3.8  In addition, FRANCHISOR shall have the right to promulgate and enforce such additional reasonable requirements as it may, in its sole judgment determine.

10.4    **Transfer Fee.**  The transferor shall pay to FRANCHISOR upon any transfer of any interest of FRANCHISEE in this Agreement or of any interest in the FRANCHISEE entity, a Transfer Fee determined as follows:

10.4.1  **Prior to FRANCHISEE's Fourth Year of Operations.**  The transferor shall pay to FRANCHISOR a Transfer Fee which is the greater of: (i) five thousand dollars ($5,000.00), increased by five percent (5%) compounded annually during the term FRANCHISEE has operated the Unit under this or other agreements with FRANCHISOR; or (ii) five percent (5%) of the Adjusted Sales Price of the Unit.

10.4.1.1  The term "Adjusted Sales Price" shall mean the sales price to be received by FRANCHISEE upon transfer of the Unit, less the amount, if any, paid by FRANCHISEE for the Unit, when purchased as an ongoing business from another franchisee or from FRANCHISOR. No adjustment shall be made for amounts paid in connection with the development of a new unit. The Adjusted Sales Price shall include, without limitation, cash, assumption of debt, equipment lease obligations and deferred financing and amounts allocated to property of every kind, nature and description: furniture, fixtures, signs, equipment, supplies and inventory; excluding only amounts reasonably allocated to land and building, if owned by FRANCHISEE. It is intended that all consideration to be paid to FRANCHISEE, or for the benefit of FRANCHISEE, however designated and whether or not included in the contract of sale shall be deemed part of the Adjusted Sales Price including, but not by way of limitation, amounts allocated to a covenant not to compete or personal service agreement.

10.4.1.2  For purposes of determining the correct Transfer Fee, FRANCHISOR reserves the right to reallocate amounts which FRANCHISEE and the transferee have allocated to land, building, equipment, covenant against competition, personal service agreement, or otherwise, if in FRANCHISOR's opinion, the allocation of the parties is unreasonable in relation to the value of the business. If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7, hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.2    **From and After FRANCHISEE's Fourth Year of Operations.**  If the transfer takes place after the commencement of FRANCHISEE's fourth year of operations, the transferor shall pay to FRANCHISOR the Transfer Fee indicated below based on the Unit's Gross Sales for the most recently completed twelve (12) calendar month period preceding the date of the contract of sale. FRANCHISOR reserves the right to select another period or to make appropriate adjustments to such Gross Sales in the event extraordinary occurrences (e.g., road construction, fire or other casualty, etc.) materially affected Unit sales during the indicated twelve (12) month period.

| Sales for Most Recent 12 Month Period | Transfer Fee |
|---|---|
| Less than $400,000.00 | $5,000.00 |
| $400,000.00 or more, but less than $600,000.00 | $6,000.00 |
| $600,000.00 or more, but less than $1,000,000.00 | $8,000.00 |
| $1,000,000.00 or more, but less than $1,400,000.00 | $12,000.00 |
| $1,400,000.00 or more | $20,000.00 |

-15-

-16-

10.4.3  If FRANCHISOR purchases the Unit from FRANCHISEE by exercise of its right of first refusal under paragraph 10.7. hereof, the Transfer Fee shall be payable by FRANCHISEE to FRANCHISOR as if FRANCHISEE had sold the franchised business to a third party.

10.4.4  **Transfer of Less Than Control.**  For any transfer that, either alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, will have the result of the transferee(s) holding an aggregate interest of less than fifty percent (50%) of the franchise licensed herein or the entity licensed hereunder, FRANCHISOR will reduce the Transfer Fee set forth in paragraph 10.4.1 or 10.4.2, as applicable, to a fixed transfer documentation fee of five hundred dollars ($500.00), increased after each five (5) years of the term of this Agreement, including any renewal period, by the same percentage as the Consumer Price Index (all cities average) published by the U.S. Department of Labor for the same period.  FRANCHISOR will waive the Transfer Fee entirely with respect to a transfer of less than control, if each transferee was an approved party to (or personal guarantor of) this Agreement prior to transfer.

10.4.5  **Transfer to Spouse or Children.**  Notwithstanding anything else contained in this subsection 10.4, and provided that FRANCHISOR determines that FRANCHISEE has been in full compliance with the terms of all agreements with FRANCHISOR and its affiliates, the Transfer Fee due in connection with a transfer of the Unit to FRANCHISEE's spouse or one or more of FRANCHISEE's children shall be the fixed transfer documentation fee described in paragraph 10.4.4 above.  The franchise agreement issued to the spouse and/or children will be on the then-current form in use at the time of transfer including the then-current Transfer Fee provisions.

10.5  **Release of Transferor.**  Upon FRANCHISOR's approval of the transfer and FRANCHISEE's compliance with the aforesaid conditions, the transferor shall, provided that the transferor no longer has an interest in the Franchise, thereupon be relieved of further obligations under the terms of this Agreement, except that the transferor shall remain obligated for FRANCHISEE's money obligations under Section 4 through the date of transfer, and under the covenants contained in Section 8 for the Post Term Period therein described, after the date of transfer.

10.6  **Transfer on Death, Disability or Incapacity.**  In the event of the death, disability or mental incapacity of FRANCHISEE, or any partner, member or shareholder of FRANCHISEE, at any time during the term of this Agreement, the legal representative of the deceased, disabled or incapacitated party, as the case may be, together with all surviving partners, members or shareholders of FRANCHISEE, if any, shall, within six (6) months of such death, disability or mental incapacity, jointly apply, in writing to transfer the Franchise or the interest of the affected party in such Franchise, to such person or persons as the legal representative may specify.  Such transfer shall be approved by FRANCHISOR upon fulfillment of all of the conditions set forth in Section 10 of this Agreement.  A Transfer Fee shall be due pursuant to subsection 10.4 above, except that paragraph 10.4.5 shall apply if the transferee is a beneficiary or heir of FRANCHISEE.

10.6.1  If the legal representative and all surviving partners, members or shareholders, if any, do not propose a transferee acceptable to FRANCHISOR under the standards set forth in this Agreement within the period set forth in paragraph 10.6 above, or if no transfer of the interest shall have been accomplished consistent with the provisions of this Section 10 within one (1) year from the date of death, disability or mental incapacity, all rights licensed to FRANCHISEE under this Agreement shall terminate forthwith and automatically revert to FRANCHISOR.  FRANCHISOR shall have the right and option, exercisable under such termination, to purchase all furniture, fixtures, signs, equipment and other chattels at a price to be agreed upon by the parties or, if no agreement as to price is reached by the parties, at such price as may be determined by a qualified appraiser, approved by both parties, such approval not to be unreasonably withheld.  FRANCHISOR shall give notice of its intent to exercise said option no later than twenty-one (21) days prior to termination.

10.6.2  If the deceased, disabled or incapacitated party is the Designated Representative, then during the interim period until a transfer of the interest under this subsection 10.6 has taken place, the legal representative and surviving partners, members or shareholders shall operate the Unit through a successor Designated Representative who shall possess such qualifications for interim management of the Unit as FRANCHISOR may determine, in its discretion, from time to time.  Failure of FRANCHISEE or the legal representative to appoint a Designated Representative so qualified within ninety (90) days after the date of death, disability or mental incapacity of the Designated Representative shall be grounds for FRANCHISOR to terminate this Agreement after sending FRANCHISEE a thirty (30) day written notice-to-cure.

10.6.3  FRANCHISOR shall have the right to require a certified copy of an order of a court of competent jurisdiction over the estate of the deceased or incapacitated person, in which the legal representative or heir or legatee shall be determined, and may rely on such certified copy for the purposes of subsection 10.6.  If not furnished with such certified copy of a court order, or in the event of a legal contest, FRANCHISOR may decline, without liability, to recognize the claim of a party to such interest.  FRANCHISOR shall not be liable to any heir, next of kin, devisee, legatee, or legal representatives of a deceased or incapacitated person by reason of approval of a transfer of the interest to the surviving spouse or a child of the deceased, provided such approval is not contrary to an order of a court of competent jurisdiction served on FRANCHISOR.

10.7  **Right of First Refusal.**  If FRANCHISEE, or any shareholder, member or partner thereof, has received and desires to accept a signed, bona fide written offer from a third party to purchase FRANCHISEE's rights under this Agreement or any shareholder's, member's or partner's interest in the franchised business, FRANCHISEE or such shareholder, member or partner shall notify FRANCHISOR and provide it with a complete copy of such offer.  FRANCHISOR shall have the right and option, exercisable within sixty (60) days after its receipt of said copy, to purchase or assume and assign without recourse to a third party FRANCHISEE's Franchise, or such shareholder's, member's or partner's interest in the franchised business, on the same terms and conditions as offered by said third party.  FRANCHISEE's exercise of its rights hereunder shall not relieve FRANCHISEE of its Transfer Fee obligation to FRANCHISOR.  Should FRANCHISOR not exercise this option and the terms of the unaccepted offer be altered, FRANCHISOR shall, in each such instance, be notified of the changed offer and shall again have sixty (60) days to exercise its right to purchase on the altered terms.  Should FRANCHISOR not exercise this option, all of the terms of Section 10 shall apply to the transfer.

*General Terms and Conditions*

## Section 11. Arbitration.

11.0    Except as otherwise specified in this Section 11, all controversies, claims or disputes between FRANCHISEE and FRANCHISOR of whatever kind or nature, whether arising out of or relating to the negotiation, performance or breach of this or any other agreement or otherwise, must be settled by arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules, as herein modified.  This provision encompasses all causes of action, whether nominally a "claim", "counterclaim" or "cross-claim", and whether arising under common law or any state or federal statute.  As used in this Section 11, the terms "FRANCHISOR" and "FRANCHISEE" include, without limitation, the past and present employees, agents, representatives, officers, directors, shareholders, members, guarantors, sureties, parent corporations, subsidiary corporations, controlled affiliated entities, predecessors, successors and/or assigns of each party hereto.  The parties intend that this provision be given the broadest possible interpretation by a court of law.

11.1    **Eligibility and Procedures.**  Arbitration must be initiated within the lesser of the time periods (a) set forth in paragraph 11.7.5 below or (b) permitted under the applicable statute of limitations for the cause of action asserted.  Any claim, controversy or dispute which is not so initiated within said lesser period shall not be eligible for arbitration under any circumstances.  Arbitration shall be initiated as provided in the Rules of the AAA by the filing of a demand for arbitration with the regional office of the AAA located in the city and state inserted in Item "L" of the Contract Data Schedule of this agreement.  If no location is inserted in Item "L" or if such insertion is incomplete or inaccurate, Boston, Massachusetts, shall be deemed to apply.  The arbitration proceedings, including without limitation all conferences, preliminary and dispositive hearings shall be conducted in such city and state unless all parties agree to another venue.  Actions to enforce an express obligation to pay moneys may be brought under the Expedited Procedures of the AAA's Commercial Arbitration Rules, provided there are no counterclaims.  The arbitrator(s) may issue such orders for interim relief as may be deemed necessary to safeguard the rights of the parties during the arbitration, but without prejudice to the ultimate rights of the parties, to the final determination of the dispute or to the rights of the FRANCHISOR to seek equitable relief from a court of competent jurisdiction at any time, even during the pendency of any arbitration proceedings initiated hereunder.

11.2    **Enforceability and Effect.**  Judgment on the award, including, without limitation, any interim award for interim relief, rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.  The binding or preclusive effect of any award shall be limited to the actual dispute or claim arbitrated, and to the parties, and will have no collateral effect on any other dispute or claim of any kind whatsoever.

11.3    **Governing Law.**  The Federal Arbitration Act and related federal judicial procedure shall govern this contract to the fullest extent possible, excluding all state arbitration law, irrespective of the location of the arbitration proceedings, the nature of the dispute between the parties or the nature of the court in which any related judicial proceedings may be brought.  Except as provided in the preceding sentence respecting arbitration law, the resolution of all disputes between the parties bound hereunder, whether in tort and regardless of the place of injury or the place of the alleged wrongdoing or whether arising out of or relating to the parties' contractual relationship, shall be governed by the law of the Commonwealth of Massachusetts without regard to choice of law principles.

11.4    **Exceptions to Arbitration.**  Disputes concerning the validity or scope of this Section 11 (arbitration), including, without limitation, whether a dispute is arbitrable hereunder, shall be beyond the authority of the arbitrator(s) and shall be determined by a court of competent jurisdiction pursuant to the Federal Arbitration Act, 9 U.S.C. §1 et seq., as amended from time to time.  In addition, the causes of action specified in the following subsections 11.5 and 11.6 are the sole and exclusive exceptions to the agreement of the parties hereto to resolve disputes through arbitration:

11.5    **FRANCHISOR's Exceptions.**  FRANCHISOR shall have the option to litigate any one or more of the causes of action specified in this subsection 11.5 and shall exercise said option by filing a complaint  in any court of competent jurisdiction:

11.5.1  the enforcement of an obligation to pay money to FRANCHISOR under an express term of any agreement;

11.5.2  any action based upon an allegation of intentional underreporting of Gross Sales by FRANCHISEE;

11.5.3  any action for declaratory or equitable relief, including, without limitation, seeking of preliminary and/or permanent injunctive relief, specific performance, other relief in the nature of equity or any action at law for damage to FRANCHISOR's property or property interests or in equity to enjoin any harm or threat of harm to FRANCHISOR's goodwill, Proprietary Marks or its tangible or other intangible property, brought at any time, including, without limitation, prior to or during the pendency of any arbitration proceedings initiated hereunder;

11.5.4  any action seeking to terminate this Agreement based upon FRANCHISEE's material breach of paragraph 5.1.7 of this Agreement (excluding subparagraph 5.1.7.1); or

11.5.5  any action in ejectment or for possession of any interest in real or personal property.

11.6    **FRANCHISEE's Exceptions.**  FRANCHISEE shall have the option to litigate any cause of action otherwise eligible for arbitration hereunder and shall exercise said option solely by filing a complaint  in any court of competent jurisdiction in which FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages.  If any such complaint fails to include such express waivers or if any such court of competent jurisdiction determines that all or any part of such waivers shall be ineffective or void for any reason whatsoever, then the parties agree that the action shall thereupon be dismissed without prejudice, leaving the parties to their arbitration remedies, if then available pursuant to this Section 11.

-17-

*General Terms and Conditions*

-18-

11.6.1  In the event FRANCHISOR litigates any cause of action pursuant to subsection 11.5 above, FRANCHISEE shall not file any counterclaim, cross-claim, offset claim or the like against FRANCHISOR in the litigation, unless FRANCHISEE expressly waives the right to a trial by jury and any and all claim(s) for punitive, multiple and/or exemplary damages. Otherwise, FRANCHISEE shall submit each such counterclaim, cross-claim, offset claim or the like to arbitration, if then available pursuant to this Section 11.

11.7    Waiver of Rights.  THE PARTIES HERETO AND EACH OF THEM KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AGREE AS FOLLOWS:

11.7.1  The parties hereto and each of them EXPRESSLY WAIVE(S) THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY; and

11.7.2.  The parties hereto and each of them EXPRESSLY WAIVE(S) ANY CLAIM FOR PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES, except that FRANCHISOR shall be free at any time hereunder to bring an action for willful trademark infringement and, if successful, to receive an award of multiple damages as provided by law; and

11.7.3  The parties hereto and each of them EXPRESSLY AGREE(S) THAT NO PARTY BOUND HEREBY MAY RECOVER DAMAGES FOR ECONOMIC LOSS ATTRIBUTABLE TO NEGLIGENT ACTS OR OMISSIONS EXCEPT FOR CONDUCT WHICH IS DETERMINED TO CONSTITUTE GROSS NEGLIGENCE OR AN INTENTIONAL WRONG; and

11.7.4  The parties hereto and each of them EXPRESSLY AGREES THAT IN THE EVENT OF ANY FINAL ADJUDICATION OR APPLICABLE ENACTMENT OF LAW THAT PUNITIVE, MULTIPLE AND/OR EXEMPLARY DAMAGES MAY NOT BE WAIVED, ANY RECOVERY BY ANY PARTY IN ANY FORUM SHALL NEVER EXCEED TWO (2) TIMES ACTUAL DAMAGES, except for an award of multiple damages to FRANCHISOR for willful trademark infringement, as provided by law.

11.7.5  ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE AND FRANCHISOR OR FRANCHISEE'S OPERATION OF THE UNIT, BROUGHT IN ANY FORUM BY ANY PARTY HERETO AGAINST THE OTHER, MUST BE COMMENCED WITHIN TWO (2) YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED, EXCEPT FOR FINANCIAL OBLIGATIONS OF FRANCHISEE.

11.8    No Class Actions.  No party shall initiate or participate in any class action litigation claim against any other party bound hereby, except that FRANCHISEE may initiate or participate in any class action arbitration claim by franchisees of FRANCHISOR against FRANCHISOR limited exclusively to alleged misappropriation of moneys from the Fund of any System authorized by this Agreement, which claim must be brought only in arbitration under the provisions of this Section 11.

11.9    Post-Term Applicability.  The provisions of this Section 11 shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement, however effected.

## Miscellaneous Provisions.

12.0    Relationship of the Parties.  This Agreement does not constitute FRANCHISEE an agent, legal representative, joint venturer, partner, employee or servant of FRANCHISOR or its affiliated corporation for any purpose whatsoever; and it is deemed understood between the parties hereto that FRANCHISEE shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of FRANCHISOR or its affiliated corporation or to create any obligation, express or implied, on behalf of FRANCHISOR or its affiliated corporation. The parties agree that this Agreement does not create a fiduciary relationship between FRANCHISOR or its affiliated corporation and FRANCHISEE.

12.1    Under no circumstances shall FRANCHISOR or FRANCHISEE be liable for any act, omission, debt or other obligation of the other party. Each party shall indemnify, protect, defend and save the other party harmless against any such claim. The cost of defending against any claim arising directly or indirectly from, or as a result of, or in connection with FRANCHISEE's operation of the Unit shall be borne by FRANCHISEE.

13.0    Non-Waiver.  Any failure of FRANCHISOR to exercise any power reserved to it hereunder, or to insist upon strict compliance by FRANCHISEE with any term, covenant or condition in this Agreement, and any waiver by FRANCHISOR of any breach of a term, covenant or condition shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition in this Agreement. Subsequent acceptance by FRANCHISOR of the payments due to it hereunder, in whole or in part, shall not be deemed to be a waiver by FRANCHISOR of any preceding breach by FRANCHISEE of any term, covenant or condition of this Agreement. FRANCHISOR may, in its sole discretion, waive or modify any obligation of other franchisees under agreements similar to this Agreement, and no such waiver or modification shall obligate FRANCHISOR to grant a similar waiver or modification to FRANCHISEE. Acceptance by FRANCHISOR of payments due under this Agreement from any other person or entity shall be deemed to be acceptance from such person or entity as an agent of FRANCHISEE and not as recognition of such person or entity as an assignee of or successor to FRANCHISEE.

14.0    Notices.  All notices hereunder by FRANCHISOR to FRANCHISEE shall, at FRANCHISOR's option, be personally delivered or sent by telecopier, prepaid private courier or certified mail to the FRANCHISEE at the address set forth in Item "I" of the Contract Data Schedule of this Agreement or to such other address as FRANCHISEE may from

*General Terms and Conditions*

time to time give notice of to FRANCHISOR. If delivery is refused, proof of attempted delivery shall be deemed delivery. All notices hereunder by FRANCHISEE to FRANCHISOR shall be sent by certified mail to FRANCHISOR at 130 Royall Street, Canton, MA 02021, Attention: Senior Vice President and General Counsel or to such other address as FRANCHISOR may from time to time give notice to FRANCHISEE by email, regular mail or any other means set forth above.

15.0    **Entire Agreement.** This Agreement, and the documents referred to herein shall be the entire, full and complete agreement between FRANCHISOR and FRANCHISEE concerning the subject matter hereof, and supersedes all prior agreements, no other representation having induced FRANCHISEE to execute this Agreement; and there are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein, which are of any force or effect with reference to this Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing. Captions, paragraph designations and section or subsection headings are included in this Agreement for convenience only, and in no way define, limit, construe or describe the scope or intent of the respective parts of this Agreement. The Special Terms and Conditions attached to this Agreement supplement the General Terms and Conditions and are intended to be additional thereto. In the event of any conflict between any provisions thereof, the provisions of the Special Terms and Conditions shall be deemed to prevail.

16.0    **Severability.** Each section, part, term and provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation of a court or agency having valid jurisdiction, such shall not impair the operation or affect the remaining portions, sections, parts, terms or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid section, part, term or provision shall be deemed not to be a part of this Agreement.

17.0    **Applicable Law.** This Agreement shall be deemed to have been made in, and shall be interpreted, construed and governed by the laws of, the Commonwealth of Massachusetts. FRANCHISEE acknowledges that this Agreement is to be performed in part through services rendered to FRANCHISEE in Massachusetts.

18.0    **Independent Investigation.** THE PROSPECT FOR SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE BY VIRTUE OF THIS AGREEMENT IS SPECULATIVE AND DEPENDS TO A MATERIAL EXTENT UPON FRANCHISEE'S CAPABILITY AS AN INDEPENDENT BUSINESS PERSON AND FRANCHISEE, AS WELL AS OTHER FACTORS. FRANCHISOR MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE POTENTIAL SUCCESS OF THE BUSINESS VENTURE UNDERTAKEN BY FRANCHISEE HEREBY. FRANCHISEE REPRESENTS AND WARRANTS THAT IT HAS ENTERED INTO THIS AGREEMENT AFTER MAKING INDEPENDENT INVESTIGATIONS OF FRANCHISOR'S BUSINESS, AND NOT IN RELIANCE UPON ANY REPRESENTATION BY FRANCHISOR AS TO SALES OR PROFITS WHICH FRANCHISEE IN PARTICULAR MIGHT BE EXPECTED TO REALIZE. FRANCHISEE FURTHER REPRESENTS AND WARRANTS THAT FRANCHISOR AND ITS REPRESENTATIVES, EMPLOYEES OR AGENTS HAVE MADE NO REPRESENTATIONS TO INDUCE FRANCHISEE TO ACQUIRE THIS FRANCHISE AND EXECUTE THIS AGREEMENT WHICH ARE NOT EXPRESSLY SET FORTH HEREIN OR IN THE DISCLOSURE MATERIALS PROVIDED TO FRANCHISEE PRIOR TO ENTERING INTO THIS AGREEMENT.

19.0    FRANCHISEE acknowledges receiving a copy of this Agreement, the attachments thereto, and agreements relating thereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. FRANCHISEE further acknowledges receiving, on the date of the first personal meeting between FRANCHISOR and FRANCHISEE and not less than ten (10) business days prior to the date on which this Agreement was executed, the disclosure documents required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures".

-19-

*General Terms and Conditions*

under paragraph 4.4 of this Agreement equal to one percent (1%) of the Gross Sales of the Baskin-Robbins Unit will be utilized, at the discretion of FRANCHISOR, to provide for the administrative expenses of the Baskin-Robbins Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of BASKIN-ROBBINS and the Baskin-Robbins System. The balance, including any interest earned by the Baskin-Robbins Fund, will be used for advertising and related expenses. Contributions to the Baskin-Robbins Fund in excess of the percentage of Gross Sales of the Baskin-Robbins Unit set forth in Item "F" of the Contract Data Schedule shall be used in accordance with the programs to which they relate.

3.3.2  In addition to its other obligations under this Section BR-3, FRANCHISEE shall participate in all sales promotion programs as required from time to time by FRANCHISOR.  Without limiting the foregoing, FRANCHISEE must redeem, for products, gift certificates, coupons, and vouchers distributed by FRANCHISOR, including, without limitation, unexpired gift certificates, coupons and vouchers issued by any previous franchise operating a Baskin-Robbins Unit at the Premises.  FRANCHISEE will be reimbursed or credited for the cost of products by FRANCHISOR upon its receipt of redeemed gift certificates. All coupons or other promotions in which FRANCHISEE participates shall bear the expiration date thereof.

3.3.3  FRANCHISOR may, from time to time in its sole discretion, initiate one or more mandatory Maximum Price Promotional Campaigns for products or services designated by FRANCHISOR.  A material aspect of these campaigns will be FRANCHISOR's right to establish the maximum price that FRANCHISEE can charge customers for the designated product(s) or service(s) during the promotional period.  FRANCHISEE agrees to participate in each such campaign and, for the duration of the promotional period, FRANCHISEE will charge customers no more than the maximum price established by FRANCHISOR for the designated product(s) and/or service(s). FRANCHISEE retains the right to charge customers less than any maximum retail price FRANCHISOR may establish.

## Section BR-4.  Payments

4.4  FRANCHISEE shall make payments to the Baskin-Robbins Fund as set forth in paragraph 4.4 of the General Terms and Conditions.  FRANCHISOR reserves the right in its sole and absolute discretion to designate or change the composition of Baskin Robbins units included in the base for purposes of determining "two-thirds" support.

## Section BR-5.  Covenants of FRANCHISEE

5.0  FRANCHISEE understands and acknowledges that every detail of the Baskin-Robbins System is important to BASKIN-ROBBINS, to FRANCHISEE and to other Baskin-Robbins franchisees, in order to maintain high and uniform standards of quality, cleanliness, appearance, service, products and procedures and thereby increase the demand for Baskin-Robbins Products and protect and enhance the reputation and goodwill of BASKIN-ROBBINS.

5.1.4  FRANCHISOR or its designated supplier shall not be liable to FRANCHISEE, or be deemed in breach or default of any obligation contained in this Agreement, for any delay or failure of delivery for any cause beyond its reasonable control, including, without limitation, difficulties of supply occasioned by war, law, weather conditions, acts of God, regulations or order of public authority, labor troubles or shortages of materials.  If BASKIN-ROBBINS or its designated supplier shall not be able to supply the full requirements of all Baskin-Robbins Units, FRANCHISOR or its designated supplier shall endeavor to apportion available Baskin-Robbins Products and Associated BR Products equitably among them.

5.1.5.1  FRANCHISEE agrees to purchase from BASKIN-ROBBINS or its designated supplier all of the Baskin-Robbins Unit's requirements for the Baskin-Robbins Products specified by FRANCHISOR from time to time in the Standards, at BASKIN-ROBBINS' or its designated supplier's prices at the time of delivery.  Such Baskin-Robbins Products will be of the variety of kinds and flavors which from time to time are selected by FRANCHISOR for supply to Baskin-Robbins franchisees.  FRANCHISOR or its designated supplier may change, at any time and from time to time without prior notice, its prices for the sale and delivery of any Baskin-Robbins Products.

