UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DUNKIN' DONUTS FRANCHISED
RESTAURANTS LLC, DD IP HOLDER
LLC, a Delaware Limited Liability Company,
DD IP HOLDER LLC, a Delaware Limited
Liability Company, BASKIN-ROBBINS
FRANCHISED SHOPS LLC, a Delaware
Limited Liability Company, and BR IP
HOLDER LLC, a Delaware Limited Liability
Company,

                              Plaintiffs,

        v.

SUNDRAM, INC., a New York Corporation,
SATYAM SHIVAM, INC. (now known as
Satyam Eastchester LLC), a New York
Corporation, SHIVAM SUNDRAM, INC.
(now known as Shivam Bruckner LLC), a
New York Corporation, TKNY PARTNERS,
LLC, a New York Limited Liability Company,
ANIL KAPOOR, a resident of Massachusetts,
and PRAN TIKU, a resident of Massachusetts,

                              Defendants.

07-CV-11134 (RJH)

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' APPLICATION FOR PRELIMINARY INJUNCTION**

EINBINDER & DUNN, LLP
*Counsel for Defendants*
104 WEST 40th STREET
NEW YORK, NEW YORK 10018
(212) 391-9500
(212) 391-9025 (facsimile)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

I.      PRELIMINARY STATEMENT ...................................................................... 1

II.     COUNTERSTATEMENT OF FACTS ............................................................ 1

III.    COUNTERARGUMENT ................................................................................ 2

        A.      Summary of the argument ................................................................... 2

        B.      Because a preliminary injunction would have the immediate effect
                of shutting down the defendants' business it should not be granted,
                inasmuch as a preliminary injunction should maintain the *status
                quo* ..................................................................................................... 3

        C.      The plaintiffs will suffer no harm, let alone irreparable harm,
                because any loss of control over their marks would be the result of
                the plaintiffs' choice not to exercise continuing control, and any
                assertion to the contrary is misleading ............................................... 5

        D.      Plaintiffs are unlikely to succeed on the merits ................................. 7

                1.      Success on the merits of the breach of contract claim is not
                        likely because the defendants paid all fees owing, if late, and in
                        any event the amount of fees paid late is a relatively small
                        amount and the default was inadvertent and brief—and in fact
                        because the defendants had paid all owing sums before the
                        plaintiffs sent notice of termination, no termination was
                        properly made ............................................................................... 7

                2.      Success on the plaintiffs' claims of trademark
                        infringement/trade dress infringement/unfair competition is
                        irrelevant unless and until the plaintiffs succeed on their cause
                        for breach of contract, else the court would be awarding post-
                        ultimate relief by way of a preliminary injunction ....................... 11

        E.      A preliminary injunction, being an extraordinary equitable remedy,
                may not be granted to the plaintiffs, who come into court with
                unclean hands .................................................................................... 12

F.    The public interest will be implicated only if the plaintiffs publicize the pending dispute; otherwise the public can be assured of receiving the very same products under the plaintiffs' names and marks it has been receiving to date ........................................................................13

G.    The court should not decide this application without permitting discovery and holding an evidentiary hearing .........................................................14

H.    Any grant of a preliminary injunction must be conditioned upon the plaintiffs' posting of a substantial undertaking.................................................15

IV.    CONCLUSION................................................................................................................16

## TABLE OF AUTHORITIES

*Amerada Hess Corp. v. Quinn,* 362 A.2d 1258, 143 N.J.Super 237 (1976) .................................8

*American Metropolitan Enterprises of New York, Inc. v. Warner Bros. Records, Inc.,* 389 F.2d 903, 904 (2d Cir. 1968) ........................................................12

*ARP Films, Inc. v. Marvel Entertainment Group, Inc.,* 952 F.2d 643 (2d Cir. 1991) .....................................................................................8, 10

*Caplan v. Fellheimer Eichen Braverman & Kaskey,* 68 F.3d 828 (3d Cir. 1995) ................................................................................................6