5.1.5.2  FRANCHISEE agrees to place its orders with FRANCHISOR or its designated supplier for Baskin-Robbins Products to be supplied by BASKIN-ROBBINS or its designated supplier at such times and in such manner as from time to time prescribed by FRANCHISOR.  FRANCHISOR or its designated supplier will deliver such orders to FRANCHISEE in accordance with regular route schedules and times of delivery established by FRANCHISOR or its designated supplier from time to time, including during non-business hours of FRANCHISEE, in its sole discretion. FRANCHISEE agrees upon receipt of notice of the scheduled delivery time, to provide FRANCHISOR or its designated supplier with a means of access to the Unit's frozen storage facility for the purpose of such delivery, by providing FRANCHISOR or its designated supplier with a key to the Unit, or by having an agent present to open the Unit, or by other appropriate arrangements made with FRANCHISOR or its designated supplier.  FRANCHISEE will also provide adequate freezer and other storage space to permit delivery of Associated BR Products required by FRANCHISOR in connection with the Baskin-Robbins Franchise.  FRANCHISEE acknowledges that late orders by FRANCHISEE cause additional administrative expenses to FRANCHISOR or its designated supplier.  FRANCHISEE agrees that FRANCHISOR or its designated supplier may, in its discretion, refuse to process a late order or impose a reasonable late charge or additional delivery expense charge, and add such charge to the next invoice payable by FRANCHISEE.

5.1.5.3  FRANCHISEE agrees to pay for all Baskin-Robbins Products which it purchases from BASKIN-ROBBINS or its designated supplier on such terms and conditions as BASKIN-ROBBINS or its designated supplier may from time to time specify. Should FRANCHISEE fail to make timely payment, FRANCHISOR shall have the right, upon notice to FRANCHISEE, to require cash or cash equivalent on or in advance of delivery.

*Baskin-Robbins Rider - pg 2*

5.1.5.4   In the event of a default by FRANCHISEE in its payment obligations under this Agreement, or in payment of rent under the Lease, if applicable, or any other agreement with FRANCHISOR, BASKIN-ROBBINS or its designated supplier shall have the right, in addition to any other remedies, without notice, to discontinue the sale or delivery of any Baskin-Robbins Products to the Unit and to any other Baskin-Robbins unit in which FRANCHISEE or any of its shareholders, members or partners has an interest, until the next regularly scheduled delivery date following the date on which FRANCHISOR or its designated supplier has received payment in full of all of FRANCHISEE's outstanding invoices for Baskin-Robbins Products, rent and any other payment(s) due under this Agreement or the Lease, if applicable or any other agreement with FRANCHISOR.

5.1.5.5   FRANCHISEE acknowledges and agrees that BASKIN-ROBBINS or its designated supplier has the exclusive right to supply FRANCHISEE Baskin-Robbins Products.

5.1.5.6   FRANCHISEE shall purchase all Associated BR Products used or offered for sale by the Baskin-Robbins Unit solely from suppliers, manufacturers, distributors, and other sources who are currently approved by FRANCHISOR.

## Section BR-7.  Proprietary Marks

7.0   BASKIN-ROBBINS is a wholly-owned subsidiary of BRI.  BASKIN-ROBBINS has been licensed by BRI to use the Proprietary Marks in conjunction with the granting of franchises for the operation of Baskin-Robbins units on terms and conditions which have been approved by BRI.  If FRANCHISOR's license from BRI shall expire or for any reason be terminated, BRI or its nominee shall succeed to all of the rights and assume all of the duties of FRANCHISOR under this Agreement.

7.0.1   FRANCHISEE acknowledges and agrees that *Baskin 31 Robbins*® is a registered trademark owned by BRI, that said mark has been and is being used by BASKIN-ROBBINS under license from BRI, and by other franchisees and licensees of BASKIN-ROBBINS; that said mark, together with the other Proprietary Marks presently owned by BRI and/or BASKIN-ROBBINS or which may be acquired in the future by either of them, constitute part of the Baskin-Robbins System; that valuable goodwill is associated with and attached to said mark and the other Baskin-Robbins Proprietary Marks; and that any and all goodwill associated with the Baskin-Robbins Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of BRI.

7.5   FRANCHISEE shall operate, advertise, and promote the Baskin-Robbins Unit under the name "Baskin-Robbins," with no accompanying words or symbols of any nature except as may be otherwise required by law or designated by FRANCHISOR.  FRANCHISEE shall not use, as part of its corporate or other business name, any Proprietary Marks used by FRANCHISOR, including, but not limited to, "Baskin-Robbins", "Baskin" or "Robbins", or any form or variations thereof, including, but not limited to, "B.R.," which, in the judgment of FRANCHISOR, is likely to cause third parties to be confused or mistaken with respect to the separate identities of BASKIN-ROBBINS and FRANCHISEE.

7.8   BASKIN-ROBBINS represents that BRI is the sole owner of all right, title and interest in and to the Baskin-Robbins Proprietary Marks and that BASKIN-ROBBINS is licensed by BRI to grant a Franchise to FRANCHISEE and to license the use of the Baskin-Robbins Proprietary Marks upon the terms and conditions of this Agreement.

## Section BR-9.  Default

9.4   **Termination** - Upon any termination or expiration of this Agreement:

9.4.6.1   FRANCHISEE shall further and immediately sell to FRANCHISOR (who hereby agrees to purchase) all of FRANCHISEE's unopened and unexpired Baskin-Robbins Products and such unopened and unexpired Associated BR Products as bear any of the Proprietary Marks, at FRANCHISEE's purchase cost.

### SPECIAL TERMS AND CONDITIONS APPLICABLE TO A
### DUNKIN' DONUTS FRANCHISE

In connection with its business and the business of its Dunkin' Donuts franchisees, DUNKIN' DONUTS has developed and used and continues to use and control the usage of certain proprietary interests, trademarks, logos, emblems and other indicia of origin, service marks and trade names, including *Dunkin' Donuts*®, which is registered as a trademark on the Principal Register of the United States Patent and Trademark Office (the "Proprietary Marks"), to identify for the public the source of goods and services marketed thereunder and to represent to the public high and uniform standards of quality, cleanliness, appearance and service.

FRANCHISEE, being cognizant of the distinctive and valuable significance to the public of all of the foregoing, desires to make use of the trademark *Dunkin' Donuts*®, and to enjoy the benefits of that mark, the other Proprietary Marks and the Dunkin' Donuts System. FRANCHISEE understands the importance of FRANCHISOR's high and uniform standards of quality, cleanliness, appearance and service to the value of the Dunkin' Donuts System and the necessity of opening and operating FRANCHISEE's Dunkin' Donuts Unit in conformity with the Dunkin' Donuts System and in accordance with FRANCHISOR's Standards and specifications.

### DEFINITIONS

As used in these Special Terms and Conditions applicable to a Dunkin' Donuts Franchise, the following defined terms shall have the following meanings:

A.  The "Dunkin' Donuts Unit" means all or a portion of the Premises dedicated to the operation of the Dunkin' Donuts System, as approved by FRANCHISOR.

B.  "Dunkin' Donuts Products" shall mean and refer to donuts, bagels, muffins, cookies and other baked goods, sandwiches, coffee, soda, frozen drinks and other beverages, all of a variety of kinds or flavors, made in accordance with specifications designated by FRANCHISOR and identified by the Dunkin' Donuts Proprietary Marks, and such other products as may be specified from time to time in writing by FRANCHISOR for sale in the Dunkin' Donuts Unit.

C.  Where applicable, the "Producing Unit" for this Dunkin' Donuts Unit is the Dunkin' Donuts manufacturing unit designated in Item "M" of the Contract Data Schedule of this Agreement.

### Section DD-1.  Grant Of The Franchise

1.0    FRANCHISOR grants to FRANCHISEE for and during the term hereof and FRANCHISEE accepts a Franchise to operate a donut shop utilizing the Dunkin' Donuts System in accordance with the terms, covenants and conditions of this agreement, at one location only, the Premises described in Item "A" of the Contract Data Schedule of this agreement (hereinafter called the "Dunkin' Donuts Unit"). In connection therewith, this Franchise includes the right to use at the Dunkin' Donuts Unit only, the trademark *Dunkin' Donuts*®, along with other Proprietary Marks owned and utilized by DUNKIN' DONUTS in connection with other Dunkin' Donuts units, and the right to use at the Unit only, the Dunkin' Donuts System including confidential and valuable information which now exists or may be acquired hereafter and set forth in FRANCHISOR's manuals or as otherwise from time to time disclosed to Dunkin' Donuts franchisees.

### Section DD-2.  Scope Of The Franchise

2.0    This Dunkin' Donuts Franchise is specific to one location only, for the term of this Agreement. It grants no rights outside the Premises, nor includes any territorial protection against competition. FRANCHISOR reserves and retains the right to operate or permit others to operate Dunkin' Donuts units or to sell or distribute Dunkin' Donuts products and/or services or to otherwise use the Dunkin' Donuts Proprietary Marks and/or the Dunkin' Donuts System, in each case at any other location. FRANCHISOR and other franchisees may compete for customers drawn from the same area as FRANCHISEE's Dunkin' Donuts Unit using the same or different brand(s).

### Section DD-3.  Advertising and Promotion

3.0    FRANCHISOR shall prepare and coordinate a "Start-Up" promotional program (or such other promotional or advertising program as FRANCHISOR may specify) for the initial opening of the Dunkin' Donuts Unit.

3.1    FRANCHISOR shall review for approval all proposed advertising and promotional materials prepared by FRANCHISEE for use in local advertising relating to the Dunkin' Donuts Unit; and

3.3.1  FRANCHISOR shall administer The Dunkin' Donuts Advertising and Sales Promotion Fund (the "Dunkin' Donuts Fund") and shall direct the development of all advertising, marketing and promotional programs for the Dunkin' Donuts System. That portion of FRANCHISEE's payments under paragraph 4.4 of this Agreement equal to one percent (1%) of the Gross Sales of the Dunkin' Donuts Unit will be utilized, at the discretion of FRANCHISOR, to provide for the administrative expenses of the Dunkin' Donuts Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of DUNKIN' DONUTS and the Dunkin' Donuts System. The balance, including any interest earned by the Dunkin' Donuts Fund, will be used for advertising and related expenses. Contributions to the Dunkin' Donuts Fund in excess of the percentage of Gross Sales of the Dunkin' Donuts Unit set forth in Item "F" of the Contract Data Schedule shall be used in accordance with the programs to which they relate.



## Section DD-4. Payments

4.4  FRANCHISEE shall make payments to the Dunkin' Donuts Fund as described in paragraph 4.4 of the General Terms and Conditions, except that sales to wholesale accounts approved by FRANCHISOR are excluded for purposes of calculating fees due under paragraph 4.4 (only).  For wholesale accounts to be approved by FRANCHISOR, FRANCHISEE must provide FRANCHISOR prior written notice of each such account.  Upon FRANCHISOR's receipt of such notice, the account shall be deemed approved, unless FRANCHISOR at any time notifies FRANCHISEE in writing that such account is not approved.  FRANCHISEE shall, within ten (10) days of receipt of a disapproval notice, discontinue sales to the disapproved wholesale account.

4.4.1  FRANCHISOR reserves the right in its sole and absolute discretion to designate or change the composition of Dunkin' Donuts Units included in the base for purposes of determining "two-thirds" support.

## Section DD-5.  Covenants of FRANCHISEE

5.0  FRANCHISEE understands and acknowledges that every detail of the Dunkin' Donuts System is important to DUNKIN' DONUTS, to FRANCHISEE and to other Dunkin' Donuts franchisees, in order to maintain high and uniform standards of quality, cleanliness, appearance, service, products and procedures and thereby increase the demand for Dunkin' Donuts Products and protect and enhance the reputation and goodwill of DUNKIN' DONUTS.

5.1  Unless this Unit is expressly authorized to manufacture donut products on the Premises, and except as DUNKIN' DONUTS may otherwise authorize and direct in writing, donut products sold at this Unit shall be produced in the Dunkin' Donuts manufacturing unit located at the address set forth in Item "M" of the Contract Data Schedule of this Agreement (the "Producing Unit").  The individual(s) or entity(ies) that controls at least a fifty percent (50%) interest in FRANCHISEE shall maintain at least a fifty percent (50%) interest in the Producing Unit, or have a documented interest in an approved cooperative production location ("CPL").

5.1.5.1  Franchisees' cooperatively-owned distribution centers under the Distributor Commitment Program ("DCP") are currently approved by DUNKIN' DONUTS to supply franchisees with a variety of ingredients, supplies and equipment. DUNKIN' DONUTS or an affiliated company may from time to time be among the approved suppliers of products, supplies, services, equipment and/or materials required for the operation of the Dunkin' Donuts Unit.  If any such party is designated an approved supplier, it will be subject to the same competitive bidding procedure as other suppliers of the same Dunkin' Donuts Products.

5.1.5.2  DUNKIN' DONUTS may, from time to time, enter into national or regional exclusive supply arrangements with one or more independent suppliers for designated Dunkin' Donuts Products.  In evaluating the need for an exclusive supplier, DUNKIN' DONUTS may take into account (without limitation) the uniqueness of the designated Dunkin' Donuts Products, the projected price and required volume of such Dunkin' Donuts Products, the investment required of a supplier in order to meet the needs for such Dunkin' Donuts Products, the supplier's ability to provide such Dunkin' Donuts Products, the lack of availability of qualified alternative suppliers, the duration of exclusivity, the desirability of competitive bidding and such other business considerations as may be relevant.

5.2.1  Sales to approved wholesale accounts must be separately designated as "wholesale" on Gross Sales reports required under paragraph 5.2.1 of the General Terms and Conditions of this Agreement.

5.2.5  FRANCHISEE's Records shall also include, without limitation, daily production, throwaway and finishing records, and records of all wholesale accounts.

## Section DD-7.  Proprietary Marks

7.0  FRANCHISEE acknowledges and agrees that *Dunkin' Donuts®* is a registered trademark owned or controlled by DUNKIN' DONUTS; that said mark has been and is being used by DUNKIN' DONUTS and by its franchisees and licensees; that said mark, together with the other Proprietary Marks presently owned or controlled by DUNKIN' DONUTS or which may be acquired in the future, constitutes part of the Dunkin' Donuts System; that valuable goodwill is associated with and attached to said mark and the other Dunkin' Donuts Proprietary Marks; and that any and all goodwill associated with the Dunkin' Donuts Proprietary Marks, including any goodwill which might be deemed to have arisen through FRANCHISEE's activities, inures directly and exclusively to the benefit of DUNKIN' DONUTS.

7.5  FRANCHISEE shall operate, advertise and promote the Dunkin' Donuts Unit under the name "Dunkin' Donuts", with no accompanying words or symbols of any nature, except as may be otherwise required by law.  FRANCHISEE shall not use, as part of its corporate or other business name, any Proprietary Marks used by FRANCHISOR, including, but not limited to, "Dunkin' Donuts" or "Dunkin", or any form or variations thereof, including, but not limited to, "Dunk" or "D.D.", which, in the judgment of FRANCHISOR, is likely to cause third parties to be confused or mistaken with respect to the separate identities of DUNKIN' DONUTS and FRANCHISEE.

## Section 10.  Transfer Provisions

10.3.1  __Transfer of this Manufacturing Retail Unit__ - If FRANCHISEE shall propose a transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more of FRANCHISEE, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of this Agreement, be subject to the requirement that an ownership interest of fifty percent (50%) or more of all satellite retail units supplied by this Unit must be transferred to (a) the same qualified transferee, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of this Agreement, and who also must own an ownership interest of fifty percent (50%) or more of one or more manufacturing Dunkin' Donuts Unit(s) at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the producing unit(s) for the satellite retail unit(s) or have a documented interest in an approved CPL.

10.3.2   Transfer of other Dunkin' Donuts Units supplied by this Manufacturing Retail Unit - If FRANCHISOR receives notice of a proposed transfer of an interest which, alone or together with other previous, simultaneous or proposed transfers, whether related or unrelated, would have the effect of transferring an interest of fifty percent (50%) or more in any Dunkin' Donuts Franchise for a retail unit supplied by this Unit, or the entity holding such Franchise, FRANCHISOR's approval of such proposed transfer shall, in addition to the requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, be subject to the requirement that the proposed transferee must (a) also be a qualified transferee of this Unit, or (b) one or more other qualified transferee(s) who also satisfy all requirements of Sections 10 and DD-10 of the Franchise Agreement for such unit, and who also must an ownership interest of fifty percent (50%) or more of another manufacturing Unit at the time of transfer which FRANCHISOR, in its sole and absolute discretion, authorizes as the manufacturing unit to supply products for such satellite retail unit or have a documented interest in an approved CPL.

RIDER TO FRANCHISE AGREEMENT

SCHEDULE "F/D"
120105

## SPECIAL TERMS AND CONDITIONS APPLICABLE TO
## DEVELOPMENT OF A NEW UNIT BY FRANCHISEE

FRANCHISEE wishes to develop a new Unit that will utilize one or more of FRANCHISOR's Proprietary Marks at the Premises. In order to facilitate FRANCHISEE's obtaining financing and other needed resources, FRANCHISOR may elect to enter into this agreement prior to having had the opportunity to review the Premises to determine if it is suitable for development as such a Unit. FRANCHISEE's right to develop and operate a Unit under the terms of this agreement at the Premises is, therefore, subject to the conditions that (i) FRANCHISOR shall approve the Premises as a suitable location for development of a Unit and (ii) FRANCHISOR shall determine that FRANCHISEE meets all of FRANCHISOR's qualifications and requirements for new, or if appropriate multiple-unit, franchisees. This Schedule enumerates the respective responsibilities of the parties pertaining to FRANCHISEE undertaking to develop a Unit on the Premises. In consideration of a conditional grant to FRANCHISEE of one or more franchise(s) for the Premises, FRANCHISEE hereby agrees as follows:

1.0  **Approval of the Premises** - Development of the Premises as a Unit must be approved by FRANCHISOR, as evidenced solely by written notice sent to FRANCHISEE by the General Manager or other duly authorized representative of FRANCHISOR (the "Site Approval Notice") pursuant to the process hereinafter described. Any real estate commitments that FRANCHISEE may make pursuant to this agreement MUST be subject to: (a) FRANCHISEE having obtained FRANCHISOR's prior written approval of development of a Unit on the Premises; (b) FRANCHISEE obtaining all necessary permits, licenses and local governmental approvals needed to develop and operate a Unit on the Premises. In addition, FRANCHISEE should include such other contingencies as FRANCHISEE's attorney may recommend. FRANCHISEE must provide FRANCHISOR a copy of any lease of the Premises within ten (10) days after its execution and receipt by FRANCHISEE.

1.1  It shall be FRANCHISEE's responsibility to retain an attorney and other appropriate, independent advisors in connection with negotiating FRANCHISEE's acquisition of the right to develop and operate a Unit on the Premises, including reviewing all agreements with FRANCHISOR. FRANCHISOR assumes no liability or obligation to FRANCHISEE or to any third party for any assistance in negotiation FRANCHISOR may elect to provide to FRANCHISEE. Although FRANCHISOR may comment on FRANCHISEE's negotiations with third parties, any assistance FRANCHISOR provides to FRANCHISEE is no substitute for the advice of independent counsel. FRANCHISOR will not act as agent, employee or fiduciary of FRANCHISEE for the purpose of assisting FRANCHISEE in negotiations.

1.2  In the event that development of a Unit on the Premises is disapproved by FRANCHISOR or by any governmental authority, this Franchise agreement and all of the parties' rights and obligations hereunder shall cease and be of no further force and effect.

1.3  FRANCHISOR's approval of the Premises is not a representation or a warranty that the Unit will be profitable or that FRANCHISEE will achieve any particular level of sales at the Unit. It merely means that the Premises has met certain minimum criteria which FRANCHISOR has established for identifying suitable sites for proposed Units in the region in which the Premises are located. Because unit development is not a precise science, FRANCHISEE agrees that FRANCHISOR's approval or disapproval of a development shall not impose any liability or obligation on FRANCHISOR. The decision to develop any particular Premises is FRANCHISEE's, subject to FRANCHISOR's final approval. A preliminary favorable opinion of the Premises by local or regional representatives of FRANCHISOR is not conclusive or binding approval, because their recommendations may be rejected by FRANCHISOR.

2.0  **Approval of FRANCHISEE** - In addition to approval of the Premises set forth above, FRANCHISEE's qualifications to obtain this Franchise must be approved in writing by FRANCHISOR. In the event FRANCHISOR disapproves FRANCHISEE's qualifications within sixty (60) days of the date of this agreement, this Franchise agreement and all of the parties' rights and obligations hereunder shall cease and expire.

3.0  **Execution of Documents** - FRANCHISEE shall execute such other documents and agreements as are customarily required by FRANCHISOR in such circumstances, including, if appropriate, but not limited to, a standard form of Lease Option Agreement or Rider to Lease, which ensures the continued availability of the Premises as a franchised unit, in the event of a default under this agreement or, if applicable, under FRANCHISEE's lease of the Premises, during the term of this agreement. If FRANCHISEE owns the Premises real estate, FRANCHISEE shall grant FRANCHISOR the right to lease the Premises on negotiated terms comparable to those under which FRANCHISOR leases comparable property from others. A Lease Option Agreement or a Rider to Lease confirming these rights in a form acceptable to FRANCHISOR, must be signed before construction commences on the Premises.

4.0  **Development of the Unit** - The Unit must be developed and constructed in strict accordance with FRANCHISOR's current standards, requirements, procedures, plans, specifications and documentation for the type, configuration and brand(s) approved for the Premises (hereinafter collectively the "Requirements"). In order that development of the Premises proceed as expeditiously as possible, FRANCHISEE shall strictly comply with the following procedures set forth in Sections 4 and 5:

4.1  FRANCHISEE shall request FRANCHISOR's review of a proposed site, submitted in writing on the prescribed form, signed by FRANCHISEE and, if applicable, FRANCHISEE's landlord (the "Request for Site Approval"). Within approximately thirty (30) days, FRANCHISOR will advise FRANCHISEE if the proposed Premises fails to meet FRANCHISOR's minimum preliminary criteria. Otherwise, FRANCHISOR will schedule a Responsibility Meeting (described below), to be held within approximately sixty (60) days after FRANCHISOR received the Request for Site Approval. This preliminary review procedure is intended to allow FRANCHISEE the opportunity to limit the amount of money FRANCHISEE spends on a site that does not meet FRANCHISOR's minimum criteria.

*Schedule "F/D"*

1

4.2  Once FRANCHISOR has scheduled a Responsibility Meeting, FRANCHISEE shall promptly hire a licensed architect for the Unit project, whose responsibility shall be to adapt FRANCHISOR's generic plans and/or specifications to the specific requirements of the Premises, the geographical region in which the Premises are located and the building codes and ordinances pertinent to the Premises, and to oversee the contractor's completion of construction of the Unit on the Premises. FRANCHISEE's architect must promptly order such topographical and boundary surveys of the Premises, soil borings and structural engineering tests as FRANCHISOR and/or FRANCHISEE's architect may require (the "Reports"). FRANCHISEE's architect must attend the Responsibility Meeting.

4.3  On the scheduled day, FRANCHISOR's representatives will meet at the Premises with FRANCHISEE and FRANCHISEE's architect, to establish a work schedule and coordinate the respective responsibilities of each of the parties with respect to development of a Unit on the Premises (the "Responsibility Meeting"). The Reports, including copies of zoning ordinances and by-laws applicable to the Premises, shall be made available to FRANCHISOR at the Responsibility Meeting by FRANCHISEE's architect. If any such Report or FRANCHISEE's architect is not available when required, FRANCHISOR may, at its option, postpone the Responsibility Meeting, in which case FRANCHISEE shall reimburse FRANCHISOR's out-of-pocket travel costs, if any. Should the Responsibility Meeting be so postponed, FRANCHISOR shall reschedule the Responsibility Meeting on a date FRANCHISEE makes a firm commitment that the architect and/or Reports will be available, no later than within thirty (30) additional days.  If FRANCHISEE is unable to comply, FRANCHISOR shall have the right to terminate this Franchise agreement, provided that, in FRANCHISOR's good faith judgement, FRANCHISEE has failed to exercise reasonable diligence to comply with the terms of this Schedule.

4.4  Subject to delays caused by FRANCHISEE or its landlord or otherwise beyond FRANCHISOR's reasonable control, FRANCHISOR shall use its best efforts to notify FRANCHISEE of its approval or disapproval of the Premises, within approximately ninety (90) days after the date FRANCHISOR received FRANCHISEE's Request for Site Approval.

4.5  FRANCHISOR assumes no responsibility for (a) evaluation of the soil or subsoil on the Premises for hazardous substances or unstable conditions, (b) inspection of any structure on the Premises for asbestos or other toxic or hazardous materials, or (c) compliance with the Americans With Disabilities Act ("ADA"). It is FRANCHISEE's sole responsibility to obtain satisfactory evidence and/or assurances that the Premises (and any structures thereon) are free from environmental contamination and in compliance with the requirements of ADA.

5.0  **Construction of the Unit** -Prior to commencement of construction of the Unit on the Premises, the plans and specifications prepared by FRANCHISEE's architect must be reviewed by FRANCHISOR and approved for compliance with FRANCHISOR's design Requirements.  FRANCHISEE is solely responsible for obtaining all necessary permits from all applicable governmental agencies for completing construction of the Unit. If FRANCHISE fails to commence construction of the Unit within twelve (12) months from the date of this Franchise Agreement, FRANCHISOR shall have the right, in its sole discretion, to terminate this agreement by written notice to FRANCHISEE.

5.1  FRANCHISEE and its contractor(s) shall obtain a comprehensive general liability insurance policy written by an insurer having at least a rating of A-XII in Best's Insurance Reports and in which FRANCHISOR is named as an additional insured party, Such policy shall comply with Subsection 5.3 of the General Terms and Conditions of this Franchise Agreement. Coverage under such insurance shall include operations, premises liability, independent contractor's coverage, contractual liability and automobile liability (owned and non-owned). Prior to commencement of construction, FRANCHISEE shall furnish FRANCHISOR an insurance certificate evidencing the foregoing policy and that FRANCHISEE or its contractor(s) have procured worker's compensation insurance covering all persons employed in construction of the Unit.

5.2  FRANCHISOR shall have the right of entry upon the Premises at all times, to inspect construction in progress, to ensure that all of FRANCHISOR's Requirements are being met. FRANCHISOR and its employees shall not act as an architect or agent of FRANCHISEE.  The duties of FRANCHISOR's construction representative are limited solely to ensuring that FRANCHISOR's Requirements are met on the Premises.  FRANCHISEE shall not rely upon any opinions expressed by FRANCHISOR or any of its employees or agents regarding structural integrity, safety or construction procedures, building codes or ordinances or other matters properly within the responsibility of FRANCHISEE's architect. FRANCHISOR assumes no liability or responsibility for architectural or engineering judgments outside the scope of the duties stated above.