*Checker Motors Corp. v. Chrysler Corp.,* 405 F.2d 319, 323 (2d Cir.), *cert. denied* 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969) ......................................................4

*Commerce Tankers Corp. v. National Maritime Union of America, AFL-CIO,* 553 F.2d 793, 800 (2d Cir. 1977), *cert. denied* 553 F.2d 793, 98 S.Ct. 400 (1977) ....................................................................................................16

*Dopp v. Franklin National Bank,* 461 F.2d 873, 878 (2d Cir. 1972) ................................4

*Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 742 (2d Cir. 1953) ...........................................................................................4

*Helene Curtis v. Nat'l Wholesale Liquidators, Inc.,* 890 F.Supp. 152 (E.D.N.Y. 1995) .....................................................................................5

*Hinkleman v. Shell Oil Co.,* 962 F.2d 372 (4th Cir. 1992) ...........................................9

*LaGuardia Associates v. Holiday Hospitality Franchising, Inc.,* 92 F.Supp.2d 119 (E.D.N.Y. 2000) .........................................................................7

*McDonald's Corp. v. Robert A. Makin, Inc.,* 653 F.Supp. 401 (W.D.N.Y. 1986) .................................................................................10

*Nestor v. McDowell,* 81 N.Y.2d 410, 599 N.Y.S.2d 507 615 N.E.2d 991 (1993) .....................................................8 (fn.)

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 814-15 65 S.Ct. 993, 997-98 (1945) ....................................................12

*Two Men & a Truck/Int'l v. Two Men & a Truck/Kalamazoo,* 949 F.Supp. 500 (W.D. Mich. 1996) .............................................................................10

*Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944) ......................................4

## FEDERAL RULES AND STATUTES

Fed.Rules Civ.Proc. Rule 65(c) ...................................................................................15

## I. PRELIMINARY STATEMENT

The defendants, four corporate franchisees of the franchisor plaintiffs and their two individual principals, submit this memorandum of law in opposition to the application of the plaintiffs for a preliminary injunction that would have the effect of forcing the defendants to close their four franchised business units during the pendency of this lawsuit—despite having paid the fees at issue even before becoming aware of notices of cure or termination sent to them (which circumstance means, in fact, there could be no proper termination based on the defaults).

"Going dark" would, in turn, have the effect of precluding the defendants from selling their franchises as an ongoing concern—even if the defendants are ultimately successful in this action—meaning the loss of more than three million dollars invested in the business. This would be the disproportionate punishment for a one-time lateness in paying thirty thousand dollars in franchise and advertisement fees—representing less than one percent of the sum invested—the unfortunate result of an inadvertent administrative error, all because the plaintiffs want to push the defendants out of the franchise systems as part of a concerted scheme to disenfranchise minority operators. And to push the defendants out of the systems, using the late payment of fees as a pretext, the plaintiffs do not reveal to the court that the defendants have paid the monies previously owing, and in fact had paid those monies even before receiving notices of the defaults, which defaults counsel for the plaintiffs did not mention even when asking counsel for the defendants to accept service of the summons and complaint in this action.

## II. COUNTERSTATEMENT OF FACTS

The defendants do not dispute, or do not have sufficient information to dispute, the majority of the facts set forth in paragraphs numbered 1 through 38, inclusive, on pages 1

through 9 of the plaintiffs' memorandum of law. The defendants proffer, in the accompanying affidavit of Neel Tiku dated February 4, 2008 (the "Tiku Aff."), the rest of the story, as it were, of the defendants' payment in full to the plaintiffs of all outstanding fees even before becoming aware of any notices to cure or termination and the insignificance of the defaults in payment, including the reasons therefor and the particular and peculiar circumstances regarding the plaintiffs' apparent coyness in notifying the defendants of their defaults, even while counsel for the plaintiffs was alerting counsel for the defendants of this lawsuit. The accompanying declaration of Michael Einbinder, Esq. (the "Einbinder Decl."), of counsel to the defendants, sets forth the basis for the defendants' belief that the plaintiffs are in the midst of a widespread offensive against minority franchisees.