5.3  If the Unit does not initially open to serve the general public, or does not commence operations (as the case may be), within fifteen (15) months from the date of this agreement, FRANCHISOR shall have the right, in its sole discretion, (a) to increase the Initial Franchise Fee(s) to the then-current initial franchise fee(s), which increase, if any, shall be payable to FRANCHISOR upon demand;  or (b) to terminate this agreement by written notice to FRANCHISEE.  In the event of any delay caused by FRANCHISOR, or if FRANCHISEE has been unavoidably delayed by act of God, government restrictions, labor difficulties, inability to obtain building materials or similar contingencies (other than making any payment) not within FRANCHISEE's control, FRANCHISOR shall extend the deadline for a period of time equal to the period of such unavoidable delay.

5.4  Before the Unit opens to serve the general public, or commences operations (as the case may be), FRANCHISEE must obtain FRANCHISOR's final approval of the construction of the building, site improvements and landscaping, as appropriate, and the installation of all signs and equipment.  FRANCHISOR's approval of construction of the unit is not a representation or warranty that the Unit has been constructed in accordance with any architectural, engineering or legal standards for design or workmanship.  It merely means that FRANCHISOR is satisfied that the Requirements which FRANCHISOR has established for consistency of design and layout have been met (or waived, where appropriate).  FRANCHISEE agrees that FRANCHISOR's approval of construction of the Unit shall not impose any liability or obligation on FRANCHISOR. FRANCHISEE also agrees that all franchise and real estate documentation must be complete and all required payments must be received by FRANCHISOR before the Unit is opened.

5.5  As soon as FRANCHISOR approves that construction and equipping the Unit are substantially complete and all conditions required for opening the Unit, or commencing operations (as the case may be), have been met, FRANCHISEE

*Schedule "F/D"*

2

 

shall promptly open the Unit to serve the general public. FRANCHISEE agrees that the Unit must open to serve the general public no later than fifteen (15) months from the date of this Agreement.

6.0    **Financing** - Prior to commencing construction of the Unit on the Premises, FRANCHISEE shall provide evidence satisfactory to FRANCHISOR that cash and/or financing is in place, sufficient to fund completion of construction and purchase of necessary improvements, equipment and signs. FRANCHISOR assumes no obligation to guarantee the funding or financing of FRANCHISEE's construction project. FRANCHISOR will not guarantee FRANCHISEE's mortgage, lease or other real estate related obligations. If FRANCHISOR, at its election, finances or guarantees the financing of FRANCHISEE's purchase or leasing of equipment and/or signs, the owner of the Premises real estate must agree that the equipment and signs are not a part of the realty and must waive any and all interest in the equipment and/or signs, in order to permit the financing of the equipment and/or signs. In this connection, the owner of the Premises real estate must sign such reasonable documents as are reasonably required by FRANCHISOR.

7.0    **Control of the Premises** - FRANCHISEE hereby represents to FRANCHISOR that FRANCHISEE will have the following relationship with the owner or lessor of the Premises (place an "x" in the appropriate box):

☒    the Premises will be owned by an independent third party landlord with which FRANCHISEE will **not** share or maintain any common partner, member, shareholder, officer, director, trustee, beneficiary, family member or other interest; or

☐    the Premises will be owned by a third party landlord with which FRANCHISEE **will** share or maintain a common partner, member, shareholder, officer, director, trustee, beneficiary, family member or other interest; or

☐    the Premises will be owned by a corporation, LLC, trust, partnership or other entity controlled by FRANCHISEE; or

☐    the Premises will be owned by the same entity that will execute the Franchise Agreement.

FRANCHISEE agrees to promptly advise FRANCHISOR of any change, whatsoever, in the relationship represented above.

RIDER TO FRANCHISE AGREEMENT

SCHEDULE "DD/BR"
ADDENDUM ONE
120104

**SPECIAL TERMS AND CONDITIONS APPLICABLE TO
A DUNKIN' DONUTS/BASKIN-ROBBINS COMBO FRANCHISE**

**THE MARKETING STARTUP FEE**

**TEST AGREEMENT**

1. Pursuant to Section D. of the Contract Data Schedule and Section 4.2 of the General Terms and Conditions of the Franchise Agreement, Franchisee was to have paid Franchisor a Marketing Startup Fee (the "Fee") in connection with the opening of the Retail Unit to the public.

2. Franchisor has agreed to forebear in collecting the fee at this time in reliance upon Franchisee's representations as set forth in this Agreement.

3. Franchisee hereby represents and warrants to Franchisor that Franchisee shall develop and execute a start up promotional program or such other promotion or advertising program as Franchisor may specify for the Retail Unit. In connection therewith, Franchisee shall utilize such website(s), program materials and methods as Franchisor shall specify from time to time. It is anticipated that such program would be undertaken in the period starting four weeks before the opening of the Retail Unit and be complete within 2 months of the opening of the retail unit.

4. In reliance on the foregoing, Franchisor agrees to forebear in collecting the Fee as set forth in the Franchise Agreement. Franchisor may collect the entire Fee, without offset, if Franchisee fails to complete the required program within 2 months of the opening of the Retail Unit.

5. All of Franchisor's remedies under the Franchise Agreement, including without limitation the right to attorneys fees, are hereby incorporated by reference.

6. Franchisor reserves the right to rescind this Test Agreement in the event that the web site intended for Franchisee's use in furtherance of this Test Agreement is not operational on the day on which the Retail Unit opens to the public. In such event, Franchisee agrees to promptly pay the Fee applicable to the market in which the Retail Unit is located and to comply with the provisions of the Franchise Agreement relating to startup promotional program or other Franchisor-required program as if this Test Agreement had not been entered into.

120105

### ADDENDUM TO THE FRANCHISE AGREEMENT AND STORE DEVELOPMENT AGREEMENT REQUIRED BY THE NEW YORK GENERAL BUSINESS LAW

Notwithstanding anything to the contrary set forth in the Franchise Agreement (the "Franchise Agreement") and/or the Store Development Agreement ("SDA") the following provisions shall supersede and apply to all Baskin-Robbins, Dunkin' Donuts and Togo's franchises offered and sold in the State of New York. There are circumstances in which an offering made by FRANCHISOR would not fall within the scope of the New York General Business Law, Article 33, such as when the offer and acceptance occurred outside the state of New York. However, an offer or sale is deemed made in New York if FRANCHISEE is domiciled in or the franchise will be opening in New York. FRANCHISOR is required to furnish a New York prospectus to every prospective franchisee who is protected under the New York General Business Law, Article 33.

1. Subsection 5.4 of the Franchise Agreement and Section 14 of the SDA shall each be supplemented by the addition of the following language as the last sentence of these sections:

    However, FRANCHISEE shall not be required to indemnify FRANCHISOR for any claims arising out of a breach of this Agreement by FRANCHISOR or other civil wrongs of FRANCHISOR.

2. Paragraph 10.3.7 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

    FRANCHISEE must execute a general release in a form satisfactory to FRANCHISOR, releasing FRANCHISOR, its shareholders, directors, officers, employees, in their corporate and individual capacities, of any claims FRANCHISEE may have against them; provided, however, that all rights enjoyed by FRANCHISEE and any causes of action arising in its favor from the provision of Article 33 of the General Business Law of the State of New York and the regulations issued thereunder shall remain in force, it being the intent of this proviso that the non-waiver provisions of the New York State General Business Law Sections 687.4 and 687.5 be satisfied.

3. Paragraph 10.1 of the Franchise Agreement shall be supplemented by adding thereto the following provisions:

    This Agreement is fully assignable by FRANCHISOR and shall inure to the benefit of any assignee or other legal successor to the interest of FRANCHISOR herein. However, no assignment shall be made except to an assignee who, in the good faith judgment of FRANCHISOR, is willing and able to assume FRANCHISOR's obligations under this Agreement.

Initials

Passive Partner Letter

Re: Franchise Business Located at: $PC^{*}$ 337513

In order to induce Togo's Eateries, Inc., Baskin-Robbins USA, CO. and/or Dunkin' Donuts Incorporated (the "Franchisor") to sell, or to approve the sale, of the above-referenced franchise to the Undersigned, the Undersigned hereby certify that:

1. The "Passive Partner(s) shall at all times, alone or together, own less than fifty percent (50%) of the legal and beneficial interest in the franchise or franchise entity (or any successor entity) which is the subject of this letter. The term Passive Partner shall mean any individual whom Dunkin' Brands, Inc. has permitted to become a franchisee.

2. At no time will any Passive Partner be active in the day-to-day operation of the store or management of the franchised business.

3. A passive investor can not hold the title of an officer or director in a Corporation or can not be a member of an LLC if the LLC's operating agreement permits a Member to bind the LLC. If however, all decision-making functions are reserved in the Operating Agreement solely to the Managing Member(s) and the passive investor is not a Managing Member, then the individual can be a Member. In no event may a passive partner be a Managing Member or Manager, as those terms are used in LLC's.

The Undersigned acknowledge and agree that this Agreement is a material inducement to Dunkin' Brands, Inc. selling, or approving the sale of, the above-referenced franchise to the Undersigned, and further acknowledge and agree that it shall be a default under the franchise agreement if the Passive Partner(s), alone or together, at any point own 50% or more of the legal and beneficial interest in the franchise or franchise entity or, in the opinion of Franchisor, become actively involved in the day-to-day operation of the store or management of the franchised business.

The Undersigned further understand and acknowledge that no change in the legal or beneficial ownership of the franchise or the franchise entity may be made without the prior written consent of the Franchisor. See the Franchise Agreement for the specific requirements.

The Undersigned agree that any breach of this agreement by the Undersigned shall constitute irreparable harm to the Franchisor and the Franchisor shall have, in addition to other legal remedies available, the right to obtain injunctive relief for such a breach, and the Undersigned agree to pay Dunkin' Brands, Inc.'s reasonable legal fees and costs incurred by the Franchisor in seeking such relief.

The Undersigned acknowledge and agree that this agreement shall be attached to and made a part of the Dunkin Brands, Inc. Franchise Agreement at the time the Franchise Agreement is executed.

Signed this day under pains and penalties of perjury.

Dated: 9/18/05

THE UNDERSIGNED:

Franchise Entity (corporation, LLC or general partnership): TKNY Partners LLC

Pran Tiku (Passive Partner)

Anil Kapoor

Revised Passive Partner Letter - English 4/22/04

PC# 337513 / BR# 4171 – New York, NY

IN WITNESS WHEREOF the parties hereto, intending to be legally bound hereby, have duly executed, sealed and delivered this agreement in duplicate, as of the date and year first written above. FRANCHISEE hereby acknowledges receipt of this Franchise Agreement, together with any amendments, at least five (5) business days prior to the date hereof. FRANCHISEE further acknowledges having carefully read this agreement in its entirety, including all Schedules identified above and the Personal Guaranty below (if applicable).

**FRANCHISOR**

**BASKIN- ROBBINS USA, CO.**
**DUNKIN' DONUTS INCORPORATED**

By: _____

Gail R. Sorrentino, Assistant Secretary

This agreement is not binding upon the above corporation(s) until executed and attested by an authorized officer.

**FRANCHISEE ACKNOWLEDGES SECTION 11 OF THE GENERAL TERMS & CONDITIONS OF THIS CONTRACT, WHICH PROVIDES FOR FRANCHISEE'S EXPRESS WAIVER OF RIGHTS TO A JURY TRIAL, TO PARTICIPATE IN CLASS ACTION LAWSUITS, TO OBTAIN PUNITIVE, MULTIPLE OR EXEMPLARY DAMAGES, AND TO BRING ANY CLAIM OR ACTION LATER THAN TWO YEARS AFTER THE DISCOVERY OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION.**

**FRANCHISEE**

WITNESS/ATTEST:

**TKNY PARTNERS LLC**

_____
witness, print name  UMA KAPOOR .

By: _____
Anil Kapoor, Manager

## PERSONAL GUARANTEE BY SHAREHOLDERS OF A CORPORATION OR MEMBERS OF A LIMITED LIABILITY COMPANY

We, the undersigned, represent and warrant that we constitute

[  ]  the shareholders of one hundred percent (100%) of the originally issued and outstanding capital stock of the above FRANCHISEE, a corporation

[ X ]  one hundred percent (100%) of the members of the above FRANCHISEE limited liability company ("LLC")

organized under the laws of the state of <u>New York</u> .  Waiving demand and notice, the undersigned hereby, jointly and severally, personally guarantee the full payment of FRANCHISEE's money obligations under Section 4 and the performance of all of FRANCHISEE's other obligations under this Franchise Agreement, including, without limitation, paragraph 6.3 and Section 8, in its entirety relative to the restrictions on the activities of FRANCHISEE. We personally agree that the Franchise Agreement shall be binding upon each of us personally. The undersigned, jointly and severally, agree that FRANCHISOR may, without notice to or consent of the undersigned, (a) extend, in whole or in part, the time for payment of FRANCHISEE's money obligations under paragraph 4; (b) modify, with the consent of FRANCHISEE, its money or other obligations hereunder; and/or (c) settle, waive or compromise any claim of FRANCHISOR against FRANCHISEE or any of the undersigned, all without in any way affecting the personal guarantee of the undersigned.  This Guarantee is intended to take effect as a sealed instrument.

_____
witness, print name  UMA KAPOOR

_____
Anil Kapoor, individually

_____
witness, print name _____

_____
Pran Tiku, individually (passive partner)
TIKU M





PC # 337513 / BR# 4171 – New York, NY

## CERTIFICATION OF FRANCHISEE

DESCRIBE BELOW ALL PROMISES AND REPRESENTATIONS MADE BY FRANCHISOR THAT ARE NOT EXPRESSLY CONTAINED IN THE FRANCHISE AGREEMENT OR UNIFORM FRANCHISE OFFERING CIRCULAR BUT WHICH INFLUENCED FRANCHISEE'S DECISION TO SIGN THIS FRANCHISE AGREEMENT.

*If the answer is "none," please write "NONE" below.*

NONE

FRANCHISEE's completion of this page is a material inducement for FRANCHISOR to grant FRANCHISEE this Franchise. If FRANCHISEE fails to complete, sign and deliver this Certification of Franchisee page to FRANCHISOR along with the Franchise Agreement, FRANCHISOR will not counter-execute the Franchise Agreement or may void the Franchise Agreement if it already has been counter-executed.

THE UNDERSIGNED HEREBY CERTIFY THAT THE INFORMATION PROVIDED ABOVE IS TRUE, that FRANCHISEE had the opportunity to obtain the advice of an attorney, and that FRANCHISEE, and not FRANCHISEE's attorney or other representative, has executed this Certification of Franchisee.

The date of the Certification shall be the date on the Franchise Agreement

Witness/Attest:                                          Franchisee

                                                **TKNY PARTNERS LLC**

witness, print name    UMA KAPOOR

                                        By
                                        Anil Kapoor, Manager, Member & individually

witness, print name

                                        Pran Tiku, Member & individually
                                        (passive partner)
                                             TIKU

# Exhibit 1E

O'ROURKE & DEGEN, PLLC
ATTORNEYS AT LAW
225 BROADWAY, SUITE 715
NEW YORK, NY 10007

212-227-4530

Fax 212-385-9813

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
NEW JERSEY

THOMAS H. O'ROURKE
1976 - 2005

December 10, 2007

BY FEDERAL EXPRESS

Sundram, Inc.
d/b/a Dunkin' Donuts
511 East 163rd Street
Bronx, New York 10451

Re:  **Notice to Cure**
     **Dunkin' Donuts**
     **PC:  340091 CUST:  55618**
     **Account Balance Due:  $6,353.76**

Dear Franchisee:

Please be advised that this firm represents the interests of
Dunkin' Donuts Franchised Restaurants LLC ("Dunkin' Donuts"),
successor in interest to Dunkin' Donuts Incorporated, with
respect to your failure to comply with the requirements of the
Franchise Agreement listed below at the following address:

| **Franchisee** | **Date/Agr** | **Location** | **Brand(s)** |
|---|---|---|---|
| Sundram, Inc., Anil Kapoor | 06/15/04 | 511 East 163rd Street Bronx, New York 10451 | DD |

Pursuant to your Franchise Agreement, this Notice shall
serve as **fifteen (15) days prior written notice that unless you
cure your defaults, Dunkin' Donuts intends to terminate your
franchise** for your failure to report gross sales and to make the
following payments **through December 10, 2007** (see annexed status
report):

| ITEM | AMOUNT |
|---|---|
| Franchise Fees | $ 3,378.59 |
| Advertising Fees | 2,863.17 |
| Collection Fee | 112.00 |
| TOTAL | $ 6,353.76 |

If you failed to provide Dunkin' Donuts with reports of your
gross sales, as required by the Franchise Agreement, all, or a

Sundram, Inc.
December 10, 2007
Page 2

portion, of the outstanding Franchise Fees and Advertising Fees
may have been estimated based upon your prior sales.

**You are required to cure these defaults within fifteen (15)
days by mailing your certified check in the amount of $6,353.76
to Dunkin' Brands, Inc., P.O Box 2965, Carol Stream, Il 60132-
2965. In addition, fax a copy of said check to Mr. Gary Zullig
at 781-737-6212.**

You are advised that if you dispute the claimed defaults and
contend that this Notice is not justified, you must advise
Dunkin' Donuts in writing within seven (7) days of your receipt
of this Notice of the substance of the dispute and provide
Dunkin' Donuts with any and all information supporting your
claims.  Dunkin' Donuts will promptly review the substance of
your dispute and make any adjustments that may be necessary to
the amounts shown to be in default and notify you thereof.
However, any dispute that you raise with respect to the amounts
in default, or any claims that you might purport to have against
Dunkin' Donuts, will not excuse your obligation to pay the
amounts owed to Dunkin' Donuts as set out herein above; nor will
such claims excuse your performance of your obligations under the
Franchise Agreement or stay the time within which you must cure
any defaults.

This notice supplements any Notice(s) of Default and/or
Termination previously sent, relating to this store.  This notice
does not supersede any prior Notice, nor does it constitute a
waiver of any rights pursuant to any Notice.  Failure to cure
these defaults within fifteen (15) days of the receipt of this
Notice, as well as your continued failure to make timely payments
and to submit financial information, as required by your
Franchise Agreement with Dunkin' Donuts, may result in
termination of your Franchise Agreement.

If payment has been made in full and all sales reports have
been submitted to Dunkin' Donuts, please disregard this notice.

Very truly yours,

RONALD D. DEGEN

RDD:rg
cc:  Ms. Sandra Richmond, Supervisor, Collections
     Mr. Gary Zullig, Collection Specialist
     Mr. Dominic Laskero, Director of Franchise Services
     Mr. Todd Matlovsky, Operations Manager

Page 4 of 9

RUN DATE: 10-DEC-07
USER : SRICHMON
CUSTOMER: 8207
LOCATION:

Dunkin' Brands Inc
*******************
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF: 2007/12/10 00:01:00

Sunfram, Inc.
511 E. 163rd St.
Bronx NY 10451-4227
55618

SHOP ADDRESS:
511 E. 163rd St.
Bronx NY 10451-4227
55618

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | RPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 340091 | 1110001 | 10140 | 402711444 | 11/01/2007 | E | 10/27/2007 | | 5900000 INDIRECT FUND INCOME | 93.25 | NA | |
| 340091 | 1110001 | 10140 | 402711444 | 11/01/2007 | E | 10/27/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 186.50 | NA | |
| 340091 | 1110001 | 10140 | 402711444 | 11/01/2007 | E | 10/27/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 186.50 | NA | |
| 340091 | 1110001 | 10610 | 402723750 | 11/01/2007 | E | 10/27/2007 | | 5300000 CONTINUING FRANCHISE FEES | 550.17 | NA | |
| 340091 | 1110001 | 10140 | 402856872 | 11/08/2007 | E | 11/03/2007 | | 5900000 INDIRECT FUND INCOME | 95.70 | NA | |
| 340091 | 1110001 | 10140 | 402856872 | 11/08/2007 | E | 11/03/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 191.41 | NA | |
| 340091 | 1110001 | 10140 | 402856872 | 11/08/2007 | E | 11/03/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 191.41 | NA | |
| 340091 | 1110001 | 10140 | 402857675 | 11/15/2007 | E | 11/10/2007 | | 5900000 INDIRECT FUND INCOME | 95.92 | NA | |
| 340091 | 1110001 | 10140 | 402857675 | 11/15/2007 | E | 11/10/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 191.84 | NA | |
| 340091 | 1110001 | 10140 | 402857675 | 11/15/2007 | E | 11/10/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 191.84 | NA | |
| 340091 | 1110001 | 10140 | 402859123 | 11/22/2007 | E | 11/17/2007 | | 5900000 INDIRECT FUND INCOME | 95.92 | NA | |
| 340091 | 1110001 | 10140 | 402859123 | 11/22/2007 | E | 11/17/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 191.84 | NA | |
| 340091 | 1110001 | 10140 | 402859123 | 11/22/2007 | E | 11/17/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 191.84 | NA | |
| 340091 | 1110001 | 10140 | 402862227 | 11/29/2007 | E | 11/24/2007 | | 5900000 INDIRECT FUND INCOME | 95.92 | NA | |
| 340091 | 1110001 | 10140 | 402862227 | 11/29/2007 | E | 11/24/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 191.84 | NA | |
| 340091 | 1110001 | 10140 | 402862227 | 11/29/2007 | E | 11/24/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 191.84 | NA | |
| 340091 | 1110001 | 10140 | 402867291 | 12/06/2007 | E | 12/01/2007 | | 5900000 INDIRECT FUND INCOME | 95.92 | NA | |
| 340091 | 1110001 | 10140 | 402867291 | 12/06/2007 | E | 12/01/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 191.84 | NA | |
| 340091 | 1110001 | 10140 | 402867291 | 12/06/2007 | S | 12/01/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 191.84 | NA | |
| 340091 | 1110001 | 10610 | 402869996 | 11/08/2007 | E | 11/03/2007 | | 5300000 CONTINUING FRANCHISE FEES | 564.66 | NA | |
| 340091 | 1110001 | 10610 | 402870804 | 11/15/2007 | E | 11/10/2007 | | 5300000 CONTINUING FRANCHISE FEES | 565.94 | NA | |
| 340091 | 1110001 | 10610 | 402872257 | 11/22/2007 | E | 11/17/2007 | | 5300000 CONTINUING FRANCHISE FEES | 565.94 | NA | |
| 340091 | 1110001 | 10610 | 402875366 | 11/29/2007 | E | 11/24/2007 | | 5300000 CONTINUING FRANCHISE FEES | 565.94 | NA | |
| 340091 | 1110001 | 10610 | 402880437 | 12/06/2007 | E | 12/01/2007 | | 5300000 CONTINUING FRANCHISE FEES | 565.94 | NA | |

TOTAL FOR GL: 1110001                6,241.76

Page 5 of 9

| PROFIT CENTER | GL CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/R DATE | TRANSACTION CHECK NO DESCRIPTION | AMOUNT EPAY CONFIRM NO ID | INVOICE |
|---|---|---|---|---|---|---|---|

TOTAL FOR BRAND :   DD

6,241.76

TOTAL FOR CUSTOMER :

6,241.76

REPORT GRAND TOTAL :

*** CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If there are any questions, please refer them to your Collections Specialist.

**O'ROURKE & DEGEN, PLLC**
ATTORNEYS AT LAW
225 BROADWAY, SUITE 715
NEW YORK, NY 10007

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
NEW JERSEY

212-227-4530

FAX 212-385-9813

THOMAS H. O'ROURKE
1976 - 2005

December 10, 2007

BY FEDERAL EXPRESS

Satayam Shivam, Inc.
d/b/a Dunkin' Donuts
2451 Eastchester Road
Bronx, New York 10469

> Re: **Notice to Cure**
> **Dunkin' Donuts**
> **PC: 340367 CUST: 54423**
> **Account Balance Due: $7,509.18**

Dear Franchisee:

Please be advised that this firm represents the interests of
Dunkin' Donuts Franchised Restaurants LLC LLC ("Dunkin' Donuts"),
successor in interest to Dunkin' Donuts Incorporated, with
respect to your failure to comply with the requirements of the
Franchise Agreement listed below at the following address:

| **Franchisee** | **Date/Agr** | **Location** | **Brand(s)** |
|---|---|---|---|
| Satayam Shivam, Inc.,<br>Anil Kapoor | 01/18/04 | 2451 Eastchester Road<br>Bronx, New York 10469 | DD |

Pursuant to your Franchise Agreement, this Notice shall
serve as **fifteen (15) days prior written notice that unless you
cure your defaults, Dunkin' Donuts intends to terminate your
franchise** for your failure to report gross sales and to make the
following payments **through December 10, 2007** (see annexed status
report):

| ITEM | AMOUNT |
|---|---|
| Franchise Fees | $ 4,003.98 |
| Advertising Fees | 3,393.20 |
| Collection Fee | 112.00 |
| TOTAL | $ 7,509.18 |

If you failed to provide Dunkin' Donuts with reports of your
gross sales, as required by the Franchise Agreement, all, or a

Satayam Shivam, Inc.
December 10, 2007
Page 2

portion, of the outstanding Franchise Fees and Advertising Fees
may have been estimated based upon your prior sales.

**You are required to cure these defaults within fifteen (15)
days by mailing your certified check in the amount of $7,509.18
to Dunkin' Brands, Inc., P.O Box 2965, Carol Stream, Il 60132-
2965.  In addition, fax a copy of said check to Mr. Gary Zullig
at 781-737-6212.**

You are advised that if you dispute the claimed defaults and
contend that this Notice is not justified, you must advise
Dunkin' Donuts in writing within seven (7) days of your receipt
of this Notice of the substance of the dispute and provide
Dunkin' Donuts with any and all information supporting your
claims.  Dunkin' Donuts will promptly review the substance of
your dispute and make any adjustments that may be necessary to
the amounts shown to be in default and notify you thereof.
However, any dispute that you raise with respect to the amounts
in default, or any claims that you might purport to have against
Dunkin' Donuts, will not excuse your obligation to pay the
amounts owed to Dunkin' Donuts as set out herein above; nor will
such claims excuse your performance of your obligations under the
Franchise Agreement or stay the time within which you must cure
any defaults.

This notice supplements any Notice(s) of Default and/or
Termination previously sent, relating to this store.  This notice
does not supersede any prior Notice, nor does it constitute a
waiver of any rights pursuant to any Notice.  Failure to cure
these defaults within fifteen (15) days of the receipt of this
Notice, as well as your continued failure to make timely payments
and to submit financial information, as required by your
Franchise Agreement with Dunkin' Donuts, may result in
termination of your Franchise Agreement.

If payment has been made in full and all sales reports have
been submitted to Dunkin' Donuts, please disregard this notice.