## III. COUNTERARGUMENT

### A.    Summary of the argument.

Because a preliminary injunction would have the immediate effect of shutting down the defendants' business it should not be granted, inasmuch as a preliminary injunction should maintain the *status quo*. The plaintiffs will suffer no harm, let alone irreparable harm, if the preliminary injunction is not granted, because any loss of control over their marks would be the result of the plaintiffs' choice not to exercise continuing control, and any assertion to the contrary is misleading. Moreover, success on the merits of the breach of contract claim, such as is required for the grant of a preliminary injunction, is not likely because the defendants paid all fees owing, and the amount of fees paid late is a relatively small amount and the default was inadvertent and brief—and in fact because the defendants had paid all owing sums before the plaintiffs sent notice of termination, no termination was properly made. Success on the plaintiffs' claims of trademark infringement/trade dress infringement/unfair competition is irrelevant unless

and until the plaintiffs succeed on their cause for breach of contract, else the court would be awarding post-ultimate relief by way of a preliminary injunction. A preliminary injunction, further, being an extraordinary equitable remedy, may not be granted to the plaintiffs, who come into court with unclean hands. Additionally, the public interest will be implicated only if the plaintiffs publicize the pending dispute; otherwise the public can be assured of receiving the very same products under the plaintiffs' names and marks it has been receiving to date. In any event, the court should not decide this application without permitting discovery and holding an evidentiary hearing. Finally, any grant of a preliminary injunction must be conditioned upon the plaintiffs' posting of a substantial undertaking.

**B.    Because a preliminary injunction would have the immediate effect of shutting down the defendants' business it should not be granted, inasmuch as a preliminary injunction should maintain the *status quo*.**

The plaintiffs request a preliminary injunction enjoining the defendants from continuing to use the trade names and marks of the plaintiffs. The plaintiffs argue that they have already terminated the franchises of the defendants and therefore the defendants are already using the plaintiffs' marks without a license. To the contrary, the plaintiffs in this lawsuit seek ratification of their purported termination of the defendants' franchises, and accordingly unless and until this court rules in favor of the plaintiffs ultimately that the defendants' franchises are no longer in effect, the defendants possess a valid and continuing license to use the marks at issue under the terms of their franchise agreements. The plaintiffs are jumping the gun, so to speak, with this application.

Under the circumstances, then, the plaintiffs seek a preliminary injunction to do the opposite of what a preliminary injunction is generally intended to do. "The purpose of a preliminary injunction," held the United States Court of Appeals for the Second Circuit in

*Checker Motors Corp. v. Chrysler Corp.,* 405 F.2d 319, 323 (2d Cir.), *cert. denied,* 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969), "is to preserve the status quo pending a determination on the merits." *See also Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 742 (2d Cir. 1953).

A preliminary injunction may never be obtained as a matter of right, wrote the United States Supreme Court in *Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). It is clearly addressed to the discretion of the district court. *See Checker Motors Corp., supra,* 405 F.2d at 323. Historically, this remedy has been viewed as drastic or extraordinary in nature and, absent a clear showing that the movant has carried the burden of persuasion, the relief will be denied. *See Dopp v. Franklin National Bank,* 461 F.2d 873, 878 (2d Cir. 1972); *Checker Motors Corp., supra,* 405 F.2d at 323.

A grant of the preliminary injunction that the plaintiffs request would be tantamount to a grant of summary judgment on the plaintiffs' claims of trademark infringement, unfair competition, trademark dilution, and trade dress infringement, Counts V-VIII of the First Amended Complaint, for which the plaintiffs ask the court to "[e]njoin Defendants and all those acting in concert with them from infringing upon Plaintiffs' trademarks, trade dress, and trade names and from otherwise engaging in unfair competition with Plaintiffs." Summary judgment would be, of course, wholly inappropriate at this stage of litigation—not least of all because no disclosure has been had, more about which below.