Very truly yours,

RONALD D. DEGEN

RDD:rg
cc:  Ms. Sandra Richmond, Supervisor Collections
     Mr. Gary Zullig, Collection Specialist
     Mr. Dominic Laskero, Director of Franchise Services
     Mr. Todd Matlovsky, Operations Manager

RUN DATE: 10-DEC-07

USER : SKICOMEON

CUSTOMER: 7607
LOCATION:

Dunkin' Brands Inc
********************
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF: 2007/12/10 00:00:00

Satyam Shivam, Inc.
2451 EASTCHESTER RD
BRONX NY 10469-5915
54423

SHOP ADDRESS:
2451 EASTCHESTER RD
BRONX NY 10469-5915
54423

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | BRAN CONFIRM | INVOICE NO ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 340367 | 1110001 | 10140 | 402704479 | 10/25/2007 | E | 10/20/2007 | 5900000 | INDIRECT FUND INCOME | 91.93 | NA | |
| 340367 | 1110001 | 10140 | 402704479 | 10/25/2007 | E | 10/20/2007 | 5901000 | NATIONAL ADVERTISING INCOME | 183.86 | NA | |
| 340367 | 1110001 | 10140 | 402704479 | 10/25/2007 | E | 10/20/2007 | 5902000 | DIRECT/REGIONAL FUND INCOME | 183.86 | NA | |
| 340367 | 1110001 | 10140 | 402711542 | 11/01/2007 | E | 10/27/2007 | 5900000 | INDIRECT FUND INCOME | 99.68 | NA | |
| 340367 | 1110001 | 10140 | 402711542 | 11/01/2007 | E | 10/27/2007 | 5901000 | NATIONAL ADVERTISING INCOME | 199.36 | NA | |
| 340367 | 1110001 | 10140 | 402711542 | 11/01/2007 | E | 10/27/2007 | 5902000 | DIRECT/REGIONAL FUND INCOME | 199.36 | NA | |
| 340367 | 1110001 | 10610 | 402718777 | 10/25/2007 | R | 10/20/2007 | 5300000 | CONTINUING FRANCHISE FEES | 542.40 | NA | |
| 340367 | 1110001 | 10610 | 402723848 | 11/01/2007 | R | 10/27/2007 | 5300000 | CONTINUING FRANCHISE FEES | 588.12 | NA | |
| 340367 | 1110001 | 10140 | 402856880 | 11/08/2007 | E | 11/03/2007 | 5900000 | INDIRECT FUND INCOME | 93.37 | NA | |
| 340367 | 1110001 | 10140 | 402856880 | 11/08/2007 | E | 11/03/2007 | 5901000 | NATIONAL ADVERTISING INCOME | 186.75 | NA | |
| 340367 | 1110001 | 10140 | 402856880 | 11/08/2007 | E | 11/03/2007 | 5902000 | DIRECT/REGIONAL FUND INCOME | 186.75 | NA | |
| 340367 | 1110001 | 10140 | 402857689 | 11/15/2007 | E | 11/10/2007 | 5900000 | INDIRECT FUND INCOME | 98.41 | NA | |
| 340367 | 1110001 | 10140 | 402857689 | 11/15/2007 | E | 11/10/2007 | 5901000 | NATIONAL ADVERTISING INCOME | 196.83 | NA | |
| 340367 | 1110001 | 10140 | 402857689 | 11/15/2007 | E | 11/10/2007 | 5902000 | DIRECT/REGIONAL FUND INCOME | 196.83 | NA | |
| 340367 | 1110001 | 10140 | 402859153 | 11/22/2007 | E | 11/17/2007 | 5900000 | INDIRECT FUND INCOME | 98.41 | NA | |
| 340367 | 1110001 | 10140 | 402859153 | 11/22/2007 | E | 11/17/2007 | 5901000 | NATIONAL ADVERTISING INCOME | 196.83 | NA | |
| 340367 | 1110001 | 10140 | 402859153 | 11/22/2007 | E | 11/17/2007 | 5902000 | DIRECT/REGIONAL FUND INCOME | 196.83 | NA | |
| 340367 | 1110001 | 10140 | 402862292 | 11/29/2007 | E | 11/24/2007 | 5900000 | INDIRECT FUND INCOME | 98.41 | NA | |
| 340367 | 1110001 | 10140 | 402862292 | 11/29/2007 | E | 11/24/2007 | 5901000 | NATIONAL ADVERTISING INCOME | 196.83 | NA | |
| 340367 | 1110001 | 10140 | 402862292 | 11/29/2007 | E | 11/24/2007 | 5902000 | DIRECT/REGIONAL FUND INCOME | 196.83 | NA | |
| 340367 | 1110001 | 10140 | 402867389 | 12/06/2007 | E | 12/01/2007 | 5900000 | INDIRECT FUND INCOME | 98.41 | NA | |
| 340367 | 1110001 | 10140 | 402867389 | 12/06/2007 | E | 12/01/2007 | 5901000 | NATIONAL ADVERTISING INCOME | 196.83 | NA | |
| 340367 | 1110001 | 10140 | 402867389 | 12/06/2007 | E | 12/01/2007 | 5902000 | DIRECT/REGIONAL FUND INCOME | 196.83 | NA | |
| 340367 | 1110001 | 10610 | 402870004 | 11/08/2007 | R | 11/03/2007 | 5300000 | CONTINUING FRANCHISE FEES | 550.90 | NA | |
| 340367 | 1110001 | 10610 | 402870818 | 11/15/2007 | R | 11/10/2007 | 5300000 | CONTINUING FRANCHISE FEES | 580.64 | NA | |
| 340367 | 1110001 | 10610 | 402872287 | 11/22/2007 | R | 11/17/2007 | 5300000 | CONTINUING FRANCHISE FEES | 580.64 | NA | |
| 340367 | 1110001 | 10610 | 402875431 | 11/29/2007 | R | 11/24/2007 | 5300000 | CONTINUING FRANCHISE FEES | 580.64 | NA | |
| 340367 | 1110001 | 10610 | 402880535 | 12/06/2007 | R | 12/01/2007 | 5300000 | CONTINUING FRANCHISE FEES | 580.64 | NA | |

Page 7 of 9

| PROFIT CENTER | GL CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E DATE | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|

TOTAL FOR GL: 1110001                                            7,397.18

TOTAL FOR BRAND : DD                                             7,397.18

TOTAL FOR CUSTOMER :                                            7,397.18

REPORT GRAND TOTAL :                                     ===============

*** CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If there are any questions, please refer them to your Collections Specialist.

O'ROURKE & DEGEN, PLLC
ATTORNEYS AT LAW
225 BROADWAY, SUITE 715
NEW YORK, NY 10007

212-227-4530

Fax 212-385-9813

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
NEW JERSEY

THOMAS H. O'ROURKE
1976 - 2005

December 10, 2007

BY FEDERAL EXPRESS

Shivam Sundram, Inc.
d/b/a Dunkin' Donuts
114 Bruckner Boulevard
Bronx, New York 10454

Re:  **Notice to Cure**
     **Dunkin' Donuts**
     PC:  340725 CUST:  56026
     Account Balance Due:  $9,151.82

Dear Franchisee:

Please be advised that this firm represents the interests of
Dunkin' Donuts Franchised Restaurants LLC LLC ("Dunkin' Donuts"),
successor in interest to Dunkin' Donuts Incorporated, with
respect to your failure to comply with the requirements of the
Franchise Agreement listed below at the following address:

| Franchisee | Date/Agr | Location | Brand(s) |
|---|---|---|---|
| Shivam Sundram, Inc.,<br>Anil Kapoor | 04/11/05 | 114 Bruckner Boulevard<br>Bronx, New York 10454 | DD |

Pursuant to your Franchise Agreement, this Notice shall
serve as **fifteen (15) days prior written notice that unless you
cure your defaults, Dunkin' Donuts intends to terminate your
franchise** for your failure to report gross sales and to make the
following payments **through December 10, 2007** (see annexed status
report):

| ITEM | AMOUNT |
|---|---|
| Franchise Fees, Advertising Fees and<br>   other charges | $ 4,893.12 |
| Advertising Fees | 4,416.70 |
| Collection Fee | 112.00 |
| TOTAL | $ 9,151.82 |

If you failed to provide Dunkin' Donuts with reports of your
gross sales, as required by the Franchise Agreement, all, or a
portion, of the outstanding Franchise Fees and Advertising Fees

Shivam Sundram, Inc.
December 10, 2007
Page 2

may have been estimated based upon your prior sales.

**You are required to cure these defaults within fifteen (15) days by mailing your certified check in the amount of $9,151.82 to Dunkin' Brands, Inc., P.O Box 2965, Carol Stream, Il 60132-2965. In addition, fax a copy of said check to Mr. Gary Zullig at 781-737-6212.**

You are advised that if you dispute the claimed defaults and contend that this Notice is not justified, you must advise Dunkin' Donuts in writing within seven (7) days of your receipt of this Notice of the substance of the dispute and provide Dunkin' Donuts with any and all information supporting your claims.  Dunkin' Donuts will promptly review the substance of your dispute and make any adjustments that may be necessary to the amounts shown to be in default and notify you thereof. However, any dispute that you raise with respect to the amounts in default, or any claims that you might purport to have against Dunkin' Donuts, will not excuse your obligation to pay the amounts owed to Dunkin' Donuts as set out herein above; nor will such claims excuse your performance of your obligations under the Franchise Agreement or stay the time within which you must cure any defaults.

This notice supplements any Notice(s) of Default and/or Termination previously sent, relating to this store.  This notice does not supersede any prior Notice, nor does it constitute a waiver of any rights pursuant to any Notice.  Failure to cure these defaults within fifteen (15) days of the receipt of this Notice, as well as your continued failure to make timely payments and to submit financial information, as required by your Franchise Agreement with Dunkin' Donuts, may result in termination of your Franchise Agreement.

If payment has been made in full and all sales reports have been submitted to Dunkin' Donuts, please disregard this notice.

Very truly yours,

*Ronald D. Degen*
RONALD D. DEGEN

RDD:rg
cc:  Ms. Sandra Richmond, Supervisor, Collections
     Mr. Gary Zullig, Collection Specialist
     Mr. Dominic Laskero, Director of Franchise Services
     Mr. Todd Matlovsky, Operations Manager
     Anil Kapoor
     85 East 10th Street
     New York, New York 10003

RUN DATE: 10-DEC-07

USER 1        SRLGMMON

CUSTOMER: 10078
LOCATION:

Shivam Sundram, Inc.
85 East 10th Street
NEW YORK NY 10003

Dunkin' Brands Inc
***************
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF: 2007/12/10 00:00:00

Page 8 of 9

SHOP ADDRESS:
114 BRUCKNER BLVD
BRONX NY 10454-4516
56026

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/R DATE | TRANSACTION | CHECK NO | DESCRIPTION | AMOUNT | EBAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 340725 | 1110001 | 10140 | 402856891 | 11/08/2007 | 11/03/2007 | R | | 5900000 INDIRECT FUND INCOME | 149.08 NA | | |
| 340725 | 1110001 | 10140 | 402856891 | 11/08/2007 | 11/03/2007 | R | | 5901000 NATIONAL ADVERTISING INCOME | 298.17 NA | | |
| 340725 | 1110001 | 10140 | 402856891 | 11/08/2007 | 11/03/2007 | R | | 5902000 DIRECT/REGIONAL FUND INCOME | 298.17 NA | | |
| 340725 | 1110001 | 10140 | 402857709 | 11/15/2007 | 11/10/2007 | R | | 5900000 INDIRECT FUND INCOME | 170.06 NA | | |
| 340725 | 1110001 | 10140 | 402857709 | 11/15/2007 | 11/10/2007 | R | | 5901000 NATIONAL ADVERTISING INCOME | 340.13 NA | | |
| 340725 | 1110001 | 10140 | 402857709 | 11/15/2007 | 11/10/2007 | R | | 5902000 DIRECT/REGIONAL FUND INCOME | 340.13 NA | | |
| 340725 | 1110001 | 10140 | 402859133 | 11/22/2007 | 11/17/2007 | R | | 5900000 INDIRECT FUND INCOME | 170.06 NA | | |
| 340725 | 1110001 | 10140 | 402859133 | 11/22/2007 | 11/17/2007 | R | | 5901000 NATIONAL ADVERTISING INCOME | 340.13 NA | | |
| 340725 | 1110001 | 10140 | 402859133 | 11/22/2007 | 11/17/2007 | R | | 5902000 DIRECT/REGIONAL FUND INCOME | 340.13 NA | | |
| 340725 | 1110001 | 10140 | 402862385 | 11/29/2007 | 11/24/2007 | R | | 5900000 INDIRECT FUND INCOME | 170.06 NA | | |
| 340725 | 1110001 | 10140 | 402862385 | 11/29/2007 | 11/24/2007 | R | | 5901000 NATIONAL ADVERTISING INCOME | 340.13 NA | | |
| 340725 | 1110001 | 10140 | 402862385 | 11/29/2007 | 11/24/2007 | R | | 5902000 DIRECT/REGIONAL FUND INCOME | 340.13 NA | | |
| 340725 | 1110001 | 10140 | 402867530 | 12/06/2007 | 12/01/2007 | R | | 5900000 INDIRECT FUND INCOME | 170.06 NA | | |
| 340725 | 1110001 | 10140 | 402867530 | 12/06/2007 | 12/01/2007 | R | | 5901000 NATIONAL ADVERTISING INCOME | 340.13 NA | | |
| 340725 | 1110001 | 10140 | 402867530 | 12/06/2007 | 12/01/2007 | R | | 5902000 DIRECT/REGIONAL FUND INCOME | 340.13 NA | | |
| 340725 | 1110001 | 10610 | 402870015 | 11/09/2007 | 11/03/2007 | R | | 5300000 CONTINUING FRANCHISE FEES | 879.60 NA | | |
| 340725 | 1110001 | 10610 | 402870838 | 11/15/2007 | 11/10/2007 | R | | 5300000 CONTINUING FRANCHISE FEES | 1003.38 NA | | |
| 340725 | 1110001 | 10610 | 402872327 | 11/22/2007 | 11/17/2007 | R | | 5300000 CONTINUING FRANCHISE FEES | 1003.38 NA | | |
| 340725 | 1110001 | 10610 | 402875524 | 11/29/2007 | 11/24/2007 | R | | 5300000 CONTINUING FRANCHISE FEES | 1003.38 NA | | |
| 340725 | 1110001 | 10610 | 402880676 | 12/06/2007 | 12/01/2007 | R | | 5300000 CONTINUING FRANCHISE FEES | 1003.38 NA | | |

TOTAL FOR GL:                                1110001                                    9,039.82

TOTAL FOR BRAND :    DD                                                                 9,039.82

Page 9 of 9

| PROFIT CENTER | GL NUMBER | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/R DATE | TRANSACTION | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|

TOTAL FOR CUSTOMER :                                        9,039.82

REPORT GRAND TOTAL :                                        ████████

*** CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If there are any questions, please refer them to your Collections Specialist.

**O'ROURKE & DEGEN, PLLC**
ATTORNEYS AT LAW
225 BROADWAY, SUITE 715
NEW YORK, NY 10007

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
NEW JERSEY

212-227-4530
FAX 212-385-9813

THOMAS H. O'ROURKE
1976 - 2005

December 10, 2007

BY FEDERAL EXPRESS

TKNY Partners, LLC
d/b/a Dunkin' Donuts and Baskin-Robbins
2083 Lexington Avenue
New York, New York 10035

Re: **Notice to Cure**
    **Dunkin' Donuts and Baskin-Robbins**
    PC: 337513 CUST: 56890
    Account Balance Due: $7,508.46

Dear Franchisee:

Please be advised that this firm represents the interests of Dunkin' Donuts Franchised Restaurants LLC, successor in interest of Dunkin' Donuts Incorporated, and Baskin-Robbins Franchised Shops LLC, successor in interest of Baskin-Robbins USA, Co. (collectively "Dunkin' Brands"), with respect to your failure to comply with the requirements of the Franchise Agreement listed below at the following address:

| Franchisee | Date/Agr | Location | Brand(s) |
|---|---|---|---|
| TKNY Partners, LLC, Anil Kapoor Pran Tiku | 02/01/06 | 2083 Lexington Avenue New York, New York 10035 | DD, BR |

Pursuant to your Franchise Agreement, this Notice shall serve as **fifteen (15) days prior written notice that unless you cure your defaults, Dunkin' Brands intends to terminate your franchise** for your failure to report gross sales and to make the following payments **through December 10, 2007** (see annexed status report):

| ITEM | AMOUNT |
|---|---|
| Franchise Fees (Dunkin' Donuts) | $ 3,563.74 |

TKNY Partners, LLC
December 10, 2007
Page 2

| | |
|---|---|
| Advertising Fees (Dunkin' Donuts) | 3,020.16 |
| Franchise Fees (Baskin-Robbins) | 439.84 |
| Advertising Fees (Baskin-Robbins) | 372.72 |
| Collection Fee | 112.00 |
| TOTAL | $ 7,508.46 |

If you failed to provide Dunkin' Brands with reports of your gross sales, as required by the Franchise Agreement, all, or a portion, of the outstanding Franchise Fees and Advertising Fees may have been estimated based upon your prior sales.

**You are required to cure these defaults within fifteen (15) days by mailing your certified check in the amount of $7,508.46 to Dunkin' Brands, Inc., P.O Box 2965, Carol Stream, Il 60132-2965. In addition, fax a copy of said check to Mr. Gary Zullig at 781-737-6212.**

You are advised that if you dispute the claimed defaults and contend that this Notice is not justified, you must advise Dunkin' Brands in writing within seven (7) days of your receipt of this Notice of the substance of the dispute and provide Dunkin' Brands with any and all information supporting your claims. Dunkin' Brands will promptly review the substance of your dispute and make any adjustments that may be necessary to the amounts shown to be in default and notify you thereof. However, any dispute that you raise with respect to the amounts in default, or any claims that you might purport to have against Dunkin' Brands, will not excuse your obligation to pay the amounts owed to Dunkin' Brands as set out herein above; nor will such claims excuse your performance of your obligations under the Franchise Agreement or stay the time within which you must cure any defaults.

This notice supplements any Notice(s) of Default and/or Termination previously sent, relating to this store. This notice does not supersede any prior Notice, nor does it constitute a waiver of any rights pursuant to any Notice. Failure to cure these defaults within fifteen (15) days of the receipt of this Notice, as well as your continued failure to make timely payments and to submit financial information, as required by your Franchise Agreement with Dunkin' Brands, may result in termination of your Franchise Agreement.

TKNY Partners, LLC
December 10, 2007
Page 3

    If payment has been made in full and all sales reports have
been submitted to Dunkin' Brands, please disregard this notice.

                             Very truly yours,

                             *Ronald D. Degen*

RDD:rg                        RONALD D. DEGEN
cc:  Ms. Sandra Richmond, Supervisor Collections
      Mr. Gary Zullig, Collection Specialist
      Mr. Dominic Laskero, Director of Franchise Services
      Mr. Louis C. Beccarelli, Director of Franchise Services
      Mr. Todd Matlovsky, Operations Manager
      Mr. Kelly Byrnes, Operations Manager
      TKNY Partners LLC
      370 West 30th Street, Apt. 5E
      New York, New York 10001

RUN DATE: 10-DEC-07

USER : SRICHMON

CUSTOMER: 9611
LOCATION:

Dunkin' Brands Inc
********** ********
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF:  2007/12/10 00:00:00

Page 1 of 9

TRNY Partners, LLC
370 W. 30th St
NEW YORK NY 10001

SHOP ADDRESS:
2083 Lexington Avenue
Manhattan NY 10035
56890

| PROFIT CENTER | GL CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | RDAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 337513 1110001 | 10140 | 402856783 | 11/08/2007 | B | 11/03/2007 | | 5900000 INDIRECT FUND INCOME | 114.74 NA | | |
| 337513 1110001 | 10140 | 402856783 | 11/08/2007 | B | 11/03/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 229.47 NA | | |
| 337513 1110001 | 10140 | 402856783 | 11/08/2007 | B | 11/03/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 229.47 NA | | |
| 337513 1110001 | 10140 | 402857522 | 11/15/2007 | B | 11/10/2007 | | 5900000 INDIRECT FUND INCOME | 122.32 NA | | |
| 337513 1110001 | 10140 | 402857522 | 11/15/2007 | B | 11/10/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 244.65 NA | | |
| 337513 1110001 | 10140 | 402857522 | 11/15/2007 | B | 11/10/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 244.65 NA | | |
| 337513 1110001 | 10140 | 402858865 | 11/22/2007 | B | 11/17/2007 | | 5900000 INDIRECT FUND INCOME | 122.32 NA | | |
| 337513 1110001 | 10140 | 402858865 | 11/22/2007 | B | 11/17/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 244.65 NA | | |
| 337513 1110001 | 10140 | 402858865 | 11/22/2007 | B | 11/17/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 244.65 NA | | |
| 337513 1110001 | 10140 | 402861720 | 11/29/2007 | B | 11/24/2007 | | 5900000 INDIRECT FUND INCOME | 122.32 NA | | |
| 337513 1110001 | 10140 | 402861720 | 11/29/2007 | B | 11/24/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 244.65 NA | | |
| 337513 1110001 | 10140 | 402861720 | 11/29/2007 | B | 11/24/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 244.65 NA | | |
| 337513 1110001 | 10140 | 402865566 | 12/06/2007 | B | 12/01/2007 | | 5900000 INDIRECT FUND INCOME | 122.32 NA | | |
| 337513 1110001 | 10140 | 402865566 | 12/06/2007 | B | 12/01/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 244.65 NA | | |
| 337513 1110001 | 10140 | 402865566 | 12/06/2007 | B | 12/01/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 244.65 NA | | |
| 337513 1110001 | 10610 | 402869907 | 11/08/2007 | B | 11/03/2007 | | 5300000 CONTINUING FRANCHISE FEES | 676.94 NA | | |
| 337513 1110001 | 10610 | 402870651 | 11/15/2007 | B | 11/10/2007 | | 5300000 CONTINUING FRANCHISE FEES | 721.70 NA | | |
| 337513 1110001 | 10610 | 402871999 | 11/22/2007 | B | 11/17/2007 | | 5300000 CONTINUING FRANCHISE FEES | 721.70 NA | | |
| 337513 1110001 | 10610 | 402874858 | 11/29/2007 | B | 11/24/2007 | | 5300000 CONTINUING FRANCHISE FEES | 721.70 NA | | |
| 337513 1110001 | 10610 | 402877911 | 12/06/2007 | B | 12/01/2007 | | 5300000 CONTINUING FRANCHISE FEES | 721.70 NA | | |

TOTAL FOR GL:  1110001                    6,583.90

| 337513 1110001 | 20140 | 402850362 | 11/08/2007 | B | 11/03/2007 | | 5908000 ALLOCATION-NAP | 9.75 NA | | |
| 337513 1110001 | 20140 | 402850362 | 11/08/2007 | B | 11/03/2007 | | 5900000 INDIRECT FUND INCOME | 19.50 NA | | |
| 337513 1110001 | 20140 | 402850362 | 11/08/2007 | B | 11/03/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 29.25 NA | | |
| 337513 1110001 | 20140 | 402850362 | 11/08/2007 | B | 11/03/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 39.01 NA | | |

TOTAL FOR BRAND :  DD                     6,583.90

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/R | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 337513 | 1110001 | 20140 | 402850748 | 11/15/2007 | R | 11/10/2007 | | 5908000 ALLOCATION-NAF | 6.88 NA | | |
| 337513 | 1110001 | 20140 | 402850748 | 11/15/2007 | R | 11/10/2007 | | 5900000 INDIRECT FUND INCOME | 13.76 NA | | |
| 337513 | 1110001 | 20140 | 402850748 | 11/15/2007 | R | 11/10/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 20.64 NA | | |
| 337513 | 1110001 | 20140 | 402850748 | 11/15/2007 | R | 11/10/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 27.52 NA | | |
| 337513 | 1110001 | 20140 | 402851394 | 11/22/2007 | R | 11/17/2007 | | 5908000 ALLOCATION-NAF | 6.88 NA | | |
| 337513 | 1110001 | 20140 | 402851394 | 11/22/2007 | R | 11/17/2007 | | 5900000 INDIRECT FUND INCOME | 13.76 NA | | |
| 337513 | 1110001 | 20140 | 402851394 | 11/22/2007 | R | 11/17/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 20.64 NA | | |
| 337513 | 1110001 | 20140 | 402851394 | 11/22/2007 | R | 11/17/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 27.52 NA | | |
| 337513 | 1110001 | 20140 | 402852520 | 11/29/2007 | R | 11/24/2007 | | 5908000 ALLOCATION-NAF | 6.88 NA | | |
| 337513 | 1110001 | 20140 | 402852520 | 11/29/2007 | R | 11/24/2007 | | 5900000 INDIRECT FUND INCOME | 13.76 NA | | |
| 337513 | 1110001 | 20140 | 402852520 | 11/29/2007 | R | 11/24/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 20.64 NA | | |
| 337513 | 1110001 | 20140 | 402852520 | 11/29/2007 | R | 11/24/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 27.52 NA | | |
| 337513 | 1110001 | 20140 | 402854773 | 12/06/2007 | R | 12/01/2007 | | 5908000 ALLOCATION-NAF | 6.88 NA | | |
| 337513 | 1110001 | 20140 | 402854773 | 12/06/2007 | R | 12/01/2007 | | 5900000 INDIRECT FUND INCOME | 13.76 NA | | |
| 337513 | 1110001 | 20140 | 402854773 | 12/06/2007 | R | 12/01/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 20.64 NA | | |
| 337513 | 1110001 | 20140 | 402854773 | 12/06/2007 | R | 12/01/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 27.52 NA | | |
| 337513 | 1110001 | 20610 | 402883047 | 11/08/2007 | R | 11/03/2007 | | 5300000 CONTINING FRANCHISE FEES | 115.08 NA | | |
| 337513 | 1110001 | 20610 | 402883428 | 11/15/2007 | R | 11/10/2007 | | 5300000 CONTINING FRANCHISE FEES | 81.19 NA | | |
| 337513 | 1110001 | 20610 | 402884067 | 11/22/2007 | R | 11/17/2007 | | 5300000 CONTINING FRANCHISE FEES | 81.19 NA | | |
| 337513 | 1110001 | 20610 | 402885184 | 11/29/2007 | R | 11/24/2007 | | 5300000 CONTINING FRANCHISE FEES | 81.19 NA | | |
| 337513 | 1110001 | 20610 | 402887427 | 12/06/2007 | R | 12/01/2007 | | 5300000 CONTINING FRANCHISE FEES | 81.19 NA | | |

TOTAL FOR GL:    1110001                                        812.56

TOTAL FOR BRAND :    BR                                         812.56

TOTAL FOR CUSTOMER :                                          7,396.46

Exhibit 1F

O'ROURKE & DEGEN, PLLC
ATTORNEYS AT LAW
225 BROADWAY, SUITE 715
NEW YORK, NY 10007

212-227-4530

Fax 212-385-9813

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
NEW JERSEY

THOMAS H. O'ROURKE
1976 · 2005

January 8, 2008

BY FEDERAL EXPRESS

Sundram, Inc.
d/b/a Dunkin' Donuts
511 East 163rd Street
Bronx, New York 10451

> Re:  **Supplemental Notice of Termination**
> **Dunkin' Donuts**
> PC:  340091 CUST:  55618

Dear Franchisee:

Please be advised that this firm represents the interests of
Dunkin' Donuts Franchised Restaurants LLC ("Dunkin' Donuts"),
successor in interest to Dunkin' Donuts Incorporated, with
respect to your failure to comply with the requirements of the
Franchise Agreement listed below at the following address:

| **Franchisee** | **Date/Agr** | **Location** | **Brand(s)** |
|---|---|---|---|
| Sundram, Inc., Anil Kapoor | Franchise Agreement 06/15/04 | 511 East 163rd Street Bronx, New York 10451 | DD |

On or about December 11, 2007 you received written Notice to
Cure (the "Notice") by overnight carrier under your Franchise
Agreement with Dunkin' Donuts for failure to pay sums due under
the Franchise Agreement.  In that Notice you were advised that
your Franchise Agreement would be terminated if you failed to
cure the defaults noted therein within fifteen (15) days after
receiving the Notice.  More than fifteen (15) days have passed
since you received the Notice and you have failed to cure the
defaults noted therein.