**C.    The plaintiffs will suffer no harm, let alone irreparable harm, because any loss of control over their marks would be the result of the plaintiffs' choice not to exercise continuing control, and any assertion to the contrary is misleading.**

The plaintiffs' assertion that they will lose control over their trademarks because of the purported terminations is misleading.[1] The defendants have contested the purported terminations and are continuing their business pending the ultimate determination of this court. And in continuing their business, as set forth in the Tiku Aff., at ¶ 16, the defendants are providing to the consuming public the same products that they have been providing all along. The four franchise business units are purchasing their products for resale from the same providers from which they have been procuring the goods to date. There has been and will be, therefore, *no variation in the quality of the goods sold under the marks of the plaintiffs.* The goods are and will continue to be "authentic," and the plaintiff franchisors will suffer no damage to their reputations and will lose no customers. The plaintiffs have offered no proof, despite a conclusory allegation to this effect, that the defendants are offering for sale inferior products under the plaintiffs' names and marks, or indeed products of any different quality than the defendants have been so selling all along.

The plaintiffs cite *Helene Curtis v. Nat'l Wholesale Liquidators, Inc.,* 890 F.Supp. 152 (E.D.N.Y. 1995) for the proposition that a demonstrated likelihood of success on the merits of a trademark infringement cause of action almost inevitably leads to irreparable injury… but, as the *Helene Curtis* court acknowledged ("almost") such is not always the case. (Whether the plaintiffs here have demonstrated a likelihood of success on the merits will be addressed in turn.)

The plaintiffs argue that a franchisor will lack control over its trademarks when a franchise agreement is terminated yet the franchisee continues to use the franchisor's marks… a situation that the plaintiffs claim results in irreparable harm. But the plaintiffs are creating this

---

[1] Although the plaintiffs in their memorandum of law prefer to address the prerequisites to the grant of a preliminary injunction out of order, the defendants will address irreparable harm—or the lack thereof—first.

situation themselves, or the illusion thereof, and not just by purporting to terminate the defendants as franchisees. The plaintiffs are not being forthright with the court, inasmuch as the plaintiffs are intentionally pretending that they will have no control over the defendants' continued use of the plaintiffs' marks during the pendency of this action.

Were the parties at the end of this action with the court having determined that the franchise agreements have been terminated, the plaintiffs might have a legitimate complaint. But now, with only the plaintiffs asserting that the agreements have ended (but the defendants asserting to the contrary) the defendants are *conceding the plaintiffs' right to continue to control the defendants' use of the marks at issue.* As set forth in the Tiku Aff, at ¶ 15, the defendants desire to remain open during the pendency of this action, in large part simply to be able to sell their franchised business as an ongoing to concern in order to salvage the substantial investment made into the business. For that reason, the defendants desire to continue doing business as usual, including by discharging all of their obligations under the their franchise agreements, loath to run (further) afoul of the plaintiff franchisors. For additional defaults or purported terminations will do the defendants no good at all.

Accordingly, the plaintiffs have no reason to suspect or to assert that they will be unable to control the defendant franchisees' use of the trademarks at issue. Any such loss of control would be created by the plaintiffs themselves (or merely fabricated as a possibility as a means to persuade this court to grant the preliminary injunction sought). But, as the plaintiffs argue, self-inflicted harm can not be deemed irreparable as a matter of law. *See* Plaintiffs' memorandum of law at p.18, citing *Caplan v. Fellheimer Eichen Braverman & Kaskey,* 68 F.3d 828 (3d Cir. 1995).

**D.    Plaintiffs are unlikely to succeed on the merits.**

    **1.    Success on the merits of the breach of contract claim is not likely because the defendants paid all fees owing, if late, and in any event the amount of fees paid late is a relatively small amount and the default was inadvertent and brief—and in fact because the defendants had paid all owing sums before the plaintiffs sent notice of termination, no termination was properly made.**

It should be noted at the outset of this component of the defendants' argument that the plaintiffs do not mention anywhere in their presentation to the court that the defendants have paid the money previously owing.