**This correspondence shall serve as notice of the termination
of your Franchise Agreement with Dunkin' Donuts, effective
immediately.**

Dunkin' Donuts demands that you immediately pay to Dunkin'
Donuts all damages it has suffered as a result of your defaults
under the Franchise Agreement.  Please note, however, that the

Sundram, Inc.
January 8, 2008
Page 2

payment and acceptance of such damages, or of additional amounts
due pursuant to the Franchise Agreement, shall not constitute a
"cure" or "waiver" of these defaults preventing termination or
requiring reinstatement of the Franchise Agreement.

Dunkin' Donuts demands that you, your agents, servants and
employees take such actions as are necessary to comply with your
post-termination obligations as set forth in the Franchise
Agreement, including, but not limited to, ceasing the use of any
methods associated with Dunkin' Donuts, ceasing the use of any
and all trademarks, service marks, and all other proprietary
marks and methods of trade identification, and all trade secrets
of Dunkin' Donuts, confidential information, signs, symbols and
slogans belonging to Dunkin' Donuts.  Dunkin' Donuts further
demands that you immediately cease use of, and return all Dunkin'
Donuts manuals to Dunkin' Donuts, and comply with the post-
termination obligations set forth in the Franchise Agreement.  In
addition, please make arrangements with your Operations Manager
to immediately de-identify your location of all signs, symbols,
slogans and proprietary marks belonging to Dunkin' Donuts.

This notice supplements any Notice(s) of Default and/or
Termination previously sent, relating to this store.  This notice
does not supersede any prior Notice, nor does it constitute a
waiver of any rights pursuant to any Notice.

You are advised that if you do not comply with the demands
set forth herein pursuant to the termination of your Franchise
Agreement, Dunkin' Donuts will submit this matter to a Court of
competent jurisdiction to seek judicial enforcement of the
termination and your post-termination obligations, as well as
damages, recovery of the franchised location, attorneys' fees,
costs and interest.

Very truly yours,

RONALD D. DEGEN

RDD:rg
cc:  Jack Laudermilk, Esq., Associate General Counsel
     Arthur Anastos, Esq., Director and Managing Counsel
     Mr. Kevin Boylen, Finance Manager, Treasury Services
     Mr. Gary Zullig, Collection Specialist
     Mr. Dominic Laskero, Director of Franchise Services
     David E. Worthen, Esq.
     Katherine L. Wallman, Esq.
     Michael Einbinder, Esq.

O'ROURKE & DEGEN, PLLC
ATTORNEYS AT LAW
225 BROADWAY, SUITE 715
NEW YORK, NY 10007

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
NEW JERSEY

212-227-4530

Fax 212-385-9813

THOMAS H. O'ROURKE
1976 - 2005

January 8, 2008

BY FEDERAL EXPRESS

Satayam Shivam, Inc.
d/b/a Dunkin' Donuts
2451 Eastchester Road
Bronx, New York 10469

Re:  **Supplemental Notice of Termination**
     **Dunkin' Donuts**
     PC:  340367 CUST:  54423

Dear Franchisee:

Please be advised that this firm represents the interests of
Dunkin' Donuts Franchised Restaurants LLC ("Dunkin' Donuts"),
successor in interest to Dunkin' Donuts Incorporated, with
respect to your failure to comply with the requirements of the
Franchise Agreement listed below at the following address:

| Franchisee | Date/Agr | Location | Brand(s) |
|---|---|---|---|
| Satayam Shivam, Inc., Anil Kapoor | Franchise Agreement 01/18/04 | 2451 Eastchester Road Bronx, New York 10469 | DD |

On or about December 11, 2007 you received written Notice to
Cure (the "Notice") by overnight carrier under your Franchise
Agreement with Dunkin' Donuts for failure to pay sums due under
the Franchise Agreement.  In that Notice you were advised that
your Franchise Agreement would be terminated if you failed to
cure the defaults noted therein within fifteen (15) days after
receiving the Notice.  More than fifteen (15) days have passed
since you received the Notice and you have failed to cure the
defaults noted therein.

**This correspondence shall serve as notice of the termination**
**of your Franchise Agreement with Dunkin' Donuts, effective**
**immediately.**

Dunkin' Donuts demands that you immediately pay to Dunkin'
Donuts all damages it has suffered as a result of your defaults
under the Franchise Agreement.  Please note, however, that the

Satayam Shivam, Inc.
January 8, 2008
Page 2

payment and acceptance of such damages, or of additional amounts
due pursuant to the Franchise Agreement, shall not constitute a
"cure" or "waiver" of these defaults preventing termination or
requiring reinstatement of the Franchise Agreement.

        Dunkin' Donuts demands that you, your agents, servants and
employees take such actions as are necessary to comply with your
post-termination obligations as set forth in the Franchise
Agreement, including, but not limited to, ceasing the use of any
methods associated with Dunkin' Donuts, ceasing the use of any
and all trademarks, service marks, and all other proprietary
marks and methods of trade identification, and all trade secrets
of Dunkin' Donuts, confidential information, signs, symbols and
slogans belonging to Dunkin' Donuts.  Dunkin' Donuts further
demands that you immediately cease use of, and return all Dunkin'
Donuts manuals to Dunkin' Donuts, and comply with the post-
termination obligations set forth in the Franchise Agreement.  In
addition, please make arrangements with your Operations Manager
to immediately de-identify your location of all signs, symbols,
slogans and proprietary marks belonging to Dunkin' Donuts.

        This notice supplements any Notice(s) of Default and/or
Termination previously sent, relating to this store.  This notice
does not supersede any prior Notice, nor does it constitute a
waiver of any rights pursuant to any Notice.

        You are advised that if you do not comply with the demands
set forth herein pursuant to the termination of your Franchise
Agreement, Dunkin' Donuts will submit this matter to a Court of
competent jurisdiction to seek judicial enforcement of the
termination and your post-termination obligations, as well as
damages, recovery of the franchised location, attorneys' fees,
costs and interest.

                                Very truly yours,

                                /RONALD D. DEGEN

RDD:rg
cc:  Jack Laudermilk, Esq., Associate General Counsel
     Arthur Anastos, Esq., Director and Managing Counsel
     Mr. Kevin Boylen, Finance Manager, Treasury Services
     Mr. Gary Zullig, Collection Specialist
     Mr. Dominic Laskero, Director of Franchise Services
     David E. Worthen, Esq.
     Katherine L. Wallman, Esq.
     Michael Einbinder, Esq.

O'ROURKE & DEGEN, PLLC
ATTORNEYS AT LAW
225 BROADWAY, SUITE 715
NEW YORK, NY 10007

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
NEW JERSEY

212-227-4530

Fax 212-385-9813

THOMAS H. O'ROURKE
1976 - 2005

January 8, 2008

BY FEDERAL EXPRESS

Shivam Sundram, Inc.
d/b/a Dunkin' Donuts
114 Bruckner Boulevard
Bronx, New York 10454

Re: **Supplemental Notice of Termination**
**Dunkin' Donuts**
PC: 340725 CUST: 56026

Dear Franchisee:

Please be advised that this firm represents the interests of
Dunkin' Donuts Franchised Restaurants LLC ("Dunkin' Donuts"),
successor in interest to Dunkin' Donuts Incorporated, with
respect to your failure to comply with the requirements of the
Franchise Agreement listed below at the following address:

| Franchisee | Date/Agr | Location | Brand(s) |
|---|---|---|---|
| Shivam Sundram, Inc., Anil Kapoor | Franchise Agreement 04/11/05 | 114 Bruckner Boulevard Bronx, New York 10454 | DD |

On or about December 11, 2007 you received written Notice to
Cure (the "Notice") by overnight carrier under your Franchise
Agreement with Dunkin' Donuts for failure to pay sums due under
the Franchise Agreement. In that Notice you were advised that
your Franchise Agreement would be terminated if you failed to
cure the defaults noted therein within fifteen (15) days after
receiving the Notice. More than fifteen (15) days have passed
since you received the Notice and you have failed to cure the
defaults noted therein.

**This correspondence shall serve as notice of the termination**
**of your Franchise Agreement with Dunkin' Donuts, effective**
**immediately.**

Dunkin' Donuts demands that you immediately pay to Dunkin'
Donuts all damages it has suffered as a result of your defaults
under the Franchise Agreement. Please note, however, that the
payment and acceptance of such damages, or of additional amounts

Shivam Sundram, Inc.
January 8, 2008
Page 2

due pursuant to the Franchise Agreement, shall not constitute a
"cure" or "waiver" of these defaults preventing termination or
requiring reinstatement of the Franchise Agreement.

Dunkin' Donuts demands that you, your agents, servants and
employees take such actions as are necessary to comply with your
post-termination obligations as set forth in the Franchise
Agreement, including, but not limited to, ceasing the use of any
methods associated with Dunkin' Donuts, ceasing the use of any
and all trademarks, service marks, and all other proprietary
marks and methods of trade identification, and all trade secrets
of Dunkin' Donuts, confidential information, signs, symbols and
slogans belonging to Dunkin' Donuts.  Dunkin' Donuts further
demands that you immediately cease use of, and return all Dunkin'
Donuts manuals to Dunkin' Donuts, and comply with the post-
termination obligations set forth in the Franchise Agreement.  In
addition, please make arrangements with your Operations Manager
to immediately de-identify your location of all signs, symbols,
slogans and proprietary marks belonging to Dunkin' Donuts.

This notice supplements any Notice(s) of Default and/or
Termination previously sent, relating to this store.  This notice
does not supersede any prior Notice, nor does it constitute a
waiver of any rights pursuant to any Notice.

You are advised that if you do not comply with the demands
set forth herein pursuant to the termination of your Franchise
Agreement, Dunkin' Donuts will submit this matter to a Court of
competent jurisdiction to seek judicial enforcement of the
termination and your post-termination obligations, as well as
damages, recovery of the franchised location, attorneys' fees,
costs and interest.

Very truly yours,

RONALD D. DEGEN

RDD:rg
cc:  Jack Laudermilk, Esq., Associate General Counsel
     Arthur Anastos, Esq., Director and Managing Counsel
     Mr. Kevin Boylen, Finance Manager, Treasury Services
     Mr. Gary Zullig, Collection Specialist
     Mr. Dominic Laskero, Director of Franchise Services
     David E. Worthen, Esq.
     Katherine L. Wallman, Esq.
     Michael Einbinder, Esq.
     Anil Kapoor
     85 East 10th Street
     New York, New York 10003

## O'ROURKE & DEGEN, PLLC
ATTORNEYS AT LAW
225 BROADWAY, SUITE 715
NEW YORK, NY 10007

212-227-4530

FAX 212-385-9813

RONALD D. DEGEN
rdegen@odlegal.com

SCOTT G. GOLDFINGER*
sgoldfinger@odlegal.com

KRISTIN M. LASHER
klasher@odlegal.com

* ALSO ADMITTED IN
NEW JERSEY

THOMAS H. O'ROURKE
1976 - 2005

January 8, 2008

BY FEDERAL EXPRESS

TKNY Partners, LLC
d/b/a Dunkin' Donuts and Baskin-Robbins
2083 Lexington Avenue
New York, New York 10035

Re:  **Supplemental Notice of Termination
Dunkin' Donuts and Baskin-Robbins**
PC:  337513 CUST:  56890

Dear Franchisee:

Please be advised that this firm represents the interests of Dunkin' Donuts Franchised Restaurants LLC, successor in interest of Dunkin' Donuts Incorporated, and Baskin-Robbins Franchised Shops LLC, successor in interest of Baskin-Robbins USA, Co. (collectively "Dunkin' Brands") with respect to your failure to comply with the requirements of the Franchise Agreement listed below at the following address:

| Franchisee | Date/Agr | Location | Brand(s) |
|---|---|---|---|
| TKNY Partners, LLC, Anil Kapoor Pran Tiku | Franchise Agreement 02/01/06 | 2083 Lexington Avenue New York, New York 10035 | DD, BR |

On or about December 11, 2007 you received written Notice to Cure (the "Notice") by overnight carrier under your Franchise Agreement with Dunkin' Brands for failure to pay sums due under the Franchise Agreement.  In the Notice you were advised that your Franchise Agreement would be terminated if you failed to cure the defaults noted therein within fifteen (15) days after receiving the Notice.  More than fifteen (15) days have passed since you received the Notice and you have failed to cure the defaults noted therein.

**This correspondence shall serve as notice of the termination of your Franchise Agreement with Dunkin' Brands, effective immediately.**

Dunkin' Brands demands that you immediately pay to it all damages that it has suffered as a result of your defaults under the Franchise Agreement.  Please note, however, that the payment and acceptance of such damages, or of additional amounts due

TKNY Partners, LLC
January 8, 2008
Page 2

pursuant to the Franchise Agreement, shall not constitute a
"cure" or "waiver" of these defaults preventing termination or
requiring reinstatement of the Franchise Agreement.

Dunkin' Brands demands that you, your agents, servants and
employees take such actions as are necessary to comply with your
post-termination obligations as set forth in the Franchise
Agreement, including, but not limited to, ceasing the use of any
methods associated with Dunkin' Brands, ceasing the use of any
and all trademarks, service marks, and all other proprietary
marks and methods of trade identification, and all trade secrets,
confidential information, signs, symbols and slogans belonging to
Dunkin' Brands.  Dunkin' Brands further demands that you
immediately cease use of, and return all Dunkin' Brands manuals
to Dunkin' Brands, and comply with the post-termination
obligations set forth in the Franchise Agreement.  In addition,
please make arrangements with your Operations Manager to
immediately de-identify your location of all signs, symbols,
slogans and proprietary marks belonging to Dunkin' Brands.

This notice supplements any Notice(s) of Default and/or
Termination previously sent and relating to this store.  This
notice does not supersede any prior Notice, nor does it
constitute a waiver of any rights pursuant to any Notice.

You are advised that if you do not comply with the demands
set forth herein pursuant to the termination of your Franchise
Agreement, Dunkin' Brands will submit this matter to a Court of
competent jurisdiction to seek judicial enforcement of the
termination and your post-termination obligations, as well as
damages, recovery of the franchised location, attorneys' fees,
costs and interest.

Very truly yours,

RONALD D. DEGEN

RDD:rg
cc: Jack Laudermilk, Esq., Associate General Counsel
    Arthur Anastos, Esq., Director and Managing Counsel
    Mr. Kevin Boylen, Finance Manager, Treasury Services
    Mr. Gary Zullig, Collection Specialist
    Mr. Dominic Laskero, Director of Franchise Services
    Mr. Louis C. Beccarelli, Director of Franchise Services
    Mr. Kelly Byrnes, Operations Manager
    David E. Worthen, Esq.
    Katherine L. Wallman, Esq.
    Michael Einbinder, Esq.
    TKNY Partners LLC
    370 West 30th Street, Apt. 5E
    New York, New York 10001

Exhibit 2

**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

DUNKIN' DONUTS FRANCHISED                        :
  RESTAURANTS LLC,                               :
  a Delaware Limited Liability Company,          :
DD IP HOLDER LLC,                                 :
  a Delaware Limited Liability Company,          :
BASKIN-ROBBINS FRANCHISED                         :
  SHOPS LLC,                                     :
  a Delaware Limited Liability Company, and      :
BR IP HOLDER LLC,                                 :
  a Delaware Limited Liability Company,          :
                                  :
          Plaintiffs,                         :
                                    :

          v.                                  :    C.A. No. 07-CV-11134 (RJH)
                                    :

SUNDRAM, INC.,                                    :
  a New York Corporation,                        :
SATYAM SHIVAM, INC.,                              :
  (now known as Satyam Eastchester LLC)          :
  a New York Corporation,                        :
SHIVAM SUNDRAM, INC.,                             :
  (now known as Shivam Bruckner LLC)             :
  a New York Corporation,                        :
TKNY PARTNERS, LLC,                               :
  a New York Limited Liability Company,          :
ANIL KAPOOR,                                      :
  a resident of Massachusetts, and              :
PRAN TIKU,                                        :
  a resident of Massachusetts,                   :
                                    :
          Defendants.                         :

------------------------------------------------------------------x

## CERTIFICATION OF GARY ZULLIG

1.    My name is Gary Zullig. I am a resident of the Commonwealth of

Massachusetts, and I make this certification based on personal knowledge.

2.    I have been employed as a Collection Case Manager for Dunkin' Brands, Inc. or Dunkin' Donuts Incorporated since July 2001.

3.    Prior to becoming a Collection Case Manager, I was employed as a Credit and Collections Supervisor from September 2000 until July 2001 for Dunkin'. I have been employed by Dunkin' Brands, Inc. or Dunkin' Donuts Incorporated since 1990.

4.    As Credit and Collections Supervisor, my duties included supervising the collection of past due monies on Dunkin' Donuts and Baskin-Robbins franchise owner accounts.

5.    Under the terms of the Franchise Agreement, franchisees are required to report the gross sales of their franchise to Dunkin' and Baskin-Robbins. .

6.    It is part of the ordinary course of business of Dunkin' and Baskin to receive sales information from franchisees and to record that information on Dunkin's and Baskin's reporting system.

7.    It is part of the function of the Accounts Receivable Department to receive the sales reports and to input the sales information into the reporting system. The information received from franchisees is generally recorded on the system within twenty-four hours of its receipt by Dunkin' and Baskin.

8.    Defendants failed to pay to Dunkin' and Baskin their franchise fees and advertising fees. Specifically, as of December 10, 2007, Defendants owed Plaintiffs at least $30,075.22 in unpaid franchise fees, advertising fees, and other charges. A true and correct copy of the accounts receivable report reflecting this amount is attached as Exhibit A.

2

9.     Defendants failed to cure their financial default within the fifteen (15) days provided in the Notice to Cure. As of January 9, 2008, Defendants owed Dunkin' and Baskin-Robbins at least $33,861.53 in unpaid franchise fees, advertising fees and other charges. A true and correct copy of the accounts receivable report reflecting this amount is attached as Exhibit B.

I certify under penalty of perjury that the foregoing is true and correct. Executed on this _//_ day of January, 2008.

Gary Zullig

3

# Exhibit 2A

RUN DATE: 10-DEC-07
USER : SKIDMON

CUSTOMER: 9611
LOCATION:

Dunkin' Brands Inc
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF:     2007/12/10 00:00:00

TONY Partners, LLC
370 W. 30th St
NEW YORK NY 10001

SHOP ADDRESS:
2003 Lexington Avenue
Manhattan NY 10035
56890

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/R | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT EBAY | INVOICE CONFIRM NO ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 337513 | 1110001 | 10140 | 402856783 | 11/08/2007 | E | 11/03/2007 | | 5900000 INDIRECT FUND INCOME | 114.74 NA | |
| 337513 | 1110001 | 10140 | 402856783 | 11/08/2007 | E | 11/03/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 229.47 NA | |
| 337513 | 1110001 | 10140 | 402856783 | 11/08/2007 | E | 11/03/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 229.47 NA | |
| 337513 | 1110001 | 10140 | 402857532 | 11/15/2007 | E | 11/10/2007 | | 5900000 INDIRECT FUND INCOME | 122.32 NA | |
| 337513 | 1110001 | 10140 | 402857532 | 11/15/2007 | E | 11/10/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 244.65 NA | |
| 337513 | 1110001 | 10140 | 402857532 | 11/15/2007 | E | 11/10/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 244.65 NA | |
| 337513 | 1110001 | 10140 | 402858865 | 11/22/2007 | E | 11/17/2007 | | 5900000 INDIRECT FUND INCOME | 122.32 NA | |
| 337513 | 1110001 | 10140 | 402858865 | 11/22/2007 | E | 11/17/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 244.65 NA | |
| 337513 | 1110001 | 10140 | 402858865 | 11/22/2007 | E | 11/17/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 244.65 NA | |
| 337513 | 1110001 | 10140 | 402861720 | 11/29/2007 | E | 11/24/2007 | | 5900000 INDIRECT FUND INCOME | 122.32 NA | |
| 337513 | 1110001 | 10140 | 402861720 | 11/29/2007 | E | 11/24/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 244.65 NA | |
| 337513 | 1110001 | 10140 | 402861720 | 11/29/2007 | E | 11/24/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 244.65 NA | |
| 337513 | 1110001 | 10140 | 402865566 | 12/06/2007 | E | 12/01/2007 | | 5900000 INDIRECT FUND INCOME | 122.32 NA | |
| 337513 | 1110001 | 10140 | 402865566 | 12/06/2007 | E | 12/01/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 244.65 NA | |
| 337513 | 1110001 | 10140 | 402865566 | 12/06/2007 | E | 12/01/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 244.65 NA | |
| 337513 | 1110001 | 10610 | 402869907 | 11/08/2007 | E | 11/03/2007 | | 5300000 CONTINUING FRANCHISE FEES | 676.94 NA | |
| 337513 | 1110001 | 10610 | 402870651 | 11/15/2007 | E | 11/10/2007 | | 5300000 CONTINUING FRANCHISE FEES | 721.70 NA | |
| 337513 | 1110001 | 10610 | 402871999 | 11/22/2007 | E | 11/17/2007 | | 5300000 CONTINUING FRANCHISE FEES | 721.70 NA | |
| 337513 | 1110001 | 10610 | 402874858 | 11/29/2007 | E | 11/24/2007 | | 5300000 CONTINUING FRANCHISE FEES | 721.70 NA | |
| 337513 | 1110001 | 10610 | 402879711 | 12/06/2007 | E | 12/01/2007 | | 5300000 CONTINUING FRANCHISE FEES | 721.70 NA | |

TOTAL FOR GL: 1110001    6,583.90

| 337513 | 1110001 | 20140 | 402850362 | 11/09/2007 | E | 11/03/2007 | | 5908030 ALLOCATION-NAP | 9.75 NA | |
| 337513 | 1110001 | 20140 | 402850362 | 11/09/2007 | | 11/03/2007 | | 5900000 INDIRECT FUND INCOME | 15.90 NA | |
| 337513 | 1110001 | 20140 | 402850362 | 11/09/2007 | | 11/03/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 29.26 NA | |
| 337513 | 1110001 | 20140 | 402850362 | 11/09/2007 | E | 11/03/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 39.01 NA | |

TOTAL FOR BRAND : DO    6,583.90

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/R | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | RPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 337513 | 1110001 | 20140 | 420850748 | 11/15/2007 | E | 11/10/2007 | | 5908000 ALLOCATION-NAF | 6.88 | NA | |
| 337513 | 1110001 | 20140 | 420850748 | 11/15/2007 | E | 11/10/2007 | | 5900000 INDIRECT FUND INCOME | 13.76 | NA | |
| 337513 | 1110001 | 20140 | 420850748 | 11/15/2007 | E | 11/10/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 20.64 | NA | |
| 337513 | 1110001 | 20140 | 420850748 | 11/15/2007 | E | 11/10/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 27.52 | NA | |
| 337513 | 1110001 | 20140 | 420851394 | 11/22/2007 | E | 11/17/2007 | | 5908000 ALLOCATION-NAF | 6.88 | NA | |
| 337513 | 1110001 | 20140 | 420851394 | 11/22/2007 | E | 11/17/2007 | | 5900000 INDIRECT FUND INCOME | 13.76 | NA | |
| 337513 | 1110001 | 20140 | 420851394 | 11/22/2007 | E | 11/17/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 20.64 | NA | |
| 337513 | 1110001 | 20140 | 420851394 | 11/22/2007 | E | 11/17/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 27.52 | NA | |
| 337513 | 1110001 | 20140 | 420852520 | 11/29/2007 | E | 11/24/2007 | | 5908000 ALLOCATION-NAF | 6.88 | NA | |
| 337513 | 1110001 | 20140 | 420852520 | 11/29/2007 | E | 11/24/2007 | | 5900000 INDIRECT FUND INCOME | 13.76 | NA | |
| 337513 | 1110001 | 20140 | 420852520 | 11/29/2007 | E | 11/24/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 20.64 | NA | |
| 337513 | 1110001 | 20140 | 420852520 | 11/29/2007 | E | 11/24/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 27.52 | NA | |
| 337513 | 1110001 | 20140 | 420854773 | 12/06/2007 | E | 12/01/2007 | | 5908000 ALLOCATION-NAF | 6.88 | NA | |
| 337513 | 1110001 | 20140 | 420854773 | 12/06/2007 | E | 12/01/2007 | | 5900000 INDIRECT FUND INCOME | 13.76 | NA | |
| 337513 | 1110001 | 20140 | 420854773 | 12/06/2007 | E | 12/01/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 20.64 | NA | |
| 337513 | 1110001 | 20140 | 420854773 | 12/06/2007 | E | 12/01/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 27.52 | NA | |
| 337513 | 1110001 | 20610 | 420883047 | 11/08/2007 | E | 11/03/2007 | | 5300000 CONTINUING FRANCHISE FEES | 115.08 | NA | |
| 337513 | 1110001 | 20610 | 420883428 | 11/15/2007 | E | 11/10/2007 | | 5300000 CONTINUING FRANCHISE FEES | 81.19 | NA | |
| 337513 | 1110001 | 20610 | 420884067 | 11/22/2007 | E | 11/17/2007 | | 5300000 CONTINUING FRANCHISE FEES | 81.19 | NA | |
| 337513 | 1110001 | 20610 | 420885184 | 11/29/2007 | E | 11/24/2007 | | 5300000 CONTINUING FRANCHISE FEES | 81.19 | NA | |
| 337513 | 1110001 | 20610 | 420887427 | 12/06/2007 | E | 12/01/2007 | | 5300000 CONTINUING FRANCHISE FEES | 81.19 | NA | |

TOTAL FOR GL: 1110001     812.56

TOTAL FOR BRAND : BK     812.56

TOTAL FOR CUSTOMER :     7,396.46

RUN DATE: 10-DEC-07

USER : SRKUSMGM

Page 4 of 9

CUSTOMER: #207
LOCATION:

Sundram, Inc.
511 E. 163rd St.
Bronx NY 10451-4227
55618

Dunkin' Brands Inc.
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF: 2007/12/10 00:00:00