As of December 10, 2007, the defendants owed the sum of $30,523.22 to the plaintiffs. By January 8, 2008—that being the date that counsel for the plaintiffs first served the notices of termination—the defendants were fully paid up with the plaintiffs, and they have remained current in payments since. In fact, as set forth in the Tiku Aff., the defendants remedied their defaults without having seen either the notices to terminate or the notices to cure. **Accordingly, because the defendants had paid all owing sums before the plaintiffs sent notice of termination, no termination was properly made.**

In *LaGuardia Associates v. Holiday Hospitality Franchising, Inc.,* 92 F.Supp.2d 119 (E.D.N.Y. 2000)—a case admittedly with more pronounced details than the case at bar, yet still more akin to the instant case than any cited by the plaintiffs—the court held that the franchisor, "by not terminating on the April 1999 default for nearly ten months, but instead essentially abandoning that right until February 2000, waived its right to rely on that default—as it seeks to do—as a basis for termination of the Agreements." 92 F.Supp.2d at 130. The franchisee defendant in LaGuardia, as the defendants herein, became current in payments to the franchisor

outside the cure period provided in the notice to cure but before notice of termination was given.[2]

What is before this court therefore is an application to shut down the defendants four franchise business units based on an inadvertent, one-time, first-time, administrative error that was promptly corrected as soon as the defendants became aware of it, precluding proper termination.

The plaintiffs cite to *Amerada Hess Corp. v. Quinn,* 362 A.2d 1258, 143 N.J.Super 237 (1976), purportedly for the blanket proposition that a franchisee's obligation to pay royalties and fees is a vital part of any franchise relationship… but the case says no such thing. Rather, in *Amerada Hess* the Superior Court of New Jersey awarded judgment to the plaintiff franchisor against a franchisee who had: sold gasoline at prices exceeding those permitted by federal statutes and the franchise agreement; not met sales quotas; not complied with the franchisor's marketing policies; failed to maintain a clean and attractive gas station; failed to devote his full time and effort to the operation of the gas station; and failed to maintain records as required by state and federal statutes. *Amerada Hess, supra,* 362 A.2d at 1262, 143 N.J.Super at 244-45. *Amerada Hess* does not concern the payment of fees, much less the inadvertent late payment of fees.

Unlike the defaulting party in *ARP Films, Inc. v. Marvel Entertainment Group, Inc.,* 952 F.2d 643 (2d Cir. 1991), the defendants herein paid their fees, curing their defaults. *In ARP Films,* immediately after stating that "failure to tender payment is generally deemed a material

---

[2] In the apparent absence of any decision more directly on point than *LaGuardia, supra,* this court might find some direction in the analogous jurisprudence of tenancy in New York: A residential tenant who has defaulted in payment of rent who cures that default even after being served with a notice to cure but before the issuance of a notice of termination of the lease/warrant of eviction will be deemed to have fully cured the default such that no termination is proper. *See, e.g., Nestor v. McDowell,* 81 N.Y.2d 410, 599 N.Y.S.2d 507 615 N.E.2d 991 (1993).

breach of a contract," the court notes, "as the district court found, and the subsequent accounting confirmed, the amounts withheld from [the defendant] were *very substantial*" (952 F.2d at 649, emphasis added). The very substantial amount withheld: $400,000. *Id.* at 648. Moreover, the $400,000 was intentionally withheld by the plaintiff, who asserted its entitlement to do so as a self-help measure. Here, the defendants merely paid just $30,000 six weeks late.

The defendants herein, unlike the defendant in *Hinkleman v. Shell Oil Co.,* 962 F.2d 372 (4th Cir. 1992) as well, paid all required fees. Moreover, the minor, inadvertent defaults of the defendants herein are likewise not anything like the egregious behavior of the terminated franchisee in *Hinkleman*. "Hinkleman," wrote the *Hinkleman* court, 962 F.2d at 376, "failed on multiple occasions to make timely payments under the franchise agreement."

> His September payment was not made until October 20. While still delinquent in reissuing that check, Hinkleman's October rent payment did not clear the bank. After two written warnings, Hinkleman tendered yet a third bad check for payments under the franchise agreement on December 25. While the January 9 and March 16 incidents occurred after Shell had given notice of termination, they lend credence to Shell's justification for termination.