SHIP ADDRESS:
511 E. 163rd St
Bronx NY 10451-4227
55618

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/R | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT EPAY | CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 340091 | 1110001 | 10140 | 402711444 | 11/01/2007 | E | 10/27/2007 | 5900000 | INDIRECT FUND INCOME | 93.25 NA | | |
| 340091 | 1110001 | 10140 | 402711444 | 11/01/2007 | E | 10/27/2007 | 5901000 | NATIONAL ADVERTISING INCOME | 186.50 NA | | |
| 340091 | 1110001 | 10140 | 402711444 | 11/01/2007 | E | 10/27/2007 | 5902000 | DIRECT/REGIONAL FUND INCOME | 186.50 NA | | |
| 340091 | 1110001 | 10610 | 402723750 | 11/01/2007 | E | 10/27/2007 | 5300000 | CONTINUING FRANCHISE FEES | 550.17 NA | | |
| 340091 | 1110001 | 10140 | 402856872 | 11/08/2007 | E | 11/03/2007 | 5900000 | INDIRECT FUND INCOME | 95.70 NA | | |
| 340091 | 1110001 | 10140 | 402856872 | 11/08/2007 | E | 11/03/2007 | 5901000 | NATIONAL ADVERTISING INCOME | 191.41 NA | | |
| 340091 | 1110001 | 10140 | 402856872 | 11/08/2007 | E | 11/03/2007 | 5902000 | DIRECT/REGIONAL FUND INCOME | 191.41 NA | | |
| 340091 | 1110001 | 10140 | 402857675 | 11/15/2007 | E | 11/10/2007 | 5900000 | INDIRECT FUND INCOME | 95.92 NA | | |
| 340091 | 1110001 | 10140 | 402857675 | 11/15/2007 | E | 11/10/2007 | 5901000 | NATIONAL ADVERTISING INCOME | 191.84 NA | | |
| 340091 | 1110001 | 10140 | 402857675 | 11/15/2007 | E | 11/10/2007 | 5902000 | DIRECT/REGIONAL FUND INCOME | 191.84 NA | | |
| 340091 | 1110001 | 10140 | 402859123 | 11/22/2007 | E | 11/17/2007 | 5900000 | INDIRECT FUND INCOME | 95.92 NA | | |
| 340091 | 1110001 | 10140 | 402859123 | 11/22/2007 | E | 11/17/2007 | 5901000 | NATIONAL ADVERTISING INCOME | 191.84 NA | | |
| 340091 | 1110001 | 10140 | 402859123 | 11/22/2007 | E | 11/17/2007 | 5902000 | DIRECT/REGIONAL FUND INCOME | 191.84 NA | | |
| 340091 | 1110001 | 10140 | 402862227 | 11/29/2007 | E | 11/24/2007 | 5900000 | INDIRECT FUND INCOME | 95.92 NA | | |
| 340091 | 1110001 | 10140 | 402862227 | 11/29/2007 | E | 11/24/2007 | 5901000 | NATIONAL ADVERTISING INCOME | 191.84 NA | | |
| 340091 | 1110001 | 10140 | 402862227 | 11/29/2007 | E | 11/24/2007 | 5902000 | DIRECT/REGIONAL FUND INCOME | 191.84 NA | | |
| 340091 | 1110001 | 10140 | 402867291 | 12/06/2007 | E | 12/01/2007 | 5900000 | INDIRECT FUND INCOME | 95.92 NA | | |
| 340091 | 1110001 | 10140 | 402867291 | 12/06/2007 | E | 12/01/2007 | 5901000 | NATIONAL ADVERTISING INCOME | 191.84 NA | | |
| 340091 | 1110001 | 10140 | 402867291 | 12/06/2007 | E | 12/01/2007 | 5902000 | DIRECT/REGIONAL FUND INCOME | 191.84 NA | | |
| 340091 | 1110001 | 10610 | 402869996 | 11/08/2007 | E | 11/03/2007 | 5300000 | CONTINUING FRANCHISE FEES | 564.66 NA | | |
| 340091 | 1110001 | 10610 | 402870804 | 11/15/2007 | E | 11/10/2007 | 5300000 | CONTINUING FRANCHISE FEES | 565.94 NA | | |
| 340091 | 1110001 | 10610 | 402872257 | 11/22/2007 | E | 11/17/2007 | 5300000 | CONTINUING FRANCHISE FEES | 565.94 NA | | |
| 340091 | 1110001 | 10610 | 402875166 | 11/29/2007 | E | 11/24/2007 | 5300000 | CONTINUING FRANCHISE FEES | 565.94 NA | | |
| 340091 | 1110001 | 10610 | 402880437 | 12/06/2007 | E | 12/01/2007 | 5300000 | CONTINUING FRANCHISE FEES | 565.94 NA | | |

TOTAL FOR GL: 1110001                 6,241.76

| PROFIT CENTER GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E DATE | TRANSACTION CHECK NO DESCRIPTION | AMOUNT RPAY | CONFIRM NO ID | INVOICE |
|---|---|---|---|---|---|---|---|---|

TOTAL FOR BRAND :  DD

6,241.76
------------------

TOTAL FOR CUSTOMER :

6,241.76
------------------

REPORT GRAND TOTAL :

=====================

<del>6,241.76</del>
=====================

*** CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial representation of what this Franchise Owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If there are any questions, please refer them to your Collections Specialist.

```
RUN DATE:   10-DEC-07                          Dunkin' Brands Inc
USER :      SMIDKMSN                  ********** ACCOUNTS RECEIVABLE STATUS REPORT **********
                                              AS OF:   2007/12/10 00:00:00

CUSTOMER:  7607                                                              SHOP ADDRESS:
LOCATION:            Satyam Shivum, Inc.                                         2431 EASTCHESTER RD
                     2431 EASTCHESTER RD                                         BRONX NY 10469-5915
                     BRONX NY 10469-5915                                         54423
                     54423
```

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/R | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | REPAY CONFIRM NO | INVOICE CONFIRM NO ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 340367 | 111001 10140 | 40270649 | 10/25/2007 E | 10/20/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 183.86 NA | | | | |
| 340367 | 111001 10140 | 40270649 | 10/25/2007 E | 10/20/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 183.86 NA | | | | |
| 340367 | 111001 10140 | 40270649 | 10/25/2007 E | 10/20/2007 | | 5900000 INDIRECT FUND INCOME | 91.93 NA | | | | |
| 340367 | 111001 10140 | 40271154 | 11/01/2007 E | 10/27/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 199.36 NA | | | | |
| 340367 | 111001 10140 | 40271154 | 11/01/2007 E | 10/27/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 199.36 NA | | | | |
| 340367 | 111001 10140 | 40271154 | 11/01/2007 E | 10/27/2007 | | 5900000 INDIRECT FUND INCOME | 99.68 NA | | | | |
| 340367 | 111001 10610 | 40218777 | 10/25/2007 E | 10/20/2007 | | 5300000 CONTINUING FRANCHISE FEES | 542.40 NA | | | | |
| 340367 | 111001 10610 | 40273940 | 11/01/2007 E | 10/27/2007 | | 5300000 CONTINUING FRANCHISE FEES | 580.12 NA | | | | |
| 340367 | 111001 10140 | 40285680 | 11/08/2007 E | 11/03/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 186.75 NA | | | | |
| 340367 | 111001 10140 | 40285680 | 11/08/2007 E | 11/03/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 186.75 NA | | | | |
| 340367 | 111001 10140 | 40285680 | 11/08/2007 E | 11/03/2007 | | 5900000 INDIRECT FUND INCOME | 93.37 NA | | | | |
| 340367 | 111001 10140 | 40285769 | 11/15/2007 E | 11/10/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 196.83 NA | | | | |
| 340367 | 111001 10140 | 40285769 | 11/15/2007 E | 11/10/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 196.83 NA | | | | |
| 340367 | 111001 10140 | 40285769 | 11/15/2007 E | 11/10/2007 | | 5900000 INDIRECT FUND INCOME | 98.41 NA | | | | |
| 340367 | 111001 10140 | 40285915 | 11/22/2007 E | 11/17/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 196.83 NA | | | | |
| 340367 | 111001 10140 | 40285915 | 11/22/2007 E | 11/17/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 196.83 NA | | | | |
| 340367 | 111001 10140 | 40285915 | 11/22/2007 E | 11/17/2007 | | 5900000 INDIRECT FUND INCOME | 98.41 NA | | | | |
| 340367 | 111001 10140 | 40286229 | 11/29/2007 E | 11/24/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 196.83 NA | | | | |
| 340367 | 111001 10140 | 40286229 | 11/29/2007 E | 11/24/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 196.83 NA | | | | |
| 340367 | 111001 10140 | 40286229 | 11/29/2007 E | 11/24/2007 | | 5900000 INDIRECT FUND INCOME | 98.41 NA | | | | |
| 340367 | 111001 10140 | 40286738 | 12/06/2007 E | 12/01/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 196.83 NA | | | | |
| 340367 | 111001 10140 | 40286738 | 12/06/2007 E | 12/01/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 196.83 NA | | | | |
| 340367 | 111001 10140 | 40286738 | 12/06/2007 E | 12/01/2007 | | 5900000 INDIRECT FUND INCOME | 98.41 NA | | | | |
| 340367 | 111001 10610 | 40287008 | 11/08/2007 E | 11/03/2007 | | 5300000 CONTINUING FRANCHISE FEES | 550.90 NA | | | | |
| 340367 | 111001 10610 | 40287081 | 11/15/2007 E | 11/10/2007 | | 5300000 CONTINUING FRANCHISE FEES | 580.64 NA | | | | |
| 340367 | 111001 10610 | 40287228 | 11/22/2007 E | 11/17/2007 | | 5300000 CONTINUING FRANCHISE FEES | 580.64 NA | | | | |
| 340367 | 111001 10610 | 40287543 | 11/29/2007 E | 11/24/2007 | | 5300000 CONTINUING FRANCHISE FEES | 580.64 NA | | | | |
| 340367 | 111001 10610 | 40288035 | 12/06/2007 E | 12/01/2007 | | 5300000 CONTINUING FRANCHISE FEES | 580.64 NA | | | | |

Page 7 of 9

| PROFIT<br>CENTER GL | CORP<br>NUMBER | INVOICE<br>NUMBER | INVOICE<br>DUE DATE | A/R<br>DATE | TRANSACTION CHECK NO DESCRIPTION | AMOUNT STAY CONFIRM NO ID | INVOICE |
|---|---|---|---|---|---|---|---|

TOTAL FOR GL:                     1110001                                                                    7,397.18
                                                                                                             -----------

TOTAL FOR BRAND :  ID                                                                                        7,397.18
                                                                                                             -----------

TOTAL FOR CUSTOMER :                                                                                         7,397.18
                                                                                                             -----------

REPORT GRAND TOTAL :                                                                                         7,397.18
                                                                                                             ===================

*** CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial
representation of what this Franchise Owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If
there are any questions, please refer them to your Collections Specialist.

RUN DATE: 10-DEC-07

USER : SRICHMON

CUSTOMER: 10078
LOCATION:

Dunkin' Brands Inc
*******************
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF: 2007/12/10 00:00:00

Page 8 of 9

Shivam Sundram, Inc.
85 East 10th Street
NEW YORK NY 10003

SHOP ADDRESS:
114 BRUCKNER BLVD
BRONX NY 10454-4516
56026

| PROFIT CENTER | GL | COMP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/R | TRANSACTION DATE | CHECK NO DESCRIPTION | AMOUNT BPAY CONFIRM | INVOICE NO ID |
|---|---|---|---|---|---|---|---|---|---|
| 34725 | 1110001 | 10140 | *02856891 | 11/08/2007 | R | 11/03/2007 | 5900000 INDIRECT FUND INCOME | 149.08 | NA |
| 34725 | 1110001 | 10140 | *02856891 | 11/08/2007 | R | 11/03/2007 | 5901000 NATIONAL ADVERTISING INCOME | 298.17 | NA |
| 34725 | 1110001 | 10140 | *02856891 | 11/08/2007 | R | 11/03/2007 | 5902000 DIRECT/REGIONAL FUND INCOME | 298.17 | NA |
| 34725 | 1110001 | 10140 | *02857709 | 11/15/2007 | R | 11/10/2007 | 5900000 INDIRECT FUND INCOME | 170.06 | NA |
| 34725 | 1110001 | 10140 | *02857709 | 11/15/2007 | R | 11/10/2007 | 5901000 NATIONAL ADVERTISING INCOME | 340.13 | NA |
| 34725 | 1110001 | 10140 | *02857709 | 11/15/2007 | R | 11/10/2007 | 5902000 DIRECT/REGIONAL FUND INCOME | 340.13 | NA |
| 34725 | 1110001 | 10140 | *02859193 | 11/22/2007 | R | 11/17/2007 | 5900000 INDIRECT FUND INCOME | 170.06 | NA |
| 34725 | 1110001 | 10140 | *02859193 | 11/22/2007 | R | 11/17/2007 | 5901000 NATIONAL ADVERTISING INCOME | 340.13 | NA |
| 34725 | 1110001 | 10140 | *02859193 | 11/22/2007 | R | 11/17/2007 | 5902000 DIRECT/REGIONAL FUND INCOME | 340.13 | NA |
| 34725 | 1110001 | 10140 | *02862385 | 11/29/2007 | R | 11/24/2007 | 5900000 INDIRECT FUND INCOME | 170.06 | NA |
| 34725 | 1110001 | 10140 | *02862385 | 11/29/2007 | R | 11/24/2007 | 5901000 NATIONAL ADVERTISING INCOME | 340.13 | NA |
| 34725 | 1110001 | 10140 | *02862385 | 11/29/2007 | R | 11/24/2007 | 5902000 DIRECT/REGIONAL FUND INCOME | 340.13 | NA |
| 34725 | 1110001 | 10140 | *02867530 | 12/06/2007 | R | 12/01/2007 | 5900000 INDIRECT FUND INCOME | 170.06 | NA |
| 34725 | 1110001 | 10140 | *02867530 | 12/06/2007 | R | 12/01/2007 | 5901000 NATIONAL ADVERTISING INCOME | 340.13 | NA |
| 34725 | 1110001 | 10140 | *02867530 | 12/06/2007 | R | 12/01/2007 | 5902000 DIRECT/REGIONAL FUND INCOME | 340.13 | NA |
| 34725 | 1110001 | 10610 | *02870015 | 11/08/2007 | R | 11/03/2007 | 5300000 CONTINUING FRANCHISE FEES | 879.60 | NA |
| 34725 | 1110001 | 10610 | *02870838 | 11/15/2007 | R | 11/10/2007 | 5300000 CONTINUING FRANCHISE FEES | 1003.38 | NA |
| 34725 | 1110001 | 10610 | *02873127 | 11/22/2007 | R | 11/17/2007 | 5300000 CONTINUING FRANCHISE FEES | 1003.38 | NA |
| 34725 | 1110001 | 10610 | *02875524 | 11/29/2007 | R | 11/24/2007 | 5300000 CONTINUING FRANCHISE FEES | 1003.38 | NA |
| 34725 | 1110001 | 10610 | *02880676 | 12/06/2007 | R | 12/01/2007 | 5300000 CONTINUING FRANCHISE FEES | 1003.38 | NA |

TOTAL FOR GL: 1110001     9,039.82

TOTAL FOR BRAND : DD     9,039.82

| PROFIT CL CENTER | CORP MEMBER | INVOICE NUMBER | INVOICE DUE DATE | A/R DATE | TRANSACTION CHECK NO DESCRIPTION | AMOUNT EXAV | INVOICE CONFIRM NO ID |
|---|---|---|---|---|---|---|---|

TOTAL FOR CUSTOMER :

9,019.82

REPORT GRAND TOTAL :

*** CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial representation of what this franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If there are any question, please refer them to your Collections Specialist.

# Exhibit 2B

Page 1 of 2

RUN DATE: 09-JAN-08
USER : GZELLIG
CUSTOMER: 82207
LOCATION:

Dunkin' Brands Inc
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF:    2008/01/09 00:00:00

Sundram, Inc.
511 E. 163rd St
Bronx NY 10451-4227
55618

SHOP ADDRESS:
511 E. 163rd St
Bronx NY 10451-4227
55618

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 340091 | 1110001 | 10140 | 428672291 | 12/06/2007 | E | 12/01/2007 | E | 5900000 INDIRECT FUND INCOME | 95.92 | NA | |
| 340091 | 1110001 | 10140 | 428672291 | 12/06/2007 | E | 12/01/2007 | E | 5901000 NATIONAL ADVERTISING INCOME | 191.84 | NA | |
| 340091 | 1110001 | 10140 | 428672291 | 12/06/2007 | E | 12/01/2007 | E | 5902000 DIRECT/REGIONAL FUND INCOME | 191.84 | NA | |
| 340091 | 1110001 | 10610 | 428880437 | 12/06/2007 | E | 12/01/2007 | E | 5300000 CONTINUING FRANCHISE FEES | 565.94 | NA | |
| 340091 | 1110001 | 10140 | 422993379 | 12/13/2007 | E | 12/08/2007 | E | 5900000 INDIRECT FUND INCOME | 94.58 | NA | |
| 340091 | 1110001 | 10140 | 422993379 | 12/13/2007 | E | 12/08/2007 | E | 5901000 NATIONAL ADVERTISING INCOME | 189.17 | NA | |
| 340091 | 1110001 | 10140 | 422993379 | 12/13/2007 | E | 12/08/2007 | E | 5902000 DIRECT/REGIONAL FUND INCOME | 189.17 | NA | |
| 340091 | 1110001 | 10140 | 422994906 | 12/20/2007 | E | 12/15/2007 | E | 5900000 INDIRECT FUND INCOME | 94.58 | NA | |
| 340091 | 1110001 | 10140 | 422994906 | 12/20/2007 | E | 12/15/2007 | E | 5901000 NATIONAL ADVERTISING INCOME | 189.17 | NA | |
| 340091 | 1110001 | 10140 | 422994906 | 12/20/2007 | E | 12/15/2007 | E | 5902000 DIRECT/REGIONAL FUND INCOME | 189.17 | NA | |
| 340091 | 1110001 | 10140 | 422998601 | 12/27/2007 | E | 12/22/2007 | E | 5900000 INDIRECT FUND INCOME | 94.58 | NA | |
| 340091 | 1110001 | 10140 | 422998601 | 12/27/2007 | E | 12/22/2007 | E | 5901000 NATIONAL ADVERTISING INCOME | 189.17 | NA | |
| 340091 | 1110001 | 10140 | 422998601 | 12/27/2007 | E | 12/22/2007 | E | 5902000 DIRECT/REGIONAL FUND INCOME | 189.17 | NA | |
| 340091 | 1110001 | 10140 | 403003910 | 01/03/2008 | E | 12/29/2007 | E | 5900000 INDIRECT FUND INCOME | 94.58 | NA | |
| 340091 | 1110001 | 10140 | 403003910 | 01/03/2008 | E | 12/29/2007 | E | 5901000 NATIONAL ADVERTISING INCOME | 189.17 | NA | |
| 340091 | 1110001 | 10140 | 403003910 | 01/03/2008 | E | 12/29/2007 | E | 5902000 DIRECT/REGIONAL FUND INCOME | 189.17 | NA | |
| 340091 | 1110001 | 10610 | 423006133 | 12/13/2007 | E | 12/08/2007 | E | 5300000 CONTINUING FRANCHISE FEES | 558.04 | NA | |
| 340091 | 1110001 | 10610 | 403007665 | 12/20/2007 | E | 12/15/2007 | E | 5300000 CONTINUING FRANCHISE FEES | 558.04 | NA | |
| 340091 | 1110001 | 10610 | 403011365 | 12/27/2007 | E | 12/22/2007 | E | 5300000 CONTINUING FRANCHISE FEES | 558.04 | NA | |
| 340091 | 1110001 | 10610 | 403016681 | 01/03/2008 | E | 12/29/2007 | E | 5300000 CONTINUING FRANCHISE FEES | 558.04 | NA | |

TOTAL FOR GL:    1110001                                            5,169.38

                                                                   5,169.38

TOTAL FOR BRAND :    DD                                             5,169.38

Page 2 of 2

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/R DATE | TRANSACTION | CHECK NO | DESCRIPTION | AMOUNT | RDAY CONFIRN NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|

TOTAL FOR CUSTOMER :

5,169.38
-------------

REPORT GRAND TOTAL :

5,169.38
=====================

*** CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If there are any questions, please refer them to your Collections Specialist.

RUN DATE: 09-JAN-08

USER : GZILLIG

CUSTOMER: 7607
LOCATION:

Dunkin' Brands Inc
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF: 2008/01/09 00:00:00

Satyam Shivam, Inc.
2451 EASTCHESTER RD
BRONX NY 10469-5915
54423

SHOP ADDRESS:
2451 EASTCHESTER RD
BRONX NY 10469-5915
54423

Page 1 of 2

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/R | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT EPAY | CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 340367 | 1110021 | 10140 | 422867389 | 12/06/2007 | E | 12/01/2007 | | 5900000 INDIRECT FUND INCOME | 98.41 NA | | |
| 340367 | 1110021 | 10140 | 422867389 | 12/06/2007 | E | 12/01/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 196.83 NA | | |
| 340367 | 1110021 | 10140 | 422867389 | 12/06/2007 | E | 12/01/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 196.83 NA | | |
| 340367 | 1110001 | 10610 | 422880535 | 12/06/2007 | E | 12/01/2007 | | 5300000 CONTINUING FRANCHISE FEES | 580.64 NA | | |
| 340367 | 1110021 | 10140 | 422933392 | 12/13/2007 | E | 12/08/2007 | | 5900000 INDIRECT FUND INCOME | 98.41 NA | | |
| 340367 | 1110021 | 10140 | 422933392 | 12/13/2007 | E | 12/08/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 196.83 NA | | |
| 340367 | 1110021 | 10140 | 422933392 | 12/13/2007 | E | 12/08/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 196.83 NA | | |
| 340367 | 1110021 | 10140 | 422994935 | 12/20/2007 | E | 12/15/2007 | | 5900000 INDIRECT FUND INCOME | 98.41 NA | | |
| 340367 | 1110021 | 10140 | 422994935 | 12/20/2007 | E | 12/15/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 196.83 NA | | |
| 340367 | 1110021 | 10140 | 422994935 | 12/20/2007 | E | 12/15/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 196.83 NA | | |
| 340367 | 1110021 | 10140 | 423096683 | 12/27/2007 | E | 12/22/2007 | | 5900000 INDIRECT FUND INCOME | 98.41 NA | | |
| 340367 | 1110021 | 10140 | 423096683 | 12/27/2007 | E | 12/22/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 196.83 NA | | |
| 340367 | 1110021 | 10140 | 423096683 | 12/27/2007 | E | 12/22/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 196.83 NA | | |
| 340367 | 1110021 | 10140 | 423004007 | 01/03/2008 | E | 12/29/2007 | | 5900000 INDIRECT FUND INCOME | 98.41 NA | | |
| 340367 | 1110021 | 10140 | 423004007 | 01/03/2008 | E | 12/29/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 196.83 NA | | |
| 340367 | 1110021 | 10140 | 423004007 | 01/03/2008 | E | 12/29/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 196.83 NA | | |
| 340367 | 1110001 | 10610 | 423006146 | 12/13/2007 | E | 12/08/2007 | | 5300000 CONTINUING FRANCHISE FEES | 580.64 NA | | |
| 340367 | 1110001 | 10610 | 423007694 | 12/20/2007 | E | 12/15/2007 | | 5300000 CONTINUING FRANCHISE FEES | 580.64 NA | | |
| 340367 | 1110001 | 10610 | 423011447 | 12/27/2007 | E | 12/22/2007 | | 5300000 CONTINUING FRANCHISE FEES | 580.64 NA | | |
| 340367 | 1110001 | 10610 | 423016778 | 01/03/2008 | E | 12/29/2007 | | 5300000 CONTINUING FRANCHISE FEES | 580.64 NA | | |
| 340367 | 1110001 | 10140 | 423078915 | 10/25/2007 | A | 10/20/2007 | | 5900000 INDIRECT FUND INCOME | 94.37 | | 2228963 |
| 340367 | 1110001 | 10140 | 423078915 | 10/25/2007 | A | 10/20/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 188.75 | | 2228963 |
| 340367 | 1110001 | 10140 | 423078915 | 10/25/2007 | A | 10/20/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 188.75 | | 2228963 |
| 340367 | 1110001 | 10140 | 423078916 | 11/01/2007 | A | 10/27/2007 | | 5900000 INDIRECT FUND INCOME | 96.34 | | 2228964 |
| 340367 | 1110001 | 10140 | 423078916 | 11/01/2007 | A | 10/27/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 192.68 | | 2228964 |
| 340367 | 1110001 | 10140 | 423078916 | 11/01/2007 | A | 10/27/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 192.68 | | 2228964 |
| 340367 | 1110001 | 10140 | 423078917 | 11/08/2007 | A | 11/03/2007 | | 5900000 INDIRECT FUND INCOME | 101.28 | | 2228955 |
| 340367 | 1110001 | 10140 | 423078917 | 11/08/2007 | A | 11/03/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 202.56 | | 2228955 |
| 340367 | 1110001 | 10140 | 423078917 | 11/08/2007 | A | 11/03/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 202.56 | | 2228955 |
| 340367 | 1110001 | 10140 | 423078918 | 11/15/2007 | A | 11/10/2007 | | 5900000 INDIRECT FUND INCOME | 95.98 | | 2228948 |
| 340367 | 1110001 | 10140 | 423078918 | 11/15/2007 | A | 11/10/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 191.96 | | 2228948 |
| 340367 | 1110001 | 10140 | 423078918 | 11/15/2007 | A | 11/10/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 191.96 | | 2228948 |

| PROFIT CENTER | GL NUMBER | CURP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/R | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 340367 | 1110001 | 10140 | 403078919 | 11/22/2007 | A | 11/17/2007 | | 5900000 INDIRECT FUND INCOME | 95.58 | | 2228960 |
| 340367 | 1110001 | 10140 | 403078919 | 11/22/2007 | A | 11/17/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 191.15 | | 2228960 |
| 340367 | 1110001 | 10140 | 403078919 | 11/22/2007 | A | 11/17/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 191.15 | | 2228960 |
| 340367 | 1110001 | 10140 | 403078921 | 11/29/2007 | A | 11/24/2007 | | 5900000 INDIRECT FUND INCOME | 95.45 | | 2228966 |
| 340367 | 1110001 | 10140 | 403078921 | 11/29/2007 | A | 11/24/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 190.91 | | 2228966 |
| 340367 | 1110001 | 10140 | 403078921 | 11/29/2007 | A | 11/24/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 190.91 | | 2228966 |
| 340367 | 1110001 | 10610 | 403079335 | 10/25/2007 | A | 10/20/2007 | | 5300000 CONTINUING FRANCHISE FEES | 556.80 | | 2228963 |
| 340367 | 1110001 | 10610 | 403079336 | 11/01/2007 | A | 10/27/2007 | | 5300000 CONTINUING FRANCHISE FEES | 568.42 | | 2228964 |
| 340367 | 1110001 | 10610 | 403079337 | 11/08/2007 | A | 11/03/2007 | | 5300000 CONTINUING FRANCHISE FEES | 597.56 | | 2228955 |
| 340367 | 1110001 | 10610 | 403079338 | 11/15/2007 | A | 11/10/2007 | | 5300000 CONTINUING FRANCHISE FEES | 566.27 | | 2228948 |
| 340367 | 1110001 | 10610 | 403079339 | 11/22/2007 | A | 11/17/2007 | | 5300000 CONTINUING FRANCHISE FEES | 563.90 | | 2228960 |
| 340367 | 1110001 | 10610 | 403079341 | 11/29/2007 | A | 11/24/2007 | | 5300000 CONTINUING FRANCHISE FEES | 563.18 | | 2228966 |

TOTAL FOR GL: 1110001                                      11,674.70

TOTAL FOR BRAND: LD                                        11,674.70

TOTAL FOR CUSTOMER:                                        11,674.70

REPORT GRAND TOTAL:                                        11,674.70
==================

*** CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If there are any questions, please refer them to your Collections Specialist.