*Ibid.*

That the defendants are nothing like Mr. Hinkleman should be obvious. The defendants tendered no bad checks. The defendants ignored no warnings, written or otherwise. The defendants did not even have the benefit of any warnings. Mr. Hinkleman is the sort of franchisee whose termination a court should perhaps feel comfortable terminating, but certainly the defendants herein are not. Neither *ARP Films* nor *Hinkleman* indicates that either defaulting party ever paid, sooner or later, the fees owing; again, the defendants herein, to the contrary, not only paid all monies owing but did so before even receiving any notice of their defaults and before the commencement of this action.

In *Two Men & a Truck/Int'l v. Two Men & a Truck/Kalamazoo,* 949 F.Supp. 500 (W.D. Mich. 1996), a decision not binding on this court in any event, the District Court for the Western District of Michigan found that the defendant franchisees therein had failed to pay royalties and advertising fees and to file monthly sales reports,[3] that the plaintiff franchisor had sent written notice of its intent to terminate the franchise agreements at issue, and that the defendants had not cured their defaults. But it is of particular importance that the court found that the "defendants did not have any intention to cure. * * * To date, the defendants have not offered to cure the violations. Thus, this Court finds that, under Michigan law, plaintiff had good cause to terminate the Franchise Agreements, and the Agreements were lawfully terminated." 949 F.Supp. at 505. Again, putting aside for the moment that the *Two Men & a Truck* court was applying Michigan law, the court found the defendants' unwillingness to cure germane. The suggestion seems to be that the court might have found differently had the defendants' merely expressed a willingness to cure their defaults, and perhaps even more so had the defendants' already cured their defaults before the matter came before the court. **The defendants herein did just that: They cured their defaults fully well in advance of suit and even in advance of notice of termination, and accordingly no termination was properly made.**

In *McDonald's Corp. v. Robert A. Makin, Inc.,* 653 F.Supp. 401 (W.D.N.Y. 1986), not unlike in *ARP Films, Inc., supra,* the defendant franchisee did not just fail to pay fees timely to its franchisor but *intentionally withheld payments of fees,* for a period of four months, contending that such payments were "not due and owing for the reasons… [that] consist of various alleged breaches of contract by the plaintiff." 653 F.Supp. at 403. No doubt the District Court for the Western District of New York took the defendant franchisee's intentional withholding of fees

---

[3] In contrast, there is no allegation herein that the defendants failed to submit any report to the plaintiffs timely.

from the franchisor into account in finding the franchise agreement at issue properly terminated as a matter of law. This court can take no such intentional withholding into account.

(Why the plaintiffs cite to, and provide copies of, the decision of the District Court for the Eastern District of Pennsylvania in an attorney's fees application—*Dunkin' Donuts v. Liu*—which in no manner addresses the merits of the underlying action, is not clear to the defendants.)

Accordingly, the plaintiffs have not demonstrated a likelihood of success on the merits of their claims for ratification of their purported termination of the defendants' franchise agreement, and therefore their application for a preliminary injunction must necessarily be denied.

**2.    Success on the plaintiffs' claims of trademark infringement/trade dress infringement/unfair competition is irrelevant unless and until the plaintiffs succeed on their cause for breach of contract, else the court would be awarding post-ultimate relief by way of a preliminary injunction.**

The plaintiffs acknowledge tacitly that success on the merits of their claims of trademark infringement, trade dress infringement, and unfair competition depend upon success on their claim of breach of contract, and in fact only a final determination by this court that the defendants breached the agreements between the parties such that termination is warranted will permit a further decision that the defendants are not entitled to continued use of the plaintiffs' marks and names. To award an injunction enjoining such continued use now, however, would be to grant the plaintiffs what is effectively post-ultimate relief at this preliminary stage of the case. And because the plaintiffs have not established that they are likely to succeed on the merits of their linchpin claim of breach of contract, to award the requested injunction now would be doubly inappropriate.