RUN DATE:   09-JAN-08

USER :      GZULLLIG

CUSTOMER: 10078
LOCATION:

Shivam Sundram, Inc.
85 East 10th Street
NEW YORK NY 10003

Dunkin' Brands Inc
*******************************
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF:    2008/01/09 03:00:00

Page 1 of 2

SHOP ADDRESS:
114 BRUCKNER BLVD
BRONX NY 10454-4516
56026

| PROPERTY CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT BRAY | INVOICE CONFIRM NO ID |
|---|---|---|---|---|---|---|---|---|---|---|
| 340725 | 1110001 10140 | 402867530 | 12/06/2007 | E | | 12/01/2007 | 5900000 | INDIRECT FUND INCOME | 170.06 NA | |
| 340725 | 1110001 10140 | 402867530 | 12/06/2007 | E | | 12/01/2007 | 5901000 | NATIONAL ADVERTISING INCOME | 340.13 NA | |
| 340725 | 1110001 10140 | 402867530 | 12/06/2007 | E | | 12/01/2007 | 5902000 | DIRECT/REGIONAL FUND INCOME | 340.13 NA | |
| 340725 | 1110001 10610 | 402880676 | 12/06/2007 | E | | 12/01/2007 | 5300000 | CONTINUING FRANCHISE FEES | 1003.38 NA | |
| 340725 | 1110001 10140 | 402993414 | 12/13/2007 | E | | 12/08/2007 | 5900000 | INDIRECT FUND INCOME | 171.83 NA | |
| 340725 | 1110001 10140 | 402993414 | 12/13/2007 | E | | 12/08/2007 | 5901000 | NATIONAL ADVERTISING INCOME | 343.65 NA | |
| 340725 | 1110001 10140 | 402993414 | 12/13/2007 | E | | 12/08/2007 | 5902000 | DIRECT/REGIONAL FUND INCOME | 343.65 NA | |
| 340725 | 1110001 10610 | 402994978 | 12/20/2007 | B | | 12/15/2007 | 5900000 | INDIRECT FUND INCOME | 171.83 NA | |
| 340725 | 1110001 10140 | 402994978 | 12/20/2007 | B | | 12/15/2007 | 5901000 | NATIONAL ADVERTISING INCOME | 343.65 NA | |
| 340725 | 1110001 10140 | 402994978 | 12/20/2007 | B | | 12/15/2007 | 5902000 | DIRECT/REGIONAL FUND INCOME | 343.65 NA | |
| 340725 | 1110001 10140 | 402998797 | 12/27/2007 | B | | 12/22/2007 | 5900000 | INDIRECT FUND INCOME | 171.83 NA | |
| 340725 | 1110001 10140 | 402998797 | 12/27/2007 | B | | 12/22/2007 | 5901000 | NATIONAL ADVERTISING INCOME | 343.65 NA | |
| 340725 | 1110001 10140 | 402998797 | 12/27/2007 | B | | 12/22/2007 | 5902000 | DIRECT/REGIONAL FUND INCOME | 343.65 NA | |
| 340725 | 1110001 10140 | 403004148 | 01/03/2008 | B | | 12/29/2007 | 5900000 | INDIRECT FUND INCOME | 171.83 NA | |
| 340725 | 1110001 10140 | 403004148 | 01/03/2008 | B | | 12/29/2007 | 5901000 | NATIONAL ADVERTISING INCOME | 343.65 NA | |
| 340725 | 1110001 10140 | 403004148 | 01/03/2008 | B | | 12/29/2007 | 5902000 | DIRECT/REGIONAL FUND INCOME | 343.65 NA | |
| 340725 | 1110001 10610 | 403006168 | 12/13/2007 | B | | 12/08/2007 | 5300000 | CONTINUING FRANCHISE FEES | 1013.78 NA | |
| 340725 | 1110001 10610 | 403007737 | 12/20/2007 | B | | 12/15/2007 | 5300000 | CONTINUING FRANCHISE FEES | 1013.78 NA | |
| 340725 | 1110001 10610 | 403011560 | 12/27/2007 | B | | 12/22/2007 | 5300000 | CONTINUING FRANCHISE FEES | 1013.78 NA | |
| 340725 | 1110001 10610 | 403016918 | 01/03/2008 | B | | 12/29/2007 | 5300000 | CONTINUING FRANCHISE FEES | 1013.78 NA | |

TOTAL FOR GL:                    1110001                    9,345.34
                                                            ----------
                                                             9,345.34

TOTAL FOR BRAND :    DD                                      9,345.34
                                                            ----------
                                                             9,345.34

Page 2 of 2

| PROFIT GL CORP | INVOICE INVOICE | A/E TRANSACTION CHECK NO DESCRIPTION | AMOUNT XPAY INVOICE |
|---|---|---|---|
| CENTER NUMBER | NUMBER DUE DATE | DATE | CONFIRM NO ID |

TOTAL FOR CUSTOMER :                                                                    9,345.34

REPORT GRAND TOTAL :                                                                    9,345.34
                                                                          ===================

*** CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial
representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If
there are any questions, please refer them to your Collections Specialist.

RUN DATE: 09-JAN-08

USER : GZILLIG

CUSTOMER: 9611
LOCATION:

Dunkin' Brands Inc
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
ACCOUNTS RECEIVABLE STATUS REPORT
AS OF: 2008/01/09 00:00:00

TKNY Partners, LLC
370 W. 30th St
NEW YORK NY 10001

SHOP ADDRESS:
2083 Lexington Avenue
Manhattan NY 10035
56890

Page 1 of 3

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE RUN DATE | A/E | TRANSACTION DATE | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 337513 | 1110001 | 20140 | 402854773 | 12/06/2007 | B | 12/01/2007 | | 5908000 ALLOCATION-NAP | 6.88 | NA | |
| 337513 | 1110001 | 20140 | 402854773 | 12/06/2007 | B | 12/01/2007 | | 5900000 INDIRECT 2ND INCOME | 13.18 | NA | |
| 337513 | 1110001 | 20140 | 402854773 | 12/06/2007 | B | 12/01/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 20.64 | NA | |
| 337513 | 1110001 | 20140 | 402854773 | 12/06/2007 | B | 12/01/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 27.52 | NA | |
| 337513 | 1110001 | 10140 | 402866566 | 12/06/2007 | B | 12/01/2007 | | 5900000 INDIRECT FUND INCOME | 122.32 | NA | |
| 337513 | 1110001 | 10140 | 402866566 | 12/06/2007 | B | 12/01/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 244.65 | NA | |
| 337513 | 1110001 | 10140 | 402866566 | 12/06/2007 | B | 12/01/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 244.65 | NA | |
| 337513 | 1110001 | 10610 | 402879711 | 12/06/2007 | B | 12/01/2007 | | 5100000 CONTINUING FRANCHISE FEES | 721.70 | NA | |
| 337513 | 1110001 | 10140 | 402993272 | 12/13/2007 | B | 12/08/2007 | | 5900000 INDIRECT FUND INCOME | 130.06 | NA | |
| 337513 | 1110001 | 10140 | 402993272 | 12/13/2007 | B | 12/08/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 260.12 | NA | |
| 337513 | 1110001 | 10140 | 402993272 | 12/13/2007 | B | 12/08/2007 | | 5902020 DIRECT/REGIONAL FUND INCOME | 260.12 | NA | |
| 337513 | 1110001 | 10140 | 402994638 | 12/20/2007 | B | 12/15/2007 | | 5900000 INDIRECT FUND INCOME | 130.06 | NA | |
| 337513 | 1110001 | 10140 | 402994638 | 12/20/2007 | B | 12/15/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 260.12 | NA | |
| 337513 | 1110001 | 10140 | 402994638 | 12/20/2007 | B | 12/15/2007 | | 5902000 DIRECT/REGIONAL FUND INCOME | 260.12 | NA | |
| 337513 | 1110001 | 10140 | 402998012 | 12/27/2007 | B | 12/22/2007 | | 5900000 INDIRECT FUND INCOME | 130.06 | NA | |
| 337513 | 1110001 | 10140 | 402998012 | 12/27/2007 | B | 12/22/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 260.12 | NA | |
| 337513 | 1110001 | 10140 | 402998012 | 12/27/2007 | B | 12/22/2007 | | 5902020 DIRECT/REGIONAL FUND INCOME | 260.12 | NA | |
| 337513 | 1110001 | 10140 | 403001196 | 01/03/2008 | B | 12/29/2007 | | 5900000 INDIRECT FUND INCOME | 130.06 | NA | |
| 337513 | 1110001 | 10140 | 403001196 | 01/03/2008 | B | 12/29/2007 | | 5901000 NATIONAL ADVERTISING INCOME | 260.12 | NA | |
| 337513 | 1110001 | 10140 | 403001196 | 01/03/2008 | B | 12/29/2007 | | 5902020 DIRECT/REGIONAL FUND INCOME | 260.12 | NA | |
| 337513 | 1110001 | 10610 | 403006026 | 12/13/2007 | B | 12/08/2007 | | 5100000 CONTINUING FRANCHISE FEES | 767.36 | NA | |
| 337513 | 1110001 | 10610 | 403007397 | 12/20/2007 | B | 12/15/2007 | | 5100000 CONTINUING FRANCHISE FEES | 767.36 | NA | |
| 337513 | 1110001 | 10610 | 403010775 | 12/27/2007 | B | 12/22/2007 | | 5100000 CONTINUING FRANCHISE FEES | 767.36 | NA | |
| 337513 | 1110001 | 10610 | 403015956 | 01/03/2008 | B | 12/29/2007 | | 5100000 CONTINUING FRANCHISE FEES | 767.36 | NA | |

TOTAL FOR GL: 1110001                    7,003.96

TOTAL FOR BRAND : DD                     7,003.96

| PROFIT CENTER | GL | CORP NUMBER | INVOICE NUMBER | INVOICE DUE DATE | A/R DATE | TRANSACTION | CHECK NO | DESCRIPTION | AMOUNT | EPAY CONFIRM NO | INVOICE CONFIRM NO ID |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 337513 | 1110001 | 20610 | 402887427 | 12/06/2007 | 12/01/2007 | | | 5300000 CONTINUING FRANCHISE FEES | 81.19 NA | | |
| 337513 | 1110001 | 20140 | 402986480 | 12/13/2007 | 12/08/2007 E | | | 5908000 ALLOCATION-NAF | 5.94 NA | | |
| 337513 | 1110001 | 20140 | 402986480 | 12/13/2007 | 12/08/2007 E | | | 5900000 INDIRECT FUND INCOME | 11.88 NA | | |
| 337513 | 1110001 | 20140 | 402986480 | 12/13/2007 | 12/08/2007 E | | | 5901000 NATIONAL ADVERTISING INCOME | 17.83 NA | | |
| 337513 | 1110001 | 20140 | 402986480 | 12/13/2007 | 12/08/2007 E | | | 5902000 DIRECT/REGIONAL FUND INCOME | 23.77 NA | | |
| 337513 | 1110001 | 20140 | 402987228 | 12/20/2007 | 12/15/2007 E | | | 5908000 ALLOCATION-NAF | 5.94 NA | | |
| 337513 | 1110001 | 20140 | 402987228 | 12/20/2007 | 12/15/2007 E | | | 5900000 INDIRECT FUND INCOME | 11.88 NA | | |
| 337513 | 1110001 | 20140 | 402987228 | 12/20/2007 | 12/15/2007 E | | | 5901000 NATIONAL ADVERTISING INCOME | 17.83 NA | | |
| 337513 | 1110001 | 20140 | 402987228 | 12/20/2007 | 12/15/2007 E | | | 5902000 DIRECT/REGIONAL FUND INCOME | 23.77 NA | | |
| 337513 | 1110001 | 20140 | 402988531 | 12/27/2007 | 12/22/2007 E | | | 5908000 ALLOCATION-NAF | 5.94 NA | | |
| 337513 | 1110001 | 20140 | 402988531 | 12/27/2007 | 12/22/2007 E | | | 5900000 INDIRECT FUND INCOME | 11.88 NA | | |
| 337513 | 1110001 | 20140 | 402988531 | 12/27/2007 | 12/22/2007 E | | | 5901000 NATIONAL ADVERTISING INCOME | 17.83 NA | | |
| 337513 | 1110001 | 20140 | 402988531 | 12/27/2007 | 12/22/2007 E | | | 5902000 DIRECT/REGIONAL FUND INCOME | 23.77 NA | | |
| 337513 | 1110001 | 20140 | 402990504 | 01/03/2008 | 12/29/2007 E | | | 5908000 ALLOCATION-NAF | 5.94 NA | | |
| 337513 | 1110001 | 20140 | 402990504 | 01/03/2008 | 12/29/2007 E | | | 5900000 INDIRECT FUND INCOME | 11.88 NA | | |
| 337513 | 1110001 | 20140 | 402990504 | 01/03/2008 | 12/29/2007 E | | | 5901000 NATIONAL ADVERTISING INCOME | 17.83 NA | | |
| 337513 | 1110001 | 20140 | 402990504 | 01/03/2008 | 12/29/2007 E | | | 5902000 DIRECT/REGIONAL FUND INCOME | 23.77 NA | | |
| 337513 | 1110001 | 20610 | 403018906 | 12/13/2007 | 12/08/2007 E | | | 5300000 CONTINUING FRANCHISE FEES | 70.12 NA | | |
| 337513 | 1110001 | 20610 | 403019648 | 12/20/2007 | 12/15/2007 | | | 5300000 CONTINUING FRANCHISE FEES | 70.12 NA | | |
| 337513 | 1110001 | 20610 | 403020943 | 12/27/2007 | 12/22/2007 E | | | 5300000 CONTINUING FRANCHISE FEES | 70.12 NA | | |
| 337513 | 1110001 | 20610 | 403022907 | 01/03/2008 | 12/29/2007 E | | | 5300000 CONTINUING FRANCHISE FEES | 70.12 NA | | |

TOTAL FOR GL: 1110001                                                                             668.15

TOTAL FOR BRAND : BR                                                                              668.15

TOTAL FOR CUSTOMER :                                                                            7,672.11

REPORT GRAND TOTAL :

===========================

7,672.11

===========================

*** CAUTION - The data contained in the above status report is provided for information purposes only, and may be a partial representation of what this Franchise owner owes. Keep in mind that Notes Receivables are not reflected in the above status report. If there are any questions, please refer them to your Collections Specialist.

Exhibit 3

**DUNKIN' DONUTS INC., et al. Plaintiffs, v. GUANG CHYI LIU, et al., Defendants.**

**CIVIL ACTION No. 99-3344, 00-3666**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**2002 U.S. Dist. LEXIS 20054**

**October 16, 2002, Decided
October 17, 2002, Filed**

**SUBSEQUENT HISTORY:** Affirmed by Dunkin' Donuts, Inc. v. Guang Chyi Liu, 2003 U.S. App. LEXIS 22812 (3d Cir. Pa., Nov. 6, 2003)

**DISPOSITION:** [*1] Plaintiffs' Fee Petition was granted in part. Judgment was entered in favor of Plaintiffs, and against Defendants, in the amount of $ 97,499.70 in attorneys' fees and $ 13,872.96 in expenses for the nonpayment issue, and $ 102,474.92 in attorneys' fees and $ 14,595.51 in expenses for their defense of Defendants' counterclaims.

**COUNSEL:** For Dunkin' Donuts Incorporated, Third Dunkin' Donuts Realty, Inc, PLAINTIFFS (2:99cv3344): David E Worthen, Steven A Browne, Robert L Zisk, Thomas P Carroll, Richard L Creech, Schmeltzer, Aptaker and Shepard, PC, Washington, DC USA. Craig R Tractenberg, John J Jacko, III, Buchanan Ingersoll Professional Corporation, Philadelphia, PA USA.

For Guang Chyi Liu, Susan Yeh Liu, GCSCL Company, Inc, DEFENDANTS (2:99-cv3344): Sean M Halpin, Richard H Glanton, Reed, Smith, Shaw and MC Clay, Philadelphia, PA USA.

Guang Chyi Liu, DEFENDANT, Pro se, Sewell, NJ USA.

Susan Yeh Liu, DEFENDANT, Pro se, Sewell, NJ USA.

For Textron Financial Corp, (2:99cv3344) RESPONDENT: Scott D Patterson, Saul, Ewing, Remick & Saul, Berwyn, PA USA.

For Dunkin' Donuts Incorporated, Third Dunkin' Donuts Realty, Inc, PLAINTIFFS (2:00cv3666): David E Worthen, Steven [*2] A Browne, Robert L Zisk, Schmeltzer, Aptaker and Shepard, PC, Washington, DC

USA, John J Jacko, III, Buchanan, Ingersol, Philadelphia, PA USA.

For Guang Chyi Liu, Susan Yeh Liu, GCSCL Company, Inc DEFENDANTS (2:00cv3666): Richard H Glanton, Reed, Smith, Shaw and MC Clay, Philadelphia, PA USA.

**JUDGES:** JAMES McGIRR KELLY, J.

**OPINION BY:** JAMES McGIRR KELLY

**OPINION:**

**MEMORANDUM AND ORDER**

**J. M. KELLY, J.**

**October 16, 2002**

Presently before the Court is a Rule 54(d) Fee Petition, or in the Alternative, Motion to Amend the Judgment to Include an Order of Reasonable Attorneys' Fees and Expenses filed by the Plaintiffs, Dunkin' Donuts Incorporated and Third Dunkin' Donuts Realty, Inc. (collectively, "Plaintiffs"). Plaintiffs filed their Petition following this Court's June 25, 2002 entry of summary judgment in their favor on Counts I-IV of their Complaint relating to nonpayment pursuant to the terms of the parties' Franchise Agreement. n1 Defendants Guang Chyi Liu a/k/a Fred Liu, Susan Yeh Liu and G.C.S.C.L. Company (collectively, "Defendants") object to this Court's jurisdiction to rule on the Fee Petition subsequent to [*3] their filing a Notice of Appeal with the United States Court of Appeals for the Third Circuit, but do not dispute the enforceability of the terms of the Franchise Agreement.

> n1 See Dunkin' Donuts Inc., et al. v. Guang Chyi Liu, et al., 2002 U.S. Dist. LEXIS 12270,

Nos. 99-3344 and 00-3666 (E.D. Pa. June 25, 2002).

For the reasons that follow, Plaintiffs' Fee Petition is **GRANTED IN PART.**

## 1. BACKGROUND

The procedural history of this case is extensive and, thus, only that portion relevant to this Court's disposition of Plaintiffs' Fee Petition will be provided below.

Following this Court's entry of summary judgment on June 25, 2002 in favor of Plaintiffs, Plaintiffs timely filed the instant Fee Petition on July 9, 2002. Defendants filed their Notice of Appeal to the Third Circuit on July 16, 2002. On July 23, 2002, the Third Circuit ordered Defendants' appeal stayed pending this Court's disposition of Plaintiffs' timely filed post-judgment motion.

Both parties were provided [*4] opportunity to brief the issue of attorneys' fees. On August 1, 2002, Defendants filed their Memorandum in Opposition to Plaintiffs' Fee Petition and, on August 12, 2002, Defendants filed a Pre-Hearing Memorandum. A hearing was held on August 14, 2002, after which time this Court ordered Plaintiffs' counsel to submit an additional memorandum within seven days concerning the allocation of fees and expenses as to certain issues, and Defendants' counsel to file a response thereto seven days thereafter. On August 22, 2002, Plaintiffs filed their Supplemental Memorandum and, on August 29, 2002, Defendants filed their Supplemental Memorandum.

Noting that they had already filed their Notice of Appeal with the Third Circuit, Defendants object to this Court's jurisdiction to rule on Plaintiffs' Petition as either a Rule 54(d) motion for attorneys' fees or a Rule 59(e) motion to amend the judgment. (Defs.' Mem. in Opp'n. to Pls.' Rule 54(d) Fee Pet., or in the Alternative, Mot. to Amend the J., at pp. 1-2.) Notwithstanding their objection to jurisdiction, Defendants also briefed this Court on the legal standard for awards of reasonable attorneys' fees under Massachusetts law. n2 (Defs.' Pre-Hearing [*5] Mem. Re: Att'ys.' Fees, at pp. 1-5.) In addition, Defendants argue that they are entitled to a jury trial on the reasonableness of requested attorneys' fees. (Defs.' Reply to Pls.' Supplemental Mem. Regarding Att'ys' Fees, at pp. 1-2.) Defendants, however, do not dispute the enforceability of the Franchise Agreement or the fee-shifting provision contained therein.

> n2 Pursuant to the choice of law provision contained in the Franchise Agreement, Massachusetts law governs its interpretation. (Dunkin'

Donuts Incorporated Franchise Agreement, P16.A.)

## 2. DISCUSSION

### 3. JURISDICTION

As a preliminary matter, Defendants object to this Court's jurisdiction to rule on Plaintiffs' Petition on the ground that Defendants already filed their Notice of Appeal with the Third Circuit. The filing of a notice of appeal is an event of jurisdictional significance, immediately conferring jurisdiction upon a court [*6] of appeals and divesting a district court of its control over those aspects of the case involved in the appeal; however, it is well-settled that a district court retains jurisdiction to act in a limited number of circumstances, such as determining an application for attorneys' fees. Sheet Metal Workers' Int'l Assoc. Local 19 v. Herre Bros., Inc., 198 F.3d 391, 394 (3d Cir. 1999) (citing Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58, 74 L. Ed. 2d 225, 103 S. Ct. 400 (1982)); Venen v. Sweet, 758 F.2d 117, 120 n.2 (3d Cir. 1985) ("A district court, during the pendency of an appeal is not divested of jurisdiction to determine an application for attorney's fees."). That well-settled principle, coupled with the Third Circuit's July 23, 2002 order staying Defendants' appeal, makes clear the Third Circuit's preference for attorneys' fees to be awarded along with the entry of final judgment to avoid piecemeal appeals. See Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 97 (3d Cir. 1988). Accordingly, this Court will retain jurisdiction to rule on Plaintiffs' petition for attorneys' fees. n3

> n3 Defendants also argue that a jury must decide the issue of attorneys' fees. Although Defendants may have had a right to a jury decision on whether Plaintiffs were entitled to recover attorneys' fees pursuant to the terms of the Franchise Agreement, they do not have the right to a jury decision on the reasonable amount of attorneys' fees. See McGuire v. Russell Miller, Inc., 1 F.3d 1306, 1315 (2d Cir. 1993); see also Longport Ocean Plaza Condominium, Inc. v. Robert Cato & Associates, Inc., 2002 U.S. Dist. LEXIS 12929, Civ. A. No. 00- CV-2231, 2002 U.S. Dist. LEXIS 12929, at *7-8 (E.D. Pa. March 5, 2002) ("it is permissible for a court to determine the amount of attorney's fees and costs to be awarded to a party pursuant to an . . . agreement in a separate proceeding, *after* a jury has determined that party may recover such an award . . . . While the Third Circuit has never opined on this procedure .

. . . this procedure is commonly used in other circuits as well . . . and is also the usual practice of this Court" (emphasis in original)).

[*7]

## 2. APPLICABLE LAW

The enforceability of the fee-shifting provision contained in the Franchise Agreement is not in dispute, and provides for the award of reasonable attorneys' fees:

> If FRANCHISEE fails to cure a default, . . . or if this Agreement is terminated, FRANCHISEE shall pay to DUNKIN' DONUTS all damages, costs and expenses, including without limitation interest at 18% per annum, or the highest permissible rate, and reasonable attorneys' fees, incurred by DUNKIN' DONUTS as a result of any such default or termination; and said interest and all damages, costs and expenses, including reasonable attorneys' fees, may be included in and form a part of the judgment awarded to DUNKIN' DONUTS in any proceedings brought by DUNKIN' DONUTS against FRANCHISEE . . . .

(Dunkin' Donuts Incorporated Franchise Agreement, P9.C.2.) The choice of law provision contained in the Franchise Agreement provides that the laws of the Commonwealth of Massachusetts shall govern its interpretation. (Id. at P16.A.)

In a diversity case, absent a conflicting applicable federal rule [*8] of procedure, state law governs not only the actual awarding of attorneys' fees but also the method of determining those fees. Northern Heel Corp. v. Compo Industries, Inc., 851 F.2d 456, 475 (1st Cir. 1988); Buse v. Vanguard Group of Investment Cos., No. 91-3560, 1998 U.S. Dist. LEXIS 1242, at *8 (E.D. Pa. Jan. 30, 1998) (citations omitted). n4 Parties may contract to permit recovery of attorneys' fees, and a federal court will enforce contractual rights to attorneys' fees if the contract is valid under applicable state law. See SNA, Inc. v Array, 173 F. Supp. 2d 347, (E.D. Pa. 2001), aff'd, No. 01-4313, 43 Fed. Appx. 486, 2002 U.S. App. LEXIS 17317 (3d Cir. August 19, 2002) (finding contract provision for recovery of attorneys' fees in event of breach enforceable under Pennsylvania law); Kucel v. Walter E. Heller Co., 813 F.2d 67, 73 (5th Cir. 1987) (finding same under Texas law); see also McGuire v. Russell Miller, Inc., 1 F.3d 1306, 1313 (2d Cir. 1993) (citations omitted). Under Massachusetts [*9] law,

counsel fees can be assessed pursuant to specific affirmative authority, such as a contract. Northern Heel Corp., 851 F.2d at 475 (citations omitted).