**E.      A preliminary injunction, being an extraordinary equitable remedy, may not be granted to the plaintiffs, who come into court with unclean hands.**

The plaintiffs come to this court with unclean hands:

- The plaintiffs have brought this action, among others, as a pretext to remove from their franchise systems minority franchisees, taking back their franchises at little or no cost, then selling them to non-minority franchisees at great profit.

- The plaintiffs do not tell the court that the defendants paid all monies owing.

- The plaintiffs' counsel did not mention the defaults even when asking counsel for the defendants to accept service of process in this action, the original summons and complaint having been filed the very same day that notices to cure were mailed.

A preliminary injunction is an extraordinary equitable remedy and it will be granted only upon a showing by the applicant that it will probably succeed on the trial and that it will suffer irreparable injury if the defendant is not restrained from certain activity pending the trial. So wrote the Second Circuit in *American Metropolitan Enterprises of New York, Inc. v. Warner Bros. Records, Inc.,* 389 F.2d 903, 904 (2d Cir. 1968).

"He who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 814-15 65 S.Ct. 993, 997-98 (1945).

This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be the abetter of iniquity. Thus while equity does not demand that its suitors shall have led blameless lives as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue.

This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion. Accordingly one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to

transgress equitable standards of conduct is sufficient cause for the invocation of the maxim….

(Internal quotations marks and citations omitted.)

As demonstrated in the accompanying Einbinder Decl., which provides only what the defendants have been able to glean on their own and which they maintain represents but the tip of the iceberg, so to speak, the plaintiffs are targeting minority franchisees for removal from the Dunkin' Donuts and Baskin-Robbins systems and terminating these franchisees' franchises for whatever reasons are or can be made available, no matter how small. The defendants have alleged this invidious discrimination as a counterclaim and will prove the plaintiff's scheme at trial, after full disclosures have been made in discovery.

The facts of the particular coyness of counsel for the plaintiffs in communicating with the defendants and their counsel regarding the defaults is further evidence of the nature of this action as a pretext. The unwillingness of counsel for the plaintiffs herein to mention the lateness of payments at issue to counsel for the defendants even as counsel for the plaintiffs was communicating with counsel for the defendants regarding the commencement of this action and the continued harassment of the defendants by the plaintiffs, all as set forth in the Tiku Aff. and the Einbinder Decl., demonstrates that the plaintiffs' hands are not just generally unclean but specifically unclean as well. Accordingly, their plea for equitable relief should not be heard.


**F.    The public interest will be implicated only if the plaintiffs publicize the pending dispute; otherwise the public can be assured of receiving the very same products under the plaintiffs' names and marks it has been receiving to date.**

The plaintiffs acknowledge that the public interest is "not a factor in the Second Circuit's test" (Plaintiff's memorandum of law at p. 19), but then assert that the public interest favors the

grant of an injunction, arguing that "central to a trademark action is whether the public is likely to be confused as to the source of the products in question" (*ibid.*).

The relevant consuming public—those who patronize Dunkin' Donuts and Baskin-Robbins retail locations—likely do want to be able to depend on getting true Dunkin' Donuts and Baskin-Robbins products from stores operating under those licensed names, and here the public will continue to be able to get the same products from the defendants' units as they have been getting all along. The public, on the other hand,  can not be said to care whether the units in question paid some of their franchise and advertising fees a few weeks late, that being the sole reason for the plaintiffs' purported termination of the defendants. Had the defendants been in fact selling inferior products, as suggested without support by the plaintiffs, then the public interest might be implicated. As it is, however, this is a minor contract dispute about the late payment of money only, and as such, so long as the public is not informed that the plaintiffs' have purported to terminate the license of the defendants, there can be and will be no consumer confusion. Certainly, the defendants will not so inform the public, for to do so could mean the ruin of their business. If the plaintiffs intend to publicize their purported revocation of the defendants' license, then the plaintiffs would again be inflicting the alleged harm upon themselves.