> n4 The Federal Rules of Civil Procedure provide general guidance on the procedures to be followed for fee petitions, but do not set forth the specific procedure by which a prevailing party should move for attorneys' fees and expenses. Thus, the procedure is often handled on an ad-hoc basis. See, e.g., TPS Technologies, Inc. v. Rodin Enterprises, Inc., 816 F. Supp. 345, 351 (E.D. Pa. 1993) (ordering prevailing plaintiff to submit motion and proposed order for attorneys' fees); Carpenter Technology Corp. v. Armco, Inc., 800 F. Supp. 215, 228 (E.D. Pa. 1992), aff'd, 993 F.2d 876 (3d Cir. 1993) (establishing schedule for briefing of attorneys' fees issue when party entitled to fees).

In the instant matter, the Franchise Agreement contains specific authority for the award of reasonable attorneys' [*10] fees and neither party disputes the choice of law provision contained therein. Accordingly, this Court's award of Plaintiffs' reasonable attorneys' fees shall be guided by Massachusetts law.

## 3. FACTORS TO CONSIDER

Under Massachusetts law, in determining an attorney's fair and reasonable charge for his or her services,

> many considerations are pertinent, including the ability and reputation of the attorney, the demand for his services by others, the amount and importance of the matter involved, the time spent, the prices usually charged for similar services by other attorneys in the same neighborhood, the amount of money or the value of the property affected by controversy, and the results secured.

Mulhern v. Roach, 398 Mass. 18, 494 N.E.2d 1327, 1331 (Mass. 1986) (citations omitted). n5 Not one of these factors is necessarily decisive, and the weight to be given to each of them will vary according to the nature of the services rendered in the particular instance under examination. Id. (citations omitted). A district court has broad discretion [*11] in awarding reasonable attorneys' fees. Washington v. Philadelphia County Court of Common Pleas, 89 F.3d 1031, 1034 (3d Cir. 1996).

n5 This method is different from the federal lodestar method, which is most commonly used when determining attorneys' fees in federal court. See Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 (3d Cir. 2000); Lindy Brothers Builders, Inc of Philadelphia v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 167-169 (3d Cir. 1973), followed by, Lindy Brothers Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp., 540 F.2d 102 (3d Cir. 1976); Northern Heel Corp., 851 F.2d at 475.

In support of their Fee Petition, Plaintiffs submit the following documents: (1) Affidavit of lead counsel, Robert L. Zisk, Esquire, of Schmeltzer, Aptaker & Shepard, P.C.; (2) "Partner, Associate & Legal Assistant Billing Rate Survey for Law Firms," which summarized billing [*12] rates in Washington, D.C., and was published by the National Survey Center in June 1, 2001; and (3) an itemized Matter Ledger Report. n6 As to the substance of Plaintiffs' itemized Matter Ledger Report, Defendants object only that the time spent and expenses charged by Plaintiffs' attorneys were excessive.

> n6 Following this Court's instruction at the August 14, 2002 hearing, Plaintiffs submitted an itemized Matter Ledger Report that differentiated between fees and expenses relating to Plaintiffs' claims for nonpayment and to their defense against Defendants' counterclaims. (See Pls.' Supp. Mem. In Support of Pls.' Rule 54(d) Fee Pet., or in the Alt. Mot. to Amend the J.)

We now turn to the factors considered when determining a reasonable attorneys' fees award under Massachusetts law.

## 1. Ability and Reputation of Attorneys and Demand for Their Services by Others.

Plaintiffs' attorneys, the approximately 45-member Washington D.C. law firm of Schmeltzer, Aptaker & Shepard, P.C., specialize in franchise [*13] litigation and have represented numerous national franchisers, including International House of Pancakes,

Arby's, Meineke Discount Mufflers, Entre Computer Centers, Cottman Transmission Systems, Midas Mufflers, Burger King Corporation, Togo's Eateries, Inc. and Baskin-Robbins, Inc. Attorneys in the firm's franchise litigation practice have worked to establish a national reputation in the field of franchise law by presenting on relevant topics for such organizations as the International Franchise Association and the ABA Forum on Franchis-

ing, and by publishing newsletters on the topic of franchise litigation. The firm has represented Plaintiffs in litigation matters across the country since 1989 as its primary national litigation counsel, and has accumulated substantial knowledge of Plaintiffs' organization, policies, practices, filing methods and history.

## 2. Importance of Matter.

The focus of the underlying case was the enforcement of the parties' Franchise Agreement, which this Court previously determined that Defendants had breached. As franchisers, the enforcement of franchise agreements is of obvious importance to sustaining Plaintiffs' business purpose.

## 3. Time [*14] Spent.

Plaintiffs' attorneys and legal assistants assert that they have expended a total of 2,705.03 hours over a period of three years, from April 1999 to June 2002, in enforcing termination of the Franchise Agreement. Plaintiffs' attorneys took four depositions of Defendants and their accountants, including one in particular where questions were repeated on the second day following the deponent's refusal to answer them the first day, and were obligated to file numerous discovery motions for Defendants' failure to provide even the most basic documents and responses.

As Plaintiffs' attorneys have accumulated a familiar understanding of Plaintiffs' business operations in the course of more than ten years of representation, Plaintiffs' attorneys were able to expend a significantly less amount of time becoming familiar with Plaintiffs' business structure and franchise organization. This familiarity resulted in a corresponding reduction in fees and expenses.

## 4. Prices Charged for Similar Services in Similar Area.

The rates charged by Plaintiffs' attorneys and legal assistants are below market when compared with the rates charged for comparable services in the Washington D. [*15] C. area, according to the information contained in the billing rate survey published in June 2001. For example, Plaintiffs' lead counsel, Robert Zisk, Esquire, billed Plaintiffs at a rate of $ 225-$ 285 per hour, reflecting the civil litigation experience he acquired over nineteen (19) years of practice, the last fifteen (15) years of which focused on franchise litigation. Mr. Zisk's billing rate is lower than eighty-one percent (81%) of all partners, regardless of experience, in the Washington D.C. area. By way of further example, Steven A. Browne, Esquire, the primary associate on the matter billed at a rate of $ 160-$ 210 per hour, a rate that is lower than the average billing rates of other associates at his level. The

majority of the hours billed by attorneys on the case were worked by Mr. Zisk and Mr. Browne.

### 5. Amount Involved or Value of Property Affected by Controversy.

The value of the controversy was substantial, specifically, Plaintiffs' rightful possession of a franchise worth in excess of $ 600,000.00.

### 6. Results Secured.

Plaintiffs' attorneys achieved Plaintiffs' primary goal of obtaining possession of its valuable business venture and terminating the [*16] Franchise Agreement.

### 4. AWARD OF REASONABLE ATTORNEYS' FEES AND EXPENSES

The Franchise Agreement provides that Defendants are responsible for reasonable attorneys' fees and expenses expended to enforce the Franchise Agreement. After careful consideration of the above factors, this Court is satisfied that the rates charged and time expended by Plaintiffs' attorneys were reasonable in light of Plaintiffs' counsel's ability and reputation, the importance of the matter, the prices charged in the Washington D.C. area, the amount involved, and the results secured. Having broad discretion to determine the reasonable amount of attorneys' fees, this Court grants Plaintiffs' Petition in part, specifically as to those discounted attorneys' fees n7 and expenses expended for the nonpayment issue upon which they prevailed on summary judgment, and for defending against Defendants' counterclaims. Those amounts are $ 97,499.70 in discounted attorneys' fees and $ 13,872.96 in expenses for the nonpayment issue; and $ 102,474.92 in discounted attorneys' fees and $ 14,595.51 in expenses for their defense of Defendants' counterclaims.

> n7 Plaintiffs received a dollar discount from Schmeltzer, Aptaker & Shepard on bills submitted in this case, which reflects an amount that is

substantially less than the actual dollar value of the hours worked on the case.

[*17]

### 3. CONCLUSION

Accordingly, Plaintiffs' Rule 54(d) Fee Petition, or in the Alternative, Motion to Amend the Judgment is **GRANTED IN PART**.

### ORDER

**AND NOW**, this 16th day of October, 2002, in consideration of the Rule 54(d) Fee Petition, or in the Alternative, Motion to Amend the Judgment to Include an Order of Reasonable Attorneys' Fees and Expenses filed by Plaintiffs Dunkin' Donuts Incorporated and Third Dunkin' Donuts Realty, Inc. (Doc. No. 183); Memorandum in Opposition thereto filed by Defendants Guang Chyi Liu a/k/a Fred Liu, Susan Yeh Liu and G.C.S.C.L. Company (Doc. No. 188); Defendants' Pre-Hearing Memorandum re: Attorneys' Fees (Doc. No. 190); Plaintiffs' Supplemental Memorandum (Doc. No. 192); and Defendants' Reply thereto (Doc. No. 193), it is **ORDERED**:

1. Plaintiffs' Rule 54(d) Fee Petition, or in the Alternative, Motion to Amend the Judgement to Include an Order of Reasonable Attorneys' Fees and Expenses is **GRANTED IN PART**.

2. Judgment is **ENTERED** in favor of Plaintiffs, and against Defendants, in the amount of $ 97,499.70 in attorneys' fees and $ 13,872.96 in expenses for the nonpayment issue, and $ 102,474.92 [*18] in attorneys' fees and $ 14,595.51 in expenses for their defense of Defendants' counterclaims.

BY THE COURT:

JAMES McGIRR KELLY, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| DUNKIN' DONUTS INC., et al. | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| GUANG CHYI LIU, et al. | : | No. 99-3344 |
| Defendants. | FILED | 00-3666 |

## MEMORANDUM AND ORDER

**J. M. KELLY, J.**                                      OCTOBER $/6$ , 2002

Presently before the Court is a Rule 54(d) Fee Petition, or

in the Alternative, Motion to Amend the Judgment to Include an

Order of Reasonable Attorneys' Fees and Expenses filed by the

Plaintiffs, Dunkin' Donuts Incorporated and Third Dunkin' Donuts

Realty, Inc. (collectively, "Plaintiffs"). Plaintiffs filed

their Petition following this Court's June 25, 2002 entry of

summary judgment in their favor on Counts I-IV of their Complaint

relating to nonpayment pursuant to the terms of the parties'

Franchise Agreement.[1] Defendants Guang Chyi Liu a/k/a Fred Liu,

Susan Yeh Liu and G.C.S.C.L. Company (collectively, "Defendants")

object to this Court's jurisdiction to rule on the Fee Petition

subsequent to their filing a Notice of Appeal with the United

States Court of Appeals for the Third Circuit, but do not dispute

the enforceability of the terms of the Franchise Agreement.

For the reasons that follow, Plaintiffs' Fee Petition is

_____

[1]     See Dunkin' Donuts Inc., et al. v. Guang Chyi Liu, et
al., Nos. 99-3344 and 00-3666 (E.D. Pa. June 25, 2002).

**GRANTED IN PART.**

## I.   BACKGROUND

The procedural history of this case is extensive and, thus, only that portion relevant to this Court's disposition of Plaintiffs' Fee Petition will be provided below.

Following this Court's entry of summary judgment on June 25, 2002 in favor of Plaintiffs, Plaintiffs timely filed the instant Fee Petition on July 9, 2002. Defendants filed their Notice of Appeal to the Third Circuit on July 16, 2002. On July 23, 2002, the Third Circuit ordered Defendants' appeal stayed pending this Court's disposition of Plaintiffs' timely filed post-judgment motion.

Both parties were provided opportunity to brief the issue of attorneys' fees. On August 1, 2002, Defendants filed their Memorandum in Opposition to Plaintiffs' Fee Petition and, on August 12, 2002, Defendants filed a Pre-Hearing Memorandum. A hearing was held on August 14, 2002, after which time this Court ordered Plaintiffs' counsel to submit an additional memorandum within seven days concerning the allocation of fees and expenses as to certain issues, and Defendants' counsel to file a response thereto seven days thereafter. On August 22, 2002, Plaintiffs filed their Supplemental Memorandum and, on August 29, 2002, Defendants filed their Supplemental Memorandum.

2

Noting that they had already filed their Notice of Appeal with the Third Circuit, Defendants object to this Court's jurisdiction to rule on Plaintiffs' Petition as either a Rule 54(d) motion for attorneys' fees or a Rule 59(e) motion to amend the judgment. (Defs.' Mem. in Opp'n. to Pls.' Rule 54(d) Fee Pet., or in the Alternative, Mot. to Amend the J., at pp. 1-2.) Notwithstanding their objection to jurisdiction, Defendants also briefed this Court on the legal standard for awards of reasonable attorneys' fees under Massachusetts law.[2] (Defs.' Pre-Hearing Mem. Re: Att'ys.' Fees, at pp. 1-5.) In addition, Defendants argue that they are entitled to a jury trial on the reasonableness of requested attorneys' fees. (Defs.' Reply to Pls.' Supplemental Mem. Regarding Att'ys' Fees, at pp. 1-2.) Defendants, however, do not dispute the enforceability of the Franchise Agreement or the fee-shifting provision contained therein.

## II.  DISCUSSION

### A.  JURISDICTION

As a preliminary matter, Defendants object to this Court's jurisdiction to rule on Plaintiffs' Petition on the ground that

---

[2]     Pursuant to the choice of law provision contained in the Franchise Agreement, Massachusetts law governs its interpretation. (Dunkin' Donuts Incorporated Franchise Agreement, ¶16.A.)

3

Defendants already filed their Notice of Appeal with the Third Circuit. The filing of a notice of appeal is an event of jurisdictional significance, immediately conferring jurisdiction upon a court of appeals and divesting a district court of its control over those aspects of the case involved in the appeal; however, it is well-settled that a district court retains jurisdiction to act in a limited number of circumstances, such as determining an application for attorneys' fees. Sheet Metal Workers' Int'l Assoc. Local 19 v. Herre Bros., Inc., 198 F.3d 391, 394 (3d Cir. 1999) (citing Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 58 (1982)); Venen v. Sweet, 758 F.2d 117, 120 n.2 (3d Cir. 1985) ("A district court, during the pendency of an appeal is not divested of jurisdiction to determine an application for attorney's fees."). That well-settled principle, coupled with the Third Circuit's July 23, 2002 order staying Defendants' appeal, makes clear the Third Circuit's preference for attorneys' fees to be awarded along with the entry of final judgment to avoid piecemeal appeals. See Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 97 (3d Cir. 1988). Accordingly, this Court will retain jurisdiction to rule on Plaintiffs' petition for attorneys' fees.[3]

---

[3]     Defendants also argue that a jury must decide the issue of attorneys' fees. Although Defendants may have had a right to a jury decision on whether Plaintiffs were entitled to recover attorneys' fees pursuant to the terms of the Franchise Agreement, they do not have the right to a jury decision on the reasonable

4

## B.  APPLICABLE LAW

The enforceability of the fee-shifting provision contained

in the Franchise Agreement is not in dispute, and provides for

the award of reasonable attorneys' fees:

> If FRANCHISEE fails to cure a default, . . . or if this
> Agreement is terminated, FRANCHISEE shall pay to
> DUNKIN' DONUTS all damages, costs and expenses,
> including without limitation interest at 18% per annum,
> or the highest permissible rate, and reasonable
> attorneys' fees, incurred by DUNKIN' DONUTS as a result
> of any such default or termination; and said interest
> and all damages, costs and expenses, including
> reasonable attorneys' fees, may be included in and form
> a part of the judgment awarded to DUNKIN' DONUTS in any
> proceedings brought by DUNKIN' DONUTS against
> FRANCHISEE . . . .

(Dunkin' Donuts Incorporated Franchise Agreement, ¶9.C.2.)  The

choice of law provision contained in the Franchise Agreement

provides that the laws of the Commonwealth of Massachusetts shall

govern its interpretation.  (Id. at ¶16.A.)

In a diversity case, absent a conflicting applicable federal

---

amount of attorneys' fees.  See McGuire v. Russell Miller, Inc.,
1 F.3d 1306, 1315 (2d Cir. 1993); see also Longport Ocean Plaza
Condominium, Inc. v. Robert Cato & Associates, Inc., Civ. A. No.
00-CV-2231, 2002 U.S. Dist. LEXIS 12929, at *7-8 (E.D. Pa. March
5, 2002) ("it is permissible for a court to determine the amount
of attorney's fees and costs to be awarded to a party pursuant to
an . . . agreement in a separate proceeding, after a jury has
determined that party may recover such an award . . . .  While
the Third Circuit has never opined on this procedure . . . .
[t]his procedure is commonly used in other circuits as well . . .
and is also the usual practice of this Court" (emphasis in
original)).

5

rule of procedure, state law governs not only the actual awarding of attorneys' fees but also the method of determining those fees. Northern Heel Corp. v. Compo Industries, Inc., 851 F.2d 456, 475 (1st Cir. 1988); Buse v. Vanguard Group of Investment Cos., No. 91-3560, 1998 U.S. Dist. LEXIS 1242, at *8 (E.D. Pa. Jan. 30, 1998) (citations omitted).[4] Parties may contract to permit recovery of attorneys' fees, and a federal court will enforce contractual rights to attorneys' fees if the contract is valid under applicable state law. See SNA, Inc. v Array, 173 F. Supp. 2d 347, (E.D. Pa. 2001), aff'd, No. 01-4313, 2002 U.S. App. LEXIS 17317 (3d Cir. August 19, 2002) (finding contract provision for recovery of attorneys' fees in event of breach enforceable under Pennsylvania law); Kucel v. Walter E. Heller Co., 813 F.2d 67, 73 (5th Cir. 1987) (finding same under Texas law); see also McGuire v. Russell Miller, Inc., 1 F.3d 1306, 1313 (2d Cir. 1993) (citations omitted). Under Massachusetts law, counsel fees can be assessed pursuant to specific affirmative authority, such as a

---

[4]     The Federal Rules of Civil Procedure provide general guidance on the procedures to be followed for fee petitions, but do not set forth the specific procedure by which a prevailing party should move for attorneys' fees and expenses.  Thus, the procedure is often handled on an ad-hoc basis.  See, e.g., TPS Technologies, Inc. v. Rodin Enterprises, Inc., 816 F. Supp. 345, 351 (E.D. Pa. 1993) (ordering prevailing plaintiff to submit motion and proposed order for attorneys' fees); Carpenter Technology Corp. v. Armco, Inc., 800 F. Supp. 215, 228 (E.D. Pa. 1992), aff'd, 993 F.2d 876 (3d Cir. 1993) (establishing schedule for briefing of attorneys' fees issue when party entitled to fees).

6

contract. Northern Heel Corp., 851 F.2d at 475 (citations omitted).

In the instant matter, the Franchise Agreement contains specific authority for the award of reasonable attorneys' fees and neither party disputes the choice of law provision contained therein. Accordingly, this Court's award of Plaintiffs' reasonable attorneys' fees shall be guided by Massachusetts law.

## C.  FACTORS TO CONSIDER

Under Massachusetts law, in determining an attorney's fair and reasonable charge for his or her services,

> many considerations are pertinent, including the ability and reputation of the attorney, the demand for his services by others, the amount and importance of the matter involved, the time spent, the prices usually charged for similar services by other attorneys in the same neighborhood, the amount of money or the value of the property affected by controversy, and the results secured.

Mulhern v. Roach, 494 N.E.2d 1327, 1331 (Mass. 1986) (citations omitted).[5] Not one of these factors is necessarily decisive, and the weight to be given to each of them will vary according to the

---

[5]     This method is different from the federal lodestar method, which is most commonly used when determining attorneys' fees in federal court. See Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 (3d Cir. 2000); Lindy Brothers Builders, Inc of Philadelphia v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 167-169 (3d Cir. 1973), followed by, Lindy Brothers Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp., 540 F.2d 102 (3d Cir. 1976); Northern Heel Corp., 851 F.2d at 475.

nature of the services rendered in the particular instance under examination. Id. (citations omitted). A district court has broad discretion in awarding reasonable attorneys' fees. Washington v. Philadelphia County Court of Common Pleas, 89 F.3d 1031, 1034 (3d Cir. 1996).

In support of their Fee Petition, Plaintiffs submit the following documents: (1) Affidavit of lead counsel, Robert L. Zisk, Esquire, of Schmeltzer, Aptaker & Shepard, P.C.; (2) "Partner, Associate & Legal Assistant Billing Rate Survey for Law Firms," which summarized billing rates in Washington, D.C., and was published by the National Survey Center in June 1, 2001; and (3) an itemized Matter Ledger Report.[6] As to the substance of Plaintiffs' itemized Matter Ledger Report, Defendants object only that the time spent and expenses charged by Plaintiffs' attorneys were excessive.

We now turn to the factors considered when determining a reasonable attorneys' fees award under Massachusetts law.

### 1. Ability and Reputation of Attorneys and Demand for Their Services by Others.

Plaintiffs' attorneys, the approximately 45-member

---

[6]     Following this Court's instruction at the August 14, 2002 hearing, Plaintiffs submitted an itemized Matter Ledger Report that differentiated between fees and expenses relating to Plaintiffs' claims for nonpayment and to their defense against Defendants' counterclaims. (See Pls.' Supp. Mem. In Support of Pls.' Rule 54(d) Fee Pet., or in the Alt. Mot. to Amend the J.)

8

Washington D.C. law firm of Schmeltzer, Aptaker & Shepard, P.C., specialize in franchise litigation and have represented numerous national franchisers, including International House of Pancakes, Arby's, Meineke Discount Mufflers, Entre Computer Centers, Cottman Transmission Systems, Midas Mufflers, Burger King Corporation, Togo's Eateries, Inc. and Baskin-Robbins, Inc. Attorneys in the firm's franchise litigation practice have worked to establish a national reputation in the field of franchise law by presenting on relevant topics for such organizations as the International Franchise Association and the ABA Forum on Franchising, and by publishing newsletters on the topic of franchise litigation.  The firm has represented Plaintiffs in litigation matters across the country since 1989 as its primary national litigation counsel, and has accumulated substantial knowledge of Plaintiffs' organization, policies, practices, filing methods and history.

### 2.   Importance of Matter.

The focus of the underlying case was the enforcement of the parties' Franchise Agreement, which this Court previously determined that Defendants had breached.  As franchisers, the enforcement of franchise agreements is of obvious importance to sustaining Plaintiffs' business purpose.

9

### 3.   Time Spent.

Plaintiffs' attorneys and legal assistants assert that they have expended a total of 2,705.03 hours over a period of three years, from April 1999 to June 2002, in enforcing termination of the Franchise Agreement. Plaintiffs' attorneys took four depositions of Defendants and their accountants, including one in particular where questions were repeated on the second day following the deponent's refusal to answer them the first day, and were obligated to file numerous discovery motions for Defendants' failure to provide even the most basic documents and responses.

As Plaintiffs' attorneys have accumulated a familiar understanding of Plaintiffs' business operations in the course of more than ten years of representation, Plaintiffs' attorneys were able to expend a significantly less amount of time becoming familiar with Plaintiffs' business structure and franchise organization. This familiarity resulted in a corresponding reduction in fees and expenses.

### 4.   Prices Charged for Similar Services in Similar Area.

The rates charged by Plaintiffs' attorneys and legal assistants are below market when compared with the rates charged for comparable services in the Washington D.C. area, according to the information contained in the billing rate survey published in

10

June 2001. For example, Plaintiffs' lead counsel, Robert Zisk,
Esquire, billed Plaintiffs at a rate of $225-$285 per hour,
reflecting the civil litigation experience he acquired over
nineteen (19) years of practice, the last fifteen (15) years of
which focused on franchise litigation. Mr. Zisk's billing rate
is lower than eighty-one percent (81%) of all partners,
regardless of experience, in the Washington D.C. area. By way of
further example, Steven A. Browne, Esquire, the primary associate
on the matter billed at a rate of $160-$210 per hour, a rate that
is lower than the average billing rates of other associates at
his level. The majority of the hours billed by attorneys on the
case were worked by Mr. Zisk and Mr. Browne.

## 5.   Amount Involved or Value of Property Affected by Controversy.

The value of the controversy was substantial,
specifically, Plaintiffs' rightful possession of a franchise
worth in excess of $600,000.00.

## 6.   Results Secured.

Plaintiffs' attorneys achieved Plaintiffs' primary goal
of obtaining possession of its valuable business venture and
terminating the Franchise Agreement.

## D.   AWARD OF REASONABLE ATTORNEYS' FEES AND EXPENSES

11

The Franchise Agreement provides that Defendants are responsible for reasonable attorneys' fees and expenses expended to enforce the Franchise Agreement. After careful consideration of the above factors, this Court is satisfied that the rates charged and time expended by Plaintiffs' attorneys were reasonable in light of Plaintiffs' counsel's ability and reputation, the importance of the matter, the prices charged in the Washington D.C. area, the amount involved, and the results secured. Having broad discretion to determine the reasonable amount of attorneys' fees, this Court grants Plaintiffs' Petition in part, specifically as to those discounted attorneys' fees[7] and expenses expended for the nonpayment issue upon which they prevailed on summary judgment, and for defending against Defendants' counterclaims. Those amounts are $97,499.70 in discounted attorneys' fees and $13,872.96 in expenses for the nonpayment issue; and $102,474.92 in discounted attorneys' fees and $14,595.51 in expenses for their defense of Defendants' counterclaims.

## III. **CONCLUSION**

Accordingly, Plaintiffs' Rule 54(d) Fee Petition, or in the

---

[7]     Plaintiffs received a dollar discount from Schmeltzer, Aptaker & Shepard on bills submitted in this case, which reflects an amount that is substantially less than the actual dollar value of the hours worked on the case.

12

Alternative, Motion to Amend the Judgment is **GRANTED IN PART**.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
DUNKIN' DONUTS INC., et al.       :          CIVIL ACTION
     Plaintiffs,                  :
                                  :
     v.                           :
                                  :
GUANG CHYI LIU, et al.            :          No. 99-3344
     Defendants.                  :             00-3666
```

### O R D E R

**AND NOW**, this $\frac{1}{6}$ day of October, 2002, in consideration of the Rule 54(d) Fee Petition, or in the Alternative, Motion to Amend the Judgment to Include an Order of Reasonable Attorneys' Fees and Expenses filed by Plaintiffs Dunkin' Donuts Incorporated and Third Dunkin' Donuts Realty, Inc. (Doc. No. 183); Memorandum in Opposition thereto filed by Defendants Guang Chyi Liu a/k/a Fred Liu, Susan Yeh Liu and G.C.S.C.L. Company (Doc. No. 188); Defendants' Pre-Hearing Memorandum re: Attorneys' Fees (Doc. No. 190); Plaintiffs' Supplemental Memorandum (Doc. No. 192); and Defendants' Reply thereto (Doc. No. 193), it is **ORDERED**:

1.  Plaintiffs' Rule 54(d) Fee Petition, or in the Alternative, Motion to Amend the Judgement to Include an Order of Reasonable Attorneys' Fees and Expenses is **GRANTED IN PART**.

2.  Judgment is **ENTERED** in favor of Plaintiffs, and against Defendants, in the amount of $97,499.70 in attorneys' fees and $13,872.96 in expenses for the nonpayment issue, and $102,474.92 in attorneys' fees and

$14,595.51 in expenses for their defense of Defendants'

counterclaims.

BY THE COURT:

JAMES McGIRR KELLY, J.

ENTE......

OCT 1

C....

2