**G.     The court should not decide this application without permitting discovery and holding an evidentiary hearing.**

As this court has already noted, while it is possible for it to grant (or refuse) a preliminary injunction on papers alone, doing so is permissible only when questions of law alone exist. When there are questions of fact, however, as there are here, to decide a motion for a preliminary injunction without holding an evidentiary hearing would be inappropriate. Accordingly, the defendants respectfully request that the court hold an evidentiary hearing at which the defendants

can present testimony regarding, among other things, the circumstances of the defendants' alleged defaults in payment of fees and the alleged harm to the plaintiffs' reputation and consumer confusion.

In order for an evidentiary hearing to be productive, however, the defendants will need, on an expedited basis, disclosure from the plaintiffs regarding the following specifically (being only a part, of course, of what the defendants will need before trial, ultimately):

- How many franchisees the plaintiffs have terminated in recent years and the race/ethnicity of each and the grounds for termination;

- To whom the plaintiffs are selling the franchised business units and development areas reclaimed from terminated franchisees, and at what price, and at what price if any the plaintiffs purchased the resold franchise from the terminated franchisees;

- In what way the products served by the defendants at the franchise business units at issue is "inferior," as asserted in the certification of Ronald D. Degen, Esq. dated January 16, 2008 (the "Degen Cert.") at ¶ 6;

- How the reputations of the plaintiffs are being damaged among New York City consumer, as also alleged in the Degen Cert., *ibid.*;

- What actual harm is being or will be suffered by the defendants; and

- How the consuming public is being or is likely to be confused by the defendants' continued use of the plaintiffs' marks during the pendency of this action.

**H.    Any grant of a preliminary injunction must be conditioned upon the plaintiffs' posting of a substantial undertaking.**

Fed.Rules Civ.Proc. Rule 65(c) provides, in pertinent part:

The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

As the Second Circuit stated in *Commerce Tankers Corp. v. National Maritime Union of America, AFL-CIO,* 553 F.2d 793, 800 (2d Cir. 1977), *cert. denied,* 553 F.2d 793, 98 S.Ct. 400 (1977), "The purpose of the injunction bond rule is to provide protection to a defendant who is under injunction in an equity action, but who ultimately prevails on the merits." Notwithstanding the plaintiffs' suggestion that the harm to be suffered by the defendants if the court grants the preliminary injunction is small compared the harm to be suffered by the plaintiffs otherwise, in fact the harm to the defendants if they are enjoined from using the marks at issue—and therefore would be unable to continue their business in any fashion—would be devastating, inasmuch as it would make it impossible for the defendants to sell their business as a going concern, forcing them instead simply to forfeit their franchise to the plaintiffs entirely on the plaintiffs' terms, meaning the loss of their entire investment of millions of dollars. This court should therefore condition the grant of any preliminary injunction upon the plaintiffs' posting of an undertaking sufficient to protect the defendants' from such a ruinous loss.

# IV. CONCLUSION

To grant a preliminary injunction enjoining the defendants from continuing to use the plaintiffs' trade marks and names during the pendency of this action would be inappropriate in light of the failure of the plaintiffs to demonstrate a likelihood of success on the merits of their essential claim of breach of contract, any harm at all (much less irreparable harm) to them, or any public interest in favor of such a grant. Enjoining the defendants from use of the plaintiffs' marks would necessarily mean the closing of their businesses immediately, meaning in turn the

impossibility of their being able to sell the combined business as a going concern and to leave

the plaintiffs' franchise systems on their own terms, rather than to be forced out because of their

ethnicity. The consequent loss of the defendants' investment to date of more than three million

dollars would be a wholly disproportionate punishment for a minor, ministerial, one-time,

inadvertent lateness in paying less than one percent of what the defendants would irrecoverably

forfeit.


Dated: New York, New York
       February 5, 2008

                                        EINBINDER & DUNN, LLP


                                        By:_____
                                            Michael Einbinder [ME-3930]
                                            Matthew David Brozik [MB-6026]
                                            *Attorney for Defendants*
                                            104 West 40th Street
                                            New York, New York 10018
                                            (212) 391-9500